No. 24-3097

---

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

STATE OF KANSAS, et al.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Kansas
Case No. 5:24-cv-04041-JWB-ADM
Honorable John W. Broomes

---

## BRIEF OF APPELLEES

*Oral Argument Requested*

---

# TABLE OF CONTENTS

Table of Authorities.................................................................. iii

Statement of Related Cases ......................................................1

Statement of the Issue ..........................................................2

Introduction...........................................................................4

Statement of the Case ...........................................................7

Summary of the Argument ..................................................12

Standard of Review ..............................................................16

Argument...............................................................................16

I.   The Supreme Court's ruling in *Department of Education v. Louisiana* confirms Plaintiffs' right to relief here. .........................17

II.  Plaintiffs will likely succeed on the merits...................................18

    A.   The Rule violates the major-questions doctrine...................18

    B.   The Rule is contrary to Title IX. ...........................................21

        1.   Title IX forbids treating one sex worse than the other. ...........................................................21

        2.   Title IX doesn't forbid sex distinctions. .......................23

        3.   Title IX sometimes requires sex distinctions. .............28

        4.   *Bostock* cannot apply to Title IX...................................30

        5.   The *de minimis*–harm standard subverts Title IX's sex-based protections...........................................33

    C.   The Rule is contrary to the Constitution and RFRA............37

        1.   The Rule violates the Spending Clause........................37

i

2.      The Rule compels and restricts speech based on content and viewpoint.................................................42

3.      The Rule is vague and overbroad. ...............................46

4.      The Rule violates RFRA..............................................49

D.      The Rule is arbitrary and capricious. ...................................50

III.    Plaintiffs will suffer irreparable harm. ........................................53

IV.     The public interest and balance of equities favor a stay...............55

V.      The injunction is not overbroad. ..................................................56

Conclusion ...........................................................................................58

Statement Regarding Oral Argument ...................................................59

Certificate of Compliance.....................................................................61

Certificate of Digital Submission..........................................................61

Certificate of Service .............................................................................62

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ..................................................................... 62, 66

*A.C. v. Metro. Sch. Dist. of Martinsville,*
75 F.4th 760 (7th Cir. 2023) .................................................... 32

*Abbott v. Perez,*
585 U.S. 579 (2018) ................................................................... 54

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
57 F.4th 791 (11th Cir. 2022) ...................................... 23, 24, 25

*Alabama v. U.S. Sec'y of Educ.,*
No. 24-12444, 2024 WL 3981994
(11th Cir. Aug. 22, 2024) .......................... 6, 32, 44, 47, 53, 57

*Arkansas v. DOE,*
No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ....... 6

*Awad v. Ziriax,*
670 F.3d 1111(10th Cir. 2012) ............................................... 55

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ............................................................. 19

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........ 7, 8, 11, 13, 14, 19, 21, 23, 30, 31, 32, 33, 36, 38

*Brannum v. Overton Cnty. Sch. Bd.,*
516 F.3d 489, 494 (6th Cir. 2008) .......................................... 28

*Burke v. Regalado,*
935 F.3d 960 (10th Cir. 2019) ............................................... 57

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979) ................................................................. 25

*Carroll Indep. Sch. Dist. v. DOE,*
No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) ......... 6

*Chalenor v. Univ. of N. Dakota*,
291 F.3d 1042 (8th Cir. 2002) ................................................... 29

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*,
695 F.2d 1126 (9th Cir. 1982) ..................................... 25, 29, 31

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir. 1993) ....................................................... 27

*Cohen v. Brown Univ.*,
101 F.3d 155 (1st Cir. 1996) ........................................... 7, 25, 31

*Colorado v. U.S. Env't. Prot. Agency*,
989 F.3d 874 (10th Cir. 2021) ................................................ 16

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ...................................................... 53

*CSX Trasnp., Inc. v. Ala. Dept' of Revenue*,
562 U.S. 277 (2011) .................................................................... 22

*Cumbey v. Meachum*,
684 F.2d 712 (10th Cir. 1982) ............................................... 25

*Dambrot v. Cent. Mich. Univ.*,
55 F.3d 1177 (6th Cir. 1995) ................................................... 49

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ............................... 8, 9, 28, 37, 43, 44, 45

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) .................................................................... 23

*Delsa Brooke Sanderson v. Wy. Highway Patrol*,
976 F.3d 1164 (10th Cir. 2020) ............................................. 48

*Dep't of Educ. v. Louisiana*,
144 S. Ct. 2507 (2024) ...................... 4, 12, 13, 17, 24, 33, 44, 57

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ....................................................... 51, 52

*Dubin v. United States*,
599 U.S. 110 (2023) .................................................................... 24

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) ...................................... 28

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................... 51

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011) ........................................................... 22

*Fischer v. United States*,
144 S. Ct. 2176 (2024) ....................................................... 24

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) ........................................................... 49

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ............................................. 32

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ............................................... 29

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ........................................................... 27

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ............................................................ 48

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ............................................ 55

*Hunt v. Wash. State Apple Advertising Comm'n*,
432 U.S. 333 (1977) ........................................................... 56

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ...................................................... 22, 31

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) ........................................................... 45

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*,
510 U.S. 86 (1993) ............................................................ 35

*Kansas Judicial Review v. Stout*,
519 F.3d 1107 (10th Cir. 2008) ............................................ 46

*Kansas v. DOE*,
No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ................. 6

*Kansas v. United States*,
214 F.3d 1196 (10th Cir. 2000) ............................................................ 40

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) ............................................................ 54

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................ 46

*L.M. v. Town of Middleborough*,
677 F. Supp. 3d 29 (D. Mass. 2023) ..................................................... 43

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) ................................................................. 33, 44

*Louisiana v. DOE*,
No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) ................ 6, 57

*Louisiana v. DOE*,
No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024)........... 7

*Maryland v. King*,
567 U.S. 1301 (2012) .......................................................................... 55

*McBoyle v. United States*,
283 U.S. 25 (1931) .............................................................................. 21

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004).......................................................... 25, 27

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ............................................................... 45

*Mohamed v. Jones*,
100 F.4th 1214 (10th Cir. 2024)........................................................... 17

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) ............................................................................ 34

*Murray v. UBS Secs., LLC*,
601 U.S. 23 (2024) .............................................................................. 28

*N. Haven Bd. of Educ. v. Bell,*
456 U.S. 512 (1982) ................................................................ 26

*Nat'l Park Producers Council v. Ross,*
598 U.S. 356 (2023) ................................................................ 31

*Neal v. Bd. of Trustees of California State Universities,*
198 F.3d 763 (9th Cir. 1999) ................................................. 29

*Niz-Chavez v. Garland,*
593 U.S. 155 (2021) ................................................................ 21

*Oklahoma v. Cardona,*
No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) .... 6

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
109 F.4th 453 (6th Cir. 2024) ........................................... 45, 47

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) .................................................................... 38

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925) ................................................................ 56

*Planned Parenthood of Kan. v. Anderson,*
882 F.3d 1205 (10th Cir. 2018) ............................................. 53

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ................................................................ 42

*Randall v. Sorrell,*
548 U.S. 230 (2006) ................................................................ 57

*Rapanos v. United States,*
547 U.S. 715 (2006) ................................................................ 27

*Resolution Trust Corp. v. Westgate Partners, Ltd.,*
937 F.2d 526 (10th Cir. 1991) .............................................. 35

*Roberts v. Colo. State Bd. of Agriculture,*
998 F.2d 824 (10th Cir. 1993) .............................................. 44

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) .................................................................. 54

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ................................................................ 42

*Rowles v. Curators of Univ. of Mo.*,
983 F.3d 345 (10th Cir. 2020) ............................................... 48

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) .................................................. 48

*Schrier v. Univ. of Colo.*,
 427 F.3d 1253 (10th Cir. 2005) ............................................. 45

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ........................................ 47, 48

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ................................................. 48

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ................................................. 49

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ......................................................... 26, 56

*Tennessee v. Cardona*,
No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ........... 39

*Tennessee v. Cardona*,
No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) .............. 6, 7, 32

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015) ............................................................... 27

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................... 42

*Texas v. United States*,
No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) ............. 6

*Throupe v. Univ. of Den.*,
988 F.3d 1243 (10th Cir. 2021) ............................................. 48

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ............................................................... 53

*Tinker v. Des Moines Indep. Community Sch. Dist.*,
393 U.S. 503 (1969) ................................................................ 47

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365, 371 (1988) ........................................................ 22

*United States v. Riverside Bayview Homes, Inc.*,
474 U.S. 121 (1985) ................................................................ 27

*United States v. Virginia*,
518 U.S. 515 (1996) ................................................................ 25

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ................................................................ 54

*West Virginia v. Environmental Protection Agency*,
597 U.S. 697 (2022) ................................................................ 20

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ................................................................ 23

*Wood v. Fla. Dep't of Educ.*,
No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024) ........... 46

## Statutes

20 U.S.C. § 1681 ...................................2, 21, 22, 23, 24, 26, 28, 31, 35, 36

20 U.S.C. § 1687 ................................................................ 27

20 U.S.C. § 1686 .................................................... 13, 14, 23, 24, 31, 35

34 C.F.R. § 106.11 ................................................................ 26

34 C.F.R. § 106.14–41................................................................ 26

34 C.F.R. § 106.31 .................................................8, 17, 30, 33, 36, 49, 52

34 C.F.R. § 106.33 ................................................................ 32, 35

34 C.F.R. § 106.34 ................................................................ 35

34 C.F.R. § 106.41 ................................................................ 32, 35, 36

34 C.F.R. § 106 ................................................................ 26

34 C.F.R. § 106.10 ..........................................4, 7, 9, 17, 30, 32, 36, 42, 56

34 C.F.R. § 106.2 ................................................. 9, 17, 42, 48

34 C.F.R. § 106.32 ........................................................ 32

42 U.S.C. § 2000bb-1 ..................................................... 49

5 U.S.C. § 705 .......................................................... 11, 16

5 U.S.C. § 706 .......................................................... 18, 50

70 Okla. Stat. Ann. § 1-125 .............................................. 20

Ala. Code § 16-1-54 ...................................................... 20

Ark. Code Ann. § 6-21-120 ............................................... 20

AS § 14.18.040 ............................................................. 9

Fla. Stat. Ann. § 553.865 ................................................. 20

Idaho Code Ann. § 33-6703 .............................................. 20

Iowa Code Ann. § 280.33 ................................................ 20

Kan. Stat. § 72-6286 ....................................................... 9

Ky. Rev. Stat. Ann. § 158.189 ........................................... 20

La. Rev. Stat. § 9:62 ..................................................... 20

Miss. Stat. Ann. § 29-18-7 ............................................... 20

N.D. Cent. Code § 15.1-06-21 ........................................... 20

Tenn. Code Ann. § 49-2-802 ............................................. 20

Utah Code § 63G-31-301 ............................................... 9, 20

Utah Stat. Ann. § 63G-31-301 ............................................ 20

## Other Authorities

117 Cong. Rec. 30,407 (1971) .................................................................. 25

118 Cong. Rec. 5807 (1972) .................................................................... 25

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................................ 23, 24, 26, 27

EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*,
88 F.R. 67,750 (Oct. 2, 2023), https://perma.cc/VY3Y-RCE8 ................. 46

John F. Manning, *What Divides Textualists from Purposivists?*,
106 Colum. L. Rev. 70, 84 (2006) ............................................................ 26

Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance,
40 F.R. 24,128, 24,139–43 (June 4, 1975) ............................................. 24

Parents Defending Education's Pet. for Reh'g En Banc,
No. 23-3630 (Aug. 26, 2024) .................................................................... 47

Programs or Activities Receiving Fed. Fin. Assistance, 89 F.R. 33,474
(Apr. 29, 2024) ................................................................................... 7, 44

The American Heritage Dictionary 376 (1975) ....................................... 21

U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017),
https://tinyurl.com/mrrjr75a ...................................................................... 7

Webster's Third New International Dictionary 648 (1966) ..................... 21

Women's Sports Found., *50 Years of Title IX* at 12 (May 2022),
https://tinyurl.com/2bttfwxd ...................................................................... 7

## STATEMENT OF RELATED CASES

There are no prior or related appeals, but many other challenges to the same rulemaking are pending in cases around the country.

## STATEMENT OF THE ISSUE

Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As its text and history show, this statute prohibits schools from treating girls and women worse than boys and men. However, it allows and sometimes requires sex distinctions to ensure equal educational opportunities. This is how it has been understood—by schools, students, teachers, state legislatures, Congress, and the Department of Education—for nearly fifty years.

But in April 2024, the Department of Education issued a new rule that rewrites Title IX by (i) redefining discrimination "on the basis of sex" (ii) regulating new forms of discrimination, (iii) forbidding sex distinctions in private spaces like locker rooms and showers when applied to individuals who identify as transgender, and (iv) expanding the definition of sex-based harassment to censor and compel speech. The district court stayed and preliminarily enjoined the Rule under the Administrative Procedure Act because it violates the Constitution in multiple respects, is contrary to Title IX, and is arbitrary and capricious. Courts across the country have reached the same conclusion. And the Supreme Court affirmed a substantially identical ruling in a similar challenge.

The issue presented is whether the district court correctly stayed and enjoined the Department's enforcement of this new Title IX rule under the APA while this case proceeds.

## INTRODUCTION

Fifty years ago, Congress passed Title IX to narrow the achievement gap between women and men by prohibiting discrimination "on the basis of sex" in education. But the Department of Education has published a new rule that reimagines sex discrimination to include concepts like gender identity that Title IX never mentions and Congress never even contemplated. The Rule would prioritize gender identity over sex and strip Title IX's primary beneficiaries—women—of its promised benefits.

This Rule turns Title IX upside down, substituting a well-established binary concept of sex for a fluid concept of gender identity. For example, under the new rule, girls must share showers (but not dormitories) with boys; women must share hotel rooms (but not sorority houses) with men; and girls must share restrooms (but not scout camps) with boys—so long as the biological boys and men do not identify as male. None of this comports with the law.

After the Department sought to partially stay preliminary injunctions entered in the Fifth and Sixth Circuits, the Supreme Court denied relief. All nine justices agreed the plaintiffs "were entitled to preliminary injunctive relief as to three provisions of the rule, including [§ 106.10,] the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (2024) (per curiam); *accord id.* at 2510 (Sotomayor, J., dissenting in part). And the majority

agreed that orders enjoining the *entire* rule were proper. *Id.* at 2510. There is no reason to reach a different result here.

The Rule is contrary to law. It attempts to decide a question of profound and sincere national debate—a job for Congress, not unelected bureaucrats. It forces schools to choose between following their states' laws or forgoing millions in federal funding. The Rule also affects all public-school students, reaching their curricula, athletics, and speech. It will harm many, including girls who must choose between sharing locker rooms with biological males or seeking an accommodation that the Department deems unfit for others. The Rule also violates constitutional rights. It forces students and teachers to silence their views on sex and gender, speak inaccurate pronouns, and share restrooms with individuals of the opposite sex.  In addition, it violates the Spending Clause, which requires Congress, not federal bureaucrats, to define clearly the conditions for the receipt of federal funds and requires state legislatures to have the opportunity to make a choice in the matter.

Plaintiff-Appellees include (1) four States—Kansas, Alaska, Utah, and Wyoming—who operate schools that receive federal funding and are thus subject to the Rule; (2) Moms for Liberty, a group of parents advocating for their children; (3) Young America's Foundation, a group of college students seeking to speak freely on campus; (4) Female Athletes United, a group of female athletes who want to ensure women's sports and private spaces remain for women, and (5) K.R., a 13-year-old girl who

wants to keep her privacy rights and express her religious beliefs about biological sex when she's at school.

All will suffer irreparable harm if the new rule goes into effect. Plaintiff States will suffer nonrecoverable compliance costs and an unconstitutional intrusion into their sovereignty. K.R. and organizational Plaintiffs face imminent loss of their statutory and constitutional rights. The new rule, for example, would punish students for declining to speak inaccurate pronouns and saying sex is fixed. It would also override state law and force K.R. and other students to share restrooms with males. When faced with this choice before, K.R. stopped using the restroom at school, suffering constantly to avoid other harm.

To date, seven federal district courts and one appellate court have enjoined Defendants' entire Title IX rewrite, staying its effect in twenty-six states and thousands of schools nationwide. Two other appellate courts affirmed the scope of two such injunctions, and as noted, the Supreme Court rejected Defendants' efforts to undo those injunctions.[1] This

---

[1] *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024); *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Louisiana v. DOE*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024); *Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024); *Arkansas v. DOE*, No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024); *Carroll Indep. Sch. Dist. v. DOE*, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024); *Kansas v. DOE*, No. 24-4041-

judicial consensus is correct. This Court should affirm the injunction here and preserve the status quo.

## STATEMENT OF THE CASE

*Title IX.* Congress passed Title IX to ensure equal educational opportunities for "women." *Cohen v. Brown Univ.*, 101 F.3d 155, 165 (1st Cir. 1996) (*Cohen II*). It has greatly succeeded. In 1970, for example, only 66% of working women had high-school diplomas; in 2016, it was 94%.[2] In 1972, only 7% of high-school varsity athletes were women; in 2018, it was 43%.[3] Title IX's *sex*-based protections fueled these improvements.

*The New Rule.* Now Defendants have reinterpreted Title IX, using *Bostock v. Clayton County*, 590 U.S. 644 (2020), as an excuse. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 89 F.R. 33,474 (Apr. 29, 2024) (the "Rule"). The Rule defines sex discrimination to include distinctions based on "gender identity," "sexual orientation," "sex stereotypes," "sex characteristics," "pregnancy or related conditions," and other conduct. 89 F.R. at 33,886 (codified at 34 C.F.R. 106.10). The Rule's list of new sex-based distinctions is

---

JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Louisiana v. DOE*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024).

[2] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://tinyurl.com/mrrjr75a.

[3] Women's Sports Found., *50 Years of Title IX* at 12 (May 2022), https://tinyurl.com/2bttfwxd.

"not exhaustive." *Id.* at 33,512. Such distinctions violate Title IX, the Rule says, because they "necessarily" require noticing "a person's sex," even if "sex" means the "physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*," 590 U.S. at 655. 89 F.R. 33,802.

The Rule interprets Title IX to allow sex distinctions unless they cause "more than *de minimis* harm," *id.* at 33,887 (codified at 34 C.F.R. § 106.31(a)(2)), a concept found nowhere in the text of Title IX. Unless exempted, any policy or "practice that prevents a person from participating in" a covered "activity consistent with [their] gender identity" causes more than *de minimis* harm. *Id.* at 33,820. In general, if a sex distinction is in Title IX, it's exempted despite any impact on transgender-identifying individuals. *Id.* at 33,816–17. So the Rule *doesn't* exempt sex-specific restrooms despite the longstanding regulation allowing them. *Id.* But sex-based distinctions in after-school sports are "longstanding," the Department says, so these remain exempt from any that might trigger the *de-minimis-harm* provision, even though sports are not mentioned in statutory text. *Id.* So the Rule unevenly requires student access to sex-specific activities "consistent with [their] gender identity." *Id.* at 33,818.

The Rule also broadens hostile-environment claims. *Id.* at 33,498. The Supreme Court has said harassment must be "severe, pervasive, *and* objectively offensive" to violate Title IX, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), but under the Rule,

harassment now need only be "severe *or* pervasive," *id.* at 33,884 (emphasis added). Complainants need not allege "particular harm" or show they were denied access to an educational program. *Id.* at 33,511. Harassment can be anything considered "unwelcome" or that "limits" a student's ability to benefit from a program. *Id.* at 33,884 (codified at 34 C.F.R. 106.2). Defendants admit this standard is "broader" than the Supreme Court's statutory interpretation in *Davis*. 89 F.R. at 33,498. Together, § 106.10 and § 106.2 force teachers and students to treat individuals according to their "gender identity" rather than biological sex, including by forcing them to use incorrect pronouns and avoid making any statement suggesting that sex is binary or immutable.

*Plaintiffs-Appellees*. Plaintiff States Kansas, Alaska, Utah, and Wyoming run educational programs that receive federal funding, thereby requiring compliance with Title IX and accompanying regulations. Appx. Vol. 1, 58–59, 169–74. These States have also enacted laws to ensure student privacy and equal participation in educational activities. For example, Kansas requires schools to provide sex-specific "overnight accommodations" for school-sponsored travel, Kan. Stat. § 72-6286(a); Alaska and Utah require sex-specific locker rooms, restrooms, and showers, AS § 14.18.040; Utah Code § 63G-31-301(1).

K.R. is a 13-year-old girl who lived in Stillwater, Oklahoma, and attended Stillwater Middle School. Appx. Vol 1, 176. Last year, K.R. encountered males who identify as females in a girls' restroom at her school.

*Id.* This made her feel uncomfortable, embarrassed, and unsafe. *Id.* at 176–77. The restrooms at Stillwater Middle provide little privacy: the stall doorways have big gaps, allowing someone to easily see into them. *Id.* at 177. After this, K.R. stopped using the school restrooms, which often forced her to avoid the restroom for nine hours at a time before Oklahoma passed a law ensuring sex-specific restrooms. *Id.* at 177–78.

K.R. is a Christian who believes God created humans male or female, and humans cannot change their God-given sex. *Id.* at 179. Her faith also teaches that she should not lie. *Id.* She believes that referring to a male as "she," "her," or any other inaccurate pronoun—or vice-versa for a female—is a lie and would violate her faith. *Id.* She knows students who identify as the opposite sex and who want others to refer to them with inaccurate pronouns. *Id.* K.R. cannot do this consistent with her faith. *Id.* K.R. sometimes discusses her religious beliefs with her friends at school. *Id.* at 179–80. That includes her belief that there are only two sexes, and that people cannot change their sex. *Id.* It also includes her discomfort about using the restroom with men or boys. *Id.* K.R. fears that if the Rule goes into effect, she could be punished for expressing her beliefs. *Id.*

Three groups are also plaintiffs. Female Athletes United was formed to defend equal educational opportunities for women and girls. *Id.* at 183. Its members advocate for women's sports and oppose sharing

intimate spaces like restrooms, locker rooms, and overnight accommodations with males. *Id.* at 184–87. Moms for Liberty has over 130,000 members. *Id.* at 29. It aims to unify, educate, and empower parents to defend their rights, including by protecting their children from harmful ideologies taught in school. *Id.* Young America's Foundation has thousands of members on college campuses. It promotes free speech and empowers members to educate campus communities through flyers, tabling, debates, and more. *Id.* Each group has members at schools covered by Title IX who have faced situations that lead them to fear the Rule will harm them and impede their advocacy. *Id.* at 63–75.

*Procedural Background.* The district court granted Plaintiffs' motion to preliminarily enjoin the Rule under the APA, 5 U.S.C. § 705. Appx. Vol. 3, 614. It held that Plaintiffs' claims would likely succeed because the Rule's new definition of sex discrimination is contrary to Title IX, not justified by *Bostock*, exceeded agency authority under the major questions doctrine, and violated the Spending Clause. *Id.* at 590–96. The *de minimis*–harm standard is contrary to law and arbitrary and capricious because it requires inconsistent applications and Defendants failed to consider significant risks. *Id.* at 589, 605. And the Rule's new harassment definition likely violated the First Amendment because it would compel and restrict speech about gender identity. *Id.* at 596–600. The court held the equities favored halting the Rule's enforcement while this case proceeds. *Id.* at 605–606.

Defendants appealed and moved to partially stay the injunction. The court below denied that request. Appx. Vol. 4, 666–73. This Court has not yet ruled. In a parallel case, the Supreme Court refused to stay a nearly identical injunction. All justices "accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule," *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (2024) (per curiam)—the exact provisions Defendants consider "relevant here," Op. Br. 2. The majority further concluded that Defendants did not show that those provisions could be severed. *Louisiana*, 144 S. Ct. at 2510. It said schools would face practical "difficulty … in determining how to [partially] apply" the Rule. *Id.*

## SUMMARY OF THE ARGUMENT

The Rule redefines sex discrimination in Title IX to cover new bases of discrimination, including discrimination based on "gender identity"; it manufactures a new *de minimis*–harm test allowing gender identity to supersede sex; and it expands sex-based harassment to compel and censor speech, forcing students to speak incorrect pronouns and preventing them from saying sex is fixed—all of this without Congress ever speaking on the matter. This Court should affirm because Plaintiffs will likely succeed on the merits, and nothing warrants disturbing the status quo.

*I.* Merits. In a similar case, Defendants moved the Supreme Court to partially stay a preliminary injunction nearly identical to the injunction below. That request was denied, and all nine Justices accepted that relief was proper as to the "relevant" sections. *Louisiana*, 144 S. Ct. 2507, 2509–10; *accord id.* at 2510 (Sotomayor, J., dissenting in part); Op. Br. 2. That order confirms that Plaintiffs deserve relief here.

*II.A.* That ruling was justified. The Rule violates the major-questions doctrine by attempting to settle an important national debate by agency fiat, rather than congressional lawmaking. The Rule is contrary to Title IX. Title IX's original public meaning ensured equal educational opportunities by prohibiting one sex from being treated worse than the other sex. Title IX is unlike Title VII. It covers only "sex." It ties multiple, complementary, phrases together in its prohibition to ensure equal opportunities for both sexes. And it applies to education, not employment. Title IX cannot be "construed" to forbid sex distinctions that advance its goals. 20 U.S.C. § 1686.

*Bostock* cannot apply to Title IX for many reasons: (i) *Bostock* interpreted Title VII, which governs relationships between private parties in the employment context. 590 U.S. at 649–50. Title IX is a Spending Clause statute requiring different analysis. (ii) *Bostock* said "sex is not relevant to" employment decisions, and Title VII treats sex like many other protected traits. *Id.* at 660 (citation omitted). Title IX covers *only* sex, which often *is* relevant to promoting equal educational opportunities.

13

(iii) Title IX cannot be "construed" to forbid sex distinctions. 20 U.S.C. § 1686. Title VII can. (iv) Title IX allows schools to treat males and females comparably; Title VII doesn't. *Bostock*, 590 U.S. at 665. (v) Finally, *Bostock* expressly declined to "address bathrooms, locker rooms, or [similar spaces]" in the workplace—the very places the Department says *Bostock* applies in schools. *Id.* at 681.

The Department manufactured a new *de minimis*–harm standard to achieve its policy goals. It argues (1) that Title IX doesn't forbid *de minimis* harms and (2) that sex distinctions *always* cause more than *de minimis* harm, but only when applied to individuals who identify as transgender. But Title IX never mentions any of this. And this non-textual construct elevates gender identity over sex. After all, if sex-specific locker room policies cause mere *de minimis* harm when applied to men who identify as men but more than *de minimis* harm when applied to men who identify as women, that means gender identity supersedes biological sex.

Nothing justifies Defendants' attempted Title IX rewrite. That's even clearer under federalism and clear-statement rules. Congress must clearly impose conditions in spending legislation. For over 50 years, everyone understood that Title IX allows sex distinctions to ensure equal educational opportunities for men and women, and the state legislatures accepted the terms of the deal. It's unreasonable to say Title IX unambiguously prioritizes gender identity over sex through a *de minimis*–

14

harm concept no one knew about until April 2024. The Department has no power to resolve this debate.

*II.B.* The Rule violates the Constitution and the Religious Freedom Restoration Act ("RFRA"). Title IX is a Spending Clause statute. The Rule changes the conditions to which recipients agreed when they accepted federal funding, forcing the States to violate their citizens' constitutional rights. It also expands liability for hostile-environment claims. Its redefinition of harassment forces people, including those with religious objections, to speak inaccurate pronouns and to avoid saying sex is fixed. This imposes viewpoint-based discrimination through a broad and vague rule. That violates the First Amendment and RFRA.

*II.C.* The Rule is arbitrary and capricious. It's not derived from reasoned decision-making. And it breaks with past practice without acknowledging it or considering serious reliance interests.

*III–IV.* Equities. Plaintiffs will suffer irreparable harm if the Rule goes into effect. The States will incur nonrecoverable compliance costs (twice if the Rule takes effect and is then vacated) and suffer an unjust intrusion into their sovereignty. K.R. and the organizational Plaintiffs will lose valuable free-speech and free-exercise rights, and some will self-censor their speech. These results violate Plaintiffs' constitutional and statutory rights. And the loss of these rights constitutes irreparable injury. In contrast, Defendants suffer no harm when they cannot act illegally. The public benefits from correctly applying the law.

*V.* Overbreadth. Defendants say the current injunction is overbroad because (i) it covers all members of organizational Plaintiffs no matter when they join the group, and (ii) the Rule can be severed. But an injunction may protect organizational members even when membership is fluid. And Defendants' severability argument has been forfeited and rejected. This Court should uphold the current injunction and preserve the status quo while this case proceeds.

## STANDARD OF REVIEW

This Court reviews a "district court's decision to grant" an APA stay or "preliminary injunction for abuse of discretion," with its factual findings reviewed "for clear error and its conclusions of law de novo." *Colorado v. U.S. Env't. Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021).

## ARGUMENT

The APA allows district courts to "postpone the effective date of an[y] agency action" to prevent irreparable injury. 5 U.S.C. § 705. To obtain either a § 705 stay or a preliminary injunction, the movant must show the same factors: likely success on the merits, irreparable harm, and the balance of equities and public interest favoring movants. *Colorado*, 989 F.3d at 883. Each factor supports the ruling below.

I.    **The Supreme Court's ruling in *Department of Education v. Louisiana* confirms Plaintiffs' right to relief here.**

In a parallel case, Defendants moved the Supreme Court to partially stay a preliminary injunction nearly identical to the injunction below. That request was denied, and all nine Justices "accept[ed] that "plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule"—§ 106.10, § 106.31, and § 106.2's harassment definition. *Louisiana*, 144 S. Ct. 2507, 2509–10; *accord id.* at 2510 (Sotomayor, J., dissenting). Those are the exact provisions the Department considers "relevant here." Op. Br. 2.

This Court is "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings.…" *Mohamed v. Jones*, 100 F.4th 1214, 1233 & n.23 (10th Cir. 2024) (cleaned up). No matter the order's precise precedential effect, the Justices' unanimous agreement on likely success supports continued relief here.

And the majority held that the entire Rule should be enjoined. *Louisiana*, 144 S. Ct. at 2510. Defendants did not show that the Rule could be severed. *Id.* Its "new definition of sex discrimination is intertwined with and affects many other provisions of" the Rule. *Id.* Here, Defendants recycle their failed arguments. *Louisiana* shows that this Court should affirm. *Alabama*, 2024 WL 3981994 at *1 n.1.

## II.    Plaintiffs will likely succeed on the merits.

Under the APA, courts must set aside rules that contradict law, contravene the Constitution, or lack a reasonable basis. 5 U.S.C. § 706(2). Because the Rule does all three, Plaintiffs will likely succeed.

### A.    The Rule violates the major questions doctrine.

The district court correctly held that the Rule violates the major questions doctrine. This doctrine ensures that Congress—not federal agencies—gets to make major policy decisions on issues of vast economic or political importance. *W. Virginia v. EPA*, 697, 721–23 (2022). It also stops agencies from interfering with areas traditionally governed by state law without clear congressional authorization. *Id.* at 724; *id.* at 743 (Gorsuch, J., concurring). The result: major questions "must be entirely regulated by the legislature itself, even if Congress" allows an agency to shore up "the details." *Id.* at 737. If an agency claims the power to make these decisions, the Court should consider whether Congress has provided "clear congressional" approval. *Id.* at 724.

Defendants' Title IX revolution lacks that approval. The district court held that whether every teacher, student, and school in America should be forced to "accept an individual's subjective gender identity regardless of biological sex," whether males should be allowed in female locker rooms and restrooms, and what criteria schools should use to determine gender identity were major questions of "vast economic and political significance." Order at 25–26. Because Title IX protects biological

sex—not gender identity, sexual orientation, and sex stereotypes—clear congressional authorization is absent. *Id.*

Despite the district court's detailed analysis of this doctrine, Defendants devote less than a page to it. Op. Br. at 25. They don't dispute that these are major questions requiring clear congressional authorization. Instead, they repeat the same conclusory argument—express congressional authorization is unnecessary because, after *Bostock*, sex discrimination includes gender-identity and sexual-orientation discrimination. Not only does this fail to encompass the entire Rule (which covers "gender stereotypes" and other features in addition to gender identity and sexual orientation), as the district court held below, *infra* Part B.4, it's incorrect. *Bostock* doesn't change Title IX's clear meaning as it's been interpreted for fifty years.

Defendants mention that *Bostock* did not apply the major questions doctrine. Op. Br. at 25. But *Bostock* was a private suit brought by private parties against private parties. No agency regulation was involved, so the doctrine didn't apply. Here, Defendants attempt to settle important issues by regulation. *This* is the situation in which the major questions doctrine applies. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

This is obviously a major question. A significant number of states have passed laws ensuring privacy in men's and women's restrooms.[4] The Rule would end the ongoing debate by bureaucratic fiat. In doing so, it threatens to change Title IX "from one sort of scheme of regulation into" a "different" one, *West Virginia*, 597 U.S. at 728 (cleaned up), displacing many state laws, affecting millions of students, and jeopardizing billions in school funding.

The Rule also attempts to fundamentally reorder the nation's education system by (1) conditioning education funding on incorporating gender ideology into the entire K-12 education system, (2) mandating a campus grievance procedure that limits the due-process rights of college students accused of sex-based harassment (with which the new definition of sex-based discrimination is thoroughly entwined), and (3) requiring schools to provide benefits to students and employees for voluntary abortions. All of these are major political issues. Defendants' changes also raise serious constitutional concerns. These "important subjects" "must be regulated by the legislature itself." *Id.* Defendants must show clear authorization for this upheaval. They cannot.

---

[4] *See, e.g.*, Ala. Code § 16-1-54; Ark. Code Ann. § 6-21-120; Fla. Stat. Ann. § 553.865; Idaho Code Ann. § 33-6703; Iowa Code Ann. § 280.33; Ky. Rev. Stat. Ann. § 158.189; La. Rev. Stat. § 9:62; Miss. Stat. Ann. § 29-18-7; N.D. Cent. Code § 15.1-06-21; 70 Okla. Stat. Ann. § 1-125; Tenn. Code Ann. § 49-2-802; Utah Stat. Ann. § 63G-31-301.

**B.      The Rule is contrary to Title IX.**

Title IX forbids schools from treating one sex worse than the other but doesn't forbid all sex distinctions. Sometimes, Title IX requires them. That makes *Bostock* inapposite. And while Defendants correctly accept that Title IX allows sex distinctions, its new *de minimis*–harm standard that favors gender identity over sex is contrary to law. Nothing in Title IX suggests that gender identity supersedes sex.

**1.      Title IX forbids treating one sex worse than the other.**

Statutory interpretation begins with the text. Courts give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). When terms have more than one possible meaning, courts choose the "everyday" one. *McBoyle v. United States*, 283 U.S. 25, 26 (1931). And they do not update statutes to suit their preferences. *Bostock*, 590 U.S. at 654–55.

Title IX's text in 20 U.S.C. § 1681(a) forbids treating one sex worse than the other. Start with "on the basis of sex." No one disputes that "sex" means the "physiological or 'biological distinctions between male and female.'" 89 F.R. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see* Op. Br. 22 (accepting this definition); Appx. Vol. 3, 584 (same).

Next, consider the word "discrimination." Sometimes, "discriminate" means "[t]o make a clear distinction; distinguish; differentiate," The American Heritage Dictionary 376 (1975), and "discrimination" means "[t]he act of discriminating," *id.*, or to treat someone differently,

Webster's Third New International Dictionary 648 (1966) ("Webster's Third")). But to "be subjected to discrimination," 20 U.S.C. § 1681(a), conveys a distinction for the wrong reason: "a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third 648. Here, precedent and dictionaries agree. To "discriminate" means to treat "similarly situated" individuals differently. *CSX Trasnp., Inc. v. Ala. Dept' of Revenue*, 562 U.S. 277, 287 (2011).

Title IX also forbids "exclud[ing] from participation in" or "den[ying] the benefits of" an educational program. 20 U.S.C. § 1681(a). These nearby terms help clarify discrimination. *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) (multiple "words together may assume a more particular meaning than those words in isolation"). To "exclude" means to "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" means "to turn down or give a negative answer." *Id.* 603. These words reinforce that discrimination is not merely "differential" treatment, but "less favorable" treatment based on sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where nothing justifies "the difference in treatment," *CSX*, 562 U.S. at 287.

Finally, these words must be understood in the context of an "education program," like classrooms, locker rooms, and school sports. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision … is often clarified by" its "context.").

While considering sex isn't "relevant to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660 (citation omitted), it *is* relevant for ensuring equal opportunities for men and women *in education*. In sum, Title IX forbids differential treatment that treats one sex worse than the other when it comes to educational opportunities. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022).

### 2.   Title IX doesn't forbid sex distinctions.

What dictionaries establish, "context" confirms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). While Title IX prohibits sex *discrimination*, it doesn't forbid all sex *distinctions*.

Start with statutory context. Section 1681(a) cannot be read "in a vacuum"; it "must be read in … context" and construed to fit "the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Here, a nearby provision states: "[N]othing … [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction shows that § 1681(a) *itself* allows sex distinctions, including to ensure comparable living facilities protecting privacy. *See United Sav.*, 484 U.S. at 371 (accepting meaning "compatible with the rest of the law"); *see also* Scalia & Garner, *supra*, 167–69.

Defendants call this rule a Title IX "carve-out." Op. Br. 15. But the rule isn't listed among the statutory exceptions, 20 U.S.C. § 1681(a)(1)– (9); its text forbids § 1681(a) from being "construed" to prohibit a sex distinction, 20 U.S.C. § 1686; and Congress called the rule an "[i]nterpretation" principle in its section title. *Id.* This title "reinforces what the [provision's] nouns and verbs independently suggest"—§ 1681(a)'s nondiscrimination mandate allows sex distinctions. *Dubin v. United States*, 599 U.S. 110, 121 (2023) (citation omitted); *see also* Scalia & Garner, *supra*, 221–24 (explaining title-and-headings canon).

Defendants accept this logic to defend another point, saying their regulations allow sex-specific bathrooms because of § 1681(a). Op. Br. 29. But if § 1686 were a mere exception to § 1681(a)'s non-discrimination rule, then the 1975 rulemaking could not have provided for sex-specific "toilet, locker room, and shower facilities" *unless* these private facilities count as "living facilities"—and Defendants insist they do not. Op. Br. 29; Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*,* 40 F.R. 24,128, 24,139–43 (June 4, 1975) ("1975 rulemaking"); *contra Adams*, 57 F.4th at 803 & n.6. Section 1686 is not an exception to § 1681(a), but an interpretive command.

Historical context confirms Title IX's plain meaning. *See Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024) (looking to "history of the provision" to discern meaning, including that it was passed in response

to "Enron accounting scandal"). "Title IX was enacted" to stop "discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979); *Cohen v. Brown Univ.*, 101 F.3d 155, 164–65 (1st Cir. 1996) (detailing same historical goal). So, "Title IX's remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender"—women. *Cohen II*, 101 F.3d at 175.

And students often need sex-specific spaces to ensure equal educational opportunities because men and women are different. Their "[p]hysical differences" are "enduring." *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996). Surely if prisoners have the constitutional right not to be viewed by guards "of the opposite sex" when "engaged in personal activities, such as undressing, using toilet facilities, or showering," *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982), young girls deserve the same privacy protections under Title IX.

As Title IX's principal sponsor understood, the law must respect relevant differences between men and women. 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh); 118 Cong. Rec. 5807 (1972) (same). When it comes to privacy, for example, "biological sex is the sole characteristic" that determines whether individuals are similarly situated for purposes of restrooms. *Adams*, 57 F.4th at 803 n.6. The same is true for sports. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126,

1131 (9th Cir. 1982). Without sex distinctions, Title IX cannot achieve its goal to stop denials of "benefits" in educational programs "on the basis of sex." 20 U.S.C. § 1681(a). *See* Scalia & Garner, *supra*, 63–65 (explaining presumption against ineffectiveness).[5]

Post-enactment developments support this interpretation. The Supreme Court has called such "developments … authoritative expressions concerning [Title IX's] scope and purpose." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (citation omitted). Start with Title IX's implementing regulations born out of the Javits Amendment, as codified throughout 34 C.F.R. § 106. *Compare* 40 F.R. 24,128, 24,139–43 *with* 34 C.F.R. § 106.14–41. These regulations allow sex-specific spaces like physical-education classes, restrooms, showers, locker rooms, and sports teams. And they arose because Congress required the Department's predecessor to submit the regulations to Congress for review. 1975 rulemaking, 40 F.R. 24,128. After six days of hearings on whether the rulemaking was "consistent with the law" and congressional intent, Congress allowed

---

[5] While some *amici* ask this Court to disregard this history and purpose, Br. of Statutory Interpretation & Equality Law Scholars, Doc. No. 010111106870, *amici* ignore that Title IX's purpose comes from its text. And "textualists" must consider "the relevant context for a statutory text includ[ing] the mischiefs the authors were addressing," John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006). Because "no party asks [this Court] to reconsider" the many precedents identifying Title IX's purpose, this Court may take them as given. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023).

the regulations to take effect. *N. Haven*, 456 U.S. at 531–32 (citation omitted).

Courts and federal administrations have long believed those regulations "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *see also* 89 F.R. at 33,817. Refusing "to overrule an agency's construction" that Congress *specifically asked to review* provides strong "evidence of the reasonableness of that construction." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985). So, courts have given Title IX's implementing regulations "high" deference. *E.g., Cohen v. Brown Univ.* ("*Cohen I*"), 991 F.2d 888, 895 (1st Cir. 1993).

Congress ratified this construction and widespread judicial understanding when it amended Title IX through the 1987 Civil Rights Restoration Act, 20 U.S.C. § 1687(2)(A). That Act reversed *Grove City* to ensure that Title IX applied to all education programs at federally funded schools, including programs like sports. *Id.* Congress did this to ensure "equal opportunities for female athletes." *McCormick*, 370 F.3d at 287; *Cohen I*, 991 F.2d at 894. With this amendment, Congress considered "the '*precise* issue' presented" here. *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality) (citation omitted, emphasis retained). That is "convincing" evidence that Congress adopted this statutory understanding. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537–38 (2015); Scalia & Garner, *supra*, 322–23 (explaining prior-construction canon). So, Congress adopted the consensus

since 1972 that Title IX allows schools to consider sex to ensure equal sex-based opportunities.

### 3. Title IX sometimes requires sex distinctions.

Title IX not only allows sex distinctions; it sometimes requires them. Again, start with the text. "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). This shows that unlawful "discrimination" cannot include sex distinctions necessary to avoid denying sex-based benefits to Title IX's primary beneficiaries— women. *See Murray v. UBS Secs., LLC*, 601 U.S. 23, 33 (2024).

Take showers and locker rooms. "As other courts have concluded, the use … of school restrooms is part and parcel of the provision of educational services covered by Title IX…" *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 295 (W.D. Pa. 2017). And students retain "a significant privacy interest in their unclothed bodies," including "the right to shield [their] body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) (citation omitted). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. But the Rule requires schools

to permit some biological males into girls' showers and locker rooms, and vice versa.

That result cannot be squared with Title IX. Students don't have equal educational benefits if forced to shower or share intimate spaces with the opposite sex. The Department agrees that students are denied Title IX benefits when schools designate sex-specific restrooms but deny students access to them "on the basis of sex." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020). K.R., for example, lost educational benefits when she "avoided using" the girls' "restroom" to keep from exposing her unclothed body to male peers. *Grimm*, 972 F.3d at 617; *see* Appx. Vol 1, 176. It's no answer to confine girls like K.R. to "single-occupancy facilities." 89 F.R. 33,820. Some say even this inflicts "legally cognizable [harm] under Title IX." *Grimm*, 972 F.3d at 618.

Similarly, for equal athletic opportunity, relevant differences cannot be ignored. Because of the "average physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark*, 695 F.2d at 1131. Equal opportunity in theory doesn't count. As courts have interpreted Title IX for years, Title IX *requires* schools to account for biological differences and to make "gender-conscience" decisions to ensure students have equal educational opportunities. *Neal v. Bd. of Trustees of California State Universities*, 198 F.3d 763, 773 n.8 (9th Cir. 1999). *See*

*also Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1049 (8th Cir. 2002) (surveying these cases).

Text, context, and history agree: Title IX forbids treating one sex worse than the other; it doesn't forbid sex distinctions.

### 4.    *Bostock* cannot apply to Title IX.

The Rule transforms Title IX. First, § 106.10 redefines "sex discrimination" to include "discrimination on the basis of … gender identity." *See* 89 F.R. at 33,802. Then with limited exceptions, § 106.31(a)(2) requires student access to sex-specific activities "consistent with [their] gender identity," *id.* at 33,818. Together, these provisions purport to allow sex distinctions, but not as applied to transgender individuals, because Defendants say such applications cause more than *de minimis* harm. *Id.* at 33,820. In their view, *Bostock* requires this. But *Bostock* doesn't extend "beyond Title VII." 590 U.S. at 681. And nothing in Title IX suggests that gender identity supersedes sex.

Section 106.10 redefines sex discrimination, contrary to Title IX. *Bostock* cannot apply to Title IX for four reasons. *First*, *Bostock* held that "sex is not relevant to the selection, evaluation, or compensation of employees" under Title VII, which treats sex like race, national origin, and other protected classifications. 590 U.S. at 660 (cleaned up). But Title IX covers *only* sex, which often *is* relevant to promoting equal educational

opportunities. Take sports and physical-education classes. Under *Bostock*, employers cannot consider sex when hiring or firing employees. For school sports and physical-education classes, that logic would mean schools cannot create sex-specific teams. But "athletics programs necessarily allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177; Op. Br. 7 (Title IX allows sex-specific "athletic teams"). That ensures equal sex-based opportunity. *Clark*, 695 F.2d at 1131.

This shows that Title VII "vastly" differs from "Title IX." *Jackson*, 544 U.S. at 175. Not only does the statute require § 1681(a)'s nondiscrimination mandate to allow sex distinctions, *see* 20 U.S.C. § 1686, Defendants accept that Title IX allows sex distinctions to ensure equal sex-based opportunities, 89 F.R. at 33,814. For example, Defendants say their longstanding regulation allowing sex-specific "toilet, locker room, and shower facilities" arose from § 1681(a)'s "general nondiscrimination mandate." Op. Br. 29. They also accept that Title IX allows sex-specific "athletic teams." *Id.* at 7. So, while Defendants say *Bostock*'s interchangeable use of "on the basis of" with "because of" shows *Bostock* covers Title IX, *id.* at 23, this "read[s] too much into too little," *Nat'l Park Producers Council v. Ross*, 598 U.S. 356, 373 (2023). Courts do not parse "[t]he language of an opinion" as though they are "dealing with … a statute." *Id.* And Defendants' contradiction dooms their dogma.

31

As other courts have held, *Bostock*'s reasoning doesn't change Title IX. *E.g.*, *Alabama*, 2024 WL 3981994 at *5; *Tennessee*, 2024 WL 3453880 at *2–*3. Defendants' cases do not suggest otherwise. For example, *Fowler v. Stitt* said (in dicta) that *Bostock* applied to equal-protection analysis, 104 F.4th 770 (10th Cir. 2024); but *Fowler* never addressed Title IX with its distinct text, context, and history. And unlike equal-protection doctrine, Title IX doesn't explicitly allow for means-ends balancing. So, incorporating *Bostock* into Title IX would foreclose sex-specific sports, showers, locker rooms, and other similar spaces. There is nothing "commonsense" about that. *Fowler*, 104 F.4th at 790. Nor are cases like *Grimm* helpful. They treat biological differences as stereotypes and equate sex with gender identity, ideas Defendants expressly disavow. *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769-70 (7th Cir. 2023); Op. Br. 22 ("§ 106.10 doesn't … redefine sex.").

*Second*, Title IX's regulations allow schools to "treat[] males and females comparably as groups." *Bostock*, 590 U.S. at 665 (rejecting this reading of Title VII). Housing for each sex must be "[c]omparable in quality and cost to the student." 34 C.F.R. § 106.32 (b)(2)(ii); *see id.* § 106.32(c)(2) (similar). "[T]oilet, locker room, and shower facilities" must be comparable. 34 C.F.R. § 106.33. And schools must "provide equal athletic opportunity for members of both sexes," *id.* § 106.41 (c), though they need not provide the same sports or teams for both, *id.* § 106.41(b). Under

Defendants' logic, these rules violate Title IX. But courts should not discount regulations "issued roughly contemporaneously with [Title IX's] enactment" that have "remained consistent over time." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024).

*Fourth*, as the district court recognized, the *Bostock* Court "explicitly declined to address ... whether its holding would be applicable to 'bathrooms, locker rooms, or anything else of the kind.'" Order at 20 (quoting *Bostock*, 590 U.S. at 681). And if *Bostock* is not applicable to restrooms and locker rooms under *Title VII*, it's unreasonable to assume it's applicable to restrooms and locker rooms under *Title IX*.

*Finally*, Title IX is not a general antidiscrimination statute like Title VII. As its text and history show, Title IX was primarily designed to protect women and girls in education. *Supra* § II.B.1–3. Title VII on the other hand protects a broader group of individuals and traits. *Bostock's* logic cannot simply be copied and pasted to a more specific statute.

## 5. The *de minimis*–harm standard subverts Title IX's sex-based protections.

Because *Bostock* cannot apply to Title IX, the Department manufactures a new *de minimis*–harm standard to achieve its policy goals. 89 F.R. at 33,887 (codified at 34 C.F.R. § 106.31(a)); Op. Br. 26–34. The Department says this standard is just another way to say "legally cognizable injury." *Id.* at 25. It's not. Rather than uphold Title IX's sex-based protections, this new standard subverts them.

Back to the text. Title IX never mentions *de minimis* harm. It prohibits schools from excluding, denying benefits, or discriminating—meaning to "treat worse." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *see supra* § II.A.1. But nothing in Title IX "says anything about how much worse." *Muldrow*, 601 U.S. at 355. The statute simply doesn't allow Defendants to define threshold liability however they please and with no statutory basis.

Defendants' illogical "harm" definition overrides Title IX's sex-based protections. The Rule says sex distinctions *always* cause more than *de minimis* harm, but only when applied to people with certain gender identities. 89 F.R. at 33,887; *see id.* at 33,815 ("stigmatic injuries" per se harmful); Op. Br. 27. So, sex-specific locker rooms cause *de minimis* harm when applied to men who identify as men, but more than *de minimis* harm when applied to men who identify as women, 89 F.R. at 33,820—even though women (whose harms Defendants dismiss) have their unclothed bodies exposed to an unclothed male in both cases. On this logic, gender identity supersedes sex—the very thing Title IX protects.

That "add[s] words" and "impose[s] a new requirement" that Title IX doesn't. *Muldrow*, 601 U.S. at 355. And far from employing an "objective standard," the Rule says harm is cognizable only if it implicates a person's "subjective, deep-core sense of self." *Compare* 89 F.R. at 33,815, *with id.* at 33,809; *see Muldrow*, 601 U.S. at 254–55. This change undermines Title IX's purpose, making it harder for students, particularly

34

girls, to "participat[e] in" or receive "the benefits of" educational programs. 20 U.S.C. § 1681. This Court favors constructions that serve, rather than frustrate, a statute's evident purpose. *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (interpreting text consistent with statute's "object").

By elevating gender identity over Title IX's sex-based protections, the Rule also leads to absurd results. For example, per Defendants, Congress required schools to allow men and women to share hotel rooms but not dorm hallways, *see* 20 U.S.C. § 1686, to wrestle each other in gym class, 34 C.F.R. § 106.34(a)(1), but not after school, *id.* § 106.41(b), and to shower together, *id.* § 106.33, but not debate each other at Girls State, (20 U.S.C. § 1681(a)(7). That's unreasonable. This Court doesn't construe statutes to produce "absurd" results Congress didn't intend. *Resolution Trust Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 531 (10th Cir. 1991).

The *de minimis*–harm standard also threatens sex-specific sports. As even the Rule recognizes, there is no statutory "exception" for athletics. 89 F.R. at 33,819. While the Javits Amendment instructed the agency to issue regulations on "intercollegiate athletics," it did not amend the relevant statutory text. So even on Defendants' theory, only intercollegiate athletics were exempted from the *de minimis*–harm rule. But that threatens the 1975 regulations, which cover K-12 sports too. In other words, the logic behind the *de minimis*–harm rule would at minimum

forbid sex-specific sports in K-12 schools. But this Court should reject this misreading of the Javits Amendment. The better reading—and only one that allows sex-designated sports in K-12 schools—is that Title IX's non-discrimination mandate allows and sometimes require sex distinctions to achieve its goals.

Moreover, the Rule on its own terms threatens sex-specific sports. Section 106.10 redefines sex discrimination, and § 106.11 says this new definition "applies … to *all* sex discrimination occurring under a recipient's education program or activity" (emphasis added). That includes athletics. 89 F.R. at 33,528 (interpreting "'program or activity' broadly …"); 34 C.F.R. § 106.31 (a)(1) (106.10 covers "other education program[s] or activit[ies]…."). And while § 106.31(a)(2) exempts § 106.41(b), it doesn't exempt § 106.41(a), which bans sex discrimination "in any interscholastic, intercollegiate, club or intramural athletics…." Nor does it limit § 106.10 or § 106.11's broad scope. Op. Br. 27 n.6. So, § 106.10's redefinition of sex discrimination applies to educational programs generally through § 106.11, *and* specifically to sports through § 106.41(a).

Defendants accept that "courts may not 'disregard [a statute's] plain terms based on some extratextual consideration,'" Op. Br. 30 (quoting *Bostock*, 590 U.S. at 673–74), but the *de minimis*–harm standard does exactly that. Sure, Defendants say "discrimination" includes "an element of injury," Op. Br. 26, but § 1681(a) also forbids sex-based exclusions and denials. Defendants don't explain how that text supports their biased

standard. Nor can it. A woman denied the privacy of a women's-only locker room is effectively "excluded" from an educational program "on the basis of sex" and is "denied the benefits of" that program. That exclusion and loss doesn't change depending on the gender identity of biological males entering these spaces. Defendants are simply using their new *de minimis*–harm standard to define Title IX injuries based on the administration's policy preferences rather than statutory text. This Court should reject this attempted Title IX rewrite.

### C.    The Rule is contrary to the Constitution and RFRA.

Besides contradicting Title IX, the Rule also violates the Constitution and RFRA. Specifically, it violates the Spending Clause, compels and restricts speech, and violates the right to exercise one's faith.

### 1.    The Rule violates the Spending Clause.

"[W]hen Congress attaches conditions to a State's acceptance of federal funds," including education funds, "the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Title IX is spending legislation, *see Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639–40 (1999), so its conditions must be clear and unambiguous. Congress's spending power is not unlimited. There are four widely-recognized re-

37

strictions (the *Dole* restrictions), all of which must be satisfied, or a Congressional spending program will be found unconstitutional. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The second *Dole* restriction is most relevant here: "if Congress desires to condition the states' receipt of federal funds, it 'must do so unambiguously… enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst,* at 451 U.S. 17). Defendants claim the Rule merely "clarifies" Title IX's existing requirement that schools cannot discriminate on the basis of sex, which, post-*Bostock*, includes discrimination on the basis of "gender identity." This argument defeats itself: A statute that imposed "unambiguous" conditions on States does not need "clarification" fifty years later. The "gender identity" condition is not contained in the text of Title IX and therefore was not "unambiguously" attached to the federal funding at the time the law was passed.

Defendants make no attempt to dispute this. They do not contest that the plain meaning of "sex," as it would have been understood by the Congress that passed Title IX or the State legislators who accepted its terms, is "biological sex." They also do not (and cannot) contest that courts evaluate Spending Clause cases in the same way they do contract cases. As the Supreme Court said in *Pennhurst*, "[t]he legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract'"

38

at the time the "contract" was made. 451 U.S. at 17. In other words, the terms set by Congress in 1972 and 1974 were that "sex" meant biological sex, not "gender identity." Those terms cannot now be changed by agency action.

The States did not agree to these conditions; they did not agree to (1) abolish sex-separated restrooms and locker rooms, (2) allow biologicals males to play on women's teams, (3) police teachers' and students' pronoun use, or (4) force teachers, students, and others to violate their religious convictions. The district court below correctly held that "Title IX did not unambiguously condition funds on the prohibition of gender identity discrimination." Order at 27. In *Tennessee* as well, the court addressed the same issue and rejected the same Defendants' arguments. *Tennessee v. Cardona,* 2024 WL 3019146, at *15 (E.D. Ky. 2024). So, it is undisputed that "sex" in 1972 and 1976 meant "biological sex," the Rule's redefinition of "sex" to include "gender identity" changes the terms of the "contract," and that is unconstitutional.

In addition to the fact that the States did not agree to the new terms of this contract, States would also have difficulty complying with it. Defendants argue that a school should have no difficulty determining a student's "gender identity" because the school may rely on the student's word. But the Rule contains no requirement that the school know a student's "gender identity" is different than his or her biological sex, schools

are not allowed to inquire about "gender identities," and a person's "gender identity" may change over time. In other words, Defendants' assurance that, "It's ok, the student will tell you," is no assurance at all. Further, they do not bother wrestling with how the Rule applies to people who do not attend or work at the school (parents, visiting students, other guests, etc.). So, if a school stops a forty-year-old (apparent) man from entering an elementary school girls' restroom, could it lose millions in federal funding? The Rule is completely silent. The Rule also provides no guidance as to how schools should treat students who "identify" as neither male nor female or as any of the other "gender identities" identified by the "respected medical organizations" on which Defendants rely. For these reasons, even if the word "sex" does need "clarification" (and it does not), the way the Rule "clarified" it is unconstitutional.

The third *Dole* restriction is that "the conditions must be related to the federal interest in the particular program." *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("*Kansas I*") (emphases added). Title IX already protects all students from discrimination on the basis of sex—but not "gender identity." Defendants sputter that the Rule creates protection for all students, but they utterly fail to explain how a rule that eliminates protections for women and girls is related to a statute that was passed specifically for the protection of women and girls. The Rule is not related to the federal interest expressed by Congress when it enacted Title IX.

The Rule also violates the fourth *Dole* restriction because it will require States to violate the Constitutional rights of students, parents, teachers, and others. The Rule contains no protections for free speech, religious liberty, or equal protection nor guidance as to how a school could possibly carry out the Rule without infringing these rights. For these reasons, the Rule violates the Spending Clause.

Finally, the Rule violates the principle that the Spending Clause and the Supremacy Clause require *Congress* to speak. The Rule effectively preempts multiple state laws, such as Kansas's S.B. 180, which requires all public schools to record a student's sex as his or her sex at birth. But only "Laws of the United States" enacted by Congress can displace state law.[6] U.S. Const., Art. VI. A federal agency cannot exercise this power unless expressly authorized by Congress to do so. The purchased preemption presented by the Rule is especially troubling because neither Congress nor a State legislature is involved. The executive agency sets the new terms of the deal (contrary to the terms previously set by Congress) and the school districts change their behavior to get the money, without any ratification of the new terms by the State legislature. The States' legislature and statutes are ignored.

---

[6] *But see Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982).

2.   **The Rule compels and restricts speech based on content and viewpoint.**

The Rule fails because it compels and restricts speech based on viewpoint. Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Schools may not forbid "the expression of an idea simply because" the government believes the expression is "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Here, the Rule forces teachers and students to speak inaccurate pronouns and to avoid saying sex is binary or immutable. The First Amendment forbids this coercion. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

Two changes require this coercion. First, § 106.10 expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 F.R. at 33,886. Second, the Rule creates a "broader standard" for hostile-environment claims. *Id.* at 33,498. Harassment need only be severe *or* pervasive. Complainants need not show "any particular harm" or exclusion from educational programs. *Id.* at 33,511. Harassment can be anything the student considers "unwelcome" or that "limits" the student's ability to benefit. *Id.* at 33,884 (codified at 34 C.F.R. § 106.2). These changes force teachers and students to speak inaccurate pronouns and to avoid saying sex is binary or immutable.

The new harassment standard requires schools to treat people according to their gender identity or they will inflict "more than de minimis

harm." 89 F.R. at 33,887. So, failing to use someone's chosen pronouns causes more than *de minimis* harm. *Id.* at 33,516 ("misgendering" can be harassment). Severe or not, pervasiveness is enough to trigger liability. And pronoun use is pervasive given its ubiquity in conversation. *Id.* at 33,498. Bolstering this fear, the Rule praises punishing a student for wearing a t-shirt saying, "There Are Only Two Genders," because that speech "invades the rights of others." *Id.* at 33,504 (citing *L.M. v. Town of Middleborough*, 677 F. Supp. 3d 29 (D. Mass. 2023)).

This change threatens Plaintiffs. For example, K.R. cannot use inaccurate pronouns or say sex isn't binary because of her Christian faith. Appx. Vol. 1, 179–80. K.R. fears that if the new Rule goes into effect, she could be punished for expressing her beliefs. *Id.* Plaintiff organizations include individuals who share similar beliefs and fears. *Id.* at 63–75.

Defendants call these fears unwarranted because their new standard "mirrors" the one for "Title VII," Op. Br. 35, and doesn't require anyone to "affirm 'any particular view on any issue,'" *id.* at 37 (citing 89 F.R. at 33,505); it merely requires "schools to address sex-based harassment," *id.* This obscures Defendants' major overhaul, which (1) changes Title IX's harassment standard contrary to statute, (2) requires a broader standard that will inevitably censor and compel more speech, and (3) prompts fears reinforced by what Defendants have said elsewhere. *See Davis*, 526 U.S. at 648–52.

*First*, the new standard is contrary to statute. It disregards *Davis*, which holds that harassment must be "severe, pervasive, *and* objectively offensive" to violate Title IX. 526 U.S. at 650 (emphasis added). In 2020, Defendants adopted the *Davis* standard and recognized that the First Amendment demands a "narrowly tailored" harassment definition to avoid censoring protected speech. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 85 F.R. 30,026, 30,142 (May 19, 2020); *accord id.* at 30,033. And *Davis* warned against "impos[ing] more sweeping liability than" it "read Title IX to require." 526 U.S. at 652. The new standard is far lower.

Certainly, this Court sometimes borrows from Title VII analysis when assessing Title IX claims. Op. Br. 35. But it doesn't when Title IX, its regulations, or precedents provide clarity on their own. *See Roberts v. Colo. State Bd. of Agriculture*, 998 F.2d 824, 833 n.14 (10th Cir. 1993). Here, *Davis* controls. And while Defendants say *Davis* arose in the context of a "private" lawsuit rather than an administrative suit, Op. Br. 36 n.10, the Court interpreted "the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX." *Alabama*, 2024 WL 3981994 at *5. Title IX's words don't change meaning based on the type of claim. *Loper Bright*, 144 S. Ct. at 2266 (statutes "have a single, best meaning"). This alone sinks the standard.

*Second*, the standard restricts speech on gender identity—a matter "of profound value and concern to the public" that "merits special protection." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) (cleaned up). "Pronouns," for example, "convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). As do statements about what defines men and women and whether sex can be changed. Some may consider these statements offensive. But *Davis* gave "very real limitations" to Title IX's definition of harassment. 526 U.S. at 652. It doesn't cover "teas[ing]," "name-calling," or isolated incidents. *Id.* "[S]chools" are not the "workplace": they require more freedom. *Id.* at 651–52.

The Department says it only requires schools to "address sex-based harassment" and doesn't tell "students and staff 'what they must say.'" Op. Br. 36 (citation omitted). But schools must apply *some* standard. The Department has now broadened that standard. And given that the Department says "misgendering" someone can be harassment, 89 F.R. at 33,516, celebrates punishing students for saying there are two only genders, *id.* at 33,504, and believes schools may prohibit the intentional use of accurate pronouns without violating free speech, *see* Op. Br. 38 (citing *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453 (6th Cir. 2024) (*PDE*)), teachers and students have much to

45

fear. Their speech must conform to the Department's standard, or they risk discipline.

*Third*, the Government's prior statements validate this fear. In 2023, for example, the Government said employers violate Title VII when they allow employees to "misgender" co-workers. EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 F.R. 67,750 (Oct. 2, 2023), https://perma.cc/VY3Y-RCE8. The Rule incorporates this guidance into Title IX. 89 F.R. at 33,516. More recently, the Government repeated its view that a school policy requiring teachers to use gender-neutral titles but not honorifics and pronouns based on gender identity violates Title VII. Statement of Interest of the U.S. of Am., *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024). Because the Title VII standard "aligns closely with the definition of hostile environment … harassment" the Rule applies to Title IX, 89 F.R. at 33,500, Plaintiffs' fears are warranted.

### 3.    The Rule is vague and overbroad.

The Rule is also vague and overbroad. A law is overbroad if it covers "a substantial amount of constitutionally protected speech." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008). And a law is too vague if it fails to give the person of ordinary intelligence a reasonable opportunity to know what it forbids. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The Rule violates both limits.

*Overbreadth*. The Rule is overbroad because it covers too much speech on controversial subjects. *Alabama*, 2024 WL 3981994 at \*5-\*6. It's nearly identical to a policy the Eleventh Circuit struck down on that basis. *Id.* (comparing Rule to unlawful policy in *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15 (11th Cir. 2022)). Such policies likely violate the First Amendment, the court said, because they restrict "political advocacy and cover[ ] substantially more speech than the First Amendment permit[s]." *Alabama*, 2024 WL 3981994 at \*6. While the Department accepts that the Rule may "occasionally" restrict speech, Op. Br. 38, pronoun use is ubiquitous; the Rule compels individuals to speak one viewpoint; and it covers conversations online. That bans "substantially more speech" than allowed. *Alabama*, 2024 WL 3981994 at \*6.

To be sure, the Department cites *PDE*, which upheld a school harassment policy covering K-12 students, 109 F.4th 453, 471, but *PDE* is nonbinding, the Sixth Circuit has been asked to review *PDE* en banc, Parents Defending Education's Pet. for Reh'g En Banc, PDE, No. 23-3630 (Aug. 26, 2024), Doc. No. 92, and *PDE* incorrectly placed the burden on the plaintiffs to show their speech is nondisruptive. The government bears that burden, including at the preliminary-injunction stage. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 509 (1969); *see PDE*, 109 F.4th at 489–90 (Batchelder, J., dissenting) (collecting cases). And while the school in *PDE* provided evidence that using correct pronouns would disrupt its campus and harm students who identify as

transgender (something the plaintiffs admitted there), 109 F.4th at 463–64, the opposite is true here, where students have engaged in desired speech and *not* caused disruption or been punished by their schools. Appx. Vol. 1, 63–74.

Defendants' other cases likewise fall short. Most did not review a First Amendment challenge. *E.g. Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Throupe v. Univ. of Den.*, 988 F.3d 1243 (10th Cir. 2021); *Delsa Brooke Sanderson v. Wy. Highway Patrol*, 976 F.3d 1164, 1168 (10th Cir. 2020). Another dealt with a policy that did not "target speech." *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 358 (10th Cir. 2020). None upheld a policy with the combination of factors the Rule has here. But many courts have struck down policies like § 106.2 when given the chance. *E.g. Cartwright*, 32 F.4th at 114–15, 1120; *Speech First, Inc. v. Fenves*, 979 F.3d 319, 323, 336–37 & n.16 (5th Cir. 2020); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215–17 (3d Cir. 2001).

*Vagueness*. The Rule is vague for the same reasons. It fails to explain what teachers and students can or can't say. For example, can an athlete say it's unfair for males to compete in women's sports without having "some impact" on transgender students? Can a teacher express to colleagues what they believe the Bible teaches about the immutability of sex? Defendants won't say. The Rule's "imprecision exacerbates its chil-

ling effect." *Cartwright*, 32 F.4th at 1121, 1125. And it creates an "impermissible risk" of suppression. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

What's more, § 106.31(a)(2) says failing to accommodate someone's gender identity automatically causes harm. And given that "gender identity" means an individual's subjective "sense of their gender," 89 F.R. at 33,809, this would deter a reasonable student from expressing the view that sex is fixed lest she subject herself to the sexual harassment process. As would the Rule's express support of cases punishing students for speaking this view. *Id.* at 33,504. The Rule's vague "some impact" standard does the same. *Id.* at 33,511. This imprecision is antithetical to a school environment where students can "voice ideas and opinions without fear of repercussion." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019).

The Rule is vague and overbroad, and Defendants' promise to respect the First Amendment cannot save it. 89 F.R. at 33,503; Op. Br. 36; *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995). Teachers and students need not bear the risk of punishment.

### 4.    The Rule violates RFRA.

The Rule's new harassment definition also compels and censors religiously motivated speech. § II.B.1–2. This violates RFRA, which forbids government from substantially burdening "a person's exercise of religion"

49

without proving that the coercion advances a "compelling … interest" using "the least restrictive means." 42 U.S.C. § 2000bb-1(a)-(b). K.R. and members of the organizational Plaintiffs believe God created humans male or female, and that humans cannot change their sex. Among other things, the Rule compels them, against their beliefs, to speak inaccurate pronouns and not to speak their view of human sexuality. *Supra* § II.B.1– 2. Defendants have no legitimate, much less compelling interest to compel and censor this religiously motivated speech. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023); *Meriwether*, 992 F.3d at 510.

## D.  The Rule is arbitrary and capricious.

Besides being contrary to law, the Rule is also "arbitrary" and "capricious" for three reasons. 5 U.S.C. § 706(2)(A).

*First*, the Rule implausibly claims its "amendments are required to fully effectuate Title IX's sex discrimination prohibition." 89 F.R. at 33,477. In reality, it elevates gender identity over sex. The Rule says transgender students face "substantial harm" if "they are excluded from a sex-separate facility consistent with their gender identity." *Id.* at 33,819. But Defendants show no concern about forcing girls to share private spaces with men—calling fears about that not "legitimate." *Id.* at 33,820. That's irrational. The Rule cannot claim it promotes Title IX by erasing sex-based protections to favor gender identity.

Second, the Rule sharply departs from past practice without a reasoned explanation. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Before the Rule, Title IX never applied to gender identity or sexual orientation. As recently as 2020, the Department said, "Title IX *did not* cover gender identity discrimination." Order at 17 (emphasis retained). Instead of acknowledging its break with precedent, the Department says its Rule merely "clarifies" Title IX. *See* 89 Fed. Red. at 33,474. But "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it's changing position," which Defendants did not do. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis retained).

Third, the Rule fails to consider reliance interests. For over 50 years, individuals and states have relied on the (correct) Title IX interpretation. For states, this includes allowing sex-specific toilets, locker rooms, shower facilities, and housing, accommodating the diverse needs of men and women. And for individuals, it included knowing they would have privacy in those spaces. The Rule nullifies all that without seriously considering the reliance interests. It requires states to alter their present arrangements to accommodate males in female spaces and females in male spaces and to accommodate nonbinary individuals in new spaces which do not currently exist. These accommodations, especially for those

with nonbinary or gender-nonconforming gender identities, cannot be accomplished with schools' existing sex-specific facilities.

The Rule doesn't take these concerns seriously. It merely says § 106.31(a)(2) compliance "may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities or creation of new programs." 89 F.R. 33,876. Far from the "more detailed justification" that the APA requires, Defendants flatly deny any significant costs as a result of the Rule. This unexplained denial violates the APA. *Regents*, 140 S. Ct. at 1915. Agencies that change longstanding policy are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* Defendants' failed to do that.

It also ignores the reliance interests of students like K.R., whose families have chosen public schools believing Title IX protects girls. The Department is changing the bargain by forcing girls to share intimate spaces with males, speak against their faith, and stay silent on important social issues involving gender identity. These students and their families will have no choice but to expend substantial resources to find educational opportunities that respect the differences between men and women and their constitutional rights.

The Rule doesn't carefully consider any of this. As a result, it's arbitrary and capricious.

### III.   Plaintiffs will suffer irreparable harm.

Having satisfied the "most important" factor—likely success on the merits—Plaintiffs also will suffer irreparable harm. *Planned Parenthood of Kan. v. Anderson*, 882 F.3d 1205, 1229 (10th Cir. 2018). They will suffer nonrecoverable compliance costs, an unjust intrusion into state sovereignty, and the loss of constitutional and statutory protections.

*Costs*. The court below found that Plaintiff States will suffer "extraordinary" compliance costs "due to the sweeping" Rule change. Appx. Vol. 3, 605. Those include investments to update training materials, hire additional Title IX coordinators, remodel facilities, and more. Appx. Vol. 1, 169–70; *id.* at 171–74. Those costs would be borne immediately without an injunction. *Id.* Because those costs are unrecoverable, they inflict irreparable harm. *Id.* at 606 (citing *Thunder Basis Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring)).

Defendants argue these costs are insufficiently quantified, Op. Br. 42, but no such requirement exists, as courts routinely find irreparable harm on evidence less than what the States provide here. *E.g. Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). And other courts deciding this same issue have aptly noticed that the States "face unrecoverable compliance costs in meeting the regulatory burdens imposed by the rule, lest they lose *billions* of dollars in federal funding for not complying." *Alabama*, 2024 WL 3981994, at *6 (emphasis added). Regardless, the Rule itself says redefining sex discrimination and harassment will

alone cause at least a 10% increase in complaints and investigations, costs that schools alone will bear. 89 F.R. at 33,851. Those acknowledged, nonrecoverable costs will irreparably harm the States.

*Sovereignty*. The Rule also would override or pressure the States to change conflicting state laws, including laws allowing sex distinctions to ensure equal sex-based opportunities. *See* Appx. Vol. 1, 24–27 (collecting statutes). That too inflicts irreparable harm. *Kansas v. United States* ("*Kansas II*"), 249 F.3d 1213, 1227 (10th Cir. 2001); *see Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.").

*Free Speech and Religious Exercise*. Violating constitutional rights always constitutes irreparable injury. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1266 (10th Cir. 2005). The Rule threatens the free-speech rights of K.R. and members of organizational Plaintiffs by causing schools to deprive them of those rights. § II.B.1–2. If the Rule goes into effect, some will self-censor their speech. This harm isn't "speculative." Op. Br. 43. It's imminent. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("self-censorship" is a "harm"). Defendants have never squarely disclaimed enforcement in the face of Plaintiffs' well-pled fears. *Cf. 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021) (noting importance of failure to disclaim future enforcement), *rev'd on*

*other grounds*, 600 U.S. 570 (2023). Likewise, the Rule forces K.R. to violate her religious beliefs by speaking against them, which also constitutes irreparable harm. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013).

## IV.   The public interest and balance of equities favor a stay.

The balance of equities favors a stay, and the public "always" benefits when the government is prevented from violating "constitutional" and important statutory "rights." *Hobby Lobby*, 723 F.3d at 1146.

Defendants say any time the "federal government 'is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" Op. Br. 45 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted)). But *King* was discussing a "*State*." *King*, 567 U.S. at 1303 (emphasis added). Defendants aren't a state. Nor are they effectuating a duly enacted statute. The Department is an agency trying to rewrite a statute. There is no sovereign harm if the Rule is enjoined.

Defendants also say the injunction injures its "compelling public interest" in preventing "sex discrimination." Op. Br. 45. But Title IX will continue to apply as it has for 50 years. And the Department redefines "sex discrimination" inconsistent with Title IX. § II.A. Nothing justifies enforcing this change. The public interest lies in correctly applying the law. *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). What's more,

on Defendants' logic, the statute has *always* prohibited gender-identity discrimination. No one will be harmed if Defendants are correct about what § 106.10 requires (though they're not), but Plaintiffs will imminent-ly suffer harm if Defendants are wrong (and they are).

## V.     The injunction is not overbroad.

This Court should retain the current injunction. Defendants say the injunction is overbroad because (1) it covers all members of organiza-tional Plaintiffs, including those who have joined post-complaint, and (2) the Rule can be severed. Op. Br. 45–53. They are wrong on both counts.

*Membership.* The injunction properly covers all members of organ-izational Plaintiffs. Associational standing allows organizations to pro-tect the interests of *all* members. *Harvard College*, 600 U.S. at 201. Lim-iting the injunction to a subset based on membership date undermines this purpose. It also untenably allows some members or their children to be protected from the Rule while others are not, based solely on when they joined. An organization may assert the interests of its members even when membership is fluid. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343–45 (1977). And it can obtain full relief only if the injunction covers both "present and prospective" members. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535-36 (1925).

56

*Severability*. First, Defendants waived any severability argument below, making just a passing reference in briefing. Appx. Vol 2, 324. "'Cursory statements, without supporting analysis and case law' are inadequate to preserve an issue." *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) (citation omitted). Defendants never detailed how the Rule could partially apply yet still protect Plaintiffs. In a challenge to a 423-page regulation, they must do *something* to show how the injunction could be narrowed. *Louisiana*, 2024 WL 3452887 at *1. Not doing so leaves the Court figure out on its own how the Rule would work with some parts severed. This, in addition to violating separation of powers principles, would require the Court to "write words into the statute, or to leave gaping loopholes, or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found." *Alabama*, 2024 WL 3981994, at *8 (cleaned up) (quoting *Randall v. Sorrell*, 548 U.S. 230, 262 (2006)).

Second, the Supreme Court has rejected the exact severance argument Defendants make here. After two Circuit panels refused to stay parallel injunctions pending appeal, Defendants made the same request to the Supreme Court. The Court rejected that request. *Louisiana*, 144 S. Ct. at 2510. This Court should too.

## CONCLUSION

The district court properly ordered preliminary relief to preserve the status quo just like the Supreme Court recognized in August. This Court should affirm the district court's preliminary injunction.

## STATEMENT REGARDING ORAL ARGUMENT

The Supreme Court's ruling in *Department of Education v. Louisiana*, 144 S. Ct. 2507 (2024), confirms that the district court's injunction is warranted. To the extent that any issues remain open, Plaintiffs agree with the Department that oral argument would assist the Court.

Dated: October 9, 2024

Respectfully submitted,

*s/Anthony J. Powell*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

James A. Campbell
Jonathan A. Scruggs
Jacob P. Warner
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@ADFlegal.org
jscruggs@ADFlegal.org
jwarner@ADFlegal.org

*Counsel for Appellees K.R. and Female Athletes United*

William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS
Anthony J. Powell
Solicitor General
Abhishek S. Kambli
Deputy Attorney General
Erin B. Gaide
Assistant Attorney General
120 SW 10th Avenue
Topeka, KS 66612-1597
(785) 296-7109
abhishek.kambli@ag.ks.gov
anthony.powell@ag.ks.gov

*Counsel for Appellee State of Kansas*

TREG TAYLOR
ATTORNEY GENERAL OF ALASKA
William E. Milks
Alaska Department of Law
P.O. Box 110300
Juneau, AK 99811
(907) 465-3600
bill.milks@alaska.gov

(303) 292-2021
wtrachman@mslegal.org

Braden H. Boucek
Kimberly S. Hermann
SOUTHEASTERN LEGAL
FOUNDATION
560 W. Crossville Rd.
Suite 104
Roswell, GA 30075
(770) 977-2131
bboucek@southeasternlegal.org
khermann@southeasternlegal.org

*Counsel for Appellees Moms for Liberty and Young America's Foundation*

*Counsel for Appellee State of Alaska*

SEAN REYES
ATTORNEY GENERAL OF UTAH
Stanford E. Purser
Assistant Attorney General
Utah Attorney General's Office
160 E. 300 South, 5th Floor
Salt Lake City, UT 84114
(801) 366-0533
spurser@agutah.gov

*Counsel for Appellee State of Utah*

BRIDGET HILL
ATTORNEY GENERAL OF WYOMING
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Appellee State of Wyoming*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,000 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word.

Dated: October 9, 2024

*s/Anthony J. Powell*
Anthony J. Powell

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing BRIEF OF APPELLEES, as submitted in digital form is an exact copy of the written document filed with the Clerk.

*s/Anthony J. Powell*
Anthony J. Powell

## CERTIFICATE OF SERVICE

I hereby certify that on October 09, 2024 the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_s/Anthony J. Powell_
Anthony J. Powell