No. 24-3097

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF KANSAS, ET AL.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, ET AL.,

*Defendants—Appellants*

On Appeal from the United States District Court
for the District of Kansas
Case No. 5:24-cv-4041-JWB

## BRIEF *AMICUS CURIAE* OF THE FOUNDATION FOR MORAL LAW IN SUPPORT OF APPELLEES

John Eidsmoe
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

October 11th, A.D. 2024          Counsel for *Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the *amicus* Foundation for Moral Law, Inc., certifies that it is not a subsidiary or affiliate of a publicly owned corporation.

/s/ *John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

October 11th, A.D. 2024

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... C-1

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES ........................................................... ii

INTEREST OF THE *AMICUS*...........................................................1

SUMMARY OF ARGUMENT ......................................................2

ARGUMENT ...............................................................................4

I.    The Department of Education's policy violates free speech, free exercise of religion, and parental rights. ...........................4

    a.  Compelled speech is an especially egregious violation of the First Amendment ................................4

    b.  The Department's policy discriminates on the basis of both content and viewpoint.......................................9

    c.  The Department's policy also violates the rights of students, parents, and teachers to free exercise of religion under federal and state constitutional and statutory provisions ..................................................... 13

    d.  The enumerated rights of freedom of speech and free exercise of religion should take priority over the unenumerated right to be identified by preferred gender pronouns ...................................................... 15

    e.  The Department's policy violates the right of parents to make decisions concerning the lives of their children .......................................................... 18

II.   The Department of Education's policy making gender identity a protected class is an unconstitutional application of Title IX based on the intent of the Framers of both Title IX and the Fourteenth Amendment .................................... 20

CONCLUSION............................................................................ 23

CERTIFICATE OF COMPLICANCE ......................................................... 25

CERTIFICATE REGARDING SERVICE .................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Bowen v. Gilliard*,
    483 U.S. 587 (1987) ........................................................ 21

*Carey v. Brown*,
    447 U.S. 455 (1980) .................................................... 16-17

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432, 439 (1985) ........................................... 20-21

*Dumbrowski v. Pfister*,
    380 U.S. 479 (1965) ........................................................ 11

*Farrington v. Tokushige*,
    273 U.S. 284 (1927) .................................................... 18-19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ........................................................ 14

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and
    City Council of Balt.*,
    879 F.3d 101 (4th Cir. 2018) ...................................... 7-10

*J.W. Hampton, Jr. & Co. v. United States*,
    276 U.S. 394 (1928) ........................................................ 22

*Karnoski v. Trump*,
    139 S. Ct. 950 (2019) ...................................................... 16

*Karnoski v. Trump*,
    926 F.3d 1180 (2019) ...................................................... 16

*Karnoski v. Trump*,
    No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec.
    11, 2017) .......................................................................... 16

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) .................................................... 12

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................................ 16

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ........................................................... 18

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ............................................................6

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ..................................................... 16-17

*National Inst. of Family and Life Advocates, dba NIFLA, v. Becerra*,
    138 S. Ct. 2361 (2018) .......................................................8

*Nordlinger v. Hahn*,
    505 U.S. 1, 10 (1992) ................................................... 20-21

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .......................................................... 16

*Ondo v. City of Cleveland*,
    795 F.3d 597 (6th Cir. 2015) ....................................... 21-22

*Parham v. J.R.*,
    442 U.S. 584 (1979) ..................................................... 18-19

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925) ..................................................... 18-19

*Reed v. Reed*,
    404 U.S. 71 (1971) ............................................................ 20

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) .............................................................. 21

*Shelton v. Tucker*
    364 U.S. 479 (1960) .......................................................... 15

*Stuart v. Camnitz*,
    114 F.3d 238 (4th Cir. 2014) .......................................... 7-8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..................................................... 9, 15

*Torcaso v. Watkins*

iv

367 U.S. 488 (1961) ........................................................... 15

*Troxel v. Granville*,
    530 U.S. 57 (2000) ...................................................... 18-19

*Vincent v. Widmar*,
    454 U.S. 263 (1981) ........................................................ 15

*West Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..........................................................7

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................ 18

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ............................................. 6, 12, 17

**Statutes**

Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb
    et seq. ........................................................................ 14-15

**Constitutions**

U.S. Const. amend. I ............................................... *passim*

U.S. Const. amend. XIV ....................................... 20-22

**Other Authorities**

David Smolin, *Fourteenth Amendment Unenumerated Rights
    Jurisprudence: An Essay in Response to* Stenberg v.
    Carhart, 24 Harv. J. L. & Pub. Pol'y 815 (2001) ............................ 17

*Do Children Grow Out of Gender Dysphoria?*, Transgender
    Trend, https://www.transgendertrend.com/children-
    change-minds/ (last visited Jan. 30, 2023) ........................................ 23

*Genesis* 1:27 (KJV) ..................................................... 14

James Cantor, *Do Trans-kids Stay Trans- When They Grow Up?*,
    Sexology Today! (Jan. 11, 2016),
    http://www.sexologytoday.org/2016/01/do-trans-kids-
    stay-trans-when-they-grow_99.html .................................................. 23

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law ("the Foundation") is a national public-interest organization based in Alabama dedicated to the defense of religious liberty and the strict interpretation of the Constitution as written and intended by its Framers.

The Foundation has an interest in this case because it believes that the executive policy challenged in this case places an unconstitutional burden on the speech of students and teachers who believe, sometimes because of religious conviction, that sex is assigned at conception or birth and cannot be changed by a personal decision or even by hormones or surgery. We also believe that the policy violates the freedom of speech as well as parental rights. Furthermore, we understand that there is no constitutional basis for such a policy under the Fourteenth Amendment, and, as such, the Department lacked authority to promulgate the policy in the first instance.

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

One purpose of an *amicus* brief is to bring to the Court's attention the ways a court decision may affect persons who are not parties to the action. Although this action does not include any individual student, parents, teachers, or other persons, such persons have interests and constitutional rights that are directly infringed by this agency action of the United States Department of Education.

Because compulsory speech contrary to a person's beliefs is more offensive than enforced silence, compelled speech is an even more egregious First Amendment violation than prohibited speech.

Furthermore, gender identification is a highly-charged medical, scientific, sociological, political, moral, and religious issue. Speech related to gender therefore deserves the highest legal protection.

Because freedom of speech is expressly protected by the First Amendment while the right to choose one's gender is at most an extra-constitutional court-created right, the status of which has not been recognized by the Supreme Court, any conflict between those rights should be resolved in favor of the enumerated right of freedom of speech.

Furthermore, many of those who are compelled by this federally-imposed policy to use "preferred" gender pronouns, object to doing so

because they believe that God has assigned to each person a gender and that they are defying God if they address people by pronouns that reflect a different gender from that which God has assigned. Likewise, they object to sharing bathrooms, showers, etc., with persons of the opposite biological sex, because they believe that violates the sexual modesty which God requires. Their beliefs and the exercise of those beliefs are protected by the First Amendment to the United States Constitution and by the constitutions and laws of the Plaintiff/Appellee States.

Additionally, questions as to one's sex or gender have very important lifelong ramifications for the person and for others. If children are to make decisions on this subject, they should make them in conjunction with their parents. A federally-imposed school policy that excludes parents from this decision or knowledge of the decision therefore violates parents' constitutional rights.

Finally, the Department of Education does not have the constitutional authority to enact such a sweeping upheaval of our country's entire education system. Not only is there no basis in Title IX, there is also no basis in the Fourteenth Amendment itself. The Executive branch has no statutory or constitutional authority to legislate protections for gender identity. That is reserved to the States or to the people by the Tenth Amendment. Even if

Congress does have the power to legislate in this area, Congress has not done so. The separation of powers doctrine and the nondelegation doctrine both forbid the Department of Education to usurp the legislative powers of Congress under Article I by redrafting Title IX so as to force the LGBTQ agenda upon the American people.

## ARGUMENT

I. **The Department of Education's policy violates free speech, free exercise of religion, and parental rights.**

    a. **Compelled speech is an especially egregious violation of the First Amendment.**

Suppose for a moment that you are a vehement opponent of Donald Trump. You intensely dislike him personally, you find his style of leadership abhorrent, you consider his "tweets" repulsive, you consider his policies immoral and destructive, and you fervently hope he is not elected. And you take it for granted that your right to express your opinion about him is protected by the First Amendment.

Suppose, then, that a law is enacted that prohibits you from saying or writing anything critical of President Trump, his style, or his policies, under severe legal penalties for violating this law. You would feel outraged, and rightly so, because your right of freedom of expression has been violated. But

you might decide to grit your teeth and remain silent rather than face the penalties.

But suppose, instead, that the law is changed, and now requires you not just to remain silent, but to affirmatively say: "I love Donald Trump, I admire his style, I love his tweets, I hope his policies are enacted, and, above all, I fervently hope he is elected in 2024." You would then be doubly outraged. You might think: "I might begrudgingly keep my mouth shut about Donald Trump, but there's no way I'm going to speak his praises. I'll go to jail instead."

The point is this: Compelled speech is an even more egregious First Amendment violation than prohibited speech. Forcing someone to say what one does not believe is worse than forcing a person to remain silent, just as forcing someone to contribute to Donald Trump's campaign is more outrageous than prohibiting donations to his opponent. And a requirement that students and teachers address people by their "preferred" names and pronouns is clearly compelled speech.

The Supreme Court has recognized that compelled speech is a First Amendment violation ever since *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), in which the Court held that public schools could not force students to say the Pledge of Allegiance if they or their parents

objected. Justice Jackson stated for the Court at 634, "[t]o sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."[2]

In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), the Court held unconstitutional a Florida statute requiring newspapers to publish replies of political candidates whom they had criticized, again invoking the compelled-speech doctrine.

Likewise, in *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court held that New Hampshire could not compel Maynard to display the state motto "Live Free or Die" on his vehicle license plate. Chief Justice Burger held for the majority at 713,

> We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. We hold that the State may not do so.

---

[2] Although Barnette and other plaintiffs objected to the Pledge for religious reasons, the Court stated at 634, "[n]or does the issue as we see it turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual."

On January 5, 2018, the Fourth Circuit held that a Baltimore ordinance requiring pregnancy clinics that do not offer or refer for abortion to disclose that fact through signs posted in their waiting rooms, violated the First Amendment. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018).

The Fourth Circuit concluded that the Baltimore ordinance constituted compelled speech because it "compel[led] a politically and religiously motivated group to convey a message fundamentally at odds with its core beliefs and mission." *Id.* at 105. The Court noted further that an integral component of the freedom of expression is "the right not to utter political and philosophical beliefs that the state wishes to have said." *Id.* at 111 (citing *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

> This Court has in the past struck down attempts to compel speech from abortion providers. [*Stuart v. Camnitz*, 114 F.3d 238, 242 (4th Cir. 2014).] And today we do the same with regard to compelling speech from abortion foes. We do so in belief that earnest advocates on all sides of this issue should not be forced by the state into a corner and required essentially to renounce and forswear what they have come as a matter of deepest conviction to believe.

*Greater Balt.*, 879 F.3d at 113.

The Fourth Circuit concluded:

> Weaponizing the means of government against ideological foes risks a grave violation of our nation's dearest principles: "that no official, high or petty, can prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. It may be too much to hope that despite their disagreement, pro-choice and pro-life advocates can respect each other's dedication and principle. But, at least in this case, as in *Stuart*, it is not too much to ask that they lay down the arms of compelled speech and wield only the tools of persuasion. The First Amendment requires it.

*Id.*

On June 26, 2018, the Supreme Court decided the case of *National Institute of Family and Life Advocates, dba NIFLA, v. Becerra*, 138 S. Ct. 2361 (2018). The California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act (known as the "FACT Act") required crisis pregnancy to post notices informing their patients that California provides free or low-cost pregnancy services, including abortion, and providing information as to how those services could be obtained. NIFLA objected, because telling people how and where they can obtain abortions runs contrary to their belief that abortion is wrong. The Court sided with NIFLA, holding that the required notice was compelled speech that violated the First Amendment.

In the present case, the policy imposed by the U.S. Department of Education is compelled speech of the most egregious nature. It requires students and teachers to address students by their "preferred pronouns" and chosen names, even though those pronouns and names may differ from the

student's gender as determined at birth or conception or as stated on the student's birth certificate or other official documents. Because the policy applies primarily to student speech, attempts by respondents in *NIFLA* and *Greater Baltimore* to downgrade the level of constitutional protection to "business speech," "commercial speech," or "professional speech" obviously do not apply to this case.

We note, further, that the right of free speech applies to students and teachers in a school setting; "[n]either students nor teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969).

### b. The Department's policy discriminates on the basis of both content and viewpoint.

The Fourth Circuit's *Greater Baltimore* decision recognized that the signs required by the Baltimore ordinance were content-based and viewpoint-based.

> The compelled speech at issue here raises particularly troubling First Amendment concerns. At bottom, the disclaimer portrays abortion as one among a menu of morally equivalent choices. While that may be the City's view, it is not the Center's. The message conveyed is antithetical to the very moral, religious, and ideological reasons the Center exists. Its avowed mission is to "provid[e] alternatives to abortion." . . . Its "pro-life Christian beliefs permeate all that the Center does."

*Greater Balt.*, 879 F.3d at 110.

The Fourth Circuit further stated:

> Particularly troubling in this regard is (1) that the ordinance applies solely to speakers who talk about pregnancy-related services but not to speakers on any other topic; and (2) that the ordinance compels speech from pro-life pregnancy centers, but not other pregnancy clinics that offer or refer for abortion.

*Id.* at 17–18. The Court drove home its point: "A speech edict aimed directly at those pregnancy clinics that do not provide or refer for abortions is neither viewpoint nor content neutral." *Id.* at 18 (emphasis added).

The federally-imposed policy is likewise content and viewpoint- based. It is content-based because it directly applies to a certain type of speech and to a specific issue: the gender of students who consider themselves to be of a different gender from that assigned at birth or conception. It is viewpoint-based because it requires speech that takes a specific viewpoint about transgenderism and forbids speech that takes a different viewpoint about transgenderism. Suppose a biologically male student claims to have transgendered into female and changes his name from John to JoAnn. One who believes transgenderism is legitimate is free to address that student as JoAnn and use female pronouns. But another who believes transgenderism is unscientific or immoral will be punished if he addresses the student as John and uses male pronouns.

A free speech violation exists if the policy has a "chilling effect" on speech. *See Dumbrowski v. Pfister*, 380 U.S. 479 (1965). If the policy forces Student A to choose between either (1) saying what he believes, that is, addressing Student B by the pronoun he believes to be correct, or (2) keeping silent, the policy clearly has a chilling effect on the Student A's freedom of speech.

As we have seen above, the law disfavors content discrimination and strongly disfavors viewpoint discrimination.

This bias violates the neutrality required of government in the marketplace of ideas. As Justice Jackson said in *Barnette* at 641–42,

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

But that is precisely what the Department has done and what it is forcing the Plaintiff/Appellee States to do. By enacting this policy, the Department has prescribed what shall be orthodox in matters of transgenderism: recognition and acceptance of transgenderism is orthodox, and all must say so; while the traditional view of gender is now unorthodox, and none may breathe a word of dissent.

Government may have some limited flexibility to advance ideas and policies by what is called "government speech,"[3] but it may not advance those policies by prohibiting private speech, much less by compelling individuals to speak in support of the government's position. For example, the State of New Hampshire may adopt "Live Free or Die" as its motto and place that motto on license plates, but the State may not compel individuals to display that motto. *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that New Hampshire may not prohibit Maynard, a Jehovah's Witness, from covering the motto). As the Court said at 717, "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for the State's ideological message." By imposing such a one-sided policy, the Department has demonstrated a clear animus against those who hold a more traditional view of gender identity.

---

[3] In light of the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), in which Coach Kennedy's prayers at the 50-yard line after football games were held not to constitute government speech, there is no possibility that students' use of names and gender pronouns could be considered government speech.

### c. The Department's policy also violates the rights of students, parents, and teachers to free exercise of religion under federal and state constitutional and statutory provisions.

A student's or teacher's reasons for not using the politically-correct name or pronouns could be many and varied. It could be accidental. Or, it could be because the "offending" student or teacher sincerely does not believe the other person's gender has changed. The student or teacher may believe one's gender is determined at conception by one's DNA and cannot be changed by a personal choice or even by hormone therapy or surgery. If a student believes this, he is (from his perspective) lying if he calls or addresses someone by a name or pronoun that is different from that assigned at birth or conception. If he believes, as many do, that gender is determined by God, he may believe he is sinning against God if he calls someone by a different gender from that which God has assigned to that person. To compel him to use terminology he does not want to use is to compel him to lie (that is, to address a student as a female when the speaker believes the student is a male) and/or to sin.

Forcing a student, teacher, or parent to sin by addressing persons by pronouns contrary to the sex which God has assigned, violates deep-seated religious convictions. Many Christians, Jews, Muslims, and others believe that their sacred books teach that God has assigned a sex to each person (for

example, *Genesis* 1:27 (KJV) states, "So God created man in his own image, in the image of God created he him; male and female created he them.") and that He requires that they treat biological males as males and biological females as females. Forcing these people to use "preferred pronouns" forces them to deny what they believe God has ordained, which is a substantial burden upon the exercise of their religious convictions.

Because this is a federal policy, it implicates the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000b–2000bb-4 et seq. [hereinafter RFRA], which imposes a heightened standard that the Government must meet if it is to be allowed to force people to violate their religious convictions. RFRA has been held constitutional as applied to the federal government in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

But because the Department is forcing the States to implement this policy, the Department is forcing the States to violate the free exercise of religion of their students, parents, teachers, and others. The constitutional provisions of the States are therefore implicated as well.

Furthermore, of the twenty States which are Plaintiffs/Appellees in this case, at least fifteen (Alabama, Arizona, Arkansas, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Oklahoma, South Carolina,

South Dakota, and Tennessee) have state Religious Freedom Restoration Acts. These state RFRAs provide that their respective states may substantially burden a person's religious convictions only if they can show a compelling interest that cannot be achieved by less restrictive means.

Religious speech is protected under both the free speech and free exercise clauses of the First Amendment. *Vincent v. Widmar*, 454 U.S. 263 (1981) (student religious group had right to use campus meeting rooms); *Torcaso v. Watkins*, 367 U.S. 488 (1961) (atheist cannot be compelled to affirm belief in God in order to become a notary).

### d. The enumerated rights of freedom of speech and free exercise of religion should take priority over the unenumerated right to be identified by preferred gender pronouns.

As the Supreme Court said in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Further, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Freedom of speech is therefore a highly-protected right, especially in an academic setting.

By contrast, the right to change one's gender identification, and *a fortiori* the right to force others to address one by those preferred names and

pronouns, is not found anywhere in the Constitution and is, at most, a "right" some have tried to read into the "emanations" and "penumbras" of the Constitution. Even *Lawrence v. Texas*, 539 U.S. 558 (2003) (recognizing a right to engage in homosexual acts), and *Obergefell v. Hodges*, 576 U.S. 644 (2015) (recognizing a right to same-sex marriage), did not recognize transgenderism. In *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) a federal district court judge struck down President Trump's order barring transgendered persons from military service on the ground that transgendered persons were a protected class. However, the Supreme Court stayed the District Court's order, *Karnoski v. Trump*, 139 S. Ct. 950 (2019), and the Ninth Circuit vacated the District Court order without ruling on the merits, *Karnoski v. Trump*, 926 F.3d 1180 (2019). Thus, the constitutional status of transgender rights remains unclear.

The relative weight of the right to change one's gender identification and to be addressed by the gender one prefers must be measured against the First Amendment rights of freedom of speech and free exercise of religion as relevant to this Court's decision.

The First Amendment expressly states that "Congress shall make no law . . . prohibiting the free exercise [of religion]; or abridging the freedom of speech." U.S. Const. Amend. I. "[E]xpression on public issues 'has always

rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Thus, the First Amendment inherently carries more weight than the conjured right to change one's gender identification. "It is one thing for the Court . . . to invalidate legislation found to be in clear violation of an explicit constitutional command; it is quite another for the Court to claim the authority to invalidate legislation based on rights not mentioned in the Constitution." Smolin, David, *Fourteenth Amendment Unenumerated Rights Jurisprudence: An Essay in Response to* Stenberg v. Carhart, 24 HARV. J. L. & PUB. POL'Y 815, 817 (2001).

When this new alleged right to transgenderism is weighed against the historic and clearly-enumerated rights to free speech and free exercise of religion, unquestionably the rights to free speech and free exercise take precedence. As the Court said in *Wooley* at 715, "[t]he First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." That applies to students and teachers who find transgenderism morally or scientifically objectionable, be they a minority or a majority.

Two concepts must be clearly distinguished. The right of a person to identify with and call himself by his preferred gender is one thing. The right of that person to force others to call him by his preferred gender, regardless of whatever moral or religious objections they may have in doing so, is something else entirely.

###### e. The Department's policy violates the right of parents to make decisions concerning the lives of their children.

In a series of decisions, the Supreme Court has recognized that parents have a fundamental right to make decisions concerning the raising and education of their children. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Farrington v. Tokushige*, 273 U.S. 284 (1927); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Parham v. J.R.*, 442 U.S. 584 (1979); *Troxel v. Granville*, 530 U.S. 57 (2000). In *Pierce* the Court stated at 535,

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

These cases limit the power of the state to intrude upon parental rights in a variety of ways: prohibiting parents from having their children instructed in any other language except English (*Meyer*); forcing parents to send their

children to public schools (*Pierce*); requiring private schools to be substantially the same as public schools (*Farrington*, *Yoder*); disregarding the authority of parents in committing their children to mental hospitals (*Parham*); requiring parents to allow visitation with grandparents (*Troxel*).

But in none of these cases did the states intrude upon parental rights nearly to the extent that the Department's policy does in the case at hand. Not only does the Department allow students to identify with a different gender from that of their birth and change their names to reflect that chosen gender. The Department also requires all employees and students to address the child by his chosen name and pronoun; changes the child's name on government documents including identification cards, yearbooks, and diplomas; allows the child to use the restrooms, locker rooms, and changing rooms of the child's chosen gender, and participate in the physical education programs of the child's chosen gender, regardless of whether other students or their parents object.

Few decisions, if any, are more life-altering than a decision to change one's gender identification. Not only will this permanently change the child's life in very substantial ways; it will alter the family as well. As parents discover that they no longer have a daughter but rather a "son" instead, as siblings discover that they no longer have a sister but rather a "brother"

instead, the entire family dynamic is dramatically changed. That the Department would change children and families so drastically is an egregious violation of parental rights as identified by the Supreme Court.

## II. The Department of Education's policy making gender identity a protected class is an unconstitutional application of Title IX based on the intent of the Framers of both Title IX and the Fourteenth Amendment.

The Department has no constitutional authority to make such a policy under both Title IX and the Fourteenth Amendment. Plaintiff-States have argued against the policy's lack of proper basis in Title IX; we concur with their arguments and won't repeat them here. However, we do want to emphasize that not only does the policy have no basis in Title IX, it has even less basis in the Fourteenth Amendment from which Title IX derives its power.

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Since expanding the Equal Protection Clause to include discrimination on the basis of sex in the 1971 case *Reed v. Reed*, 404 U.S. 71, the Supreme Court has articulated a primary principle for the Equal Protection Clause's reach: all persons "similarly situated" or "who are in all relevant respects alike" should be treated alike. *See City of Cleburne*

*v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

The Department of Education, in its haste to subscribe to the ideology of gender identity which rejects the scientific reality of biological sex, has missed this fundamental principle of the Supreme Court's Equal Protection jurisprudence. A biological male who identifies as female is not similarly situated nor alike in all relevant respects to biological females, especially not in the education context of Title IX. In the education context, dealing with bathrooms, locker rooms, housing, and athletics, the primary relevant respect in question is biological anatomy. Gender identity in such a context does not even meet the threshold purpose of the Equal Protection Clause.

Beyond this, gender identity is neither a suspect classification, nor does it meet the Supreme Court's criteria for such a class. The Supreme Court has identified the criteria for a suspect class as historical purposeful discrimination, immutable characteristics, and political powerlessness. *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). The Sixth Circuit has recently noted that,

> The Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so. Moreover, the Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender.

*Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015). Gender identity does not meet any of the criteria to even be considered as a suspect class: there is limited to no history of purposeful discrimination, the only potential immutable characteristic is a rejection of biological sex, and the current political and cultural lobby for gender identity ideology is anything but politically powerless.

Gender identity is not within the ambit of the Fourteenth Amendment and therefore cannot be within the ambit of Title IX. Under the Tenth Amendment, that is a power reserved to the States or to the people. Congress, in enacting Title IX, had no intention of including gender identity in the protection it provides against discrimination. Under the nondelegation doctrine, *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394 (1928), the Department has no authority expand Title IX to include categories not recognized by the Constitution nor protected by Title IX. The Department is not Congress and has no authority to legislate. In its misguided zeal to force the LGBTQ agenda upon the American people, the Department has invaded the powers reserved to the States under the Tenth Amendment, violated the separation of powers under Article I which reserves to Congress the power to legislate, and the nondelegation doctrine which limits administrative agencies to interpreting, not redrafting, congressional legislation.

# CONCLUSION

Transgenderism is a relatively new subject, at least in the public arena, and there is much to be learned. Dr. James Cantor reports that, according to a consensus of ten scientific studies, "[t]he exact number varies by study, but roughly 60–90% of trans-kids turn out no longer to be trans by adulthood."[4] One can only imagine how much damage can be done to children and to their families by facilitating or encouraging children to identify with the opposite gender. For example, a child who identifies with the opposite sex may decide to take puberty blockers or undergo surgery, only to change his/her mind later. The physical, mental, social, emotional, and/or psychological damage to children and their families may be severe and irreparable.

A matter like this cannot be left to the political process, because the constitutional rights of parents and children are at stake. A basic purpose of a bill of rights is to place certain matters above and outside the political process. These include executive actions that violate the constitutional rights of parents

---

[4] Dr. Cantor, James, "Do Trans-kids Stay Trans- When They Grow Up?", SEXOLOGY TODAY, 11 January 2016, http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html. *See*, "Do Children Grow Out of Gender Dysphoria?", TRANSGENDER TREND, https://www.transgendertrend.com/children-change-minds/. *See also,* de Vries, Annelou LC., Hannema, Sabine E, "Growing Evidence and Remaining Questions in Adolescent Transgender Care, *New England Journal of Medicine* 388:3 (January 18, 2023), https://www.nejm.org/doi/full/10.1056/NEJMe2216191.

and children and that usurp legislative authority by redrafting legislation and enacting a policy with no lawful basis in either statute or the Constitution.

The Department Policy violates the free speech rights of students and teachers and violates the right of parents to control the upbringing of their children. The Department Policy forces fundamental changes in the very fabric of American education and family life, changes that require more deliberation than a simple stroke of an executive pen.

The order of the district court should therefore be affirmed.

Respectfully submitted,

John Eidsmoe
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

Counsel for *Amicus Curiae*

October 11th, A.D. 2024

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., and 6th Cir. R. 32(b)(1), this document contains 5,334 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

*/s/ John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

October 11h, A.D. 2024

**CERTIFICATE REGARDING SERVICE**

I certify that on October 11th, A.D. 2024, a true copy of this document is being filed electronically (via CM/ECF) and will thereby be served on all counsel of record.

/s/ *John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

October 11th, A.D. 2024