No. 24-3097

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF KANSAS; STATE OF ALASKA; STATE OF UTAH; STATE OF WYOMING;
SHAWNA ROWLAND, AS MOTHER ON BEHALF OF K.R., A MINOR; MOMS FOR LIBERTY;
YOUNG AMERICA'S FOUNDATION; FEMALE ATHLETES UNITED,
*Plaintiffs-Appellees,*

*v.*

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA,
UNITED STATES SECRETARY OF EDUCATION, IN HIS OFFICIAL CAPACITY;
UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND,
UNITED STATES ATTORNEY GENERAL, IN HIS OFFICIAL CAPACITY,
*Defendants-Appellants.*

Appeal from the United States District Court
for the District of Kansas
No. 5:24-cv-04041-JWB-ADM
The Hon. John W. Broomes

BRIEF OF MISSISSIPPI, ALABAMA, ARKANSAS, FLORIDA, GEORGIA, IDAHO, INDIANA,
IOWA, KENTUCKY, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE,
NORTH DAKOTA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE,
TEXAS, VIRGINIA, AND WEST VIRGINIA AS AMICI CURIAE SUPPORTING
PLAINTIFFS-APPELLEES AND AFFIRMANCE

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................ii

INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT .... 1

ARGUMENT ........................................................................................ 2

I.    Background Principles Show That Title IX Prohibits Only Discrimination Based On Biological Sex ........................................ 2

II.   Extending Title IX Beyond Biological Sex Would Have Profound Negative Ramifications .................................................. 10

CONCLUSION ................................................................................... 14

CERTIFICATE OF COMPLIANCE...................................................... 17

CERTIFICATE OF DIGITAL SUBMISSION ....................................... 17

CERTIFICATE OF SERVICE.............................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. School Board of St. Johns County,*
57 F.4th 791 (11th Cir. 2022) (en banc) ............................. 4, 9, 10, 12

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) (per curiam)............................................. 5, 6, 7

*Arlington Central School District Board of Education v. Murphy,*
548 U.S. 291 (2006)............................................................................ 3

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020)..................................................................... 8, 9

*Cummings v. Premier Rehab Keller, PLLC,*
142 S. Ct. 1562 (2022)................................................................. 2, 4, 5

*Davis v. Monroe County Board of Education,*
526 U.S. 629 (1999)............................................................................ 9

*Gebser v. Lago Vista Independent School District,*
524 U.S. 274 (1998)............................................................................ 8

*Gonzales v. Oregon,*
546 U.S. 243 (2006)......................................................................... 5, 9

*Gregory v. Ashcroft,*
501 U.S. 452 (1991)......................................................................... 7, 8

*Jackson v. Birmingham Board of Education,*
544 U.S. 167 (2005)............................................................................ 4

*Milliken v. Bradley,*
418 U.S. 717 (1974)............................................................................ 9

*New York v. United States*,
    505 U.S. 144 (1992) ..................................................... 7

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022) (per curiam) ..................................... 5

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) .................................................... 3, 4

*San Antonio Independent School District v. Rodriguez*,
    411 U.S. 1 (1973) ....................................................... 7

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .................................................... 2

*Tennessee v. Cardona*,
    No. 24-5588, 2024 WL 3453880
    (6th Cir. July 17, 2024) ............................................. 8, 9

*Tennessee v. Dep't of Education*,
    104 F.4th 577 (6th Cir. 2024) ................................... 3, 4, 8

*Texas v. Becerra*,
    No. 6:24-CV-211-JDK, 2024 WL 3297147
    (E.D. Tex. July 3, 2024) ............................................. 11

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................. 6

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 ........................................ 2, 8

U.S. Const. amend. X ..................................................... 7

## Statutes

20 U.S.C. § 1681 .......................................................... 6

20 U.S.C. § 1686 ..................................................... 10, 11

20 U.S.C. § 1687 ............................................................ 2

42 U.S.C. § 18114 ......................................................... 13

42 U.S.C. § 18116 ...................................................... 2, 11

**Regulations**

34 C.F.R. § 106.33 ......................................................... 10

34 C.F.R. § 106.41 ......................................................... 12

**Rule**

Fed. R. App. P. 29 ............................................................ 1

**Other Authorities**

86 Fed. Reg. 32637 (June 22, 2021) ............................... 3

87 Fed. Reg. 47824 (Aug. 4. 2022) .................................. 4

88 Fed. Reg. 22860 (Apr. 13, 2023) .............................. 12

89 Fed. Reg. 33474 (Apr. 29, 2024) .............................. 11

89 Fed. Reg. 37522 (May 6, 2024) ............................ 11, 13

118 Cong. Rec. 5730 (1972) ................................... 6, 8, 10

Ruth Bader Ginsburg,
    The Fear of the Equal Rights Amendment,
    Wash. Post (Apr. 7, 1975) .................................... 10

U.S. Dep't of Education,
    Title IX, Revised Sexual Harassment Guidance
    (Jan. 2001) ................................................................ 3

**INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT**

This Court should affirm the district court's order enjoining the Department of Education's extraordinary rule extending Title IX's prohibition of discrimination "on the basis of sex" to sexual orientation and gender identity. The district court was right to reject the Department's view and to hold that Title IX prohibits only discrimination based on biological sex. As plaintiffs-appellees' brief explains, Title IX's text, structure, and aims compel that result. This brief emphasizes two more reasons why this Court should honor Title IX's text, structure, and aims. First, background principles powerfully reinforce that Title IX applies only to discrimination based on biological sex. And second, adopting the contrary view would have profound negative ramifications.

A sound understanding of Title IX is of special concern to amici curiae—the States of Mississippi, Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Virginia, and West Virginia.[*] That understanding has ushered in tremendous success for women and girls and has protected privacy, dignity, and safety for over 50 years. The Department's attempt to rewrite Title IX jeopardizes all that. And Title IX's nondiscrimination provision applies to a wide range of educational

---

[*] The States may file this brief without the parties' consent or leave of the Court. Fed. R. App. P. 29(a)(2).

programs that receive federal funds and (through the Affordable Care Act) to hospitals, clinics, doctors, and state-sponsored health programs that receive federal funds. 20 U.S.C. § 1687; 42 U.S.C. § 18116(a). Title IX thus accounts for billions of dollars in funding to States and others, including amici. A flawed view of Title IX imperils that funding. Amici thus have a strong interest in the correct resolution of this case.

## ARGUMENT

### I. Background Principles Show That Title IX Prohibits Only Discrimination Based On Biological Sex.

Bedrock constitutional limitations reinforce that Title IX prohibits only discrimination on the basis of biological sex.

*First*, Title IX nowhere gives clear notice that it extends to sexual orientation or gender identity—which, given the limits on Congress's power, means that Title IX does not apply to those matters.

Title IX exercises Congress's power under the Constitution's Spending Clause, U.S. Const. art. I, § 8, cl. 1. Using that power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But a spending-power law functions like "a contract" and "operates based on consent." *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1570 (2022). Congress's authority "to enact Spending Clause legislation rests ... on whether the recipient voluntarily and knowingly accepts the terms of that contract." *Ibid.* (cleaned up). A spending-power law thus must "furnish[ ] clear

notice" of what it requires, because recipients "cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain." *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 296 (2006) (internal quotation marks omitted). So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

Title IX does not provide "clear notice" that it extends to sexual-orientation or gender-identity discrimination. The statute's text, structure, and aims show that it bars discrimination based on biological sex. States' Br. 21-37. That view prevailed—unbroken—for decades. Nearly 30 years after Title IX's enactment, the Department of Education declared: "Title IX does not prohibit discrimination on the basis of sexual orientation." U.S. Dep't of Education, Title IX, Revised Sexual Harassment Guidance 3 (Jan. 2001). Just a few years ago, the Department reaffirmed that "Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity." 86 Fed. Reg. 32637, 32637 (June 22, 2021) (noting Department's view under prior Administration). "It can't be that sexual orientation and gender identity have always been protected" under Title IX, "given the clear evidence of prior contrary agency positions." *Tennessee v. Dep't of Education*, 104 F.4th 577, 600, 612 (6th Cir. 2024). Rather, the view that Title IX covers "sexual orientation and gender

identity discrimination" is "new" and would "substantially change[ ] the experience" of regulated parties. *Id.* at 612, 613. Recipients of Title IX funds did not "voluntarily and knowingly accept[ ]" (*Cummings*, 142 S. Ct. at 1570) that Title IX extends beyond biological sex.

The absence of contrary evidence is striking. No contemporaneous dictionary shows that *sex* embraces sexual orientation or gender identity. *Cf. Adams v. School Board of St. Johns County*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc) ("Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that ... 'sex' ... meant biological sex."). Nor does anything in Title IX's implementing regulations. *Cf. Jackson v. Birmingham Board of Education*, 544 U.S. 167, 183 (2005) (recipients on notice of liability for discriminatory retaliation where, among other things, Title IX's regulations "clearly prohibit[ed] retaliation and have been on the books for nearly 30 years"). The same is true of Title IX's legislative history. *Cf. Pennhurst*, 451 U.S. at 18 (pointing to lack of "legislative history ... suggest[ing] that Congress intended" States to incur certain liability). And no caselaw from near the statute's enactment (or for decades after that) applies any similar theory of sex discrimination. *Cf.* 87 Fed. Reg. 47824, 47829 (Aug. 4. 2022) (proposed rule) (current Administration recognizing that "extend[ing]" Title IX's "prohibition on sex discrimination ... to gender identity discrimination" "reflect[s] recent developments in sex discrimination law") (capitalization omitted). Indeed, despite the importance of the scope-of-Title-IX issue to

4

this Administration and the many times it has briefed the issue, the best contemporaneous evidence the Administration has come up with to support its view is—*nothing*.

*Second*, nothing in Title IX shows Congress's intention to give federal agencies—which play a vital role in enforcing Title IX—the power to make national policy on sexual orientation and gender identity.

When Congress wants to "authoriz[e] an agency to exercise powers" on matters of "vast" "economic and political significance," it must "speak clearly." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam). Courts cannot rely on "ambigu[ous] or doubtful expression[s]" of Congress's intent to "resolve important policy questions." *NFIB v. OSHA*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring). This "background interpretive principle"—"rooted in the Constitution's separation of powers"—has at least as much force as the contract-law analogy that applies to spending-power laws. *Cummings*, 142 S. Ct. at 1576 (Kavanaugh, J., concurring). And the principle has particular force on important matters involving "earnest and profound debate." *Gonzales v. Oregon*, 546 U.S. 243, 249 (2006).

Extending Title IX beyond biological sex would hand to federal agencies—and strip from the people—power over significant questions on sexual orientation and gender identity. It would empower the Department of Education to require schools to force boys and girls to share bathrooms, locker rooms, and other intimate spaces with those of

the opposite sex. It would allow Washington-based functionaries to end the longstanding practice—necessary for equal opportunity, competitive integrity, and physical safety—of separating school athletics based on sex. And, because Title IX's nondiscrimination prohibition now applies in federally funded healthcare programs, it would allow agency officials with no medical training to dictate to doctors when and how they can rely on sex-based distinctions when caring for patients. *See infra* Part II.

But Title IX does not empower any federal agency to decide for the Nation these "political[ly] significan[t]" matters. *Alabama Ass'n*, 141 S. Ct. at 2489. There is no evidence that Congress even considered whether to give agencies power over sexual orientation or gender identity in this context. *West Virginia v. EPA*, 142 S. Ct. 2587, 2623 (2022) (Gorsuch, J., concurring) ("an agency's attempt to deploy an old statute focused on one problem to solve a new and different problem" may be "a warning sign that it is acting without clear congressional authority"). Yet adopting the Administration's position would require concluding that Congress considered and embraced the breathtaking consequences set out above when it passed a statute to "protect[ ] ... women" from discrimination (118 Cong. Rec. 5730, 5804 (1972)) and that simply prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). It defies belief that Congress would set national policy—or delegate that authority to agencies—"in so cryptic a fashion." *West Virginia*, 142 S. Ct. at 2608 (majority opinion).

*Third*, Title IX nowhere shows that Congress decided to effectuate an extraordinary shift in the federal-state balance of power over education policy.

The Constitution embraces a system of "dual sovereignty," in which "States possess sovereignty concurrent with that of the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see* U.S. Const. amend. X. This division of authority "secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992). By leaving much power with the States, the Constitution makes those who most affect everyday life more accountable to the people. *Gregory*, 501 U.S. at 458. Under this federal structure, States exercise primary "control" over education. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 29, 49 (1973). If Congress wants "to alter" this "balance," it must "make its intention to do so" "unmistakably clear." *Gregory*, 501 U.S. at 460. This "plain statement rule" (*id.* at 461) guards against "intru[sions]" into the "domain of state law." *Alabama Ass'n*, 141 S. Ct. at 2489. And it "assures that [Congress] has in fact faced, and intended to bring into issue, the critical matters involved." *Gregory*, 501 U.S. at 461.

Title IX does not reflect Congress's clear intent to effectuate the broad takeover of education policy that would result if Title IX applied to sexual orientation and gender identity. Title IX combats "unjustified discrimination against women" in education, while respecting inherent

differences between the sexes. 118 Cong. Rec. at 5303, 5808. And it does so while preserving "state and local" "control" of "education." *Tennessee v. Dep't of Education*, 104 F.4th at 593. Yet the rule here would impose federal control over school policy far beyond the statute's clear aims. Nothing in Title IX's text, context, or history suggests that Congress "in fact faced" or "intended to bring into issue" (*Gregory*, 501 U.S. at 461) that intrusion on state authority.

These background principles reinforce the error in relying, as the rule does, on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), to extend Title IX beyond discrimination based on biological sex.

First, the statute in *Bostock*—Title VII—is not subject to the clear-notice rule that governs Title IX. Title IX is "an exercise of" Congress's "Spending Clause power," but Title VII is not. *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *3 (6th Cir. July 17, 2024). The "contractual framework" for spending-power legislation "distinguishes Title IX from Title VII": unlike Title IX, Title VII "is framed in terms not of a condition but of an outright prohibition" of discrimination. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 286 (1998).

Second, although federal agencies play a vital role in enforcing both Title VII and Title IX, only Title VII could be said to give agencies a clear mandate to reach beyond discrimination based on biological sex. Title VII puts all sex-based employment actions off limits. *Bostock* thus explained that an employer violates Title VII by "intentionally fir[ing]" an employee

"based in part on sex"—even when "other factors besides ... sex contributed to the decision." 140 S. Ct. at 1741. Title IX is different. It does not put sex-based distinctions off limits. Rather, it recognizes that sex *is* sometimes relevant to providing equal educational opportunities. Title IX thus *allows* and at times *requires* recognizing and acting on inherent differences between the sexes. *See Adams*, 57 F.4th at 811 ("Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes."). That nuanced approach distinguishes Title IX from Title VII.

Last, Title IX applies in a context—education—with a "deeply rooted" "tradition" of state and local "control." *Milliken v. Bradley*, 418 U.S. 717, 741 (1974). Title VII "serve[s] different goals" and applies in a vastly different context. *Tennessee v. Cardona*, 2024 WL 3453880, at *3; *see Davis v. Monroe County Board of Education*, 526 U.S. 629, 651 (1999) ("[S]chools are unlike the adult workplace"). And Title IX nowhere reflects Congress's intention "to effect a radical shift of authority from the States to the Federal Government" (*Gonzales*, 546 U.S. at 275) beyond what was needed to stop discrimination against women and girls in education. State and local officials thus retain their authority until Congress says otherwise.

## II. Extending Title IX Beyond Biological Sex Would Have Profound Negative Ramifications.

The legal reasons for enforcing Title IX's text are powerfully reinforced by the profound practical ramifications of extending the statute beyond biological sex.

*First*, extending Title IX beyond biological sex would gravely undermine privacy in the intimate spaces that are ubiquitous in everyday life—restrooms, locker rooms, dorm rooms, and more.

"Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, The Fear of the Equal Rights Amendment, Wash. Post (Apr. 7, 1975). Title IX embraces that commonsense understanding—that "differential treatment by sex" may be necessary to "preserve[ ]" "personal privacy." 118 Cong. Rec. at 5807. The statute and longstanding regulations thus permit "separate living facilities for the different sexes" (20 U.S.C. § 1686) and "separate toilet, locker room, and shower facilities on the basis of sex" (34 C.F.R. § 106.33). These provisions reflect that the ability to "shield[ ] one's body from the opposite sex" in intimate settings is essential to dignity and "has been widely recognized throughout American history and jurisprudence." *Adams*, 57 F.4th at 805.

Yet the rule here takes the view that Title IX dramatically restricts (and may prohibit) separating facilities based on biological sex. The rule

says that "students experience sex-based harm that violates Title IX" if they cannot access "sex-separate facilities ... consistent with their gender identity." 89 Fed. Reg. 33474, 33818 (Apr. 29, 2024). That view would "require schools to subordinate the fears, concerns, and privacy interests of biological women to the desires of transgender biological men to shower, dress, and share restroom facilities with their female peers." App.23. The Administration has acted similarly in a rule purporting to implement Section 1557 of the Affordable Care Act, which incorporates Title IX's nondiscrimination prohibition in federally funded healthcare programs. 42 U.S.C. § 18116(a). In that rule the Administration claims that nonbinary and transgender persons must be given access to "intimate space[s]" (like shared hospital rooms) "consistent with their gender identity." 89 Fed. Reg. 37522, 37593 (May 6, 2024); *see Texas v. Becerra*, No. 6:24-CV-211-JDK, 2024 WL 3297147, at *3 (E.D. Tex. July 3, 2024) (Administration's position means that "provider[s] must allow biological males who 'identify' as female into female-exclusive facilities, including shared hospital rooms"). The Administration's position here thus threatens to do away with sex-separate facilities—despite Title IX's explicit authorization of sex-separate spaces to protect privacy. 20 U.S.C. § 1686.

*Second*, discarding the settled understanding of Title IX would largely destroy women's and girls' opportunities in school athletics.

Title IX's most visible impact has perhaps been the progress it has ushered in for women's and girls' sports. This success owes to Title IX's recognition that, due to "inherent differences" and "physiological advantages" between males and females, *Adams*, 57 F.4th at 819 (Lagoa, J., concurring), structuring sports based on biological sex is essential for equal opportunity, competitive integrity, and physical safety. Title IX's longstanding athletics regulation—which took effect with Congress's approval—thus provides that schools may operate "separate teams for members of each sex" in "contact sport[s]" and sports "based upon competitive skill." 34 C.F.R. § 106.41(b). The Administration's position here would drastically limit—or end—that practice. The Administration has proposed a rule requiring that students be allowed to participate in sports "consistent with their gender identity." 88 Fed. Reg. 22860, 22891 (Apr. 13, 2023). Although the Administration paused this rulemaking after intense public pushback spotlighting the problems of issuing the rule in an election year, it continues to press a view of Title IX—in this rule and otherwise—that would command the same result.

*Third*, applying Title IX beyond discrimination based on biological sex would upend the practice of medicine.

By applying Title IX's nondiscrimination mandate in healthcare, Section 1557 of the Affordable Care Act embraces the recognition that sex-based distinctions have objective consequences for medical treatment. Thus, under Section 1557, federally funded providers may

12

generally ask about and use sex-based distinctions to provide sound care. 42 U.S.C. § 18114 (prohibiting any regulation that would "interfere[ ] with communications" on "treatment options" or "restrict[ ] the ability of health care providers to" disclose "relevant information to patients").

The Administration's view would end that. Besides undercutting individual privacy as the rule here does, the rule purporting to implement Section 1557 would remake standards of care and undermine the doctor-patient relationship. That rule acknowledges that doctors often must ask about a patient's "sex-related medical history" and "health status" when "providing care." 89 Fed. Reg. at 37595. But it says that such "inquiries may rise to the level of harassment on the basis of sex" if, in the Administration's policy-driven view, they are not "relevant" or are "unwelcome." *Ibid.* Doctors thus may prematurely cut off efforts to assess their patients and inform them about the risks of certain medical procedures. The rule also says that doctors may not "use sex-based distinctions to administer individualized care" if doing so causes "distress." *Id.* at 37593, 37594. So if a doctor refuses to provide gynecological services to males, that provider could face liability for sex discrimination if a male patient claims to have suffered "distress." The rule also claims that "discrimination based on anatomical or physiological sex characteristics is inherently sex-based" and prohibited. *Id.* at 37576. So a doctor who would perform surgery to remove cancerous

breast tissue could face liability for refusing to surgically remove the healthy breast tissue of patients suffering from gender dysphoria.

No one in 1972 believed that Title IX was enacted to dramatically undercut privacy and dignity, to make widespread athletic success for women and girls impossible, and to undermine the practice of medicine. The rule here demands that courts pretend that things were otherwise. This Court should reject that view and affirm the district court's order blocking the rule's enforcement.

## CONCLUSION

This Court should affirm the preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*
SCOTT G. STEWART
  *Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Amici Curiae*

October 15, 2024

*Counsel for Additional Amici States*

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JOHN M. FORMELLA
Attorney General
State of New Hampshire

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

JASON S. MIYARES
Attorney General
Commonwealth of Virginia

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32, it contains 3118 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: October 15, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I, Scott G. Stewart, hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Carbon Black software, and according to the program are free of viruses.

Dated: October 15, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that the foregoing brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: October 15, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*
