# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Kansas
Case No. 5:24-cv-04041-JWB-ADM
Honorable John W. Broomes

## BRIEF OF DR. STEPHEN CRANNEY AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

Ryan M. Lawson
1818 LAW FIRM, PLLC
217 Main St.
Williamsburg, KY 40769
833-844-1818
    *Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………….. iii

IDENTITY AND INTEREST OF AMICUS CURIAE …………………... v

INTRODUCTION……………………………..…………………………. 1

ARGUMENT……………………………………………………………... 3

I.     INTRODUCTION…………………………………………………. 3

II.    THE POLL…………..…………………………………………….... 8

III.   EVIDENCE FOR MALE VIOLENCE……………………………. 15

CONCLUSION……………………..……………………………………. 18

CERTIFICATE OF COMPLIANCE..……………………………………   20

CERTIFICATE OF SERVICE…………………………………………. 21

# TABLE OF AUTHORITIES

**CASES**

*Bonitz v. Fair,*
804 F.2d 164 (1st Cir. 1986)............................................................. 6

*Brannum v. Overton Cnty. Sch. Bd.,*
516 F.3d 489, 494 (6th Cir. 2008)..................................................... 5

*Covino v. Patrissi,*
967 F.2d 73 (2d Cir. 1992)................................................................. 6

*Doe v. Luzerne Cnty.,*
660 F.3d 169, 176 (3d Cir. 2011)...................................................... 5

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586, 633-34 (4th Cir. 2020)............................................... 5

*Farmer v. Perrill,*
288 F.3d 1254 (10th Cir. 2002)......................................................... 6

*Fortner v. Thomas,*
983 F.2d 1024 (11th Cir. 1993)......................................................... 6

*Harris v. Miller,*
818 F.3d 49, 57-58 (2d Cir. 2016)..................................................... 7

*Henry v. Hulett,*
969 F.3d 769 (7th Cir. 2020)............................................................. 6

*Lee v. Downs,*
641 F.2d 1117 (4th Cir. 1981)........................................................... 6

*Oliver v. Scott,*
276 F.3d 736, 744 (5th Cir. 2002)..................................................... 6

*Parkell v. Danberg,*
833 F.3d 313 (3d Cir. 2016)............................................................... 6

*Sepulveda v. Ramirez*,
967 F.2d 1413 (9th Cir. 1992)...........................................……… 6

*Turner v. Safley*,
480 U.S. 78 (1987)............................................................. 6

*U.S. v. Virginia*,
518 U.S. 515, 533 (1996)..................................…............... 5

**OTHER AUTHORITIES**

538, *538's Pollster Rating,*
available at https://tinyurl.com/2e6p9ffk ……..............................……14

Andrew Gilligan, Unisex changing rooms put women in danger, *The Times* Sep. 2,2018, available at https://tinyurl.com/4f9d7fzb .....………17

Cecilia Dhejna et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6(2) *PLoS One* 2011), available at https://tinyurl.com/uks8unny .....……... 15

Federal Bureau of Investigation, *2019 Crime in the United States*, available at https://tinyurl.com/22b94tgd …........................... 5

Pew Research Center, Americans' Complex Views on Gender Identity and Transgender Issues, available at https://tinyurl.com/2by6tacp …... 7

Rosemary Gartner, "Sex, Gender, and Crime" in *The Oxford Handbook of Crime and Criminal Justice*, Michael Tonry, ed., 348, 349-50, 352-55, 361-66 (2011)............................................................ 5

Stantcheva, Stefanie. "How to run surveys: A guide to creating your own identifying variation and revealing the invisible." 15:1 *Annual Review of Economics*, 205 (2023)....................................…..... 9

SurveyUSA, Strong Majorities Prefer Female-Only Interactions for Women, Girls in Athletics, Restroom, Other Situations, available at https://tinyurl.com/bdf7xyea ...........................…................ 14

W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale Law & Policy Review, 227, 228 (2018)...........................................…..................... 4

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Dr. Stephen Cranney, as *amicus curiae*, respectfully urges this Court to uphold the District Court's preliminary injunction because the proposed Rule's changes to Title IX would cause severe harm that is serious, immediate, and for some, potentially irreversible.

Dr. Cranney is an expert in the fields of sociology and demography. He has published several academic and popular articles on subjects relating to sexuality and social change. He is deeply concerned that the proposed changes to the government's enforcement of Title IX will cause serious harm to both society and the very individuals Title IX is intended to protect.

Pursuant to Fed. R. App. P. 29(a)(2), counsel for *amicus curiae* certifies that this Brief was not authored in whole or in part by counsel for any party and that no person or entity, other than *amicus curiae*, has made a monetary contribution to its preparation or submission. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to this filing.

# **INTRODUCTION**

The debate around transgender accommodations is one of the most fraught of our times. The fervor of other writings and previous court rulings on both sides of the issue makes this clear. Before beginning in earnest, we must address some simple points.

*Amicus Curiae's* position acknowledges the humanity of all people regardless of their sex and gender identification and holds that everyone's rights are important. Respecting everyone's rights is difficult, for people differ in their interests and needs. Yet, it is the law's role to balance these rights when they come into conflict. Achieving this balance is no less important in the matter of transgender rights versus the rights of the overwhelming majority of the population who are not transgender. Whatever balance the law strikes, it cannot sacrifice the rights of one group, especially when representing the overwhelming number of people in society, for the other. Unfortunately, that sacrifice is exactly what these Title IX rule-changes represent.

The vast majority of people in the United States hold strong cultural norms about who can appropriately see who in a state of undress. Being exposed to genitals characteristic of the opposite sex (or having

their own genitals and private areas exposed to people of the opposite sex) seriously violates those norms. As *Amici's* survey and related research, experience, and surveys demonstrate, these rights are not just widespread, but grounded in strong, concrete reason.

This Brief accomplishes several things. We begin by discussing the history of bathroom segregation, its justification and various laws surrounding privacy. We continue by discussing a methodologically robust survey conducted for the purposes of this Brief that involves a representative sample of the American population that shows the overwhelming privacy interest that the average American feels towards single-sex bathroom spaces. This survey was designed specifically to capture the popular concern over this topic and demonstrates in exquisite scientific detail how far the removal of bathroom and locker separation by sex will prejudice and harm the privacy rights of the average student, particularly for women.

This survey was prepared and supervised by Dr. Stephen Cranney, who holds a dual Ph.D. in Sociology and Demography. Dr. Cranney owns a data science firm, is a non-Resident Fellow at Baylor's Institute for the Studies of Religion, and is an adjunct professor at Catholic University of

America where he has taught a course on human sexuality. He has published over 30 peer-reviewed studies, many of which were in the domain of sexuality and gender. His research has been reported on by *The Guardian*, *The New York Times*, *Deseret News*, *The Wall Street Journal*, *The Atlantic,* and *Christianity Today*.

Title IX recognizes the fundamental, important distinction of the sexes, a distinction felt, seen and acknowledged by the vast majority of Americans. It was their will, expressed through the legislative acts of their representatives and upheld by generations of legal professionals (both judges and lawyers) that have established, maintained and perpetuated the fundamental privacy and fairness concerns that the biological distinctions of sex implicates. To recognize the ability of transgender individuals to enter intimate areas not belonging to their birth sex would collapse those practical and legal distinctions that preserve the liberty, privacy and fairness for all Americans who use school bathrooms.

## ARGUMENT

## I.     Introduction

Bathrooms and locker rooms involve the most intimate parts of our physical selves. In these places, we are sometimes nude, always vulnerable, and engaged in acts that we are hesitant to share with anyone and only with those who are either like ourselves in sex or to whom we are bound through intimate relations. Because of these physical and emotional concerns, segregation in these areas is justified on both legal and moral grounds. This segregation also serves an important social function. Not only does sexual segregation protect the basic privacy rights that Americans commonly feel—it serves to protect these individuals from sexual and other forms of assault. It is a bulwark of safety for both body and spirit.

As scholarly research demonstrates, sex-segregated bathrooms were "among the earliest anti-sexual harassment laws in the [American] nation;" such segregation had its origins in concerns about the safety of women.[1] The safety concerns of sexual assault were therefore pre-eminent from the beginning in sex segregation. And, since nothing has changed in the nature of men and women since the institution of separate

_____

[1] W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale Law & Policy Review, 227, 228 (2018).

bathrooms was created, these original reasons for segregation retain an evergreen vigor. Indeed, the disparity in rates of crimes between the sexes,[2] the overwhelming rate of sexual violence of men against women, and the dearth of such violence by women against men remains significant.[3] We shall also see through anecdotal reports of individual instances and public records information that assault in intimate spaces, both restrooms and other venues, remains a serious and continuing danger.

American law is far from insensate to the importance of privacy to human dignity and its central role as a protected right.[4] The Supreme Court has recognized the right to bodily privacy, holding that "[p]hysical differences between man and women…are enduring."[5] In fact, when

---

[2] Among the many sources proving this point, we cite as most easily accessible the FBI's own crime numbers for the US in the most recently accessible year, 2019. Federal Bureau of Investigation, 2019 Crime in the United States, https://tinyurl.com/22b94tgd (last visited Oct. 15, 2024).

[3] Rosemary Gartner, "Sex, Gender, and Crime" in *The Oxford Handbook of Crime and Criminal Justice*, Michael Tonry, ed., 348, 349-50, 352-55, 361-66 (2011).

[4] Various Circuits have recognized the right to bodily privacy in general, see *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176 (3d Cir. 2011); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 633-34 (4th Cir. 2020) (Niemeyer, J., dissenting); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008).

[5] *U.S. v. Virginia*, 518 U.S. 515, 533 (1996).

integrating the Virginia Military Institute (VMI), the Supreme Court held that "VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements…," thereby implicitly recognizing the legally necessary separation of accommodations.[6]

Federal circuit courts across the country have extended this right to privacy even to prisoners,[7] holding that inmates cannot be forced to expose their bodies to members of the opposite sex without serious justification even when that member of the opposite sex is a prison

---

[6] *Id*, 550 fn. 19.

[7] Courts have typically accomplished this extension by applying the factors established by the Supreme Court in *Turner v. Safley* to prison rules regarding privacy rights. 480 U.S. 78, 89-91 (1987). For federal Circuit courts applying the *Turner* factors to bodily privacy, see *Bonitz v. Fair*, 804 F.2d 164 (1st Cir. 1986) (Overruled on unrelated grounds); *Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992); *Parkell v. Danberg*, 833 F.3d 313 (3d Cir. 2016); *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981); *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (Holding that prisoners retain at least a minimum Fourth Amendment interest in privacy); *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020); *Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir. 1992); *Farmer v. Perrill*, 288 F.3d 1254 (10th Cir. 2002); *Fortner v. Thomas*, 983 F.2d 1024 (11th Cir. 1993).

guard.[8] In making this decision, these Courts clearly considered biological sex as the important criterion.[9]

Given that even prisoners are protected from exposure to those born of the opposite sex, it would be strange indeed if school children, in being forced to endure this exposure, were to have fewer rights than a federal inmate. It would be a bizarre situation for a middle school-aged girl on an athletic team to have less protection from a member of the opposite sex than a convicted sex offender, yet in eliminating Title IX sex-segregation, we risk this unjust hypothetical becoming reality.

That this position is not just a reflection of legal reasoning, but good common sense cannot be denied. Transgender individuals make up a vanishingly small minority. [10] While that fact does not mean they should be harmed or injured, it also does not mean they should receive special

---

[8] *See Bonitz*, 172-73; *Harris v. Miller*, 818 F.3d 49, 57-58 (2d Cir. 2016); *Lee*, 1120; *Farmer*, 1256-57 (Where a transgender inmate objected to being viewed by others while being strip searched); *Sepulveda*, 114-1417; *Fortner*, 1030. Each of these cases involve strip-searches of inmates involving guards of the opposite sex.

[9] *Id.*

[10] Pew Research Center, *Americans' Complex Views on Gender Identity and Transgender Issues*, https://tinyurl.com/2by6tacp (last accessed Oct. 15, 2024) (Putting the total number of transgender individuals at 1.6% of the population).

privileges, especially if that privilege significantly harms others. Most people recognize this truth. In fact, *Amicus Curiae* has fielded and analyzed a robust, national poll that shows just how common is the sentiment that privacy in intimate spaces is a sensitive and basic right natural to our condition as a sexed species.

Given that bodily dignity and privacy form a serious component of our natural liberty, the feeling of violation in these areas is in fact a violation of these same rights and represents in part those basic liberties our Constitution is intended to protect.

## II.    The Poll

Dr. Cranney's custom survey was designed to ask the basic question at the heart of this case: does the presence of transgender individuals in bathrooms violate the basic privacy rights of individual citizens? In order to answer this simpler question, however, Dr. Cranney had to ask a series of revelatory and highly relevant questions that together provide a firm and comprehensive answer. Privacy is an essentially personal issue. It has as much if not more to do with the subjective feelings of security, discretion, and dignity as any objective measure. Consequently, the only way to determine rigorously whether the presence of transgender

individuals in bathrooms violates the privacy rights and expectations of individuals is to ask.

*Amicus Curiae* conducted a nationally representative survey using the SurveyMonkey/Momentive panel to gauge attitudes and comfort levels of women and men sharing spaces with biological members of the opposite sex who identified as their same-sex. A panel survey is one in which a survey company hires a panel of people to take surveys. This is a very standard, reputable method of obtaining representative numbers about the United States population.[11] In this particular case, the survery was balanced by age and gender, helping to ensure that it matched the demographics of the United States per U.S. Census estimates. The original sample had N=1,058, but to assure quality responses , a quality check question was added to remove bad-faith survey takers. The survey asked "this is a quality check question, please select D." Respondents who did not select D were removed, leaving a final sample size of 928. The poll ran from September 12th to September 13th, 2024.

---

[11] Stantcheva, Stefanie. "How to run surveys: A guide to creating your own identifying variation and revealing the invisible." 15:1 *Annual Review of Economics*, 205 (2023).

This survey showed relevant results indicating the grave privacy violations of the majority of Americans, both male and female, that the presence of transgender individuals in bathrooms, locker rooms, and private spaces will create. Through their own expressions of discomfort, it is almost impossible to deny that their rights will be seriously violated if the Court fails to uphold basic Title IX protections in segregating sensitive facilities.

The questions and their results are reflected below, followed by a brief explanatory discussion.

1. *How comfortable would you feel if a biological member of the opposite sex who identified as a member of your sex <u>saw you</u> undress in the locker room? For example, if you are a man and a biological woman who identifies as a man saw you undress, or if you are a woman and a biological man who identifies as a woman saw you undress?*

| Response | Male % | Female % |
|---|---|---|
| *Very uncomfortable* | 38 | 57 |
| *Somewhat uncomfortable* | 19 | 20 |
| *Somewhat comfortable* | 12 | 12 |
| *Very comfortable* | 30 | 11 |

2. *How comfortable would you feel if <u>you saw</u> a biological member of the opposite sex who identified as a member of your sex undress in the locker room? For example, if you are a man and you saw a biological woman who*

*identifies as a man undress, or if you are a woman and you saw a biological man who identifies as a woman undress?*

| Response | Male % | Female % |
|---|---|---|
| Very uncomfortable | 37 | 52 |
| Somewhat uncomfortable | 21 | 21 |
| Somewhat comfortable | 12 | 15 |
| Very comfortable | 29 | 12 |

3. *Should women in a high school gym class be required to share a shower space with a biological male that identifies as a female?*

| Response | Male % | Female % |
|---|---|---|
| Yes | 36 | 17 |
| No | 54 | 71 |
| Maybe | 10 | 12 |

4. *If a female sports team sleeps over at a hotel while on a tournament trip and the teammates are sharing rooms, should the female teammates be pressured into sharing a room with a biological man who identifies as a woman?*

| Response | Male % | Female % |
|---|---|---|
| Yes, the female teammates should be pressured into sharing a room with a biological man who identifies as a woman | 35 | 20 |
| No, the female teammates should not be pressured into sharing a room with a biological man who identifies as a woman | 65 | 80 |

5. *How comfortable would you feel if a biological man who has male genitalia (penis, testicles), but who identifies as a woman walked around naked in a woman's locker room while there were elementary school-aged girls present?*

| Response | Male % | Female % |
|---|---|---|
| *Very uncomfortable* | 56 | 72 |
| *Somewhat uncomfortable* | 10 | 8 |
| *Somewhat comfortable* | 9 | 9 |
| *Very comfortable* | 25 | 11 |

This survey is very clear. The overwhelming majority of Americans are simply not comfortable with the presence of transgender individuals born into the opposite sex being in their intimate, private spaces. This sense of deep violation is the ultimate affront to one's sense of privacy and therefore basic privacy rights. This deep sense of violation extends both to individuals themselves as well as to individuals' concerns for the privacy rights of their children.

The sexual differences in the survey are remarkable. While majorities of men still support strict biological sex-only spaces, for women the majority is overwhelming. In total, 77% of American women would be uncomfortable and feel their privacy violated if seen undressed by a

person born into the opposite sex. 73% would experience the same violation of privacy if they merely saw a person born into the opposite sex undressed.

In summary, well over 70% of women find a privacy violation regardless of whether they are the ones being exposed or exposing.

When children are involved, the concern is even more drastic. Fully 80% of women are uncomfortable with the presence of someone born into the opposite sex if elementary-aged children are present. In school-aged sports-trips the numbers are the same, with 80% of women saying that female teammates shouldn't be *pressured* into sharing rooms.

Please note the wording used in the above question: these Americans don't simply object to the *requirement* that girls share rooms with people born into the opposite sex, they object even to *the strong suggestion* of this violation of their children's privacy.

These results have also been confirmed by another nationally representative survey conducted by the highly ranked survey firm

SurveyUSA.[12] SurveyUSA conducted this project in 2023 with a sample size of 1,262. They showed that "88% say a female 12-year-old attending a sleep-away summer camp for boys and girls, who has been signed up by her parents for a girls' cabin, should be assigned bunkmates who are female only."[13]

The results of both ours and the SurveyUSA surveys show that women overwhelmingly consider the elimination of single-sex accommodations a violation of their privacy, creating situations where women would be rendered especially vulnerable to violence and its threat. Women's rejection in these cases is not bigoted; it is justified, rational, and its aim is equity. Indeed, destroying this equity and rendering women less secure from violence against women by those who are born male threatens to make victims out of the innocent and undeserving public, inflicted by the hands of the very institution—the government—which is supposed to protect their safety and rights.

---

[12] 538, *538's Pollster Rating*, https://tinyurl.com/2e6p9ffk (last visited Oct. 15, 2024).
[13] SurveyUSA, *Strong Majorities Prefer Female-Only Interactions for Women, Girls in Athletics, Restroom, Other Situations*, https://tinyurl.com/bdf7xyea (last visited Oct. 15, 2024).

## III.  Evidence for Male Violence

*Amicus Curiae*'s survey is one of the strongest direct pieces of evidence that the elimination of Title IX sex-segregation would seriously harm Americans' privacy rights. Experience and studies from other nations and national jurisdictions highlight that this is far from an isolated concern of Americans, but that real cause for concern exists *everywhere* that the boundaries between the sexes are broken down.

In the world of transgender studies, one of the longest and most reliable data sets emerged from Sweden where, at the time of the last in-depth analysis, transgender individuals had been involved in the study for three decades.[14] Because of the length of the study and the large number of subjects, its results provide clear and robust insights into the sociological and psychological conditions of transgender individuals over time and as a group.

One of the most relevant findings of this long-term and highly robust study for our purposes is the criminality rate. As is well-known,

---

[14] Cecilia Dhejna et al. *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6(2) *PLoS One*, https://tinyurl.com/uks8unny (2011).

men commit crimes at vastly higher rates than women.[15] This differential in the propensity to commit crimes, especially of a sexual nature,[16] is a key reason for the segregation of men and women into separate bathrooms and lodging facilities. Because of the tight relationship between privacy and protection from crime, the concern for one's physical security should properly be read as a part of one's privacy rights. Privacy, in other words, intertwines with safety.

According to this study, sexual transition did nothing to abate the higher criminality of those born as men. The study found:

> [R]egarding any crime, male-to-females had a significantly increased risk for crime compared to female controls (aHR 6.6; 95% CI 4.1–10.8) but not compared to males (aHR 0.8; 95% CI 0.5–1.2). This indicates that they retained a male pattern regarding criminality. The same was true regarding violent crime. By contrast, female-to-males had higher crime rates than female controls (aHR 4.1; 95% CI 2.5–6.9) but did not differ from male controls. This indicates a shift to a male pattern regarding criminality and that sex reassignment is coupled to increased crime rate in female-to-males. *The same was true regarding violent crime.* (Emphasis added)[17]

In other words, while men remain just as violent after their transition,

---

[15] FBI 2019 Crime Statistics.

[16] *See* Gartner.

[17] *Id*

women become more violent after theirs and in no case does violence decrease.

These results paint a very unfortunate picture for women who identify as such, as they face the potential of increased violence when exposed to anyone who has undergone serious exposure to testosterone. Hardly a ringing endorsement for joining the sexes.

A non-scientific, but still rigorous study by the British newspaper *The Times* confirms the legitimate safety concerns of women who share spaces with men.[18] They found that "[u]nisex changing rooms are more dangerous for women and girls than single-sex facilities…Almost 90% of reported sexual assaults, harassment, voyeurism in swimming pool and sports-centre (sic) changing rooms happen in unisex facilities, which make up less than half the total."[19]

Of a total of 134 complaints reported across Britain in 2017-2018, 120 occurred in unisex changing rooms while only 14 occurred in single-sex rooms.[20] "The data emerged four days after Darren Johnson, a serial

---

[18] Andrew Gilligan, Unisex changing rooms put women in danger, *The Times* Sep. 2, 2018, available at https://tinyurl.com/4f9d7fzb.
[19] *Id.*
[20] *Id.*

voyeur, was sentenced to 16 months' imprisonment after stalking schoolgirls in the mixed changing area of a Putney leisure centre (sic)."[21]

In other words, while the sexually offending male-to-female transgender inmate may not characterize all or even most transgender individuals, neither is it a myth; it remains a reality that threatens the majority who identify with their birth sex.

## Conclusion

The results of *Amicis Curiae*'s survey and a cursory survey of other data sources available vindicate the common-sense and long-held position that intimate spaces should be segregated by sex. Not only do the majorities of both men and women (but especially women) view this segregation as an essential part of their right to privacy and physical safety, but the violation of this segregation can result in the expected harms to women who stand to suffer increased chances of sexual assault when exposed to men who transition to become women.

This Survey is particularly important to reflect the otherwise silent majority—those who use bathrooms, locker rooms, and other private

---

[21] *Id.*

facilities who oppose being exposed to individuals who are different than themselves in the most intimate ways and from whom they have legitimate fears in their exposure.

To strike down the Title IX protections of women and men who make up the vast majority of the American public (over 99%, in fact), to support the perceived needs of a very small minority (less than 1%) cannot be anything but a serious violation of their Constitutional rights to privacy, safety, and perhaps, in an extreme circumstance, even life itself.

DATED this 15th day of October, 2024.

Respectfully submitted,

/s/ Ryan M. Lawson
Ryan M. Lawson
1818 LAW FIRM, PLLC
217 Main Street
Williamsburg, KY 40769
833-844-1818
*ryan@1818lawfirm.com*

COUNSEL FOR *AMICUS CURIAE*

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 3,585 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a monospaced typeface using Microsoft Word with Century Schoolbook 14-point font in text and in footnotes.


/s/ Ryan M. Lawson
Ryan M. Lawson

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, an electronic copy of the foregoing brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Ryan M. Lawson
Ryan M. Lawson