No. 24-3097

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

_____

STATE OF KANSAS, et al.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants.*

_____

On Appeal from an Order of the
United States District Court for District of Kansas
Case No. 24-cv-4041, Hon. John W. Broomes

_____

BRIEF OF *AMICI CURIAE* THE CENTER FOR RELIGION,
CULTURE, AND DEMOCRACY AND 30 SCHOLARS
IN SUPPORT OF APPELLEES

_____

Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway,
Suite 1600
Plano, TX 75075
972-941-4444
jdys@firstliberty.org

Camille P. Varone
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
202-921-4105
cvarone@firstliberty.org

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................ 1

DISCLOSURE STATEMENT .................................................................. 3

ARGUMENT ........................................................................................ 4

I.  SCHOOL CHILDREN WILL FACE THE CLASSIC TRILEMMA
    THAT MOTIVATES RIGHTS TO SILENCE FOUND
    THROUGHOUT OUR LAW. ............................................................ 4

    A.  The Trilemma ........................................................................ 6

    B.  The History of the Right to Silence. ...................................... 7

    C.  Liberties Undergirding the Right to Silence ......................... 13

II. CONSTITUTIONAL, STATUTORY, AND COMMON LAW
    PROTECTIONS AFFIRM THE FOUNDATIONAL ROLE OF
    THE RIGHT NOT TO SPEAK ........................................................ 15

    A.  Absolute Rights to Silence ................................................... 16

        1.  The right against self-incrimination ............................... 16

        2.  The common law right to privacy ................................... 17

        3.  Constitutional bans on religious tests for office ............. 19

        4.  Testimonial and confidentiality privileges ..................... 20

    B.  Presumptive Liberties Not to Speak ..................................... 22

        1.  *Caveat emptor* .............................................................. 23

        2.  No duty to disclose generally ......................................... 23

3. Trade secret rights ............................................. 24

4. Thousands more liberties of silence ................................. 24

C. Silent Conduct as Legal Power ............................................. 25

1. Universal assumpsit (public accommodations)............... 25

2. Implied acceptance of tendered goods ............................. 26

3. Apparent authority or agency.......................................... 26

4. Consent to a tort by conduct, custom, or usage .............. 27

5. Common law marriage ...................................................... 27

6. Creation of a bailment...................................................... 28

III. THE LAW CONTAINS NO GENERAL DUTY TO SPEAK AND ONLY RARELY REQUIRES SPEECH ......................................... 29

A. The Right to Silence Contrasted with Formal Limitations on Powers to Speak ............................................................... 29

B. No General Duty to Speak ..................................................... 30

C. Even the Duty to Testify is Narrowly Circumscribed ......... 31

D. In Sum, the Law Privileges Silence ..................................... 33

CONCLUSION ........................................................................ 34

APPENDIX – List of *Amici Curiae* Scholars .................................. App. 1

# TABLE OF AUTHORITIES

## Cases

*Armored Car Servs., Inc. v. First Nat'l Bank of Miami,*
114 So.2d 431 (Ct. App. Fla. 1959) ....................................................... 28

*Bunnell v. Stern,*
25 N.E. 910 (N.Y. 1890) .......................................................................... 28

*Eisenstadt v. Baird,*
405 U.S. 438 (1972) .................................................................................. 12

*Entick v. Carrington,*
[1765] 95 Eng. Rep. 807 (C.P.) .............................................................. 12

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985) .................................................................................. 18

*Kastigar v. United States,*
406 U.S. 441 (1972) .................................................................................. 31

*Laidlaw v. Organ,*
15 U.S. 178 (1817) .................................................................................... 23

*Millar v. Taylor,*
[1769] 98 Eng. Rep. 201 (K.B.) .............................................................. 17

*Mullen v. United States,*
263 F.2d 275 (D.C. Cir. 1958) ................................................................ 21

*Murphy v. Holland,*
237 Va. 212, 377 S.E.2d 363 (1989) ...................................................... 28

*Murphy v. Waterfront Comm'n of N.Y. Harbor,*
378 U.S. 52 (1964) .................................................................................... 13

*Nestle v. Commonwealth*,
   22 Va. App. 336, 470 S.E.2d 133 (Ct. App. Va. 1996) ......................... 9

*People v. Phillips* (N.Y. Ct. Gen. Session 1813),
   *as reported in* 1 Cath. Law. 199 (1955)............................................... 21

*Roe v. Wade*,
   410 U.S. 113 (1973)............................................................................. 12

*Scott v. Hammock*,
   870 P.2d 947 (Utah 1994) ...................................................................... 9

*Serv. Oil Co. v. White*,
   542 P.2d 652 (Kan. 1975)..................................................................... 23

*Spectrum Sys. Int'l Corp. v. Chemical Bank*,
   581 N.E.2d 1055 (N.Y. 1991) ............................................................... 22

*The Clandeboye*,
   70 F. 631 (4th Cir. 1895)...................................................................... 23

*Trammel v. United States*,
   445 U.S. 40 (1980)............................................................................... 20

*Vlaming v. W. Point Sch. Bd.*,
   895 S.E.2d 705 (Va. 2023) ................................................................... 15

*Woolsey v. Judd*,
   11 How. Pr. 49 (N.Y. Super. Ct. 1855)................................................. 18

## Constitution and Statutes

U.S. Const. amend. V ................................................................................ 16

U.S. Const. art. VI, cl. 3 ........................................................................... 19

## Other Authorities

Albert W. Alschuler, *A Peculiar Privilege in* Historical Perspective:
The Right to Remain Silent, 94 Mich. L. Rev. 2625
(1996) ................................................................. 9, 10, 14, 17

1 William Blackstone, *Commentaries* (1765) ................................ 7, 10, 27

3 William Blackstone, *Commentaries* (1765) ........................................... 25

Gerard V. Bradley, *The No Religious Test Clause and the
Constitution of Religious Liberty: A Machine That Has Gone of
Itself*, 37 Case W. Res. L. Rev. 674 (1986) ........................................... 19

Ray Andrews Brown, *The Law of Personal Property* (3d ed., Walter
B. Rauschenbush, ed. 1975) ................................................................ 28

H. Tomás Gómez-Arostegui, *Copyright at Common Law in 1774*,
47 Conn. L. Rev. 1 (2014) ................................................................ 12

R.H. Helmholz, *Origins of the Privilege Against Self-Incrimination:
The Role of the European Ius Commune*, 65 N.Y.U. L. Rev. 962
(1990) .................................................................. 7, 10, 13, 14

R.H. Helmholz, *Roman Canon Law in Reformation England* (1990)...... 8

Edward J. Imwinkelreid, *The New Wigmore: A Treatise on Evidence*
(4th ed. 2021)............................................................... 8, 13, 21

Adam J. MacLeod, *The First Amendment, Discrimination, and
Public Accommodations at Common Law*,
112 Kentucky L.J. 209 (2024)....................................................... 25, 26

Milton Meltzer, *The Right to Remain Silent* (1972)
 ............................................................... 10, 11, 14, 16, 17, 31

Thomas W. Merrill & Henry E. Smith*, The Oxford Introductions to
U.S. Law: Property* (2010) ................................................................ 25

E.M. Morgan, *The Privilege Against Self-Incrimination*,
34 Minn. L. Rev. 1 (1949) .............................................................. 10, 11

Note, *An Originalist Analysis of the No Religious Test Clause*,
120 Harv. L. Rev. 1649 (2007) ............................................................ 20

Gregory W. O'Reilly, *England Limits the Right to Silence and Moves
Toward an Inquisitorial System of Justice*, 85 J. Crim. L. &
Criminology 402 (1994) ........................................................................ 10

William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383 (1960) ........................ 19

Prosser and Keeton on the Law of Torts (5th ed. 1984) ............. 23, 24, 27

Seward Reese, *Confidential Communications to the Clergy*,
24 Ohio St. L.J. 55 (1963) .................................................................... 9

Restatement (Third) Agency (2006) ........................................................ 27

Zvi S. Rosen, *Common-Law Copyright*, 85 U. Cin. L. Rev. 1055
(2018) .............................................................................................. 18, 19

Irene Merker Rosenberg & Yale L. Rosenberg, *In the Beginning:
The Talmudic Rule Against Self Incrimination*, 63 N.Y.U. L. Rev.
955 (1988) ............................................................................................. 9

Eric Schnapper, *Unreasonable Searches and Seizures of Papers*,
71 Va. L. Rev. 869 (1985) .......................................................... 12, 17, 18

Ned Snow, *A Copyright Conundrum: Protecting Email Privacy*,
55 U. Kan. L. Rev. 501 (2007) ............................................................ 19

2 Joseph Story, *Commentaries on the Constitution of the United
States* (4th ed., Boston, Little, Brown 1858) ...................................... 18

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*,
4 Harv. L. Rev. 198 (1890) .......................................................... 12, 17

vi

John Henry Wigmore, *Evidence in Trials at Common Law*
(John T. McNaughten rev. 1961) ................................. 10, 11, 24, 31, 32

Bradford Wilson, *The Origin and Development of the Federal Rule of Exclusion*, 18 Wake Forest L. Rev. 1073 (1982) .................................. 18

## INTERESTS OF *AMICI CURIAE*[1]

*Amicus curiae* the Center for Religion, Culture and Democracy ("CRCD") supports the creation and promotion of scholarship at the intersection of religion, culture, and democracy. *Amici curiae* scholars[2]—several of whom are fellows for CRCD—are experts in various fields, including American constitutionalism, law, and history, among other disciplines. These scholars write and teach about the fundamental maxims, doctrines, and rights that undergird our legal system. Each scholar *amicus* has an interest in remaining free to speak the truth or not speak in his or her scholarship and classroom.

CRCD and these scholars share a concern not only about the implications of this case for religious freedom in America but also about its impact upon the law's general liberty of silence, which facilitates and secures a number of constitutional, statutory, and common law rights. This liberty of silence protects many interests, including: preventing

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than *amici curiae*, its members, or its counsel contributed money intended to fund preparation or submission of this brief.
[2] See Appendix to Brief *Amici Curiae* for a list of *amici* scholars.

officials from leading people to lie or to betray themselves; guarding confidential and fiduciary relationships; ensuring the sanctity of moral and religious conscience; safeguarding dissenters; promoting the efficient crafting and enforcement of contracts; disincentivizing fraud; and advancing the just administration of equity. Therefore, *amici* have an interest in the outcome of this proceeding.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Center for Religion, Culture and Democracy certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

In Oklahoma, teenager K.R. faces a difficult dilemma. She must choose between freely speaking and compliance with federal law. Compelling her to use preferred pronouns and names would be a lie and violate her faith. But the law does not permit her to stay silent: it seeks her affirmative speech.   Under the Final Rule, students across the country face a similar choice.

## ARGUMENT

## I. SCHOOL CHILDREN WILL FACE THE CLASSIC TRILEMMA THAT MOTIVATES RIGHTS TO SILENCE FOUND THROUGHOUT OUR LAW.

In a world full of words hastily spoken, silence is golden. American law reflects this timeless truth. Though less famous (and less audible) than its cousin freedom of expression, the right *not* to speak is equally as fundamental. Indeed, while we commonly think of the right to silence as undergirding the First Amendment's protection against compelled speech and the Fifth Amendment's protection against self-incrimination, the liberty of silence appears in many other areas of the law. Some, such as the spousal testimonial privileges and the confessional seal between clergy and their religious congregants, derive directly from the same jurisprudential principles, maxims, and canons as the rights against

oath-taking and self-incrimination. Others, such as the freedom of the press not to disclose their sources and the right of privacy in personal information, derive from the absolute common law right of secrecy that gave us common law copyright. Still others, such as the right to accept tendered goods without expressly endorsing their quality, originate in other sources of law but have the added benefit of protecting the pervasive, fundamental liberty not to speak.

These rights to remain silent are justified and animated by a small number of familiar legal principles and doctrines. They are not arbitrary. They are connected. They are designed to release a person from the trilemma of falsehood, betrayal (of self or another), or legal sanction. When viewed together with many other powers, immunities, and liberties of silence that can be found throughout the law, these varied rights appear as instances of the law's general inclination—presumptive in some instances and robustly absolute in others—to favor silence and to protect those who want to leave certain things unsaid. Indeed, the right to refrain from speaking so pervades the entire law that it is easily taken for granted. Only when government places it in jeopardy, as the U.S. Department of Education ("DOE") did in this case, do we really

notice it. Rather than compel individuals to communicate a proposition that they believe to be untrue, our law is inclined to leave them free to say nothing about the matter.

As this Court considers the constitutional ramifications of the DOE's Final Rule[3], understanding the place of silence in the law is critical. Given the historic roots and pervasive impact of the right to silence, along with the significant interests that this right protects— among them, freedom of speech and freedom of religion—the Court should affirm the ruling of the court below.

## A. The Trilemma

The Final Rule forces school children to refer to transgender students by the students' preferred pronouns or else risk investigation or discipline. This mandate requires students to choose among three bad options: self-betrayal, falsehood, or sanctions. They may either betray themselves as heretical dissenters from gender ideology, betray their religious convictions by agreeing to use the preferred pronouns, or face punishment for remaining silent. Constitutional, statutory, and common

---

[3] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106).

law assiduously avoid putting people in a position where the only way to avoid sanction is to say something they know to be false.

### B. The History of the Right to Silence

The right not to speak—that is, the right to silence—is not a recent invention but an indispensable foundation stone in the edifice of Anglo-American law and constitutionalism. For centuries, this right has been part of the common law, securing the presumption of innocence, freedom of the press, liberty of conscience, private property rights, and other fundamental liberties. Blackstone taught that the authority of the maxim justifying the right—that "no man shall be bound to accuse himself"—lies in immemorial custom and usage. 1 William Blackstone, *Commentaries* *68 (1765).

The right extends well beyond English common law. What legal historian Richard Helmholz calls "protection against intrusive questioning into one's private conduct and opinions by officious magistrates" has long been part of the general *ius commune*—the common law of all nations. R.H. Helmholz, *Origins of the Privilege Against Self Incrimination: The Role of the European Ius Commune*, 65 N.Y.U. L. Rev. 962, 988 (1990). Some confidential privileges such as the

clergy-penitent and attorney-client privileges—in essence, rights of a witness to remain silent in legal proceedings—originated in Roman law. Edward J. Imwinkelried, *The New Wigmore: A Treatise on Evidence* § 6.2.3 at 661, § 6.2.4 at 663 (4th ed. 2021).

"Roman law not only excluded confessions from evidence but also punished any priest who revealed a confession." Imwinkelried, *supra*, at § 6.2.3 at 661. The private "penitential forum" behind the confessional seal came from Roman and canon law into the common law because English ecclesiastical courts took it as given. *See* R.H. Helmholz, *Roman Canon Law in Reformation England* 113-14 (1990). The privilege fell out of favor during the fervent disruptions of the Protestant Reformation, with a resulting "expansion of human conduct being punished" by courts, as "[c]onduct that had once been sorted out privately now gave rise to public controversy." *Id*. at 113. Indeed, the loss of the penitential forum, combined with Puritan zeal to enforce Sabbath laws, duties of sexual chastity, and other religious obligations, caused all sorts of private confessions to be asserted in public courts during the tumultuous sixteenth century. *See id*. at 109-17.

The right to keep religious confessions private later re-emerged in in the early 1800s in the United States as Puritanical zeal lost its cultural dominance. *See, e.g.*, *Scott v. Hammock*, 870 P.2d 947, 951-52 (Utah 1994) (explaining history of clergy-penitent privilege); *see generally*, Seward Reese, *Confidential Communications to the Clergy*, 24 Ohio St. L.J. 55 (1963). All fifty states now recognize the privilege by statute. *Nestle v. Commonwealth*, 470 S.E.2d 133, 138 (Ct. App. Va. 1996).

The right of the accused to remain silent in judicial proceedings originated in ancient Jewish and Christian teachings about human dignity and conscience. *See* Albert W. Alschuler, *A Peculiar Privilege in Historical Perspective: The Right to Remain Silent*, 94 Mich. L. Rev. 2625, 2638-40 & n.52 (1996). The Talmudic principle is "that no man may render himself an evil person." Irene Merker Rosenberg & Yale L. Rosenberg, *In the Beginning: The Talmudic Rule Against Self Incrimination*, 63 N.Y.U. L. Rev. 955, 956 (1988). The Christian version appeared early in the fourth century when, in a commentary on an Epistle to the Hebrews often attributed to the first century apostle Saint Paul, John Chrysostom wrote, "I do not say to you that you should betray yourself in public nor accuse yourself before others, but that you obey the

prophet when he said, Reveal your ways unto the Lord." R.H. Helmholz, *Origins, supra*, at 982. Gratian's Decretum in the twelfth century affirmed that principle, *id.*, and a century later the Decretals of Pope Gregory IX stated that no one may "be forced to respond since no one is bound to betray himself," *id.* at 967 & n.26. The incorporation of the right to silence into Western law culminated in the maxim that "no man shall be bound to accuse himself." 1 Blackstone, *supra*, at *68; Alschuler, at 2639-41, 2648-49.

While the right of silence took shape in the ancient *ius commune*, it attained its present constitutional status in Anglo-American jurisprudence during the formative centuries before and after the English Civil War. *See, e.g.*, E.M. Morgan, *The Privilege Against Self-Incrimination*, 34 Minn. L. Rev. 1 (1949); *see also* Milton Meltzer, *The Right to Remain Silent* 21-75 (1972). English lawyers invoked it as an important security against the unjust excesses of Star Chamber and the Court of High Commission. *See* Morgan, *supra*, at 6-12; Helmholz, *Origins*, *supra*, at 965-67, 975-80, 987-89; 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2250 at 270-91 (John T. McNaughten rev. 1961); Gregory W. O'Reilly, *England Limits the Right*

*to Silence and Moves Towards an Inquisitorial System of Justice*, 85 J. Crim. L. & Criminology 402, 407-19 (1994). Wigmore opined that the consistent assertion of the right was motivated by the rise of Archbishop Whitgift in 1583, who was "determined to crush heresy wherever its head was raised." 8 Wigmore, *supra*, at § 2250 at 279. When Sir Edward Coke rose first to Chief Justice of Common Pleas and then to Chief Justice of King's Bench in 1613, he established the right to silence in a series of contests with the Star Chamber and High Commission. *Id*. at § 2250 at 280-82; Morgan, *supra*, at 7-8; Meltzer, *supra*, at 54-57. By the time Parliament set aside the judgment against John Lilburn following his famous trial, English lawyers accepted his argument that it is "contrary to the laws of God, nature, and the kingdom for any man to be his own accuser … illegal and most unjust, against the liberty of the subject and law of the land and Magna Charta." 8 Wigmore, *supra*, § 2250 at 282-84; *see also* Meltzer, *supra*, at 58-75.

Another venerable common law source of the right to silence is the doctrine that became known as the right to privacy, which earlier was

called common law copyright.[4] This right to privacy is a right to keep one's written expressions and personal information to oneself. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 198-204 (1890). It is a fundamental, common law right, grounded in immemorial usage and custom, in contrast with the statutory privilege of copyright protection in intellectual works after publication, which is contingent upon statutory law. Indeed, English courts, which declared the right in landmark decisions in the eighteenth century, *see generally* H. Tomás Gómez-Arostegui, *Copyright at Common Law in 1774*, 47 Conn. L. Rev. 1 (2014), dated its authority at least as far back as Magna Carta, *see* Eric Schnapper, *Unreasonable Searches and Seizures of Papers*, 71 Va. L. Rev. 869, 912 (1985).

The fundamental right to privacy did its best work following the English Revolution in securing privacy of opinion against the incursions of powerful orthodoxies and political views. In *Entick v. Carrington*

---

[4] Today, the term "right to privacy" is associated with the judicially created doctrine of substantive due process, as laid out in cases such as *Eisenstadt v. Baird*, 405 U.S. 438 (1972), and *Roe v. Wade*, 410 U.S. 113 (1973). But the fundamental common law secured a right to privacy long before the Supreme Court considered challenges to contraception and abortion laws. *See generally* Warren & Brandeis, *supra*, at 195-202.

[1765] 95 Eng. Rep. 807 (C.P.), and other decisions, common law judges declared the right an important security for political dissenters and reporters of facts or opinions that proved inconvenient to powerful elites.

## C. Liberties Undergirding the Right to Silence

As this history demonstrates, the chief purpose of the right to silence is to prevent officials from leading people to lie or to betray themselves—behavior that would implicate both free exercise and free speech concerns. The right to silence enables the law to avoid what jurists have called a moral trilemma, in which telling the truth, telling a lie, or remaining silent are all equally bad outcomes. *See Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964); Helmholz, *Origins*, *supra*, at 983 & n.101. The right to silence also serves several subsidiary concerns, such as due process and the presumption of innocence, religious liberty, the sanctity of private domains within society and lawful expectations of privacy, the efficiency that results from an economy of words, the value of confidential information, and the sanctity of fiduciary relations and other relationships of trust. *See Murphy*, 378 U.S. at 55; Imwinkelried, *supra*, at § 5.3.3 at 447-511, § 6.2.3 at 662-63.

13

The concern motivating the development of the right to silence in the criminal context is truthfulness and integrity of the soul, that a person not be forced to choose between lying and accusing himself. *See* Helmholz, *Origins*, *supra*, at 982-83. So strong is the law's insistence that it not lead an accused into speaking falsehood that, for some time, English courts *forbade* the accused from testifying in his own proceeding under oath, lest he perjure himself to the jeopardy of his soul. *See* Alschuler, *supra*, at 2645.

The right to silence also protects the rights of the dissenter. When the U.S. Congress considered the Bill of Rights, the right of an accused not to testify against himself was regarded as so self-evident that no one spoke a word against the Fifth Amendment. *See* Meltzer, *supra*, at 87. The right against self-incrimination was viewed as "the citizen's defense against government oppression. Without such fair procedure to protect the accused, a despot could crush all opposition. The pages of history reddened by the blood of heretics, dissenters, and nonconformists were argument enough for the Fifth Amendment." *Id.*

During the Medieval and early Modern eras, the threat of criminal or ecclesiastical sanction was the most pressing threat to truthfulness

and integrity. Today, people face other sanctions for refusing to speak their opinions, quite apart from any criminal prosecution. *See, e.g.*, *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 712-13 (Va. 2023) (schoolteacher lost job when he declined to refer to transgender student by government-mandated pronouns, despite agreeing to use the student's preferred name). The right to silence can protect Americans from that threat, just as it has protected minority views and opinions for centuries.

## II.    CONSTITUTIONAL, STATUTORY, AND COMMON LAW PROTECTIONS AFFIRM THE FOUNDATIONAL ROLE OF THE RIGHT NOT TO SPEAK.

Like most maxims of fundamental law, "no man shall be bound to accuse himself" has wide application throughout the law, resulting in specific liberties of silence in what we today call criminal and civil law. The right shows up wherever the threat of legal sanction or liability might tempt someone to communicate what he understands to be false.

Anglo-American law secures the right to silence in three forms: First and most prominently, the law recognizes a categorical, immunized, and absolute liberty not to speak in some contexts. Second, the law recognizes a defeasible liberty not to speak, which is the absence of a duty

to speak. Third, the law recognizes a power to communicate by acts of silence rather than by express affirmation or renunciation.[5]

## A. Absolute Rights to Silence

The right to silence is best known as an absolute, immunized liberty protecting the criminally accused from having to choose between perjury and self-incrimination. Yet the right is not confined to criminal prosecutions. Other examples include the common law copyright, testimonial privileges, and protections against religious tests and oath-taking requirements.

### 1. The right against self-incrimination

The most famous example is the right against self-incrimination, known to generations of crime drama viewers as the right to remain silent—a right reflected not only in the constitutions of most states but also in the Bill of Rights. Meltzer, *supra*, at 85. The Fifth Amendment to the United States Constitution extends the common law right to the entire criminal proceeding, creating "an absolute privilege, one that no

---

[5] The examples in the categories below are not comprehensive, and this Court will undoubtedly call to mind examples not mentioned in this brief. Yet even this limited list demonstrates that the right to silence is not isolated but rather pervades the legal fabric of our country.

evidentiary showing can overcome." Alschuler, *supra*, at 2647. "[T]he right to silence is meant to shield innocent and guilty alike [f]rom arbitrary rule [and] official lawlessness." Meltzer, *supra*, at 16.

## 2. The common law right to privacy

As mentioned above, the common law privacy right is primarily a right to keep secret one's writings, papers, and other personal expressions. It cannot be abrogated without the consent of the person whose sentiments are at issue. More than a century ago, Warren and Brandeis described the breadth and strength of the right, saying:

> Neither does the existence of the right depend upon the nature or value of the thought or emotion, nor upon the excellence of the means of expression. The same protection is accorded to a casual letter or an entry in a diary and to the most valuable poem or essay, to a botch or daub and to a masterpiece. In every such case the individual is entitled to decide whether that which is his shall be given to the public.

Warren & Brandeis, *supra*, at 199.

The right is absolute and strongly immunized. *Millar v. Taylor* [1769] 98 Eng. Rep. 201, 242 (K.B.). The common law privacy right began as an "absolute immunity of certain property from search or seizure." Schnapper, *supra*, at 876. Congress's extension of copyright protection *after* first publication did not diminish the older, absolute, common law

17

right. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552-54 (1985). It remains one of the strongest rights in American law. As a New York court observed half a century after the first Copyright Act, "The right is still absolute and exclusive; and so long as the manuscript may exist unpublished, and its author or his representatives may choose, perpetual." *Woolsey v. Judd*, 11 How. Pr. 49, 56 (N.Y. Super. Ct. 1855). It remains "absolute as well as unlimited." *Id.* at 58.

American law secures this right to privacy in a variety of particular legal doctrines, including the Fourth Amendment's prohibition against unreasonable searches and seizures of houses, papers, and effects, *see* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1902 at 662 (4th ed., Boston, Little, Brown 1858); Bradford Wilson, *The Origin and Development of the Federal Rule of Exclusion*, 18 Wake Forest L. Rev. 1073, 1077-81 (1982), the common law freedom of the press that the Fourth Amendment declares, *see* Schnapper, *supra*, at 870-71, 928, and the common law copyright, *see generally* Zvi S. Rosen, *Common-Law Copyright*, 85 U. Cin. L. Rev. 1055 (2018).

In the early twentieth century, as technology changed rapidly, the right expanded along with the technology and blocked efforts to

eavesdrop, access financial records, and acquire personal health information. *See* William L. Prosser, *Privacy*, 48 Cal. L. Rev. 383, 389-92 (1960). The right can now be turned to meet the challenges of new technologies such as email correspondence and Internet broadcasting. *See generally* Ned Snow, *A Copyright Conundrum: Protecting Email Privacy*, 55 U. Kan. L. Rev. 501 (2007); Rosen, *supra*, at 1100-17. It can certainly protect spoken words and private thoughts.

### 3. Constitutional bans on religious tests for office

While most provisions of the federal Constitution and various state constitutions declare fundamental rights that are long-settled in the common law, the Constitution's ban on religious tests "as a Qualification to any Office or public Trust under the United States," U.S. Const. art. VI, cl. 3, was truly innovative. The Federalists' solution to the problem of contending religious factions within a pluralistic nation was to allow a person assuming national office to remain silent concerning matters of religious conscience. *See* Gerard V. Bradley, *The No Religious Test Clause and the Constitution of Religious Liberty: A Machine That Has Gone of Itself*, 37 Case W. Res. L. Rev. 674, 702 (1986). This provision has played a quiet part in securing the "conditions of religious pluralism," a "key cog

in the apparatus" of religious liberty in a constitutional "machine which would run by itself." *Id.* at 678-79, 720.

Similarly, the Constitution's allowance for an office holder to make an affirmation rather than swear an oath, art. VI, cl. 3, was designed to accommodate the convictions of minority religious sects, such as the Quakers, by allowing them *not* to speak words that they could not speak in good conscience. *See* Note, *An Originalist Analysis of the No Religious Test Clause*, 120 Harv. L. Rev. 1649, 1657 (2007).

### 4. Testimonial and confidentiality privileges

Other examples of the absolute right of silence include testimonial privileges. Rather than suppress the truth, these privileges protect confidential relationships and encourage candor and truthfulness in those relationships.

**Spousal Privileges:** The law still secures two spousal privileges— the spousal immunity privilege and the marital communication privilege—to protect the "harmony and sanctity" of a marriage. *Trammel v. United States*, 445 U.S. 40, 44 (1980). In some states, a similar privilege disallows testimony by an unemancipated child against his or her

parents in criminal proceedings or prohibits revealing confidential parent-child communications. Imwinkelried, *supra*, at § 6.2.2.

**Clergy-Penitent Privilege:** The clergy-penitent privilege safeguards religious liberty. *See Mullen v. United States*, 263 F.2d 275, 277-80 (D.C. Cir. 1958); Imwinkelried, *supra*, at § 6.2.3 at 662. The privilege also guards the same sanctity of mind and soul that an accused enjoys in criminal prosecutions. As a New York court explained in excusing a clergyman from answering a grand jury, the "mild and just principles of the common law" avoid placing a witness "in such a horrible dilemma, between perjury and false swearing."

> If he tells the truth he violates his ecclesiastical oath—If he prevaricates he violates his judicial oath—Whether he lies, or whether he testifies the truth he is wicked, and it is impossible for him to act without acting against the laws of rectitude and the light of conscience. The only course is, for the court to declare that he shall not testify or act at all.

*People v. Phillips* (N.Y. Ct. Gen. Sess. 1813), *as reported in* 1 Cath. Law. 199, 201, 203 (1955).

**Other Confidentiality Privileges:** The law also preserves confidentiality within other relationships of trust, such as those between an attorney and client, Imwinkelried, *supra*, at § 6.2.4, accountant and client, *id.*, at § 6.2.5, and physician and patient, *id.*, at § 6.2.6. These

privileges also operate as immunized liberties not to testify, which secure the duty of the fiduciary—the lawyer, physician, or counselor—not to disclose the communication. Unless the client or patient waives the privilege, such as by placing the communication at issue in a legal proceeding, *see Lee v. Calhoun*, 948 F.2d 1162, 1167 (10th Cir. 1991), or by disclosing it, *see United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir. 1989), the liberty and duty not to disclose the confidential communications are immunized and, in some cases, absolute. *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 581 N.E.2d 1055, 1059-61 (N.Y. 1991) (describing difference between "absolute immunity" afforded to privileges recognized at common law, such as attorney-client privilege, and presumptive privileges such as that covering trial preparation work product).

### B. Presumptive Liberties Not to Speak

Though less robust than the absolute or immunized liberties of silence, other liberties not to speak appear throughout the law. Presumptive liberties of silence disincentivize fraud, perjury, and other acts of dishonesty by removing any legal motivation to speak where speaking would be directly adverse to one's interests.

### 1. *Caveat emptor*

Some liberties have developed legal doctrines to define and protect them. One common example is the absence of a duty to make warranties about one's home or real estate to a prospective purchaser, known as the doctrine of *caveat emptor*, or "buyer beware." *See, e.g.*, *Serv. Oil Co. v. White*, 542 P.2d 652, 659 (Kan. 1975). Someone selling real estate has no general duty to disclose characteristics of the *res* that might make it unfit for the purchaser's purposes. *See id*.

### 2. No duty to disclose generally

Contract and tort law also privilege silence in the absence of wrongdoing. It is well-established that neither a vendor nor a vendee of land, goods, or services has a duty in tort or contract to disclose to the other extrinsic intelligence that might affect the price of goods under consideration, and a failure to disclose will constitute neither breach nor deceit. *See Laidlaw v. Organ*, 15 U.S. 178 (1817). Of course, a duty to disclose may derive from a relationship of trust or an actual disclosure. *See, e.g.*, *The Clandeboye*, 70 F. 631, 636-36 (4th Cir. 1895); Prosser and Keeton on the Law of Torts 738-40 (5th ed. 1984). But where negotiating parties meet on equal footing, "so long as one adversary does not actively

mislead another, he is perfectly free to take advantage, no matter how unfair, of ignorance." Prosser and Keeton, *supra*, at 737-38.

### 3. Trade secret rights

Trade secrecy is another instance of the right secured by established legal doctrines. *See* 18 U.S.C. § 1833(b). Though defeasible, the trade secret right is a complex and active right, protected by a qualified privilege in evidence law. 8 Wigmore, at § 2212 at 155-59.

### 4. Thousands more liberties of silence

The preceding examples are just three instances of a broad liberty that stretches across both public and private life and touches thousands of subject matters. It is easy to overlook its pervasiveness because the liberty of silence is characterized by the absence of any law requiring disclosure or speech on the subject, and the *absence* of law seldom attracts the attention it deserves. On the vast range of matters that human minds daily consider, no law compels a person to disclose his or her thoughts. The absence of laws requiring such disclosures reflects the common law's general, favorable posture toward freedom not to speak.

### C. Silent Conduct as Legal Power

In many contexts, the law attributes a particular legal meaning to silence—either assent or a lack of assent—rather than require a person to disclose her mind. This frees a person to establish rights or duties without having to choose between expressly affirming or renouncing a particular proposition as true or false.

This is important where a person has sound reasons to accept an obligation *and* has sound reasons to refuse to accept propositional truths that may be inferred from the obligation.

### 1. Universal assumpsit (public accommodations)

The power to license entries is one of the essential incidents of property ownership. Property owners may create licenses not only by specific invitation, *see* Thomas W. Merrill & Henry E. Smith, *The Oxford Introductions to U.S. Law: Property* 85-87 (2010), but also by silent acts. Significantly, a property owner may convey to the entire public a universal license to enter by opening her property as a business or place of public accommodation. *See* 3 Blackstone, *supra*, at *164; Adam J. MacLeod, *The First Amendment, Discrimination, and Public Accommodations at Common Law*, 112 Kentucky L.J. 209 (2024). This

does not require an express invitation to each person. Rather, the scope of the license is determined by the purposes of the business. *See* MacLeod, *supra*, at 224-25. Only if the owner wants to terminate the license for some good reason must she explain her reasoning. *Id.* at 253-60.

### 2. Implied acceptance of tendered goods

Buyers of goods may accept tendered goods by silent acts. A contract for the sale of goods is performed once the seller tenders goods and the purchaser accepts. The purchaser may accept the tender either expressly or by retaining the goods without objecting within a reasonable time period. *See, e.g.*, U.C.C. § 2-606 (Am. L. Inst. & Unif. L. Comm'n 2023); *Parkwood Lumber, Inc. v. Rivisco, Inc.*, 205 F.3d 1324 (2d Cir. 2000). This power to accept tender of goods without expressly endorsing their quality is well-established in the law and is an indispensable legal tool by which commerce is conducted.

### 3. Apparent authority or agency

Under long-settled doctrine, legal agency can be created by an apparent conferral of agency, without expression, where the principal acts in such a way that a third party would reasonably infer agency. *See Am. Nat'l Bank of Sapulpa v. Bartlett*, 40 F.2d 21, 24-25 (10th Cir. 1930).

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) Agency § 2.03 (2006).

### 4. Consent to a tort by conduct, custom, or usage

A person may consent to an activity that would otherwise be a tort. Prosser and Keeton, *supra*, at § 18. Without an expression of approval or disapproval, "[s]ilence and inaction may manifest consent where a reasonable person would speak if he objected." *Id*. at 113. For example, a person who steps into a boxing ring has consented to what would otherwise be a series of batteries. *Id*. Consent can also be inferred from usage or immemorial custom, as where local custom allows free entry on wild land privileges that would otherwise be a trespass. *Id*. at 113-14.

### 5. Common law marriage

People may be married for certain legal purposes by silent acts. Marriage's primary purpose is to "ascertain and fix upon some certain person . . . the care, the protection, the maintenance, and the education of the children." *See* 1 Blackstone, *supra*, at *455. Because it is not the

child's fault if her parents never expressed their intentions publicly, our law long-recognized marriage by conduct, known as "common law marriage." A couple may be deemed common law married to secure the legitimacy of children born to their *de facto* marriage, even in states that no longer recognize common law marriage, as effective to establish all the rights and duties of spouses. *See Murphy v. Holland*, 377 S.E.2d 363, 366-68 (Va. 1989).

### 6. Creation of a bailment

Finally, persons may also create bailments by silent acts. While the creation of a bailment requires a transfer of possession for a purpose certain and acceptance by the bailee with an intention to take custody, *see* Ray Andrews Brown, *The Law of Personal Property* §§ 10.2-10.4 (3d ed., Walter B. Rauschenbush, ed. 1975), the parties may create the bailment silently by implication from their conduct. *See Armored Car Serv., Inc. v. First Nat'l Bank of Miami*, 114 So.2d 431, 434 (Ct. App. Fla. 1959); *see also Bunnell v. Stern*, 25 N.E. 910 (N.Y. 1890).

28

## III.  THE LAW CONTAINS NO GENERAL DUTY TO SPEAK AND ONLY RARELY REQUIRES SPEECH.

### A. The Right to Silence Contrasted with Formal Limitations on Powers to Speak

Rules that require some expression to achieve a legal objective are rare, and always preserve the status quo. Where important fundamental and natural rights are stake, such as the rights of children and dependents, or the natural property rights of third parties, the law sometimes requires affirmative expression, sometimes in writing, before it will alter a person's legal status or impose a new legal disability.

The strongest examples require an express writing in a particular form. The Statute of Wills requires a witnessed and attested writing before a testator may frustrate the expectations of heirs under rules of intestate succession. The Statute of Frauds requires a particular, signed, and delivered writing to bind a person to a promise to marry, guarantee a debt, or purchase or sell real property. Expressions of intent are also required to form a negotiable instrument and to disclaim one's inheritance. Strong reasons support these rules; common law rights, duties of familial support, and the natural property rights of third parties are at stake.

None of these legal doctrines imposes any duty to speak. They require an affirmative expression only if the speaker wants to impose a new liability on some person—himself or someone else. Silence preserves the status quo, whether that status quo is the inheritance of the heirs, or the bilateral character of a contractual promise.

### B. No General Duty to Speak

Of course, a person may undertake an obligation to speak by her own volition. A lawyer who agrees to represent a client assumes a new duty to communicate on the client's behalf. A military officer assumes a general obligation to pass lawful orders down to enlisted personnel. And a schoolteacher assumes a general obligation to communicate knowledge to her students. But even the most rigorous such obligations are general and defeasible, not specific and absolute. The lawyer retains discretion to decide which arguments are best. The officer swears an oath to the Constitution and thus retains a duty not to issue orders that would violate the Constitution or the laws of war. Schools hire teachers to think and teach, not to mouth words they believe to be false.

Furthermore, none of those defeasible obligations to communicate are part of the fundamental law. They do not apply to everyone. They

cannot be forced on anyone. They are undertaken for particular reasons as part of the general obligations associated with particular offices and roles. There is no universal, much less absolute, legal duty to speak.

## C.     Even the Duty to Testify is Narrowly Circumscribed

Perhaps the closest thing to a duty to speak is the general obligation to testify truthfully in judicial proceedings. "The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established . . . ." *Kastigar v. United States*, 406 U.S. 441, 443 (1972). But relative to the right *not* to speak, the duty to testify is a newcomer to the law. Prior to the sixteenth century, no right or duty to testify existed in common law. 8 Wigmore, *supra*, at § 2190 at 62-65.

Unlike rights to silence, which can be found throughout the law, the duty to testify is narrowly circumscribed. It arises only when a judicial officer or other authorized official compels testimony. *Id.* at § 2195 at 78-80. Under current law, no one owes a duty to testify whenever a statement is demanded. *Compare* Meltzer, *supra*, at 29, 40, 44, 45, 53 (detailing how oath *ex officio* prompted development of the right to silence). Professor Wigmore noted, "The testimonial duty is without effect

31

unless there is *power to compel* its performance." 8 Wigmore, *supra*, at § 2195 at 78 (emphasis original). "Inherently and primarily, the power belongs to the judiciary, because the application of the law to facts in litigation requires a finding of the facts." *Id*.

Even in the context of legal compulsion, the duty to testify does not extend to opinions or sentiments, but only to events and occurrences that are relevant to a particular case or controversy. Indeed, theological and political opinions are protected by qualified privileges. *Id*. at § 2213-14 at 159-65. And above all, the duty is to testify *truthfully*, to provide knowledge and evidence in one's possession, *id*. at § 2192 at 70-74, and is "not performed by an answer that is *false*," *id*. at § 2194 at 76 (emphasis original).

Furthermore, even the duty to testify in judicial proceedings is only a general obligation; it is defeasible. It is defeated when it runs up against any number of testimonial privileges and immunized liberties not to speak, such as: the spousal privileges against compelled testimony or disclosing spousal communications; privileges for confidential communications involving lawyers, physicians, and clergy; the right of privacy in private papers and writings; and the rights to remain silent

and not to incriminate oneself. When those privileges and liberties are lawfully invoked, the law sides with candor and truthfulness against disclosure and publicity. As these and other instances of the right to silence demonstrate, the law frequently accommodates silence to privilege truth over coerced expression.

### D. In Sum, the Law Privileges Silence

Neither law nor equity compels individuals to speak. The law takes pains to avoid coercing people to communicate propositions they do not believe to be true. It makes all sorts of accommodations to silence. Most dramatically, our fundamental law and constitutions secure the right to silence in both criminal and civil contexts. Less dramatically, but no less importantly, the law secures liberties of silence and powers to act without speaking, preferring to draw inferences rather than force people to face the trilemma among saying something they don't believe, paying the cost for speaking the truth, or suffering loss for remaining silent. When in doubt, the law privileges silence.

It would be surprising and out of character with America's tradition of civil liberty under law were this court to empower a government agency to compel school children to use particular pronouns in reference to a

particular person rather than leave them at liberty to remain silent on the matter. Indeed, it would be far more consistent with the authoritarian zeal of Archbishop Whitgift and the Puritans who coerced public confessions of alleged spiritual offenses in the sixteenth century than with the "benevolent and just principles" of the common law and American constitutions.

The law protects the freedom of the mind and conscience by securing rights to silence. When people speak, they must be free to speak deliberately, and to say what they understand to be true. The law frees people to choose between speech and silence to save them from the temptations of choosing between truth and falsehood.

## CONCLUSION

The Court should affirm the decision of the lower court.

Respectfully submitted,

October 16, 2024        /s/ Camille P. Varone

Camille P. Varone
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
202-921-4105
cvarone@firstliberty.org

Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway,
Suite 1600
Plano, TX 75075
972-941-4444
jdys@firstliberty.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.      Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 6470 words.

2.      Undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Office Word 16.88 in 14-point Century Schoolbook font.

October 16, 2024                    /s/ Camille P. Varone
                                    Camille P. Varone
                                       *Counsel of Record*
                                    FIRST LIBERTY INSTITUTE
                                    1331 Pennsylvania Ave. NW,
                                    Suite 1410
                                    Washington, DC 20004
                                    202-921-4105
                                    cvarone@firstliberty.org

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that on the 16th day of October, 2024, the foregoing Brief *Amici Curiae* was filed using the Court's CM/ECF system, which will serve a notice of electronic filing on all registered users, including counsel for the parties.

October 16, 2024

/s/ Camille P. Varone
Camille P. Varone
  *Counsel of Record*
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW,
Suite 1410
Washington, DC 20004
202-921-4105
cvarone@firstliberty.org

# APPENDIX

# APPENDIX[1]

Adam MacLeod, Professor of Law, St. Mary's University, School of Law; Senior Research Fellow, Center for Religion, Culture & Democracy.

Adeline A. Allen, Professor of Law, Trinity Law School.

Owen Anderson, Professor of Philosophy, Arizona State University.

Hunter Baker, Provost, Dean of Faculty, Professor of Political Science, North Greenville University; Senior Fellow, Center for Religion, Culture & Democracy.

Jordan Ballor, Director of Research, Center for Religion, Culture & Democracy.

Francis J. Beckwith, Professor of Philosophy & Church-State Studies, Associate Director of Graduate Studies, Baylor University.

Hon. John G. Browning, Distinguished Jurist in Residence and Professor of Law, Thomas Goode Jones School of Law, Faulkner University; Justice (ret.) Fifth District Court of Appeals, Texas.

Patrick M. Garry, Professor of Law, University of South Dakota School of Law; Senior Fellow, Center for Religion, Culture & Democracy.

Rev. Gifford Grobien, Assistant Provost and Professor of Systematic Theology, Concordia Theological Seminary, Fort Wayne.

Mark David Hall, Professor, Robertson School of Government, Regent University; Senior Fellow, Center for Religion, Culture & Democracy.

Nicholas Higgins, Associate Professor and Chair of Political Science Department, North Greenville University.

---

[1] Institutions listed for identification purposes only. Opinions expressed are those of individual *amici*, and not necessarily of their affiliated institutions.

Jason Jewell, Professor, Chairman of Department of Humanities, Faulkner University.

Bethany Kilcrease, Professor of History, Aquinas College.

Joseph M. Knippenberg, Professor of Politics, Oglethorpe University.

Morgan Marietta, Dean of Economics, Politics & History, Professor of Politics & Law, University of Austin.

Melissa Mathes, Professor of Religion and Politics, United States Coast Guard Academy.

Micah Mattix, Associate Professor of English, Chair of English & Communications Studies, Regent University.

Wilfred M. McClay, Professor of History, Hillsdale College; Senior Fellow, Center for Religion, Culture & Democracy.

Rev. Gerald R. McDermott, Distinguished Professor of Anglican Studies, The Reformed Episcopal Seminary; Senior Fellow, Center for Religion, Culture & Democracy.

Allen Mendenhall, Professor, Executive Director of the Manuel H. Johnson Center for Political Economy, Troy University.

Catherine R. Pakaluk, Director of Social Research and Associate Professor, The Catholic University of America; Senior Fellow, Center for Religion, Culture & Democracy.

James Patterson, Associate Professor of Politics, Ave Maria University; Research Fellow, Center for Religion, Culture & Democracy.

Peter Scaer, Professor of Exegetical Theology, Concordia Theological Seminary, Fort Wayne.

Jeff Shafer, Director, The Hale Institute, New Saint Andrews College.

Luke Sheahan, Assistant Professor of Political Science, Duquesne University.

Gary L. Steward, Associate Professor History, Dean of the School of Humanities and Social Sciences, Colorado Christian University.

Kevin Valler, Professor of Philosophy, Institute of American Constitutional Thought and Leadership, University of Toledo.

Micah J. Watson, Professor of Political Science, Calvin University.

John D. Wilsey, Professor of Church History and Philosophy; Chair, Department of History and Historical Theology, The Southern Baptist Theological Seminary; Senior Fellow, Center for Religion, Culture & Democracy.

Jacob Wolf, Assistant Professor of Politics, Center for Economics, Politics, and History, University of Austin.