**No. 24-3097**

# In the United States Court of Appeals for the Tenth Circuit

━━━━━━━◆━━━━━━━

STATE OF KANSAS, ET AL.*,*

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellants*.

━━━━━━━━━━━━━━━

On Appeal from the United States District Court
for the District of Kansas
Case No. 5:24-cv-04041

━━━━━━━◆━━━━━━━

**BRIEF OF PROFESSOR GERARD V. BRADLEY
AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES**

━━━━━━━◆━━━━━━━

DAVID H. THOMPSON
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Amicus Curiae Professor Gerard V. Bradley*

## TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES ..................................................................... ii

AUTHORITY TO FILE ..........................................................................1

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION ...................................................................................1

ARGUMENT ...........................................................................................3

I.    A Proper Textualist Analysis Demonstrates That Title IX
      Does Not Prohibit Classifications Based on Gender Identity. ........................3

      A.    Textualism Interprets Language In Context To Determine
            the Original Understanding of a Statute..................................3

      B.    The Language and Context of Title IX Show That It Was Not
            Originally Understood To Prohibit Classifications Based on
            Gender Identity. ......................................................................6

      C.    "Applying *Bostock*" To Interpret Title IX Is Not Textualism. ...........11

II.   The Legislative History of Title IX Confirms It Does Not Prohibit
      Classifications Based on Gender Identity......................................19

CONCLUSION ......................................................................................27

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                             **<u>Page</u>**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
     57 F.4th 791 (11th Cir. 2022) ........................................................................ 14

*Biden v. Nebraska*,
     143 S. Ct. 2355 (2023) .................................................................................. 16

*Bostock v. Clayton County*,
     590 U.S. 644 (2020) ........................................................ 1, 11, 12, 13, 14, 18

*Burrage v. United States*,
     571 U.S. 204 (2014) ...................................................................................... 13

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
     587 U.S. 262 (2019) ...................................................................................... 12

*FDA v. Brown & Williamson Tobacco Corp.*,
     529 U.S. 120 (2000) ...................................................................................... 16

*Gross v. FBL Fin. Sers., Inc.*,
     557 U.S. 167 (2009) ...................................................................................... 13

*Kansas v. U.S. Dep't of Educ.*,
     No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ............... 9, 14

*Loper Bright Enter. v. Raimondo*,
     144 S. Ct. 2244 (2024) ........................................................................ 6, 16, 18

*Niz-Chavez v. Garland*,
     593 U.S. 155 (2021) .................................................................................. 5, 6, 12

*Reiter v. Sonotone Corp.*,
     442 U.S. 330 (1979) ...................................................................................... 18

*Rumsfeld v. Padilla*,
     542 U.S. 426 (2004) ...................................................................................... 12

*Takwi v. Garland*,
     22 F.4th 1180 (10th Cir. 2022) ....................................................................... 4

*Tennessee v. Cardona*,
     No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) .......... 9, 14

*Tennessee v. Cardona*,
     No. 2:24-072-DCR, 2024 WL 3631032 (E.D. Ky. July 10, 2024) ............... 12

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023).........................................................................5

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
    508 U.S. 439 (1993)...............................................................11, 12

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013).......................................................................13

*West Virginia v. EPA*,
    597 U.S. 697 (2022).........................................................................5

*Wisc. Cent. Ltd. v. United States*,
    585 U.S. 274 (2018).........................................................................3

*Yates v. United States*,
    574 U.S. 528 (2015).......................................................................13

## Statutes and Rules

20 U.S.C.
    § 1681(a) ......................................................................................12
    § 1681(a)(5)–(9)...........................................................................14
    § 1686 .............................................................................9, 10, 13, 14

Fed. R. App. P. 29(a)(4)(E) ...............................................................1

## Legislative Materials

116 Cong. Rec. H28020 (1970) ........................................................22

116 Cong. Rec. H28025 (1970) ........................................................22

116 Cong. Rec. S35451 (1970)....................................................22, 23

117 Cong. Rec. S30412 (1971) ........................................................19

117 Cong. Rec. S30415 (1971) ........................................................19

117 Cong. Rec. S35016 (1971) ........................................................23

117 Cong. Rec. S35018 (1971) ........................................................23

117 Cong. Rec. S35033 (1971) ........................................................26

118 Cong. Rec. S5811 (1972) ..........................................................21

*Discrimination Against Women: Hearings Before the Special Subcomm.*
    *on Educ. Of the H. Comm. On Educ. & Labor*,
    91st Cong. 231 (1970) ...............................................................20, 21

Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 ..............6, 7, 11

*Equal Rights for Men and Women: Hearings Before Subcomm. No. 4 of the H. Comm. On the Judiciary*, 92d Cong. 94 (1971)...................25

*Executive Session of the S. Comm. On the Judiciary*, 91st Cong. 11 (Feb. 29, 1972) ................................................................23, 24

*Equal Rights: Hearings Before the S. Comm. On the Judiciary*, 91st Cong. 431 (1970) ...........................................................24, 26

H.R. Rep. No. 92-359 (1971).................................................................25

H.R.J. Res. 208, 92d Cong. § 1, 86 Stat. 1523 (1972)............................ 21

S. Rep. No. 92-689 (1972) ....................................................................24

*The "Equal Rights" Amendment: Hearings Before the Sub-comm. on Constitutional Amendments of the S. Comm. On the Judiciary*, 91st Cong. 563 (1970) ....................................................................24

## <u>Other Authorities</u>

9 OXFORD ENGLISH DICTIONARY (1961) .................................................. 7

AMERICAN HERITAGE DICTIONARY (1976) ...............................................7

Amy Coney Barrett, *Assorted Canards of Contemporary Legal Analysis: Redux*, 70 CASE W. RES. L. REV. 855 (2020)................................................4, 5

Birch Bayh, *Personal Insights and Experiences Regarding the Passage of Title IX*, 55 CLEV. ST. L. REV. 463 (2007)...................................19

Gerard V. Bradley, *Moral Truth and Constitutional Conservatism*, 81 LA. L. REV. 1317 (2021) ..............................................................1

Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61 (1994)...........................6, 9, 15, 16

RICHARD EKINS & DAVE KING, THE TRANSGENDER PHENOMENON (2006) ..............8

Neil Gorsuch, *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 CASE W. RES. L. REV. 905 (2016)......................................4

John Johnson, *Trans-sexualism: A Journey Across Lines of Gender*, L.A. TIMES (July 25, 1988), https://goo.gl/jECJ5E .........................................8

Brett Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118 (2016)........................................................4

John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70 (2006) ......................................3, 5, 6, 9, 16

Caleb Nelson, *What Is Textualism?*,
 91 Va. L. Rev. 347 (2005) ...................................................3, 4, 5, 6, 9, 13, 16

Michael Norman, *Suburbs Are a Magnet to Many Homosexuals*,
 N.Y. Times (Feb. 11, 1986), https://goo.gl/ku77gA .......................................8

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation
 of Legal Texts (2012) ...................................................................................5

Antonin Scalia, A Matter of Interpretation: Federal Courts
 and the Law (Amy Guttmann ed., 1997)..................................................4, 15

Antonin Scalia, *Response*, *in* A Matter of Interpretation:
 Federal Courts and the Law (Amy Gutmann ed., 1997) ........................15

The American College Dictionary (1970)..........................................................7

The Random House College Dictionary (rev. ed. 1973) ...................................7

Webster's Third New International Dictionary (1976)..............................7, 8

## AUTHORITY TO FILE

All parties have consented to the filing of this brief. FED. R. APP. P. 29(a)(2).

## INTEREST OF AMICUS CURIAE[1]

*Amicus Curiae* Professor Gerard V. Bradley is a Professor of Law Emeritus at the University of Notre Dame. He has taught courses in Legal Ethics, Constitutional Law, Criminal Procedure, and Constitutional Theory. In those classes he addressed the proper mode of interpretation of legal texts—constitutions, statutes, rules, and judicial precedents. In his scholarship, he has explained that Title IX should not be construed to apply to distinctions based on gender identity even in light of the Supreme Court's decision in *Bostock v. Clayton County,* 590 U.S. 644 (2020). *See* Gerard V. Bradley, *Moral Truth and Constitutional Conservatism*, 81 LA. L. REV. 1317, 1384–99 & n.255 (2021).

## INTRODUCTION

Textualism is a simple idea that requires diligence in practice. The idea is this: Judges should construe statutory language as it was originally understood at the time of its enactment. But the *practice* of textualism is more than the caricature of simply stringing together dictionary definitions. To the contrary, textualism requires courts to consult various sources of meaning, including the text of the provision at issue,

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than *amicus curiae* or his counsel contributed money intended to fund the preparation or submission of this brief. FED. R. APP. P. 29(a)(4)(E).

the text of the surrounding provisions in the statute, and the context in which the statute was enacted. By considering text and context, a court arrives at the best reading of a particular statute.

The text and context of Title IX confirm that it prohibits discrimination that treats members of one sex worse than members of the other sex—and that it says nothing at all about "gender identity." The text of Title IX's anti-discrimination provision, the text of surrounding provisions in Title IX—including a provision specifically providing guidance on how to construe Title IX's anti-discrimination provision—and the historical context in which Title IX was enacted all confirm this reading. And likely for this reason, neither the Department of Education nor its *amici* make any serious effort to provide a legitimate textual analysis of Title IX.

Instead, their entire argument can be summed up in a word: *Bostock*. They ask this Court to uncritically "apply *Bostock*" to interpret Title IX. But *Bostock* interpreted a different statute that uses different language and was enacted at a different time by a different Congress in a different context. Simply importing *Bostock* to Title IX is not textualism. Although the Department and its *amici* attempt to cloak their argument as "textualist" one, that label does not survive even cursory inspection.

Finally, to the extent the Court finds legislative history relevant, the history of Title IX leaves no doubt. Everyone understood Title IX to prohibit discrimination

that treated the members of one sex worse than members of the other sex. And literally no one understood Title IX to prohibit all classifications that bear some relation to sex, such as gender identity. Indeed, the entire concept of gender identity was virtually unknown at the time of Title IX's enactment. That fact is less about the expected applications that Congress had for Title IX and more about the original public meaning of *the rule* that Congress adopted in Title IX. Under any mode of interpretive analysis, the Court should reject the interpretation offered by the Department and its *amici*.

## ARGUMENT

## I.    A Proper Textualist Analysis Demonstrates That Title IX Does Not Prohibit Classifications Based on Gender Identity.

### A.    Textualism Interprets Language In Context To Determine the Original Understanding of a Statute.

As the Supreme Court has explained, statutes should be interpreted based on what an ordinary reader would have understood the text to mean at the time of enactment. *See Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). That conclusion follows from multiple principles. First, "the statutory text alone has survived the constitutionally prescribed process of bicameralism and presentment." John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70, 73 (2006). Second, "statutes have serious consequences for people outside of the legislature," and "people should not be held to legal requirements of which they

lacked fair notice." Caleb Nelson, *What Is Textualism?*, 91 VA. L. REV. 347, 352 (2005). Third, there is no better alternative given our constitutional separation of powers. *See* Neil Gorsuch, *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 CASE W. RES. L. REV. 905, 918-19 (2016).

Although textualism represents a straightforward principle, conducting a textualist analysis requires careful judgment. More specifically, "textualism isn't a mechanical exercise, but rather one involving a sophisticated understanding of language as it's actually used in context." Amy Coney Barrett, *Assorted Canards of Contemporary Legal Analysis: Redux*, 70 CASE W. RES. L. REV. 855, 859 (2020). Thus, textualism is not literalism. *See* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 24 (Amy Guttmann ed., 1997) ("the good textualist is not a literalist"); Nelson, *supra*, at 376 ("no mainstream judge is interested solely in the literal definitions of a statute's words"); Barrett, *supra*, at 856–57 (describing literalism as a "caricature" of textualism). And judges must instead interpret the statutory language while "taking account of the context of the whole statute." Brett Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2144 (2016).

Often, a textualist analysis begins with dictionaries. *See Takwi v. Garland*, 22 F.4th 1180, 1187 (10th Cir. 2022). But it does not end there because "[t]here is a lot more to understanding language than mechanistically consulting dictionary

definitions." *See* Barrett, *supra*, at 857. Thus, "textualists do not come to the enterprise of statutory interpretation armed only with a dictionary." *Id.* at 858.

Instead, they acknowledge that statutory language is given meaning by its surrounding context. Nelson, *supra*, at 348 ("no 'textualist' favors isolating statutory language from its surrounding context"); Manning, *supra*, at 79–80 ("one can make sense of others' communications only by placing them in their appropriate social and linguistic context"). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotations omitted). Textualism therefore "calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012); *see also Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("this Court has a duty to construe statutes, not isolated provisions"). Courts thus "consult grammar and dictionary definitions—along with statutory structure and history"—to determine how "ordinary people" would have understood the relevant statute. *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021). And textualists may "use the public context in which Congress acted as a guide to the meaning of the statutory language." Nelson, *supra*, at 409; *see also* Manning, *supra*, at 84–85 (noting that textualists may

consider "public knowledge of the problems that inspired [a statute's] enactment"); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 61 (1994) ("Words take their meaning from contexts," which include "the problems the authors were addressing.").

In sum, textualism is more than reading dictionary definitions. It is instead a search for the "best meaning" of the statute at the time of enactment. *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). And that search requires assessment of "all the textual and structural clues bearing on that meaning." *Niz-Chavez*, 593 U.S. at 160. Most significantly, here, it requires interpreting the language in the context of that particular statute.

**B.    The Language and Context of Title IX Show That It Was Not Originally Understood To Prohibit Classifications Based on Gender Identity.**

Congress enacted Title IX as part of the "Education Amendments of 1972." *See* Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235. Within that statute, Title IX is labeled "Prohibition of Sex Discrimination," and the statute declares immediately below that title: "Sex Discrimination Prohibited." *See* 86 Stat. at 373. Section 901(a) of the Education Amendments of 1972, now codified at 20 U.S.C. § 1681(a), provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance." *See* 86 Stat. at 373.

There is little dispute in this case over the dictionary definitions of the particular words in Title IX. For example, everyone agrees the word "sex" in Title IX means sex—*i.e.*, the biological state of being male or female. *See* Br. for Appellants, Doc. 84 at 22 (Aug. 26, 2024) ("Dep't Br."); *see also* Br. of Statutory Interpretation and Equality Law Scholars as *Amici Curiae* in Support of Defs.-Appellants, Doc. 133 at 2 n.2 (Sept. 5, 2024) ("Professors' Br."). And there would be no basis for any other conclusion since dictionaries at the time invariably defined "sex" in terms of the biological and binary distinction between males and females. *See* 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these"); AMERICAN HERITAGE DICTIONARY 1187 (1976) ("[t]he property or quality by which organisms are classified according to their reproductive functions"); THE AMERICAN COLLEGE DICTIONARY 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and female are distinguished"); THE RANDOM HOUSE COLLEGE DICTIONARY 1206 (rev. ed. 1973) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); WEBSTER'S THIRD NEW INTERNATIONAL

7

DICTIONARY 2081 (1976) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction").

At its core, the relevant interpretive question here is whether Title IX has anything at all to say about gender identity. And more specifically, where Title IX protects against discrimination in, exclusion from, and denial of the benefits of a school program "on the basis of sex," does that provision also protect against discrimination in, exclusion from, and denial of benefits of a school program on the basis of "gender identity"? To answer that question, a proper textualist analysis requires more than piecing together dictionary definitions but instead requires looking at how the language is used in the context of *this statute*.

As an initial matter, Title IX does not mention "gender identity." That silence is unsurprising since the term—indeed the entire concept—was virtually unknown at the time. The term "transgender" appears to have been first coined by an obscure magazine in 1969, RICHARD EKINS & DAVE KING, THE TRANSGENDER PHENOMENON 82 (2006) (citing the use of the terms "transgenderal" in Virginia Prince, *Change of Sex or Gender*, 10 TRANSVESTIA 53, 65 (1969)). It was first used in the *New York Times* in 1986, Michael Norman, *Suburbs Are a Magnet to Many Homosexuals*, N.Y. TIMES (Feb. 11, 1986), https://goo.gl/ku77gA, and its first use in the *Los Angeles Times* was not until 1988, John Johnson, *Trans-sexualism: A Journey Across Lines of Gender*, L.A. TIMES (July 25, 1988), https://goo.gl/jECJ5E. Moreover, as the

dictionaries of the time demonstrate, there was no understanding that the definition of "sex" incorporated some notion of "gender identity."

A proper textualist analysis takes this public context into account. *See* Nelson, *supra*, at 409; Manning, *supra*, at 84-85; Easterbrook, *supra*, at 61. Title IX indisputably arose out of a concern about discrimination against women at colleges and universities. *See Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *1 (D. Kan. July 2, 2024); *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146, at *1-2 (E.D. Ky. June 17, 2024). That public context gives meaning to the language in the statute. And it rebuts the idea that the text of Title IX, enacted in 1972, would have originally been understood to address a fringe concept discussed in the journal of "Transvestia."

Even though the phrase "gender identity" does not appear in Title IX, one might attempt to suggest the concept is somehow baked into language of Section 1681(a). But the only way this argument works is if discrimination "on the basis of sex" in Section 1681(a) prohibits every single classification that bears some *relation* to sex. And zooming out from Section 1681(a) to examine the entire context of Title IX forecloses that argument. For example, the statute makes clear that not every *distinction* on the basis of sex is *discrimination* on the basis of sex under Title IX. Specifically, Title IX provides that it should *not* "be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different

sexes." 20 U.S.C. § 1686. But if schools can put boys in one dorm and girls in another dorm—based on their sex—without violating Section 1681(a), then Section 1681(a) does *not* prohibit every single classification that bears some *relation* to sex. And if Section 1681(a) does not prohibit every classification that bears some *relation* to sex, there is no plausible argument that it prohibits classifications based on gender identity.

To put it bluntly, there is literally zero textualist evidence that anyone originally understood Title IX to prohibit discrimination based on "gender identity"—a concept that no one had ever even heard of before. Nothing in the statute's historical public context, nothing in the dictionary definitions of the statute's terms, and nothing in the statute's broader text and structure even hint at the idea that the language in Title IX addresses gender identity. To the contrary, all textualist indicators of original meaning point in one direction: The statute generally prohibits differential treatment that treats members of one sex worse than members of the other sex.[2] There is no legitimate textualist argument to the contrary.

---

[2] Although this brief focuses on Title IX as applied to "gender identity" given the nature of the challenge before the Court, the correct interpretation of Title IX would also confirm that Title IX does not prohibit classifications on the basis of sexual orientation.

### C.    "Applying *Bostock*" To Interpret Title IX Is Not Textualism.

The Department of Education and the "Statutory Interpretation and Equality Law Scholars" *Amici* tell the Court to simply apply *Bostock* to interpret Title IX. *See* Dep't Br. 20-21; Professors' Br. 3. That is not textualism. *Bostock* interpreted a different statute with different text enacted at a different time by a different Congress to address a different problem. While "applying *Bostock*" to Title IX may be good enough for government work, *see, e.g.*, Dep't Br. 20-21, it is not good enough for a federal judiciary bound to give a statutory provision its ordinary meaning in light of the statute's text and context. Thus, regardless of *Bostock*, a textualist must roll up his or her sleeves and interpret *this* statute.

Moreover, there are numerous reasons why *Bostock*'s analysis of Title VII does not translate to Title IX. First, *Bostock* itself acknowledged that a prohibition on "sex discrimination" likely demonstrates that a statute is "focus[ed] on differential treatment between the two sexes as groups" and thus would be interpreted differently from Title VII. *Bostock*, 590 U.S. at 659. And in the public law for the Education Amendments of 1972, Title IX is introduced the following way: "TITLE IX—PROHIBITION OF SEX DISCRIMINATION." *See* 86 Stat. at 373. Immediately below that and immediately before Section 901(a), now codified as Section 1681(a), the public law states: "SEX DISCRIMINATION PROHIBITED." Although this language does not appear in the codified version of

11

Title IX, the statutes at large provide the "'legal evidence of laws.'" *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (quoting 1 U.S.C. § 112). Thus, even under *Bostock*'s own terms, Title IX should be read differently from Title VII.

In addition, Title IX uses language different from the language so critical to *Bostock*'s holding— "because of." *See Bostock*, 590 U.S. at 656. Title IX instead prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). To be the "basis of" something means to be the "foundation or support" of it. *See Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3631032, at *3 (E.D. Ky. July 10, 2024) (internal quotations omitted). And to be "*the*" basis of something indicates a singular or principal cause rather than a mere contributing factor. *See, e.g.*, *Niz-Chavez*, 593 U.S. at 166 (noting that the use of a "definite article" like "the" indicates a discrete and singular item); *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (same); *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (same). Thus, discrimination "on the basis of sex" indicates that the individual's actual sex—and nothing else—was the sole or primary motivation for the discrimination.

Separately, *Bostock*'s reading of "because of" was informed by prior judicial gloss on Title VII. Specifically, *Bostock*'s pivotal move was taking the phrase "because of" and converting it to, in the Court's words, "the language of law" as opposed to the language of an ordinary person. *Bostock*, 590 U.S. at 656. In the

Court's view, this meant that Title VII establishes "a but-for test" that directs a court "to change one thing at a time and see if the outcome changes." *Id.* To support this conclusion, the Court did not do a textual analysis of the relevant Title VII provision but rather relied on cases providing a judicial gloss on other provisions, such as the retaliation provision of Title VII, *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), a provision in the ADEA, *see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), and a provision in the Controlled Substances Act, *see Burrage v. United States*, 571 U.S. 204 (2014).

For a textualist, however, a judicial gloss on different statutory provisions with different text and context does not relieve the Court of its duty to interpret *this* statute, Title IX, based on *its own* text and context. Indeed, "[t]extualists acknowledge that the same statutory language might be understood differently if adopted in a context that suggests one purpose than if adopted in a context that suggests another." Nelson, *supra*, at 355. And the Supreme Court has "several times affirmed that identical language may convey varying content when used in different statutes." *Yates v. United States*, 574 U.S. 528, 537 (2015). Most critically here: Title IX uses *different language* from Title VII.

Next, Title IX contains different provisions that shed light on its anti-discrimination provision. Most notably, Section 1686 explains that Title IX should not "be construed to prohibit . . . separate living facilities for the different sexes." 20

13

U.S.C. § 1686. Title VII has no comparable rule of construction that provides interpretive guidance. Nor does Title VII display the same focus as Title IX on the treatment of the binary, biological sexes. *See* 20 U.S.C. § 1681(a)(5)-(9).

Finally, Title IX arises from a different context. While Title VII may have established a principle that sex, in addition to race, national origin, and other protected classifications, "is not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660 (cleaned up), Title IX in contrast clearly says sex *is* relevant to educational opportunities. The two statutes thus serve different ends for different venues. Title VII, as construed by *Bostock*, removes consideration of sex from the workplace entirely (outside of bona fide occupational qualifications), while Title IX in contrast determines *how* sex will be considered in the education context—because, as the text and context of Title IX indicates, sex *is* relevant to educational opportunity. Put simply, the "school is not the workplace." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022). And this distinction follows from the fact that Title IX was addressing a different problem. Specifically, Title IX arose out of a concern about discrimination against women at colleges and universities. *See Kansas*, 2024 WL 3273285, at *1; *Cardona*, 2024 WL 3019146, at *1-2. This different context— reflected in both the text and history of Title IX—requires a different textual analysis.

The Department of Education and the Professor *Amici* ask this Court to ignore the specific context of Title IX and uncritically apply *Bostock*. That is not textualism. Nor is it textualism to focus on the phrase "on the basis of" in isolation. Instead, courts must interpret the relevant statutory provision in light the entire statute and its context.

The Professor *Amici* suggest that interpreting Title IX in light of its historical context "center[s] on policy concerns and speculation about how Congress would have imagined" Title IX applying to gender identity. Professors' Br. 16. There are two flaws in their argument. First, there is a difference between determining what the rule *is* and determining how the rule will apply to particular situation. *See* Nelson, *supra*, at 356 (noting the textualist principle that "the intent that matters" is "*the rule that legislators meant to adopt rather than the real-world consequences that legislators expected the rule to have*" (emphasis added)). And there is no doubt that "the import of language depends upon its context, which includes the occasion for, and hence the evident purpose of, its utterance." *See* Antonin Scalia, *Response*, *in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 144 (Amy Gutmann ed., 1997). Thus, it is not textualism (and not possible) to determine the *meaning of a rule* in a text without at least considering the context that the drafter was addressing. *See* Easterbrook, *supra*, at 61 ("Words take their meaning from contexts," which include "the problems the authors were addressing.").

Second, and relatedly, the historical context of the enactment of Title IX is a relevant consideration in a textual analysis. *See* Nelson, *supra*, at 409; Manning, *supra*, at 84-85; Easterbrook, *supra*, at 61. "Context is not found exclusively within the four corners of a statute," as Justice Barrett recently explained. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) (internal quotations omitted). "'Language takes meaning from its linguistic context,' as well as 'historical and governmental contexts.'" *Id.* (quoting Frank Easterbrook, *The Case of the Speluncean Explorers: Revisited*, 112 HARV. L. REV. 1876, 1913 (1999)). For example, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), the Court explained "that the 'meaning' of a word or phrase 'may only become evident when placed in *context*,'" *Biden v. Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring). "And the critical context in *Brown & Williamson* was tobacco's 'unique political history,'" which included "the tobacco industry's 'significant' role in 'the American economy.'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 160). Thus, the Professor *Amici* are wrong to ask this Court to ignore the history and "public context in which Congress acted" when enacting Title IX. Nelson, *supra*, at 409. That history and context instead serves "as a guide to the meaning of the statutory language." *Id.*

The Professor *Amici* do not even attempt to construe Section 1681(a) in light of the context of Title IX. For example, their entire discussion of Section 1686—which, critically, explains that Title IX should not be construed to prohibit sex-

separated living facilities—appears in a footnote. *See* Professors' Br. 4-5 n.5. And all they say about Section 1686 is that it "does not categorically exclude LGBT people from Title IX." *Id.* But that proves nothing: the point is that Section 1686 *provides interpretive guidance* on how to understand the meaning of Section 1681(a). The Professor *Amici* say they "do not address" Section 1686 in any greater depth "[i]n the interest of space," *id.*, but their brief came in over 2,000 words below the word limit, *see id.* at 20. Their decision to ignore Section 1686 is telling.

Next, the Department's argument for applying *Bostock* to Title IX rests on one case. Specifically, the Department asserts that "Title IX imposes a causation standard no more stringent than but-for causation under Title VII." Dep't Br. 21 (citing *Doe v. University of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020)). But *Doe v. University of Denver* was not even construing statutory text, let alone applying *Bostock* (which had not been decided yet) to Title IX. And *Doe*'s analysis—that "evidence of an employer's discriminatory treatment of a group to which both genders can belong does *not* give rise to an inference of gender discrimination" in the Title IX context, *id.* (emphasis added)—would counsel *against* the Department's rule here. The Department offers no other source of binding authority for the proposition that *Bostock* should apply to Title IX.

Finally, both the Department and the Professor *Amici* attempt to rest their argument on the phrasing used in judicial opinions. *See* Dep't Br. 23-24; Professors'

Br. 6–7. But as the author of *Bostock* recently explained, "it would be a mistake to read judicial opinions like statutes." *Loper Bright*, 144 S. Ct. at 2281 (Gorsuch, J., concurring); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). When "judges reach a decision in our adversarial system, they render a judgment based only on the factual record and legal arguments the parties at hand have chosen to develop." *Loper Bright*, 144 S. Ct. at 2281 (Gorsuch, J., concurring). "A later court assessing a past decision must therefore appreciate the possibility that different facts and different legal arguments may dictate a different outcome." *Id.* And that principle is especially significant in the context of applying *Bostock* to Title IX given *Bostock*'s express statement that the Court was not addressing "other laws" or "bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681.

The Department and the Professor *Amici* cannot claim the mantle of textualism when they do not actually perform any textual analysis. It is not textualism to ignore statutory provisions, *see* Professors' Br. 4-5 n.5; it is not textualism to read a judicial opinion like a statute, *see* Dep't Br. 23-24; Professors' Br. 6-7; and it is not textualism to uncritically apply a case interpreting a different statute with different text that was enacted at a different time and in a different context, *see* Dep't Br. 20-21; Professors' Br. 3. For a textualist, *Bostock* does not control the interpretation of Title IX.

## II.    The Legislative History of Title IX Confirms It Does Not Prohibit Classifications Based on Gender Identity.

The legislative debate over Title IX itself makes clear that Congress targeted discrimination against members of one sex or the other sex when it barred discrimination "on the basis of sex." The legislation that was ultimately enacted as Title IX was authored and proposed by Senator Birch Bayh of Indiana, and it largely grew out of his work in the early 1970s on the draft Equal Rights Amendment ("ERA"), which during that period contained a section guaranteeing equal opportunities for women in education. Birch Bayh, *Personal Insights and Experiences Regarding the Passage of Title IX*, 55 CLEV. ST. L. REV. 463, 468 (2007). In June of 1970, Representative Edith Green's Special Subcommittee on Education held a series of hearings designed to highlight the ongoing discrimination against women in education and to lay the groundwork for responsible legislation. In 1971, as progress on the ERA stalled, Senator Bayh decided to propose the education provisions from the draft ERA as an amendment to the Higher Education Act of 1971, then under consideration. *Id.* at 467. His amendment was ruled non-germane, 117 CONG. REC. S30412, 30415 (1971), but Senator Bayh re-introduced a revised version of the bill in February of 1972, which was ultimately enacted as Title IX.

Congress's understanding of "sex discrimination" as discrimination against members of one sex or the other is evident from the record compiled during

19

Representative Green's Education Subcommittee hearings. One witness before the Subcommittee, for example, in the course of criticizing discrimination against women based on "[p]resumed differences in the stamina and strength of the two sexes," was careful to note that there were of course "actual physiological differences." *Discrimination Against Women: Hearings Before the Special Subcomm. On Educ. Of the H. Comm. On Educ. & Labor*, 91st Cong. 1098 (1970) (statement of Stephen Schlossberg, Gen. Counsel, UAW). He urged that "the only protective legislation" that was permissible "is that based on real biological factors, such as that dealing with maternity leaves, separate rest rooms, pregnancy, and the like." *Id.* at 1100. Another witness, Dr. Ann Scott, professor at the University of Buffalo and active member of the National Organization for Women, submitted written testimony to the Special Subcommittee insisting that true equality for women in educational institutions would require taking into account "a woman's unique biological ability to bear children," by offering them free child care and more generous maternity leave so as to "relieve women of the penalties their biology exacts." *Id.* at 231.

In like form, the Subcommittee included in its report an article that stressed "[t]hat differences between the sexes do in fact exist is not to the point," in discussing discrimination against women in the work force, because while "some differences that relate to job performance" do "have a *valid* physiological basis," others "are

socially or culturally based." *Id.* at 989, 990 (excerpt from Col. Jeanne M. Holm, *Women and Future Manpower Needs*, DEFENSE MGMT. J. (1970)).

The floor debate in the Senate in 1972 over Title IX likewise shows that Congress was legislating against the shared premise that the focus of the legislation was the *biological* differences between the sexes. For example, Senator Bayh, in speaking in support of his proposed bill, introduced into the Record a paper by Dr. Bernice Sandler, a contemporary expert on the problem of sex discrimination. Dr. Sandler spoke against the extra burdens faced by female students because of their different *physiological* characteristics: "Many students are denied leave for pregnancy and childbirth," she noted, and often "[g]ynecological services are not available for women students, although urological services are available for male students." 118 CONG. REC. S5811 (1972).

Some of the strongest evidence of Congress's contemporary understanding of Title IX as prohibiting discrimination against members of one sex or the other comes from Congress's contemporaneous consideration of the proposed Equal Rights Amendment, which would have forbidden the abridgment of the "[e]quality of rights . . . on account of sex." H.R.J. Res. 208, 92d Cong. § 1, 86 Stat. 1523 (1972). While the ERA ultimately was not ratified, because it used similar language as Title IX, because it was passed roughly contemporaneously, and because Title IX in fact *grew out of the ERA*, Congress's understanding of the meaning of that proposed

constitutional amendment is highly persuasive evidence of its understanding of Title IX. That evidence is also unequivocal: Congress intended to forbid discrimination against members of one sex or the other.

This is clear, for example, from a series of statements on the House and Senate floors that took place during Congress's initial consideration of the ERA in 1970. On the House side, Representative Catherine May from Washington, speaking "in enthusiastic and wholehearted support" of the ERA, acknowledged that "[m]en and women do have obvious physiological differences," even if "they also perform many of the same or overlapping roles." 116 CONG. REC. H28020 (1970) (statement of Rep. May). Another supporter, Representative McClory from Illinois, similarly noted that he did not want his support to be misconstrued as "a denial of any protection of benefits to which women are entitled by reason of their physical and biological differences." *Id.* at 28025 (statement of Rep. McClory). In like form, on the Senate side, Senator Bayh (a sponsor of the ERA, as he was of Title IX), clarified that the proposed amendment "would not eliminate all the differences between the sexes. Congressional enactment would not and should not eliminate the natural physiological differences between the sexes." 116 CONG. REC. S35451 (1970) (statement of Sen. Bayh).

When the Senate continued floor debate over the ERA in 1971, that understanding of "the natural physiological differences between the sexes," *id.*,

persisted. For instance, Sen. Bayh introduced into the record a Yale Law Journal article analyzing the proposed amendment, which concluded that it would "not preclude legislation" based on "a physical characteristic unique to one sex." 117 CONG. REC. S35016 (1971). "Thus not only would laws concerning wet nurses and sperm donors be permissible, but so would laws establishing medical leave for childbearing." *Id.* Similar considerations, the same article continued, would "permit the separation of the sexes in public rest rooms." *Id.* at 35018.

The same understanding of sex discrimination is manifest from the hearing and reports of the House and Senate Judiciary Committees concerning the ERA. The Senators on the Judiciary Committee had a number of exchanges on the nature of sex discrimination in a February 29, 1972, executive session. Senator Fong of Hawaii asked Senator Bayh, for example, whether the ERA would subject women to the draft and, if so, whether "they would be forced . . . to live in the same barracks with men?" *Executive Session of the S. Comm. On the Judiciary*, 91st Cong. 11 (Feb. 29, 1972). Senator Bayh agreed that women would be subject to the draft but did not agree that they would live in the same barracks since "the right of privacy would be involved." *Id.* "This goes to the basic physiological characteristics and differences . . . between sexes, and we are not trying to change that," Senator Bayh emphasized. *Id.* at 12. Later in the same session, Senator Gurney of Florida agreed that the

question of "who has the right to go into what toilet" "revolv[ed] around physiological differences," and would not be affected by the ERA. *Id.* at 19.

A few months later, the Committee heard testimony from the Chairman of the National Organization for Women, Wilma Scott Heide, who carefully noted that "[t]o demand to be equal to men under the law is not to state or imply sameness of biology." *The "Equal Rights" Amendment: Hearings Before the Sub-comm. on Constitutional Amendments of the S. Comm. On the Judiciary*, 91st Cong. 563 (1970) (statement of Wilma Scott Heide, Chairman, Nat'l Org. for Women). The point instead was that "biology is not relevant to human equity," *id.*, and accordingly "[t]here are no men's roles or women's roles beyond the biological," *id.* at 566.

The report issued by the Senate Judiciary Committee on March 14, 1972, is to the same effect. According to the report, "the proponents of the Amendment" did not understand it to "prohibit reasonable classifications based on characteristics that are unique to one sex," including "separation of persons of different sexes under some circumstances" such as "sleeping quarters at coeducational colleges, prison dormitories, and military barracks," or other "activities which involve disrobing, sleeping and personal bodily functions." S. Rep. No. 92-689, at 11, 12, 17 (1972).

Much the same understanding played out on the House side. In March and April of 1971, a Subcommittee of the House Judiciary Committee heard testimony on the proposed amendment, including from Abner Mikva, then a Representative

from Illinois, who spoke in favor the ERA but carefully noted that "[b]ecause of the admitted physiological differences between the sexes, and a long tradition of sexual privacy, there are various instances in which the mutual convenience of men and women dictates separate facilities or treatment. Separate washrooms for men and women has been the most widely cited example." *Equal Rights for Men and Women: Hearings Before Subcomm. No. 4 of the H. Comm. On the Judiciary*, 92d Cong. 94 (1971).

In 1971, the House Judiciary Committee issued a report endorsing a softening amendment to the ERA proposed by Representative Wiggins of California that would have exempted any discriminatory law that "reasonably promotes the health and safety of the people." H.R. Rep. No. 92-359, at 1 (1971). The minority of the Committee included a statement of their own views, insisting that the amendment simply was not necessary to preserve "reasonable classifications based on characteristics that are unique to one sex," since "'[e]quality' does not mean 'sameness.'" *Id.* at 7. Thus, even under the original text of the ERA "a law providing for payment of the medical costs of child bearing could only apply to women." *Id.* Nor would there be anything impermissible about "a separation of the sexes with respect to such places as public toilets, as well as sleeping quarters of public institutions." *Id.*

The legislative debates over Title IX and the ERA reveal, crucially, not only that Congress viewed "sex" as defined in terms of the different biological traits of men and women, but also that Congress's understanding of sex as being biological was *the very reason* Congress sought to eliminate it as a permissible basis of discrimination. The legal analysis of the proposed ERA that Senator Bayh introduced into the record, for example, noted that sex discrimination was improper because "[s]ex, like race and lineage, is an immutable trait, a status into which the class members are locked by accident the accident of birth." 117 Cong. Rec. S35033 (1971) (quoting *Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529, 540 (Cal. 1971)). Testimony before the Senate Judiciary Committee in support of the ERA likewise underscores the contemporaneous understanding that sex was determined by permanent, objective, and readily identifiable physiological characteristics. *See Equal Rights: Hearings Before the S. Comm. On the Judiciary*, 91st Cong. 431 (1970) (statement of Pauli Murray, Prof., Brandeis Univ.) (noting that "women" had "been subjected to a prolonged history of legal proscriptions and disabilities based on upon biological characteristics which where permanent and easily identifiable").

The legislative history thus confirms what the textualist analysis shows: Title IX was originally understood to prohibit discrimination that treated the members of one sex more favorably than the members of the other sex, and it does not prohibit classifications based on gender identity.

## CONCLUSION

For these reasons, the Court should affirm the district court's preliminary injunction.

Dated: October 16, 2024

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Amicus Curiae*
*Professor Gerard V. Bradley*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 6,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Tenth Circuit Rule 32.

This brief complies with typeface requirements of Fed. R. App. P. 32(a)(5) and Tenth Circuit Rule 32 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

The electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

Dated: October 16, 2024

/s/ David H. Thompson
David H. Thompson

*Counsel for Amicus Curiae*
*Professor Gerard V. Bradley*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of October, 2024, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the CM/ECF System. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

Dated: October 16, 2024

/s/ David H. Thompson
David H. Thompson

*Counsel for Amicus Curiae*
*Professor Gerard V. Bradley*
