No. 24-3097

# United States Court of Appeals for the Tenth Circuit

————————————

STATE OF KANSAS, ET AL.,
PLAINTIFFS-APPELLEES,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION, ET AL.,
DEFENDANTS-APPELLANTS.

————————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF KANSAS,*
*NO. 24-CV-4041, HON. JOHN W. BROOMES, PRESIDING*

————————————

**BRIEF OF AMERICA FIRST LEGAL FOUNDATION AS**
***AMICUS CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE**

————————————

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

America First Legal Foundation is a nonprofit corporation that does not have a parent corporation and is not publicly held. No publicly owned corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................i

Table of Authorities .............................................................................. iii

Interest of *Amicus Curiae* ......................................................................1

Introduction ...........................................................................................3

Argument...............................................................................................6

     I.     The Rule unlawfully conflates biological sex with gender identity...............................................................................6

          A.     Sex is biological. ...................................................7

          B.     Title IX does not cover gender identity discrimination. ...........10

     II.     The Rule would nullify Title IX's protections for women. ................15

          A.     The Rule renders Title IX's administration absurd. .................15

          B.     The Rule threatens women's opportunities—and safety. .........19

Conclusion ...........................................................................................24

Exhibit 1: Memorandum for Kimberly Richey from Reed Rubinstein (Jan. 8, 2021)

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) .................10

*Adams v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022)................................................... 7, 9, 11, 13, 15, 23

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ......................... 1, 3, 7, 11, 12, 13

*Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793 (6th Cir. 1977) ..20

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................2

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................ 9, 10

*Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012)..................................8

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .......................................................3

*Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016).......................16

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)........................7

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984).........................................................8

*Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013)......................................10

*L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) .......................................................9

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004) ........................................................................ 8, 19

*Meriwether* v. *Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................20

*NCAA v. Alston*, 594 U.S. 69 (2021) .....................................................................21

*Neese v. Becerra*, 640 F. Supp. 3d 668 (N.D. Tex. 2022) ......................................19

*Nguyen v. INS*, 533 U.S. 53 (2001).........................................................................9

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) .................................................................11

*United States v. Virginia*, 518 U.S. 515 (1996) ....................................................4, 9

**STATUTES**

20 U.S.C. § 1681 ........................................................................................ 3, 7, 13

20 U.S.C. § 1686................................................................................................3, 7

Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974)................................7

OTHER AUTHORITIES

A. McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Independent Women's Forum, https://perma.cc/FFC3-68QV ................................................................21

A. Wilson, *NCAA Title IX 50th Anniversary: The State of Women in College Sports* (2022), https://perma.cc/4CDW-PLQZ ..............................................................20

Am. Compl., *Gaines v. NCAA*, No. 1:24-cv-01109-MHC, Doc. 64 (N.D. Ga. June 26, 2024)................................................................................................................22

*Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (Dec. 2015), https://perma.cc/6FAS-676M ....................................................................................16

I. Yip, *Nonbinary runner Nikki Hiltz advances to semifinals for Team USA*, NBC News (Aug. 6, 2024), https://perma.cc/AJ75-2MPS............................................14

J. Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 (Oct. 2018), https://perma.cc/8PYT-CGUG ................................................................................17

K. Camburn, *9 Young People Explain what Being Non-binary Means to Them* (July 14, 2019), https://perma.cc/SSD6-ZFML ....................................................16

L. Gilbert, *Female Athlete's Injury Creates Outrage Around Coed Sports*, The Daily Signal (Nov. 7, 2023), https://perma.cc/G4F8-35YL.................................22

M. Koenig, *School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, New York Post (Feb. 28, 2024), https://perma.cc/5TV8-W9GE ................................................................................21

*Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/NRM2-LTJW..............21

N. Barber, *The evolutionary psychology of physical attractiveness: Sexual selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995)...2

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ....................................................................................................10

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* (2022), https://perma.cc/KM5L-F26V......................................... 16, 18

*The Gender Book*, https://perma.cc/42WU-KRLX .................................................17

The Trevor Project, *National Survey on LGBT Youth Mental Health 2019*,
    https://perma.cc/5MTL-GFBG..................................................................................6

## RULES

Enforcement of Title IX of the Education Amendments of 1972 With Respect to
    Discrimination Based on Sexual Orientation and Gender Identity in Light of
    *Bostock v. Clayton County*, 86 Fed. Reg. 32637 (2021) .......................................23

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (2022) ...................2

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    89 Fed. Reg. 33474 (2024) .................................................. 2, 4, 11, 13, 14, 18, 20

Nondiscrimination on the Basis of Sex Under Federally Assisted Education
    Programs and Activities, 40 Fed. Reg. 24128 (1975) ...........................................8

Preventing and Combating Discrimination on the Basis of Gender Identity or
    Sexual Orientation, 86 Fed. Reg. 7023 (2021)......................................................2

## REGULATIONS

34 C.F.R. § 106.32 ......................................................................................................4, 7

34 C.F.R. § 106.33 ................................................................................................. 3, 4, 7

34 C.F.R. § 106.34 ...........................................................................................................7

34 C.F.R. § 106.37 .........................................................................................................20

34 C.F.R. § 106.40 ......................................................................................................7, 8

34 C.F.R. § 106.41 ............................................................................................... 3, 4, 7, 8

34 C.F.R. § 106.43 ...........................................................................................................7

34 C.F.R. § 106.52 ...........................................................................................................7

34 C.F.R. § 106.59 ...........................................................................................................7

34 C.F.R. § 106.61 ...........................................................................................................7

## INTEREST OF *AMICUS CURIAE*

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States by preventing executive overreach, ensuring due process and equal protection for every American citizen, and encouraging understanding of the law and individual rights guaranteed under the Constitution and laws of the United States.[1]

America First Legal has a substantial interest in this case. First, it represents parents nationwide who are fighting, *inter alia*, to protect their daughters' physical safety, personal privacy, and access to sports and other educational opportunities. Second, as a participant in notice-and-comment rulemaking and an organization often engaged in litigation to protect the rule of law, it has an interest in ensuring that the Executive Branch does not abuse the Constitution, the Administrative Procedure Act, and controlling Supreme Court authorities, as it has done here. Third, America First Legal's attorneys include the former Trump Administration official who authored the Department of Education's Office of General Counsel memorandum on *Bostock v. Clayton County*, 590 U.S. 644 (2020), referenced in the Biden Administration's Final Rule. *See* Nondiscrimination on the Basis of Sex in Education

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33807, 33820 (2024). The referenced memorandum is attached as Exhibit 1.

The Biden Administration's criticisms of the memorandum have included inconsistency with Executive Order 13988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (2021), and failure to "explain how a school should determine a student's 'biological' sex."[2] First, executive orders do not rewrite statutes. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). Second, the settled science is that there are self-evident biological differences in morphology between males and females and that these differences are critical to human reproduction. *See, e.g.*, N. Barber, *The evolutionary psychology of physical attractiveness: Sexual selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995). Thus, the Biden Administration's assertion that the federal government must "explain" to a school (or anyone else) how to determine biological sex erases objective reality. The infinitely more difficult question is how to determine "gender identity," and the Biden Administration's guidance makes no attempt to explain *that*. *See infra* Part II.A.

---

[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41530–31 (2022).

2

## INTRODUCTION

Title IX, enacted in 1972 and titled "Sex," provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). Statutory and regulatory text and structure, Supreme Court precedents, and all other available evidence show that the ordinary public meaning of the term "sex" at the time of Title IX's enactment referred to biological male and female, not "gender identity." Under Title IX, "sex, like race and national origin, is an immutable characteristic determined solely by" biology. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion). Gender identity is a "distinct concept[] from sex." *Bostock*, 590 U.S. at 669.

Congress did not blind itself to reality when enacting Title IX. Title IX recognizes that ensuring equality between men and women requires accounting for and accommodating biological differences through, for instance, "separate living facilities for the different sexes," "separate toilet, locker room, and shower facilities," and "separate [sports] teams." 20 U.S.C. § 1686; 34 C.F.R. §§ 106.33, 106.41(b).[3] In accord with the broader statutory prohibition on sex discrimination, male and female

---

[3] All references to Title IX regulations refer to the regulations as they existed before the Rule.

facilities must be "comparable," and schools must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. §§ 106.32(b), 106.33, 106.41(c). In short, Title IX forbids treating one sex worse than the other; it does not forbid (and sometimes mandates) recognizing that boys and girls have "inherent," "enduring" biological differences. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The Biden Administration's Rule, by contrast, upends the plain text, the relevant statutory context, and Congress's uniquely clear legislative intent by forcing schools nationwide to disregard biological differences between boys and girls, nullifying all the ways that Congress sensibly recognized that boys and girls are not the same. The Rule here interprets Title IX's prohibition on sex discrimination to "include" "discrimination against an individual on the basis of their . . . gender identity." 89 Fed. Reg. at 33803. The Department of Education asserts that such discrimination "is sex discrimination because [it] necessarily involves consideration of a person's sex." *Id.* at 33802.

The Rule elides the critical, enduring distinctions between males and females that form the meaning of the statutory term "sex." In relevant Title IX cases, the issue presented has been whether a person with some different gender identity can engage in some sex-selective activity. Again, such activities and places—sports, living facilities, bathrooms—are statutorily permitted to discriminate based on biological sex because it is relevant to all those situations. Presumably, that's why the

Department here tries to run from the issue of school athletics—while imposing a Rule that will make it impossible for schools to have sports teams separated by sex. The Department simply wants some biological boys to be considered girls—but Title IX cares only about biological sex.

When biological sex is a relevant and permissible basis for differential treatment, "gender identity" does not flip the table. This is because biological sex is not the same as the recent notion of "gender identity." A rule that no boy may enter and use the girls' bathroom is permitted under Title IX. That a boy calling himself a girl (or anything else) also cannot use the girls' bathroom does not result in unlawful sex discrimination, for this person has been treated the same as any other boy. The boy's gender identity is irrelevant. To reach a contrary result, the Rule rewrites Title IX and overrides Supreme Court precedents.

The Rule's unlawful conflation of biological sex and gender identity turns Title IX on its head. Rather than protect women's facilities, for instance, the Rule opens them to male intrusion. The Rule makes physical differences between male and female irrelevant—rendering null even the possibility of preventing men who have gone through puberty from entering girls' spaces or playing on their teams. Rather than protect privacy, the Rule upends centuries of common practice and opens otherwise closed bathrooms and locker rooms to anyone at any time based on self-proclaimed identities. By the Rule's logic, gender identity trumps all.

These ill-effects of the Rule will snowball. It is not possible to maintain two facilities (or teams) that are sex- *and* gender identity-separated. If a biological male is entitled to run girls' cross-country, it would presumably be impermissible sex discrimination to forbid *another* biological male (regardless of gender identity) from also competing on the girls' team. And what about the other "more than 100 gender identities"?[4] Ultimately, the Rule destroys Title IX: once one replaces "sex" with "gender identity" and defines "gender identity" as all varieties of fluid expression without connection to sex, every activity or facility must be open to a person based on their own self-described, internal, outwardly-invisible, and ever-changing "identity."

Title IX does not require ending women's sports, throwing intimate facilities open to all, and otherwise disregarding the biological reality that boys and girls are different. The Court should affirm.

## ARGUMENT

### I.    The Rule unlawfully conflates biological sex with gender identity.

When Title IX contemplates sex-based treatment, it cannot violate Title IX for schools to act accordingly. In other words, if Title IX allows schools to separate sports, living facilities, and bathrooms based on biological sex, then Title IX could

---

[4] The Trevor Project, *National Survey on LGBT Youth Mental Health 2019*, at 7, https://perma.cc/5MTL-GFBG.

not simultaneously make it unlawful to exclude opposite-sex individuals, no matter how they identify. Concluding otherwise, as the Department of Education did, unlawfully conflates sex and gender identity.

### A.    Sex is biological.

Sex has always, including at the time of Title IX, meant biological sex. *See Bostock*, 590 U.S. at 655; *id.* at 734–44 (Alito, J., dissenting) (Appendix A); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–15 (11th Cir. 2022) (en banc); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–34 (4th Cir. 2020) (Niemeyer, J., dissenting). Throughout, the statute articulates the distinction between the two sexes, *e.g.*, "both sexes," "Boy or Girl," "Father-son or mother-daughter activities," 20 U.S.C. § 1681(a)(2), (7), (8); *see also id.* § 1686.

Longstanding regulations echo this distinction. *E.g.*, 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43, 106.52, 106.59, 106.61. Shortly after enacting Title IX, Congress passed the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations implementing the provisions of Title IX "which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974). Congress reserved the right to review any regulation following publication to determine whether it was "inconsistent with the Act from which it derives its authority." *Id.*, § 509, 88 Stat. at 567

7

(cleaned up).  The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations. *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24128, 24142–43 (1975)*, with* 34 C.F.R. § 106.41. After congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder). Thus, the Department's pre-Rule regulations validly and authoritatively clarified Congress's view of a recipient's non-discrimination duties under Title IX, including with respect to sex-separated athletics under 34 C.F.R. § 106.41. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984).

Additional evidence that the Department historically considered the term "sex" and human biology inextricably linked may be found in the Department's regulations expressly prohibiting discrimination related to pregnancy. 34 C.F.R. § 106.40(b)(1); *see id.* § 106.40(b)(5) (referring to the protected student as a "she"). Biological males, regardless of their "gender identity" or surgical procedures, forever have one X and one Y chromosome and cannot ovulate or carry and bear children. *See Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 55 (2012) (Ginsburg,

J., dissenting) ("[I]t is the capacity to become pregnant which primarily differentiates the female from the male." (cleaned up)).

Biological sex is real. It "is not a stereotype." *Adams*, 57 F.4th at 813. "Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States* v. *Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping." *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) (quoting 518 U.S. at 533). "[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Virginia*, 518 U.S. at 533.

The Supreme Court has likewise recognized that governmental policies can and often should recognize the inherent differences between the sexes. As it explained in one case, "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *see also, e.g., Virginia*, 518 U.S. at 550 n.19 (explaining that admitting women to VMI "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part) ("A sign that says 'men only'

looks very different on a bathroom door than a courthouse door."); *cf.* Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ("Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy.").

In sum, sex is biological, and that's how Title IX uses the term.

**B.    Title IX does not cover gender identity discrimination.**

Where sex provides an appropriate basis for drawing distinctions—as in sports, facilities, and single-sex groups expressly protected by Title IX—a person is not excluded "because of" or "based on" gender identity. Instead, a person is excluded based on sex. A boy excluded from a girls' facility is excluded for one reason: because he is a boy. His gender identity matters no more than the color of his shoes. That's why Judge Easterbrook explained that the question here boils down to whether "Title IX uses the word 'sex' in the genetic sense." *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023) (opinion concurring in the judgment). As explained above, as Judge Easterbrook agrees, and as the Department does not meaningfully dispute, Title IX's reference to "sex" means biological sex.

Under both general equal protection and Title IX principles, a plaintiff alleging discrimination must show that he "was treated differently than a similarly situated" person. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also Cleburne*, 473 U.S. at 439. Nondiscrimination laws "keep[] governmental

decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). And for sex-based policies permitted by Title IX, "biological sex is the 'relevant respect' with respect to which persons must be 'similarly situated,' because biological sex is the sole characteristic on which" those policies are based. *Adams*, 57 F.4th at 803 n.6 (cleaned up). Thus, biological males are similarly situated to each other for purposes of these policies. Prohibiting a male who identifies as something else from using the girls' bathroom does not treat similarly situated people differently. Absent differential treatment, no Title IX claim exists.

The Rule's conclusion otherwise wrongly conflates gender identity with biological sex. Relying on *Bostock*, the Rule insists that discrimination based on gender identity" "is sex discrimination because [it] necessarily involves consideration of a person's sex." 89 Fed. Reg. at 33802. But for sex-separated facilities or activities, it makes no difference whether a biological boy is a transgender girl or nonbinary or a eunuch or any of the other 100+ gender identities. *Bostock*'s inquiry is inapt, because we already know that such policies discriminate based on sex. Even if "discrimination based on . . . transgender status necessarily entails discrimination based on sex," *Bostock*, 590 U.S. at 669, discrimination based on sex does not necessarily entail discrimination based on gender identity. Sex-separated activities obviously discriminate based on sex—and gender identity is irrelevant.

11

*Bostock* confirms this result. That decision "proceed[ed] on the assumption" that the term "sex," as used in Title VII, "refer[red] only to biological distinctions between male and female." 590 U.S. at 655. Not only did *Bostock* proceed on that assumption, it *depends* on the understanding that gender identity is a "distinct concept[] from sex." *Id.* at 669. *Bostock* provided the hypothetical of "an employer who fires a transgender person" who is biologically male, explaining that "[i]f the employer retains an otherwise identical employee who" is biologically female, "the employer intentionally penalizes a [male] person . . . for traits or actions that it tolerates in a[] [female] employee" and thus engages in sex discrimination. *Id.* at 660. If that is true—a puzzle considered below—it is only because the employee's sex is, in reality, male.

Presumably that's why the Department never really applied *Bostock*'s "straightforward rule": "chang[e] the [person's] [gender identity]" and see if it "yield[s] a different choice by the" policy. 590 U.S. at 659–60. When it comes to sex-separated activities, the choice would remain the same: no matter a male's gender identity, they are not entitled to participate in the female activity. Again, that's because the policy discriminates based on sex, not gender identity. And *sex*—

biological sex—is the relevant classification under which individuals asserting a Title IX claim must be similarly situated. *See Adams*, 57 F.4th at 803 n.6.[5]

Last and more broadly, the Department took an unwarranted leap from *Bostock*'s definition of "transgender" to the more encompassing term of "gender identity." *Bostock* assumed a simple definition: transgender means the opposite of one's biological sex. *See* 590 U.S. at 660–61 ("transgender status [is] inextricably bound up with sex"). The Rule does too: "The Department understands the term 'transgender' to refer to a person whose sex assigned at birth differs from their gender identity." 89 Fed. Reg. at 33803. This assumption is dubious: as explained in more detail below, we are now told that there are more than 100 gender identities, and transgender is an umbrella, dynamic term. See *infra* Part II.A. A prominent athlete who is biologically female and identifies as transgender and non-binary recently

---

[5] Of course, there could be many reasons not to apply *Bostock*'s reasoning in this context. Unlike Title VII, Title IX is not a "broad rule" lacking exceptions. *Bostock*, 590 U.S. at 669. The word "exceptions" is found within the first four words of Title IX. 20 U.S.C. § 1681(a). Title IX has a host of exceptions clarifying that "sex" is either male or female, and the two sexes can often be separated. *See* 20 U.S.C. § 1681(a)(1)–(9) (e.g., "Social fraternities or sororities; voluntary youth services organizations;" "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations . . . limited to persons of one sex;" "Boy or Girl conferences;" "Boys State;" "Girls State;" and "'beauty' pageants"). These broad *exceptions* show that sex is often a permissible—and appropriate—consideration under Title IX. But the Department's reasoning fails even when fully applying *Bostock*'s logic, as explained.

competed for the United States in the Olympics—in the female competition.[6] Nothing prohibits a biological female from identifying as a transgender female.

In any event, though, the Rule is not limited to this narrow concept of "transgender," but instead is tied to "gender identity," which the Department "understands" "to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33809. On this definition of gender identity as a person's internal sense of identity—nonbinary, two-spirit, genderflux, eunuch, bigender, agender—without necessary connection to sex, how could it be true that discrimination based on gender identity "is" discrimination based on sex? The Department has no explanation. Once its outdated stereotypes are corrected, gender identity has no inherent connection with sex, and the Rule's logic falls apart.

Of course, the Court need not go down the gender identity rabbit hole to grasp the simple points botched by the Department: "Sex" under Title IX means biological sex. A student excluded based on sex is not excluded based on gender identity. A student may thus be excluded from a bathroom, sport, or single-sex group for being the opposite sex, regardless of the student's appearance, identification, or orientation. And schools do not face liability under Title IX for recognizing reality-based

---

[6] I. Yip, *Nonbinary runner Nikki Hiltz advances to semifinals for Team USA*, NBC News (Aug. 6, 2024), https://perma.cc/AJ75-2MPS.

differences between boys and girls. The Department of Education's Rule is unlawful.

## II.    The Rule would nullify Title IX's protections for women.

Conflating "sex" and "gender identity" eviscerates Title IX, denying women and girls the legal protection that Congress intended to provide. As the Eleventh Circuit explained, if "sex" includes "gender identity," then "the various carveouts" for sex-separated activities like living facilities and sports teams "would be rendered meaningless." *Adams*, 57 F.4th at 813.  Reading "sex" as "gender identity" "would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity"—even though Title IX's text and longstanding regulations permit sex-based carveouts, not "gender identity"-based ones. *Id.* at 814. The results would be both absurd and profoundly discriminatory against women.

### A.    The Rule renders Title IX's administration absurd.

Reading "sex" in Title IX as "gender identity" would result in many absurdities. First, it is impossible to maintain activities or facilities that are separated by *both* sex and gender identity. As soon as a school permits a boy to run on the girls' cross-country team, that team is no longer sex-separated.  Then presumably it would also discriminate based on gender identity to keep males who identify as males from

that formerly-female team. This interpretation would put schools "in an impossible position," and in practice would seem to redefine "sex" in Title VII as "*only* gender identity"—contradicting text, history, and tradition. *Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 737–38 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part) (emphasis added); *see supra* Part I.

One might respond that the answer is *four* teams: for females who identify as females, females who identify as males, males who identify as males, and males who identify as females. Beyond being administratively impossible, that solution would *still* discriminate, at least applying the Rule. The World Professional Association for Transgender Health refers to "gender identity" as a "person's deeply felt, internal, intrinsic sense of their own gender."[7] Transgender advocacy groups say there are at least 100 such identities. *See supra* note 4. Further confusing the matter is that, according to the American Psychological Association, "some people" "experience their gender identity as fluid."[8]

---

[7] *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, S252 (2022), https://perma.cc/KM5L-F26V ("WPATH Standards").

[8] *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 836 (Dec. 2015), https://perma.cc/6FAS-676M; *see* K. Camburn, *9 Young People Explain what Being Non-binary Means to Them* (July 14, 2019), https://perma.cc/SSD6-ZFML ("I choose to see my gender as a creature that exists not *because* of me or *for* me, rather, it exists *through* me. I am merely a conduit of expression for the multitude of ways gender takes form. Each day is different.").

Likewise, the American Academy of Pediatrics says that being transgender is not limited to those "whose gender identity does not match their assigned sex," but "also encompasses many other labels individuals may use to refer to themselves" and "can be fluid, shifting in different contexts."[9] Being "transgender," the AAP explains, is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience."[10] The AAP suggests the following "explanation" of "gender identity,"[11]—note especially the "Rules":[12]



---

[9] J. Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4, at 2 (Oct. 2018), https://perma.cc/8PYT-CGUG.
[10] *Id.* at 3.
[11] *Id.*
[12] *The Gender Book*, https://perma.cc/42WU-KRLX.

The Department's Rule seems to parrot these expansive definitions, explaining that it "understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809. But making this definition part of Title IX deprives the statute of meaning. Take a biological boy who has a "gender identit[y] that encompass[es] or blend[s] elements of other genders"—and one "that changes over time."[13] He wishes to use the girls' locker room. Under the Rule, how would a school avoid federal government investigation and a Title IX violation? By excluding him, the school has not treated him differently from other males, but that is not good enough. The school has no other students with this gender identity to compare him to, at least that day, much less a female student with this gender identity. But that's no matter: under the Rule, "den[ying] a [blending/changing] student access to a sex-separate facility or activity consistent with that student's gender identity . . . would violate Title IX's general nondiscrimination mandate." 89 Fed. Reg. at 33818.

And how does the school know which facility is "consistent" with the 100+ gender identities? The Department shrinks from this impossible task, explaining that it "does not specify how a [school] must provide access to sex-separate facilities for students who do not identify as male or female," though the Department is "aware" that many schools "rely on a student's consistent assertion." *Id.* at 33818–19. What

---

[13] WPATH Standards, *supra* note 7, at S80.

that means in practice is that a student can have access on any given day to whichever facility the student desires—no matter the privacy or safety concerns of other students, or even what the student's parents have to say. *See id.* at 33818 (suggesting "coordinat[ion] with the student, and the student's parent or guardian *as appropriate*" (emphasis added)).

This is the Rule's effect. Every program or activity would be open on demand to any person at the moment they verbalize any gender identity, whatever that identity might mean, regardless of its relation to biological sex, and no matter if it changed from the moment before. Bathrooms, locker rooms, living facilities, and sports teams could not be subject to any meaningful rules at all. *See generally Neese v. Becerra*, 640 F. Supp. 3d 668, 680 (N.D. Tex. 2022) ("If 'on the basis of sex' included 'sexual orientation' and 'gender identity,'" "Title IX and its regulations would be nonsensical."). Congress could not have intended these absurdities.

## B.    The Rule threatens women's opportunities—and safety.

Under the Rule, Title IX could not fulfill its goal of combatting "pervasive discrimination against women with respect to educational opportunities." *McCormick*, 370 F.3d at 286. By elevating gender identity over sex, the Rule would strip women of opportunities, deprive them of private spaces, undermine their pursuit of equality, and endanger their physical safety.

Title IX's enactment has led to a flourishing environment in girls' sports. "The girls' high school participation rate is greater than 11 times what it was when Title IX was passed, an increase of more than 1,000%."[14] Yet still today, girls' participation numbers are below what the boys' participation numbers were in 1972 at Title IX's passage.[15] The Rule would undermine this progress: "It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977). Though the Department fakes a punt on athletics, its Rule admonishes that a "categorical" sex separation of sports will not be acceptable. 89 Fed. Reg. at 33817.

Girls who are displaced by biological boys in sports do not stand a chance. If they continue to compete in the female category, they lose. And they lose more than just competitions, they lose opportunities. Coaches will recruit biological males for women's teams. Schools will be forced to allocate scholarships away from biological females to males. *See Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("[U]nder Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c)."). As the Supreme Court discussed in *NCAA v.*

---

[14] A. Wilson, *NCAA Title IX 50th Anniversary: The State of Women in College Sports* (2022), at 15, https://perma.cc/4CDW-PLQZ.
[15] *Id.*

*Alston*, athletics provide a host of opportunities: "paid internships," "athletic awards," "academic and graduation awards," "graduate degrees," "vocational school," "tutoring," and much more. 594 U.S. 69, 104–06 (2021). If Title IX is re-defined, female athletes will routinely be blocked from these opportunities.

Ignoring differences between sexes will also endanger women. There is no shortage of recent examples. For instance, Payton McNabb, a North Carolina vol-leyball player, is currently dealing with partial paralysis and a traumatic brain injury due to a "spike by a male athlete who identified as transgender" in 2022. Payton was in high school when the injury occurred.[16]

A Massachusetts girls' basketball team forfeited a game this year due to inju-ries from a male player.[17]

In 2023, a female field hockey player "was hit in the mouth by a shot from a boy" and "suffered 'significant facial and dental injuries.'"[18] The girl was hospital-ized. And the incident left "horror in the eyes" of her teammates who "sobb[ed] not only in fear for their teammate, but also in fear that they had to go back out onto the

---

[16] A. McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Independent Women's Fo-rum, https://perma.cc/FFC3-68QV.

[17] M. Koenig, *School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, New York Post (Feb. 28, 2024), https://perma.cc/5TV8-W9GE.

[18] *Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/NRM2-LTJW.

field and continue a game, playing against a male athlete who hospitalized one of our own."[19]

Safety, of course, goes beyond the field of play. If biological males are allowed to compete because of their gender identity, they will be allowed to access the girls' showers, locker rooms, and bathrooms. The NCAA is currently being sued for allowing a biological male "complete and unrestricted access to the women's locker rooms, showers, and restrooms," causing girls to be anxious, "stressed out," and feeling their "privacy and sense of safety was violated."[20]

The Department insists that "a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom or locker room," while excluding a male who identifies as something else from the same restroom or locker room "*does* cause cognizable harm." Appellants' Br. 28. This claim is deeply confused. First, by a "women's restroom or locker room," the Department is seemingly referring to a facility designated for the female *sex*—which, as Title IX uses the term, is biological. (The Department seems to concede the point. *See, e.g.*, *id.* at 12, 22 ("assuming" "sex" is biological).) When a male who wants to enter that female facility is denied access, the harm is always the same: denial based on sex. The

---

[19] *Id.*; L. Gilbert, *Female Athlete's Injury Creates Outrage Around Coed Sports*, The Daily Signal (Nov. 7, 2023), https://perma.cc/G4F8-35YL.

[20] Am. Compl. ¶ 477, *Gaines v. NCAA*, No. 1:24-cv-01109-MHC, Doc. 64 (N.D. Ga. June 26, 2024).

Department has no explanation for why the male's subjective reason for desiring access to the facility matters under Title IX. Nor does the Department explain its stereotype that no cisgender males desire access to female facilities (the Department does not even bother to define "cisgender"), or that all non-cisgender males (whoever that category might include) do. Again, gender identity is irrelevant to the exclusion, just as it is irrelevant under Title IX.

Of course, the Department also glosses over all the harms that females would suffer from the intrusion of biological males into their personal facilities. As shown, the Rule flings the door open to negative consequences for girls and women seeking an equal opportunity to compete, learn, and live.

*       *       *

The Department has proclaimed that its interpretation "is most consistent with the purpose of Title IX, which is to ensure equal opportunity."[21] But "[c]hanging how we define 'female' so that it includes individuals of both sexes, and then disallowing any distinctions among them on the basis of sex, is by definition and in effect a rejection of Title IX's equality goals." *Adams*, 57 F.4th at 820 (Lagoa, J., concurring). The Department's Rule would make the equality sought by Title IX impossible

---

[21] Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32637, 32639 (2021).

by denying the biological reality that men are not women. The Department's Rule is unlawful.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

s/ Christopher Mills
CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay St. #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

OCTOBER 16, 2024

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 5,419 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  October 16, 2024

/s Christopher Mills
Christopher Mills

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief

was served electronically on all parties via CM/ECF.

Dated:  October 16, 2024

s/ Christopher Mills
Christopher Mills

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, issued without the notice required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE GENERAL COUNSEL

Date:  January 8, 2021

MEMORANDUM FOR KIMBERLY M. RICHEY
ACTING ASSISTANT SECRETARY
OF THE OFFICE FOR CIVIL RIGHTS

*Re: Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020)*

The U.S. Department of Education's (Department) Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681, *et seq*., and its implementing regulations at 34 C.F.R. Part 106, prohibiting discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.  You have asked the Office of the General Counsel a series of questions regarding the effect of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), with respect to Title IX.  Our answers are presented below.

**Question 1:    Does the *Bostock* decision construe Title IX?**

**Answer:**  No.  *Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) construes the prohibition on sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII).  The Court decided the case narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes.  *Id.* at 1753.  The Department does not have authority to enforce Title VII.  Our understanding is OCR occasionally receives cases alleging discrimination filed by employees.  OCR's Case Processing Manual describes OCR's views on its jurisdiction over employment-related complaints.

Title IX, which the Department does have authority to enforce, prohibits sex discrimination in education programs or activities receiving Federal financial assistance. But Title IX text is very different from Title VII text in many important respects.  Title IX, for example, contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex.  *Compare* 42 U.S.C. §§ 2000e-1, 2000e-2 *with* 20 U.S.C. §§ 1681(a), 1686.  However, Title VII and Title IX both use the term "sex", and it is here *Bostock* may have salience.  *Bostock* compels us to interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment.  *Bostock*, 140 S. Ct. at 1738 (citations omitted).  And as explained below, specifically in the answer to Question 2, the Department's longstanding construction of the term "sex" in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of "sex" at the time of Title IX's enactment.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

**Question 2:    Does *Bostock* affect the meaning of "sex" as that term is used in Title IX?**

**Answer:**  No.  *Bostock* does not affect the meaning of "sex" as that term is used in Title IX for at least two reasons.  First, as we pointed out in response to Question 1, *Bostock* does not construe Title IX.  However, it is worth noting the Court's assumption that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female.  *See Bostock*, 140 S. Ct. at 1738–39; *see also* 1784–91 (Appendix A) (Alito, J. dissenting).[1]  This is consistent with and further supports the Department's long-standing construction of the term "sex" in Title IX to mean biological sex, male or female.

Second, statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the Department's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could *only* have been, as Justice Gorsuch put it, "biological distinctions between male and female."  *See* 20 U.S.C. §§ 1681(a), 1686; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Bostock*, 140 S. Ct. at 1739, 1784–91 (Appendix A) (Alito, J. dissenting); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) ("discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."); *General Elec. Co v. Gilbert*, 429 U.S. 125, 146, 149 (1976) (Brennan, J. and Marshall, J. dissenting) ("*Geduldig* itself obliges the Court to determine whether the exclusion of a sex-linked disability from the universe of compensable disabilities was actually the product of neutral, persuasive actuarial considerations, or rather stemmed from a policy that purposefully downgraded women's role in the labor force. . . . [T]he Court simply disregards a history of General Electric practices that have served *to undercut the*

---

[1] The Court's assumption that "sex" as used in Title VII means the biological distinctions between male and female drove the reasoning.

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female.  If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified *as male at birth* for traits or actions that it tolerates in an employee identified *as female at birth*."

140 S. Ct. at 1741 (emphasis added).  In other words, a male employee who identifies as female nonetheless remains a biological male.  Therefore, when an employer discriminates against such a person for certain "traits or actions" otherwise tolerated in a biological female, *Bostock* holds the employer violated Title VII.

*Bostock* uses a "but for" analysis to determine whether an employee's homosexuality or transgender status is covered by Title VII's bar on sex discrimination.  *See Bostock* at 1742.  We believe the same "but for" analysis would logically extend to individuals who allege discrimination on the basis that they are heterosexual or non-transgender.  Nevertheless, we note no reason to believe the Court's logic necessarily leads to the conclusion that all forms of sexual orientation are covered by Title VII.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, and was issued without the review required under the Department's Rulemaking and Guidance Procedures. 85 Fed. Reg. 6,837 (Oct. 5, 2020).

*employment opportunities of women who become pregnant while employed*.") (citations and footnote omitted).[2]

As stated in the Preamble to the Title IX Final Rule published on May 19, 2020:

> Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition. For example, 20 U.S.C. 1681(a)(2), which concerns educational institutions commencing planned changes in admissions, refers to ''an institution which admits only students of one sex to being an institution which admits students of both sexes.'' Similarly, 20 U.S.C. 1681(a)(6)(B) refers to ''men's'' and ''women's'' associations as well as organizations for ''boys'' and ''girls'' in the context of organizations ''the membership of which has traditionally been limited to persons of one sex.'' Likewise, 20 U.S.C. 1681(a)(7)(A) refers to ''boys''' and ''girls''' conferences. Title IX does not prohibit an educational institution ''from maintaining separate living facilities for the different sexes'' pursuant to 20 U.S.C. 1686.

> . . . .

> In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes. For example, the Department's justification for not allowing schools to use "a single standard of measuring skill or progress in physical education classes . . . [if doing so] has an adverse effect on members of one sex" was that "if progress is measured by determining whether an individual can perform twenty-five push-ups, the standard may be virtually out-of-reach for many more women than men because of the difference in strength between average persons of each sex."

U.S. Dep't of Educ., Office for Civil Rights, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Final Rule, 85 Fed. Reg. 30,178 (May 19, 2020).

Additional evidence that the term "sex" and human biology are inextricably linked under Title IX may be found in the Department's regulations expressly prohibiting discrimination related to a student or employee's pregnancy. 34 C.F.R. § 106.40(b)(1). These regulations are valid only because they effectuate Title IX's prohibition against sex discrimination. *See* 20 U.S.C. § 1682. Courts have recognized, quite correctly in our view, that discrimination on the basis of pregnancy constitutes discrimination on the basis of female physiology and is therefore prohibited under Title

---

[2] *Gilbert* and *Newport News* are Title VII cases. *Frontiero* is a due process case. However, all are roughly contemporaneous with the enactment of Title IX and the promulgation of the Department's regulations, and all suggest the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation, issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

IX.  *Conley v. Nw. Fla. State College*, 145 F. Supp. 3d 1073, 1077 (N.D. Fl. 2015).  Biological males, regardless of transgender status or surgical interventions, are incapable of bearing children.

The Title IX regulations became effective only after direct and extensive Congressional review, including six days of House hearings to determine whether the regulations were "consistent with the law and with the intent of the Congress in enacting the law."  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–33 (internal quotation marks omitted).  Accordingly, they carry extra weight and interpretative authority.  *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 468 U.S. 837, 842–45 (1984).  Additionally, the Title IX statute has been amended repeatedly since the Title IX regulations were adopted, *see, e.g.*, *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–87 (2d Cir. 2004) (discussing amendments made by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 3(a), 102 Stat. 28, 28–29 (1988)), and although the matter has been the subject of some debate within Congress, Congress has not disturbed these regulations.  *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–35 (1982) ("Where an agency's statutory construction has been 'fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (citations and internal quotation marks omitted).

Consequently, based on controlling authorities, we must give effect to the ordinary public meaning at the time of enactment and construe the term "sex" in Title IX to mean biological sex, male or female.  Congress has the authority to rewrite Title IX and redefine its terms at any time.  To date, however, Congress has chosen not to do so.

**Question 3:  How should OCR view allegations that a recipient targets individuals for discriminatory treatment on the basis of a person's transgender status or homosexuality?**

**Answer:**  Although *Bostock* expressly does not decide issues arising under Title IX or other differently drafted laws, the logic of *Bostock* may, in some cases, be useful in guiding OCR's understanding as to whether the alleged discrimination on the basis of a person's transgender status or homosexuality necessarily takes into account the person's biological sex and, thus, constitutes discrimination on the basis of sex.  Depending on the facts, complaints involving discrimination on the basis of transgender status or homosexuality might fall within the scope of Title IX's non-discrimination mandate because they allege sex discrimination.  *See Bostock*, 140 S. Ct. at 1741, 1737 ("Sex plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status).

However, we emphasize that Title IX and its implementing regulations, unlike Title VII, may *require* consideration of a person's biological sex, male or female.  20 U.S.C. §§ 1681(a), 1686; 34 CFR §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61.  Consequently, we believe a recipient generally would not violate Title IX by, for example, recording a student's biological sex in school records, or referring to a student using sex-based pronouns that correspond to the student's biological sex, or refusing to permit a student to participate in a program or activity lawfully provided for members of the opposite sex, regardless of transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation, issued without the notice required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62,597 (Oct. 5, 2020).

**Question 4: After *Bostock*, how should OCR view allegations of employment discrimination or sexual harassment based on an individual's transgender status or homosexuality?**

**Answer:** We address the employment and harassment aspects of this question separately below.

A.      Employment

In *Bostock*, the Supreme Court considered "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" under Title VII.  *Bostock*, 140 S. Ct. at 1753. Assuming the term "sex" in Title VII means biological sex, male or female, the Supreme Court held: "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex.  Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id*. at 1737.  Title IX also prohibits termination of an employee on the basis of sex, meaning a person's biological sex, male or female.  By analogy to *Bostock*, terminating an employee on the basis of the employee's homosexuality or transgender status implicates that employee's sex and, thus, is at least in part discrimination on the basis of the employee's biological sex.  An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion).  Even Title VII, however, recognizes that there are circumstances where an individual's sex is relevant to employment and expressly provides that an employer may consider sex "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."  42 U.S.C. § 2000e-2(e)(1).  If a person's sex is a bona fide occupational qualification, "such that consideration of sex with regard to such action is essential to successful operation of the employment function concerned," then Title IX and its implementing regulations, like Title VII, would not prohibit discrimination on the basis of sex.  34 C.F.R. § 106.61; *see also* 34 C.F.R. §§ 106.55(c), 106.59.

B.      Sexual Harassment

In the Title IX Final Rule, issued on May 19, 2020, the Department for the first time recognized and defined sexual harassment as a form of sex discrimination with regulations that had the force and effect of law.  85 Fed. Reg. 30,026.  Under our regulations, "sexual harassment" means conduct on the basis of sex that satisfies one or more of the following:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct (hereinafter referred to as "*quid pro quo* sexual harassment");

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

5 of 13

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, and is also inconsistent with the new regulations that the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Appellate Case: 24-3089      Document: 12      Date Filed: 07/02/2024      Page: 38

(3) "Sexual assault" as defined in 20 U.S.C. § 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. § 12291(a)(10), "domestic violence" as defined in 34 U.S.C. § 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30(a).

The preamble acknowledged "[a]nyone may experience sexual harassment, irrespective of gender identity or sexual orientation," 85 Fed. Reg. 30,178, and stated the "final regulations focus on prohibited conduct, irrespective of the identity of the complainant and respondent," 85 Fed. Reg. 30,179. Under 34 C.F.R. § 106.30(a), the Department continues to interpret "conduct on the basis of sex" as conduct on the basis of a person's biological sex. Consistent with *Bostock*, harassment on the basis of a person's transgender status or homosexuality may implicate that person's biological sex and, thus, may at least in part constitute "conduct on the basis of sex." Accordingly, unwelcome conduct on the basis of transgender status or homosexuality may, if so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity on the basis of their transgender status or homosexuality, constitute sexual harassment prohibited by Title IX. 34 C.F.R. § 106.30(a).

**Question 5:** **How does the Department interpret Title IX and its implementing regulations in light of *Bostock* with respect to athletics, intimate facilities, religious exemptions, and other sex-segregated programs or activities addressed under Title IX and its regulations?**

**Answer:** Our answer to this question is based on three propositions. First, *Bostock* applies only to Title VII. *Compare* 42 U.S.C. § 2000e, *et seq. with* 20 U.S.C. §§ 1681, *et seq.* It does not purport to construe, much less abrogate, Title IX's statutory and regulatory text permitting or requiring biological sex to be taken into account in an educational setting.[3] Second, the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or sexual orientation. Third, the Department's regulations recognizing the male/female biological binary carry extra weight and interpretative authority because they were the product of uniquely robust and direct Congressional review. *Bell*, 456 U.S. at 531–32 (describing Congressional review of regulations implementing Title IX); *see also Mead Corp.*, 533 U.S. at 226–27; *Chevron*, 468 U.S. at 842–45. Consequently, our view is that *Bostock's* holding and reasoning, to the extent relevant, support the Department's position that Title IX's statutory and regulatory provisions permit, and in some cases require, biological sex, male or female, to be taken into account in an education program or activity.[4] *See* 20 U.S.C. §§ 1681(a), 1686; 34 CFR

---

[3] *Bostock* emphasized that general non-discrimination statutes often contain exceptions that override a general duty in some circumstances. *See, e.g.*, 140 S. Ct. at 1754 ("As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations [in Title VII].").  Even under Title VII (concerning workplace discrimination), the *Bostock* Court expressly left open the issue of sex-segregated facilities and policies.

[4] This Memorandum does not presume to exhaust the ways recipients may lawfully consider sex under Title IX in their programs and activities, and there may be circumstances not addressed by this document under which a recipient's consideration of sex does not constitute unlawful discrimination under Title IX.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Appellate Case: 24-4089    Document: 2    Date Filed: 07/03/2025    Page: 68

§§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 133; *Yates*, 574 U.S. at 537-38; *Davis*, 489 U.S. at 809.

A.    Athletics

We believe the ordinary public meaning of controlling statutory and regulatory text requires a recipient providing separate athletic teams to separate participants solely based on their biological sex, male or female, and not based on transgender status or homosexuality, to comply with Title IX.

Under Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible and may be required because the sexes are not similarly situated.  34 CFR § 106.41.  Biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring."); *Frontiero*, 411 U.S. at 686 (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth").  Accordingly, schools must consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate.  *See McCormick*, 370 F.3d at 287 ("[I]dentical scheduling for boys and girls is not required.  Rather, compliance is assessed by first determining whether a difference in scheduling has a negative impact on one sex, and then determining whether that disparity is substantial enough to deny members of that sex equality of athletic opportunity."); *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1192 (9th Cir. 1989) (quoting *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team.  Thus, athletic opportunities for women would be diminished")).

*Bostock* does not diminish the relevance of biological sex in athletics, and does not address the validity of the Department's historic measures to ensure biological females (girls and women) have equal opportunities to participate in athletics because males and females are not similarly situated with respect to athletic competition.[5]  Unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities.  Indeed, Title IX was enacted, and its regulations promulgated, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunities for students who are biological females, including by providing for sex-segregated athletics.

The fact is, Congress specifically mandated that the Department consider promulgating regulations to address sports.  After first enacting Title IX, Congress subsequently passed another

---

[5]Although the Department does not address Equal Protection Clause claims regarding separate athletic teams for biological females and biological males, the Department's position on such claims is stated in its Brief for the United States as Amicus Curiae Supporting Appellants and Urging Reversal in *Hecox v. Little*, Nos. 20-35813, 20-35815, U.S. Court of Appeals for the Ninth Circuit (filed Nov. 19, 2020).

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, issued without the review required under the Department's Rulemaking and Guidance Procedures.

statute, entitled the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports." Public Law 93–380 (HR 69), § 844, 88 Stat 484, 612 (August 21, 1974). Congress reserved the right to review the regulations following publication to determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority." *Id*.

The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations. *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24,128, 21,142–43 (June 4, 1975) (promulgating § 86.41 Athletics) *with* 34 C.F.R. § 106.41. After Congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick*, 370 F.3d at 287 (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder). Consequently, the regulations validly and authoritatively clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX.").

34 C.F.R. § 106.41 prohibits a recipient from discriminating on the basis of sex with respect to providing athletic programs or activities, permits a recipient to provide sex-segregated teams for competitive activities or contact sports, and obligates a recipient to provide equal athletic opportunity for members of both sexes.[6] As it has for over forty years, the Department must interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*," and 34 C.F.R. § 106.41(c), regarding equal athletic opportunity for "members of *both sexes*" (emphasis added), to mean operation of teams and equal opportunity for biological males, and for biological females. Based on statutory text and regulatory history, it seems clear that if a recipient chooses to provide "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), then it must separate those teams solely on the basis of biological sex, male or female, and not on the basis of transgender status or sexual orientation, to comply with Title IX.[7]

---

[6] Specifically, 34 C.F.R. § 106.41(a) provides a general rule that recipients shall not provide athletics separately based on sex. However, 34 C.F.R. § 106.41(b) permits a recipient to operate or sponsor separate teams for members of each sex where selection for the teams is based on competitive skill, or the activity is a contact sport, and also provides that where a recipient operates or sponsors a team in a particular sport for members of one sex with no such team for members of the opposite sex, then members of the excluded sex must be allowed to try out for the team unless it is for a contact sport. Finally, 34 C.F.R. § 106.41(c) obligates a recipient to provide "equal athletic opportunity for members of both sexes" by taking into account specified factors in deciding what athletic programs to offer.

[7] Different treatment based on transgender status or homosexuality would generally constitute unlawful sex discrimination because students who do not identify as transgender or homosexual cannot generally be treated worse than students who identify as transgender or homosexual. *See*

ARCHIVED AND NOT FOR RELIANCE.

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, and without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

B.      Intimate Facilities

As discussed above, the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female.  That too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress.  *See, e.g.*, *Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61.  34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex."  Therefore, we believe the plain ordinary public meaning of the controlling statutory and regulatory text requires a recipient providing "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on biological sex.

Our opinion is contrary to the holding of a divided panel of the Fourth Circuit Court of Appeals in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020).  There, the court held denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX and acknowledged that "*Bostock* expressly does not answer this 'sex-separated restroom' question."  *Id*. at 618 (citing *Bostock* 140 S. Ct. at 1753).  The court's analysis of 34 C.F.R. § 106.33, in its entirety, was:

> [T]he Board emphasizes a Department of Education implementing regulation, 34 C.F.R. § 106.33, which interprets Title IX to allow for "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are "comparable" to each other. But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity. And the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex. All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what "sex" means.
>
> As explained above, Grimm consistently and persistently identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restrooms as part of the appropriate treatment. Rather than contend with Grimm's serious medical need, the Board relied on its own invented classification, "biological gender," for which it turned to the sex on his birth certificate. And even when Grimm provided the school with his amended birth certificate, the Board *still* denied him access to the boys restrooms. For these reasons, we hold that the Board's application of its restroom policy against Grimm violated Title IX.

*Id.* at 618–19 (citations omitted) (emphasis in original).

_____

*Bostock*, 140 S. Ct. at 1747.  ("But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.")

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Our opinion is also contrary to a divided Eleventh Circuit panel decision, *Adams by and through Kasper v. School Board of St. Johns County*, 968 F. 3d 1286 (11th Cir. 2020). There, the court also held that denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX. Specifically:

> The School Board believes 34 C.F.R. § 106.33 of the Title IX implementing regulations forecloses Mr. Adams's discrimination claim. Section 106.33 reads:
>
> > A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.
>
> The School Board argues that the use of the term "sex" in this regulation clearly means "biological sex," or sex assigned at birth. Thus, it asserts that dividing restrooms by sex assigned at birth—requiring transgender boys to use the girls' restroom and transgender girls to use the boys' restroom—cannot be discriminatory under Title IX. The Board considers Mr. Adams a "biological female," and it seeks to exclude him from the boys' restroom on this basis. But Mr. Adams's discrimination claim does not contradict the implementing regulations for two reasons. First, Mr. Adams is not challenging § 106.33's provision of separate restrooms for girls and boys. He is simply seeking access to the boys' restroom as a transgender boy. And second, the regulation does not mandate how to determine a transgender student's "sex." Thus, we perceive no conflict between the text of § 106.33 and Mr. Adams's successful claim of discrimination.

*Id*. at 1308. The court reasoned that Title IX and its accompanying regulations contain no definition of the term "sex" and "the plain language of the regulation sheds no light on whether Mr. Adams's 'sex' is female as assigned at his birth or whether his 'sex' is male as it reads on his driver's license and his birth certificate." *Id*. at 1310. It explicitly rejected the argument which *Bostock* relied upon, reading the term "sex" to mean "biological sex" and not transgender status. And it concluded the traditional understanding of biological sex to be "narrow" and "unworkable." *Id*.

We are unpersuaded by the Title IX analysis in both *Adams* and *Grimm* for at least three reasons. First, as described above in response to Question 3, we believe, based on our review of the statutory text, regulatory history, and cited authorities, that the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female. The notion that "because neither Title IX nor the regulation define 'sex' or 'on the basis of sex,' the statute and regulation cannot be presumed to mean 'biological sex'" is at odds with controlling interpretative canons. *Compare Bostock*, 140 S. Ct. at 1738 *with Adams*, 968 F. 3d at 1310. And if the terms "sex" and "on the basis of sex" are truly ambiguous, then the Department's longstanding construction, reflected in the implementing regulations and reaffirmed in the Title IX Final Rule is entitled to deference and is for now controlling.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation. It was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Second, *Adams* and *Grimm* failed to rigorously analyze Title IX's plain text, *compare Bostock,* 140 S. Ct. at 1738–1743, or to fairly address the legal consequence of the Department's unique implementing regulations, *see Bell,* 456 U.S. at 531–32. In *Adams*, for example, the majority variously argued *Bostock* does not endorse reading the term "sex" to mean "biological sex"; Title IX and its regulations do not define "sex"; and the traditional understanding of biological sex is "narrow and unworkable." *Adams,* 968 F. 3d at 1310. In *Grimm*, the court asserted "the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex," arguing the act of creating sex-separated restrooms in and of itself is not discriminatory but relying on "discriminatory notions of what 'sex' means" is unlawful. *Grimm*, 972 F.3d at 618 (footnote omitted). Both panels assuredly should have engaged in the textual analysis mandated by controlling Supreme Court authorities, *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538–39 (2019), determined the term's ordinary public meaning at the time of enactment, and addressed the interplay of the entire statutory and regulatory text. [8]

Third, the Department issued its Title IX regulation on May 19, 2020 stating, "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition." 85 Fed. Reg. 30,178. "In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes." *Id*. *Adams* and *Grimm* were decided more than two months after publication of the Title IX rule and its interpretative preamble. Yet neither discussed the Department's interpretation. As *Adams* suggests, the Department's views on the meaning of "sex" in Title IX should have been given deference, or, at a minimum, addressed in the panel decisions, particularly because the statutory and regulatory definition of "sex," or supposed lack thereof, was purportedly critical to the outcome in both cases. *See Adams*, 968 F.3d at 1310 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)); *Chevron,* 467 U.S. at 842–44.

---

[8]For example, *Grimm's* panel reasoned:

> In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." In light of our equal protection discussion above, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students.

*Grimm*, 972 F.3d at 618. However, Grimm was not treated "worse than similarly situated students" because under the Department's regulations the proper comparator should have been biological females not biological males.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

C.    Religious Exemptions

The holding in *Bostock* does not affect the statutory exemption from Title IX, 20 U.S.C. § 1681(a)(3), and its implementing regulations, 34 C.F.R. § 106.12, for an educational institution controlled by a religious organization. *Maxon, et al. v. Fuller Theological Seminary*, No. 2:19-cv-09969 (C.D. Cal. Oct. 7, 2020), *appeal docketed*, No. 20-56156 (9th Cir. Nov. 4, 2020). For example, *Bostock* acknowledged the express statutory exception in Title VII for religious organizations and expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution[.]" *Bostock*, 140 S. Ct. at 1753–54. Thus, the Court "recognized that the First Amendment can bar the application of employment discrimination laws[.]" *Id*. at 1754 (citing *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012)). Accordingly, the Department's regulations implementing Title IX do not and lawfully could not require a recipient to restrict "any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution," including the free exercise of religion. 34 C.F.R. § 106.6(d)(1).

Additionally, the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq*., "operates as a kind of super statute, displacing the normal operation of other federal laws [] [such that] it might supersede Title VII's commands in appropriate cases." *Bostock*, 140 S. Ct. at 1753–54. The Department also acknowledges that RFRA operates as a super statute that might supersede Title IX's commands in appropriate cases. Office of the General Counsel, U.S. Dep't of Educ., Guidance Regarding Department of Education Grants and Executive Order 13798, 85 Fed. Reg. 61,736, 61,738–39 (Sept. 30, 2020) ("Congress expressly applied RFRA to all Federal law, statutory or otherwise, whether adopted before or after its enactment. RFRA therefore applies to all laws governing ED programs, including but not limited to nondiscrimination laws such as Title IX") (footnotes omitted). Although OCR does not have jurisdiction over complaints lodged under RFRA, schools and individuals may inform the Department of a burden or potential burden under RFRA, using the process provided in the Department's Guidance Regarding Department of Education Grants and Executive Order 13798, here.

D.    Other Sex-Segregated Programs or Activities Addressed Under Title IX and its Regulations

Title IX and its implementing regulations address other circumstances under which it is permissible to provide education programs or activities based on distinctions between the two biological sexes. Examples include, but are not limited to, the following:

- The admissions policies of any public institution of undergraduate higher education that traditionally and continually from its establishment has had a policy of admitting only students of one sex. 20 U.S.C. § 1681(a)(5).
- The membership practices of certain organizations such as a social fraternity or social sorority whose members are primarily students at an institution of higher education. 20 U.S.C. § 1681(a)(6)(A).

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation. It was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

- Organizations such as the Girl Scouts whose membership "has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age." 20 U.S.C. § 1681(a)(6)(B).
- Separate mother-daughter and father-son activities. 20 U.S.C. § 1681(a)(8).
- A school's decision to provide separate housing for members of each sex. 20 U.S.C. § 1686.
- A recipient's decision to provide single-sex classes, extracurricular activities, or schools subject to specific regulatory requirements on the basis of sex. 34 C.F.R. § 106.34(b)-(c).
- A recipient's decision to separate students in physical education classes involving contact sports based on each student's sex, or to conduct separate sessions in human sexuality classes for students of each sex. 34 C.F.R. § 106.34(a)(1), (a)(3).

For the reasons discussed in response to Questions 2, 3, 5(A), and 5(B), the term "sex" with respect to these and other similar programs or activities should be construed to mean biological sex, male or female.

Please contact us if we may be of further assistance.

.

U.S. DEPARTMENT OF EDUCATION
THE OFFICE OF THE GENERAL COUNSEL

**Reed Rubinstein**
Digitally signed by
Reed Rubinstein
Date: 2021.01.08
14:28:38 -05'00'

Reed D. Rubinstein,
Principal Deputy General Counsel delegated
the authority and duties of the General Counsel