## Case No. 24-3097

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

---

STATE OF KANSAS, et al.,
*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,
*Defendants-Appellants.*

_____

*On Appeal from the United States District Court for the District of Kansas (Topeka)*
*Case No. 5:24-cv-04041-JWB-ADM · The Honorable John W. Broomes*

**BRIEF OF *AMICUS CURIAE* THE DEFENSE OF FREEDOM INSTITUTE FOR POLICY STUDIES IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

DONALD A. DAUGHERTY, JR.
MARTHA A. ASTOR*
**DEFENSE OF FREEDOM INSTITUTE**
1455 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004
don.daugherty@dfipolicy.org
martha.astor@dfipolicy.org

October 16, 2024        *Counsel for Amicus Curiae*

*Admission to be sought





## 10th CIR. FORM 4. DISCLOSURE STATEMENT

### UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

### Fed. R. App. P. 26.1 and Tenth Circuit Rule 26.1 Disclosure Statement

STATE OF KANSAS, et al.,
Plaintiffs-Appellees

v.                                                    Case No.    24-3097

UNITED STATES
DEPARTMENT OF EDUCATION, et al.,
Defendants-Appellants.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), (b), and/or (c), the undersigned, on behalf of  THE DEFENSE OF FREEDOM INSTITUTE FOR POLICY STUDIES

[Party Name(s)]

certifies[1] as follows:

☐    The following parent corporation(s); publicly held corporation(s); organizational victim(s); and/or debtor(s) are disclosed as required by Fed. R. App. P. 26.1 (attach additional pages if necessary):

☒    There is no information to disclose pursuant to Fed. R. App. P. 26.1.

October 16, 2024

Date

Signature

---

[1] Pursuant to Federal Rule of Appellate Procedure 26.1(d)(3), this disclosure statement must be promptly updated whenever any of the information required under Fed. R. App. P. 26.1 changes.

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..............................................................i

TABLE OF AUTHORITIES ................................................ii

STATEMENT OF INTEREST............................................1

SUMMARY OF ARGUMENT ............................................2

ARGUMENT ......................................................................7

    I.   Because Title IX Was Enacted Pursuant to the Spending
        Clause, Which Sets Limits on Congress's Authority That Do
        Not Apply To Title VII, *Bostock* Does Not Control. ...................7

    II.  The Interpretation of Title IX Required to Justify the
        New Rule Would Violate Spending Clause Restrictions. ........10

        A.   Title IX Does Not So Clearly State the Proposed
              Conditions Set Forth In the New Rule That Recipients of
              Federal Funds Could Exercise Their Choice Knowingly
              and Cognizant Of The Consequences...............................11

        B.   Pressuring Plaintiffs–Appellees to Acquiesce to the
              Proposed Condition Would Be So Coercive As To
              Constitute Compulsion.....................................................18

CONCLUSION..................................................................22

CERTIFICATE OF COMPLIANCE ....................................24

CERTIFICATE OF DIGITAL SUBMISSION .....................25

CERTIFICATE OF SERVICE .............................................26

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Alabama v. U.S. Sec'y of Educ.*,
   No. 24-12444, 2024 U.S. App. LEXIS 21358
   (11th Cir. August 22, 2024)................................................................4

*Arkansas v. U.S. Dep't. of Educ.*,
   No. 4-24-CV-636-RWS, 2024 U.S. Dist. LEXIS 130849
   (E.D. Mo. July 24, 2024)............................................................12, 15

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ..............................................................................12

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ..............................2, 3, 4, 5, 6, 7, 10, 14, 15, 16, 17

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ...............................................................................12

*Davis v. Monroe Cnty, Sch. Bd.*,
   526 U.S. 629 (1999) ..........................................................................7, 8, 9

*Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*,
   No 23-2064, 2024 U.S. App. LEXIS  10378 (10th Cir. Apr. 30, 2024)...5

*Farmer v. Kan. State Univ.*,
   918 F. 3d 1094 (10th Cir., 2019) ..........................................................8

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ....................................................................7, 8, 13

*Innes v. Kansas State Univ.*,
   184 F.3d 1275 (10th Cir. 1999) ............................................................8

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...............................................................................7

*Kansas v. United States Dep't. of Educ.*,
   No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479
   (10th Cir. July 2, 2024) ............................................................ 5, 12, 14

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) ................................................. 16

*Louisiana v. U.S. Dep't. of Educ.*,
   No. 24-30399, 2024 U.S. App. LEXIS 17886 (5th Cir. 2024) ................. 2

*Louisiana v. U.S. Dep't. of Educ.*,
   No. 3:24-cv-563-TAD-KDM, 2024 U.S. Dist. LEXIS 105645
   (W.D. La. June 13, 2024) ................................................. 1, 3

*Marks v. United States*,
   430 U.S. 188 (1977) ................................................. 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) .................................... 8, 9, 11, 18, 19, 21

*New York v. United States*,
   505 U.S. 144, 168 (1992) ................................................. 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ............................................ 10, 11, 12, 18

*Sch. Dist. v. Sec'y of the United States Dep't of Educ.*,
   584 F.3d 253 (6th Cir. 2009.) ............................................. 17

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................. 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
   600 U.S. 181 (2023) ................................................. 7

*Tennessee v. Cardona*,
   No. 24-5588, 2024 U.S. App. LEXIS 17600 (6th Cir. July 17, 2024).....2

*Tennessee v. Becerra*,
  No. 24-5220, 2024 U.S. App. LEXIS 21521 (6th Cir. Aug. 26, 2024) ..21

*Tennessee v. Dep't. of Educ.*,
  104 F. 4th 577 (6th Cir. 2024) ...............................................................17

*Texas v. United States*,
  No. 2-24-CV-86-Z, 2024 U.S. Dist. LEXIS 121812
  (N.D. Tex. July 11, 2024) .......................................................................15

*U.S. Dep't. of Educ. v. Louisiana*,
  144 U.S. Ct. 2507 (2024) .........................................................................2

*United States v. Lane*,
  883 F.2d 1484, (10th Cir. 1989) ...............................................................7

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................................5

*West Virginia v. Dep't of Treasury*,
  59 F.4th 1124 (11th Cir. 2023)..................................................................9

## Constitutional Provisions

U.S. Const. article I, § 8 ....................................................................... 2, 8

## Statutes

20 U.S.C. § 1682 .......................................................................................19

## Regulations

34 C.F.R. § 106.10 ............................................................................... 6, 15

## Other Authorities

Exec. Order 13,988, *Preventing and Combating Discrimination on the
  Basis of Gender Identity or Sexual Orientation*, 86 Fed. Reg. 7023,
  7023 (Jan. 20, 2021) ................................................................................2

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,*
89 Fed. Reg. 33,474 (Apr. 29, 2024) ...................................................... 1

*Restatement (Second) of Contracts*, § 201(2)(a) ...................................... 13

*Restatement (Second) of Contracts,* § 201(b). ......................................... 14

U.S. Dep't. of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs, by State* ............................................................. 20

U.S. Dep't. of Justice; Civil Rights Division, Title IX Legal Manual, V. *Federal Funding Agency Methods to Enforce Compliance* ................... 2

## STATEMENT OF INTEREST[1]

The Defense of Freedom Institute for Policy Studies ("DFI") is a national nonprofit organization dedicated to defending and advancing educational freedom and opportunities for every American family and student and to protecting the civil and constitutional rights of Americans at school. As part of that effort, DFI is co-counsel for Mississippi, Louisiana, Montana, and Idaho, along with the Attorneys General for those four states, in *Louisiana v. U.S. Dep't. of Educ.*, No. 24-30399, 2024 U.S. App. LEXIS 17886 (5th Cir. July 17, 2024), which challenges new regulations under Title IX published by the Department of Education on April 29, 2024, *see Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "New Rule").[2] Plaintiffs-Appellees here challenge the New Rule on the same

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus curiae or its counsel, contributed money to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

[2] The District Court for the Western District of Louisiana preliminarily enjoined enforcement of the New Rule in the plaintiff-states in *Louisiana,*

1

grounds as DFI's clients do in the separate lawsuit. In this brief, DFI focuses on the validity of the New Rule as an exercise of Congress's authority under the Spending Clause, U.S. Const. art. I, § 8.

## SUMMARY OF ARGUMENT

On the day he was inaugurated, President Biden directed all federal agencies to revise their policies to reflect the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *See* Exec. Order 13,988, *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021). *Bostock* held that Title VII's prohibition on employment discrimination "because of [an] individual's . . . sex" included terminating an employee simply for being gay or transgender because, under that statute's text, "[s]ex plays a necessary and undisguisable role" in such decisions. *Bostock*, 590 U.S. at 652, 658.

---

No. 3:24-cv-563, 2024 U.S. Dist. LEXIS 105645 (W.D. La. June 13, 2024). On interlocutory appeal, the Department moved for a partial stay, which the Fifth Circuit denied. *Louisiana*, 2024 U.S. App. LEXIS 17886, at *7. The Department then applied to the Supreme Court for such relief pending appeal, which the Supreme Court denied. *See U.S. Dep't. of Educ. v. Louisiana*, 144 S. Ct. 2507 (2024) (per curiam).

Consistent with the inaugural directive, Defendants-Appellants argue to this Court that *Bostock*'s reasoning applies here because "claims arising under Title VII and Title XI [are assessed] under the same legal analysis because the statutes serve the same purpose of eradicating sex discrimination." Br. of Appellants, ECF No. 84 at 13. Furthermore, Appellants argue, the District Court "was wrong to conclude that the Rule likely violates the major questions doctrine and the Spending Clause." *Id.* Thus, they ask that this Court vacate the District Court's preliminary injunction. *Id.* at 52.

As a threshold matter, however, before the Appellants filed their brief on August 26, 2024 the United States Supreme Court unanimously rejected requests for relief in cases nearly identical cases to this one while the United States Courts of Appeals in the Sixth and Fifth Courts of Appeals considers those appeals: "Importantly, all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Louisiana*, 144 S. Ct. at 2509-2510. Furthermore, the Court did not find "a sufficient basis to

3

disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule," such that the scope of the injunction was overbroad. *Id. at 3*.[3]

The Supreme Court's refusal to disturb the preliminary injunctions in Tennessee and Louisiana while those Courts consider this line of appeals in the regular course is consistent with the decisions thus far of nearly every lower court in the litigation of the New Rule Title IX ("New Rule Litigation" occurring across the United States.[4]

Similarly, with regard to the specific issue of whether *Bostock* controls, the District Court as already explained in denying Appellants' request for a partial stay that "[b]ecause of the[] significant differences

---

[3] Four justices dissented from this part of the decision, stating that they "would stay the preliminary injunctions except as to the three provisions above, in keeping with the traditional principle of equitable remedies that 'relief afforded [to] the plaintiffs' must not 'be more burdensome than necessary to redress the complaining parties." *Id.*, at 2 (Sotomayor, J., dissenting in part).

[4] The Supreme Court ruled similarly to all of the District Courts in this line of cases with the exception of Alabama, which denied plaintiffs' preliminary injunction motion. That decision, however, was promptly reversed by the Eleventh Circuit which provided a "rule-wide injunction" in Alabama, Florida, Georgia, and South Carolina. *Alabama v. U.S. Sec'y of Ed.*, No. 24-12444, 2024 U.S. App. LEXIS 21358, at * 22-23 (11th Cir. August 22, 2024).

between Title IX and Title VII, uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX."[5]  *Kansas v. United States Dep't. of Educ.*, No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479, at * 37 (10th Cir. July 2, 2024).  Besides the textual differences between Titles VII and IX, Congress enacted Title IX as an exercise of its Spending Clause power, which means that there must have been "clear congressional authorization" for actions. "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)).  Yet the District Court found that this is exactly what the Department did.

"Here, Congress did not authorize the DoE to rewrite Title IX or 'render any statutory provisions meaningless,' which is the result of the Final Rule." *Kansas*, 2024 U.S. Dist. LEXIS 116479, * at 39.  Again, the District Court's legal conclusion is consistent with the decisions thus far

---

[5] In *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No 23-2064, 2024 U.S. App. LEXIS  10378, at *21, n.9 (10th Cir. Apr. 30, 2024) (unpublished opn.), this Court applied Title VII reasoning to a Title IX case.  However, the District Court explained earlier in this appeal that *Dimas* was neither helpful nor binding on the issues presented here because the issue was not presented to the court of appeals or published. *Kansas*, 2024 U.S. Dist. LEXIS 116479, at *30, n.4.

of nearly every lower court in the New Rule Litigation.  In large part because of "the[] significant differences between Title IX and Title VII, uniformly applying *Bostock* is not appropriate and would contradict the purpose of Title IX." *Id.* at 37.  Like the other New Rule Litigation courts, this Court should now again reject Appellants' misinterpretation of *Bostock* and Title IX.

While Title IX was enacted pursuant to Congress's Spending Clause authority, Title VII was enacted pursuant to its power to regulate interstate commerce.  As a result, the Spending Clause is completely irrelevant to Title VII and was not mentioned or considered in *Bostock*; nonetheless, the Clause is essential to properly analyzing Title IX because it constrained Congress's authority to place conditions on funds provided under that statute.

A prohibition under Title IX on discrimination based on gender identity, as set forth in the New Rule, *see, e.g.,* 34 C.F.R. §106.10, and as Appellants argue for here and in the other New Rule Litigation cases, would violate Congress's exercise of its spending powers by (1) imposing a requirement that was not unambiguously clear to states and other recipients when Title IX was enacted in 1972 and (2) effectively coercing

Plaintiffs-Appellees' (including party's school districts) into now exposing themselves to civil liability for sexual orientation discrimination in exchange for funds that they first began receiving five decades ago. *Id.*

## ARGUMENT

**I.  Because Title IX Was Enacted Pursuant to the Spending Clause, Which Sets Limits on Congress's Authority That Do Not Apply To Title VII, *Bostock* Does Not Control.**

The Supreme Court has recognized that notwithstanding some textual similarities, Titles VII and IX are "vastly different." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283-84 (1998)). Most notably, Title VII focuses exclusively on hiring and firing in employment, while Title IX's entire purpose is to ensure equal educational opportunities for women and girls. Title VII "bears minimal relevance to cases involving" Title XI.

Another significant difference is that Congress enacted Title IX under its Spending Clause power, *see Davis v. Monroe Cnty, Sch. Bd.*, 526 U.S. 629, 640 (1999), and Title VII under the Commerce Clause, *see United States v. Lane*, 883 F.2d 1484, 1490-91, 1491 n. 13, (10th Cir. 1989). Thus, while Title VII regulates employers directly pursuant to

Congress's expressly enumerated power under Article I, Section 8, *see Students for Fair Admissions, Inc. v. President & Fellows of Harv. College*, 600 U.S. 181, 238, 256-57 (2023), Title IX creates an arrangement in the nature of a contract between the federal government and states and other recipients accepting funds it offers under the statute, *see Jackson*, 544 U.S. at 181-82; *Farmer v. Kan. State Univ.*, 918 F. 3d. 1094 (10th Cir., 2019). Under its Spending Clause authority, Congress may impose conditions on recipients of federal funds that go beyond its expressly enumerated powers. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012). ("Congress may use this power to . . . condition such a grant [of federal funds] upon the States' 'taking certain actions that Congress could not require them to take.'") (citation omitted); *Davis*, 526 U.S. at 640; *Innes v. Kansas State Univ.*, 184 F.3d 1275, 1281 (10th Cir. 1999). "That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition." *Gebser*, 524 U.S. at 286.

Congress's spending clause authority "is of course not unlimited . . . but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The two restrictions relevant here are

that conditions imposed upon states receiving federal funds (1) must be "unambiguous[]" so that states can "exercise their choice knowingly, cognizant of the consequences of their participation," and (2) must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id*. at 207–11 (internal quotations omitted). Each of these requirements is "equally important" and each must be "equally" satisfied for a condition on funding to be constitutional. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

These restrictions "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577. For example, the restrictions help to preserve "the political accountability key to our federal system." *Id.*, at 578. "[W]hen a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds," "state officials can fairly be held politically accountable for choosing to accept or refuse [a] federal offer." *Id.*

By contrast, Title VII was enacted pursuant to Congress's interstate commerce authority, which grants expansive regulatory power. *Id*, at 549-50. Thus, "the requirement that recipients receive

9

adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination'" under that statute, *Davis*, 526 U.S. at 651 (cleaned up), but "whether a specific application [of Title VII] was anticipated is irrelevant," *Bostock*, 590 U.S. at 677 (cleaned up). The limits imposed by the Spending Clause were not at issue in *Bostock*, yet they are fundamental to any analysis under Title IX.

## II.    The Interpretation of Title IX Required to Justify the New Rule Would Violate Spending Clause Restrictions.

The proposed condition advanced by the New Rule fails the two Spending Clause requirements. First, such a condition on the acceptance of federal funding is not "unambiguously" clear from the face of Title IX. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Discrimination on the basis of "sex" and of "sexual orientation" do not have identical meanings, *see Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex."), so being on statutory notice of the former does not necessarily mean being on notice of the latter. And this would seem to also be true at the time Title IX was enacted. *See Bostock,* 590 U.S. at 686, 702-04 (Alito, J., dissenting). Thus, Plaintiffs–Appellees could not "voluntarily and knowingly" agree that in exchange for federal funds under Title IX,

they would expose themselves to civil liability for failing to prohibit gender identity or sexual orientation discrimination. *Sebelius*, 567 U.S. at 577.

Second, forcing Plaintiffs–Appellees to now choose between accepting conditions that went unmentioned for decades and facing the potential loss of a significant percentage of their education funding "is economic dragooning that leaves the States with no real option but to acquiesce." *Id.* at 582. The Spending Clause gives Congress no authority to engage in such federal coercion.

### A. Title IX Does Not So Clearly State the Proposed Conditions Set Forth In the New Rule That Recipients of Federal Funds Could Exercise Their Choice Knowingly and Cognizant Of The Consequences.

Given that "[t]he legitimacy of Congress's power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract,'" the Supreme Court "insist[s] that Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds. *Pennhurst*, 451 U.S. at 17. If Congress desires "to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*. "'[L]egislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to

11

be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Like any party entering into a contract, "[s]tates cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington*, 548 U.S. at 296. (quoting *Pennhurst*, 451 U.S. at 17).

A recipient's understanding of the deal it entered into with the federal government is critical to the Spending Clause analysis. And Title IX falls short of providing notice to the Plaintiff States that "sex discrimination includes gender identity because when Title IX was enacted in 1972, it did not clearly and unambiguously encompass sexual orientation discrimination, such that recipients would have had notice of the condition. *See Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29; *Arkansas*, 2024 U.S. Dist. LEXIS 130849, at *42.

"The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Arlington*, 548 U.S. at 296; *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) (courts must

"construe the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable'") (quoting *Gebser*, 524 U.S. at 287).

The "bargain" struck between Congress and the states in the mid-1970's did not clearly and unambiguously include the latter consenting to potential liability for gender identity discrimination in exchange for federal funds. Black letter contract law holds that Plaintiffs–Appellees' understanding of the bargain trumps any different understanding now put forth by the United States:

> Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . that party [here, Defendants] did not know of any different meaning attached by the other [here, the United States], and the other knew the meaning attached by the first party.

*Restatement (Second) of Contracts*, § 201(2)(a). Although there is no dispute that the parties here knew that they both understood Title IX to prohibit discrimination on the basis of an individual's biological sex, there was no reason for Plaintiffs–Appellees to know that the United States had a more expansive understanding until, five decades later, it first asserted that Title IX also prohibited gender identity and sexual orientation discrimination. At the least, the United States "had reason

to know the meaning attached by" Plaintiffs–Appellees to the term "sex" when it first began providing funding under Title IX, *id.*, § 201(2)(b), which also supports the conclusion that Plaintiffs–Appellees' understanding prevails.

As *Bostock* acknowledged repeatedly, reading Title VII's language to encompass gender identity or sexual orientation discrimination was, at the least, "a new application" that was largely "unexpected" by Congress when it enacted the statute. *See, e.g., Bostock*, 590 U.S. at 649, 673-82. But if a ban on gender identity and sexual orientation discrimination is a new application not anticipated when Title VII was passed, recipients of federal funds under Title IX could not clearly have notice that that the statute might similarly extend as far as it does in the New Rule.

The District Court correctly recognized that the extension of Title IX to these "unexpected applications" was not consistent with Congress's Spending Clause authority. *Tennessee*, 2024 U.S. App. LEXIS. 17800, No *8-9. Other New Rule Litigation courts point to the time when Title IX was enacted in 1972 because it did not clearly and unambiguously encompass sexual orientation discrimination, such that recipients would

have had notice of the condition. *See Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29; *Arkansas*, 2024 U.S. Dist. LEXIS 130849, at *42.

Like the District Court, *id.* at *32-33, the other courts in the New Rule Litigation have rejected Appellants' contention that *Bostock* controls their interpretation of Title IX. *See, e.g., Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29-30, 34; *Tennessee*, 2024 U.S. Dist. LEXIS 106559, at *27-28; *Texas v. United States*, No. 2:24-CV-86-Z, 2024 U.S. Dist. LEXIS 121812, at *13-14 (N.D. Tex. July 11, 2024); Those courts further concluded that when Title IX was enacted in 1972, it did not clearly and unambiguously encompass sexual orientation discrimination, such that recipients would have had notice of the condition. *See Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29; *Tennessee*, 2024 U.S. Dist. LEXIS 106559, at *27-28; *Arkansas v. U.S. Dept. of Educ.*, No. 4:24-CV-636-RWS, 2024 U.S. Dist. LEXIS 130849, at *42 (E.D. Mo. July 24, 2024).

Appellants assert that Title IX "places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms." Br. Of Appellants at 25. Undermining this contention, however, is their allegation elsewhere in their brief that

the New Rule only "clarifies" the meaning of the term "sex." *Id.*, at 1 ("The first such provision (§ 106.10) *clarifies* that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex.") (emphasis added); *see also New Rule*, 89 Fed. Reg. at 33476 ("These regulations . . . [c]larify that sex discrimination includes discrimination on the basis of . . . gender identity."). This begs the question if Title IX has clearly and unambiguously encompassed gender identity and sexual orientation since 1972, why is the New Rule now needed to clarify it? *See Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) (Spending Clause requires that agency rules must "follow[] *clearly* from the . . . [statutory] text") (emphasis in original). Title IX did not, in fact, give the constitutionally-required notice, which explains why Appellants hope to "clarify" it with the New Rule.

Contrary to Appellants' contention (at 25), *Jackson* does not support their argument that Title IX provides the requisite clear statement. There, the Court focused on the meaning of the term "discrimination," and concluded that "retaliation" was one type of such "intentional unequal treatment," 544 U.S. at 175 (citation omitted); however, *Bostock* and nearly every other court that has considered the

separate term, "sex," has proceeded with the understanding that there are only *two* types – male and female – and never found the term to be "broad."

Where a current Secretary of Education argues that a provision should be interpreted differently than a former Secretary interpreted it, the Court will consequently find that the meaning "is unclear." *Sch. Dist. v. Sec'y of the United States Dep't of Education*, 584 F.3d 253, 277 (6th Cir. 2009). Such is the case with the New Rule, which conflicts directly with the Department's previous interpretations of Title IX. The District Court noted that in prior guidance not only did *Bostock* not "'construe Title IX'" but the District Court went on to explain that the "'Title IX text is very different from Title VII text in many important respects,' including that Title IX 'contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex.'" *Tennessee v. Dep't. of Educ.*, 104 F.4th 577, 585 (6th Cir. 2024; *see also* U.S. Dep't. of Educ., Memorandum for Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights, *Re: Bostock v. Clayton Cty.,* (January 8, 2021) https://tinyurl.com/sszpkk2x,

at 1, 6 ("[T]he Department's longstanding construction of the term 'sex' in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of 'sex' at the time of Title IX's enactment. . . . [T]he ordinary public meaning of 'sex' at the time of Title IX's enactment was biological sex, male or female, not transgender status or sexual orientation.")

The new conditions contained in the New Rule was simply not part of the original bargain that Appellees consented to under Title IX. Appellants hope to inject it into the parties' agreement after-the-fact, which supports the conclusion that they seek to coerce acceptance out of Appellees. *Sebelius*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25) ("'Congress' power to legislate under the spending power . . . does not include surprising participating States with postacceptance or 'retroactive' conditions.'").

**B.** **Pressuring Plaintiffs–Appellees to Acquiesce to the Proposed Condition Would Be So Coercive As To Constitute Compulsion.**

Assuming, *arguendo*, that Title IX clearly states the proposed condition, acceptance by Plaintiffs-Appellees cannot be voluntary if it has been coerced out of them by the federal government. When the

spending "inducement" has passed from more than "'relatively mild encouragement" to what amounts to "a gun to the head," there is coercion. *Sebelius*, 567 U.S. at 581. Thus, courts must "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence.' . . . [W]hen 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.*, at 577 (citations omitted).[6]

Among other things, federal coercion erodes political accountability: "when the State has no choice, the Federal Government can achieve its objectives without accountability. . . Indeed, this danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers." *Sebelius*, 567 U.S. at 578; *see also New York v. United States*, 505 U.S. 144, 168 (1992) ("where

---

[6]Although the Chief Justice wrote for a plurality that the federal government had engaged in unconstitutional coercion in attaching conditions to the Affordable Care Act, in cases where the Supreme Court's majority agrees on a result, but has no single rationale which explains the assent of those justices "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977).

the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished").

The United States' interpretation effectively imposes a new condition by leveraging the potential loss of long-existing funding. If a recipient of federal funds fails or refuses to comply with Title IX, the federal government can take steps to terminate its funding. *See* 20 U.S.C. § 1682; U.S. Dep't. of Justice, Civil Rights Division, Title IX Legal Manual, V. *Federal Funding Agency Methods to Enforce Compliance*, available at https://tinyurl.com/byjsscde. The termination of federal funding would cripple a recipient; Kansas and its local programs received at least $1,385,123,550 of funding from the Department last year and are projected to receive at least $1,453,732,665 this year. *See* U.S. Dep't. of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs, by State*, available at https://tinyurl.com/4k2rr5hh (last accessed October 16, 2024). If all plaintiff-states' funding, including Alaska, Utah, and Wyoming, was terminated the numbers are

staggering, the local programs received a combined $4,157,276,888 last year and a predicted $4,378,358,995 in the coming year. *Id.*[7]

Furthermore, the reason why the proposed condition is coercive is not only that Plaintiffs-Appellees may lose funding, but that the "threatened loss" of funding alone gives them no option "but to acquiesce" to the United States' interpretation of Title IX. *Sebelius*, 567 U.S. at 582. The mere prospect of a loss of substantial funding Plaintiffs–Appellees have long relied on to educate students is so staggering that they would have no real choice. *Tennessee v. Becerra*, No. 24-5220, 2024 U.S. App. LEXIS 21521, at * 4-5 (6th Cir. Aug. 26, 2024) (federal government threatens to terminate funding to Tennessee for failure to conform to HHS's interpretation of Title X).

It is entirely reasonable for recipients like Plaintiffs–Appellees to be concerned about their federal funding if they do not adhere to the Department's interpretation of Title IX, which is undoubtedly a high priority for the Biden Administration (and its possible successor). The

---

[7] Last year Alaska received $410,535,971 in funding and is predicted to be funded at $419,589,124 in the coming year. Utah received $2,099,674,819 in the prior year and is projected to receive $2,231,170,778 next school year. In the prior year Wyoming received $261,942,548 and is projected to receive $273,866,428 in the coming year.

Executive Branch is pursuing an (overly) aggressive interpretation of Title IX in the New Rule Litigation, having gone so far as to seek emergency relief (unsuccessfully) from the Supreme Court.

Besides the possible loss of federal funding, Plaintiffs–Appellees will face certain exposure to litigation like the discrimination claims at the heart of this lawsuit. Furthermore, because the United States' position as demonstrated by the New Rule is that Title IX encompasses not only sexual orientation discrimination but also gender identity and other types of discrimination, *see New Rule*, 89 Fed. Reg. at 33376, Plaintiffs–Appellees would almost certainly have to defend against many new varieties of Title IX claims in the future.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiffs'-Appellees' brief, the judgment of the District Court should be affirmed.

October 16, 2024                          Respectfully submitted,

                                          /s/ Martha A. Astor
                                          Martha A. Astor*
                                          Counsel, Litigation

                                          Donald A. Daugherty, Jr.
                                          Senior Counsel, Litigation
                                          Martha A. Astor*

Counsel, Litigation
Defense of Freedom Institute
for Policy Studies
1455 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004
(414) 559-6902
Don.Daugherty@dfipolicy.org
Martha.Astor@dfipolicy.org

***Counsel for Amicus Curiae***

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This document complies with the word limits established by Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 4,542 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).


Dated:  October 16, 2024
Washington, D.C.                           /s/ Martha A. Astor
                                           Martha A. Astor*
                                           Counsel for Amicus Curiae

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that (1) all required privacy redactions have been made in this brief pursuant to 10th Cir. R. 25.5; (2) this electronic submission is an exact copy of the hard copies that will be submitted to the Court; and (3) this brief has been scanned for viruses using the most recent version of SentinelOne, version 23.3.3.264 [October 16, 2024], and according to that program the document is virus-free.


Dated:  October 16, 2024
Washington, D.C.                              /s/ Martha A. Astor
                                                      Martha A. Astor*
                                                      Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Unite States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on October 16, 2024.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  October 16, 2024
Washington, D.C.                                    /s/ Martha A. Astor
                                                            Martha A. Astor*
                                                            Counsel for Amicus Curiae