No. 24-3097

In the
United States Court of Appeals
for the Tenth Circuit

_____

STATE OF KANSAS, et al.,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the District of Kansas
Case No. 5:24-cv-04041-JWB-ADM

_____

Brief of *Amici Curiae* America's Future, Public Advocate of the United
States, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin
Foundation, LONANG Institute, Restoring Liberty Action Committee, and
Conservative Legal Defense and Education Fund
in Support of Plaintiffs-Appellees and Affirmance

_____

JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  1532 S. 1400 Road
  Council Grove, KS 66846

October 16, 2024
*Attorneys for Amici Curiae*

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  wjo@mindspring.com
  *Attorney of Record

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), it is

hereby certified that the *Amici Curiae* America's Future, Public Advocate of the

United States, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin

Foundation, LONANG Institute, and Conservative Legal Defense and Education

Fund are non-stock, nonprofit corporations, have no parent companies, and no

person or entity owns them or any part of them, except for Restoring Liberty

Action Committee, which is an educational organization.

   */s/ William J. Olson*
William J. Olson
Attorney of Record for *Amici Curiae*

ii

# TABLE OF CONTENTS

<u>Page</u>

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE DOE RULE IS *ULTRA VIRES*, AS IT DOES NOT IMPLEMENT, BUT
      RATHER UNDERMINES, TITLE IX . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Rule Destroys Personal Privacy for Women and Girls . . . . . 5

      B.    DOE Intends to Expand the Rule to Women's and Girls'
            Sports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    The Rule Censors the Free Speech Rights of Teachers and
            Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   THE *BOSTOCK* DECISION NEITHER CONTROLS NOR INFORMS A
      DECISION IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  THE DOE RULE PRESUPPOSES THAT BIOLOGICAL SEX IS NOT AN
      IMMUTABLE AND UNIVERSAL REALITY, BUT RATHER A SOCIAL
      CONSTRUCT, CHANGEABLE AT WILL . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iii

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
*Genesis* 1:27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**U.S. CONSTITUTION**
Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**STATUTES**
20 U.S.C. § 1686 . . . . . . . . . . . . . . . . . . . . . . . . . . 20
42 U.S.C. § 2000e-2 . . . . . . . . . . . . . . . . . . . . . . . . 15

**CASES**
*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) . . . 20, 21
*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) . . . . . . . . . . . . . . 15-18, 23
*Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) . . . 5
*Gloucester Cty. Sch. Bd. v. Grimm*, 141 S. Ct. 2878 (2021) . . . . . . . . . . . 6
*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) . . . . . . . . . 23
*Tennessee v. Cardona*, 2024 U.S. Dist. LEXIS 106559 (E.D. Ky. 2024) . . . . 6
*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) . . . . . . . . 14, 15

**MISCELLANEOUS**
40 *Fed. Reg.* 24,134 . . . . . . . . . . . . . . . . . . . . . . . . . . 21
88 *Fed. Reg.* 22,860 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
89 *Fed. Reg.* 33,474, *et seq.* (Apr. 29, 2024) . . . . . . . . . . . . . . . . 4, 5, 15
118 *Cong. Rec.* 5803 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
118 *Cong. Rec.* 5804 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
118 *Cong. Rec.* 5807 . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22
118 *Cong. Rec.* 5808 . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
P. Berger & T. Luckmann, The Social Construction of Reality: A Treatise
    in the Sociology of Knowledge (Knopf Doubleday: 1967) . . . . . . . . . 29
A.M. Codevilla, "The Rise of Political Correctness: From Marx to
    Gramsci to Trump," *Claremont Review of Books* (Fall 2016) . . . . . 25-28
Thomas Cooper, edt., The Institutes of Justinian (3rd edt.) (Voorhies: 1852) . 24
R. del Giudice, "High School Girl Who Lost Race to Transgender
    Athletes Files Federal Complaint," *Daily Signal* (June 18, 2019) . . . . . 11

iv

D.L. Drakeman, <u>The Hollow Core of Constitutional Theory</u> (Cambridge
    Univ. Press: 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R. Gaydos, "Ex-NCAA swimmer still upset over Lia Thomas making it to
    500 finals in 2022 championships," *Fox News* (Mar. 23, 2023) . . . 12, 13

R. Gaydos, "Swimmer Riley Gaines slams ESPN for Lia Thomas
    Women's History Month segment," *Fox News* (Mar. 26, 2023) . . . . . . 12

M. Ginsberg, "House Passes Ban On Men Participating In Women's
    Sports," *Daily Caller* (Apr. 20, 2023) . . . . . . . . . . . . . . . . . . . . . 14

A. Hall, "Transgender Bathrooms Are An Assault On Reality And
    Freedom," *The Federalist* (July 11, 2016) . . . . . . . . . . . . . . . . . . . 8

E. Kao and A. Jones, "We Must Fight the Sexualization of Children by
    Adults," *Heritage Foundation* (Oct. 5, 2019) . . . . . . . . . . . . . . . . . 7

J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC*
    (Sept. 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Liberty Counsel, "Predators in Women's Facilities" . . . . . . . . . . . . . . . . 8

J. Lohn, "A Look At the Numbers and Times: No Denying the
    Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022) . . . . . . 12

N. Modan, "Half of states now restrict trans student athletes,"
    K12Dive.com (Feb. 13, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

M. Rothblatt, <u>The Apartheid of Sex: A Manifesto on the Freedom of
    Gender</u> (Crown Pub.: 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

H. Salem, "25 Signs of Child Grooming and Abuse Parents Should
    Recognize," *Family Education* (Aug. 2, 2023) . . . . . . . . . . . . . . . . 7

B. Sandler, "Title IX: How We Got It and What a Difference It Made,"
    55 Clev. St. L. Rev. 473 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 22

S. Soule, "I Am a Women's Track and Field Champion. Here's Why I
    Continue to Fight for the Future of Women's Sports," *Fox News*
    (Oct. 4, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

"Teacher Accused of Sexually Abusing Child," *KPRC2Click2H*
    (Apr. 18, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

H. W. Titus, "The Law of Our Land," Journal of Christian
    Jurisprudence, vol. 6 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

"When Do Children Feel Modesty?" *You Are Mom* (Mar. 15, 2019) . . . . . . 7

The White House, "Executive Order on Preventing and Combating
    Discrimination on the Basis of Gender Identity or Sexual
    Orientation" (Jan. 20, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INTEREST OF *AMICI CURIAE*[1]

America's Future, Public Advocate of the United States, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, LONANG Institute, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund are nonprofit organizations which work to defend constitutional rights and protect liberties. These *amici* filed *amicus* briefs in the Fifth and Sixth Circuits involving challenges to the same Title IX Rule at issue in this appeal.[2]

## STATEMENT OF THE CASE

On his first day in office, President Biden issued an executive order instructing each federal agency to implement regulations to change the definition of "sex discrimination" to include "sexual orientation" and "gender identity."[3]

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] *Tennessee v. Cardona*, No. 24-5588, Sixth Cir., Brief *Amicus Curiae* of America's Future, *et al*. (Sept. 3, 2024); and *Louisiana v. Dept. of Education*, No. 24-30399, Fifth Cir., Brief *Amicus Curiae* of America's Future, *et al*. (Sept. 26, 2024).

[3] The White House, "Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation" (Jan. 20, 2021).

2

On April 29, 2024, the U.S. Department of Education ("DOE") issued a Final Rule which declared that "sex discrimination 'includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity.'" *Kansas v. United States Dep't of Educ.*, 2024 U.S. Dist. LEXIS 116479, *8-9 (D. Kan. 2024) ("*Kansas*"). The rule, *inter alia*, requires students to be allowed to access bathrooms and locker rooms based on their gender identity and requires schools to use whatever pronouns the student chooses. The rule was to take effect on August 1, 2024. *Id.* at *8.

The states of Kansas, Alaska, Utah, and Wyoming, as well as a group of individuals and organizations sued DOE alleging that Title IX, which bans discrimination on the basis of sex in federal education funding, was intended to remedy discrimination against biological women, and that the DOE's Final Rule constituted a legislative determination the DOE had no authority to make. *Id.* at *26. Plaintiffs also argued that requiring teachers and state education officials to use the preferred pronouns of students violated the First Amendment's prohibition on compelled speech. *Id.* at *45-47.

The district court agreed that the text of the statute covered discrimination on the basis of biological sex and could not be stretched to cover such categories

3

as sexual orientation or gender identity. *Id.* at *38. The court found that the

Plaintiffs had demonstrated likelihood of success that the pronoun rule would

violate the First Amendment. *Id.* at *51-52. Finally, the court found that the

Final Rule violates the Administrative Procedure Act as it "is arbitrary and

capricious because it offers an implausible explanation for agency action, is a

sharp departure from prior action without a reasonable explanation, and failed to

consider important interests…." *Id.* at *60. The court entered an injunction

against the rule being enforced in the Plaintiff States, the individual plaintiff's

school, and schools attended by members of the organizational plaintiffs. *Id.* at

*73-74.

## ARGUMENT

## I.    THE DOE RULE IS *ULTRA VIRES*, AS IT DOES NOT IMPLEMENT, BUT RATHER UNDERMINES, TITLE IX.

Purporting to implement Title IX, the DOE Rule actually undermines it,

imposing radical new requirements on educational institutions receiving federal

funding in pursuit of an extremist "transgender" ideology. Although the Rule

claims to amend the definition of sex discrimination, it actually twists the words

beyond all recognition, to cover "'discrimination on the basis of sex stereotypes,

sex characteristics, pregnancy or related conditions, sexual orientation, and

4

gender identity.'" *Kansas* at *8-9.  The Rule provides not a shred of evidence that this new interpretation is consistent with the text, context, or purpose of Title IX.

The Rule's false presuppositions and radical political agenda are without statutory support:

1.   The term "gender identity" now "describe[s] an individual's sense of their gender, which may or may not be different from their sex **assigned at birth**."  89 *Fed. Reg.* at 33809 (emphasis added).

2.   A recipient of federal funds may not deny a male student who identifies as female "access to the girls' **restroom, shower, or locker room** because the regulation that allows sex separate facilities for restrooms and locker rooms will now be subject to the new rule under which such conduct is categorically deemed to result in more than de minimis harm to a transgender person." *Kansas* at *35 (emphasis added).

3.   The Rule "would subvert Congress' goals of protecting biological women in education." *Id.* at *37.

4.   The Rule creates a new standard for "**hostile environment harassment**" which has a definition that is "vague and also overbroad because it is

5

entirely fact dependent and there is no guidance as to how a recipient is to determine what constitutes hostile environment harassment." *Id*. at *48-49 (emphasis added).

5.    A student's preferred pronoun must be used by teachers and fellow students. *Id*. at *40, 47.

Each of these provisions shamelessly undermines the protections for actual women and girls that Title IX was intended to protect.

### A.    The Rule Destroys Personal Privacy for Women and Girls.

Rather than an effort to "clarify" the meaning of the term "sex discrimination" (89 *Fed. Reg*. at 33476), the Rule imposes and institutionalizes discrimination against biological females.  One critical casualty of the Rule is the personal privacy afforded women and girls by use of their own bathrooms and locker rooms, as well as their safety.  *See Kansas* at *37.

To compel schools to allow biological boys to fulfill their teenage dream — to shower with teenage girls — DOE expands on a deeply flawed decision of the Fourth Circuit which allowed a biological girl to use the boys' restroom.  *See* 89 *Fed. Reg*. at 33805.  *Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).  In no way does that decision support the Rule.  Although

6

Justices Thomas and Alito would have granted certiorari in that early "gender identity" case, the Supreme Court declined.  *Gloucester Cty. Sch. Bd. v. Grimm*, 141 S. Ct. 2878 (2021).  That Fourth Circuit decision was seriously flawed, as detailed in four *amicus* briefs filed in that case by most of these *amici*.[4]

One of the intervenor-plaintiffs in a parallel challenge to the Rule, A.C., is a biological female who described the emotional and mental harms to her caused by the invasion of her locker room by a biological boy.  *See Tennessee v. Cardona*, 2024 U.S. Dist. LEXIS 106559 at *20 (E.D. Ky. 2024).  A.C.'s reaction is perfectly natural and proper.  Although such matters are of little import to the current DOE, children have a natural sense of modesty which this Rule seeks to strip away from them.  This aspect of the Rule not only violates deeply held religious principles of multiple religions, but it also should be seen

---

[4] *G.G. v. Gloucester County School Board*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, Fourth Circuit (May 10, 2016); *Gloucester County School Board v. G. G.*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, U.S. Supreme Court (Jan. 10, 2017); *G.G. v. Gloucester County School Board*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, Fourth Circuit (May 15, 2017); *Gloucester County School Board v. Gavin Grimm,* Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, U.S. Supreme Court (Mar. 26, 2021).

7

for what it is — a deeply immoral Rule.  No government should have the power to harm children in this manner, and no court should permit it.[5]

In response to DOE's Notice of Proposed Rulemaking ("NPRM"), some of these *amici* submitted comments, highlighting these privacy issues and illustrating the invasion of males into female locker rooms.  These *amici* noted the case of Riley Gaines, a University of Kentucky student and swimmer, who explained:

> she had felt "extreme discomfort" being forced to change in the same locker room as the male Thomas.  "That's not something we were forewarned about, which I don't think is right in any means, changing in a locker room with someone who has different parts," Gaines said.[6]

Seven years ago, civil rights group Liberty Counsel compiled a list of more than 50 news stories of incidents across the country of men committing

---

[5]  *See* "When Do Children Feel Modesty?" *You Are Mom* (Mar. 15, 2019).  Ripping away modesty is an attribute of "grooming" of children to become sexually available to adults.  *See, e.g.*, E. Kao and A. Jones, "We Must Fight the Sexualization of Children by Adults," *Heritage Foundation* (Oct. 5, 2019); H. Salem, "25 Signs of Child Grooming and Abuse Parents Should Recognize," *Family Education* (Aug. 2, 2023).  Reports of sexual abuse of children by both male and female teachers occurs regularly.  "Teacher Accused of Sexually Abusing Child," *KPRC2Click2H* (Apr. 18, 2021).

[6]  Comments of America's Future, *et al.*, to DOE at 9 (May 15, 2023).

8

sexual assaults and taking indecent photographs in women's restrooms.[7]

Although most of the men were not transgender, all were biological males.  In

practice, opening women's bathrooms to men identifying as women simply opens

women's bathrooms to men generally — for any assertion of a different "gender

identity" is treated as an irrefutable fact.  As the court below noted, "it is not

hard to imagine that, under the Final Rule, an industrious older teenage boy may

simply claim to identify as a female to gain access to the girls' showers, dressing

rooms, or locker rooms so that he can observe his female peers disrobe and

shower….  [I]t is clear that the DoE failed to consider several important aspects

of the problems raised by the Finale Rule."  *Kansas* at *58.  Men's and women's

rooms have always been separate:

> Sex-specific bathrooms were originally established not only because
> of men and women's **distinct hygienic needs**, but also because
> **women are far more vulnerable to sexual assault** than men, and
> creating protected areas where only women strip naked prevents
> sexual violence.  While some left-leaning publications have decried
> this idea as "paternalistic" and "antiquated," the estimated 1 in 6
> women who will experience sexual assault (or the 17.7 million
> existing victims) might disagree.[8]

---

[7]  Liberty Counsel, "Predators in Women's Facilities."

[8]  A. Hall, "Transgender Bathrooms Are An Assault On Reality And
Freedom," *The Federalist* (July 11, 2016) (emphasis added).

9

The "transgender" denial of reality encapsulated in the Rule creates a harsh, cold new reality for America's women and girls, which elevates those suffering from the mental illness of "gender dysphoria" and related conditions over the rights of all others.

**B.    DOE Intends to Expand the Rule to Women's and Girls' Sports.**

Although the Final Rule does not address school athletics, DOE has already begun a separate rulemaking to force schools that receive federal funds to allow biological males who identify as female to play on women's and girls' sports teams.  *See* 88 *Fed. Reg.* 22,860 (Apr. 13, 2023).  Although that sports rulemaking is neither final nor before this Court, how the Court rules here will have an effect on DOE's rulemaking on athletics, and thus is addressed here.

State schools have rules, and more recently state legislation, designed to promote women's sports and protect women.  If approved, the Final Rule will be used to seek to undermine women's sports and remove that protection.  An Idaho law banning biological males from competing on teams designated for girls and women was designed specifically to deliver on Title IX's promise of equal access to sports for females, and is now pending on a petition for certiorari, which was

10

supported by most of these *amici*.[9]  DOE's proposed athletics rule would

override Idaho law and similar laws in fully half the states for any school

receiving federal funding.[10]

Further, the proposed athletics rule could introduce untenable disruption in

school athletics, as the "gender identity" of a school's athletes is mutable and

may change at any time.  According to transgender ideology, "gender fluidity" is

just as real as "gender identity":  "[f]or some people, gender identity and

expression isn't fixed – rather, it can change daily."[11]  According to

"gender-fluid" psychologist Liz Powell, "gender fluidity enables people to take

their identity and expression one day at [a] time, instead of feeling tied to a

single, overarching gender label."  *Id.*  According to Powell, gender "'is not a

fixed point' … but rather flexible and able to shift depending on various factors,

both within a person's internal self as well as their external surroundings."  *Id.*

---

[9]  *Little v. Hecox*, U.S. Supreme Court, Case No. 24-38, Brief of *Amicus Curiae* America's Future, *et al.* at 5.

[10]  N. Modan, "Half of states now restrict trans student athletes," *K12Dive.com* (Feb. 13, 2024).

[11]  J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC* (Sept. 14, 2022).

11

As some of these *amici* pointed out in Comments filed with DOE, "[t]he scars inflicted by radical 'gender ideology' are not just physical.  They are mental too, and have left deep wounds in the lives of girls denied a fair chance at sporting events because of schools adopting cruel and misguided policies like the NPRM."[12]

In 2019, Connecticut high school sprinter Selina Soule, who missed her chance to compete in the New England 55-meter regionals because two biological boys ran faster than she did,[13] explained:  "It wasn't long before I discovered that athletic associations have the power to make rules that directly impacted my ability to win races.  No matter how hard I trained, enduring long hours of practice, I just couldn't beat a boy."[14]

In 2018, a man named Will Thomas was listed on the roster of the Penn State men's swim team.[15]  The following season, Thomas "transitioned," identified as "Lia Thomas," and began swimming on the women's team.  On the

---

[12]  Comments of America's Future, *supra*, at 9.

[13]  R. del Giudice, "High School Girl Who Lost Race to Transgender Athletes Files Federal Complaint," *Daily Signal* (June 18, 2019).

[14]  S. Soule, "I Am a Women's Track and Field Champion.  Here's Why I Continue to Fight for the Future of Women's Sports," *Fox News* (Oct. 4, 2022).

[15]  Will Thomas, 2018-19 Men's Swimming and Diving, *Penn Athletics*.

12

men's team, Thomas was mediocre, but competing against women, Thomas dominated. "During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, [Thomas] ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle. As [Thomas'] career at Penn wrapped, [Thomas] moved to fifth, first and eighth in those respective events on the women's deck."[16] In March 2022, Thomas snatched the NCAA women's championship in the 500-meters.[17]

In March 2023, ESPN lauded Thomas in its "Women's History Month" segment.[18] Riley Gaines, the former University of Kentucky swimmer who was edged out by Thomas for a fifth-place title in another 2022 NCAA women's event, responded. "Lia Thomas is not a brave, courageous woman who EARNED a national title," Gaines stated on Twitter. "He is an arrogant, cheat who STOLE a national title from a hardworking, deserving woman. The @ncaa

---

[16] J. Lohn, "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022).

[17] R. Gaydos, "Ex-NCAA swimmer still upset over Lia Thomas making it to 500 finals in 2022 championships," *Fox News* (Mar. 23, 2023).

[18] R. Gaydos, "Swimmer Riley Gaines slams ESPN for Lia Thomas Women's History Month segment," *Fox News* (Mar. 26, 2023).

13

is responsible…. If I was a woman working at ESPN, I would walk out. You're spineless @espn." *Id.*

After Thomas spoke out in support of the proposed athletics rule, Riley Gaines again responded. "Under the guise of competitive fairness? Are you really trying to say you would have won a national title against the men? Does it not break your heart to see women lose out on these opportunities? The Biden Administration-proposed bill denies science, truth, and common sense."[19] "This take is selfish and shows an utter disregard for women." *Id.*

Rather than implementing a congressional directive, DOE promulgated its rule because efforts to impose the desired transgender policy have failed in Congress. In 2015, Congress refused to enact the Student Non-Discrimination Act of 2015 ("SNDA"), S. 439 114th Cong. (2015), which would have expanded Title IX to include gender identity, and similar to the Rule, the SNDA would have prohibited discrimination based on actual or perceived sexual orientation or gender identity. That bill failed in the Senate, while last year, **the House passed a ban on males in women's sports to reverse the Rule**, though it failed in the

---

[19]  Riley Gaines post https://x.com/Riley_Gaines_/status/1648141754640613379 (Apr. 17, 2023).

14

Senate and would have faced a certain veto from President Biden.[20]  But the

Department's argument that it is simply "clarifying" the law fails in the face of

the evidence that it is revolutionizing it.

### C.    The Rule Censors the Free Speech Rights of Teachers and Students.

The court below accepted Plaintiffs' arguments that the Final Rule's new

harassment standard "violates the First Amendment rights of individuals by

compelling speech that aligns with Defendants' ideology, censoring speech

through content-based restrictions and viewpoint discrimination, chilling speech

through vague and overbroad language, and forcing individuals to engage in

speech that violates their sincerely held beliefs." *Kansas* at *45-46.

The court below cited the Supreme Court pronouncements regarding a law

which violates "constitutional rights because it is unconstitutionally vague and

overbroad resulting in chilled speech." *See id*. at *46-47.  Indeed, with respect

to the Final Rule's requirement that certain pronouns be used, the Supreme Court

affirmed that "[i]f there is any fixed star in our constitutional constellation, it is

that no official, high or petty, can prescribe what shall be orthodox in politics,

---

[20]  M. Ginsberg, "House Passes Ban On Men Participating In Women's Sports," *Daily Caller* (Apr. 20, 2023).

15

nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Rule is not only *ultra vires* in contravention of the clear text of Title IX, but also blatantly unconstitutional.

The court below was correct: "The result is that speech is chilled because what student wants to 'run the risk of being accused of' sex-based harassment and subjected to an investigation and potential discipline." *Kansas* at *52. The Rule destroys Title IX in an act of obliteration, not interpretation.

## II.    THE *BOSTOCK* DECISION NEITHER CONTROLS NOR INFORMS A DECISION IN THIS CASE.

The Department grounds its Final Rule in the Supreme Court's decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). *See* 89 *Fed. Reg.* at 33806-08. Regardless, as multiple Courts of Appeals have concluded, *Bostock* does not apply in any way to Title IX.

*Bostock* interpreted Title VII, which prohibits employers from making employment decisions "because of … sex." 42 U.S.C. § 2000e-2. *Bostock* determined that making an adverse employment decision against a homosexual or transgender-identifying person that would not be made against a person of the opposite sex discriminates "because of sex," because the person's sex would be a

16

"but-for" cause of the employment action. *Bostock* at 657. Accordingly, for

purposes of Title VII, the Court stated, "[a]n individual's homosexuality or

transgender status is not relevant to employment decisions." *Id.* at 660. As the

court below noted, "the reasoning from *Bostock* does not automatically transfer

to the Title IX context, nor does *Bostock* compel the changes to the Title IX

regulations encompassed by the Final Rule." *Kansas* at *32.

*Bostock* expressly made clear that its reasoning was not to be used outside

the context of Title VII, and that even in that context, the Court was only

addressing adverse employment actions, not single-sex accommodations for

privacy purposes. "Under Title VII, too, we do not purport to address

bathrooms, locker rooms, or anything else of the kind." *Bostock* at 681. The

Biden DOE disregarded this limiting language and relied on *Bostock* as if it had

decided the issue here, but the district court honored the Supreme Court's

guidance. *See Kansas* at *30-31.

The court below correctly distinguished between Title VII and Title IX:

"*Bostock* involved a different statute.… Title IX is about schools, and 'the

school is not the workplace.'" *Kansas* at *30-31. The court below looked at the

text of Title IX, the carveouts for sex-separated facilities, legislative history, and

17

prior regulations to find that "one of the principle purposes of [Title IX] was to root out discrimination against women in education." *Id.* at *28.

As the district court recognized, there is a massive structural difference between Title VII and Title IX, in that Title IX explicitly carves out areas where specific federally funded programs are textually entitled to make distinctions on the basis of the biological realities of sex. Title VII does not. The district court recognized that "[t]he Final Rule essentially renders meaningless the exemptions in Title IX." *Id*. at *34.

Defendants try to limit the scope of Title IX's provision for sex-separated living facilities only to that. *See* Brief of Appellants at 29. But the district court was correct for not limiting Title IX in that artificial way, noting that the statute also allows for sex-segregation for "comparable facilities," and that must mean bathrooms and locker rooms. *Kansas* at *35.

*Bostock* conceded that "[t]hose who adopted the Civil Rights Act might not have anticipated their work would lead to" covering classes such as homosexual and transgender when the drafters were thinking of biological sex. *Bostock* at 653. Still, "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another," Title VII must be applied as

18

*Bostock* applied it. *Id*. These *amici* believe that the text and history of Title VII not only did not compel *Bostock*'s result, but also did not permit it. However, even under *Bostock*, the plain text of Title IX flatly forbids a similar result here.

Title VII makes no textual "carveouts" for when sex differences may be considered in the employment context, but Title IX does so, and those carveouts are based on the inherent biological differences between males and females. The legislative history of Title IX explains why biological differences between males and females, men and women, are relevant, indeed central, in the Title IX context. Title IX Senate sponsor Birch Bayh (D-IN) introduced the legislation, stating that its object was to ensure that females have the same educational opportunities available to males. Senator Bayh attacked "corrosive and unjustified discrimination against women."[21] He stressed that the bill was designed to address preferential treatment for biological males over females. *Id*. He denounced stereotypes of females as "pretty things who go to college to find a husband … and finally marry, have children and never work again."[22]

---

[21]  118 *Cong. Rec.* 5803.

[22]  118 *Cong. Rec.* 5804.

19

Senator Bayh repeatedly lamented disparate opportunities in education and employment between "males" and "females." *Id*. "I am concerned that in 1970 the percentage of the female population enrolled in college was markedly lower than the percentage of the male population...." *Id*. He further added, "[i]t is of little comfort for women to know that they are encouraged to further their schooling but that ... they will be earning far less than male colleagues for the rest of their lives."[23]

Senator Bayh noted that Title IX's language dealt expressly with differentiations on the basis of "sex." "Central to my amendment are sections 1001-1005 which would prohibit discrimination **on the basis of sex** in federally-funded education programs." *Id*. at 5807 (emphasis added). Section 1007 of Title IX required the Commissioner of Education to "investigate **sex** discrimination at all levels of education ... and report ... recommendations for action to guarantee equality of opportunity in education **between the sexes**." *Id*. at 5808 (emphasis added). There was no concept of "gender identity" involved in either the statute's intent or its text. As the district court noted, "The text of

---

[23]  118 *Cong. Rec.* 5807.

20

the statute also supports a finding that the term 'sex' meant biological sex and not gender identity or sexual orientation." *Kansas* at *29.

One of the carveouts in Title IX expressly allows schools to maintain "separate living facilities" by biological sex. "Notwithstanding anything to the contrary contained in this title, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.

The Final Rule, juxtaposed against the statutory text, produces a schizophrenic result that cannot be squared with Title IX's text. The district court implicitly referenced the canon against surplusage when it concluded that "[t]he Final Rule essentially renders meaningless the exemptions in Title IX." *Kansas* at *34. It is incomprehensible that the text of Title IX permits sex-segregated college cafeterias or laundry areas, but not bathrooms or locker rooms.

The Eleventh Circuit is in accord, noting that the implementing regulations for Title IX expressly allow for "'separate toilet, locker room, and shower facilities on the basis of sex,' so long as the facilities 'provided for students of one sex [are] comparable to such facilities provided for students of **the other**

21

**sex.**'" *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (quoting 34 C.F.R. § 106.33) (emphasis added).  Notably, the regulations themselves envision the actual binary world of two biological sexes.

The way the DOE Office of Civil Rights ("OCR") interpreted Title IX at the time of its passage is also instructive.  OCR promulgated regulations in 1975 to initially implement Title IX.  The implementing regulations clearly envisioned two — and only two — distinct sexes and were intended to close the gap between biological males and females in school athletics:

> The Department's intent … is to require institutions to take the interests of **both sexes** into account in determining what sports to offer.  As long as there is no discrimination against members of **either sex**, the institution may offer whatever sports it desires….  In so doing, an institution should consider by a reasonable method it deems appropriate, the interests of **both sexes**.  [40 *Fed. Reg*. 24134 (1975) (emphasis added).]

The regulations, in these earliest days of Title IX, also "permit[ted] separate teams for members of each sex where selection for the team is based on competitive skill or the activity involved is a contact sport." *Id*.  Clearly, the text recognizes and accounts for inherent biological differences between men and women.

22

In his remarks, Senator Bayh made clear that Title IX would allow "differential treatment by sex" "in sports facilities or other instances where **personal privacy must be preserved**."[24]  Nothing in the language of Title IX even contemplates allowing biological males to penetrate the locker rooms, bathrooms, and sports competitions of biological female students.

Dr. Bernice Sandler, a pioneer instrumental in the enactment of Title IX, recognized the salient fact that advocates of transgender ideology and too many courts fail to recognize.  That is, in sports, "some sex segregation is necessary. **If all teams were integrated by sex, few women would have access to sports**." B. Sandler, "Title IX: How We Got It and What a Difference It Made," 55 CLEV. ST. L. REV. 473, 482 (2007) (emphasis added).  That is precisely the evil Title IX sought to remedy.

Now the Department attempts to stretch the 1972-1975 term "sex discrimination" to encompass the 2024 term "gender identity."  It is a blatant departure from the intent and text of Title IX to socially construct gender contrary to simple biology.  In the intervening half-century, Congress has never redefined the word "sex" relative to Title IX in a manner so patently contrary to

---

[24]  118 *Cong. Rec.* 5807 (emphasis added).

23

the legislation's text or intent.  The Department has no such authority and no

deference is accorded to the Rule.  *See Loper Bright Enterprises v. Raimondo*,

144 S. Ct. 2244 (2024).

As the court below correctly put it, "The DoE's reinterpretation of Title

IX … would subvert Congress' goals of protecting biological women in

education." *Kansas* at *37.  The court added, "The Final Rule would, among

other things, require schools to subordinate the fears, concerns, and privacy

interests of biological women to the desires of transgender biological men to

shower, dress, and share restroom facilities with their female peers." *Id.* at *37.

The court below was correct.  *Bostock* is irrelevant to Title IX, and the

Department's purported "rulemaking" is impermissible lawmaking by fiat,

contrary to the clear textual command of Title IX.

## III.    THE DOE RULE PRESUPPOSES THAT BIOLOGICAL SEX IS NOT AN IMMUTABLE AND UNIVERSAL REALITY, BUT RATHER A SOCIAL CONSTRUCT, CHANGEABLE AT WILL.

Putting aside what could fairly be described as the absurdities that the

federal government seeks to impose on schools under the DOE Rule, discussed

*supra*, the question remains, what is the Biden Administration attempting to

accomplish?  Should this Court be tempted to reverse direction and sanction the

24

DOE Rule on the assumption it was somehow mandated by the Equal Protection Clause, it would repudiate any pretense of examining the "historical core" of the Clause to adopt what Professor Donald L. Drakeman has termed "the hollow core of constitutional theory."[25]

The Rule mandates students and faculty speak and think in accordance with the radical progressive value of transgenderism. We know from natural law that biological sex is a fixed reality,[26] but progressive doctrine tells us that biological sex is irrelevant, as explained by one of its earliest spokespersons:

---

[25] *See* D.L. Drakeman, The Hollow Core of Constitutional Theory (Cambridge Univ. Press: 2020) at 3 ("For constitutional theory to return to its historical core … it needs to refocus on … the will of the lawmaker, the Framers' intentions….").

[26] Perhaps the earliest writing reflecting the natural law was the Book of *Genesis* where it is written: "So God created man in his own image, in the image of God created he him; male and female created he them." *Genesis* 1:27. This same understanding was later reflected in The Institutes of Justinian, written around 535 AD. "The law of nature is that law which nature teaches to all animals. For this law does not belong exclusively to the human race, but belongs to all animals, whether of the earth, the air, or the water. Hence comes the union of the male and female, which we term matrimony; hence the procreation and bringing up of children. We see, indeed, that all the other animals besides men are considered as having knowledge of this law." Thomas Cooper, edt., The Institutes of Justinian (3rd edt.) at 6 (Voorhies: 1852). *See also* H. W. Titus, "The Law of Our Land," JOURNAL OF CHRISTIAN JURISPRUDENCE, vol. 6 (1986).

25

> [T]ransgenderism developed during the 1980s. The guiding
> principle … is that people should be free to **change**, either
> **temporarily or permanently**, the sex type to which they were
> assigned since infancy … even if a sex type was real at birth, it **can
> now be changed at will**…. [M. Rothblatt, <u>The Apartheid of Sex: A
> Manifesto on the Freedom of Gender</u> (Crown Pub.: 1995) at 16
> (emphasis added).]

We are told that we must not just respect, but also embrace, the

psychological pathology inherent in a person believing he was born in the wrong

body. The Rule demands faculty and students use the government's language to

express the government's thoughts. The modesty of girls must be sacrificed.

Women's sports must be sacrificed. Girls must be put in danger. No price is

too high to advance the progressive agenda of transgenderism. And, under the

Rule, faculty and students must speak about transgenderism in a politically

correct manner, forsaking truth and reality, according to this rubric:

> "Comrade, your statement is factually incorrect."
> "Yes, it is. But it is politically correct."[27]

When our nation's school systems are required to treat a lie as though it

were the truth, there must be a powerful underlying agenda, which Professor

Angelo M. Codevilla explained as follows:

---

[27] A.M. Codevilla, "The Rise of Political Correctness: From Marx to
Gramsci to Trump," *Claremont Review of Books* (Fall 2016).

26

> Because all progressives, Communists included, claim to be about creating **new human realities**, they are perpetually **at war against nature's laws** and limits.  But since reality does not yield, progressives end up **pretending** that they themselves *embody* those new realities.  Hence, any progressive movement's **nominal goal** eventually ends up being subordinated to the urgent, all-important question of the movement's own **power**.  [*Id*. (emphasis added).]

We might ask, where do Progressives come up with this never-ending series of demands on our society?  Codevilla explained why the vicious attacks on those brave souls who are slow to embrace the Progressives' newest cause will never cease:

> Why does the American Left demand ever-new P.C. obeisances?  In 2012 no one would have thought that defining **marriage between one man and one woman**, as enshrined in U.S. law, would brand those who do so as motivated by a **culpable psychopathology** called **"homophobia," subject to fines and near-outlaw status**.  Not until 2015-16 did it occur to anyone that requiring persons with male personal plumbing to use public bathrooms reserved for men was a sign of the same pathology.  Why had not these become part of the P.C. demands previously?  **Why is there no canon of P.C. that, once filled, would require no further additions?**
>
> Because *the point of P.C. is not and has never been merely about any of the items that it imposes, but about the imposition itself*.  [*Id*. (emphasis added).]

No one should think that accepting the illogic of transgenderism will satisfy the beast of Progressivism.  Rather, feeding the beast ensures that tomorrow there will be more demands that Americans yield to some other

27

favored cause.  Polygamy?  Minor Attracted Persons?  Why not, once we have

undermined the constraint of biology and religion?  And today's cause *du jour*

not only demands that we suspend disbelief and embrace transgenderism — but it

also requires us to abandon Free Speech, to silence, or at least marginalize, all

voices in opposition:

> **[T]hat power is insecure as long as others are able to question the truth of what the progressives say** about themselves and the world, progressive movements end up struggling not so much to create the promised new realities as to **force people to speak and act** as if these were real: **as if what is correct politically — i.e., what thoughts serve the party's interest — were correct factually**.  [*Id*. (emphasis added).]

The nation's school system presents perhaps the best area to mold the

minds of the next generation to subordinate themselves to the escalating dictates

of Progressivism.  Accordingly, the DOE Rule requires both teachers and

students to say what all know is false, in service to the collective.  Eight years

ago, Codevilla anticipated such rules would be imposed on schools:

"Progressive parties everywhere have sought to **monopolize educational and**

**cultural institutions** in order to **force those under their thumbs to sing their**

**tunes or to shut up**."  *Id*. (emphasis added).  Writing during earlier days of

transgenderism, Codevilla stated:

28

Consider **our ruling class's** very latest demand:  Americans must agree that someone with a penis can be a woman, while someone else with a vagina can be a man.  **Complying with such arbitrariness is beyond human capacity**.  In Orwell's *1984*, as noted, Big Brother's agent demanded that Winston acknowledge seeing five fingers while he was holding up four.  But that is small stuff next to what the U.S. ruling class is demanding of a free people.  [*Id*. (emphasis added).]

Our progressive rulers are disrupters in our society — condemning both the past and the present, tearing down monuments, ridiculing our history, demeaning our institutions, always criticizing, never content, always demanding change.  Not believing in God, the Bible, or eternal life, they work to destroy what exists in the hope of creating the new man — a utopia in the here and now as a type of Heaven on Earth.  Meanwhile, while under constant attack, the rest of society labors to keep functioning the institutions on which our nation relies — most especially the family and the church.

To be sure, judges who challenge the transgender orthodoxy will pay a price even though they are part of our nation's ruling class.  Fortunately, under our constitutional scheme, this will not include termination from employment, but there are other costs that are imposed on dissident voices.  As physicist Eric Weinstein described forces at work in a different context:

29

> Whatever it is is not really trying to fool you, it's trying to instruct you…. Think about [the establishment media] as a set of instructions for how to keep your job…. But if you say what you understand to be true, you can know what the consequences are…. In essence, this is a lot like Caligula installing his horse as a Senator. No one's fooled that the horse is an ordinary human senator. The choice is, do you wish to say something.[28]

This latest progressive cause of transgenderism seeks to destroy what exists in pursuit of the creation of a new human reality. This progressive program is sometimes described as "imagining what can be, unburdened by what has been." To Progressives, reality is only a social construct.[29] The Progressives at DOE seek to control the entire government school environment, operating under no limiting principle, and if a victory is achieved here today, they will seek to build upon it tomorrow.

If courts do not ground the law in reality — in fixed and universal truths — then every right we enjoy is put at risk. To approve DOE's effort to compel schools to bow to transgenderism, this Court would need to be unburdened not only **by what has been**, but also **by what actually is**. The district court

---

[28] *See* Eric Weinstein, Are we on the Brink of Revolution? *Chris Williamson podcast* (Sept. 2, 2024) (14:00-15:33).

[29] *See generally* P. Berger & T. Luckmann, The Social Construction of Reality: A Treatise in the Sociology of Knowledge (Knopf Doubleday: 1967).

30

courageously refused to be politically correct at the cost of being factually and legally incorrect.  This court should do no less.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

_/s/ William J. Olson_

JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  1532 S. 1400 Road
  Council Grove, KS 66846

October 16, 2024
*Attorneys for Amici Curiae*

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  wjo@mindspring.com
*Attorney of Record

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiffs-Appellees and Affirmance complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 6,402 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

  */s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
Dated: October 16, 2024

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 16th day of October 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

    */s/ William J. Olson*

William J. Olson
Attorney for *Amici Curiae*

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I HEREBY CERTIFY that with respect to the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiffs-Appellees and Affirmance, all required privacy redactions have been made, and that the hard copies being submitted to the clerk's office are exact copies of the electronic version.  I FURTHER CERTIFY that the digital submission of this document has been scanned for viruses with scanning program McAfee Internet Security, version 1.22.203, most recently updated on October 16, 2024, and according to the program, the file is free from viruses.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
