No. 24-3097

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

State of Kansas, et al.

*Plaintiffs-Appellees*,

v.

United States Department of Education, et al.

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Kansas

Nos. 5:24-CV-04041-JWB-ADM

Honorable John W. Broomes

**BRIEF OF *AMICUS CURIAE* THE AMERICAN CIVIL RIGHTS PROJECT IN SUPPORT OF PLAINTIFFS-APPELLEES**

Joseph A. Bingham
  *Counsel of Record*
American Civil Rights Project
Post Office Box 12207
Dallas, TX 75225
(214) 504-1835
*Counsel for Amicus Curiae*

# Table of Contents

Table of Contents ................................................................................................... i

Table of Authorities ........................................................................................... iii

Interest of *Amicus Curiae* ................................................................................. 1

Summary of the Argument ............................................................................... 1

Argument ................................................................................................................ 3

    I.    The Provisions Openly (in the Scope Provision)
        and Discretely (in the Spaces Provision) Rewrite
        Title IX ......................................................................................... 3

        A.    § 106.10 dramatically rewrites Title IX's
                scope by extending it to discrimination on
                the basis of gender identity and sexual
                orientation *independently* of sex ............................................ 3

        B.    § 106.31(a)(2) more subtly rewrites Title
                IX to ban *most* of the female-only spaces
                it's long and uncontroversially been
                understood to protect. ............................................................... 4

    II.    Appellants' Justifications for the Provisions
         Fail, Badly ..................................................................................... 6

        A.    To justify § 106.10, Appellants reject
                *Bostock*'s reasoning in order to extend its purported
                holding ......................................................................................... 6

B.    History (legislative and otherwise) gives
the lie to Appellants' pseudo textual
interpretation of Title IX; that interpretation
simply did not exist in the original interpretive
community. ............................................................................ 13

III.  Appellants' Arguments for the Provisions Have
Astonishing Implications ................................................................ 17

IV.  Title IX is Wiser than the Appellants, and Accordingly
Does not Require the Shower Scenes from *Starship
Troopers* ........................................................................................ 18

Conclusion ............................................................................................. 20

Certificate of Service ............................................................................. 21

Certificate of Compliance ...................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Bostock v. Clayton County,*
  590 U.S. 644 (2020)..........................................................................1, 2, 5-9, 14, 20

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ...................................................................... 14, 17

*Metropolitan Sch. Dist. of Martinsville v. A.C.,*
  75 F.4th 760 (7th Cir. 2023) .............................................................................14

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989) ............................................................................................9

## STATUTES

Education Amendments of 1974, § 844 ................................................................10

Pregnancy Discrimination Act of 1978.................................................................4

Title VII of the Civil Rights Act of 1964 ....................................................6, 7, 8, 9

Title IX of the Education Amendments of 1972 ........................1, 2-4, 6-7, 10-20

20 U.S.C. § 1681.........................................................................3, 10, 11, 12, 13, 15

20 U.S.C. § 1682.................................................................................................12

20 U.S.C. § 1683.................................................................................................13

20 U.S.C. § 1686.............................................................10, 11, 12, 13, 14, 15, 17, 18

## OTHER AUTHORITIES

Amanda Terkel, *Bathroom Panic Has Long Stood in the
  Way of Equal Rights: The Women's Movement and Now*

*the LBGT Movement Have Run Up Against Restroom Fears*,
HuffPost Politics (Mar. 24, 2016) .......................................................... 16

Emily Crockett, *Phyllis Schlafly Started the War on Women.*
*But It Will Outlive Her*, VOX (Sep. 7, 2016)..................................... 16

Neil J. Young, *How the Bathroom Wars Shaped America:*
*It's Not Just North Carolina. Some of America's Great*
*Political Struggles Have Pivoted Around Who Uses*
*Which Toilet*, Politico History Dept., May 18, 2016 ......................... 14, 15, 16

*Public Papers of the Presidents of the United States:*
*Jimmy Carter, 1980-1981*, Best Books (1981) ................................. 16

Richard Elkins & Dave King, *The Transgender*
*Phenomenon* 82 (2006)........................................................................ 7

Verhoven, Paul, director. *Starship Troopers*.
Sony Pictures, 1997............................................................................ 18

Virginia Prince, *Change of Sex or Gender*,
10 Transvestia 53, 60 (1969)............................................................. 7

## REGULATIONS

34 C.F.R. § 106.10 ...................................................... 2, 3, 4, 6, 8, 17, 18, 19

34 C.F.R. § 106.31(a)(2) .................................................. 2, 3, 4, 5, 10, 17

34 C.F.R. § 106.33 ............................................................ 12, 13, 14, 17, 18

34 C.F.R. 106.40 ................................................................................ 4

40 Fed. Reg. 24,141 ......................................................................... 12

40 Fed. Reg. 24,142......................................................................... 4

45 C.F.R. § 86.32 ............................................................................. 12

45 C.F.R. § 86.33 ..................................................................... 12, 13, 14, 17

45 C.F.R. § 86.40 ........................................................................... 4

45 Fed. Reg. 30,960 ........................................................................ 4

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* regulation the U.S. Department of Education, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ..............1, 2, 5, 6, 8-11, 18, 20

## Interest of *Amicus Curiae*

The American Civil Rights Project (the "ACR Project") is a public-interest law firm, dedicated to protecting and where necessary restoring the equality of all Americans before the law.  The ACR Project believes its expertise will benefit the Court in its consideration of this case.  This case interests the ACR Project because it focuses on the proper interpretation of some of America's most important civil rights enactments.

No party's counsel authored any portion of this brief. No person other than *amicus* and his counsel made any monetary contribution to fund the preparation or submission of this brief.  The parties have consented to the filing of this brief.

## Summary of the Argument

Through the *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* regulation the U.S. Department of Education (the "DOEd") promulgated in April (the "New Rule"),[1] the Appellants altered the regulations effectuating Title IX of the Education Amendments of 1972 ("Title IX").  Appellants rely heavily on their misreading of the Supreme Court's opinion in *Bostock v. Clayton Cnty.*[2] They couple that bad-faith reading of binding authority with a breathtaking interpretive revision of Title IX's text, history, and meaning, a farcical "plain

---

[1]    89 Fed. Reg. 33,474 (Apr. 29, 2024).
[2]    590 U.S. 644 (2020).

1

reading" that wholly disregards conclusive evidence of the text's original public meaning to rewrite it in service of regulatory overreach.

To understand the breadth of that overreach, we focus on two specific provisions of the New Rule: 34 C.F.R. § 106.10 (the "Scope Provision") and 34 C.F.R. § 106.31(a)(2) (the "Spaces Provision" and, with the Scope Provision, the "Provisions")) and the Appellants' justification for the propriety of the Provisions.  Exploring those purported justifications will, necessarily, expose how the Appellants' bad-faith misconstrual of *Bostock* as supporting the New Rule wars with the Supreme Court's reasoning in that decision.  Exploring those purported justifications will also reveal the implications of the Appellants' reinterpretation of Title IX's text, history, and meaning, showing that the Provisions (and Appellants' reasoning) are indefensible.

## Argument

### I. THE PROVISIONS OPENLY (IN THE SCOPE PROVISION) AND DISCRETELY (IN THE SPACES PROVISION) REWRITE TITLE IX

#### A. § 106.10 DRAMATICALLY REWRITES TITLE IX'S SCOPE BY EXTENDING IT TO DISCRIMINATION ON THE BASIS OF GENDER IDENTITY AND SEXUAL ORIENTATION *INDEPENDENTLY* OF SEX.

Title IX forbids federally funded education programs or activities from engaging in sex discrimination. Its key provision states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."[3] There is no other section of Title IX that forbids other kinds of discrimination. By its express terms, Title IX addresses sex discrimination and only sex discrimination. A federal funding recipient's discrimination based on anything *other* than sex does not violate Title IX.

The Scope Provision says differently. According to the Scope Provision, Title IX does *not* limit its prohibition to barring discrimination on the basis of sex. Instead, under the Scope Provision, "[d]iscrimination on the basis of sex

---

[3]   20 U.S.C. § 1681(a).

includes discrimination on the basis of … sexual orientation, and gender identity."[4]

### B.    § 106.31(a)(2) more subtly rewrites Title IX to ban *most* of the female-only spaces it's long and uncontroversially been understood to protect.

The Spaces Provision is less transparent (as explained, below, in Sec. II.B.), but equally sweeping in administratively overruling the work of Congress (as further explained, below, in Sec. III).

---

[4]    The Scope Provision also includes in its expansion of "Discrimination on the basis of sex" "discrimination on the basis of sex stereotypes[,]" "sexual characteristics[,]" and "pregnancy or related conditions."  We ellipse out these additions because, unlike those discussed in the main text, above, they are well established and unobjectionable as properly falling within the ambit of the general rule established by Congress in Title IX.  For example, when President Ford approved the first set of Title IX regulations in 1975 (discussed in the main body text, below), those regulations included 45 C.F.R. § 86.40, which clarified that "on the basis of sex" in Title IX definitionally included "Pregnancy or related conditions[,]" and specified how this provision forbid and required particular kinds of treatment of expecting mothers.  *See* 40 Fed. Reg. 24,142.  § 86.40 provided the same protections for pregnancy-related discrimination that the <u>DOEd</u> subsequently retained when it opened its doors in 1980 (as 34 C.F.R. § 106.40).  *See* 45 Fed. Reg. 30,960.  Roughly contemporaneous Congressional action clarified that, more generally, the legislature agreed that discrimination due to pregnancy and pregnancy-related conditions should be scored as a species of sex discrimination—as a specific example, Congress passed the Pregnancy Discrimination Act of 1978 to expressly clarify this point in employment law.

On its face, though, the Spaces Provision purports to amend only the DOEd's existing regulations concerning the statutory exceptions to Title IX's general nondiscrimination requirement, without altering those statutory exceptions. It purports to do no more than require that funding recipients who differently treat or separate the sexes in such situations do so "in a manner" working "no more than de minimis harm." Oh, it also specifies that any treatment "that prevents a person from" conducting themselves "consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex."

These Provisions, alone, would have major ramifications, eliminating a host of single-sex spaces that administrations of both parties (including, nominally, the current one) have uniformly understood Congress to have protected under the statutory exceptions. But the New Rule goes further. In its discussion of submitted comments concerning the Spaces Provision, the New Rule reads out of those statutory exceptions any authorization for federal funding recipients to maintain separate bathrooms, locker rooms, or shower facilities for the sexes.[5]

---

[5]    New Rule, at pp. 33820-21.

## II.    APPELLANTS' JUSTIFICATIONS FOR THE PROVISIONS FAIL, BADLY.

### A.    TO JUSTIFY § 106.10, APPELLANTS REJECT *BOSTOCK*'S REASONING IN ORDER TO EXTEND ITS PURPORTED HOLDING.

According to the Appellants, redefining "on the basis of sex [to] include[ ] discrimination on the basis of … sexual orientation, and gender identity" is unproblematic, because it "flows from the statute's 'plain terms'" as interpreted by *Bostock*.[6]  But that contention is flatly wrong, because it misreads the Supreme Court's reasoning in *Bostock*.

*Bostock* held that when someone is the subject of adverse action by an employer based on gender non-conforming behavior it would have accepted from an employee of another sex, that action was taken because of sex for purposes of Title VII, because the person's sex was a but-for cause of the adverse action.

*Bostock* explicitly declined to reach beyond the Title VII (employment) context.[7]  Moreover, it does not find a new protected class in Title VII more than 50 years after its passage.  Instead, it assesses the treatment of

---

[6]    New Rule, p. 33805.

[7]    *Bostock*, 590 U.S. at 681 (of "other federal or state laws prohibit[ing] sex discrimination" and "sex-segregated bathrooms, locker rooms, and dress codes[,]" noting that "none of these other laws are before us;" "we do not purport to address bathrooms, locker rooms, or anything else of the kind[;]" and concluding that "[w]hether other policies and practices might not qualify as unlawful discrimination or find justifications under other provisions of [even] Title VII are questions for future cases, not these.").

employees exhibiting the same behavior and correctly notes that Title VII bans *sex* discrimination: if an employer would allow a biological woman to wear a dress, then it must not differently treat an otherwise comparable biological man. Whatever its weaknesses, this approach is perfectly coherent and provides a clear rule for evaluating employer decisions for *sex* discrimination.

The same approach can be applied to Title IX. It, too, by its terms, bans *sex* discrimination, not discrimination based on sexual orientation or gender identity.[8] Thus (any applicable exceptions aside), if a girl in feminine attire can attend a school as a student, then a boy in feminine attire must be able to do so as well.

The transgender plaintiff prevailed in *Bostock* ***precisely because***, however the plaintiff "identified," the plaintiff's *sex* had not changed. Title VII only applied because an employer who fires a biological *male* employee who identifies as a woman, but would not have fired a biological *female* employee

---

[8]   The distinction between sex and gender identity was recognized by the original interpretive community for at least Title IX. Indeed, precisely this distinction drove the coining of the term "transgender" to contrast with the older "transsexual" – "transgender" was intended to describe individuals who had adopted the traits of the opposite sex *without* having actually attempted to cross over into "becoming" a member of the opposite sex (through the body's surgical alteration). In 1969, Virginia Prince, a male who lived as a woman, wrote in the underground magazine Transvestia: "I, at least, know the difference between sex and gender and have simply elected to change the latter and not the former." Virginia Prince, *Change of Sex or Gender*, 10 Transvestia 53, 60 (1969), quoted in Richard Elkins & Dave King, *The Transgender Phenomenon* 82 (2006).

identifying as a woman, definitionally makes the fired employee's sex a "but-for cause" of the termination.[9]  The plaintiff's gender identification was relevant only as a behavior the employer accepted from a woman, but not from a man, not as an additional form of discrimination whose prohibition had been newly discovered in Title VII's then 56-year-old text.[10]

Accordingly, the Appellants' inclusion of "discrimination on the basis of … sexual orientation, and gender identity" within the Scope Provision is overbroad and misleading.  While *Bostock* found that differentially treating someone because of their homosexuality or transgender-ness must qualify, it continued to make the signature feature of "sex" discrimination differential treatment of individuals *because of their sexes*, not because of their orientation or gender identities.  Without differential treatment of individuals *because of their sexes*, *Bostock* does not care what those individuals' sexual orientations or gender identities might be: no differential treatment because of sex, no sex discrimination.

The Scope Provision, in severing the short-hand version of *Bostock* from its reasoning, misses this point and follows where *Bostock*'s reasoning does not lead.  To see how, notice how the New Rule dismisses the commenter observation "that discrimination against a person because they are nonbinary

---

[9]  *Bostock*, 140 S.Ct. at 1741-42.
[10]  *Id.* at 1739 (noting that "[t]he *only* statutorily protected characteristic at issue in today's cases is '*sex*,'" and stipulating that "sex" in Title VII "refer[s] *only* to biological distinctions between male and female" (emphasis added)).

or bisexual does not require consideration of a person's sex."[11] The New Rule brushes off this observation without analysis, primarily by asserting that *Bostock* holds "such traits are 'inextricably bound up with sex'" and secondarily, by reference to "Supreme Court precedent [on] gender nonconformance."[12]

But *Bostock* didn't involve either nonbinary-ness, or bisexuality.[13] And neither *are* bound up sex the way that homosexuality and transgender-ness are. Simply put, we cannot apply *Bostock*'s reasoning in a parallel fashion for these statuses and reach the same conclusion the Supreme Court did. Imagine a Title VII hypothetical: an employer happily employs heterosexual and homosexual workers, but fires anyone it discovers to be bisexual—that hypothetical employer accepts no behavior from employees of one sex that it would not of another. *Bostock*'s reasoning simply does not apply here, or rather, *Bostock*'s reasoning in no way dictates that such behavior could be characterized as discrimination because of an employee's sex.

Similarly, *Price Waterhouse* and its progeny cannot be impressed to serve this end, either. The "nonconformance" at issue in that case involved an employer punishing a female employee for behaving in ways that it deemed

---

[11]  New Rule, pp. 33806-7.

[12]  *Id.* (citing *Bostock*, 590 U.S. at 660-61 and *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).

[13]  *Bostock*, 590 U.S. at 660-661 ("...homosexuality and transgender status are inextricably bound up with sex.").

unladylike, which it would have accepted—and lauded—from a man.[14]  But, there is no behavior implicated by either nonbinary-ness or bisexuality which a hypothetical anti-nonbinary or anti-bisexual funding recipient would accept from one sex and not from another.  That recipient's standards would be identical for individuals of both sexes.  Whatever such a funding recipient does in acting on its prejudices, it *does not* discriminate based on sex.

History (legislative and otherwise) gives the lie to Appellants' pseudo textual interpretation of Title IX; that interpretation simply did not exist in 1972.

Appellants justify the Spaces Provision by relying on cherry-picked elements of legislative history to defeat the original public (and plain) meaning of Congress's legislated text—something that legislative history simply can't do.  Even if legislative history *could* ever trump legislation, however, Appellants get the relevant legislative history badly wrong.  In fact, history demonstrates a national public *consensus*, both at the time of and following enactment of the relevant text, that it didn't mean what Appellants contend.

The New Rule correctly states that Title IX imposes a blanket prohibition on sex discrimination, subject only to specific, Congressionally crafted exceptions.[15]  It flags as the primary examples of such Congressional exceptions "20 U.S.C. [§] 1681(a)(1) through (9)[,]" along with "20 U.S.C.

---

[14]  *Price Waterhouse*, 490 U.S. at 1790-91.
[15]  E.g., New Rule, p. 33816.

[§] 1686[.]"[16]  Through the last of those, Congress established that "nothing contained [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes."

Nonetheless, the New Rule continues to assert that "there is no statutory exception" allowing funding recipients to maintain "sex-separate restrooms and locker rooms[.]"[17]  In order to make this assertion, despite Congress's specific enactment of § 1686, the DOEd reasons as follows: "[§] 1686 specifically carves out from Title IX's general statutory prohibition on sex discrimination an allowance for recipients to maintain sex-separate living facilities….  But that carve-out does not apply to … bathrooms, locker rooms, or shower facilities[.]"[18]  They admit that, in the same rulemaking in 1975, the then-Department of Health, Education, and Welfare ("HEW") issued a rule to authorize the maintenance of such separate facilities.  But they insist that they were not "living facilities" or subject to the Congressional exception found in § 1686.

To support the contention that bathrooms, locker rooms, and showers are not "living facilities[,]" they observe that "the original Title IX regulations … cited 907 of the Education Amendments (20 U.S.C. [§] 1686) as one of the

---

[16]  *Id.*  The New Rule similarly contends that the Javits Amendment functionally enacted an additional exception to Title IX's general rule against sex separation (citing Education Amendments of 1974 § 844).

[17]  New Rule, p. 33819, pp. 33820-21.

[18]  *Id.*

sources of its statutory authority for the housing provision…, whereas it cited only sections 901 and 902 of the Education Amendments (20 U.S.C. [§§] 1681-1682) as its statutory authority for the provision governing toilet, locker room, and shower facilities."[19]

This argument depends on a careless reading of the original regulations and is advanced in the face of overwhelming contrary evidence showing the original public meaning of § 1686's text.

Begin with Appellants' careless reading.  It is true that, when HEW promulgated the original set of Title IX regulations in 1975, it cited as authority for 45 C.F.R. § 86.32—its housing rule—"Secs. 901, 902, 907, Education Amendments of 1972, 86 Stat. 373, 374, 375; 20 U.S.C. [§§] 1681, 1682, 1686[.]"[20]  And, a paragraph later, HEW indeed cited as its authority for 45 C.F.R. § 86.33 (the antecedent of § 106.33) "Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374[.]"[21]

But this won't support Appellants' contention that HEW issued § 86.33 as something other than an interpretive clarification of § 1686.  This is easily seen from the rabble-scrabble nature of HEW's citations *throughout* the publication.  For example, in explaining the authority it sought to effectuate through § 86.32, HEW noted that "Secs. 901, 902, [and] 907" had been codified at "20 U.S.C. [§§] 1681, 1682, 1686[.]"  A paragraph later, in explaining what

---

[19]  *Id.*
[20]  40 Fed. Reg. 24,141.
[21]  *Id.*

authority it sought to effectuate through § 86.33, HEW made no reference to the codification of "Secs. 901, 902, Education Amendments of 1972"—this doesn't reflect an administrative assertion that these provisions were never codified, it's just sloppiness.  Similarly, a page later in the Federal Register, when explaining its authority to promulgate the already referenced rule concerning pregnancy-related discrimination, HEW cited "Secs. 901, 902 Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. [§§] 1681, 1683[.]" Neither § 1681 nor § 1683, though, grants any agency any regulatory authority, and § 1683 concerns the judicial review of agency actions taken pursuant to Title IX.  Does this mean that HEW lacked the authority to regulate pregnancy-related discrimination or suggest that HEW understood itself to lack such regulatory authority?

To ask the question is to answer it: these are scriveners' errors.  The omissions of related detail from one or another explicatory cite is unfortunate. It is not meaningful.  A statutory interpreter should seek stronger evidence of the original understanding of these enactments than what amount to typos.

B.    HISTORY (LEGISLATIVE AND OTHERWISE) GIVES THE LIE TO APPELLANTS' PSEUDO TEXTUAL INTERPRETATION OF TITLE IX;

13

### THAT INTERPRETATION SIMPLY DID NOT EXIST IN THE ORIGINAL INTERPRETIVE COMMUNITY

Thankfully, a robust history shows that § 86.33 (or its successor § 106.33) was not understood as a free-standing regulatory assertion, nor was its status as an interpretive clarification of § 1686's text ever contested or even questioned until the Biden-Harris administration.

On the one hand, we have searched and have found no examples of anyone: (a) interpreting § 1686 between Congress's passage of Title IX and President Ford's approval of the § 86.33 as requiring the abolition of single-sex bathrooms, locker rooms, and showers;[22] or (b) contending in the years since that President Ford overstepped his regulatory authority or misinterpreted § 1686 in issuing § 86.33.[23]

On the other hand, the 1970s *did* see an intense fight over whether the federal government *should* prohibit the maintenance of separate-sex

---

[22] Indeed, we have been unable to identify: (a) any court case whatsoever referencing § 1686 prior to 1995; (b) any article or treatise referencing § 1686 at all, published prior to 1985; or (c) any article or treatise referencing § 1686 in conjunction with bathrooms, locker rooms, or showers prior to 1995.

[23] Even when the Fourth and Seventh Circuit Courts of Appeals recently applied what they wrongly described as *Bostock*'s reasoning to find that sex-specific restrooms violate Title IX, they did so by side-stepping § 106.33, rather than by contending that § 106.33 was arbitrary or capricious. *See Metropolitan Sch. Dist. of Martinsville v. A.C.*, 75 F.4th 760, 770 (7th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020).

bathrooms, locker rooms, and showers.  It just wasn't a fight over the meaning of Title IX or its regulations.  Instead, that fight unfolded in the *late* 1970s, as part of the debate over and defeat of the proposed Equal Rights Amendment.

At the same time that Congress passed Title IX, it also passed the ERA and sent it off to the states for consideration of ratification.[24]  The language of the ERA's core provision was familiar: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."  As far as public federal funding recipients would have been concerned, its impact would not have been notably different from that of § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.").  Or rather, the impact of the ERA would not have been notably different from that of § 1681, except for the fact that Title IX included statutory exceptions (like § 1686) while the ERA included no exceptions at all.

Still, "[b]y 1974, 33 states had passed the ERA, just five short of the number needed for full ratification.  Though the odds of stopping the

---

[24] E.g., Neil J. Young, *How the Bathroom Wars Shaped America: It's Not Just North Carolina. Some of America's Great Political Struggles Have Pivoted Around Who Uses Which Toilet*, Politico History Dept., May 18, 2016 ("A proposed constitutional amendment guaranteeing sex equality under the law, the ERA had been passed by Congress in 1972 and set to the states for ratification.").

amendment looked poor, [Phyllis] Schlafly quickly organized a national movement to block the ERA's adoption."[25]

The ERA never made it to the requisite 38 ratifying states, before the game-clock ran down to zero in 1979.[26]  One of the most salient issues its opponents advanced to prevent that result was an assertion that its sweeping language (lacking any exceptions) would require the transformation of all bathrooms into unisex facilities.[27]

Indeed, in the years between Title IX's passage and the ERA's defeat, the fight over single-sex bathrooms, locker rooms, and showers, grew so intense that the President of the United States (an ERA supporter) was drawn into the argument.  President Carter insisted that there had "been a lot of

---

[25] *Id.*

[26] While at its relevant high-water mark, the ERA seemed to have secured the ratification of 35 states, it subsequently saw 5 revoke their ratification.

[27] *See, e.g, Id.* ("Once gender equity had been guaranteed under the Constitution, Schlafly cautioned, no laws could prevent men from entering women's bathrooms."), Emily Crockett, *Phyllis Schlafly Started the War on Women. But It Will Outlive Her*, VOX (Sep. 7, 2016) ("Schlafly started a ruthlessly effective grassroots movement to convince housewives that the ERA would erase all legal differences between men and women, leading to horrors like … unisex bathrooms[.]"); Amanda Terkel, *Bathroom Panic Has Long Stood in the Way of Equal Rights: The Women's Movement and Now the LBGT Movement Have Run Up Against Restroom Fears*, HuffPost Politics (Mar. 24, 2016) ("…supporters weren't ready for Phyllis Schlafly, the conservative activist who successfully mobilized against the ERA by warning that it would lead to … the proliferation of public unisex bathrooms.  Then, as now, scaring people about what could happen behind closed stall doors proved to be very effective, as even ERA supporters admitted.").

distortions about the equal rights amendment….  It doesn't say anything about bathrooms….  It says that the Federal Government nor (sic) a State government shall not take away equal rights from a person because they're a woman.  That's all it says."[28]

So starting 2 years after Title IX's passage, and ranging over the next five year, the nation focused ever more intently on the fight over a Constitutional amendment and, specifically, its potential impact on single-sex bathrooms, locker rooms, and showers.  President Ford approved § 86.33 in the midst of that fight.  No one, literally no one, complained that in doing so he was overriding Congress's decisions in Title IX.  No one—literally *no one*— in that nationwide battle between Phyllis Schlafly and ERA advocates argued that actually, these most radical and controversial potential applications of the Amendment had already been realized with the enactment of Title IX in 1972.

That's simply inconceivable if Appellants were even *arguably* right as to the original public meaning of § 686.  Appellants' understanding of § 1686 was not shared by anyone, *at all*, in the original interpretative community because it was the same nonsense when that text was enacted that it remains a half-century later.

## III.  APPELLANTS' ARGUMENTS FOR THE PROVISIONS HAVE ASTONISHING IMPLICATIONS

---

[28] *Public Papers of the Presidents of the United States: Jimmy Carter, 1980-1981*, Best Books (1981), p. 2006.

The Appellants do not draw together their assertions concerning the Scope Provision and the Spaces Provision.  But those implications are just as real, and just as iron-clad, whether or not they seek to avoid them.

According to the Appellants, § 1686 offers no authority for the existence of § 106.33.  More, according to the Appellants, "§ 106.33 'cannot override the statutory prohibition against *discrimination* on the basis of sex."[29]  While they do not draw the necessary inference, it is the clear position of the Appellants that, at all federal funding recipients, at all times since 1972, Title IX has made separate sex bathrooms illegal.

Nonetheless, the Appellants continue to maintain through the New Rule that it is no violation of Title IX for federal funding recipients to maintain in the future separate bathrooms defined by gender identity.  But if the Scope Provision defines "Discrimination on the basis of sex [to] include[ ] discrimination on the basis of … sexual orientation, and gender identity[,]" that cannot be true, either.  If § 106.33 is not rooted in § 1686 and if all discrimination based on gender identity is sex discrimination prohibited by Title IX, then all *gender* defined bathrooms, locker rooms, and shower facilities would be equally illegal.

Whatever window dressing they place on it, the Appellants' New Rule really does require what Jimmy Carter insisted that the ERA would not: the

---

[29]  *New Rule*, p. 33821 (emphasis in original) (citing *Grimm*, 972 F.3d at 618).

transformation of every bathroom, locker room, and shower in America into the shower scenes from *Starship Troopers*.[30]

## IV.   TITLE IX IS WISER THAN THE APPELLANTS, AND ACCORDINGLY DOES NOT REQUIRE THE SHOWER SCENES FROM *STARSHIP TROOPERS*

It is important to note that—if the Court is willing to listen to the enacting generation and to follow its practices—Title IX ***does not require*** federally funded schools to do any such thing.  Properly understood, Title IX does not require recipients to assign transgender individuals to the bathrooms, locker rooms, showers, or athletic teams of the sex they psychologically identify with.  Our analysis indicates that the statutory texts neither ***prohibits*** them from doing so if they wish to, nor ***requires*** it.  Since the Appellants' assertions in the Scope Provision are flatly wrong, there is no federal law forbidding gender identity discrimination, so there is no need for a law that expressly authorizes such separation.  Just as they may separate by left- and right-handedness, they may separate by gender identity.

This is as it should be.  Deciding how to handle a situation with a student who is transgender requires some flexibility.  It may take some time for all the different federal funding recipients in America to experiment sufficiently to identify a best approach (if, indeed, any such single approach ever emerges as

---

[30]   Verhoven, Paul, director. *Starship Troopers*.  Sony Pictures, 1997.

best for all).  Quite possibly, no single answer will ever emerge as the best for all scenarios.  Sometimes one solution will prove best, sometimes another.

This is what federalism is for.  To allow experimentation.  To allow different populations and different funding recipients to choose what is best for them.  To allow different families and students to find the best matches for their needs.  There is no need to impose a single answer.

Appellants' one-size-fits-all approach isn't just bad law; it's bad policy.

## Conclusion

The Appellants substantively misread *Bostock* and Title IX.  They seek to impose, on every funding recipient in the nation, policies Congress never approved.  Their case for doing so depends on a scriveners' error and unfamiliarity with the relevant legal history.  The district court properly enjoined their lawless New Rule from being enforced.  The Court should leave the district court's preliminary injunction standing in order to avoid restoring the efficacy of the Appellants' substantive errors of law.

Respectfully Submitted,

Joseph A. Bingham
   *Counsel of Record*
The American Civil Rights Project
P.O. Box 12207
Dallas, Texas 75225
(214) 504-1835
joe@americancivilrightsproject.org
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

On October 16, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit. Counsel further certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Joseph A. Bingham*

Joseph A. Bingham

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of FED. R. APP. P. 29(a)(5), because excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 3,573 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac version 16.89.1 in Century Expanded BT, Size 14.

*/s/ Joseph A. Bingham*

Joseph A. Bingham