**[ORAL ARGUMENT REQUESTED]**

**No. 24-3097**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

————————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court for the District of Kansas
No. 5:24-cv-04041-JWB-ADM
Hon. John W. Broomes

————————————

**REPLY BRIEF FOR APPELLANTS**

————————————

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
*Attorneys, Appellate Staff
Civil Division, Room 7209
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-1673*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ............................................................................. 1

ARGUMENT ............................................................................................................... 2

I.    Plaintiffs Are Unlikely to Prevail on the Merits. ...................................... 2

      A.    The Supreme Court's Stay Order Does Not Resolve This Appeal ........... 2

      B.    Gender-Identity Discrimination Is Necessarily Sex Discrimination. ................................................................................. 3

      C.    Section 106.31(a)(2)'s De Minimis Harm Standard Effectuates Title IX's Text. ..................................................................... 10

      D.    The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns. ..................................... 17

II.    The Remaining Factors Weigh Against Preliminary Injunctive Relief. .............. 23

      A.    Plaintiffs Failed to Establish Irreparable Harm. ....................................... 23

      B.    The Equities and Public Interest Weigh Against an Injunction. .............. 24

II.    At a Minimum, the Injunction Is Overbroad. ...................................... 25

CONCLUSION ............................................................................................................ 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................ 1, 3, 5, 6, 7, 8, 9, 10

*Burlington N. & Santa Fe Ry. Co. v. White,*
548 U.S. 53 (2006) .......................................................................... 11

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999) ............................................................... 17, 18, 19

*Department of Educ. v. Louisiana,*
144 S. Ct. 2507 (2024) ............................................................ 2, 3, 27

*Doe v. Princeton Univ.,*
30 F.4th 335 (3d Cir. 2022) ................................................................ 7

*Doe v. Purdue Univ.,*
928 F.3d 652 (7th Cir. 2019) .............................................................. 7

*Dunn v. Commodity Futures Trading Comm'n,*
519 U.S. 465 (1997) ................................................................... 13-14

*Florida v. Department of Health & Human Servs.,*
19 F.4th 1271 (11th Cir. 2021) ......................................................... 24

*Fowler v. Stitt,*
104 F.4th 770 (10th Cir. 2024) ........................................................... 4

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998) ................................................................... 17, 19

*Harmon v. City of Norman,*
61 F.4th 779 (10th Cir. 2023) .......................................................... 20

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993) ................................................................... 21, 22

*Initiative & Referendum Inst. v. Walker,*
450 F.3d 1082 (10th Cir. 2006) ....................................................... 24

*Jackson v. Birmingham Bd. of Educ.,*
544 U.S. 167 (2005) ................................................................ 9, 10, 11

*Kentucky v. Biden*,
  57 F.4th 545 (6th Cir. 2023) .......................................................... 24

*L.M. v. Town of Middleborough*
  677 F. Supp. 3d 29 (D. Mass. 2023) .............................................. 20

*Members of the City Council of the City of L.A. v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ...................................................................... 21

*Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*,
  109 F.4th 453 (6th Cir. 2024) ........................................................ 22

*Rowles v. Curators of the Univ. of Mo.*,
  983 F.3d 345 (8th Cir. 2020) ................................................ 7, 21, 22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ........................................................................ 19

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) .......................................................... 23

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) .......................................... 22, 22-23

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ......................................................... 23

*Throupe v. University of Denver*,
  988 F.3d 1243 (10th Cir. 2021) ..................................................... 21

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ...................................................................... 14

**Statutes:**

Education Amendments of 1974,
  Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612 ................... 14

20 U.S.C. § 1681(a) ............................................................... 8, 10, 11

20 U.S.C. § 1681(a)(6) .................................................................. 11

20 U.S.C. § 1686 ........................................................................... 9

42 U.S.C. § 2000e-2(a)(1) .............................................................. 8

**Regulations:**

34 C.F.R. § 106.2 ................................................. 1, 17, 22

34 C.F.R. § 106.6(d) ............................................ 20

34 C.F.R. § 106.10 ............................................... 1

34 C.F.R. § 106.31(a)(2) ...................................... 1, 13

34 C.F.R. § 106.33 ............................................... 12

34 C.F.R. § 106.34(a)-(b) .................................... 12

**Other Authorities:**

62 Fed. Reg. 12,034 (Mar. 13, 1997) ................... 18

85 Fed. Reg. 30,026 (May 19, 2020) .................. 18

89 Fed. Reg. 33,474 (Apr. 29, 2024) .......... 1, 4, 6, 9, 10, 11, 12, 13, 14, 15, 16, 20

# GLOSSARY

| | |
|---|---|
| Department | Department of Education |
| RFRA | Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.* |
| Rule | *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) |
| Title IX | Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 304-311 |

## INTRODUCTION AND SUMMARY

Title IX's prohibition on sex discrimination, like Title VII's corresponding

provision, is "written in starkly broad terms." *Bostock v. Clayton County*, 590 U.S. 644,

680 (2020). Consistent with those broad terms, the Department of Education's

challenged rule, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule), includes the three separate

provisions at issue here: 34 C.F.R. § 106.10, which applies *Bostock*'s reasoning to

recognize that discrimination on the basis of gender identity is necessarily

discrimination "on the basis of sex" under Title IX; 34 C.F.R. § 106.31(a)(2), which

employs a settled understanding of discrimination to establish a de minimis harm

standard under which schools may not differentiate based on sex in ways that cause

harm, unless otherwise permitted by Congress; and 34 C.F.R. § 106.2, which reflects a

longstanding definition of sex-based harassment to require schools to address

unwelcome sex-based conduct that is subjectively and objectively offensive and "so

severe or pervasive that it limits or denies a person's ability to participate" in the

school's education program. Contrary to plaintiffs' assertions, these provisions

operate independently of each other—as well as of the Rule's many other,

unchallenged provisions—and properly implement the statute's broad terms

consistent with precedent both from the Supreme Court and this Court.

There was accordingly no basis for the district court to enjoin these provisions,

let alone to issue a blunderbuss injunction, blocking myriad provisions that plaintiffs

did not challenge and that cause them no injury. The court's error is only

underscored by the expansive (and expanding) geographic scope of the injunction, which applies to thousands of schools throughout the country attended by members (or the children of members) of plaintiff associations—schools that are not parties to this litigation, within states not parties to this litigation, and whose interests in implementing the Rule the district court never considered. This Court should therefore vacate—or at minimum, substantially narrow—the injunction.

## ARGUMENT

### I. Plaintiffs Are Unlikely to Prevail on the Merits.

#### A. The Supreme Court's Stay Order Does Not Resolve This Appeal.

The Supreme Court's denial of the Department's emergency stay requests in different matters brought by different plaintiffs does not control this Court's review of the district court's issuance of a preliminary injunction. As explained in the Department's opening brief, Opening Br. 19 n.4, the Supreme Court's decision declining to partially stay two related preliminary injunctions pending appeal turned on both the "emergency posture" and the "limited record" at the emergency-stay stage. *Department of Educ. v. Louisiana*, 144 S. Ct. 2507, 2510 (2024) (per curiam). The Court also made clear that its decision governed only what should happen in "the interim period while" appeals "are pending in the Courts of Appeals." *Id.*

The Supreme Court's order makes no mention of *Bostock* or Title IX's text. Nor did the Court address any other merits issue. Moreover, the Supreme Court

noted that the Sixth Circuit had "already expedited its consideration of the case and scheduled oral argument for October," emphasizing that it "expect[ed] that the Courts of Appeals will render their decisions with appropriate dispatch." *Louisiana*, 144 S. Ct. at 2510. That observation would have made little sense if, as plaintiffs suggest, the Supreme Court already resolved the merits of challenges to the Rule in its brief per curiam order without any meaningful discussion. *See* Response Br. 17.

**B.**  **Gender-Identity Discrimination Is Necessarily Sex Discrimination.**

In challenging § 106.10, plaintiffs fail to acknowledge what this provision— separate and apart from the other challenged Rule provisions—does. *See* Response Br. 30-36 (conflating §§ 106.10 and 106.31(a)(2)). Section 106.10 stands on its own and, properly understood, answers only one question pertinent to this litigation: Where individuals are subject to discriminatory treatment because of their gender identity—such as by receiving detention "simply for being … transgender," *Bostock*, 590 U.S. at 651—is that discrimination "on the basis of sex" under Title IX? Reflecting the statute's plain text, and consistent with this Court's precedent, § 106.10 makes clear that the answer is yes. Punishing a student "for traits or actions" that a school "would not have questioned in members of a different sex" assigned at birth is a decision in which "[s]ex plays a necessary and undisguisable role." *Id.* at 652. Separate provisions of the Rule answer related but distinct questions, including what constitutes discrimination when schools separate individuals on the basis of sex

(§ 106.31(a)(2)) or permit sex-based harassment (§ 106.2). But § 106.10 deals only with what it means for discrimination to be "on the basis of sex." Its terms are a straightforward application of *Bostock*'s interpretation of materially identical statutory language. This Court should reject plaintiffs' various attempts to sidestep *Bostock*'s reasoning and Title IX's text in favor of their own extratextual views of Title IX's meaning.[1]

      **1.** As an initial matter, this Court's decision in *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024), forecloses plaintiffs' assertion that "*Bostock* doesn't extend 'beyond Title VII.'" Response Br. 30 (quoting 590 U.S. at 681). In *Fowler*, this Court squarely rejected the contention that *Bostock*'s "logic concerning the intertwined nature of transgender status and sex was confined to Title VII." 104 F.4th at 790. Applying "*Bostock*'s commonsense reasoning … in the equal protection context," this Court explained that the Supreme Court's focus "on Title VII and the issue before it suggests a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII." *Id.* Plaintiffs' attempts to diminish *Fowler* as "dicta" or limited to the "equal-protection analysis," Response Br. 32, ignores this Court's central insight that *Bostock*'s logic applies beyond Title VII. And it overlooks that, if anything, *Bostock*'s

---

[1] The Court should likewise reject plaintiffs' passing assertion that the Department adopted § 106.10 without adequate explanation, Response Br. 51, as the Department explained at length its conclusion that *Bostock*'s reasoning applies to Title IX, *see* 89 Fed. Reg. at 33,801-810.

reasoning applies with even greater force in the Title IX context given the shared purpose and nearly identical language of Title VII and Title IX.

**2.**      Even apart from plaintiffs' misreading of *Fowler*, their continued opposition to § 106.10 is surprising, as they nowhere indicate that they intend to discriminate against individuals "simply for being … transgender," *Bostock*, 590 U.S. at 651. Indeed, plaintiffs agree at points that the insight reflected in § 106.10—which mirrors *Bostock*'s central logic that discrimination against someone for being transgender or gay necessarily involves discrimination based on sex—is distinct from the question of what may be permissible in the context of traditionally sex-separate spaces like restrooms (a question *Bostock* did not directly address, and which the Rule separately addresses in § 106.31(a)(2)). *See* Response Br. 30 (recognizing that § 106.31(a)(2), not § 106.10, governs "access to sex-specific activities"). Plaintiffs' challenge to § 106.10 thus finds no support in their persistent focus on locker rooms, restrooms, and other sex-separate contexts. *See* Response Br. 23-36. As the Rule makes clear, sex separation in those contexts—where such separation has long been allowed so long as it comports with Title IX's general nondiscrimination mandate—is governed by § 106.31(a)(2), not § 106.10.

Plaintiffs nonetheless insist that discriminating against someone simply for being transgender is not sex discrimination and that § 106.10 is therefore invalid. *See* Response Br. 12, 30. By attacking § 106.10's understanding of the scope of discrimination "on the basis of sex," plaintiffs assert, in direct contravention of *Bostock*

and this Court's decision in *Fowler*, that they can "discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. Under plaintiffs' view of Title IX, they are free to openly and "intentionally penalize[]" a student "identified as male at birth for traits or actions" they tolerate in a student "identified as female at birth." *Id.* Whether or not plaintiffs would actually choose, for example, to bar students from band for being gay or to give students detention for being transgender, plaintiffs contend that those plainly discriminatory actions would not violate Title IX. While plaintiffs ignore these startling consequences of their view of Title IX and their challenge to § 106.10, this Court should not—regardless of its view of plaintiffs' challenges to the separate provisions at §§ 106.31(a)(2) and 106.2.

**3.** In challenging the Rule's application of *Bostock*'s reasoning to Title IX, plaintiffs repeat the same basic mischaracterization as the district court, contending that the Rule "redefin[es] … 'sex' to include 'gender identity.'" Response Br. 39. According to plaintiffs, § 106.10 thus contravenes Title IX because the statute uses "sex" to refer to "biological sex." Response Br. 39. Yet the Department is not asking this Court to reach any contrary holding as to the meaning of "sex" as used in Title IX. *See* Opening Br. 22. As the Rule explains, gender-identity discrimination is sex discrimination "even if [sex] is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Plaintiffs similarly suggest that, at the time Congress enacted Title IX, it did not contemplate how the statute would apply to sexual-orientation or gender-identity discrimination. Response Br. 38-39. *Bostock* similarly acknowledged that "few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons" or "that the law would turn out to protect male employees." 590 U.S. at 673, 678. But the Court dismissed those points, because "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Id.* at 674. Title IX's plain terms are entitled to equal respect.

**4.** Plaintiffs identify no textual basis for treating Title IX differently from Title VII in determining when discrimination is sex-based. Plaintiffs nowhere explain how Title VII's prohibition on discrimination "because of … sex" differs in any material way from Title IX's prohibition "on the basis of sex." Indeed, as plaintiffs recognize, Response Br. 31, the Supreme Court used the two terms interchangeably in *Bostock.* And plaintiffs cite no case interpreting Title IX to impose a higher causation standard than Title VII. Nor could they, as appellate courts have uniformly concluded that alleged discrimination is actionable under Title IX—just as it is under Title VII—even when sex is only one but-for cause. *See, e.g., Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022); *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019); *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020).

Plaintiffs nonetheless assert that Title IX differs from Title VII because the former only "prohibit[s] one sex from being treated worse than the other sex." Response Br. 13. But plaintiffs point to no decision adopting that understanding of Title IX, and for good reason: The text of the statute—like the text of Title VII—prohibits discrimination against individuals, not groups. *Compare* 20 U.S.C. § 1681(a) (prohibiting discrimination against any "person"), *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination against "any individual"). Under both Title VII and Title IX, defendants cannot escape liability for sex discrimination against an individual by saying that they generally treat men and women equally. *Bostock*, 590 U.S. at 658-59.

Nor is it relevant that Title IX includes statutory carve-outs permitting sex differentiation in specific contexts. Response Br. 25-29. Whatever the scope of those provisions, they do not undermine the fundamental insight that discriminating against someone for being transgender is sex discrimination and is thus barred in any context where Title IX's nondiscrimination mandate applies. Indeed, that Congress considered it necessary to craft those exclusions only underscores the breadth of Title IX's core mandate in 20 U.S.C. § 1681(a). *See* Opening Br. 24-25.

Plaintiffs attempt to find in § 1686—a statutory provision about schools maintaining sex-separate living facilities—some textual basis to distinguish Title IX and Title VII's language prohibiting sex discrimination. On plaintiffs' account, that provision is a "rule of construction" for Title IX's nondiscrimination mandate, not an exception to it, such that the statute must be "construed" to permit some sex

8

distinctions while barring others under some unstated rubric. Response Br. 23 (citing 20 U.S.C. § 1686). To begin, even if § 1686 were a "rule of construction," plaintiffs identify no textual reason that such a "rule" would govern the meaning of § 1681's "on the basis of sex" language—the only matter § 106.10 addresses—rather than the meaning of what actions constitute unlawful discrimination. More fundamentally, it makes no difference whether § 1686's carve-out for the maintenance of sex-separate living facilities is treated as a "rule of construction" or one of Title IX's "exceptions." Response Br. 23-24. As discussed, *Bostock*'s key insight—reflected in § 106.10— follows from the unambiguous text of Title IX's prohibition against discrimination "on the basis of sex."[2]

 **5.** Finally, plaintiffs' invocation of interpretive canons—under the major-questions doctrine and the Spending Clause—fails. Response Br. 18-21, 37-41. Like the provision at issue in *Bostock*, Title IX is "written in starkly broad terms." 590 U.S. at 680; *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, 183 (2005) (rejecting a Spending Clause argument because "Title IX itself … supplied sufficient notice to the Board that it could not retaliate" against those complaining of sex discrimination, even though the "statute makes no mention of retaliation" (quotation marks omitted)). Any "elephant," then, "has never hidden in a mousehole; it has been

---

[2] While § 106.10 concerns only what qualifies as "on the basis of sex," the Rule elsewhere reflects Title IX's instructions permitting sex-separation in many contexts, including living facilities. *See* 89 Fed. Reg. at 33,814.

standing before us all along." *Bostock*, 590 U.S. at 680. Congress did not need to speak more clearly than it did in defining the scope of discrimination "on the basis of sex." 20 U.S.C. 1681(a).[3]

## C. Section 106.31(a)(2)'s De Minimis Harm Standard Effectuates Title IX's Text.

While § 106.10 addresses the scope of the statute's phrase "on the basis of sex," § 106.31(a)(2) serves a different function: It recognizes that Title IX's nondiscrimination mandate permits some differential treatment based on sex to the extent that such treatment does not subject a person to more than de minimis harm. The standard neither contravenes Title IX, *contra* Response Br. 33-37, nor is arbitrary and capricious, *contra* Response Br. 50-52. To the contrary, it follows directly from Title IX's text and Supreme Court precedent.

**1.** "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175. The de minimis harm standard effectuates the text and structure of that nondiscrimination mandate. Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, Title IX's nondiscrimination mandate—and, by extension, § 106.31(a)(2)—implicates "only" those sex-based distinctions "that subject[] any person to legally cognizable injury—i.e., more than de

---

[3] Plaintiffs do not bolster their major-question arguments by invoking (or mischaracterizing) provisions of the Rule the district court never found likely to be unlawful and the merits of which are not at issue in this appeal. *See* Response Br. 20.

minimis harm," *id.* at 33,814. In addition, § 106.31(a)(2) gives effect to Title IX's "specific, narrow exceptions" and exclusions, *Jackson*, 544 U.S. at 175, by carving out contexts in which Congress permitted recipients to differentiate on the basis of sex— such as membership in fraternities and sororities, 20 U.S.C. § 1681(a)(6)—even if doing so causes cognizable harm.

Plaintiffs offer no sound reason to doubt the interpretation of Title IX reflected in § 106.31(a)(2). They stress that Title IX "doesn't forbid all sex *distinctions*." Response Br. 23. The Department agrees and "does not interpret Title IX to prohibit all sex-based distinctions or separation." 89 Fed. Reg. at 33,814. Rather, Title IX broadly prohibits "discrimination," 20 U.S.C. § 1681(a), while specifying discrete contexts where the general nondiscrimination mandate does not apply. The Rule tracks that statutory structure by making clear that § 106.31(a)(2)'s de minimis harm standard does not apply where "there is a statutory basis for allowing otherwise." 89 Fed. Reg. at 33,814.

Plaintiffs also assert that "Title IX never mentions *de minimis* harm." Response Br. 34. But no one disputes that discrimination refers to "distinctions or differences in treatment that injure protected individuals." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006); *see* Response Br. 21-22 (agreeing that discrimination means differential, less favorable treatment). On the contrary, plaintiffs appear to agree that the statute's prohibition on discrimination incorporates the concept of "worse" treatment; they just object to the Department's standard regarding "how

much worse," without offering any metric of their own. Response Br. 34 (quotation marks omitted). Far from being "manufacture[d]," Response Br. 33, however, the Rule's de minimis harm standard simply reflects the commonsense understanding of the word "discrimination" as used in Title IX.

In the absence of any serious disagreement that distinguishing between discrimination and mere differential treatment necessarily turns on some understanding of harm, plaintiffs insist that § 106.31(a)(2) is invalid because the Department applied that insight to individuals' ability to access sex-separate activities and facilities consistent with their gender identity. Response Br. 34-37. To start, that contention does not undermine the general de minimis harm standard in § 106.31(a)(2)'s first sentence, which makes clear that the provision protects all students from harmful treatment that differentiates on the basis of sex unless otherwise permitted by Congress. 89 Fed. Reg. at 33,818. The Rule thus does not elevate "gender identity over sex." *Contra* Response Br. 21. As explained, Opening Br. 27-28, when cisgender students must access sex-separate facilities and activities— like restrooms or certain classes and extracurricular activities, *see* 34 C.F.R. §§ 106.33, 106.34(a)-(b)—consistent with their sex at birth, they generally experience no cognizable sex-based harm, as plaintiffs seemingly recognize by defending sex separation in those contexts. *See* Response Br. 28-29. Nothing, moreover, prevents schools from taking steps "to ensure privacy and safety for *all* students in a recipient's sex-separate facilities," 89 Fed. Reg. at 33,820 (emphasis added), including for

cisgender students like the individual plaintiff here, *contra* Response Br. 29 (claiming

that § 106.31(a)(2) "cannot be squared with Title IX" given concerns of cisgender

students like the individual plaintiff).

In any event, plaintiffs are mistaken that there is anything unlawful about the

application of § 106.31(a)(2)'s standard to specifically recognize that harm arises

where a school "prevents a person from participating in an education program or

activity consistent with the person's gender identity." 34 C.F.R. § 106.31(a)(2).

Indeed, plaintiffs do not contest that evidence-based determination; they simply

disagree that such harm should amount to prohibited discrimination. But the Rule's

straightforward application of the de minimis harm standard to "contexts for which

there is no statutory exception, such as sex-separate restrooms," faithfully implements

both the statute's broad nondiscrimination mandate and the limited contexts where

Congress provided a different rule. 89 Fed. Reg. at 33,819.

Because § 106.31(a)(2) reflects the distinctions that Congress itself drew in

enacting Title IX, plaintiffs are wrong that the Rule "leads to absurd results" that

"Congress didn't intend." Response Br. 35. Congress "could have, but did not,"

exempt other sex-separate education programs and activities, including school

facilities like restrooms, from the general nondiscrimination mandate. 89 Fed. Reg. at

33,821. Plaintiffs' atextual speculation about Congress's supposed intent ignores that

"the purposes underlying [a statute] are most properly fulfilled by giving effect to the

plain meaning of the language as Congress enacted it," *Dunn v. Commodity Futures*

*Trading Comm'n*, 519 U.S. 465, 474 (1997), which is what the Department did in promulgating § 106.31(a)(2).

Likewise, plaintiffs err in arguing that the de minimis harm standard implicates principles reflected in the major-questions doctrine or the Spending Clause. Response Br. 18-20, 37-41. Section 106.31(a)(2) effectuates a commonsense understanding of "discrimination" and the distinctions "Congress … itself" drew in enacting Title IX, *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted), and it therefore does not implicate either set of principles. *See* 89 Fed. Reg. at 33,815; *supra* pp. 9-10.

**2.** Section 106.31(a)(2) also is not arbitrary and capricious. Many of plaintiffs' arguments on this front collapse into their flawed assertion that the Rule contravenes Title IX by allowing sex separation in some contexts but not others, particularly with regard to athletics. Response Br. 35-37, 50-52. The Rule, however, reflects the distinctions Congress itself drew. The Department reasonably explained that the Rule excepts sex-separate athletic teams from the de minimis harm standard because—as plaintiffs recognize, Response Br. 35—separate legislation "made clear that the Title IX regulations should reflect the fact that athletic competition raises unique considerations," 89 Fed. Reg. at 33,819 (discussing Education Amendments of 1974, Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612). And as explained, Opening Br. 27 n.5, the Rule leaves unchanged the regulations allowing sex-separate

athletics teams that were promulgated against that distinct statutory backdrop.  *Contra* Response Br. 36 (erroneously suggesting the Rule "threatens sex-specific sports").

Separately, the Rule reasonably addressed concerns related to privacy, safety, and compliance.  *Contra* Response Br. 29, 50-52.  The Rule makes clear that "the Department strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy."  89 Fed. Reg. at 33,820.  The experience of schools across the country, moreover, supports the Department's conclusion that those interests can be safeguarded "without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." *Id.*; *see* New Jersey, et al., Amici Curiae Br. 10-11 (explaining that "sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks.").  And the Rule expressly addressed how schools may provide "safe and nondiscriminatory access to facilities" for all students, including "[f]or nonbinary students."  89 Fed. Reg. at 33,818.  *Contra* Response Br. 40 (claiming the Rule "provides no guidance" on this question).

Equally unavailing are plaintiffs' assertions that the Rule fails to address schools' concerns regarding gender-identity verification.  Response Br. 39-40, 51. Schools may take reasonable measures to verify individuals' gender identity, including by relying on a person's "consistent assertion" or "written confirmation … by the student or student's parent, counselor, coach, or teacher."  89 Fed. Reg. at 33,819. Those measures may be applied to any "person" accessing school facilities or

15

activities, *id.*, not just students.  *Contra* Response Br. 40.  The fact that the Rule

distinguishes reasonable means of compliance from "invasive" or "burdensome"

measures, 89 Fed. Reg. at 33,819, does not mean that the Rule requires schools to

"rely on [a] student's word" without documentation or scrutiny, Response Br. 39.

Finally, plaintiffs are incorrect that the Department failed to adequately account

for reliance interests.  *See* Response Br. 51-52.  The Rule addressed at length not only

how § 106.31(a)(2)'s de minimis harm standard operates, including its interaction with

various aspects of schools' existing practices such as safety and privacy policies, 89

Fed. Reg. at 33,814-825, but also the potential costs to recipients of complying with

the Rule, *id.* at 33,876.  As plaintiffs acknowledge, Response Br. 52, the Department

explained that while § 106.31(a)(2) may "require updating of policies or training

materials," it "will not require significant expenditures, such as construction of new

facilities or creation of new programs," 89 Fed. Reg. at 33,876.  Indeed, nothing in the

Rule prevents schools from maintaining existing sex-separate facilities, such as

restrooms and locker rooms.  *Contra* Response Br. 51.  Nor does anything require

schools to construct "single-occupancy facilities," as "such facilities are not the only

way a recipient could provide nondiscriminatory access to its facilities."  89 Fed. Reg.

at 33,820.  Nothing more was required of the Department to address the potential

reliance interests of schools and students.

**D. The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns.**

Section 106.2's definition of hostile-environment harassment bars "[u]nwelcome" and "offensive" sex-based conduct "so severe or pervasive that it limits or denies a person's ability to participate" in a recipient's education program or activity. 34 C.F.R. § 106.2. That standard neither chills nor compels speech. And the standard is not invalid simply because it—like standards long applied under both Title IX and Title VII—differs in certain respects from the standard required to support judicially implied damages actions as announced in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).

**1.** Plaintiffs' reliance on *Davis* is misplaced. *See* Response Br. 45. The district court did not rely on any perceived inconsistency with *Davis* in enjoining § 106.2's definition of hostile-environment harassment, and for good reason. In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied private right of action, 526 U.S. at 641, a context in which courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). The question in *Davis* was "whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526 U.S. at 639. The Court thus addressed "the proper definition of 'discrimination' in the context of a private damages action." *Id.* at 649. In that specific "context," the

Court concluded that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 649-50.

Nothing in *Davis* suggested that its standard for damages liability created as part of the Court's authority to shape the judicially implied private right of action controls in the administrative-enforcement context.  The Court instead recognized that those contexts present different questions, explaining "we are asked to do more than define the scope of the behavior that Title IX proscribes" in determining what conduct "support[s] a private suit for money damages."  *Davis*, 526 U.S. at 639.  The Court also repeatedly and approvingly cited the Department's then-applicable hostile-environment standard, *id.* at 647-48, 651, which—similar to the Rule—defined prohibited sex-based harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997).  Far from affixing a narrow meaning to any term in Title IX, *Davis* recognized that the circumstances under which recipients could be held liable for violating Title IX turned on the nature of the action and the relief sought.  Indeed, even the 2020 rule did more than "simply codify" *Davis*.  *See* 85 Fed. Reg. 30,026, 30,033 (May 19, 2020).

Plaintiffs likewise misread *Davis* in asserting that its damages standard was necessary to ensure harassment does not infringe protected speech.  Response Br. 47.

18

Although the *Davis* dissent discussed the First Amendment, the majority nowhere suggested that its holding was motivated by such concerns. *See* 526 U.S. at 667 (Kennedy, J., dissenting). Rather, the Court made clear that the standard reflected the appropriate limits on Title IX's judicially implied damages action, *see id.* at 640 (majority opinion), which implicates issues of fair notice not presented in the administrative-enforcement context, *see Gebser*, 524 U.S. at 290 (explaining federal funding can be terminated only after "notice and unsuccessful efforts to obtain compliance" and limiting implied private damages action under Title IX to "comparable conditions").

2.     Plaintiffs, like the district court, wrongly assert that § 106.2's hostile-environment standard compels students and teachers "to speak inaccurate pronouns and to avoid saying sex is binary or immutable." Response Br. 42. As explained, Opening Br. 36-38, the Rule merely requires schools to address sex-based harassment, which is not the same as "telling" individual students and staff "what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).

Plaintiffs' contrary arguments misconstrue the Rule. The Rule does not mandate that anyone—including the individual plaintiff here—use particular pronouns or prohibit anyone from engaging in particular speech. *Contra* Response Br. 42. Nor can plaintiffs graft on additional requirements not contained in the Rule by

parsing other filings or agency actions that predate the Rule or address distinct issues.[4] Response Br. 46. And in insisting that the Rule contains no protection for First Amendment rights, Response Br 40, 49, plaintiffs simply ignore the Department's express statement that "nothing in the regulations"—including § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516; *see also* 34 C.F.R. § 106.6(d).[5]

      **3.** The Rule is not facially overbroad or vague. *Contra* Response Br. 46-49. Plaintiffs make no showing that the Rule proscribes a "substantial" amount of protected speech either in an absolute sense or relative to the Rule's "plainly legitimate sweep." *Harmon v. City of Norman*, 61 F.4th 779, 795 (10th Cir. 2023) (quotation marks omitted). Like the district court, plaintiffs focus on the standard's application to a narrow category of speech involving pronouns and gender-identity issues. Response Br. 47. Plaintiffs' arguments about those contexts are not only wrong, *supra* p.19, but also irrelevant because "the mere fact that one can conceive of some impermissible

----

[4] Plaintiffs similarly do not advance their argument by referencing, Response Br. 43, the facts of *L.M. v. Town of Middleborough*, 677 F. Supp. 3d 29, 39 (D. Mass. 2023), a case that did not implicate Title IX and that the Rule cited only for the uncontested principle that "schools can prohibit speech that is in 'collision with the rights of others to be secure and be let alone,'" 89 Fed. Reg. at 33,504 (quoting *L.M.*, 677 F. Supp. 3d at 38).

[5] For much the same reason, plaintiffs' argument that the Rule violates the Religious Freedom Restoration Act (RFRA) also fails. *See* Response Br. 49-50; *see also* 89 Fed. Reg. at 33,822 ("The Department likewise interprets and applies its regulations consistent with RFRA").

applications of a statute is not sufficient to render it susceptible to an overbreadth challenge," *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

Plaintiffs' vagueness challenges are equally unavailing. *See* Response Br. 48-49. Plaintiffs nowhere explain how the Rule fails to provide notice of the proscribed conduct, which "is defined and narrowed using language with common usage and understanding" in the antidiscrimination context. *Rowles*, 983 F.3d at 358. Instead, plaintiffs speculate about the standard's application to a narrow set of stylized hypotheticals involving issues related to gender identity. Response Br. 48. But as the Supreme Court has explained, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The Rule is not vague for refraining to speculate ex ante how the hostile-environment standard may apply in hypothetical future scenarios.

**4.** At bottom, plaintiffs' First Amendment challenges to the hostile-environment standard cannot be squared with the fact that courts—including this one—have long applied analogous standards under both Title VII and Title IX without facial First Amendment difficulties. *See Harris*, 510 U.S. at 21 (applying "severe or pervasive" standard under Title VII); *Throupe v. University of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (same in Title IX).

Plaintiffs' efforts to distinguish that precedent fall flat. Plaintiffs observe that many of these cases did not raise First Amendment concerns, Response Br. 48, but

that is the point: This Court (and others) have long applied analogous standards without discerning constitutional problems. Moreover, where First Amendment concerns were raised, courts rejected them, as plaintiffs concede. *See* Response Br. 45 (discussing *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 468 (6th Cir. 2024) (upholding harassment policy against constitutional challenge)); *Rowles*, 983 F.3d at 355 (same). Likewise, plaintiffs contend that the cases involved policies "that did not 'target speech.'" Response Br. 48 (quoting *Rowles*, 983 F.3d at 358). That not only wrongly suggests that those cases did not deal with speech, *see Harris*, 510 U.S. at 21 (applying hostile-environment standard to allegedly harassing speech), it is also irrelevant because § 106.2's hostile-environment standard also "do[es] not target speech but instead prohibit[s] conduct," *Rowles*, 983 F.3d at 358; *see* 34 C.F.R. § 106.2 (prohibiting offensive and unwelcome "sex-based *conduct*" (emphasis added)).

Plaintiffs seek to bolster their arguments by invoking out-of-circuit precedent, Response Br. 48, but those cases only underscore the validity of the Rule's hostile-environment standard. Plaintiffs principally rely on *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), but that case involved a "staggeringly broad" policy that extended to actions based on "a long list of characteristics," including "political affiliation"; covered a wide array of conduct, including any "that may be humiliating"; and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." *Id.* at 1115,

1125 (quotation marks omitted). Section 106.2's hostile-environment standard has none of those features. Plaintiffs' other examples are equally inapposite. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) (addressing standing to challenge speech restrictions "outside Title IX protected categories"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 216-17 (3d Cir. 2001) (addressing standard that required no "showing of severity or pervasiveness").

## II. The Remaining Factors Weigh Against Preliminary Injunctive Relief.

### A. Plaintiffs Failed to Establish Irreparable Harm.

Plaintiffs fail to demonstrate that the Rule—and particularly the provisions that they challenge—will cause them irreparable harm. *See* Opening Br. 41-45.

1. Plaintiffs assert that their compliance costs constitute irreparable harm. Response Br. 53. But they do not tie such costs to the provisions that the district court concluded were likely unlawful, referencing a general intent to "update training materials" and "hire additional" staff. Response Br. 53. The vast majority of the Rule, however, consists of provisions that neither the district court nor plaintiffs have demonstrated are unlawful. Beyond that, plaintiffs made no effort to quantify their anticipated costs, let alone as a percentage of their budgets or as compared to ordinary costs of Title IX compliance. *See* Opening Br. 42-43. Plaintiffs suggest that "no such requirement exists," Response Br. 53, but courts look to "the peculiarity and size" of

compliance costs in considering preliminary relief, *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

**2.** The plaintiff states also claim that they will suffer irreparable harm because the Rule would frustrate their ability to implement contrary state laws. But as explained, Opening Br. 45, many of the purportedly conflicting state laws or policies plaintiffs invoke are perfectly consistent with the Rule. In any event, as plaintiffs elsewhere stress, Response Br. 37, the Rule implements Spending Clause legislation, and states may not demand the federal government's money while rejecting the terms on which the federal government has elected to make that money available. *See Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021).

**3.** Finally, the suggestion that the individual plaintiff or members of the plaintiff associations could face potential violations of their constitutional rights cannot justify the preliminary injunction. Response Br. 54-55. As discussed, Opening Br. 43, plaintiffs' speculative "fear[s]," Appx. Vol. 1, at 190, "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) (quotation marks omitted).

## B. The Equities and Public Interest Weigh Against an Injunction.

Plaintiffs do not substantially dispute that the equities and public interest favor enforcement of a regulation intended to stamp out sex discrimination. Nor do they

dispute that the injunction's sweeping geographic scope means that it applies to thousands of individual schools across the country—many of which are located in states that raised no objection to the Rule and nearly all of which are overwhelmingly attended by students that raised no objection to the Rule. And there is no dispute that the plaintiff associations' fluid membership—including their leveraging of the preliminary injunction to recruit new members—creates immense regulatory uncertainty for the nation's schools, which cannot proceed with any certainty as to the regulatory requirements they face from one day to the next. *See generally* Opening Br. 45-47.

Plaintiffs' response is that the Rule misinterprets Title IX or is otherwise unlawful. *See* Response Br. 55-56. But that argument collapses with the merits. Plaintiffs also suggest that the injunction properly "covers all members of organizational Plaintiffs." Response Br. 56. But even putting aside the inequity of allowing individuals to join the plaintiff associations and enjoy the benefit of the injunction after the fact, plaintiffs ignore that the district court seriously erred in its equitable analysis by extending the injunction to so many non-parties without accounting for the disruption to their interests in the effectuation of the Rule.

## III. At a Minimum, the Injunction Is Overbroad.

Finally, the injunction is overbroad insofar as it extends to provisions that plaintiffs did not challenge and that they do not connect to any asserted injury. That includes § 106.10 and the many parts of § 106.2 beyond the definition of hostile-

environment harassment as applied to gender-identity discrimination. *See* Opening Br. 47-52. Plaintiffs barely engage with the Department's discussion on these points. *See* Response Br. 57. They offer no justification for the injunction's extension to provisions of the Rule that they did not challenge and that the court did not find unlawful. Nor do plaintiffs dispute that the challenged provisions operate independently of each other and the dozens of other provisions that have nothing to do with gender identity. The cursory arguments that plaintiffs do offer in defense of the injunction's scope are wrong in any event.

*First*, plaintiffs suggest that the Department forfeited its severability arguments. Yet as plaintiffs recognize, Response Br. 57, the Department's briefing below specifically addressed severability, *see* Appx. Vol. 2, at 323-24, 400. Both parties also expressly addressed severability at the preliminary-injunction hearing. *See* Appx. Vol. 3, at 541-42, 552-53. And the district court addressed the question in its preliminary-injunction ruling. *Id.* at 606-07. An argument pressed and passed upon below is not forfeited. Moreover, before the district court had found any provision likely invalid, it would have been unreasonable to expect the government to specifically explain how the remaining portions would continue to operate. *Contra* Response Br. 57.

*Second*, plaintiffs contend that the Supreme Court already rejected the Department's severability arguments in the related stay proceedings. Response Br. 57. That too is wrong: The stay applications were evaluated in an "emergency posture" and on a "limited record" where "the burden is on the [g]overnment as applicant to

show" entitlement to emergency relief. *Louisiana*, 144 S. Ct. at 2510. Here, by contrast, the burden is on plaintiffs to justify the injunction.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
    *Principal Deputy Assistant Attorney*
    *General*

*Of Counsel:*

LISA BROWN
    *General Counsel*
    *U.S. Department of Education*

MELISSA N. PATTERSON
  /s/ *David L. Peters*
STEPHANIE R. MARCUS
JACK STARCHER
STEVEN A. MYERS
DAVID L. PETERS
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7209*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-1673*
    *david.l.peters@usdoj.gov*

October 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*
_____
David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ David L. Peters*
David L. Peters