# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

———————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court for the District of Kansas

———————————

## EMERGENCY MOTION FOR A PARTIAL STAY PENDING APPEAL

———————————

*Of Counsel:*

LISA BROWN
  *General Counsel*
  *U.S. Department of Education*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue*
  *NW Washington, DC 20530*
  *(202) 514-1673*

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ............................................................... 1

STATEMENT .................................................................................................. 4

      A.     Title IX and the Final Rule ............................................................ 4

      B.     Prior Proceedings ........................................................................... 6

ARGUMENT .................................................................................................. 9

I.     The Department is likely to succeed in showing that the district court's
preliminary injunction is overbroad ...................................................... 10

      A.     The district court erred in enjoining provisions of the Rule not
challenged by plaintiffs. ............................................................... 10

      B.     Even as to the challenged provisions, the injunction is overbroad. ....... 13

           1.     Plaintiffs are not entitled to an injunction against § 106.10's
basic prohibition on gender-identity discrimination ..................... 14

           2.     The injunction is overbroad in enjoining § 106.2 in all
respects. ..................................................................................... 18

II.    The remaining factors favor a partial stay ............................................. 20

CONCLUSION ............................................................................................. 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## INTRODUCTION AND SUMMARY

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 175 (2005). Congress also tasked the Department of Education with issuing rules to effectuate the statute's broad prohibition on sex discrimination.

Pursuant to that delegated authority, the Department promulgated a rule in April 2024 making a variety of amendments to Title IX's regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). Those amendments do many things, ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces to breastfeeding students. Plaintiffs do not challenge the vast majority of those changes.

Instead, plaintiffs' request for a preliminary injunction challenged provisions relating to the Rule's application of Title IX's prohibition against sex discrimination to transgender individuals. Even then, the allegations of harm underpinning plaintiffs' claims concern the application of two discrete provisions—34 C.F.R. § 106.31(a)(2) and the definition of "hostile environment harassment" within 34 C.F.R. § 106.2—to particular factual contexts, primarily concerning the ways recipients may differentiate students based on sex, such as by providing sex-separate bathrooms and using sex-

specific pronouns.  Importantly, plaintiffs establish no harm stemming from the Rule's basic antidiscrimination requirement in 34 C.F.R. § 106.10, which precludes recipients from denying students educational opportunities "simply for being … transgender," *Bostock v. Clayton County*, 590 U.S. 644, 651 (2020).

The district court nonetheless preliminarily enjoined enforcement of the entire Rule as to plaintiffs—that is, in the four plaintiff States and as to an Oklahoma middle school attended by the plaintiff student as well as to schools nationwide attended by a member (or the child of a member) of the plaintiff associations.  The court entered its sweeping injunction despite the Department's express determination that the provisions of the Rule could operate independently and the severability provisions within the Rule itself.  The injunction contravenes bedrock principles requiring that equitable relief be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  The court plainly erred in enjoining provisions of the Rule that plaintiffs did not challenge and that the court did not find unlawful.  The court also erred in enjoining the challenged provisions in a manner reaching beyond any correlation with plaintiffs' claimed harm.

On appeal, the Department will show that issues of scope aside, the court's injunction cannot be squared with Title IX's plain text and Supreme Court precedent.  In this interim posture, however, the Department seeks narrower relief to vindicate core, equitable limitations on the scope of injunctive relief, including to the extent the injunction enjoins provisions that plaintiffs never challenged and sweeps

broader than necessary to "redress the plaintiff[s'] particular injur[ies]." *Gill*, 585 U.S. at 73. Specifically, the Department asks that the injunction be stayed to the extent it extends beyond the 2024 Rule's provisions at (i) 34 C.F.R. § 106.31(a)(2) and (ii) 34 C.F.R. § 106.2's definition of "hostile environment harassment" as applied to discrimination on the basis of gender identity.

The Department is likely to succeed in showing the injunction is overbroad. Absent a partial stay, the district court's injunction will irreparably harm the Department's interest in eliminating sex discrimination in federally funded educational programs and the public interest in ensuring that such educational programs are free from sex discrimination. The harm is accentuated by the fact that plaintiffs have asked the district court to extend the injunction to potentially thousands of schools nationwide. In contrast, plaintiffs will suffer no harm from the Department's requested stay.

The Rule's effective date is August 1. The Department respectfully requests a decision on its stay request by July 25 to allow the Solicitor General to decide whether to seek relief from the Supreme Court—and to allow the Court to consider any such request—if this Court denies relief.[1]

---

[1] Per Federal Rule of Appellate Procedure 8(a), defendants sought a stay from the district court on July 10. We will notify this Court if the district court acts.

**STATEMENT**

**A.    Title IX and the Final Rule**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exclusions. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 175 (2005); *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682.

Since Title IX's enactment, the Department has regularly exercised its authority to promulgate regulations implementing the statute's prohibition on sex discrimination. It did so again in the Rule, which makes a variety of changes to its current Title IX regulations. 89 Fed. Reg. at 33,882-96. Among other things, the Rule streamlines administrative requirements related to Title IX coordinators, *id.* at 33,885 (to be codified at 34 C.F.R. § 106.8(a)); revises recipients' notice of nondiscrimination and record-keeping requirements, *id.* at 33,885-86 (to be codified at 34 C.F.R. § 106.8(c), (f)); ensures access to lactation spaces for breastfeeding students, *id.* at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(3)(v)); addresses a recipient's response to sex discrimination, *id.* at 33,888-91 (to be codified at 34 C.F.R. § 106.44); and

4

provides recipients additional flexibility regarding procedures to respond to claims of sex discrimination, including sex-based harassment, *id.* at 33,891-95 (to be codified at 34 C.F.R. §§ 106.45-106.46).

This district court's preliminary injunction decision concerns other provisions of the Rule. Section 106.10 delineates the scope of prohibited sex discrimination under Title IX. It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886. As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)).

Separately, § 106.31(a)(2) details when otherwise permissible separation or differentiation on the basis of sex constitutes prohibited sex discrimination. It sets out the general principle that Title IX permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] … by subjecting a person to more than de minimis harm." 89 Fed. Reg. at 33,887. The final sentence of § 106.31(a)(2) provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." *Id.* This provision also recognizes, however, that

Congress specified certain contexts in which a school may permissibly differentiate on the basis of sex, even though greater than de minimis harm may result. *See id.* at 33,886; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 ("separate living facilities"); 34 C.F.R. § 106.41(b) (sex-separate athletic teams). The Rule does not alter the existing athletics regulations, which are the subject of a separate rulemaking. *See* 89 Fed. Reg. at 33,817.

Lastly, § 106.2 defines many terms, including prohibited "sex-based harassment." One form of such harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 89 Fed. Reg. at 33,884.

### B.     Prior Proceedings

Plaintiffs are Kansas, Alaska, Utah, and Wyoming, as well as a middle-school student from Oklahoma and three national membership organizations. Plaintiffs challenge the Rule's treatment of gender identity, claiming that the application of certain provisions to contexts such as bathrooms and pronouns will cause them irreparable harm. *See* Dkt. No. 25, at 1 (complaining that the Rule would "institutionalize gender ideology in every aspect of K-12 education") (Pls. Mot.). Plaintiffs sought preliminary injunctive relief.

On July 2, 2024, the district court entered a preliminary injunction barring the Department from enforcing the entire Rule in plaintiff States, as to the plaintiff student's middle school, and as to schools attended by members (or the children of members) of the plaintiff associations.[2]  Dkt. No. 53, at 1, 46 (Op.).  The court held that § 106.10's inclusion of gender identity in the scope of prohibited sex discrimination was contrary to Title IX, reasoning that the Rule "place[s] gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex" and thus "subvert[s] Congress' goals of protecting biological women in education."  Op. 23.  The court rejected the Department's reliance on *Bostock*, 590 U.S. 644, concluding that "uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX."  Op. 23.  For similar reasons, the court concluded that the major-questions doctrine and Spending Clause required clearer congressional authorization for the Rule's treatment of gender identity.  Op. 24-28.

The court also concluded that the Rule's treatment of gender identity was arbitrary and capricious.  According to the court, the Department failed to address several relevant factors, including concerns about the Rule's effect on the privacy and safety of cisgender students in sex-separate spaces.  Op. 34-37.[3]

---

[2] The district court instructed the plaintiff associations to file a notice identifying the schools attended by their members or their members' children "[i]n order to effectuate th[e] preliminary injunction" as to these members.  Op. 46.

[3] The court rejected plaintiffs' arguments concerning athletics, explaining that the "Rule carves out an exception for the athletics regulation."  Op. 23.

Separately, the court held that § 106.2's definition of hostile environment sex-based harassment contravened the First Amendment. Op. 29-33. The court concluded that the standard was "overbroad" and "vague." Op. 29. The court reasoned that the standard "chill[ed]" protected speech related to gender identity, such as the speech of students "who want to … refer to individuals with biologically accurate pronouns[] and speak in opposition to sharing bathrooms and other intimate spaces with individuals who do not share their biological sex." Op. 30.

Although plaintiffs advanced a handful of other theories as to the Rule's invalidity, *see, e.g.*, Pls. Mot. 24-25, the Court expressly declined to reach them, Op. 40. As to the remaining factors, the court concluded that the equities favored plaintiffs and that plaintiffs faced irreparable injuries in the form of compliance costs and the infringement of individual First Amendment rights. Op. 38-39.

As to the injunction's scope, the court recognized that it "did not explicitly address all of the provisions in the Final Rule" and that the provisions it did address were covered by severability clauses. Op. 40. But the court did not limit the injunction to the challenged provisions or to the applications of the Rule that the court deemed invalid. Instead, the court enjoined the Rule in its entirety. Op. 40.

Likewise, the court enjoined the Rule in full not only within plaintiff States and as to the plaintiff student's middle school, but also as to schools attended by unidentified members (or the children of members) of the plaintiff associations. Op. 43-45. The court has not yet resolved the parties' disagreement regarding whether

injunctive relief will extend to newly recruited members of the plaintiff associations, which have advertised the injunction via social media in an apparent attempt to expand their ranks. *See* Dkt. Nos. 59, 63, 65; *see, e.g.,* @Moms4Liberty, X, (July 8, 2024, 7:40 AM), https://perma.cc/SMH2-RLHP (offering to "[e]xempt" individuals from the Rule's coverage "by becoming a member"); @YAF, X, (July 4, 2024, 7:04 AM), https://perma.cc/27ZM-23S2 (inviting the public to "Exempt Your School from the Biden Administration's Radical Rewrite of Title IX By Joining YAF!"). Nor has the court addressed whether one plaintiff association can obtain county-wide injunctive relief for each member's child, rather than the school-wide relief the court originally contemplated. *See* Dkt. Nos. 62, 64.[4]

## ARGUMENT

In determining whether to grant a stay pending appeal, this Court considers (1) likelihood of success on appeal; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and

---

[4] Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1361. Dkt No. 1, at 9. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

(4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Each factor weighs in favor of a partial stay.

## I. The Department is likely to succeed in showing that the district court's preliminary injunction is overbroad.

The Department is likely to succeed on its claim that the district court's injunction is overbroad. Constitutional and equitable principles require that injunctions be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *see, e.g., Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921 (2024) (staying preliminary injunction to the extent it applied beyond the plaintiffs and enjoined unchallenged state-law provisions). The district court's injunction defies this fundamental principle of equitable relief several times over.

### A. The district court erred in enjoining provisions of the Rule not challenged by plaintiffs.

The district court's injunction is plainly overbroad in enjoining the many provisions of the Rule that plaintiffs do not challenge and that the court did not find invalid. As plaintiffs' filings make clear, their claims—and the purported harms underlying those claims—are grounded principally in objections to the Rule's treatment of gender identity. *See* Pls. Mot. 1, 20, 51. In particular, plaintiffs' challenges concern applications of three provisions of the Rule: the scope of prohibited discrimination in § 106.10; the de minimis harm standard in § 106.31(a)(2); and the definition of "hostile environment harassment" in § 106.2. The district court likewise focused on these provisions. Op. 23-38.

The Rule, however, is hardly limited to those provisions. It revises many aspects of Title IX's current regulations, most of which have nothing to do with gender identity—such as provisions concerning Title IX coordinators, 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.8(a)); recipients' notice of nondiscrimination and record-keeping obligations, *id.* at 33,885-86 (to be codified at 34 C.F.R. § 106.8(c), (f)); access to lactation spaces, *id.* at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(3)(v)); a recipient's response to sex discrimination, *id.* at 33,888-91 (to be codified at 34 C.F.R. § 106.44); grievance procedures for claims of sex discrimination, *id.* at 33,891-95 (34 C.F.R. §§ 106.45-106.46); and prohibitions on retaliation, *id.* at 33,896 (to be codified at 34 C.F.R. §§ 106.2, 106.71). Plaintiffs concededly did not challenge the vast majority of these provisions, Dkt. No. 63, at 2 ("Plaintiffs do not challenge every provision of the Final Rule"), and the district court did not find a single one of these provisions unlawful. The court nonetheless enjoined the entire Rule without explaining why doing so was necessary to remedy plaintiffs' asserted injuries.

That was error. It contravenes bedrock principles of equity to enjoin the Rule beyond those provisions that plaintiffs challenged and the court found unlawful—*i.e.*, beyond particular applications of §§ 106.10, 106.31(a)(2), and 106.2. *See, e.g.*, *Gill*, 585 U.S. at 73; *see also Labrador*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay) (concluding that the "the district court clearly strayed from equity's traditional

bounds" in enjoining statutory provisions that plaintiffs "failed to 'engage' with" and that "don't presently affect them").

The district court's suggestion that the inclusion of gender identity "permeates the entire rule," Op. 40, cannot be squared with the operation of the unchallenged provisions or the Department's express severability determination. As noted above, the Rule includes provisions governing numerous issues that have nothing to do with gender identity. Even if some of those provisions could be applied based on the understanding that gender-identity discrimination is a form of sex discrimination, that does not mean that all *other* applications of those provisions are suspect or that the Department's decision to adopt those provisions turned on its conclusions about gender-identity discrimination.

Moreover, as the court acknowledged, Op. 40, each subsection in which the challenged provisions appear contains a severability clause, which provides that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby," 34 C.F.R. § 106.9; *see also id.* §§ 106.16, 106.24, 106.48, 106.62, 106.72, 106.82. The severability provisions resolve any doubt that the Department would have adopted the Rule's unchallenged provisions addressing grievance procedures, lactation accommodations, and other issues not related to gender identity on their own. *See American Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021).

Nor can the injunction's scope be justified by the district court's conclusion that the Rule "would be invalid in its entirety" because the treatment of gender identity rendered the "rulemaking … arbitrary and capricious." Op. 40. To the extent the court meant to justify the injunction's scope by reference to vacatur principles, the Department disputes that vacatur is an available remedy under the Administrative Procedure Act. *See United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring in the judgment). In any event, the district court granted a preliminary injunction, not vacatur. And even were vacatur an appropriate remedy, there would be no basis to vacate provisions that plaintiffs do not even challenge, particularly in light of the Rule's express severability provisions. *See VanDerStok v. Garland*, 86 F.4th 179, 196-97 (5th Cir. 2023). At a minimum, therefore, the district court's injunction should be stayed to the extent it applies beyond the three provisions plaintiffs challenge and the court deemed unlawful.

**B.   Even as to the challenged provisions, the injunction is overbroad.**

The injunction is overbroad even as to the few provisions plaintiffs do challenge. Most importantly, plaintiffs identify no harm from § 106.10's prohibition on discriminating against students simply for being transgender. Nor do they identify any harm from § 106.2 beyond the provision's definition of hostile-environment harassment as applied to discrimination on the basis of gender identity.

### 1. Plaintiffs are not entitled to an injunction against § 106.10's basic prohibition on gender-identity discrimination.

The problem of overbreadth is particularly evident with respect to § 106.10. As explained, Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 106.10 sets out the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 89 Fed. Reg. at 33,886, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" *id.* at 33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)). Section 106.10 thus makes clear that prohibited sex discrimination under Title IX includes actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender. The district court erred in enjoining § 106.10 because the harms plaintiffs invoke flow from other Rule provisions, not § 106.10. And the district court's decision to enjoin § 106.10 was doubly flawed because plaintiffs cannot succeed on the merits of their challenge to that provision, which represents a clear-cut application of *Bostock*'s reasoning.

**a.** The Department is likely to succeed in showing that the district court erred in enjoining § 106.10 because plaintiffs identify no harm flowing from that provision. As a preliminary matter, plaintiffs do not challenge all of § 106.10, such as the portion

recognizing that prohibited discrimination includes discrimination on the basis of sexual orientation; indeed, plaintiffs nowhere suggest that they intend to engage in discrimination against students simply for being gay. Plaintiffs thus offer no reason to enjoin this or other aspects of § 106.10.

Even as to § 106.10's inclusion of gender identity, plaintiffs do not suggest that an injunction is necessary because they intend to engage in the quintessential discrimination based on gender identity that the Supreme Court confronted in *Bostock*—treating transgender students worse "simply for being … transgender." 590 U.S. at 651-52. Plaintiffs admit that there are "many areas—like science fairs and student government—where" they "don't intend to discriminate against transgender students." Dkt. No. 63, at 3. Yet if § 106.10 were enjoined, the Department's Title IX regulations would not expressly bar such sex discrimination.

Rather, plaintiffs object to the Rule's provisions regarding gender identity as applied to sex-separate facilities like bathrooms and to pronoun usage. *See* Pls. Mot. 47, 51. But § 106.10 is not the cause of recipients' asserted harms; rather, plaintiffs' quarrel stems from the provisions of § 106.31(a)(2) regarding permissible sex-separation and § 106.2's definition of hostile-environment harassment as applied to gender-identity discrimination. The Supreme Court's analysis in *Bostock* reflects this distinction, holding that discrimination on the basis of gender identity is necessarily a form of prohibited sex discrimination without "purport[ing] to address bathrooms, locker rooms," or other sex-differentiated contexts. 590 U.S. at 681.

Accordingly, the portions of the injunction that the Department does not seek to stay will fully protect against plaintiffs' asserted harms during the appeal. And plaintiffs identify no other harms that justify enjoining § 106.10, which the Department made clear should operate independently if other Rule provisions were invalidated. *See* 89 Fed. Reg. at 33,848 (identifying § 106.10 in its severability discussion as an example of a provision "intended to operate independently" of other provisions).

**b.** Beyond plaintiffs' lack of harms, § 106.10 reflects a straightforward application of *Bostock*. There, the Court considered Title VII's provision making it unlawful "for an employer ... to discriminate against any individual ... because of such individual's ... sex." 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656-57 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even assuming that "sex" in Title VII "refer[s] only to biological distinctions between male and female," *id.* at 655, and even without having

to decide how the insight applies to contexts such as "bathrooms, locker rooms, and dress codes," *id.* at 681.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on sex discrimination. Title IX bars discrimination "on the basis of sex," which imposes a causation standard no more stringent than but-for causation under Title VII. *See, e.g.,* *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (using the phrase "on the basis of" interchangeably with Title VII's "because of" causal standard). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation and gender identity. 590 U.S. at 661 (emphasis omitted). A school, like an employer, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That conclusion does not depend, the Department explained, on viewing the term "sex" in Title IX to mean anything other than "only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

The district court rejected this straightforward application of *Bostock*'s reasoning on the ground that the Supreme Court's decision concerned only Title VII, not Title IX. Op. 19. But as this Court recently explained, nothing in *Bostock* "indicate[s] that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). Rather, the Supreme Court's focus "on Title VII and the issue before it suggests a proper exercise of

17

judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII." *Id.*[5] Accordingly, various courts have concluded that under *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of sex discrimination prohibited by Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). Because plaintiffs' challenge to § 106.10 cannot be reconciled with precedent of this Court or the Supreme Court, the district court's injunction of that provision could be stayed on that basis alone, even setting aside the absence of harms.

## 2. The injunction is overbroad in enjoining § 106.2 in all respects.

The injunction is also overbroad because it bars *all* applications of § 106.2. Notably, the Department's severability determination addresses more than the invalidation of a whole Rule provision; the Rule specifically provides that even "[i]f any provision of this subpart [containing § 106.2] *or its application to any person, act, or practice* is held invalid, the remainder of the subpart *or the application of its provisions to any*

---

[5] The district court's suggestion that *Fowler* has no bearing on this case because the decision concerned the Equal Protection Clause, Op. 24, ignores this Court's conclusion that *Bostock*'s reasoning applies beyond Title VII claims.

*person, act, or practice* shall not be affected thereby." 34 C.F.R. § 106.9 (emphases added); *see* 89 Fed. Reg. at 33,848.

Enjoining § 106.2 wholesale stretches far beyond plaintiffs' quarrel with this provision. To begin, § 106.2 defines dozens of terms, but plaintiffs' challenges only involve the definition of one particular form of sex-based harassment: hostile-environment harassment. The injunction is overbroad even as it applies to the definition of hostile-environment harassment, which § 106.2 describes as "[u]nwelcome sex-based conduct that[] … is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2). Plaintiffs object to this standard's application to discrimination on the basis of gender identity, focusing on such things as preferred pronouns and instances of misgendering. *See* Pls. Mot. 26, 31-33. But § 106.2's hostile-environment standard applies beyond gender-identity discrimination. It protects all students from "[u]nwelcome sex-based conduct." 89 Fed. Reg. at 33,884. Plaintiffs offer no explanation for how they are irreparably harmed by § 106.2's application outside the context of gender-identity-based discrimination.[6]

---

[6] In district court, the associational plaintiffs have attempted to expand injunctive relief to individuals who were not members when the complaint was filed or even when the court entered the injunction on appeal. *See* Dkt. 59, 63. If, as plaintiffs claim, the injunction permits plaintiff associations to advertise the injunction to expand their ranks, the Department is also likely to prevail in showing that

*Continued on next page.*

## II.  The remaining factors favor a partial stay.

The remaining stay factors tilt decisively towards the Department.  Any time the federal government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted).  The harm is particularly pronounced here because the Rule effectuates Title IX's twin goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. University of Chi.*, 441 U.S. 677, 704 (1979).  No one disputes that preventing discrimination serves a compelling public interest.  Moreover, the overbroad injunction could impair the rights of individuals under provisions entirely unrelated to plaintiffs' claims by, for example, precluding the Department from ensuring that a new mother need not express breastmilk in a bathroom stall.

The uncertainty surrounding the injunction's member-related geographic scope—and the plaintiff organizations' effort to expand that scope, *see supra* p. 9— only underscores the importance of the Department's request for an immediate stay

---

longstanding equitable principles foreclose such relief (and may need to seek further relief pending appeal).  But the Department does not understand the injunctive relief referenced in the district court's order to extend to such newly-recruited members— or to all K-12 schools within the entirety of each county where a member's child resides, as plaintiffs have further argued in motions still pending before the district court.  *See* Dkt. Nos. 59, 62, 63, 64.  And the *substantive* overbreadth of the injunctive relief already ordered—which is now in effect within the plaintiff States—is clear and warrants this Court's immediate intervention.

regarding the injunction's substantive scope.  The injunction enjoins enforcement of the entire Rule as to hundreds of schools across the country attended by unidentified members of the plaintiff associations, including many of the nation's largest colleges and universities.  Dkt. No. 67.  Indeed, one of the plaintiff associations has gone further and requested the injunction apply not only to individual schools attended by its members' children, but to any K-12 school within the entirety of any county in which a member's child resides, even absent any showing that the child actually attends a federally funded school in that county.  Dkt. No. 62.  The proposed list of over 800 counties covers many of the nation's largest school systems.  Dkt. No. 62 (including Los Angeles County, Miami-Dade County, and Cook County).

By contrast, plaintiffs suffer no harm from the proposed limited stay.  As discussed above, plaintiffs suffer no harm from the many provisions they did not challenge.  And as to the limited provisions plaintiffs do challenge, they identify no harm from those provisions' application in the mine-run of circumstances. Accordingly, the harms that the district court found justified preliminary injunctive relief are not implicated and, in any event, would not outweigh the harm to the Department from the court's overbroad injunction.

## CONCLUSION

The preliminary injunction should be stayed to the extent it extends beyond the following 2024 Rule provisions: (i) 34 C.F.R. § 106.31(a)(2) and (ii) 34 C.F.R. § 106.2's definition of "hostile environment harassment" as applied to discrimination on the

basis of gender identity.  The Department respectfully requests a decision on this

request by July 25.


      Respectfully submitted,

*Of Counsel:*

LISA BROWN
    *General Counsel*
    *U.S. Department of Education*

BRIAN M. BOYNTON
    *Principal Deputy Assistant Attorney*
    *General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK E. STARCHER
STEVEN A. MYERS
*/s/ David L. Peters*
DAVID L. PETERS
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7209*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-1673*

July 2024

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,197 words. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

I further certify that this motion complies with the requirements of Tenth Circuit Rule 27.1 because counsel for plaintiffs-appellees were advised in advance of its filing. Plaintiffs-appellees state that they oppose this motion.

*/s/ David L. Peters*
David L. Peters

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ David L. Peters*
David L. Peters

# ADDENDUM

## TABLE OF CONTENTS

District Court Docket .................................................................................. A1

Notice of Appeal (July 10, 2024) ............................................................ A15

District Court Preliminary Injunction Order (July 2, 2024) ...................... A17

District Court Memorandum and Order (July 2, 2024) ............................. A18

Query    Reports    Utilities    Help    Log Out

INTERLOCUTORYAPPEAL,MJLC1

# U.S. District Court
## DISTRICT OF KANSAS (Topeka)
## CIVIL DOCKET FOR CASE #: 5:24-cv-04041-JWB-ADM

Kansas, State of et al v. United States Department of Education et al
Assigned to: District Judge John W. Broomes
Referred to: Magistrate Judge Angel D. Mitchell
Case in other court: 10CCA, 24-03097
Cause: 05:551 Administrative Procedure Act

Date Filed: 05/14/2024
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Kansas, State of**                represented by    **Abhishek Kambli**
Office of the Kansas Attorney General
Special Litigation and Constitutional Issues
Division
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
785-296-6109
Email: abhishek.kambli@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Braden H. Boucek**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: bboucek@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James L. Kerwin**
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227
303-292-2021
Email: jkerwin@mslegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Rodriguez**
Kansas Attorney General - Topeka
120 SW 10th Avenue, 2nd Floor

A1

Topeka, KS 66612
785-368-8197
Fax: 785-296-3131
Email: jay.rodriguez@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan Rand Miller**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: jmiller@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberly S. Hermann**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: khermann@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kris W. Kobach**
Kobach Law, LLC
PO Box 155
Lecompton, KS 66050
913-638-5567
Email: kkobach@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lance F. Sorenson**
Utah Attorney General's Office
350 N. State Street, Suite 230
Salt Lake City, UT 84114
801-366-0260
Fax: 801-366-0101
Email: lancesorenson@agutah.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Schelhaas**
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
307-777-5786

A2

Fax: 307-777-6869
Email: ryan.schelhaas@wyo.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Trachman**
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227
303-292-2021
Email: wtrachman@mslegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
Office of the Kansas Attorney General
120 SW 10th Avenue
Second Floor
Topeka, KS 66612
785-296-7109
Email: erin.gaide@ag.ks.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alaska, State of**                     represented by   **Abhishek Kambli**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Rodriguez**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Erin Gaide**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Utah, State of**                       represented by   **Abhishek Kambli**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Rodriguez**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Erin Gaide**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

A3

**Plaintiff**

**Wyoming, State of**                    represented by **Abhishek Kambli**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **James Rodriguez**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Erin Gaide**
                                         (See above for address)
                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawna Rowland**                       represented by **Henry W. Frampton , IV**
*as mother on behalf of*                 Alliance Defending Freedom - AZ
*minor*                                  15100 North 90th Street
K. R.                                    Scottsdale, AZ 85260
                                         480-444-0020
                                         Fax: 480-444-0028
                                         Email: hframpton@ADFlegal.org
                                         *LEAD ATTORNEY*
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

                                         **Jonathan A. Scruggs**
                                         Alliance Defending Freedom - AZ
                                         15100 North 90th Street
                                         Scottsdale, AZ 85260
                                         480-444-0020
                                         Fax: 480-444-0028
                                         Email: jscruggs@ADFlegal.org
                                         *LEAD ATTORNEY*
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

                                         **Natalie D. Thompson**
                                         Alliance Defending Freedom - DC
                                         440 1st treet NW
                                         Washington, DC 20001
                                         202-393-8690
                                         Fax: 202-347-3622
                                         Email: nthompson@ADFlegal.com
                                         *LEAD ATTORNEY*
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

                                         **Rachel A. Rouleau**
                                         Alliance Defending Freedom
                                         44180 Riverside Parkway
                                         Lansdowne, VA 20176

A4

571-707-4655
Fax: 571-707-4790
Email: rrouleau@ADFlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyson C. Langhofer**
Alliance Defending Freedom
44180 Riverside Pkwy.
Lansdowne, VA 20176
571-707-4655
Fax: 571-707-4790
Email: tlanghofer@adflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Moms for Liberty**                      represented by  **Abhishek Kambli**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Rodriguez**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Erin Gaide**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Young America's Foundation**            represented by  **Abhishek Kambli**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Rodriguez**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Erin Gaide**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Female Athletes United**                represented by  **Henry W. Frampton , IV**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

A5

**Jonathan A. Scruggs**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natalie D. Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel A. Rouleau**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyson C. Langhofer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Department of Education**    represented by    **Rebecca Kopplin**
DOJ-Civ
1100 L Street NW
Washington, DC 20005
202-514-3953
Fax: 202-616-8470
Email: rebecca.m.kopplin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Miguel Cardona**    represented by    **Rebecca Kopplin**
*United States Secretary of Education; in his*    (See above for address)
*official capacity*    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice**    represented by    **Rebecca Kopplin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Merrick Garland**    represented by    **Rebecca Kopplin**
*United States Attorney General; in his*    (See above for address)
*official capacity*    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

A6

**Movant**

**New Jersey, State of**                              represented by  **Jason Andrew Zavadil**
*on behalf of California, Pennsylvania,*             Irigonegaray, Turney, & Revenaugh LLP
*Colorado, Delaware, District Of Columbia,*          1535 SW 29th Street
*Hawaii, Illinois, Massachusetts, Michigan,*         Topeka, KS 66611-1901
*Minnesota, New York, Oregon, Rhode*                 785-267-6115
*Island, Vermont, and Washington*                    Fax: 785-267-9458
                                                     Email: jason@itrlaw.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Lauren E. Van Driesen**
                                                     Office of the New Jersey Attorney General
                                                     124 Halsey Street, 5th Floor
                                                     Newark, NJ 07101
                                                     973-648-2566
                                                     Email: lauren.vandriesen@law.njoag.gov
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2024 | 1 | COMPLAINT with trial location of Topeka (Filing fee $405, Internet Payment Receipt Number AKSDC-6347300.), filed by Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Attachments: # 1 Table of Exhibits, # 2 Exhibit 1 - Final Rule, # 3 Exhibit 2 - Ohio Comment Letter, # 4 Exhibit 3 - Tennessee Comment Letter, # 5 Exhibit 4 - ADF Comment Letter re: Lack of Legal Authority, # 6 Exhibit 5 - ADF Comment Letter re: Freedom of Speech & Religion, # 7 Exhibit 6 - ADF Comment Letter re: Female Athletics, # 8 Exhibit 7 - SLF Comment Letter, # 9 Exhibit 8 - MSLF Comment Letter) (Gaide, Erin) (Entered: 05/14/2024) |
| 05/14/2024 | 2 | CIVIL COVER SHEET by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Gaide, Erin) (Entered: 05/14/2024) |
| 05/14/2024 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge John W. Broomes and Magistrate Judge Angel D. Mitchell for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent & consent forms are available at http://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge (jsh) (Entered: 05/14/2024)** |
| 05/15/2024 | | Summons Issued as to Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice; to the U.S. Attorney (issued to Attorney for service). Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (jk) (Entered: 05/15/2024) |
| 05/15/2024 | 3 | MOTION for attorney Jonathan A. Scruggs to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6348699.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) |

| | | |
|---|---|---|
| | | (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission of Jonathan Scruggs, # 2 ECF Registration Form for Jonathan Scruggs)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/15/2024 | 4 | MOTION for attorney Henry W. Frampton, IV to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number CKSDC-6348717.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for Henry Frampton, # 2 ECF Registration Form for Henry Frampton)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/15/2024 | 5 | MOTION for attorney Natalie D. Thompson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6348733.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for N. Thompson, # 2 ECF Registration Form for Natalie Thompson)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/16/2024 | 6 | ORDER granting 3 Motion to Appear Pro Hac Vice of Jonathan A. Scruggs for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 7 | ORDER granting 4 Motion to Appear Pro Hac Vice of Henry W. Frampton, IV for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 8 | ORDER granting 5 Motion to Appear Pro Hac Vice of Natalie D. Thompson for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 9 | MOTION for attorney Rachel A. Rouleau to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6349478.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for R. Rouleau, # 2 ECF Registration Form for Rachel Rouleau)(Langhofer, Tyson) (Entered: 05/16/2024) |
| 05/17/2024 | 10 | ORDER granting 9 Motion to Appear Pro Hac Vice of Rachel A. Rouleau for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/17/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/17/2024) |
| 05/20/2024 | 11 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon United States Department of Justice served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
| 05/20/2024 | 12 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon Miguel Cardona served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
| 05/20/2024 | 13 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon Merrick Garland served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |

A8

| 05/20/2024 | 14 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon United States Department of Education served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
|---|---|---|
| 05/21/2024 | 15 | MOTION for Leave to File Excess Pages by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/21/2024) |
| 05/21/2024 | 16 | MOTION for attorney Kimberly Hermann to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352391.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 17 | MOTION for attorney Jordan Miller to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352405.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 18 | MOTION for attorney Braden Boucek to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352408.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 19 | CERTIFICATE OF SERVICE by Kansas, State of re 15 Motion for Leave to File Excess Pages. (Gaide, Erin) (Entered: 05/21/2024) |
| 05/21/2024 | 20 | ORDER granting 15 Motion for Leave to File Excess Pages. Entered by District Judge John W. Broomes on 05/21/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 05/21/2024) |
| 05/23/2024 | 21 | ORDER granting 16 Motion to Appear Pro Hac Vice of Kimberly S. Hermann for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/23/2024 | 22 | ORDER granting 17 Motion to Appear Pro Hac Vice of Jordan Rand Miller for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/23/2024 | 23 | ORDER granting 18 Motion to Appear Pro Hac Vice of Braden H. Boucek for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/24/2024 | 24 | MOTION for a Stay / Preliminary Injunction by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Kambli, Abhishek) (Entered: 05/24/2024) |
| 05/24/2024 | 25 | MEMORANDUM IN SUPPORT of 24 Motion for a Stay / Preliminary Injunction by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Attachments: # 1 Exhibit List Table of Exhibits, # 2 Ex 1 - Declaration of Amy Cawvey, # 3 Ex 2 - Declaration of Jennie Earl, # 4 Ex 3 - Declaration of K.R., # 5 Ex 4 - Declaration of Kristi Burton Brown, # 6 Ex 5 - Declaration of A.B.S., # 7 Ex 6 - Declaration of A.R.S., # 8 Ex 7 - Declaration of T.P., # 9 Ex 8 - Declaration of Elizabeth Zwahlen, # 10 Ex 9 - Declaration of Rachel Flynn, # 11 Ex 10 - Declaration of Thomas Adcock, # 12 Ex 11 - Declaration of Merianne Jensen, # 13 Ex 12 - Declaration of Rebekah Zoznek, # 14 Ex 13 |

A9

| | | |
|---|---|---|
| | | - Declaration of Kailee Verdeyen, # [15](#) Ex 14 - Declaration of Tricia Plank, # [16](#) Ex 15 - Declaration of Deborah Lochner, # [17](#) Ex 16 - Declaration of T.Z.)(Kambli, Abhishek) (Entered: 05/24/2024) |
| 05/28/2024 | [26](#) | MOTION for attorney Ryan Schellhaas to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357284.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/28/2024 | [27](#) | MOTION for attorney James Luke Kerwin to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357299.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/28/2024 | [28](#) | MOTION for attorney William E. Trachman to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357306.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/29/2024 | 29 | ORDER granting [26](#) Motion to Appear Pro Hac Vice of Ryan Schelhaas for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/29/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/29/2024) |
| 05/29/2024 | 30 | ORDER granting [27](#) Motion to Appear Pro Hac Vice of James L. Kerwin for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/29/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/29/2024) |
| 05/29/2024 | [31](#) | ENTRY OF APPEARANCE by Rebecca Kopplin on behalf of Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 05/29/2024) |
| 05/29/2024 | [32](#) | JOINT MOTION to Set Briefing Schedule on Plaintiffs' Motion for Preliminary Relief and Notice of Availability for Hearing (Doc. [24](#) ) by Plaintiff Kansas, State of. (Gaide, Erin) (Entered: 05/29/2024) |
| 05/30/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: [32](#) Joint MOTION to Set Briefing Schedule on Pltf Mot for Prelim Relief & Not of Availability for Hearing. The motion will be resolved by the District Judge.**(alh) (Entered: 05/30/2024) |
| 05/30/2024 | [33](#) | ORDER re [32](#) the parties' joint motion to set briefing schedule and hearing on Plaintiffs' motion for a stay/preliminary injunction (Doc. [24](#) ). The parties request the court set deadlines for briefing; the requested briefing deadlines are granted. Defendants are to file a response to the motion (Doc. [24](#) ) by 11:59 p.m. on 6/13/2024 and are limited to 55 pages. Plaintiffs may file a reply brief by 11:59 a.m. on 6/19/2024 and are limited to 35 pages. The court sets this matter for hearing on 6/20/2024 at 09:00 AM in Wichita Courtroom 238 (JWB). Further, the court directs counsel to confer with one another and file a joint status report on or before noon CDT on 6/7/2024. Although Plaintiffs request a decision by 7/1/2024, the court declines to affirmatively indicate a date by which a decision will be issued. The court is aware of the time sensitive nature of the motion. Signed by District Judge John W. Broomes on 5/30/2024. (mam) (Entered: 05/30/2024) |
| 05/30/2024 | 34 | NOTICE of Hearing re [33](#) Order: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Case Management Conference set for 6/10/2024 at 01:30 PM before District Judge John W. Broomes by phone (JWB - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 4983860). The court will discuss the joint status report with counsel for the parties, attempt to resolve any disputes presented therein regarding case management |

A10

|            |    |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
|------------|----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |    | and scheduling, and set any additional deadlines that may be appropriate. Counsel may appear for the conference in person at the Wichita Courthouse, Room 238, or by telephone. The parties and party representatives need not attend; however, lead counsel for each side must have the authority to make decisions regarding the need for, and scheduling of, any additional deadlines and events in the case. At or before the time the joint status report is filed, lead counsel for each side shall inform the court by email to chambers at KSD_Broomes_Chambers@ksd.uscourts.gov, regarding who will appear in person and who will appear by phone for the case management conference. To the extent the parties agree on the need for additional scheduling in this case, they may submit a proposed additional scheduling order to chambers email at any time prior to the case management conference. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (mam) (Entered: 05/30/2024) |
| 05/31/2024 | 35 | ORDER denying without prejudice 28 Motion for attorney William E. Trachman to appear pro hac vice. The court reached out to Mr. Trachman and advised him on the appropriate actions to take in correcting the affidavit and ECF registration form on 5/29/2024. To date Mr. Trachman has not submitted the corrected forms. For these reasons this motion is denied without prejudice. Signed by Magistrate Judge Angel D. Mitchell on 5/31/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 05/31/2024) |
| 06/07/2024 | 36 | JOINT STATUS REPORT by Kansas, State of. (Kambli, Abhishek) (Entered: 06/07/2024) |
| 06/10/2024 | 37 | MINUTE ENTRY for proceedings held before District Judge John W. Broomes: STATUS CONFERENCE held on 6/10/2024. (Court Reporter Jana McKinney.) (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (jmr) (Entered: 06/10/2024) |
| 06/13/2024 | 38 | OPPOSITION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 24 Motion for a Stay / Preliminary Injunction. (Kopplin, Rebecca) (Entered: 06/13/2024) |
| 06/17/2024 | 39 | ENTRY OF APPEARANCE by Kris W. Kobach on behalf of Kansas, State of. (Kobach, Kris) (Entered: 06/17/2024) |
| 06/18/2024 | 40 | MOTION for attorney Lauren E. Van Driesen to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6385447.) by Office of the Attorney General for the State of New Jersey. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Zavadil, Jason) (Entered: 06/18/2024) |
| 06/18/2024 | 41 | MOTION for Leave to Appear and File a Brief as Amici Curiae in Support of 38 Defendants' Opposition to 24 Plaintiffs' Motion for a Stay and/or Preliminary Injunction by Movant Office of the Attorney General. (Attachments: # 1 Exhibit Brief of Amici Curiae) (Zavadil, Jason) (Entered: 06/18/2024) |
| 06/18/2024 |    | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 41 MOTION for Leave to file TO APPEAR AND FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY AND/OR PRELIMINARY INJUNCTION . The motion will be resolved by the District Judge.**(alh) (Entered: 06/18/2024) |
| 06/18/2024 | 42 | ORDER granting 40 Motion to Appear Pro Hac Vice of Lauren E. Van Driesen for Office of the Attorney General for the State of New Jersey pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/18/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 06/18/2024) |

A11

| 06/19/2024 | 43 | REPLY TO RESPONSE TO MOTION by Plaintiff Kansas, State of re 24 Motion for a Stay / Preliminary Injunction. (Attachments: # 1 Table of Exhibits, # 2 Ex. 1 - Louisiana v. Department of Education Order, # 3 Ex. 2 - Texas v. Cardona Order, # 4 Ex. 3 - Tennessee v. Cardona Order, # 5 Ex. 4 - KASB Policies and Forms, # 6 Ex. 5 - Declaration of Tiffany Justice, # 7 Ex. 6 - Declaration of Madison Hahn, # 8 Ex. 7 - Declaration of KBB, # 9 Ex. 8 - Declaration of Megan Degenfelder)(Kambli, Abhishek) (Entered: 06/19/2024) |
|---|---|---|
| 06/20/2024 | 44 | MINUTE ENTRY for proceedings held before District Judge John W. Broomes: MOTION HEARING held on 6/20/2024 re 24 MOTION for Preliminary Injunction MOTION to Stay Case filed by Kansas, State of. MATTER TAKEN UNDER ADVISEMENT. (Court Reporter Jana McKinney.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 06/20/2024) |
| 06/20/2024 | 45 | SUPPLEMENTAL MEMORANDUM IN SUPPORT of 24 Motion for a Stay / Preliminary Injunction by Plaintiff Kansas, State of. (Kambli, Abhishek) (Entered: 06/20/2024) |
| 06/21/2024 | 46 | ORDER granting 41 Motion for Leave to File. Entered by District Judge John W. Broomes on 06/21/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 06/21/2024) |
| 06/24/2024 | 47 | SUPPLEMENTAL BRIEF IN OPPOSITION to 24 Motion for a Stay / Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) Modified on 7/15/2024 to re-link. (mam) (Entered: 06/24/2024) |
| 06/25/2024 | 48 | MOTION for attorney Lance Sorenson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6394456.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 06/25/2024) |
| 06/26/2024 | 49 | MOTION for attorney William Trachman to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6395756.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell) (Gaide, Erin) (Entered: 06/26/2024) |
| 06/26/2024 | 50 | ORDER granting 48 Motion to Appear Pro Hac Vice of Lance F. Sorenson for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/26/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 06/26/2024) |
| 06/26/2024 | 51 | ORDER granting 49 Motion to Appear Pro Hac Vice of William E. Trachman for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/26/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 06/26/2024) |
| 07/02/2024 | 52 | TRANSCRIPT of Other Hearing held June 20, 2024 before Judge John W. Broomes, Court Reporter Jana McKinney, 316-315-4268, jana mckinney@ksd.uscourts.gov. Transcript purchased by: Ms. Rebecca Kopplin.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

A12

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the court reporter or through PACER. Release of Transcript Restriction set for 9/30/2024. (jlm) (Entered: 07/02/2024) |
| 07/02/2024 | 53 | MEMORANDUM AND ORDER granting 24 Motion for Stay/Preliminary Injunction. Signed by District Judge John W. Broomes on 7/2/2024. (kas) (Entered: 07/02/2024) |
| 07/02/2024 | 54 | PRELIMINARY INJUNCTION. Signed by District Judge John W. Broomes on 7/2/2024. (kas) (Entered: 07/02/2024) |
| 07/08/2024 | 55 | UNOPPOSED MOTION for Extension of Time to File Answer re 1 Complaint by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kopplin, Rebecca) (Additional attachment added on 7/9/2024: # 1 Correct Motion) (msb) (Entered: 07/08/2024) |
| 07/09/2024 | 56 | DOCKET ANNOTATION: Please be advised that the incorrect document was erroneously attached at time of filing in entry 55 Unopposed Motion for Extension of Time to File Answer to 1 Complaint. The correct document is now attached to docket entry 55 and to this entry for noticing purposes only. (msb) (Entered: 07/09/2024) |
| 07/09/2024 | 57 | ORDER granting 55 Defendants' Unopposed Motion for Extension of Time to Respond to the Complaint. Defendants Miguel Cardona, Merrick Garland, United States Department of Education, and United States Department of Justice must answer or otherwise respond to the complaint by August 5, 2024. Signed by Magistrate Judge Angel D. Mitchell on 7/9/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 07/09/2024) |
| 07/10/2024 | 58 | NOTICE OF INTERLOCUTORY APPEAL as to 53 Memorandum and Order, 54 Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 07/10/2024) |
| 07/10/2024 | 59 | MOTION for a Partial Stay Pending Appeal re 53 Memorandum and Order, 54 Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 07/10/2024) |
| 07/11/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 59 MOTION Partial Stay of Preliminary Injunction Pending Appeal re 54 Preliminary Injunction, 53 Order on Motion for Preliminary Injunction, Order on Motion to Stay Case . The motion will be resolved by the District Judge.(alh)** (Entered: 07/11/2024) |
| 07/11/2024 | | APPEAL FEE STATUS: filing fee waived re: 58 Notice of Interlocutory Appeal on behalf of Defendants Miguel Cardona, Merrick Garland, United States Department of Education, and United States Department of Justice. (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (kas) (Entered: 07/11/2024) |
| 07/11/2024 | 60 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 58 Notice of Interlocutory Appeal. (Attachments: # 1 Preliminary Packet)(kas) (Entered: 07/11/2024) |
| 07/11/2024 | 61 | APPEAL DOCKETED in 10CCA on 7/11/2024 and assigned Appeal No. 24-3097 re 58 Notice of Interlocutory Appeal, filed by Merrick Garland, United States Department of Justice, Miguel Cardona, United States Department of Education. (kas) (Entered: 07/11/2024) |
| 07/12/2024 | 62 | MOTION to Revise Stay/Preliminary Injunction Order by Plaintiff Moms for Liberty. (Attachments: # 1 Exhibit Declaration of Tiffany Justice, # 2 List of Counties)(Gaide, Erin) |

|  |  | (Entered: 07/12/2024) |
|---|---|---|
| 07/12/2024 |  | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 62 MOTION to Modify . The motion will be resolved by the District Judge.**(alh) (Entered: 07/12/2024) |
| 07/12/2024 | 63 | OPPOSITION by Plaintiffs Alaska, State of, Female Athletes United, Kansas, State of, Moms for Liberty, Shawna Rowland, Utah, State of, Wyoming, State of, Young America's Foundation re 59 Motion for a Partial Stay Pending Appeal. (Attachments: # 1 Table of Exhibits, # 2 Exhibit Exhibit 1 - Louisiana v. U.S. Dep't of Educ., Case No. 3:24-CV-00563 (W.D. La. July 11, 2024), # 3 Exhibit Exhibit 2 - Tennessee v. U.S. Dep't of Educ., Case No. 2:24-cv-00072-DCR-CJS (E.D. Ky. July 10, 2024))(Gaide, Erin) (Entered: 07/12/2024) |
| 07/14/2024 | 64 | OPPOSITION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 62 Motion to Revise Stay/Preliminary Injunction Order. (Attachments: # 1 Ex. A)(Kopplin, Rebecca) (Entered: 07/14/2024) |
| 07/15/2024 | 65 | REPLY TO RESPONSE TO MOTION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re: 59 Motion for Miscellaneous Relief *(Partial Stay Pending Appeal)* (Kopplin, Rebecca) (Entered: 07/15/2024) |
| 07/15/2024 | 66 | TRANSCRIPT ORDER FORM: Transcript Already on File filed by Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 58 Notice of Interlocutory Appeal (Kopplin, Rebecca) (Entered: 07/15/2024) |
| 07/15/2024 | 67 | NOTICE of Organizational Plaintiff Schools by Kansas, State of re 54 Preliminary Injunction, 53 Order on Motion for Preliminary Injunction, Order on Motion to Stay Case (Attachments: # 1 Exhibit List of Schools K-12, # 2 Exhibit List of Colleges and Universities)(Gaide, Erin) (Entered: 07/15/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/16/2024 06:45:47 | | |
| **PACER Login:** | david.l.peters | **Client Code:** |  |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-04041-JWB-ADM |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

A14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| STATE OF KANSAS *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 24-4041-JWB |
| UNITED STATES DEPARTMENT OF EDUCATION *et al.*, | |
| *Defendants*. | |

**<u>NOTICE OF APPEAL</u>**

NOTICE is hereby given that Defendants Miguel Cardona, in his official capacity as Secretary of Education; the United States Department of Education; Merrick Garland, in his official capacity as United States Attorney General; and the United States Department of Justice appeal to the United States Court of Appeals for the Tenth Circuit from the Court's July 2, 2024, Memorandum and Order (ECF No. 53) and Preliminary Injunction (ECF No. 54) granting Plaintiffs' motion for a preliminary injunction (ECF No. 24).

Dated: July 10, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Rebecca Kopplin*
REBECCA KOPPLIN
Cal. Bar 313970
ELIZABETH TULIS
BENJAMIN TAKEMOTO

HANNAH SOLOMON-STRAUSS
PARDIS GHEIBI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: 202-514-3953
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

      Plaintiffs,

v.                                      Case No.  24-4041-JWB

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

      Defendants.

## PRELIMINARY INJUNCTION

The United States Department of Education, Miguel Cardona, Secretary of U.S. Dept. of Education, the United States Department of Justice, Merrick Garland, Attorney General of the United States, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are ENJOINED from implementing, enacting, enforcing, or taking any action to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against Kansas, Alaska, Utah, Wyoming, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty.  Plaintiff Organizations are directed to file a notice in the record identifying the schools which their members or their members' children, as applicable, attend on or before July 15, 2024.

IT IS SO ORDERED.  Dated this 2nd day of July, 2024.

                                          __s/ John W. Broomes_____
                                          JOHN W. BROOMES
                                          UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

        Plaintiffs,

v.                                           Case No.  24-4041-JWB

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

        Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on Plaintiffs' motion for a stay/preliminary injunction. (Doc. 24.)  The motion has been fully briefed and is ripe for decision.  (Docs. 25, 38, 43, 45, 47.) Plaintiffs seek an injunction forbidding the "Final Rule"—as that term is defined herein—from going into effect on August 1, 2024.  (Doc. 24 at 1.)  The court held a hearing on the motion on June 20, 2024.  For the reasons set forth herein, Plaintiffs' motion for a preliminary injunction is GRANTED.

## I.      Facts and Procedural History

At its core, this case involves statutory interpretation of the word "sex" as that term is used in Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et. seq*.  The court begins with the history of Title IX and a review of the previous regulations issued by Defendant United States Department of Education (the "DoE").

In short, Title IX's text mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Title IX was enacted on June 23, 1972, after a lengthy

1

battle.  *See Tennessee v. Cardona,* 2024 WL 3019146, at *2 (E.D. Ky. June 17, 2024) (discussing the history of Title IX).  Title IX was "patterned after Title VI of the Civil Rights Act of 1964." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 684–85 (1979).  When the provisions were introduced in the Senate for debate, Senator Bayh commented that the "heart of this amendment is a provision banning sex discrimination in educational programs receiving federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment."  *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982) (quoting 118 Cong. Rec. 5,803 (1972)).  He stressed that "one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women."  118 Cong. Rec. at 5,803.  He urged the passage of the amendment to "root out . . . the social evil of sex discrimination in education."  *Id.* at 5,804.  It was clear to all that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).

There are exemptions to Title IX, including those for religious organizations, military institutions, and social fraternities.  § 1681.  Also, institutions of undergraduate higher education which traditionally and continually only admitted students "of one sex" were exempt. § 1681(a)(5).  Further, § 1686 states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  Congress also passed legislation authorizing federal agencies which are empowered to extend federal financial assistance to an education program or activity to issue rules or regulations that are consistent with achievement of the objectives of the statute.  20 U.S.C. § 1682.

The United States Department of Health, Education, and Welfare promulgated final regulations in 1975 concerning Title IX.[1] *Bell*, 456 U.S. at 515. The Title IX regulations included regulations in the area of athletics. High schools and colleges were given three years to comply with the regulation on athletics which required equal opportunities for "members of both sexes" to participate in athletics. 34 C.F.R. § 106.41(c), (d). The regulations also provided that a recipient "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Amendments to the regulations became effective on November 24, 2006, to "clarify and modify Title IX regulatory requirements pertaining to the provision of single-sex schools, classes, and extracurricular activities in elementary and secondary schools." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 71 Fed. Reg. 62530-01 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34). The third major amendment to the regulations occurred in 2020. These amendments addressed sex-based harassment as a form of sex discrimination, a recipient's obligation to address sexual harassment, grievance procedures, and implemented remedies for victims. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020) (codified in Title 34 of the Code of Federal Regulations). This was the first time that the regulations addressed sexual harassment and included a definition for that term. § 106.30.

On June 15, 2020, the United States Supreme Court issued *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020). The Court held that an employer violates Title VII of the Civil

---

[1] "HEW's functions under Title IX were transferred in 1979 to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 678, 20 U.S.C. § 3441(a)(3) (1976 ed., Supp. IV)." *Bell*, 456 U.S. at 516, n.4.

3

A20

Rights Act of 1964 by firing an individual for being homosexual or transgender. *Bostock*, 590 U.S. at 683. On January 8, 2021, the DoE issued a memorandum regarding *Bostock*. *See* U.S. Dep't of Educ., Memorandum Re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) at 1 (Jan. 8, 2021) (rescinded in 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. Notably, DoE stated that *Bostock* did not "construe Title IX," and that the "Title IX text is very different from Title VII text in many important respects," including that Title IX "contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex." *Tennessee v. Dep't of Educ.*, No. 22-5807, ---F.4th---, 2024 WL 2984295, at *2 (6th Cir. June 14, 2024) (quoting the January 8, 2021, memorandum). As the Sixth Circuit has noted, however, the new Biden administration has an "opposite take" on *Bostock*. *Id.*

On March 8, 2021, President Biden issued an executive order tasking the Secretary of Education to review all existing regulations, orders, guidance documents, policies and other similar agency actions to determine whether they were inconsistent with the Administration's policy that all students be guaranteed an educational environment free from discrimination on the basis of sex and discrimination on the basis of sexual orientation or gender identity. *See* Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021). On June 22, 2021, the DoE published its interpretation of Title IX in the Federal Register. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). Notably, this document is currently enjoined from being applied to several States, including Plaintiffs Alaska and Kansas. *Tennessee*, 2024 WL 2984295, at *26–27.

On July 12, 2022, the DoE published the proposed regulations in the Federal Register.  The DoE received more than 240,000 comments on the proposed regulations.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33477 (Apr. 29, 2024), the "Final Rule."  The Final Rule slightly modified some of the proposed regulations based on the comments and is set to take effect on August 1, 2024.  According to the Final Rule, the DoE amended the regulations to "better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate."  89 Fed. Reg. at 33,474.  The Final Rule's main changes identified by the DoE include a change in the grievance procedures for complaints of sex discrimination, clarifying that Title IX's prohibition on sex discrimination includes different forms of sex-based harassment and a modification to the definition of that term, and clarifying that sex discrimination "includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* at 33,476.

With respect to the expansion of what constitutes sex discrimination under Title IX, DoE believes that its definition of sex discrimination is "consistent with the Department's statutory authority under Title IX, prior and current Department guidance, various Executive Orders, and Federal case law precedents."  *Id.* at 33,804.  In support, DoE repeatedly references the Supreme Court's decision in *Bostock* throughout the Final Rule.  DoE acknowledges that the Supreme Court expressly stated that its decision in *Bostock* was only applicable to Title VII but relies on that decision for authority to promulgate the new regulations.

The new regulations also amend § 106.31 to add a provision related to differential treatment or separation on the basis of sex which is permitted under the statute or regulations.  A recipient must not carry out "such different treatment or separation in a manner that discriminates on the

basis of sex by subjecting a person to more than de minimis harm." Fed. Reg. at 33,887 (to be codified at 34 C.F.R. 106.31(a)(2). The regulation defines "more than de minimis harm" as "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." *Id.* The regulation states that § 106.31(a)(2) is not applicable to the aforementioned statutory exemptions to Title IX and the corresponding regulations to those exemptions. *Id.* DoE contends that the new regulation would not apply to sex-separate athletic teams permitted under § 106.41(b) as that regulation is carved out in § 106.31(a)(2). Fed. Reg. at 33,819. Section 106.31(a)(2) would apply to bathrooms and shower facilities. *Id.* at 33,819. Further, it would also apply to single-sex classes or portions of classes, such as physical education, that are allowed under the current regulations. *Id.*

The term "gender identity" is not defined in the new regulations. The DoE determined that it was not necessary to define the term. But the term is understood as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809. The DoE did not specify how a school should determine a student's gender identity. *Id.* at 33,819. However, requiring a "student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm." *Id.*

Further, the Final Rule amends the definitions for sexual harassment. The previous version of § 106.30 in which sexual harassment was addressed has been removed and there are amendments to the definition section (§ 106.2) which include a definition for "sex-based harassment." *Id.* at 33,884. The Final Rule also changes the grievance procedures with respect to the process that is required after a sex discrimination complaint is filed.

Plaintiffs filed this complaint on May 14, 2024.  (Doc. 1.)  Plaintiffs include the States of Kansas, Alaska, Utah, and Wyoming.   Plaintiffs also include K.R., a minor, and three organizations: Moms for Liberty, Young America's Foundation, and Female Athletes United (the "Plaintiff Organizations").   Plaintiffs allege that the Final Rule is contrary to law, in excess of statutory jurisdiction, arbitrary and capricious, violates separation of powers principles, violates the Spending Clause, and violates the First Amendment.  Plaintiffs seek a declaratory judgment holding the Final Rule unlawful and other related declaratory relief.   Plaintiffs also seek a preliminary and permanent injunction prohibiting Defendants from enforcing the Final Rule, as well as a stay of the Final Rule's effective date.  Plaintiff States all receive federal funding for their schools and are thus required to comply with the Final Rule.  A failure to comply with Title IX may result in termination of federal funding.  20 U.S.C. § 1682.  Plaintiff States assert that the Final Rule conflicts with laws passed in their states such as laws regarding separate facilities and restrooms for both sexes and prohibiting males from competing against females in sports.  (Doc. 25 at 25–26.)

Plaintiff K.R. attends a public middle school in Oklahoma.  K.R. has submitted an affidavit in support of the motion.  K.R. states that she has encountered biological males using the girls' restroom in her school.  (Doc. 25-4 at 3.)  She was very uncomfortable using the restroom with a biological male and did not feel safe. Because she didn't feel safe, she remarkably refused to use the restroom at school during this time period in which transgender students were allowed to use the restroom which corresponded with their gender identity.  Although most of the biological males using the girls' restroom identified as females, K.R. attested that on some occasions biological males who did not identify as female used the girls' bathroom because they knew they could get away with it.  (*Id.*)  Oklahoma passed a law which prohibits students from using a bathroom that

does not align with their biological sex.  Okla. Stat. Ann. tit. 70, § 1-125.  After the passage of this law, K.R. returned to using the school bathroom.  She fears, however, that the Final Rule will allow biological males to use the girls' bathroom.

Additionally, K.R. is a Christian who believes that God created two sexes, male and female. She also believes that a person cannot change their sex.  K.R. believes that it violates her religious beliefs to use a pronoun for an individual when that pronoun does not accurately reflect their sex. She has spoken on her beliefs at school.  K.R. fears that she will be punished under the Final Rule for declining to use a student's preferred pronouns and for expressing her religious beliefs.  (Doc. 25-4 at 6.)

Plaintiff Moms for Liberty is a national organization.  (Doc. 43-6.)  Its members' children attend schools that receive federal funding.  Its members include Merianne Jensen, Tricia Plank, Debbie Lochner, and Rebekah Koznek, who have all submitted declarations in support of the motion for injunctive relief.  Ms. Jensen lives in Virginia and has minor children in the Prince William County School District.  (Doc. 25-12 at 3.)  Ms. Plank lives in Pennsylvania and has minor children in the Upper Adams School District.  (Doc. 25-15.)  Ms. Lochner lives in New York and has a minor student in the Newark Central School District.  (Doc. 25-16.)  Ms. Koznek lives in California and has minor children in the Atascadero Unified School District.  (Doc. 25-13.)  The members declare that they and their children have deeply-held religious beliefs regarding gender identity and transgender issues similar to the beliefs of K.R.  They also share the belief that individuals should use the bathroom that aligns with their biological sex.  (Docs. 25-13 at 2; 25-15 at 2; 25-16 at 2.)  The members further state that their children share those views and have expressed them at their schools.  (Docs. 25-12, 25-13, 25-15, 25-16.)  Similar to K.R., their children have continued to use pronouns that align with biological sex based on their religious

beliefs.  They fear, however, that the Final Rule will subject them to school discipline for expressing statements related to gender identity.  Moms for Liberty has set also forth evidence that its mission would be impeded by the Final Rule by deterring its members and their children from expressing their viewpoints about gender identity and transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms. (Doc. 43-6.)

Plaintiff Young America's Foundation is a national organization devoted to promoting traditional values and providing students with resources to advance such values on college campuses.  (Docs. 1 at 7; 43-7 at 2.)  Young America has chapters on campuses across the country and including Kansas State University, the University of Utah, and the University of Wyoming. (doc. 43-7 at 2.)  Young America's members at these schools include declarants Thomas Adcock, Rachel Flynn, and Kailee Verdeyen.  All three have similar beliefs to K.R.  They plan to bring speakers to campus to discuss these issues with similar viewpoints and to personally engage in discussion on their views.  (Docs. 25-11, 25-10, 25-14.)  They are concerned that the Final Rule will subject them to investigatory or disciplinary proceedings and are afraid that they will be deterred from organizing events and speaking their views.

Plaintiff Female Athletes United ("FAU") is an organization that was formed to defend equal opportunity, fairness, and safety in women's and girls' sports.  (Doc. 25-5.)  FAU members A.R.S., T.P., and T.Z. attend public schools in Kansas, Wyoming, and Utah.  All three are minor students and play girls' sports at their schools and they currently do not have to play against biological males because of current state laws.  They also want to continue to speak freely about their views on women's sports, sharing intimate spaces with biological males, and issues related to gender identity.  They are concerned that they will be forced to express messages that they do

not agree with and want to continue speaking about their opinions on these issues in school. They are also concerned about having to share private places such as bathrooms and locker rooms with biological males. Sharing these intimate places make them feel uncomfortable and unsafe. (Docs. 25-7, 25-8, 25-17.)

On May 24, Plaintiffs filed a motion for a preliminary injunction. Plaintiffs seek a stay of the Final Rule under 5 U.S.C. § 705 prohibiting enforcement of the Final Rule during the pendency of this litigation. Defendants oppose the motion. The court held a hearing on the matter on June 20. At the hearing, the court heard oral argument from the parties and took the matter under advisement. The court has also reviewed an amici brief in support of Defendants filed by the Attorney General of New Jersey on behalf of several States that are not parties. (Doc. 41.) These States oppose the relief requested by Plaintiffs.

The court notes that there are several actions pending throughout the United States in which the plaintiffs in those cases raise similar claims and most of which have also sought injunctive relief. (*See* Doc. 36 at 3) (citing cases). At this time, two courts have issued decisions granting injunctive relief to the plaintiffs in those cases and enjoining the DoE from enforcing the Final Rule. *See Louisiana, et al. v. Dep't of Ed., et al*., No. 3:24-CV-00563, 2024 WL 2978786, at *2 (W.D. La. June 13, 2024); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, __ F. Supp.3d __, 2024 WL 3019146, at *1 (E.D. Ky. June 17, 2024). Those courts limited injunctive relief to the plaintiff States in those cases. This court joins those courts in granting injunctive relief to Plaintiffs as set forth herein.

## II.   Standard

Under the Administrative Procedures Act ("APA"), a reviewing court shall hold unlawful and set aside agency actions when the court finds such actions to be "(A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; or (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."  5 U.S.C. § 706(2).

Further, pursuant to 5 U.S.C. § 705, a court reviewing a final rule may stay the effective date of agency action pending conclusion of the review proceedings.  In determining whether to stay the effective date of the final rule, the court applies the same four factors traditionally used to analyze a request for a preliminary injunction. *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *cf. Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980) (explaining that a § 705 stay is a provisional remedy in the nature of a preliminary injunction).  The four factors which must be shown by the movant to obtain preliminary injunctive relief include: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *Id*.  The third and fourth factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  "Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant—viz., movants must satisfy a heightened standard.  They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'"  *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation omitted.)  "In seeking such an injunction,

the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* (citation and internal quotation marks omitted).

## III.  Analysis

Plaintiffs seek a preliminary injunction staying the effective date of the Final Rule.  In support, Plaintiffs contend that they will prevail on all of their claims.  Plaintiffs contend that the Final Rule is contrary to Title IX, violates the major questions doctrine, violates the Spending Clause and the individual Plaintiffs' constitutional rights, and is arbitrary and capricious.[2]  The court begins with the issue of standing and then turns to the arguments on the merits.  Ultimately, the court finds that Plaintiffs are likely to prevail on several claims and, as such, are entitled to injunctive relief.

### A.  Standing

The court has a duty to determine whether a party has standing if the court believes that there is an issue or if standing is raised by the parties.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).  In their response brief, Defendants only challenge standing with respect to Plaintiffs' claim that the regulation violates RFRA.  (Doc. 38 at 44–46.)  Constitutional standing requires (i) that the plaintiff suffer an "injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  These requirements ensure that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction."  *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  Where, as here, a

---

[2] While Plaintiffs raise additional arguments, the court declines to address those at this time in light of its finding that Plaintiffs will prevail on the issues addressed herein.

plaintiff seeks prospective relief such as an injunction, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). "The threatened injury must be certainly impending and not merely speculative." *Id.* (quotations and citation omitted). Plaintiffs have the burden to establish standing. *See Gandy*, 416 F.3d at 1154.

The court has no trouble finding that Plaintiffs have established standing with respect to their claims.[3] The Plaintiff States have laws pertaining to students' privacy and separation of students by their biological sex. The Plaintiff States allege that the Final Rule interferes with their sovereign right to create and enforce their own laws, imposes administrative costs and burdens, and requires Plaintiff States to redesign or reconfigure their physical facilities. (Doc. 1 ¶¶ 209, 210, 212.) States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Texas v. Cardona*, No. 4:23-CV-00604-O, ---F. Supp. 3d.---, 2024 WL 2947022, at *11 (N.D. Tex. June 11, 2024) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)). Here, Plaintiffs contend that DoE seeks to regulate Title IX in a manner that is not compatible with their state laws. *See* K.S.A. § 72-6286(a) (requiring that overnight accommodations on school travel be separated by sex of the student); Alaska Stat. § 14.18.040 (requiring that schools provide showers, toilets, and training-room facilities for both sexes for athletic or recreational purposes): Utah Code Ann. § 63G-31-301(1) (restrooms and changing rooms must correspond to the student's sex); and Wyo. Stat. Ann. § 21-25-102

---

[3] In any event, even if the individual Plaintiffs do not have standing on their RFRA claim, standing as to the other claims addressed herein has been plausibly alleged and this court's decision to grant preliminary injunctive relief is based on Plaintiffs' claims as addressed herein. Further, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1153, n.19 (10th Cir. 2022) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

(separating athletic activities by sex).  Recipients of federal education funding in Utah are faced with having to either comply with Title IX or state law regarding bathroom use.  As a result, those schools would have to reconfigure all bathrooms to comply with both state law and the Final Rule. (Doc. 25-3 at 3.)

Further, new duties are imposed under the Final Rule that were not required under the prior regulations.  The States must now investigate allegations of sex discrimination based on gender identity discrimination.  The States must comply with the requirement of new policies in accordance with the Final Rule and hire Title IX coordinators to make sure the policies are carried out.  (Docs. 25-2, 25-3.)  This is sufficient to show an injury for standing purposes.  Further, Plaintiff States have standing due to the alleged injuries to their state universities.  *See Tennessee*, 2024 WL 2984295, *4 (quoting *Arkansas v. Texas*, 346 U.S. 368, 370, 371 (1953) (holding that Arkansas had Article III standing to represent the interests of the University of Arkansas because under Arkansas law "the University of Arkansas is an official state instrumentality" and "any injury . . . to the University is an injury to Arkansas").  They are also threatened with a loss of federal funding if they fail to comply with the Final Rule.  *Id.* at *5.  The States have further sufficiently alleged that their injury is traceable to Defendants and redressable by a favorable ruling.  *See id.* at *7; *see also Texas*, 2024 WL 2947022 at *18–19.

Next, K.R. and the Plaintiff Organizations have put forth evidence by way of declarations as discussed herein.  In those declarations, K.R. and the Plaintiff Organizations' members attest to their religious beliefs that there are two sexes, a person's sex cannot be changed, and that they believe that they must use pronouns which align with a person's biological sex.  They have all espoused these views at their schools.  In light of the Final Rule, however, they are fearful that they would be subject to investigation and potential discipline for continuing to speak their views.

The court finds that K.R. has standing to challenge the Final Rule. *See Kansas Judicial Review v. Stout*, 519 F.3d 1107, 116–17 (10th Cir. 2008) (discussing standing with respect to a First Amendment claim).

Turning to the Plaintiff Organizations, they have standing to sue on behalf of their members when (1) their members have standing in their own right; (2) the interests at stake are relevant to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the individual members to participate in the lawsuit. *See Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 181 (2000). Based on the affidavits submitted by the members of the Plaintiff Organizations, the court finds that those members have established standing to challenge the constitutionality of the Final Rule based on a potential chilling of their speech in violation of the First Amendment. *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) ("Parents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children.") (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007)). In their supplemental briefing, Defendants contend that the affidavits fail to show that the members face imminent, irreparable injury outside of the Plaintiff States. (Doc. 47 at 3.) This argument, however, is focused on the scope of relief. It does not suggest that this deprives the Plaintiff Organizations of standing.

Next, the interest at stake must be relevant to the organization's purpose. All three Plaintiff Organizations have submitted declarations setting forth their purpose. Moms for Liberty is a nationwide organization with chapters across the country. Moms for Liberty's mission is to defend the fundamental right of parents to raise their children in accordance with their values and morals. (Doc. 43-6.) Its mission would be impeded if the Final Rule went into effect by deterring its members and their children from expressing their viewpoints about gender identity and

transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms.  *Id.*  YAF is a national organization with "thousands of student members on college campuses across the country" and in all fifty states.  (Doc. 43-7.) Their mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.  *Id.*  Those values include the belief that sex is determined at birth, "there are two sexes/genders, and an individual cannot change his or her sex/gender."  *Id.* at 2.  If the Final Rule goes into effect, it will impede the mission by deterring their members from engaging in discussion about gender identity and transgenderism and it will deter students from hosting speakers who discuss these issues.  *Id.* at 3.  Finally, one of FAU's purposes and goals is that its members can "freely advocate in favor of fairness in women's sports at their schools."  (Doc. 25-5 at 9.)  This includes empowering its members to express views that males should not be permitted on women's teams or in private spaces such as restrooms and locker rooms.  FAU members also want to express their beliefs that male athletes who identify as female are in fact males.  *Id.* at 8.  FAU is concerned that its members will lose their scholarships, privacy, and freedom of speech.  Based on this review, the court finds that the interests at stake are relevant to the Plaintiff Organizations' purposes.

Finally, neither the claim nor the relief sought requires that the individual members participate.  Plaintiffs are merely seeking declaratory and injunctive relief.  (Doc. 1 at 81–83.)  As such, the individual members do not need to participate.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009).

Based on the foregoing, the court finds that Plaintiffs have standing to challenge the Final Rule.

## B.  Preliminary Injunction Element One: Prevail on the Merits

### i.   Contrary to Law

Plaintiffs argue that the final regulation is contrary to the plain language of Title IX in defining sex discrimination as discrimination on the basis of gender identity.  The court must first look to the statute to determine its meaning.  "After all, only the words on the page constitute the law adopted by Congress and approved by the President."  *Bostock*, 590 U.S. at 654.  Further, the court is to interpret a statute "in accord with the ordinary public meaning of its terms at the time of its enactment."  *Id.*  The Supreme Court recently held that the court "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enter. v. Raimondo*, ---S. Ct.---, 2024 WL 3208360, *22 (June 28, 2024).  The court must exercise its "independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  *Id.*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  At issue here is Title IX's command that an individual not be discriminated against "on the basis of sex."  Therefore, the court must determine the ordinary meaning of this command.  *Bostock*, 590 U.S. at 654.  After review, the court finds that the unambiguous plain language of the statutory provisions and the legislative history make clear that the term "sex" means the traditional concept of biological sex in which there are only two sexes, male and female.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (discussing that the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme.")

Defendants do not dispute that at the time Title IX was enacted in 1972, the term "sex" was understood to mean the biological distinctions between males and females and conceded as such

during the hearing.  Tr. at 27–28; *see Bostock*, 590 U.S. at 655 (assuming that "sex" in Title VII referred only to the "biological distinctions between male and female"); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions) (discussing that in 1972, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions."); *Tennessee*, 2024 WL 3019146, at *9 (citing *The American College Dictionary* 1109 (1970) and *Webster's Third New International Dictionary* 2081 (1971) (sex was defined as "one of the two divisions of organic [sic] esp. human beings respectively designated male or female").

The legislative history also supports a finding that the term "sex" referred to biological sex. As discussed, one of the principal purposes of the statute was to root out discrimination against women in education.  The legislative history shows that Congress was concerned about the unequal treatment between men and women for admissions opportunities, scholarships, and sports.  The legislative history provided statistics on the number of women and men being included in various programs and activities.  118 Cong. Rec. at 5,804–06.  The legislative history is clear that Congress was referring to the biological sex of both males and females.

The text of the statute also supports a finding that the term "sex" meant biological sex and not gender identity or sexual orientation.  Title IX explicitly provides exceptions to the nondiscrimination mandate.  In one exception, the statute discusses that Title IX will not apply for a period of time to an institution which "admits only students of one sex" while that institution transitions to "being an institution which admits students of both sexes." § 1681(a)(2).  In another exception discussing "father-son" and "mother-daughter" activities, the statute states that such activities, if provided for "one sex," shall not be precluded for the "other sex" as long as the "other

sex" has opportunities for "reasonably comparable activities." § 1681(a)(8). Therefore, it is clear from the statutory language that the term "sex" refers to the traditional binary concept of biological sex. That is also supported by the ordinary meaning of the word "sex" at the time Congress enacted Title IX. Given this background, the plain language of "sex" in Title IX does not mean "gender identity."

Defendants do not make much effort to dispute that the term "sex" in Title IX means biological sex. Rather, Defendants argue that this makes no difference because discrimination on the basis of gender identity **is** discrimination on the basis of biological sex. (Doc. 38 at 19.) Therefore, the final regulation is not contrary to Title IX. In support of their position, Defendants rely on *Bostock* and other cases citing *Bostock* in support, including the Tenth Circuit's recent decision applying *Bostock* to the Equal Protection clause. *See Fowler v. Stitt*, No. 23-5080, ---F.4th---, 2024 WL 3035712 (10th Cir. June 18, 2024).[4]

The "only question" in *Bostock,* however, was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" in violation of Title VII. 590 U.S. at 681. First and foremost, *Bostock* involved a different statute, Title VII, which prohibits sex discrimination in employment. Although the statutes are similar in that they both prohibit sex discrimination, there are notable differences. Significantly, Title IX includes several carve outs to the prohibition on sex discrimination that are not present in Title VII. *See* § 1681(a)(1)–(9). Further, Title IX is about schools, and "the school is not the workplace." *Adams by & through Kasper v. Sch. Bd. of*

---

[4] The court also notes that in an unpublished opinion the Tenth Circuit assumed for purposes of an appeal "that under Title IX, discrimination on the basis of sexual orientation is sex-based discrimination." *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ*., No. 23-2064, 2024 WL 1881076, at *8, n.9 (10th Cir. Apr. 30, 2024). This statement was contained in a footnote without discussion. Because the issue here was not presented to the court of appeals for review and the decision was unpublished, *Dimas* is neither binding nor helpful. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) ("[U]npublished orders are not binding precedent . . . .")

*St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) ("Courts, moreover, must bear in mind that schools are unlike the adult workplace."); *id.* at 675 (Kennedy, J., dissenting) (noting the "differences between children and adults, peers and teachers, schools and workplaces" and that "schools are not workplaces and children are not adults"). The Supreme Court also explicitly declined to address any other laws and the meaning of their terms or whether its holding would be applicable to "bathrooms, locker rooms, or anything else of the kind." *Bostock*, 590 U.S. at 681.

If *Bostock* expressly disavowed its application to bathrooms and showers under Title VII, it certainly has no application to bathrooms and showers under Title IX. Moreover, *Bostock* arose in a situation where the plaintiffs were employees of private businesses who were fired because of decisions they made as consenting adults regarding their private lives, and those decisions caused no harm to their employers, coworkers, or anyone else for that matter. In that sense, *Bostock* can fairly be described as a live-and-let-live decision where employers were prohibited from interfering with their employees' personal lifestyle choices when those choices had no bearing on the employees' abilities to perform their jobs. By contrast, this case involves the government's decision to interpose itself into the field of education, an area traditionally left to state and local governments and the schools, themselves, and in which the government's edicts result in the subordination of the interests of non-transgender students (many of whom are minors) in free speech, privacy, and safety to the interests of transgender students in expressing and conducting themselves in accordance with their individual notions of gender identity. These differences, among others, demonstrate why the reasoning from *Bostock* does not automatically transfer to the Title IX context, nor does *Bostock* compel the changes to the Title IX regulations encompassed by the Final Rule.

Notwithstanding these differences, Defendants assert that the Final Rule's definition of sex discrimination is not contrary to law because "it is impossible to discriminate against a person for being transgender 'without discriminating against that individual based on sex.'" (Doc. 38 at 12)( quoting *Bostock*, 590 U.S. at 660).   In repeating this quote throughout their brief, however, Defendants are ignoring Title IX's carve outs which explicitly allow discrimination based on (biological) sex.   These carve outs show that Congress recognized that recipients could properly discriminate on the basis of sex under certain circumstances.   Therefore, not all differential treatment based on biological sex is discrimination under Title IX.   Rather, Title IX "prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other.  But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process." *Texas*, 2024 WL 2947022, at *31.

Specifically, Title IX provides that a recipient may maintain "separate living facilities for the different sexes."   20 U.S.C. § 1686.   This "instruction is the authoritative expression of Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Texas*, 2024 WL 2947022, at *32 (citing 118 Cong. Rec. 5,807 (Feb. 28, 1972)).   The Final Rule essentially renders meaningless the exemptions in Title IX. *Louisiana*, 2024 WL 2978786, at *11.   The DoE argues that the Final Rule protects those exemptions because they are excepted from the new discrimination standard which provides that

> a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education

program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

DoE explains that this provision continues to allow sex separation based on biological sex with respect to the statutory exceptions and the regulations regarding housing and athletics. Essentially, under DoE's interpretation, a recipient may deny the request of a male student who identifies as female to live in a female dormitory because that is a living facility. By contrast, a recipient may not deny that same male student access to the girls' restroom, shower, or locker room because the regulation that allows sex separate facilities for restrooms and locker rooms will now be subject to the new rule under which such conduct is categorically deemed to result in more than de minimis harm to a transgender person. DoE's justification is that Congress has allowed sex segregation in, and only in, those limited circumstances identified in the statutory text. DoE's explanation does not pass muster because the "comparable facilities," i.e. bathrooms and locker rooms, impacted by the Final Rule appear to fall under the statutory category of living facilities. 34 C.F.R. § 106.33. The statute does not define "living facilities." However, the implementing regulations enacted after the passage of Title IX and §§ 106.32 and 106.33 directly correspond with § 1686. Section 106.32 deals with "housing," and § 106.33 with "comparable facilities." Although the final regulations were "published without public comment," § 106.33 "was meant to cover" § 1686. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023). Bathrooms and locker rooms would be facilities that are used for activities of daily living such as bathing and dressing. Given Congress's stated concern about privacy for students, it would be counterintuitive if that privacy only extended to students who lived in student housing.

Plaintiffs also argue that the Final Rule is contrary to Title IX in that it would allow biological men to play on women's sports teams. Defendants, however, argue that the athletics

regulation is not impacted by the new rule.  The Final Rule's proposed § 106.31(a)(2) does include the athletics regulation as a circumstance in which a policy may lawfully cause more than de minimis harm to students.  *See* 89 Fed. Reg. at 33,887.  There is also a proposed rule that will amend the athletics regulation.  *See* 89 Fed. Reg. at 33,839 (citing 88 Fed. Reg. 22,862.)  Because the proposed rule is not final and the Final Rule carves out an exception for the athletics regulation, the court has not considered the arguments on athletics in ruling on whether the agency acted without statutory authority in promulgating the Final Rule.  *See Louisiana*, 2024 WL 2978786, at *14 (declining to consider the effect of the Final Rule on sports at the preliminary injunction stage due to the proposed rule).

Significantly, the purpose of Title IX was to protect "biological women from discrimination in education[;] [s]uch purpose makes it difficult to sincerely argue that, at the time of enactment, 'discrimination on the basis of sex' included gender identity, sex stereotypes, sexual orientation, or sex characteristics."  *Id.*, at *12.  The DoE's reinterpretation of Title IX to place gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex would subvert Congress' goals of protecting biological women in education.  The Final Rule would, among other things, require schools to subordinate the fears, concerns, and privacy interests of biological women to the desires of transgender biological men to shower, dress, and share restroom facilities with their female peers.  Moreover, to expand sex discrimination to encompass "self-professed and potentially ever-changing gender identity is inconsistent with Title IX's sex-separation dictates."  *Texas*, 2024 WL 2947022, at *38 (citing *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result).  Because of these significant differences between Title IX and Title VII, uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX.  Although not briefed by the parties, the

Tenth Circuit's decision in *Fowler* does not compel a different decision for the same reasons. There, the question was whether purported discrimination based on transgender status was sex-based discrimination that implicated the Equal Protection clause. 2024 WL 3035712, at *13. Here, the sex-based categories of Title IX are explicit—and the question is what the text of Title IX requires as a result.

The Final Rule's interpretation of sex and discrimination are therefore contrary to the statute and historical context of Title IX. The court finds that Plaintiffs are likely to succeed on their claim that the DoE exceed its statutory authority in expanding the definition of sex discrimination in the Final Rule. *See Tennessee*, 2024 WL 3019146, *13; *Louisiana*, 2024 WL 2978786, *12.

### ii. Major Questions Doctrine

As discussed herein, the term "sex" is unambiguous as used in Title IX. Moreover, under *Raimondo*, even if that term was ambiguous, it no longer results in deference to DoE's interpretation of the meaning of "sex" under Title IX. 2024 WL 3208360, at *22. The court therefore does not defer to the agency's interpretation of Title IX with regard to the Final Rule. The DoE simply lacks authority to expand sex to mean gender identity. The DoE is an administrative agency created by statute and, as such, only possesses "the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). In issues of "vast economic and political significance," the Supreme Court has held that Congress must speak clearly if "it wishes to assign" such issues to an agency. *Util. Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). This is because agencies "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (internal quotations and citation

omitted).  Therefore, if DoE's regulatory action in formulating the Final Rule "bring[s] about an enormous and transformative expansion in [the DoE's] regulatory authority," then there must have been "clear congressional authorization" for those actions.  *Util. Air. Reg. Grp.*, 573 U.S. at 324.  Here, Congress did not authorize the DoE to rewrite Title IX or "render any statutory provisions meaningless," which is the result of the Final Rule.  *Texas*, 2024 WL 2947022, at *36.

In response to Plaintiff's argument, Defendants merely state that this is not a major questions case and that the DoE "does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity."  (Doc. 38 at 55.)  Rather, Defendants argue that the Final Rule is justified in light of *Bostock* and that the major questions doctrine should not be invoked because it was not invoked in *Bostock*.  *Id.*  Defendants' argument fails to grasp that the major questions doctrine is applicable to agency action that exceeds its authority.  The major questions doctrine could not have been raised in *Bostock* because that case involved a claim of individual discrimination under Title VII; it was not a challenge to agency action.  Therefore, Defendants' argument is not persuasive and they make no attempt to address Plaintiffs' arguments that this issue is a major question.  Their bedrock position that the Final Rule is justified in light of *Bostock* carries no weight for the reasons stated herein.

The Final Rule clearly decides major questions involving whether to force schools, students, and teachers to accept an individual's subjective gender identity regardless of biological sex.  Further, it determines whether biological males who identify as females are allowed in female bathrooms and locker rooms.  It further prohibits requiring any medical documentation or other documents to determine whether those beliefs are sincere and there are no limits on how "many times a person may change their gender identity."  *Louisiana*, 2024 WL 2978786, at *13.  The Final Rule is applicable to "every public elementary school, middle school, high school, and

college in the United States that receives federal financial assistance." *Id*.  The reach of the Final Rule is clearly significant.  Further, States are threatened with hundreds of millions, or even billions, of dollars of lost funding if they fail to comply with the Final Rule.  Moreover, States who have conflicting state laws will be required to spend significant sums to make improvements to facilities to comply with the Final Rule and their own laws.  *Id.*

In deciding these questions, DoE has essentially taken it upon itself to answer questions that have prompted significant debate at both the state and federal levels in recent years.  *See Texas*, 2024 WL 2947022, at *36 and n.126 (citing authority).  In Congress, several proposals that would expand "Title IX's anti-discrimination provisions to include sexual orientation and gender identity" have been repeatedly rejected.  *Id.* (citing Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015); Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021); Equality Act, H.R. 5, 117th Cong. § 9(2) (2021)).  Further, the Final Rule represents an enormous invasion into the sphere of education, which has traditionally been an area where States have been sovereign. *United States v. Lopez*, 514 U.S. 549, 564 (1995).

In sum, the court finds that the Final Rule involves issues of both vast economic and political significance and therefore involves a major question.  *See Louisiana*, 2024 WL 2978786, *14; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40.  As such, Congress must have given the agency "clear statutory authorization" to promulgate such a Final Rule.  *W. Virginia*, 597 U.S. at 723.  The court finds that Congress did not give such clear statutory authorization to the DoE.  *See Louisiana*, 2024 WL 2978786, *14–15; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40.  Therefore, Defendants do not have authority to expand the meaning of "sex discrimination" to include gender identity.

### iii. Spending Clause

The above analysis is sufficient to show a likelihood of success on the merits as to some of Plaintiff's claims. But the court further notes Plaintiffs argue that the Final Rule violates the Constitution's Spending Clause. Title IX was enacted pursuant to Congress's authority under the Spending Clause, which marks another substantial distinguishing feature between this case and *Bostock*. *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 181 (2005). Under Spending Clause jurisprudence, "Congress may attach conditions on the receipt of federal funds . . . [but] [s]uch conditions must (among other requirements) bear some relationship to the purpose of the federal spending[.]" *New York v. United States*, 505 U.S. 144, 167 (1992). If Congress desires "to impose a condition on the grant of federal moneys, it must do so unambiguously," so that the States may "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Legislation that conditions the receipt of federal moneys must (1) be in pursuit of the general welfare; (2) impose unambiguous conditions; (3) such conditions must relate to federal interests in the program; and (4) not induce unconstitutional action. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Here, Plaintiffs argue that the last three requirements are not met here because Title IX did not impose a condition regarding gender identity discrimination, the Final Rule is contrary to federal interests, and it will violate the First Amendment. (Doc. 25 at 52–56.) The court finds that Plaintiffs are likely to prevail on this claim in that Title IX did not unambiguously condition funds on the prohibition of gender identity discrimination and the Final Rule results in First Amendment constraints. As such, the court declines to address the argument that the Final Rule is contrary to federal interests.

Based on this court's extensive discussion herein, at the time of enactment, sex discrimination under Title IX meant discrimination based on biological sex. Title IX did not

prohibit discrimination based on gender identity. Defendants' arguments relating to *Bostock* are not persuasive for the reasons discussed. Defendants further contend that an express statement covering gender identity is not required and cite to *Jackson* in support. (Doc. 38 at 52–53.) In *Jackson,* the Supreme Court rejected an argument that Title IX did not encompass retaliation because the defendant was not on notice that it could be liable for retaliating against those who complain of Title IX violations. 544 U.S. at 182. While holding as much, the Court made clear that the Board was on notice because Title IX's private cause of action broadly encompasses "diverse forms of intentional sex discrimination," such as retaliation and sexual harassment. *Id.* at 183. The Court further explained the regulations prohibiting retaliation had "been on the books for nearly 30 years" and the courts had already interpreted Title IX to cover retaliation. *Id.*

In contrast, this case involves agency action in which the Final Rule expands the definition of sex discrimination. *Tennessee*, 2024 WL 3019146, *15. Further, DoE has not had regulations regarding gender identity discrimination on the books for several years and, just a few short years ago, took a position contrary to the one being advanced today. Therefore, a "clear statement from Congress equating 'sex' to 'gender identity' or 'transgender status is necessary before States' acceptance of federal funds may be conditioned on such a term." *Id.* Title IX does not provide such a statement. The Plaintiff States here did not knowingly and voluntarily agree to ignore the "differences between biological sex and gender identity in exchange for federal funds under Title IX." *Texas*, 2024 WL 2947022, at *41. Nor did they "agree to abolish sex-specific bathrooms, locker rooms, room assignments, and sports in exchange for Title IX's funds." *Id.* (citing *Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.")). In sum, Title IX falls short of providing notice to the Plaintiff States that "sex discrimination

includes gender identity." *Id.* at *42.  Therefore, the Final Rule violates the Spending Clause because it introduces conditions for spending that were not unambiguously clear in Title IX. Further, based on the discussion *infra*, the Final Rule violates the Spending Clause because it violates' students First Amendment rights.  *See Louisiana*, 2024 WL 2978786, at *16.

The court finds that Plaintiffs are likely to succeed on their claim that the Final Rule violates the Spending Clause.  *See id.*; *Tennessee*, 2024 WL 3019146, *15.

### iv.  First Amendment

K.R. and the Plaintiff Organizations assert that the Final Rule violates the First Amendment rights of individuals by compelling speech that aligns with Defendants' ideology, censoring speech through content-based restrictions and viewpoint discrimination, chilling speech through vague and overbroad language, and forcing individuals to engage in speech that violates their sincerely held beliefs.  (Doc. 25 at 40.)  The court finds that Plaintiffs have shown that the Final Rule violates the First Amendment by chilling speech through vague and overbroad language.  See *Tennessee*, 2024 WL 3019146, at *24 (ruling that the Final Rule was vague and overbroad.)  Given this ruling, the court declines to address all of Plaintiffs' arguments at this stage.

Plaintiffs assert that the Final Rule violates their constitutional rights because it is unconstitutionally vague and overbroad resulting in chilled speech.  Chilled speech is different from the suppression of speech; it is self-imposed but nonetheless violates the First Amendment. *See Speech First, Inc. v. Sands*, 144 S. Ct. 675, 676 (2024) (Thomas, J., dissenting) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (discussing that "self-censorship" violates the "First Amendment just as acutely as a direct bar on speech")).  The First Amendment's Free Speech Clause prohibits government entities and actors from "abridging the freedom of speech."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1326 (2024).  When a vague law "abut(s) upon

sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal citations and quotations omitted).  A regulation is also impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

Plaintiffs argue that the Final Rule's sexual harassment definition will chill students who want to articulate that sex is immutable and binary, explain their beliefs as to the differences between men and women, refer to individuals with biologically accurate pronouns, and speak in opposition to sharing bathrooms and other intimate spaces with individuals who do not share their biological sex.[5]  (Doc. 25 at 26–30, 44–46.)  They assert that the term "gender identity" is vague as it is not defined but is explained in the preamble to the Final Rule to be an individual's subjective sense of their gender.  (*Id.* at 44) (quoting 89 Fed. Reg. at 33,809.)  Further, the term sex stereotypes is defined as any asserted differences between males and females.  Moreover, and relevant to this particular aspect of Plaintiffs' claim, the standard for harassment has changed and now encompasses gender identity discrimination such that students are concerned that any speech that sex is immutable would risk a harassment claim.  Plaintiffs' concerns were shared by the general public as evidenced in the preamble.  89 Fed. Reg. at 33,809.

---

[5] Plaintiffs also argue that there is a chilling effect for students who wish to speak in opposition of allowing biological males to compete in women's sports, but the court does not consider this argument in its analysis due to the Final Rule's carveout for athletics.

With respect to the concerns that the term "gender identity" was impermissibly vague, the Department disagreed but offered no further guidance.  Rather, the Department stated that this "term of vital importance can be subjectively defined by each and every individual based entirely upon his or her own internal sense of self."  *Tennessee*, 2024 WL 3019146, at *24.  Further, although a student may not know "another's gender identity," the Department stated that gender identity discrimination remains sex discrimination.  89 Fed. Reg. at 33,809.

Turning to the sex-based harassment standard, hostile environment harassment is defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)"  *Id.* at 33,884 (amending 34 C.F.R. § 106.2).  This definition is vague and also overbroad because it is entirely fact dependent and there is no guidance as to how a recipient is to determine what constitutes hostile environment harassment.  Again, commenters raised these same concerns to the Department.  This is concerning given the Department's position on the issues of gender identity and misgendering.  As pointed out by Plaintiffs, the preamble makes clear that the Department views misgendering as potentially sex-based harassment.  The Department states that a "stray remark, such as a misuse of language, would not constitute harassment," but otherwise fails to identify what objectively constitutes harassment and under whose standard is it measured. 89 Fed. Reg. at 33,516.  Rather, the Department merely kept parroting the definition in support of its position that the standard is not vague or overbroad.  *Tennessee*, 2024 WL 3019146, at *26 ("Not only did the Department fail to meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined*.")  This is concerning because the "objective standard" is "inherently not objective at all because the Final Rule imposes a viewpoint

consistent with the affirmation of gender identity. So, in the context of misgendering, the offensive conduct must be 'subjectively offensive' and 'objectively offensive' as viewed through the lens of someone who recognizes sex and gender to be separate and distinct." *Id.* at *25 (quotations and citations omitted).

Notably, during the hearing, the court asked the DoE's counsel whether students could engage in a civil discourse regarding the issue of gender identity without being fearful of an accusation of sex-based harassment. Specifically, the court asked defense counsel if a student were to state that she believes that sex and gender are the same, they are immutable, and/or that a person's gender identity cannot deviate from his or her biological sex, would that person be subjected to an actionable discrimination complaint under the Final Rule? Defense counsel could not definitively answer the question and continued to state that it would depend on the facts and specific circumstances. Counsel then stated that the complainant would also have to show that such speech limited or denied a person's ability to participate in or benefit from the recipient's education program or activity. What does it mean to limit a person's ability to participate in an education program? Those terms are not defined in the Final Rule and, as discussed at the hearing, the term "program or activity" as defined by Title IX means **all** operations of a school.[6] *See* 20 U.S.C. § 1687. Therefore, this standard for actionable discrimination under the Final Rule could conceivably be met in any circumstance where a student simply complained that he could not concentrate in class due to another student's statements on the topic of gender identity. This interpretation is supported by the Department's statement that the student need not demonstrate a

---

[6] Indeed, as all counsel agreed at the hearing, the statutory definition of "program or activity" reaches every aspect of every part of every state and local government in the entire nation if any part thereof receives federal financial assistance. *See* 20 U.S.C. 1687(1)(A). And since pretty much every state and local government receives some federal funding of one kind or another, the practical application of this statute is to sweep in every aspect of every state and local government in the country. The astonishing sweep of that language only gets pared down when section 1681 of title 20 limits the prohibitions against sex-based discrimination to any "education program or activity."

particular harm just "some impact on their ability to participate or benefit from the education program . . . ." 89 Fed. Reg. at 33,511.  Therefore, contrary to defense counsel's argument that this language imposes some limit on the scope of a harassment claim, it does not; rather, it is an entirely subjective standard that is potentially met whenever the complainant alleges that the conduct or speech somehow impacts the complainant's education.  And there is no objective standard to measure whether the complainant was actually impacted because there is no need to demonstrate harm.

In sum, the court finds that this standard is impermissibly vague and overbroad.  *Tennessee*, 2024 WL 3019146, at *27.  There was not one lawyer in the courtroom, including the undersigned, who was able to offer any possible explanation of what a parent should tell their child about the limits of legal speech at their schools on the topic of gender identity or sexual orientation under the Final Rule.  The result is that speech is chilled because what student wants to "run the risk of being accused of" sex-based harassment and subjected to an investigation and potential discipline.  *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022).

### v. Arbitrary and Capricious

Finally, the court finds in the alternative that the Department acted arbitrarily and capriciously when promulgating the Final Rule.  Even if the agency had the authority to alter the Title IX standard in this manner, the court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

> An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023) (quoting *Wyoming, U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011)).

Plaintiffs assert that they will succeed on this claim because the DoE's explanation for the Final Rule is implausible and the Final Rule is a sharp departure from past practice without reasonable explanation. With respect to their first argument, Plaintiffs contend that the agency action is implausible because the Final Rule inflicts harm on those it was meant to protect and elevates transgender individuals' interests. Essentially, Plaintiffs argue that the agency failed to consider and give weight to harm to females who will have to share intimate spaces with biological males. In response to this argument, Defendants argue that the DoE's reasoning flows from carefully considering the structure and text of Title IX. (Doc. 38 at 25.) The DoE asserts it fully considered and addressed privacy concerns and determined that there was a lack of evidence that transgender students posed a risk to non-transgender students in a single-sex space and asserted that such generalized concerns have been unsubstantiated. 89 Fed. Reg. at 33,820. The DoE determined that not allowing a biological male who identifies as a female to use the girls' locker room amounts to gender identity discrimination and always results in more than de minimis harm. By contrast, the agency concludes that a biological female is not harmed by having to share a locker room and shower with a biological male because her privacy concerns are not substantiated.

During oral argument, the court noted that such treatment elevates gender identity discrimination over the traditional view of biological sex discrimination that Title IX was intended to address. The DoE has determined that the harm to the transgender student is more than the harm to the biological female. In fact, according to the DoE, biological females are not harmed by having to share a bathroom and shower with biological males. Such a conclusion is not supported by the evidence in this case. Notably, K.R.'s affidavit states that she avoided using school

34

restrooms and that biological males who do not even identify as females went into the female restroom because they knew that they would get away with it and wanted to go into the female restroom with the girls.  (Doc. 25-3 at 3.)  Such fears by students, therefore, come from real and justified concerns.

Further, the DoE was faced with numerous comments in which similar fears about legitimate harms were expressed.  The State of Tennessee offered evidence of "numerous instances of males attacking females in public restrooms that were designated for females only."  *Tennessee*, 2024 WL 3019146 at *35 (citing to the administrative record).  This comment by Tennessee was not addressed at all in the preamble.  Further, the DoE's position ignores the fact that the biological sexes have long had separate spaces to use the restroom and shower and that this is based on a "significant privacy interest in [one's] unclothed" body.  *Id.* (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) and citing *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) ("most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'"); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy."); *Grimm*, 972 F.3d at 633 (Neimeyer, J., dissenting) (discussing that "courts have long recognized" an individual's bodily privacy interests are "significantly heightened when persons of the opposite biological sex are present.") (collecting cases).  That privacy interest was recognized by Congress as evidenced in the congressional record and as set forth in Title IX.  Further, the Supreme Court recognized that integrating an all-male military institution "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."  *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

In response to the court's questions about biological females' fears and safety concerns, especially in light of K.R.'s affidavit, defense counsel stated that the school should have policies in place to protect the student from transgender biological males using restrooms and locker rooms and that other States that require transgender students have access to the restrooms and locker rooms of their choice have not had privacy and safety concerns.  Further, counsel stated that a biological female who feels unsafe using the locker room or restroom could ask for an accommodation such as using the staff restrooms.  According to the DoE, such accommodation, however, is clearly not acceptable as a response to a transgender student.  Rather, that student is to use the restroom or shower facilities that align with the student's gender identity.  Moreover, the school cannot seek documentation or otherwise attempt to confirm the student's gender identity with a medical provider.  Defense counsel asserts that the recipient can put in place policies to verify gender identity, and the recipient can seek verification from a parent or coach.  The preamble merely discusses that the DoE is aware that some schools rely on the student, or written confirmation from a parent, a coach, or a teacher.  89 Fed. Reg. at 33,819.  However, this was merely an observation of current practices, not the DoE's blessing on such practices.  In the next sentence, the DoE clearly states that requiring a student to submit to "burdensome documentation requirements. . . imposes more than de minimis harm." *Id.*  The DoE does not explicitly authorize any policy to determine a student's gender identity apart from said student's own statement and, in fact, dissuades a recipient from any documentation requirements, which could include a letter from a parent or coach.  Given that and the evidence before the court, it is not hard to imagine that, under the Final Rule, an industrious older teenage boy may simply claim to identify as a female to gain access to the girls' showers, dressing rooms, or locker rooms so that he can observe his female peers disrobe and shower.  Under the Final Rule, the recipients would appear to be obliged to

36

accept this young man's assertions and give him unfettered access to those female facilities, or else risk running afoul of the anti-discrimination provisions of the Final Rule.  "Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with [biological] females in the girls' locker room goes beyond the scope of arbitrary and capricious." *Louisiana*, 2024 WL 2978786, at *19. "As the Department would have it, sex means sex except when gender identity comes until play. Not only is this an illogical distinction forbidden by Title IX's exclusions, but it would also constitute the very type of sex discrimination Title IX prohibits by privileging transgender persons with the ability to abide by their biological sex or not in order to take advantage of preferred benefits or services." *Texas*, 2024 WL 2947022, at *38.  Therefore, the Final Rule's explanation for its actions is implausible under the arbitrary and capricious standard.  Moreover, it is clear that the DoE failed to consider several important aspects of the problems raised by the Final Rule.

The Final Rule is also a sharp departure from past practice without reasonable explanation. The DoE claims that this rule is merely a clarification.  However, just two short years before the proposed rule was issued, the DoE stated that Title IX *did not* cover gender identity discrimination. Further, the Final Rule's attempt to reason the exceptions in section 106.31(a)(2) rings hollow. The DoE claims that a recipient may engage in sex discrimination, including gender identity discrimination, if it is done in accordance with a statutory exception or the athletics regulation. DoE's justification for allowing gender identity discrimination to continue in athletics is because of the unique considerations that athletics presents and its new proposed regulation which is not at issue here.  89 Fed. Reg. at 33,839.  However, the regulation regarding sex separation in restrooms and locker rooms has been in effect just as long as the athletics regulation.  And just as Congress was concerned about equal treatment in athletics, it was also concerned about privacy for students.

Therefore, the DoE has failed to adequately explain the reason for allowing continued sex separation in athletics but not in restrooms and locker rooms.

The court further finds that the DoE failed to adequately consider several relevant factors when drafting the Final Rule. The DoE failed to include requirements for a change in gender identity, failed to consider harms to non-transgender students, and failed to sufficiently explain how the harm to transgender students is outweighed by the harm to non-transgender students with respect to the use of restrooms and locker rooms. *See Louisiana*, 2024 WL 2978786, *19.

In sum, the court finds that the Final Rule is arbitrary and capricious because it offers an implausible explanation for agency action, is a sharp departure from prior action without a reasonable explanation, and failed to consider important interests as discussed herein.

### vi. Conclusion

In sum, the court finds that Plaintiffs are likely to prevail on their claims that the Final Rule is contrary to law and exceeds statutory authority, the Final Rule is an unconstitutional exercise of legislative power under the Spending Clause, the Final Rule violates the First Amendment, and the Final Rule is arbitrary and capricious. In light of the decision herein and the relief available as discussed below, the court declines to address all of Plaintiffs' claims and arguments pertaining to other laws and provisions of the Final Rule.

### C. Preliminary Injunction Element 2: Irreparable Injury

The court finds that Plaintiffs have shown irreparable injury if the Final Rule goes into effect on August 1. Based on the declarations, Plaintiff States will incur costs that cannot be recouped including costs to update policies, materials, and hiring additional Title IX staff. Further, States are required to comply with the Final Rule in a short period of time. "Plaintiffs have sufficiently demonstrated that the compliance costs here are extraordinary due to the sweeping

policy changes they are required to implement and the short timeframe in which they must do so. And because the recovery of these costs would necessarily be barred, this factor weighs in favor of a finding of irreparable harm." *Tennessee*, 2024 WL 3019146, at *39 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.")). Further, private Plaintiffs have shown irreparable harm with respect to the violation of First Amendment rights. *Louisiana*, 2024 WL 2978786, at *19. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### D. Preliminary Injunction Elements 3 and 4: Balance of Harms and Public Interest

The final two factors involve balancing the harms to each party and the public interest. The Tenth Circuit has held that when a law "is likely unconstitutional," the government's interests do "not outweigh a plaintiff's interest in having [his or her] constitutional rights protected." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation and citation omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014). Further it is always in the public interest to "prevent the violation of a party's constitutional rights." *Id.*

Moreover, the regulations that are currently in effect have essentially "been unchanged for approximately 50 years. Therefore, it would be of relatively little harm to others to maintain the status quo pending the resolution of this lawsuit." *Tennessee*, 2024 WL 3019146, *42. The court finds that these factors weigh in favor of Plaintiffs.

### E. Scope

Plaintiffs seek to stay the Final Rule in its entirety and also ask the court for a nationwide preliminary injunction. In response, Defendants ask the court to allow some parts of the Final

Rule to go forward and to limit any injunctive relief to the Plaintiff States and K.R.'s school. Defendants point to the severability clause contained in each subsection in the current regulations which provides: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9; 106.18; 106.48; *see also* 89 Fed. Reg. at 33,848.

Although the court did not explicitly address all of the provisions in the Final Rule, the court finds that § 106.10, the new definition of sex discrimination, is unlawful for the reasons stated herein.  That impermissible definition permeates the entire rule and, as such, it is difficult to excise the remaining regulations without also eliminating those regulations that involve sex discrimination.  *Tennessee*, 2024 WL 3019146, at *43.  Further, Plaintiffs will likely prevail on their claim that the DoE's rulemaking was arbitrary and capricious.  Therefore, the Final Rule would be invalid in its entirety.  *Id.*  The court also declines to parse out the sections that may remain as "rulemaking is exclusively within the purview of the Executive Branch."  *Id.* (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (asking whether the legislature would have "preferred what is left of its statute to no statute at all").

Finally, Plaintiffs seek a nationwide injunction[7] so that all parties may be provided relief. Defendants object to a nationwide injunction asserting that the relief should be limited to the Plaintiff States.  Plaintiffs argue that universal relief is appropriate here because of the Plaintiff Organizations.  In response, Defendants assert that it is not appropriate because the affidavits submitted are mostly limited to individuals in the plaintiff States.  (Doc. 47.)  Defendants

---

[7] As noted by Judge Crabtree recently, the "proper terminology for this request is unsettled."  *Alaska v. United States Dep't of Educ.*, No. 24-1057-DDC-ADM, 2024 WL 3104578, at *17 (D. Kan. June 24, 2024) (discussing that courts have used both nationwide and universal in seeking such relief).

painstakingly review all of the declarations and the physical locations of the declarants in their supplemental brief to support their position that relief should be limited to the Plaintiff States and K.R.'s school even though some affidavits are from individuals in other States.  But Defendants fail to cite any authority that injunctive relief should be so limited in light of Plaintiff Organizations' standing to bring this suit.  As such, they can seek relief on behalf of all their members.  An injunction limiting relief to Plaintiff States would not provide the Plaintiff Organizations complete relief.

The court recognizes that nationwide injunctions are the "subject of much debate." *Alaska*, 2024 WL 3104578, at *17, n.11.  Both courts that have granted similar relief have limited that relief to the plaintiff States involved in those cases.  *See Tennessee*, 2024 WL 3019146, at *43; *Louisiana*, 2024 WL 2978786, at *20.  In *Louisiana*, the Plaintiffs included several school districts in Louisiana, and the States of Louisiana, Montana, Mississippi, and Idaho.  2024 WL 2978786, at *2, n.13.  The Plaintiffs in *Tennessee* included Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia.  2024 WL 3019146, at *6.  Those actions did not include private plaintiffs and are thus distinguishable.

Under section 705 of the APA a reviewing court is to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is under review.  5 U.S.C. § 705.  "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (citing *Doran v. Salem Inn, Inc.*, 422 U. S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.")  Nationwide injunctions are a "relatively new phenomenon" and a phenomenon which

the Supreme Court has yet to fully address.  *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J., concurring) (discussing that "the propriety of universal injunctive relief [is] a question of great significance that has been in need of the Court's attention for some time.")  Problems with nationwide injunctions include depriving other courts of the opportunity to weigh in on these important questions, encouraging forum shopping, and circumventing rules governing class-wide relief.  *Texas,* 599 U.S. at 694 (Gorsuch, J., concurring).  Issuing a nationwide injunction in this case would result in the court ordering Defendants to stop the Final Rule from taking effect for **everyone**, including States which clearly do not want such relief as evidenced in the amicus brief.  As discussed, this issue is currently being litigated in several districts and a nationwide injunction may result in one or more of those courts concluding that the plaintiffs can no longer show an irreparable injury in light of a decision granting universal relief.  Both courts in *Tennessee* and *Louisiana* refrained from issuing nationwide injunctions at least in part because of the ongoing litigation in other courts.  Given the above, the court remains circumspect about the propriety of a nationwide injunction in this case.

In formulating a preliminary injunction, the court is to exercise its discretion and judgment in light of the "equities of a given case [and] the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted).  The Supreme Court instructs that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Here, Plaintiffs include organizations with members all over the country.  Therefore, to provide complete relief to all parties, the court must enjoin the Final Rule from going into effect against Plaintiffs and their members given the rulings herein.  At this time, there is no evidence before the court that enjoining the Final Rule from being applied to the members of the Plaintiff Organizations would be unduly burdensome to Defendants as opposed to providing a nationwide or universal injunction.

Instead, the court determines that the better path is to abide by the traditional approach and limit preliminary injunctive relief to the parties, including the members of Plaintiff Organizations.  That leaves it to Defendants, in the first instance, to determine whether patchwork enforcement of the Final Rule is feasible and worth the risk of running afoul of the court's injunction, thereby exposing Defendants and their representatives to sanctions for contempt.  This seems to align with the APA's admonition that, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. § 705.  That is the first sentence in section 705.  It is only the second sentence of that section that empowers a reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.*  That sequencing of the statutory language suggests that the better approach is to allow the agency to evaluate the court's ruling and the scope of relief provided in order to determine whether a voluntary stay of the entire rule should be rendered until judicial review is completed.  The agency is in a far better position than the court to evaluate the practicalities and feasibility of continued enforcement of the rule in light of relief afforded to date.  In this case, that means that Defendants can evaluate the cumulative effect of relief provided by this court, along with relief provided in

other courts, both prior to and after this order is entered, in making a decision as to whether to stay the effective date of the Final Rule pending completion of judicial review.

Additionally, the court's decision is influenced by the Tenth Circuit's admonition that certain injunctions are disfavored and require heightened scrutiny, including "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Fish*, 840 F.3d at 723–24.  Under the APA, courts are ultimately authorized to set aside unlawful agency action, a remedy referred to as vacatur.  *See* 5 U.S.C. § 706(2).  "[V]acatur is universal in scope because an unlawful regulation cannot be vacated as to only one party." *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *47 (N.D. Tex. June 11, 2024) (citing *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ., et al.*, 98 F.4th 220, 255 (5th Cir. 2024)).  But that case was decided at summary judgment, not on a motion for preliminary injunction.  *See id.* at *1.  And while the Fifth Circuit case relied on for that proposition held that vacatur was appropriate even at the preliminary injunction phase, that conclusion remains the subject of substantial debate.  *See, e.g., Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J., concurring).  Granting a nationwide injunction in this case would effectively give Plaintiffs all the relief they might ultimately hope to obtain at the completion of this litigation – a decision better made with a fully developed record.  Suffice it to say that this court can fashion appropriate preliminary relief for Plaintiffs without resort to universal injunctions, leaving it to Defendants to determine in the first instance whether continued enforcement in compliance with this decision is worth the effort.  *See, e.g.,* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 476–79 (2017).

As for Plaintiff States, the court can enjoin implementation and enforcement of the Final Rule with respect to the States, including any education programs or activities within those States.

Turning to Plaintiff K.R., the court observes that counsel for Defendants conceded at oral argument that relief for K.R. should be imposed at the level of her school. The court agrees. By way of example, given that the flash points of this dispute involve matters such as how to segregate and restrict access to intimate spaces such as bathrooms, dressing rooms, and showers, it would be impossible to limit relief to K.R., yet allow Defendants to demand compliance with the Final Rule as to everyone else who uses those facilities at her school. Accordingly, relief for K.R. is appropriately provided by enjoining Defendants from implementing or enforcing the Final Rule at her school. As for the Plaintiff Organizations, given their standing to seek relief on behalf of their members, the appropriate scope of relief there is, similar to the relief provided for K.R., to enjoin implementation and enforcement of the Final Rule at any school attended by a member of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.

While the scope of this relief is broad, it follows the traditional approach of limiting injunctive relief to the parties to this litigation. Moreover, there is no obvious reason to limit the relief sought by Plaintiff Organizations to the geographic limits of the co-plaintiff States. The Plaintiff Organizations demonstrated standing in their own right; thus, they could have brought this suit on their own without joining with Plaintiff States. Accordingly, it makes no sense to penalize Plaintiff Organizations by circumscribing the scope of relief to which they are otherwise entitled by limiting it to the States represented by their co-plaintiffs. To rule otherwise would risk rendering the participation of the Plaintiff Organizations a legal nullity because they would have obtained the same relief through the participation of Plaintiff States.

Finally, nothing in this order limits the ability of any school to adopt or follow its own policies, or otherwise comply with applicable state or local laws or rules regarding the subjects

addressed herein.  Rather, it simply prohibits Defendants from demanding compliance with the Final Rule by the schools affected by this order, or imposing any consequences for such schools' failure to comply with the Final Rule.

Accordingly, Defendants are enjoined from implementing or taking any action to enforce the Final Rule against Plaintiff States, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.  In order to effectuate this preliminary injunction, Plaintiff Organizations are directed to file a notice in the record identifying the schools which the members of Young America's Foundation or Female Athletes United attend, as well as the schools attended by the minor children of the members of Moms for Liberty, on or before July 15, 2024. This filing should not identify members of those organizations or the children of any such members.  Rather, it should provide notice to Defendants of the schools as to which this order enjoins enforcement of the Final Rule.  Should Defendants conclude that they need to know the names of members or their children, Defendants can seek that information through discovery and the court can evaluate the propriety of any such requests and the need for protective orders or similar tools surrounding disclosure of such information, all in a more concrete context.

## F.  Bond

Under Rule 65(c), the court may issue an injunction "only if" the moving party provides security sufficient to cover damages sustained by the enjoined party if that enjoined party were wrongly enjoined.  Private Plaintiffs ask the court to waive the bond requirement.  (Doc. 43 at 35 n.9.)  In the Tenth Circuit, district courts have "wide discretion" in determining "whether to require security." *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)

(emphasis added).  Where there is "an absence of proof showing a likelihood of harm" to the enjoined party, failing to require a bond is permissible.  *See id.*

Here, the court finds that no security is necessary in this case due to the strength of Plaintiffs' case and the public interest.  Moreover, the current regulations continue to be in effect which support a finding that the injunction will not harm Defendants.

## IV.   Conclusion

Plaintiffs' motion for a preliminary injunction (Doc. 24) is GRANTED.

Accordingly, it is hereby ordered that the United States Department of Education, Miguel Cardona, Secretary of U.S. Dept. of Education, the United States Department of Justice, Merrick Garland, Attorney General of the United States, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are ENJOINED from implementing, enacting, enforcing, or taking any action to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against Kansas, Alaska, Utah, Wyoming, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty.  Plaintiff Organizations are directed to file a notice in the record identifying the schools which their members or their members' children, as applicable, attend on or before July 15, 2024.[8]  IT IS SO ORDERED.  Dated this 2nd day of July, 2024.

  __s/ John W. Broomes_____
  JOHN W. BROOMES
  UNITED STATES DISTRICT JUDGE

---

[8] The court will enter the preliminary injunction by separate order.  *See Alaska*, 2024 WL 3208360, *20, n.14 (citing cases requiring a preliminary injunction to be entered by separate document).