**[ORAL ARGUMENT REQUESTED]**

**No. 24-3097**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

————————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court for the District of Kansas
No. 5:24-cv-04041-JWB-ADM
Hon. John W. Broomes

————————————

**BRIEF FOR APPELLANTS**

————————————

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ..........................................................3

STATEMENT OF THE ISSUE...................................................................4

STATEMENT OF THE CASE ....................................................................4

    A.    Title IX and the Final Rule...........................................................4

    B.    Prior Proceedings.........................................................................7

        1.    District Court Proceedings .................................................7

        2.    Appellate & Related Proceedings ......................................10

SUMMARY OF ARGUMENT.................................................................. 12

STANDARD OF REVIEW ...................................................................... 18

ARGUMENT ............................................................................................ 18

I.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges................. 18

    A.    Gender-Identity Discrimination Is Necessarily a Form of Discrimination on the Basis of Sex................................................18

    B.    The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text.........................................................................................26

    C.    The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns...........................................34

II.    The Remaining Factors Weigh Against Preliminary Injunctive Relief.............. 41

    A.    Plaintiffs Failed to Establish Irreparable Harm. ........................41

    B.    The Equities and Public Interest Weigh Against an Injunction..............45

III.    At a Minimum, the Injunction Is Overbroad......................................................... 47

CONCLUSION ................................................................................................................ 52

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville,*
75 F.4th 760 (7th Cir. 2023) ................................................................ 21, 28

*Adams ex. rel. Kasper v. School Bd. of St. Johns Cty.,*
57 F.4th 791 (11th Cir. 2022) ................................................................ 30

*Alabama v. Cardona,*
--- F. Supp. 3d ----, 2024 WL 3607492 (N.D. Ala. July 30, 2024),
*mot. for inj. pending appeal granted,*
No. 24-12444 (11th Cir. Aug. 22, 2024) ................................................ 11

*American Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980) ............................................................... 42-43

*Arkansas v. U.S. Dep't of Educ.,*
--- F. Supp. 3d ----, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ............. 11

*Arnold, Constable & Co. v. United States,*
147 U.S. 494 (1893) ............................................................................. 24

*Aviva Life & Annuity Co. v. FDIC,*
654 F.3d 1129 (10th Cir. 2011) ............................................................. 31

*Bostock v. Clayton County,*
590 U.S. 644 (2020) .............................. 2, 5, 6, 12, 19, 20, 21, 22, 23, 24, 25, 26, 30, 51

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................................. 47

*Cannon v. University of Chi.,*
441 U.S. 677 (1979) ............................................................................. 45

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.,*
--- F. Supp. 3d ----, 2024 WL 3381901 (N.D. Tex. July 11, 2024) ............. 11

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999) ............................................................................. 35-36, 36

*Delsa Brooke Sanderson v. Wyoming Highway Patrol,*
976 F.3d 1164 (10th Cir. 2020) ............................................................. 39

*Department of Educ. v. Louisiana,* --- S. Ct. ---,
Nos. 24A78, 24A79, 2024 WL 3841071 (U.S. Aug. 16, 2024) ......... 11, 12, 19, 51, 52

*Doe v. University of Denver*,
  952 F.3d 1182 (10th Cir. 2020) ....................................................... 21

*First W. Capital Mgmt. Co. v. Malamed*,
  874 F.3d 1136 (10th Cir. 2017) ...................................................... 41

*Florida v. Department of Health & Human Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ...................................................... 44

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024) ....................................... 2, 13, 19, 22

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) .......................................................... 42

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................ 18

*Grabowski v. Arizona Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ........................................................ 21

*Grimm v. Gloucester Cty. Sch. Bd.*,
  972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020) ............................ 21, 28

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ...................................................................... 24

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ...................................................................... 43

*Harmon v. City of Norman*,
  61 F.4th 779 (10th Cir. 2023) ............................................... 37, 38, 39

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ........................................................... 35, 36, 38, 40

*Heideman v. South Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ............................................ 41, 42, 51

*Initiative & Referendum Inst. v. Walker*,
  450 F.3d 1082 (10th Cir. 2006) ...................................................... 43

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) .......................................................... 1, 2, 4, 25, 34

*Louisiana v. U.S. Dep't of Educ.*,
--- F. Supp. 3d ----, 2024 WL 2978786 (W.D. La. June 13, 2024),
*stay denied*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) ........................ 11

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................... 45

*Members of the City Council of the City of L.A. v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ............................................................................. 39

*Merit Energy Co. v. Haaland*,
2022 WL 17844513 (10th Cir. Dec. 22, 2022) ............................................ 33

*Muldrow v. City of St. Louis*,
601 U.S. 345 (2024) ............................................................................. 26

*New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*,
854 F.3d 1236 (10th Cir. 2017) ....................................................... 18, 45

*New Mexico Health Connections v. U.S. Dep't of Health & Human Servs.*,
946 F.3d 1138 (10th Cir. 2019) ............................................................. 33

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020) ............................................... 42, 44

*Oklahoma v. Cardona*,
--- F. Supp. 3d ----, 2024 WL 3609109 (W.D. Okla. July 31, 2024) ........................ 11

*Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*,
109 F.4th 453 (6th Cir. 2024) ............................................................... 38

*Pennsylvania v. DeVos*,
480 F. Supp. 3d 47 (D.D.C. 2020) ........................................................ 42

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) ............................................................. 42

*Rowles v. Curators of the Univ. of Mo.*,
983 F.3d 345 (8th Cir. 2020) ......................................................... 38, 39

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006) ............................................................................. 38

*Tennessee v. Cardona*,
--- F. Supp. 3d ----, 2024 WL 3019146 (E.D. Ky. June 17, 2024),
*stay denied*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ............................ 11

*Texas v. United States,*
    --- F. Supp. 3d ----, 2024 WL 3405342 (N.D. Tex. July 11, 2024) ............................11

*Throupe v. University of Denver,*
    988 F.3d 1243 (10th Cir. 2021) ........................................................ 35, 39, 40

*Ward v. Utah,*
    398 F.3d 1239 (10th Cir. 2005) ................................................................ 37, 39

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 41, 47

**Statutes:**

Civil Rights Act of 1964:
    42 U.S.C. § 2000e-2(a)(1) ...................................................................... 5, 20
    42 U.S.C. § 2000e-2(e) .............................................................................. 24

Education Amendments of 1974,
    Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612 ......................................27

5 U.S.C. §§ 701-706 ........................................................................................ 3

20 U.S.C. § 1234g(a) ...................................................................................... 5

20 U.S.C. § 1681 ......................................................................................... 29

20 U.S.C. § 1681(a) .............................................................. 4, 18, 21, 23, 26, 50

20 U.S.C. § 1681(a)(6) .................................................................................. 6

20 U.S.C. § 1681(a)(6)(A) .............................................................................. 27

20 U.S.C. § 1681(a)(6)(B) .............................................................................. 27

20 U.S.C. § 1682 .............................................................................. 4, 5, 44

20 U.S.C. § 1683 ......................................................................................... 5

20 U.S.C. § 1686 .......................................................................... 4, 6, 15, 27, 29

28 U.S.C. § 1292(a)(1) .................................................................................. 3

28 U.S.C. § 1331 ......................................................................................... 3

28 U.S.C. § 1361 ........................................................................................ 3

**Regulatory Materials:**

34 C.F.R. § 100.7(a)-(d) .......................................................................... 5

34 C.F.R. § 100.8(a) ................................................................................. 5

34 C.F.R. § 106.2 ................................................................ 7, 10, 34, 35, 48

34 C.F.R. § 106.6(d) ................................................................................ 36

34 C.F.R. § 106.8(a) ................................................................................. 5

34 C.F.R. § 106.8(c) ................................................................................. 5

34 C.F.R. § 106.8(f) ................................................................................. 5

34 C.F.R. § 106.8(a) (2020) ................................................................... 50

34 C.F.R. § 106.8(c) (2020) ................................................................... 50

34 C.F.R. § 106.8(d) (2020) ................................................................... 50

34 C.F.R. § 106.9 .................................................................................... 49

34 C.F.R. § 106.10 ........................................................................ 6, 18, 48

34 C.F.R. § 106.16 .................................................................................. 49

34 C.F.R. § 106.30(a)(2) (2020) ............................................................ 35

34 C.F.R. § 106.31(a)(2) ............................................................ 6, 10, 27, 48

34 C.F.R. § 106.32 .................................................................................. 30

34 C.F.R. § 106.33 .................................................................................. 28

34 C.F.R. § 106.40(b) ............................................................................. 48

34 C.F.R. § 106.40(b)(3)(v) ..................................................................... 5

34 C.F.R. § 106.57(e)(2) ........................................................................... 5

34 C.F.R. § 106.44 ................................................................................... 5

34 C.F.R. § 106.44(j)(2) .................................................................. 48

34 C.F.R. §§ 106.45-106.46 ......................................................... 5, 48

34 C.F.R. § 106.48 ......................................................................... 49

34 C.F.R. § 106.71 ......................................................................... 48

34 C.F.R. § 106.71(a) (2020) ........................................................ 50

45 C.F.R. § 86.1 (1975) ................................................................. 50

45 C.F.R. § 86.3(a)-(b) (1975) ...................................................... 50

45 C.F.R. § 86.4 (1975) ................................................................. 50

45 C.F.R. § 86.6(a) (1975) ............................................................ 50

45 C.F.R. § 86.9(a) (1975) ............................................................ 50

45 C.F.R. § 86.9(c) (1975) ............................................................ 50

45 C.F.R. § 86.36(a)-(c) (1975) .................................................... 50

45 C.F.R. § 86.37(a)(2) (1975) ..................................................... 50

45 C.F.R. § 86.37(b) (1975) .......................................................... 50

45 C.F.R. § 86.38(a) (1975) .......................................................... 50

45 C.F.R. § 86.39 (1975) ............................................................... 50

45 C.F.R. § 86.51(a)(4) (1975) ..................................................... 50

45 C.F.R. § 86.53 (1975) ............................................................... 50

45 C.F.R. § 86.56(b) (1975) .......................................................... 50

45 C.F.R. § 86.59 (1975) ............................................................... 50

Exec. Order No. 14,021,
    86 Fed. Reg. 13,803 (Mar. 11, 2021) ........................................ 5

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .............................................................. 3

**Other Authorities:**

*Nondiscrimination on the Basis of Sex in Education Programs or*
  *Activities Receiving Federal Financial Assistance,*
  85 Fed. Reg. 30,026 (May 19, 2020) ................................................................. 5

*Nondiscrimination on the Basis of Sex in Education Programs or*
  *Activities Receiving Federal Financial Assistance,*
  89 Fed. Reg. 33,474 (Apr. 29, 2024) ............................... 1, 6, 7, 18-19, 21, 22, 25, 26,
  27, 28, 29, 30, 31, 32, 33, 35,
  36, 37, 38, 39, 40, 41, 48, 49

*Revised Sexual Harassment Guidance: Harassment of Students by*
  *School Employees, Other Students, or Third Parties,*
  66 Fed. Reg. 5512 (Jan. 19, 2001) ................................................................. 35

## RULE 28.2(C)(3) STATEMENT

There have been no prior or related appeals in this case. Several other challenges to the same rulemaking are pending in cases around the country.

# GLOSSARY

| | |
|---|---|
| Department | Department of Education |
| Rule | *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) |
| Title IX | Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 304-311 |

**INTRODUCTION**

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education to issue rules to effectuate the statute's sweeping prohibition on sex discrimination.

In April 2024, the Department exercised that delegated authority by issuing a rule that makes a variety of amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). The Rule does many things, ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Only three provisions of the Rule are relevant here—and in particular, those provisions are at issue only insofar as they apply to discrimination on the basis of gender identity.

The first provision (§ 106.10) clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex. The second (§ 106.31(a)(2)) provides that schools violate Title IX when they differentiate on the basis of sex in a way that causes a person more than de minimis harm and when that differentiation lacks a statutory basis; as relevant here, it means that individuals must be permitted to use restrooms consistent with their gender identity. And the third

(§ 106.2's definition of hostile-environment harassment) recognizes that unwelcome sex-based conduct that is "subjectively and objectively offensive" and "so severe or pervasive that it limits or denies" a person's ability to benefit from an educational program constitutes hostile-environment harassment. All three provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at 175, and all three are consistent with precedent of this Court and the Supreme Court.

Plaintiffs' challenges to these provisions are meritless. Section 106.10 flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). As this Court recently explained, *Bostock*'s essential insight "concerning the intertwined nature of transgender status and sex" is not confined to Title VII. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). Section 106.31(a)(2) likewise follows directly from the statutory text: unless the statute provides otherwise, it violates Title IX's general nondiscrimination mandate to treat a person differently on the basis of sex when that differential treatment causes more than de minimis harm. And § 106.2's definition of hostile-environment harassment, which requires recipients to address conduct that limits or denies students the right to an education free from sex discrimination, is consistent with the standards that courts—including this one—have long applied in both the Title IX and Title VII contexts.

The district court nevertheless entered a sweeping preliminary injunction barring the Department from enforcing the entirety of the Rule in Kansas, Alaska, Utah, and Wyoming as well as to thousands of individual schools across the country. In so holding, the court erred in refusing to apply *Bostock*'s central teaching—*i.e.*, discrimination on the basis of gender identity is necessarily discrimination on the basis of sex—to the materially indistinguishable language of Title IX.  Beyond that, the court erroneously found that the ordinary costs associated with implementing the Rule amounted to irreparable harm sufficient to warrant preliminary relief.  And the court failed to justify an injunction against the entirety of the Rule when it found plaintiffs likely to prevail in showing only three discrete provisions to be unlawful.

This Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction under 28 U.S.C. §§ 1331 and 1361, as well as 5 U.S.C. §§ 701-706.  Appx. Vol. 1, at 23-24.[1]  The district court entered a preliminary injunction on July 2, 2024.  Appx. Vol. 3, at 615.  Defendants timely appealed on July 10, 2024.  *Id.* at 616; Fed. R. App. P. 4(a)(1)(B).  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[1] Citations to "Appx. Vol. X, at XX" refer to the volume and page number of the appendix filed with this brief.

## STATEMENT OF THE ISSUE

In April 2024, the Department of Education issued a rule making numerous changes to its regulations implementing Title IX of the Education Amendments of 1972. After finding that plaintiffs were likely to succeed on challenges to three of the new or changed provisions, the district court preliminarily enjoined the Department from enforcing the entire Rule within four states and as to thousands of schools affiliated with the individual and associational plaintiffs. The question presented is whether the district court erred in entering the preliminary injunction.

## STATEMENT OF THE CASE

### A.     Title IX and the Final Rule

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 175 (2005); *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. And Congress established a detailed administrative enforcement scheme requiring the Department to first attempt to secure compliance through voluntary means before it may suspend or terminate

federal financial assistance. *See id.* §§ 1234g(a), 1682-1683; *see also* 34

C.F.R. §§ 100.7(a)-(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations

implementing the statute's prohibition on sex discrimination, including in 2020. *See*

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal*

*Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020). One month after publication

of the 2020 rule, the Supreme Court held that the prohibition on discrimination

"because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-

2(a)(1), necessarily encompasses discrimination because of sexual orientation and

gender identity. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). Following

*Bostock*, the President directed the Department to review the 2020 rule and existing

guidance "for consistency with governing law." Exec. Order No. 14,021, § 2(a), 86

Fed. Reg. 13,803, 13,803 (Mar. 11, 2021).

After an extensive public engagement process, the Department issued the Rule.

Among other things, the Rule streamlines requirements related to Title IX

Coordinators, 34 C.F.R. § 106.8(a); revises recipients' notice of nondiscrimination and

record-keeping requirements, *id.* § 106.8(c), (f); ensures access to lactation spaces for

breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); addresses a

recipient's response to sex discrimination, *id.* § 106.44; and provides recipients

additional flexibility regarding procedures to respond to claims of sex discrimination,

including sex-based harassment, *id.* §§ 106.45-106.46.

5

The district court's preliminary injunction decision concerns other provisions of the Rule.  Section 106.10 describes the scope of prohibited sex discrimination under Title IX.  It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  34 C.F.R. § 106.10.  As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'"  89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Separately, § 106.31(a)(2) details when separation or differentiation on the basis of sex constitutes prohibited sex discrimination.  It sets out the general principle that Title IX bars "different treatment or separation on the basis of sex" when such differential treatment or separation "discriminates … by subjecting a person to more than de minimis harm."  34 C.F.R. § 106.31(a)(2).  Section 106.31(a)(2) further provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex."  *Id.*  The provision recognizes, however, that Congress carved out certain contexts in which a school may permissibly differentiate on the basis of sex even though more than de minimis harm may result.  *Id.*; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities).

6

Finally, § 106.2 defines many terms, including "sex-based harassment." 34 C.F.R. § 106.2. One form of such harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." *Id.* Section 106.2 explains that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of several enumerated factors. *Id.*

Nothing in the Rule alters the existing regulation regarding sex-separate athletic teams, which is the subject of a separate rulemaking. *See* 89 Fed. Reg. at 33,817.

## B.    Prior Proceedings

### 1.    District Court Proceedings

Plaintiffs are Kansas, Alaska, Utah, and Wyoming, as well as a middle-school student from Oklahoma and three membership associations. Plaintiffs challenge the Rule's treatment of gender-identity discrimination, claiming that its application to contexts such as restrooms and pronouns will cause them irreparable harm. *See* Appx. Vol. 1, at 15-16 (asserting that the Rule would "institutionalize the left-wing fad of transgender ideology in our K-12 system and tie school funding to it"); *id.* at 49 (asserting that the Rule "would require students to use an individual's 'preferred pronouns' and names of choice"). Plaintiffs sought preliminary injunctive relief.

The district court preliminarily enjoined the Department from enforcing the entire Rule within plaintiff states, as to the plaintiff student's middle school, and as to schools attended by members (or the children of members) of the plaintiff associations.  Appx. Vol. 3, 568, 613.  The court held that § 106.10's inclusion of gender-identity discrimination in the scope of prohibited sex discrimination was contrary to Title IX, reasoning that the Rule "place[s] gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex" and thus "subvert[s] Congress' goals of protecting biological women in education."  *Id.* at 590.  The court rejected the Department's reliance on *Bostock*, opining that "uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX."  *Id.*  And the court determined that the "Tenth Circuit's decision in *Fowler* does not compel a different decision" because that case "implicated the Equal Protection clause."  *Id.* at 591.  For similar reasons, the court concluded that the major-questions doctrine and Spending Clause required clearer congressional authorization for the Rule.  *Id.* at 591-596.

The court also held that § 106.31(a)(2)'s de minimis harm standard contravened Title IX and was arbitrary and capricious.  The court questioned the Rule's application of that standard to certain contexts involving sex separation (*e.g.*, restrooms) but not others (*e.g.*, living facilities).  Appx. Vol. 3, at 589.  The court further faulted the Department for "fail[ing] to adequately consider several relevant factors" with respect

to individuals accessing "restrooms and locker rooms" consistent with their gender identity.  *Id.* at 605.[2]

Separately, the court held that § 106.2's definition of hostile-environment harassment contravened the First Amendment.  Appx. Vol. 3, at 596-600.  The court concluded that the standard was "overbroad" and "vague."  *Id.* at 596.  The court reasoned that the standard "chill[ed]" protected speech related to gender identity, such as the speech of students "who want to … refer to individuals with biologically accurate pronouns[] and speak in opposition to sharing bathrooms and other intimate spaces with individuals who do not share their biological sex."  *Id.* at 597.

Plaintiffs advanced a handful of other theories as to the Rule's invalidity, *see, e.g.*, Appx. Vol. 1, at 16, but the district court declined to address them, Appx. Vol. 3, at 607.  As to the remaining injunction factors, the court concluded that the equities favored plaintiffs and that plaintiffs faced irreparable injuries in the form of compliance costs and the infringement of individual First Amendment rights.  *Id.* at 605-606.

Regarding the injunction's scope, the court recognized that it "did not explicitly address all of the provisions in the Final Rule" and that the provisions it did address were covered by severability clauses.  Appx. Vol. 3, at 596.  But the court declined to limit the injunction to the challenged provisions or to the gender-identity-related

---

[2] The court rejected plaintiffs' arguments concerning athletics, explaining that the "Rule carves out an exception for the athletics regulation."  Appx. Vol. 3, at 590.

applications of the Rule that it deemed invalid. Instead, the court enjoined the Rule in its entirety within the four plaintiff states, as to the plaintiff student's middle school, and as to the plaintiff associations' members. *Id.* at 607-613. "In order to effectuate th[e] preliminary injunction" as to the latter group, the court instructed the plaintiff associations to file notices identifying the schools attended by their members or their members' children. *Id.* at 613. The court subsequently clarified that the injunction applied to "schools attended by the current and prospective" members of the plaintiff associations. Appx. Vol. 4, at 673. To date, plaintiffs have identified thousands of schools across the country purportedly attended by one of their unidentified members (or a child of one of those members). *See* Appx. Vol. 3, at 622-665; Appx. Vol. 4, at 677-739; *id.* at 744-778.

### 2.    Appellate & Related Proceedings

The Department filed an emergency motion in this Court seeking to partially stay the injunction. *See* Emergency Mot. for Partial Stay Pending Appeal (July 16, 2024). The Department asked the Court to stay the injunction except as to the following 2024 Rule provisions: (i) 34 C.F.R. § 106.31(a)(2), and (ii) 34 C.F.R. § 106.2's definition of hostile-environment harassment as applied to discrimination on the basis of gender identity. As of this filing, that application remains pending.

Numerous other challenges to the Rule are pending in cases around the country.[3]  In two such cases, the Solicitor General filed applications asking the Supreme Court to partially stay preliminary injunctions pending appeal.  The Court denied the applications, reasoning that "[i]n this emergency posture in this Court, the burden is on the Government as applicant" to show entitlement to relief and that "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule."  *Department of Educ. v. Louisiana*, --- S. Ct. -----, Nos. 24A78, 24A79, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam).  The Court also stated that it "today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to [the] three provisions of the rule" challenged by plaintiffs, noting that the dispute before the Court concerned whether "other provisions of the

---

[3] *See Alabama v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3607492 (N.D. Ala. July 30, 2024) (denying preliminary injunction), *mot. for inj. pending appeal granted*, No. 24-12444 (11th Cir. Aug. 22, 2024); *Louisiana v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 2978786 (W.D. La. June 13, 2024) (granting preliminary injunction), *stay denied*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam); *Tennessee v. Cardona*, 2024 WL 3019146 (E.D. Ky. June 17, 2024) (granting preliminary injunction), *stay denied*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3381901 (N.D. Tex. July 11, 2024) (granting preliminary injunction); *Texas v. United States*, --- F. Supp. 3d ----, 2024 WL 3405342 (N.D. Tex. July 11, 2024) (granting preliminary injunction); *Arkansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (granting preliminary injunction); *Oklahoma v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3609109 (W.D. Okla. July 31, 2024) (granting preliminary injunction).

new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson— dissented, explaining that the "injunctions are overbroad" because they "bar the Government from enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at *2 (Sotomayor, J., dissenting in part).

## SUMMARY OF ARGUMENT

**I.** The district court erred in holding that the challenged Rule provisions— and, in particular, their application to certain contexts involving gender-identity discrimination—were likely unlawful.

**A.** The Rule provision addressing the scope of prohibited sex discrimination (§ 106.10) properly recognizes that gender-identity discrimination is necessarily a form of sex discrimination. That conclusion follows directly from the statute's plain text and from the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination. That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to physiological or "biological distinctions between male and female." *Id.* at 655.

None of the district court's reasons for distinguishing *Bostock* withstand scrutiny. As this Court recently recognized, *Bostock*'s logic "concerning the

intertwined nature of transgender status and sex" is not confined to Title VII. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). That logic applies with equal force to the Title IX context. This Court and others assess claims arising under Title VII and Title IX under the same legal analysis because the statutes serve the same purpose of eradicating sex discrimination and impose the same causation standards. Title IX's various statutory exemptions do not suggest that its core prohibition against discrimination "on the basis of sex" can be read differently than Title VII's prohibition on discrimination "because of sex." The district court ran afoul of basic rules of statutory interpretation by relying on nebulous, atextual considerations like the court's sense of Title IX's history and purposes to conclude that "sex discrimination" carries different meanings in materially identical statutory text.

For largely the same reasons, the district court was wrong to conclude that the Rule likely violates the major-questions doctrine and the Spending Clause. Both holdings turned on the district court's erroneous conclusion that the Rule rewrites Title IX's definition of sex discrimination. But as the Supreme Court made clear in *Bostock*, the conclusion that gender-identity discrimination is a form of sex discrimination flows clearly from the statutory text. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the major-questions doctrine and Spending Clause have no application to the Rule.

13

**B.**     Section 106.31(a)(2) sets out the circumstances in which drawing sex-based distinctions constitutes prohibited discrimination.  Title IX does not prohibit all sex-based distinctions; rather, it bars only those distinctions that cause cognizable—*i.e.*, more than de minimis—harm.  At the same time, Congress identified certain contexts, such as fraternity membership and living facilities, in which recipients may draw sex-based distinctions—even if they cause harm—notwithstanding Title IX's prohibition on sex discrimination.  Section 106.31(a)(2) thus effectuates Title IX's text and structure by providing that, unless a statutory basis for the exception applies, a recipient may not separate or differentiate on the basis of sex in a manner that subjects a person to more than de minimis harm.

The Rule also details how § 106.31(a)(2)'s standard applies to gender-identity discrimination.  The Rule explains that preventing individuals from accessing sex-separate facilities and activities consistent with their gender identity subjects individuals to cognizable harm.  Recipients thus must permit individuals to access sex-separate facilities and activities consistent with their gender identity, unless those facilities or activities fall within a congressionally recognized exception.  Applying those principles to restrooms, the separation of facilities by sex generally does not violate Title IX because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom, and vice versa.  But because restrooms are not exempt from Title IX's nondiscrimination mandate and denying individuals the ability to access sex-separate restrooms consistent with their gender

14

identity causes cognizable harm, preventing transgender students from accessing restrooms that align with their gender identity would violate Title IX, as various courts have found.

The district court wrongly concluded that the de minimis harm standard's application to restrooms contravenes Title IX because restrooms fit into the statutory carve-out for sex-separate living facilities in 20 U.S.C. § 1686. But as the Department explained, § 1686's carve-out for living facilities is narrow and has never been understood to authorize the longstanding regulations governing restrooms, which were promulgated pursuant to Title IX's general nondiscrimination mandate rather than § 1686. Section 106.31(a)(2)'s application to restrooms thus reflects the deliberate choices that Congress itself drew in exempting certain contexts from the nondiscrimination mandate, without including any such exemption for sex-separate restrooms. The Rule neither conflicts with Title IX nor is unreasonable for carefully adhering to the statutory language that Congress actually enacted.

The district court also erred in concluding that the Department failed to adequately account for privacy, safety, and compliance concerns related to § 106.31(a)(2)'s application to sex-separate facilities. The Rule not only affirmed the importance of privacy and safety but also explained that nothing prevents recipients from ensuring the privacy and safety of all students in sex-separate facilities, including by enforcing existing prohibitions on harassment and other forms of misconduct. The Rule further explained that no credible evidence indicates that transgender

15

students pose a particular risk to their cisgender peers or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interests. And the Rule explained that recipients may take reasonable measures to verify an individual's gender identity for purposes of compliance with § 106.31(a)(2).

C.     The district court further erred in holding that § 106.2's definition of hostile-environment harassment contravenes the First Amendment. The standard announced in § 106.2 closely tracks the Department's longstanding interpretation of Title IX as well as the standard applied for evaluating hostile-environment harassment under Title VII. No court had previously found those standards in conflict with the First Amendment; to the contrary, various courts—including this one—have upheld those proscriptions on hostile-environment harassment without raising any First Amendment concerns. And if any doubt remained, the Rule makes clear that no provision requires or authorizes a recipient to violate anyone's First Amendment rights when addressing sex-based harassment.

The district court misapprehended the Rule's operation in suggesting that the hostile-environment standard is overbroad or vague. The Rule defines the scope of prohibited harassment narrowly in terms of specific and required elements and in language with common usage in the nondiscrimination context. Even if the bar on harassing conduct occasionally sweeps in speech, any impact on protected speech is not so substantial, either in absolute or relative terms, as to raise overbreadth concerns. Nor is the standard so indeterminate as to fail to put the public on notice

16

of what is prohibited. That courts—including this Court—have long applied analogous standards in both the Title VII and Title IX contexts without raising overbreadth or vagueness concerns demonstrates that § 106.2 comports with the First Amendment.

**II.** The remaining preliminary-injunction factors favor the government. Most importantly, plaintiffs failed to establish irreparable harm. The ordinary costs of complying with a federal regulation do not amount to irreparable harm, particularly where (as here) plaintiffs made no showing that their costs were sufficiently unusual or extensive to justify the extraordinary remedy of a preliminary injunction. Equally unavailing was the district court's abstract invocation of First Amendment rights, as plaintiffs identified no individual facing an objective and concrete threat of specific future harm. In contrast, the equities plainly favor the implementation of a regulation intended to fight sex discrimination in education, particularly in light of the district court's sweeping injunction, which applies to thousands of schools throughout the country attended by members (or the children of members) of plaintiff associations— schools that are not parties to this litigation, within states not parties to this litigation, and whose interests in implementing the Rule the district court never considered.

**III.** Finally, the preliminary injunction was at minimum substantively overbroad. The district court found only three provisions of the Rule invalid, and even then, only their application to specific contexts involving gender-identity discrimination. The Department's severability determinations make clear that the

remaining provisions could and should take effect even if those three provisions were enjoined. The district court's expansive injunction vastly exceeded what was necessary to redress "the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

## STANDARD OF REVIEW

This Court reviews "the district court's decision to grant a preliminary injunction for abuse of discretion," with the "district court's factual findings" reviewed for "clear error and its conclusions of law de novo." *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (quotation marks omitted).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges.

#### A. Gender-Identity Discrimination Is Necessarily a Form of Discrimination on the Basis of Sex.

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 106.10 describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at

18

33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)).  Section 106.10

thus makes clear that Title IX's prohibition on sex discrimination covers actions like

excluding a student from homecoming for being pregnant, giving a student detention

for being gay, or barring a student from band for being transgender.

 The district court's decision—mirroring plaintiffs' challenges—focused on

§ 106.10's inclusion of gender identity.  *See* Appx. Vol. 3, at 584-591; *see also* Appx.

Vol. 1, at 43, 56-57.  On that score, the court rejected the Rule's recognition that the

reasoning of *Bostock*, when applied to the text of Title IX, compels the conclusion that

discrimination based on gender identity is necessarily a form of discrimination "on the

basis of sex."  *See* Appx. Vol. 3, at 586-587.  But the reasons the district court gave for

that conclusion have no foundation in the text of the statute and cannot be squared

with the analysis in *Bostock* or this Court's decision in *Fowler v. Stitt*, 104 F.4th 770

(10th Cir. 2024).[4]

---

 [4] In denying the Department's stay applications in the related actions, the
Supreme Court did not address—or even mention—the applicability of *Bostock* to
Title IX's text.  Nor did it otherwise resolve the merits of the Department's appeals
from the preliminary injunctions.  The brief per curiam order merely noted that "all
Members of the Court today accept[ed]" that the plaintiffs there were entitled to
preliminary relief as to the challenged provisions, a statement describing only a stay-
stage determination regarding the preliminary injunctions, as the dissent made clear.
*Department of Educ. v. Louisiana*, --- S. Ct. -----, Nos. 24A78, 24A79, 2024 WL 3841071,
at *1 (U.S. Aug. 16, 2024) (per curiam); *see id.* at *2 (Sotomayor, J., dissenting in part)
("For now, on the briefing and record currently before us, I would stay the
preliminary injunctions except as to the three [challenged] provisions.").  The Court's
and dissent's analysis concerned only the separate question of whether "other
provisions of the new rule should still be permitted to take effect in the interim period

*Continued on next page.*

1. Section 106.10 reflects a straightforward application of *Bostock*'s reasoning. There, the Supreme Court confronted the provision of Title VII making it unlawful "for an employer … to discriminate against any individual … because of such individual's … sex." *Bostock*, 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even on the assumption that "sex" in Title VII "refer[s] only to biological distinctions between male and female," *id.* at 655, and without having to decide how the insight applies to sex differentiation in contexts such as "bathrooms, locker rooms, and dress codes," *id.* at 681.

---

while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals"—and again, addressed only whether the Department had satisfied its "burden … as applicant to show" in that "emergency posture" that it was entitled to a stay, without purporting to weigh in on the appeals that the Court noted were ongoing. *Id.* at *1; *see id.* at *2 (Sotomayor, J., dissenting in part).

*Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex," 20 U.S.C. § 1681(a). Title IX imposes a causation standard no more stringent than but-for causation under Title VII. *See Doe v. University of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." (quotation marks omitted)). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school, no less than an employer, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that in light of *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). That conclusion does not depend, the Department explained, on viewing the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

**2.** None of the district court's reasons for rejecting that conclusion are valid. The court emphasized that "the plain language of 'sex' in Title IX does not

21

mean 'gender identity.'" Appx. Vol. 3, at 586. But § 106.10 does not purport to redefine sex—it simply applies *Bostock*'s analysis to determine that discrimination on the basis of gender identity is necessarily discrimination on the basis of sex even assuming that "sex" refers only to physiological or "biological distinctions between male and female." *Bostock*, 590 U.S. at 655. Indeed, much of the district court's analysis appeared to be driven by the assumption that the Rule is somehow inconsistent with the view that "there are only two sexes, male and female." Appx. Vol. 3, at 584. But as discussed, § 106.10, like *Bostock*, recognizes that discrimination based on gender identity is sex discrimination even under that understanding of sex. 89 Fed. Reg. at 33,802.

The district court also dismissed *Bostock* on the ground that the decision was limited to Title VII. Appx. Vol. 3, at 586. But as this Court recently explained, nothing in *Bostock* "indicate[s] that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII." *Fowler*, 104 F.4th at 790. Rather, the Supreme Court's focus "on Title VII and the issue before it suggests a proper exercise of judicial restraint, not a silent directive that its reasoning about the link between homosexual or transgender status and sex was restricted to Title VII." *Id.* (applying "*Bostock*'s commonsense reasoning … in the equal protection context"). The district court's suggestion that *Fowler* has no bearing on this case simply because the decision concerned the Equal Protection Clause, Appx. Vol. 3, at 591, ignores this Court's conclusion that *Bostock*'s reasoning applies beyond Title VII claims. It also

ignores that, if anything, *Bostock*'s reasoning has greater force in the Title IX context given the shared purpose and nearly identical language of Title VII and Title IX.

Indeed, *Bostock*'s core insight—that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual *based on* sex," 590 U.S. at 660 (emphasis added)—applies equally to Title IX. If an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female" yet "retains an otherwise identical employee who was identified as female at birth," the employer has engaged in discrimination based on sex assigned at birth because it has "intentionally penalize[d] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Exactly the same is true under Title IX: a school that excludes or punishes a transgender female student for being transgender has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because it has penalized her for traits it would have tolerated in an otherwise identical student identified as female at birth.

The district court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different than Title IX's prohibition on discrimination "on the basis" of sex. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis" of for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)). And in other contexts, the Supreme Court has

23

explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

The district court also suggested that the "purpose[s]" of Title VII and Title IX differ.  Appx. Vol. 3, at 590.  But broad assertions regarding statutory purpose cannot undermine the straightforward textual analysis set out above.  In any event, the relevant purpose of both statutes is the same: to root out sex discrimination, albeit in different settings.  As for the fact that Title IX contains statutory provisions allowing sex separation in some education-specific contexts, *id.* at 586-587, those provisions hardly compel a different understanding as to the scope of prohibited sex discrimination in the first instance.  Title VII also contains statutory exceptions specific to the employment setting, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow sex separation or differentiation in certain contexts, like "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681.  Yet the Supreme Court still held that gender-identity discrimination is necessarily a form of sex discrimination.  The presence of statutory provisions that allow for sex separation in certain contexts only reinforces the Rule's conclusion:  they show that Congress understood Title IX's general prohibition against sex discrimination otherwise could have been applied to such separation or differentiation.  *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in

24

the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation marks omitted)).

**3.**      Finally, the district court erred in concluding that the Rule is suspect under the major-questions doctrine and the Spending Clause. Appx. Vol. 3, at 591-596. On both scores, the district court's holding stemmed from its erroneous conclusion that the Rule somehow "expand[ed] sex to mean gender identity." *Id.* at 591. As already explained, discrimination on the basis of gender identity is necessarily a form of sex discrimination covered by Title IX's text, even if sex "is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see supra* pp. 20-21. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the major-questions doctrine and Spending Clause have no bearing on the scope of prohibited discrimination in § 106.10. The statute places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms. *Cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (holding that Title IX's private right of action encompasses retaliation claims even though the statute does not specifically mention retaliation). And just as the major-questions doctrine posed no obstacle to *Bostock*'s recognition that Title VII prohibits gender-identity discrimination, as the Equal Employment Opportunity Commission had already concluded, it poses no obstacle to recognizing that the Department has correctly interpreted the parallel text of Title IX.

**B.     The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text.**

Section 106.31(a)(2) is the provision detailing when otherwise permissible separation or differentiation on the basis of sex constitutes prohibited sex discrimination.  It provides that subject to certain congressionally recognized exceptions, recipients may not differentiate on the basis of sex when doing so causes more than de minimis harm.  The district court concluded that § 106.31(a)(2)'s application to restrooms and locker rooms contravened Title IX, Appx. Vol. 3, at 588-590, and was arbitrary and capricious, *id.* at 601-605.  Neither conclusion withstands scrutiny.

1.     Section 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex.  20 U.S.C. § 1681(a).  As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."  *Bostock*, 590 U.S. at 681 (quotation marks omitted); *see Muldrow v. City of St. Louis*, 601 U.S. 345, 354 (2024) (same).  Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815,  Title IX prohibits "only" those sex-based distinctions "that subject[] any person to legally cognizable injury—*i.e.*, more than de minimis harm," *id.* at 33,814.  The Rule thus explains that recipients generally may not separate or differentiate on the basis of sex where doing so causes harm.

At the same time, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation." 89 Fed. Reg. at 33,814. Rather, the Rule recognizes that in certain contexts Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See* 89 Fed. Reg. at 33,816. Those limited contexts permit, among other things, sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); voluntary youth service organizations, *id.* § 1681(a)(6)(B); and "living facilities," *id.* § 1686. The Rule effectuates Congress's decision to treat those contexts differently by excepting them from § 106.31(a)(2)'s de minimis harm standard. 89 Fed. Reg. at 33,816.[5]

The Rule further specifies how § 106.31(a)(2) applies to gender-identity discrimination.[6] The Rule explains that, except as provided in the recognized exceptions, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity because "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 34 C.F.R. § 106.31(a)(2). As relevant here, the Department has long recognized that sex

---

[5] Congress also legislated separately regarding Title IX's application to athletics, *see* Education Amendments of 1974, Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612. As the district court correctly recognized, this case does not implicate the regulation concerning sex-separate athletic teams, which is the subject of a different, ongoing rulemaking. *See* Appx. Vol. 3, at 590; 89 Fed. Reg. at 33,817.

[6] Section 106.31(a)(2)'s protections are not limited to that context, instead applying "with equal force to all students." 89 Fed. Reg. at 33,818.

separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom or locker room, and vice versa. 89 Fed. Reg. at 33,818. That is why existing regulations permit sex-separate "toilet, locker room, and shower facilities," so long as the facilities are "comparable." 34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because doing so *does* cause cognizable harm and because restrooms are not exempted from the statute's general nondiscrimination mandate. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held that school policies that prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g.*, *A.C*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

**2.** The district court did not dispute that Title IX's nondiscrimination mandate generally prohibits sex differentiation or separation that causes more than de minimis harm. Nor did the court dispute the Department's conclusion—supported by ample case law—that preventing a person from participating in an education program or activity, including accessing a sex-separate facility, consistent with their gender identity subjects the person to harm. And the court recognized that Congress exempted certain contexts from Title IX's general nondiscrimination mandate, but not others. *See* Appx. Vol. 3, at 588 (recognizing that "Title IX's carve outs" mean

28

that "not all differential treatment based on biological sex is discrimination under Title IX").

The court nonetheless concluded that § 106.31(a)(2) cannot apply to restrooms and locker rooms because those facilities "appear to fall under the statutory category of living facilities" in 20 U.S.C. § 1686. Appx. Vol. 3, at 589. The court, however, misapprehended the scope of § 1686 and its relation to the Department's regulations allowing sex-separate restrooms and locker rooms. As the Rule explains, § 1686 "specifically carves out from Title IX's general statutory prohibition on sex discrimination an allowance for recipients to maintain sex-separate living facilities," but "that is the extent of the reach" of § 1686. 89 Fed. Reg. at 33,821. The "carve-out does not apply … to any other aspects of a recipient's education program or activity … such as bathrooms, locker rooms, or shower facilities[,] … which have long been addressed separately from 'living facilities.'" *Id.* That is why the Department's longstanding regulation regarding "toilet, locker room, and shower facilities" was promulgated in 1975 pursuant to the statute's general nondiscrimination mandate, 20 U.S.C. § 1681, not the living-facilities provision in § 1686. 89 Fed. Reg. at 33,821. By contrast, the Department's separate housing provision—which was

promulgated at the same time and is now codified at 34 C.F.R. § 106.32—expressly relied on § 1686 "as one of the sources of its statutory authority." *Id.*[7]

The court also suggested that applying the de minimis harm standard to restrooms but not living facilities "would be counterintuitive." Appx. Vol. 3, at 589. But § 106.31(a)(2) reflects the distinctions that Congress drew in enacting Title IX. Congress (not the Department) expressly excepted sex-separate living facilities—amongst other things—from Title IX's general nondiscrimination mandate. *See* 89 Fed. Reg. at 33,816. Congress "could have, but did not," include an exemption for sex-separate restrooms and locker rooms. *Id.* at 33,821. The Rule effectuates the distinctions Congress drew by recognizing that Title IX requires that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury"—including by preventing individuals from participating in a sex-separate program or activity consistent with their gender identity—"*unless there is a statutory basis for allowing otherwise.*" *Id.* at 33,814 (emphasis added). The Supreme Court "has explained many times" that courts may not "disregard [a statute's] plain terms based on some extratextual consideration," *Bostock*, 590 U.S. at 673-74, such as the district court's intuitions about Congress's purported intent in enacting Title IX.

---

[7] For much the same reason, the district court's ruling finds no support in *Adams ex. rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), which relied on assumptions similarly misapprehending the relationship between § 1686 and Title IX's implementing regulations, *see id.* at 811-13.

**3.**     The district court separately erred in holding that § 106.31(a)(2) was arbitrary and capricious.  Appx. Vol. 3, at 600-605.  The arbitrary and capricious standard requires only a "rational" explanation for the agency's actions.  *Aviva Life & Annuity Co. v. FDIC*, 654 F.3d 1129, 1131 (10th Cir. 2011) (quotation marks omitted).  The Rule's extensive discussion of § 106.31(a)(2)'s applications to sex-separate facilities—including issues related to safety, privacy, and compliance—easily satisfies this "highly deferential" standard.  *Id.* (quotation marks omitted).

Much of the district court's reasoning merely collapses into its flawed conclusion that the Rule contravenes Title IX.  Appx. Vol. 3, at 601, 604.  But as explained, the Rule reflects distinctions made by Congress, not the Department.  Congress excluded sex-separate living facilities and other specific contexts from Title IX's nondiscrimination mandate; it did not exempt restrooms or locker rooms.  *See* 89 Fed. Reg. at 33,816.  The Department clearly articulated how those congressional choices affect the Rule's operation, explaining that "§ 106.31(a)(2) applies in contexts for which there is no statutory exception, such as sex-separate restrooms and locker rooms."  *Id.* at 33,819.  It was hardly arbitrary and capricious for the Department to recognize the distinctions drawn by Congress and effectuate Title IX's nondiscrimination mandate accordingly.

The district court also opined that the Rule "failed to adequately consider" concerns related to "privacy and safety" in restrooms and locker rooms.  Appx. Vol. 3, at 603-605.  The Rule, however, thoroughly addressed these concerns, explaining

31

that the Department "agrees that recipients have a legitimate interest in protecting all students' safety and privacy" and that such goals are not "inconsistent with § 106.31(a)(2)." 89 Fed. Reg. at 33,820. The Rule emphasized that nothing prevents recipients from taking steps "to ensure privacy and safety for all students in a recipient's sex-separate facilities—steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further explained that recipients may "offer[] single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*

The court nonetheless insisted that the Rule "failed to consider" the purported "harm to non-transgender students with respect to the use of restrooms and locker rooms" posed by "transgender students." Appx. Vol. 3, at 605. But the Department reasonably explained that, based on its "enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." 89 Fed. Reg. at 33,820. The Department pointed to the experience of schools across the country who attested that, when "integrat[ing] transgender students into gender-specific facilities," "hypothetical fears and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Brief of School Administrators, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952 (4th Cir. Nov. 25, 2019),

2019 WL 6341095, at *18-19; *see* 89 Fed. Reg. at 33,820. It also noted that various court decisions have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820 (citing examples). No more was required to justify the conclusion that a "recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." *Id.*[8]

The district court likewise erred in suggesting that the Rule arbitrarily precludes recipients from taking reasonable measures to verify individuals' gender identity. Appx. Vol. 3, at 603-604. The Department explained that recipients may not require documentation that would be invasive or burdensome, or where "access to such documentation is prohibited by law." 89 Fed. Reg. at 33,819. But the Department also made clear that recipients may adopt non-burdensome measures, such as requesting "written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819 (noting also

---

[8] The court's suggestion that "evidence in this case," Appx. Vol. 3, at 601, undermines the Department's conclusion disregards the bedrock principle that the reasonableness of agency action is evaluated based on the "administrative record before the agency at the time the decision was made," not after-the-fact and anecdotal evidentiary submissions. *Merit Energy Co. v. Haaland*, 2022 WL 17844513, at *3 (10th Cir. Dec. 22, 2022); *see also New Mexico Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138, 1161-62 (10th Cir. 2019) (same).

that recipients may rely on "a student's *consistent* assertion" (emphasis added)). That hardly amounts to a requirement of allowing individuals "unfettered access" to sex-separate spaces on the basis of pretextual assertions of gender identity, as the court suggested, Appx. Vol. 3, at 604.

### C.    The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns.

The district court also erred in holding that the Rule's prohibition on harassment—particularly, the application of § 106.2's definition of hostile-environment harassment to certain contexts involving transgender individuals—contravenes the First Amendment. Appx. Vol. 3, at 596-600. The court's conclusion rests on a basic misapprehension of how the hostile-environment standard operates as well as a disregard for longstanding antidiscrimination practice and principles.

**1.**    It is well established that prohibited sex discrimination under Title IX includes sex-based harassment. *See Jackson*, 544 U.S. at 174. One form of prohibited harassment is hostile-environment harassment, which § 106.2 defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 34 C.F.R. § 106.2.

The Rule makes a handful of changes to the definition of hostile-environment harassment promulgated in 2020, but the standard announced in § 106.2 is hardly

novel.  *See* 89 Fed. Reg. at 33,497.  It closely tracks the Department's "longstanding

interpretation of Title IX" and accompanying "enforcement practice" prior to the

2020 amendments.  *Id.* at 33,508; *see Revised Sexual Harassment Guidance: Harassment of*

*Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19,

2001).[9]  It also mirrors the standards applied in the context of "numerous civil rights

laws, including Title VII."  89 Fed. Reg at 33,508; *see Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993) (applying a severe "or" pervasive standard to conduct that

"alter[ed] the conditions" of employment (quotation marks omitted)); *see also Throupe v.*

*University of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (assessing "Title IX

discrimination claims" premised on hostile-environment harassment "under the same

legal analysis as Title VII claims" (quotation marks omitted)).

    Prior to litigation over the Rule, no court had held that the standards for

evaluating hostile-environment harassment long applied in the Title VII and Title IX

contexts contravened the First Amendment.  To the contrary, the Supreme Court

upheld "similar proscriptions on hostile environment harassment" in both contexts

"without raising any First Amendment concerns."  89 Fed. Reg. at 33,505-06; *see Davis*

---

[9] Whereas the 2020 standard prohibited unwelcome sex-based conduct "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person" access to an education program or activity, 34 C.F.R. § 106.30(a)(2) (2020), the Rule prohibits unwelcome sex-based conduct that "based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies" such access, 34 C.F.R. § 106.2.

*ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) (Title IX);[10] *Harris*, 510 U.S. at 23 (holding Title VII's harassment standard applied to sex-based insults, despite First Amendment objections). That makes sense: A recipient can ensure that the classroom, like the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance," *Harris*, 510 U.S. at 21 (quotation marks omitted), and while simultaneously safeguarding the right of individuals to "engage in a civil discourse" on contentious issues consistent with the First Amendment, Appx. Vol. 3, at 599.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the Department expressly recognized that the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

---

[10] In *Davis*, the Court addressed the standard for a private damages claim premised on hostile-environment harassment brought under Title IX's implied right of action. 526 U.S. at 650. Although the *Davis* standard differs from § 106.2 in certain respects, the standard for private damages actions need not control in the administrative enforcement context. *See* 89 Fed. Reg. at 33,497-501. The district court, moreover, nowhere suggested that the Rule was invalid for departing from *Davis*.

2.      Although plaintiffs raised other First Amendment objections to § 106.2's definition of hostile-environment harassment, the court held only that the standard is so "vague" and "overbroad" as to "chill[]" protected speech.  Appx. Vol. 3, at 596. That was wrong.  An overbroad law prohibits a "substantial" amount of protected speech "judged in relation to its plainly legitimate sweep," while a vague law "fails to provide … a reasonable opportunity to understand what conduct it prohibits" and "encourages arbitrary and discriminatory enforcement."  *Harmon v. City of Norman*, 61 F.4th 779, 795, 797-98 (10th Cir. 2023) (alteration and quotation marks omitted). This Court has warned that because "facial" invalidation of an overbroad or vague regulatory scheme "push[es] the judiciary towards the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims."  *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005).  Such "strong medicine" is not warranted here.  *Id.* at 1246.

To start, nothing in the Rule "imposes a viewpoint" regarding "the affirmation of gender identity" or any other issue.  *Contra* Appx. Vol. 3, at 598 (quotation marks omitted).  Section 106.2's hostile-environment standard neither compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue."  89 Fed. Reg. at 33,505.  The Rule merely requires that schools receiving federal funding address sex-based harassment in their educational programs. Requiring schools to address sex-based harassment—even where it involves speech— is different in kind from "telling" individual students and staff "what they must say."

37

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). Indeed, the Rule makes clear that a recipient "must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503.

The hostile-environment standard also poses no overbreadth problems. It "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in" an education program or activity. 89 Fed. Reg. at 33,503. The Rule "only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] … is ignored." *Id.* at 33,506. Even if the prohibition occasionally "sweeps in speech," *id.* at 33,494, there is no indication that the standard prohibits a substantial amount of protected speech in an absolute sense or relative to the Rule's "plainly legitimate sweep." *Harmon*, 61 F.4th at 795 (quotation marks omitted); *see, e.g.*, *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 471 (6th Cir. 2024) (rejecting overbreadth challenge to similar harassment policy).

Courts and agencies have long applied analogous harassment standards in the Title VII and Title IX contexts. *See Harris*, 510 U.S. at 23; *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 352, 355 (8th Cir. 2020) (rejecting overbreadth challenge to standard nearly identical to § 106.2's hostile-environment standard). That includes

this Court, which has articulated and applied similar standards in cases arising under both statutes, without suggesting those standards raise issues of overbreadth.  *See, e.g.*, *Throupe*, 988 F.3d at 1251 (applying "severe or pervasive" standard to evaluate Title IX hostile-environment claim); *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020) (same as to Title VII hostile-environment claim).  The district court simply ignored this well-established precedent.

The court also failed to identify a "substantial number of … applications" in which the hostile-environment standard is "unconstitutional."  *Harmon*, 61 F.4th at 795 (quotation marks omitted).  Instead, the court focused on the Rule's application to a narrow set of contexts involving gender identity.  Appx. Vol. 3, at 599.  As explained, *supra* pp. 37-38, the court badly misunderstands the Rule's operation in those contexts.  In any event, this Court is "vigilant in applying a most exacting analysis" to the requirement that overbreadth be "substantial," *Ward*, 398 F.3d at 1247, and "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge," *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

Section 106.2's hostile-environment standard also is not vague.  It offers "specific and required elements," 89 Fed. Reg. at 33,506, "using language with common usage and understanding" in the antidiscrimination context, *Rowles*, 983 F.3d at 358.  And it enumerates relevant considerations based on factors that "courts and

agencies have used in evaluating a hostile environment" for decades in both the Title

VII and Title IX contexts.  89 Fed. Reg. at 33,512.  Indeed, while the district court

suggested that "there is no guidance as to how a recipient is to determine what

constitutes hostile environment harassment," Appx. Vol. 3, at 598, the Rule discussed

the required elements at length, including addressing the "objectively offensive" and

"limits or denies" elements that the court questioned, *id.* at 598-599 (quotation marks

omitted); *see* 89 Fed. Reg. at 33,509 (addressing "Subjectively and Objectively

Offensive"); *id.* at 33,511 ("Limits or Denies").  The hostile-environment standard's

specificity and long lineage more than suffices to put the public on constitutionally

adequate notice of its contours and demonstrates that it is neither unworkable nor

prone to arbitrary enforcement.

The district court's remaining grounds for deeming the hostile-environment

standard vague fare no better.  The court faulted the standard for being "entirely fact

dependent," Appx. Vol. 3, at 598, but the Supreme Court has explained that "whether

an environment is 'hostile' or 'abusive' can be determined only by looking at all the

circumstances," *Harris*, 510 U.S. at 23; *see also Throupe*, 988 F.3d at 1252 (same).

Likewise, the standard is not vague merely because it applies to discrimination based

on "gender identity," a term the Department declined to define.  *Contra* Appx. Vol. 3,

at 598.  The Department explained that "a specific definition" was unnecessary

because the "term is now well understood" and "used widely in laws and policies."  89

Fed. Reg. at 33,809.  Even so, the Rule explained that gender identity "describe[s] an

40

individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809.

## II. The Remaining Factors Weigh Against Preliminary Injunctive Relief.

The preliminary injunction should be vacated for the independent reason that plaintiffs have not made the requisite "clear showing" that the remaining preliminary injunction factors are satisfied. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs have not established that they will suffer immediate and irreparable harm absent the injunction. Nor have they demonstrated that the balance of harms and public interest weigh in favor of preliminary relief.

### A. Plaintiffs Failed to Establish Irreparable Harm.

A showing of irreparable harm is an essential "prerequisite for the issuance of a preliminary injunction." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quotation marks omitted). Demonstrating such harm "is not an easy burden to fulfill," *id.* (quotation marks omitted); the asserted "injury must be certain, great, actual[,] and not theoretical," *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation marks omitted). The district court erred in concluding that plaintiffs made that showing.

**1.** The only asserted harms that the district court deemed irreparable were the costs incurred by the plaintiff states in complying with the Rule and "the violation of First Amendment rights." Appx. Vol. 3, at 605-606. But plaintiffs in no way

carried their burden of showing that any such harms were sufficiently "certain" and "great" to justify preliminary injunctive relief. *Heideman*, 348 F.3d at 1189 (quotation marks omitted).

The plaintiff states' general averments that their schools will expend "time and money" to comply with the Rule are woefully insufficient to establish irreparable harm. Appx. Vol. 1, at 160, 172; Appx. Vol. 2, at 388. Plaintiffs made no effort to quantify their supposed compliance costs. Nor have they established that any such costs are "serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotation marks omitted). Absent such a showing, courts routinely reject claims of irreparable harm premised on undifferentiated costs. *See Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 68 (D.D.C. 2020) (rejecting claims of irreparable harm in challenge to 2020 Title IX rule); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 304 (S.D.N.Y. 2020) (same).

Moreover, the overwhelming majority of the costs about which plaintiffs speculate relate to unchallenged provisions of the Rule. *See, e.g.*, Appx. Vol. 1, at 169. Those costs represent the sort of garden-variety expenses that school districts incur every year. *See id.* (explaining that schools "annually train teachers and staff members on the requirements of Title IX"). As various courts have found, such "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see also American Hosp. Ass'n v.*

42

*Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm.").

Similarly, the district court's abstract concerns about First Amendment rights cannot justify a preliminary injunction. The court nowhere specified whose First Amendment rights were immediately threatened or how. Appx. Vol. 3, at 606. Of course, the plaintiff states cannot assert the constitutional rights of their citizens, as a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quotation marks omitted). And neither the individual plaintiff nor any of the identified members of the plaintiff associations identified an "objectively justified fear of real consequences" from the exercise of their First Amendment rights. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) (quotation marks omitted). To the contrary, plaintiffs' speculative declarations establish, at most, "mere allegations of a subjective chill," which "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (alteration and quotation marks omitted); *see* Appx. Vol. 1, at 180 ("I am afraid that … I could be punished for expressing my beliefs, for using accurate pronouns, and for declining to use inaccurate pronouns."); *id.* at 190 ("I fear that the Title IX rule changes deter female athletes from speaking out against males who identify as females."); *id.* at 213 ("I fear that I will be forced to say things I disagree with.").

**2.**     The plaintiff states below also asserted that they faced irreparable harm in the form of lost federal funding and the infringement of their sovereign interests. Appx. Vol. 1, at 57-62.  The district court did not deem those claimed harms irreparable, *see* Appx. Vol. 3, at 605-606, and for good reason.

Plaintiffs made no showing that any school within their states faced an imminent loss of federal funding.  That is hardly surprising, for "Title IX clearly provides that an agency may not take administrative action to revoke a recipient's funding until notice and opportunity to cure has been provided." *New York*, 477 F. Supp. 3d at 304 n.12.  In particular, funding cannot be terminated until (1) the Department has unsuccessfully endeavored to obtain voluntary compliance; (2) the recipient has had an opportunity to contest the Department's allegations at an administrative hearing; (3) the Department has provided notification to Congress; and (4) 30 days have passed.  *See* 20 U.S.C. § 1682.  The extensive review process required by statute renders any claim of harm premised on the loss of federal funding entirely theoretical.

Equally unavailing are the plaintiff states' assertions that the Rule causes them sovereign harm by preempting conflicting state law.  "[I]t is black-letter law that the federal government does not invade areas of state sovereignty simply because it exercises its authority in a way that preempts conflicting state laws." *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (alteration and quotation marks omitted).  "Indeed, to conclude otherwise would mean that a

state would suffer irreparable injury from all … federal laws with preemptive effect." *Id.* at 1292; *see also New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1255 (10th Cir. 2017) (holding that agencies' actions "complying with their congressionally-mandated responsibility" did not "invade[] or harm[] the State's sovereign interests"). Beyond that, many of the purportedly conflicting state laws or policies plaintiffs invoke are perfectly consistent with the Rule. *See* Appx Vol. 3, at 580 (citing laws about athletic teams and religious liberty).

**B. The Equities and Public Interest Weigh Against an Injunction.**

The remaining factors tilt decisively towards the Department. Every time the federal government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). The Rule effectuates Title IX's goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. University of Chi.*, 441 U.S. 677, 704 (1979). No one disputes that preventing discrimination serves a compelling public interest.

The harm to the Department is particularly pronounced here given the preliminary injunction's sweeping scope, which affects far more than the parties to this litigation. The court enjoined the Rule not only within plaintiff states and as to

45

the plaintiff student's middle school, but also as to individual schools attended by as-yet unidentified members (or the children of members) of the plaintiff associations. Appx. Vol. 3, at 612. That includes thousands of elementary, secondary, and post-secondary schools throughout the country, including many of the nation's largest colleges and universities. *See id.* at 622-665; Appx. Vol. 4, at 677-739; *id.* at 744-778. The district court seriously erred in its equitable analysis by extending the injunction to so many schools that have raised no objection to the Rule, attended by so many students that have raised no objection to the Rule, within so many states that have raised no objection to the Rule. The court did not even attempt to account for the disruption to these non-parties' ongoing Rule-implementation efforts or interests in the effectuation of the Rule. *See* Brief of Amici Curiae California, et al., at 2-4, *Tennessee v. Cardona*, No. 24-5588 (6th Cir. Aug. 13, 2024) (explaining on behalf of twenty states and the District of Columbia their "compelling interests in Title IX's prompt and full enforcement" and asserting harms to their schools under a "return to the 2020 [Title IX] Rule").

The injunction's scope, moreover, could expand further, creating additional uncertainty for the nation's schools and universities. The plaintiff associations are advertising the injunction via social media in an apparent attempt to expand their ranks. *See, e.g.*, @Moms4Liberty, X, (July 8, 2024, 7:40 AM), https://perma.cc/SMH2-RLHP (offering to "[e]xempt your child's school" from the Rule's coverage "by becoming a member"); @yaf, X, (July 4, 2024, 10:04 PM),

46

https://perma.cc/27ZM-23S2 (inviting the public to "Exempt Your School from the Biden Administration's Radical Rewrite of Title IX By Joining YAF!").  Despite the inequity of allowing individuals to join the plaintiff associations and enjoy the benefit of the injunction after the fact, the district court has since clarified that the injunction applies to "schools attended by the current and prospective" members of the plaintiff associations.  Appx. Vol. 4, at 673.  The fluid nature of the plaintiff associations' membership—and, by extension, the injunction—places school systems across the country in regulatory limbo, unable to proceed with any certainty as to the regulatory requirements they face from one day to the next, or from one campus to the next.

Plaintiffs, by contrast, have established no cognizable harm from complying with the Rule while they litigate their claims.  In any case, any such harms would be dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students have equal access to federally funded educational opportunities.  *Cf. Winter*, 555 U.S. at 23 (public interest in naval training "outweighed" irreparable injury to wildlife).

## III.    At a Minimum, the Injunction Is Overbroad.

Finally, at a minimum, the preliminary injunction was substantively overbroad, for "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" on their valid claims.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**A.**　　The court plainly erred in enjoining provisions of the Rule that plaintiffs did not challenge and that the court did not find unlawful.  The court admitted that it "did not explicitly address all of the provisions in the Final Rule," Appx. Vol. 3, at 607, much less find any of those unaddressed provisions unlawful.  Instead, the district court's decision addresses only three discrete Rule provisions:  § 106.10, § 106.31(a)(2), § 106.2's definition of hostile-environment harassment.  But the Rule made dozens of unrelated changes, most of which have nothing to do with gender identity.  To identify a few specific examples:

- The Rule requires schools to provide pregnant and post-partum students with reasonable modifications and to inform pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program.  34 C.F.R. § 106.2; *see* 89 Fed. Reg. at 33,481-33,884.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation.  34 C.F.R. § 106.71.

- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures.  34 C.F.R. §§ 106.45-106.46.

- The Rule affirms that recipients may disclose certain information to parents and legal guardians about their minor children.  34 C.F.R. § 106.44(j)(2).

None of those amendments depends in any way on the challenged provisions addressing gender-identity discrimination and harassment.  All of them would remain

fully operative if the challenged provisions were enjoined in whole or in part, and each of them could easily have been issued as separate rules.

The district court's decision to enjoin unaddressed provisions of the Rule is particularly problematic because, as the court recognized, Appx. Vol. 3, at 607, the Department specified that the Rule's provisions are "intended to operate independently of each other," 89 Fed. Reg. at 33,848.  The Department left no doubt that pre-existing severability clauses in the Title IX regulations apply to the Rule.  *Id.* Those clauses make clear that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby."  34 C.F.R. §§ 106.9, 106.16, 106.48.  The Rule thus expressly instructs that "the potential invalidity of one provision should not affect the other provisions."  89 Fed. Reg. at 33,848.

In particular, the Rule specifies that provisions not deemed unlawful "operate separately from the clarification of the scope of sex discrimination under § 106.10." 89 Fed. Reg. at 33,848.  Even if § 106.10 remained enjoined, every other provision of the Rule's amendments would continue to function simply by operating under Title IX's prohibition against discrimination "on the basis of sex," without any further regulatory gloss.  That includes: the unchallenged definitions in § 106.2; the requirements for Title IX Coordinators in § 106.8; the protections for pregnant and post-partum students in § 106.40; the provisions specifying recipients' obligations to

respond to discrimination in § 106.44; the grievance-procedure provisions in § 106.45 and § 106.46; the duties of employers in § 106.57 and § 106.60; and the clarification regarding retaliation in § 106.71.

Indeed, the Title IX regulations have long operated without such a regulatory gloss. The Department's pre-existing regulations (amended in 2020) repeatedly reference "sex discrimination" without defining that term or clarifying its scope. *See, e.g.*, 34 C.F.R. § 106.8(a) (2020) (Title IX coordinators); *id.* § 106.8(c) (2020) (grievance procedures); *id.* § 106.8(d) (2020) (extraterritoriality); *id.* § 106.71(a) (2020) (retaliation). Earlier regulations, too, have long referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *E.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a), (c), 86.36(a)-(c), 86.37(a)(2), (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). The term "sex discrimination" or its variants has been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), which confirms that analogous provisions of the Rule would likewise remain fully operative even if § 106.10 were enjoined.

**B.**     The district court also erred in enjoining § 106.10 and § 106.2 beyond its definition of hostile-environment harassment as applied to discrimination on the basis of gender identity. Even putting aside plaintiffs' failure to demonstrate a likelihood of success in their challenge to § 106.10, *see supra* pp. 18-26, plaintiffs do not identify any

50

harm they would suffer if they could not engage in discrimination on the basis of gender identity (let alone the other bases listed in § 106.10, such as pregnancy or sex stereotypes).  They have never suggested that they wish to punish transgender students "simply for being … transgender," *Bostock*, 590 U.S. at 651, by, for example, barring them from participating in the science fair, the marching band, or student government.

Likewise, § 106.2 amended a score of terms used throughout the Title IX regulations.  Plaintiffs challenge only the definition of hostile-environment harassment, primarily focusing on its application to discrimination on the basis of gender identity.  *See* Appx. Vol. 1, 49 (asserting that the Rule "would require students to use an individual's 'preferred pronouns'" and "honorifics").  There was no basis for enjoining any more of § 106.2 than this application of this definition.

**C.**    The Supreme Court's denial of the stay applications in the related actions does not justify upholding the district court's overbroad injunction here.  As the Supreme Court emphasized, the stay applications were evaluated in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief.  *Louisiana*, 2024 WL 3841071, at *1.  Here, by contrast, the burden is on plaintiffs to justify the district court's sweeping injunction.  *See Heideman*, 348 F.3d at 1189.  As explained, plaintiffs cannot do so, as the court "went beyond [its] authority to remedy the discrete harms alleged here" by "blocking the Government from enforcing scores of regulations that

51

[plaintiffs] never challenged and that bear no apparent relationship to [their] alleged injuries." *Louisiana*, 2024 WL 3841071, at *2 (Sotomayor, J., dissenting in part).

**CONCLUSION**

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*

*Of Counsel:*

LISA BROWN
  *General Counsel*          MELISSA N. PATTERSON
  *U.S. Department of Education*    */s/ David L. Peters*
                       STEPHANIE R. MARCUS
                       JACK STARCHER
                       STEVEN A. MYERS
                       DAVID L. PETERS

    *Attorneys, Appellate Staff*
    *Civil Division, Room 7209*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-1673*
    *david.l.peters@usdoj.gov*

August 2024

## STATEMENT REGARDING ORAL ARGUMENT

The federal government respectfully requests oral argument.  The district court preliminarily enjoined the Department from enforcing a regulation implementing Title IX's prohibition on discrimination on the basis of sex in education programs or activities receiving federal financial assistance.  Oral argument would facilitate the Court's consideration of the case.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,856 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*
David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Tenth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ David L. Peters*
David L. Peters

**ADDENDUM**

## TABLE OF CONTENTS

20 U.S.C. § 1681 ...................................................................................A1

20 U.S.C. § 1682 ...................................................................................A4

Memorandum & Order (July 2, 2024), ECF No. 53 ..........................................A5

Preliminary Injunction Order (July 2, 2024), ECF No. 54 ......................................... A52

**20 U.S.C. § 1681**

**§ 1681. Sex**

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

(4) Educational institutions training individuals for military services or merchant marine

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

(5) Public educational institutions with traditional and continuing admissions policy

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and

continually from its establishment has had a policy of admitting only students of one sex;

(6) Social fraternities or sororities; voluntary youth service organizations

this section shall not apply to membership practices--

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

(7) Boy or Girl conferences

this section shall not apply to--

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for--

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

(8) Father-son or mother-daughter activities at educational institutions

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

(9) Institution of higher education scholarship awards in "beauty" pageants

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals

A2

of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

…

**20 U.S.C. § 1682**

**§ 1682. Federal administrative enforcement; report to Congressional committees**

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

                Plaintiffs,

v.                                            Case No.  24-4041-JWB

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

                Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on Plaintiffs' motion for a stay/preliminary injunction. (Doc. 24.)  The motion has been fully briefed and is ripe for decision.  (Docs. 25, 38, 43, 45, 47.) Plaintiffs seek an injunction forbidding the "Final Rule"—as that term is defined herein—from going into effect on August 1, 2024.  (Doc. 24 at 1.)  The court held a hearing on the motion on June 20, 2024.  For the reasons set forth herein, Plaintiffs' motion for a preliminary injunction is GRANTED.

## I.     Facts and Procedural History

At its core, this case involves statutory interpretation of the word "sex" as that term is used in Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et. seq*.  The court begins with the history of Title IX and a review of the previous regulations issued by Defendant United States Department of Education (the "DoE").

In short, Title IX's text mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Title IX was enacted on June 23, 1972, after a lengthy

1

battle.  *See Tennessee v. Cardona,* 2024 WL 3019146, at *2 (E.D. Ky. June 17, 2024) (discussing the history of Title IX).  Title IX was "patterned after Title VI of the Civil Rights Act of 1964." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 684–85 (1979).  When the provisions were introduced in the Senate for debate, Senator Bayh commented that the "heart of this amendment is a provision banning sex discrimination in educational programs receiving federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982) (quoting 118 Cong. Rec. 5,803 (1972)).  He stressed that "one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women."  118 Cong. Rec. at 5,803.  He urged the passage of the amendment to "root out . . . the social evil of sex discrimination in education." *Id.* at 5,804.  It was clear to all that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).

There are exemptions to Title IX, including those for religious organizations, military institutions, and social fraternities.  § 1681.  Also, institutions of undergraduate higher education which traditionally and continually only admitted students "of one sex" were exempt. § 1681(a)(5).  Further, § 1686 states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  Congress also passed legislation authorizing federal agencies which are empowered to extend federal financial assistance to an education program or activity to issue rules or regulations that are consistent with achievement of the objectives of the statute.  20 U.S.C. § 1682.

The United States Department of Health, Education, and Welfare promulgated final regulations in 1975 concerning Title IX.[1] *Bell*, 456 U.S. at 515. The Title IX regulations included regulations in the area of athletics. High schools and colleges were given three years to comply with the regulation on athletics which required equal opportunities for "members of both sexes" to participate in athletics. 34 C.F.R. § 106.41(c), (d). The regulations also provided that a recipient "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Amendments to the regulations became effective on November 24, 2006, to "clarify and modify Title IX regulatory requirements pertaining to the provision of single-sex schools, classes, and extracurricular activities in elementary and secondary schools." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 71 Fed. Reg. 62530-01 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34). The third major amendment to the regulations occurred in 2020. These amendments addressed sex-based harassment as a form of sex discrimination, a recipient's obligation to address sexual harassment, grievance procedures, and implemented remedies for victims. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020) (codified in Title 34 of the Code of Federal Regulations). This was the first time that the regulations addressed sexual harassment and included a definition for that term. § 106.30.

On June 15, 2020, the United States Supreme Court issued *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020). The Court held that an employer violates Title VII of the Civil

---

[1] "HEW's functions under Title IX were transferred in 1979 to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 678, 20 U.S.C. § 3441(a)(3) (1976 ed., Supp. IV)." *Bell*, 456 U.S. at 516, n.4.

Rights Act of 1964 by firing an individual for being homosexual or transgender.  *Bostock*, 590

U.S. at 683.  On January 8, 2021, the DoE issued a memorandum regarding *Bostock*.  *See* U.S.

Dep't of Educ., Memorandum Re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) at 1 (Jan. 8,

2021) (rescinded in 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-

memorandum-01082021.pdf.  Notably, DoE stated that *Bostock* did not "construe Title IX," and

that the "Title IX text is very different from Title VII text in many important respects," including

that Title IX "contains numerous exceptions authorizing or allowing sex-separate activities and

intimate facilities to be provided separately on the basis of biological sex or for members of each

biological sex."  *Tennessee v. Dep't of Educ.*, No. 22-5807, ---F.4th---, 2024 WL 2984295, at *2

(6th Cir. June 14, 2024) (quoting the January 8, 2021, memorandum).  As the Sixth Circuit has

noted, however, the new Biden administration has an "opposite take" on *Bostock*.  *Id.*

On March 8, 2021, President Biden issued an executive order tasking the Secretary of

Education to review all existing regulations, orders, guidance documents, policies and other similar

agency actions to determine whether they were inconsistent with the Administration's policy that

all students be guaranteed an educational environment free from discrimination on the basis of sex

and discrimination on the basis of sexual orientation or gender identity.  *See* Exec. Order No.

14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021).  On June 22, 2021, the DoE published its interpretation

of Title IX in the Federal Register.  Enforcement of Title IX of the Education Amendments of

1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light

of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021).  Notably, this document is

currently enjoined from being applied to several States, including Plaintiffs Alaska and Kansas.

*Tennessee*, 2024 WL 2984295, at *26–27.

On July 12, 2022, the DoE published the proposed regulations in the Federal Register.  The DoE received more than 240,000 comments on the proposed regulations.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33477 (Apr. 29, 2024), the "Final Rule."  The Final Rule slightly modified some of the proposed regulations based on the comments and is set to take effect on August 1, 2024.  According to the Final Rule, the DoE amended the regulations to "better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate."  89 Fed. Reg. at 33,474.  The Final Rule's main changes identified by the DoE include a change in the grievance procedures for complaints of sex discrimination, clarifying that Title IX's prohibition on sex discrimination includes different forms of sex-based harassment and a modification to the definition of that term, and clarifying that sex discrimination "includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* at 33,476.

With respect to the expansion of what constitutes sex discrimination under Title IX, DoE believes that its definition of sex discrimination is "consistent with the Department's statutory authority under Title IX, prior and current Department guidance, various Executive Orders, and Federal case law precedents."  *Id.* at 33,804.  In support, DoE repeatedly references the Supreme Court's decision in *Bostock* throughout the Final Rule.  DoE acknowledges that the Supreme Court expressly stated that its decision in *Bostock* was only applicable to Title VII but relies on that decision for authority to promulgate the new regulations.

The new regulations also amend § 106.31 to add a provision related to differential treatment or separation on the basis of sex which is permitted under the statute or regulations.  A recipient must not carry out "such different treatment or separation in a manner that discriminates on the

basis of sex by subjecting a person to more than de minimis harm." Fed. Reg. at 33,887 (to be codified at 34 C.F.R. 106.31(a)(2). The regulation defines "more than de minimis harm" as "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." *Id.* The regulation states that § 106.31(a)(2) is not applicable to the aforementioned statutory exemptions to Title IX and the corresponding regulations to those exemptions. *Id.* DoE contends that the new regulation would not apply to sex-separate athletic teams permitted under § 106.41(b) as that regulation is carved out in § 106.31(a)(2). Fed. Reg. at 33,819. Section 106.31(a)(2) would apply to bathrooms and shower facilities. *Id.* at 33,819. Further, it would also apply to single-sex classes or portions of classes, such as physical education, that are allowed under the current regulations. *Id.*

The term "gender identity" is not defined in the new regulations. The DoE determined that it was not necessary to define the term. But the term is understood as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809. The DoE did not specify how a school should determine a student's gender identity. *Id.* at 33,819. However, requiring a "student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm." *Id.*

Further, the Final Rule amends the definitions for sexual harassment. The previous version of § 106.30 in which sexual harassment was addressed has been removed and there are amendments to the definition section (§ 106.2) which include a definition for "sex-based harassment." *Id.* at 33,884. The Final Rule also changes the grievance procedures with respect to the process that is required after a sex discrimination complaint is filed.

Plaintiffs filed this complaint on May 14, 2024.  (Doc. 1.)  Plaintiffs include the States of Kansas, Alaska, Utah, and Wyoming.   Plaintiffs also include K.R., a minor, and three organizations: Moms for Liberty, Young America's Foundation, and Female Athletes United (the "Plaintiff Organizations").   Plaintiffs allege that the Final Rule is contrary to law, in excess of statutory jurisdiction, arbitrary and capricious, violates separation of powers principles, violates the Spending Clause, and violates the First Amendment.  Plaintiffs seek a declaratory judgment holding the Final Rule unlawful and other related declaratory relief.   Plaintiffs also seek a preliminary and permanent injunction prohibiting Defendants from enforcing the Final Rule, as well as a stay of the Final Rule's effective date.  Plaintiff States all receive federal funding for their schools and are thus required to comply with the Final Rule.  A failure to comply with Title IX may result in termination of federal funding.  20 U.S.C. § 1682.  Plaintiff States assert that the Final Rule conflicts with laws passed in their states such as laws regarding separate facilities and restrooms for both sexes and prohibiting males from competing against females in sports.  (Doc. 25 at 25–26.)

Plaintiff K.R. attends a public middle school in Oklahoma.  K.R. has submitted an affidavit in support of the motion.  K.R. states that she has encountered biological males using the girls' restroom in her school.  (Doc. 25-4 at 3.)  She was very uncomfortable using the restroom with a biological male and did not feel safe. Because she didn't feel safe, she remarkably refused to use the restroom at school during this time period in which transgender students were allowed to use the restroom which corresponded with their gender identity.  Although most of the biological males using the girls' restroom identified as females, K.R. attested that on some occasions biological males who did not identify as female used the girls' bathroom because they knew they could get away with it.  (*Id.*)  Oklahoma passed a law which prohibits students from using a bathroom that

does not align with their biological sex.  Okla. Stat. Ann. tit. 70, § 1-125.  After the passage of this law, K.R. returned to using the school bathroom.  She fears, however, that the Final Rule will allow biological males to use the girls' bathroom.

Additionally, K.R. is a Christian who believes that God created two sexes, male and female. She also believes that a person cannot change their sex.  K.R. believes that it violates her religious beliefs to use a pronoun for an individual when that pronoun does not accurately reflect their sex. She has spoken on her beliefs at school.  K.R. fears that she will be punished under the Final Rule for declining to use a student's preferred pronouns and for expressing her religious beliefs.  (Doc. 25-4 at 6.)

Plaintiff Moms for Liberty is a national organization.  (Doc. 43-6.)  Its members' children attend schools that receive federal funding.  Its members include Merianne Jensen, Tricia Plank, Debbie Lochner, and Rebekah Koznek, who have all submitted declarations in support of the motion for injunctive relief.  Ms. Jensen lives in Virginia and has minor children in the Prince William County School District.  (Doc. 25-12 at 3.)  Ms. Plank lives in Pennsylvania and has minor children in the Upper Adams School District.  (Doc. 25-15.)  Ms. Lochner lives in New York and has a minor student in the Newark Central School District.  (Doc. 25-16.)  Ms. Koznek lives in California and has minor children in the Atascadero Unified School District.  (Doc. 25-13.)  The members declare that they and their children have deeply-held religious beliefs regarding gender identity and transgender issues similar to the beliefs of K.R.  They also share the belief that individuals should use the bathroom that aligns with their biological sex.  (Docs. 25-13 at 2; 25-15 at 2; 25-16 at 2.)  The members further state that their children share those views and have expressed them at their schools.  (Docs. 25-12, 25-13, 25-15, 25-16.)  Similar to K.R., their children have continued to use pronouns that align with biological sex based on their religious

beliefs.  They fear, however, that the Final Rule will subject them to school discipline for expressing statements related to gender identity.  Moms for Liberty has set also forth evidence that its mission would be impeded by the Final Rule by deterring its members and their children from expressing their viewpoints about gender identity and transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms. (Doc. 43-6.)

Plaintiff Young America's Foundation is a national organization devoted to promoting traditional values and providing students with resources to advance such values on college campuses.  (Docs. 1 at 7; 43-7 at 2.)  Young America has chapters on campuses across the country and including Kansas State University, the University of Utah, and the University of Wyoming. (doc. 43-7 at 2.)  Young America's members at these schools include declarants Thomas Adcock, Rachel Flynn, and Kailee Verdeyen.  All three have similar beliefs to K.R.  They plan to bring speakers to campus to discuss these issues with similar viewpoints and to personally engage in discussion on their views.  (Docs. 25-11, 25-10, 25-14.)  They are concerned that the Final Rule will subject them to investigatory or disciplinary proceedings and are afraid that they will be deterred from organizing events and speaking their views.

Plaintiff Female Athletes United ("FAU") is an organization that was formed to defend equal opportunity, fairness, and safety in women's and girls' sports.  (Doc. 25-5.)  FAU members A.R.S., T.P., and T.Z. attend public schools in Kansas, Wyoming, and Utah.  All three are minor students and play girls' sports at their schools and they currently do not have to play against biological males because of current state laws.  They also want to continue to speak freely about their views on women's sports, sharing intimate spaces with biological males, and issues related to gender identity.  They are concerned that they will be forced to express messages that they do

not agree with and want to continue speaking about their opinions on these issues in school. They are also concerned about having to share private places such as bathrooms and locker rooms with biological males. Sharing these intimate places make them feel uncomfortable and unsafe. (Docs. 25-7, 25-8, 25-17.)

On May 24, Plaintiffs filed a motion for a preliminary injunction. Plaintiffs seek a stay of the Final Rule under 5 U.S.C. § 705 prohibiting enforcement of the Final Rule during the pendency of this litigation. Defendants oppose the motion. The court held a hearing on the matter on June 20. At the hearing, the court heard oral argument from the parties and took the matter under advisement. The court has also reviewed an amici brief in support of Defendants filed by the Attorney General of New Jersey on behalf of several States that are not parties. (Doc. 41.) These States oppose the relief requested by Plaintiffs.

The court notes that there are several actions pending throughout the United States in which the plaintiffs in those cases raise similar claims and most of which have also sought injunctive relief. (*See* Doc. 36 at 3) (citing cases). At this time, two courts have issued decisions granting injunctive relief to the plaintiffs in those cases and enjoining the DoE from enforcing the Final Rule. *See Louisiana, et al. v. Dep't of Ed., et al*., No. 3:24-CV-00563, 2024 WL 2978786, at *2 (W.D. La. June 13, 2024); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, __ F. Supp.3d __, 2024 WL 3019146, at *1 (E.D. Ky. June 17, 2024). Those courts limited injunctive relief to the plaintiff States in those cases. This court joins those courts in granting injunctive relief to Plaintiffs as set forth herein.

## II.  Standard

Under the Administrative Procedures Act ("APA"), a reviewing court shall hold unlawful and set aside agency actions when the court finds such actions to be "(A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; or (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."  5 U.S.C. § 706(2).

Further, pursuant to 5 U.S.C. § 705, a court reviewing a final rule may stay the effective date of agency action pending conclusion of the review proceedings.  In determining whether to stay the effective date of the final rule, the court applies the same four factors traditionally used to analyze a request for a preliminary injunction.  *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *cf. Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980) (explaining that a § 705 stay is a provisional remedy in the nature of a preliminary injunction).  The four factors which must be shown by the movant to obtain preliminary injunctive relief include: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.  *Id*.  The third and fourth factors "merge" when the government is the party opposing the injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal.  *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  "Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant—viz., movants must satisfy a heightened standard.  They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'"  *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation omitted.)  "In seeking such an injunction,

the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* (citation and internal quotation marks omitted).

## III.   Analysis

Plaintiffs seek a preliminary injunction staying the effective date of the Final Rule.  In support, Plaintiffs contend that they will prevail on all of their claims.  Plaintiffs contend that the Final Rule is contrary to Title IX, violates the major questions doctrine, violates the Spending Clause and the individual Plaintiffs' constitutional rights, and is arbitrary and capricious.[2]  The court begins with the issue of standing and then turns to the arguments on the merits.  Ultimately, the court finds that Plaintiffs are likely to prevail on several claims and, as such, are entitled to injunctive relief.

### A.  Standing

The court has a duty to determine whether a party has standing if the court believes that there is an issue or if standing is raised by the parties.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).  In their response brief, Defendants only challenge standing with respect to Plaintiffs' claim that the regulation violates RFRA.  (Doc. 38 at 44–46.)  Constitutional standing requires (i) that the plaintiff suffer an "injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  These requirements ensure that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction."  *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  Where, as here, a

---

[2] While Plaintiffs raise additional arguments, the court declines to address those at this time in light of its finding that Plaintiffs will prevail on the issues addressed herein.

plaintiff seeks prospective relief such as an injunction, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). "The threatened injury must be certainly impending and not merely speculative." *Id.* (quotations and citation omitted). Plaintiffs have the burden to establish standing. *See Gandy*, 416 F.3d at 1154.

The court has no trouble finding that Plaintiffs have established standing with respect to their claims.[3] The Plaintiff States have laws pertaining to students' privacy and separation of students by their biological sex. The Plaintiff States allege that the Final Rule interferes with their sovereign right to create and enforce their own laws, imposes administrative costs and burdens, and requires Plaintiff States to redesign or reconfigure their physical facilities. (Doc. 1 ¶¶ 209, 210, 212.) States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Texas v. Cardona*, No. 4:23-CV-00604-O, ---F. Supp. 3d.---, 2024 WL 2947022, at *11 (N.D. Tex. June 11, 2024) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)). Here, Plaintiffs contend that DoE seeks to regulate Title IX in a manner that is not compatible with their state laws. *See* K.S.A. § 72-6286(a) (requiring that overnight accommodations on school travel be separated by sex of the student); Alaska Stat. § 14.18.040 (requiring that schools provide showers, toilets, and training-room facilities for both sexes for athletic or recreational purposes): Utah Code Ann. § 63G-31-301(1) (restrooms and changing rooms must correspond to the student's sex); and Wyo. Stat. Ann. § 21-25-102

---

[3] In any event, even if the individual Plaintiffs do not have standing on their RFRA claim, standing as to the other claims addressed herein has been plausibly alleged and this court's decision to grant preliminary injunctive relief is based on Plaintiffs' claims as addressed herein. Further, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1153, n.19 (10th Cir. 2022) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

(separating athletic activities by sex). Recipients of federal education funding in Utah are faced with having to either comply with Title IX or state law regarding bathroom use. As a result, those schools would have to reconfigure all bathrooms to comply with both state law and the Final Rule. (Doc. 25-3 at 3.)

Further, new duties are imposed under the Final Rule that were not required under the prior regulations. The States must now investigate allegations of sex discrimination based on gender identity discrimination. The States must comply with the requirement of new policies in accordance with the Final Rule and hire Title IX coordinators to make sure the policies are carried out. (Docs. 25-2, 25-3.) This is sufficient to show an injury for standing purposes. Further, Plaintiff States have standing due to the alleged injuries to their state universities. *See Tennessee*, 2024 WL 2984295, *4 (quoting *Arkansas v. Texas*, 346 U.S. 368, 370, 371 (1953) (holding that Arkansas had Article III standing to represent the interests of the University of Arkansas because under Arkansas law "the University of Arkansas is an official state instrumentality" and "any injury . . . to the University is an injury to Arkansas"). They are also threatened with a loss of federal funding if they fail to comply with the Final Rule. *Id.* at *5. The States have further sufficiently alleged that their injury is traceable to Defendants and redressable by a favorable ruling. *See id.* at *7; *see also Texas*, 2024 WL 2947022 at *18–19.

Next, K.R. and the Plaintiff Organizations have put forth evidence by way of declarations as discussed herein. In those declarations, K.R. and the Plaintiff Organizations' members attest to their religious beliefs that there are two sexes, a person's sex cannot be changed, and that they believe that they must use pronouns which align with a person's biological sex. They have all espoused these views at their schools. In light of the Final Rule, however, they are fearful that they would be subject to investigation and potential discipline for continuing to speak their views.

14

A18

The court finds that K.R. has standing to challenge the Final Rule. *See Kansas Judicial Review v. Stout*, 519 F.3d 1107, 116–17 (10th Cir. 2008) (discussing standing with respect to a First Amendment claim).

Turning to the Plaintiff Organizations, they have standing to sue on behalf of their members when (1) their members have standing in their own right; (2) the interests at stake are relevant to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the individual members to participate in the lawsuit. *See Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 181 (2000). Based on the affidavits submitted by the members of the Plaintiff Organizations, the court finds that those members have established standing to challenge the constitutionality of the Final Rule based on a potential chilling of their speech in violation of the First Amendment. *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) ("Parents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children.") (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007)). In their supplemental briefing, Defendants contend that the affidavits fail to show that the members face imminent, irreparable injury outside of the Plaintiff States. (Doc. 47 at 3.) This argument, however, is focused on the scope of relief. It does not suggest that this deprives the Plaintiff Organizations of standing.

Next, the interest at stake must be relevant to the organization's purpose. All three Plaintiff Organizations have submitted declarations setting forth their purpose. Moms for Liberty is a nationwide organization with chapters across the country. Moms for Liberty's mission is to defend the fundamental right of parents to raise their children in accordance with their values and morals. (Doc. 43-6.) Its mission would be impeded if the Final Rule went into effect by deterring its members and their children from expressing their viewpoints about gender identity and

15

A19

transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms. *Id.* YAF is a national organization with "thousands of student members on college campuses across the country" and in all fifty states. (Doc. 43-7.) Their mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. *Id.* Those values include the belief that sex is determined at birth, "there are two sexes/genders, and an individual cannot change his or her sex/gender." *Id.* at 2. If the Final Rule goes into effect, it will impede the mission by deterring their members from engaging in discussion about gender identity and transgenderism and it will deter students from hosting speakers who discuss these issues. *Id.* at 3. Finally, one of FAU's purposes and goals is that its members can "freely advocate in favor of fairness in women's sports at their schools." (Doc. 25-5 at 9.) This includes empowering its members to express views that males should not be permitted on women's teams or in private spaces such as restrooms and locker rooms. FAU members also want to express their beliefs that male athletes who identify as female are in fact males. *Id.* at 8. FAU is concerned that its members will lose their scholarships, privacy, and freedom of speech. Based on this review, the court finds that the interests at stake are relevant to the Plaintiff Organizations' purposes.

Finally, neither the claim nor the relief sought requires that the individual members participate. Plaintiffs are merely seeking declaratory and injunctive relief. (Doc. 1 at 81–83.) As such, the individual members do not need to participate. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009).

Based on the foregoing, the court finds that Plaintiffs have standing to challenge the Final Rule.

**B. Preliminary Injunction Element One: Prevail on the Merits**

### i. Contrary to Law

Plaintiffs argue that the final regulation is contrary to the plain language of Title IX in defining sex discrimination as discrimination on the basis of gender identity. The court must first look to the statute to determine its meaning. "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 590 U.S. at 654. Further, the court is to interpret a statute "in accord with the ordinary public meaning of its terms at the time of its enactment." *Id.* The Supreme Court recently held that the court "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enter. v. Raimondo*, ---S. Ct.---, 2024 WL 3208360, *22 (June 28, 2024). The court must exercise its "independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). At issue here is Title IX's command that an individual not be discriminated against "on the basis of sex." Therefore, the court must determine the ordinary meaning of this command. *Bostock*, 590 U.S. at 654. After review, the court finds that the unambiguous plain language of the statutory provisions and the legislative history make clear that the term "sex" means the traditional concept of biological sex in which there are only two sexes, male and female. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (discussing that the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme.")

Defendants do not dispute that at the time Title IX was enacted in 1972, the term "sex" was understood to mean the biological distinctions between males and females and conceded as such

during the hearing.  Tr. at 27–28; *see Bostock*, 590 U.S. at 655 (assuming that "sex" in Title VII referred only to the "biological distinctions between male and female"); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions) (discussing that in 1972, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions."); *Tennessee*, 2024 WL 3019146, at *9 (citing *The American College Dictionary* 1109 (1970) and *Webster's Third New International Dictionary* 2081 (1971) (sex was defined as "one of the two divisions of organic [sic] esp. human beings respectively designated male or female").

The legislative history also supports a finding that the term "sex" referred to biological sex. As discussed, one of the principal purposes of the statute was to root out discrimination against women in education.  The legislative history shows that Congress was concerned about the unequal treatment between men and women for admissions opportunities, scholarships, and sports.  The legislative history provided statistics on the number of women and men being included in various programs and activities. 118 Cong. Rec. at 5,804–06.  The legislative history is clear that Congress was referring to the biological sex of both males and females.

The text of the statute also supports a finding that the term "sex" meant biological sex and not gender identity or sexual orientation.  Title IX explicitly provides exceptions to the nondiscrimination mandate.  In one exception, the statute discusses that Title IX will not apply for a period of time to an institution which "admits only students of one sex" while that institution transitions to "being an institution which admits students of both sexes." § 1681(a)(2).  In another exception discussing "father-son" and "mother-daughter" activities, the statute states that such activities, if provided for "one sex," shall not be precluded for the "other sex" as long as the "other

sex" has opportunities for "reasonably comparable activities." § 1681(a)(8). Therefore, it is clear from the statutory language that the term "sex" refers to the traditional binary concept of biological sex. That is also supported by the ordinary meaning of the word "sex" at the time Congress enacted Title IX. Given this background, the plain language of "sex" in Title IX does not mean "gender identity."

Defendants do not make much effort to dispute that the term "sex" in Title IX means biological sex. Rather, Defendants argue that this makes no difference because discrimination on the basis of gender identity **is** discrimination on the basis of biological sex. (Doc. 38 at 19.) Therefore, the final regulation is not contrary to Title IX. In support of their position, Defendants rely on *Bostock* and other cases citing *Bostock* in support, including the Tenth Circuit's recent decision applying *Bostock* to the Equal Protection clause. *See Fowler v. Stitt*, No. 23-5080, ---F.4th---, 2024 WL 3035712 (10th Cir. June 18, 2024).[4]

The "only question" in *Bostock,* however, was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" in violation of Title VII. 590 U.S. at 681. First and foremost, *Bostock* involved a different statute, Title VII, which prohibits sex discrimination in employment. Although the statutes are similar in that they both prohibit sex discrimination, there are notable differences. Significantly, Title IX includes several carve outs to the prohibition on sex discrimination that are not present in Title VII. *See* § 1681(a)(1)–(9). Further, Title IX is about schools, and "the school is not the workplace." *Adams by & through Kasper v. Sch. Bd. of*

---

[4] The court also notes that in an unpublished opinion the Tenth Circuit assumed for purposes of an appeal "that under Title IX, discrimination on the basis of sexual orientation is sex-based discrimination." *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 23-2064, 2024 WL 1881076, at *8, n.9 (10th Cir. Apr. 30, 2024). This statement was contained in a footnote without discussion. Because the issue here was not presented to the court of appeals for review and the decision was unpublished, *Dimas* is neither binding nor helpful. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) ("[U]npublished orders are not binding precedent . . . .")

*St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) ("Courts, moreover, must bear in mind that schools are unlike the adult workplace."); *id.* at 675 (Kennedy, J., dissenting) (noting the "differences between children and adults, peers and teachers, schools and workplaces" and that "schools are not workplaces and children are not adults"). The Supreme Court also explicitly declined to address any other laws and the meaning of their terms or whether its holding would be applicable to "bathrooms, locker rooms, or anything else of the kind." *Bostock*, 590 U.S. at 681.

If *Bostock* expressly disavowed its application to bathrooms and showers under Title VII, it certainly has no application to bathrooms and showers under Title IX. Moreover, *Bostock* arose in a situation where the plaintiffs were employees of private businesses who were fired because of decisions they made as consenting adults regarding their private lives, and those decisions caused no harm to their employers, coworkers, or anyone else for that matter. In that sense, *Bostock* can fairly be described as a live-and-let-live decision where employers were prohibited from interfering with their employees' personal lifestyle choices when those choices had no bearing on the employees' abilities to perform their jobs. By contrast, this case involves the government's decision to interpose itself into the field of education, an area traditionally left to state and local governments and the schools, themselves, and in which the government's edicts result in the subordination of the interests of non-transgender students (many of whom are minors) in free speech, privacy, and safety to the interests of transgender students in expressing and conducting themselves in accordance with their individual notions of gender identity. These differences, among others, demonstrate why the reasoning from *Bostock* does not automatically transfer to the Title IX context, nor does *Bostock* compel the changes to the Title IX regulations encompassed by the Final Rule.

Notwithstanding these differences, Defendants assert that the Final Rule's definition of sex discrimination is not contrary to law because "it is impossible to discriminate against a person for being transgender 'without discriminating against that individual based on sex.'" (Doc. 38 at 12)( quoting *Bostock*, 590 U.S. at 660). In repeating this quote throughout their brief, however, Defendants are ignoring Title IX's carve outs which explicitly allow discrimination based on (biological) sex. These carve outs show that Congress recognized that recipients could properly discriminate on the basis of sex under certain circumstances. Therefore, not all differential treatment based on biological sex is discrimination under Title IX. Rather, Title IX "prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other. But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process." *Texas*, 2024 WL 2947022, at *31.

Specifically, Title IX provides that a recipient may maintain "separate living facilities for the different sexes." 20 U.S.C. § 1686. This "instruction is the authoritative expression of Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Texas*, 2024 WL 2947022, at *32 (citing 118 Cong. Rec. 5,807 (Feb. 28, 1972)). The Final Rule essentially renders meaningless the exemptions in Title IX. *Louisiana*, 2024 WL 2978786, at *11. The DoE argues that the Final Rule protects those exemptions because they are excepted from the new discrimination standard which provides that

> a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education

program or activity consistent with the person's gender identity subjects a person
to more than de minimis harm on the basis of sex.

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

DoE explains that this provision continues to allow sex separation based on biological sex
with respect to the statutory exceptions and the regulations regarding housing and athletics.
Essentially, under DoE's interpretation, a recipient may deny the request of a male student who
identifies as female to live in a female dormitory because that is a living facility.  By contrast, a
recipient may not deny that same male student access to the girls' restroom, shower, or locker
room because the regulation that allows sex separate facilities for restrooms and locker rooms will
now be subject to the new rule under which such conduct is categorically deemed to result in more
than de minimis harm to a transgender person.  DoE's justification is that Congress has allowed
sex segregation in, and only in, those limited circumstances identified in the statutory text.  DoE's
explanation does not pass muster because the "comparable facilities," i.e. bathrooms and locker
rooms, impacted by the Final Rule appear to fall under the statutory category of living facilities.
34 C.F.R. § 106.33.  The statute does not define "living facilities."  However, the implementing
regulations enacted after the passage of Title IX and §§ 106.32 and 106.33 directly correspond
with § 1686.  Section 106.32 deals with "housing," and § 106.33 with "comparable facilities."
Although the final regulations were "published without public comment," § 106.33 "was meant to
cover" § 1686.  *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023).
Bathrooms and locker rooms would be facilities that are used for activities of daily living such as
bathing and dressing.  Given Congress's stated concern about privacy for students, it would be
counterintuitive if that privacy only extended to students who lived in student housing.

Plaintiffs also argue that the Final Rule is contrary to Title IX in that it would allow
biological men to play on women's sports teams.  Defendants, however, argue that the athletics

regulation is not impacted by the new rule.  The Final Rule's proposed § 106.31(a)(2) does include the athletics regulation as a circumstance in which a policy may lawfully cause more than de minimis harm to students.  *See* 89 Fed. Reg. at 33,887.  There is also a proposed rule that will amend the athletics regulation.  *See* 89 Fed. Reg. at 33,839 (citing 88 Fed. Reg. 22,862.)  Because the proposed rule is not final and the Final Rule carves out an exception for the athletics regulation, the court has not considered the arguments on athletics in ruling on whether the agency acted without statutory authority in promulgating the Final Rule.  *See Louisiana*, 2024 WL 2978786, at *14 (declining to consider the effect of the Final Rule on sports at the preliminary injunction stage due to the proposed rule).

Significantly, the purpose of Title IX was to protect "biological women from discrimination in education[;] [s]uch purpose makes it difficult to sincerely argue that, at the time of enactment, 'discrimination on the basis of sex' included gender identity, sex stereotypes, sexual orientation, or sex characteristics."  *Id.*, at *12.  The DoE's reinterpretation of Title IX to place gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex would subvert Congress' goals of protecting biological women in education.  The Final Rule would, among other things, require schools to subordinate the fears, concerns, and privacy interests of biological women to the desires of transgender biological men to shower, dress, and share restroom facilities with their female peers.  Moreover, to expand sex discrimination to encompass "self-professed and potentially ever-changing gender identity is inconsistent with Title IX's sex-separation dictates."  *Texas*, 2024 WL 2947022, at *38 (citing *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result).  Because of these significant differences between Title IX and Title VII, uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX.  Although not briefed by the parties, the

Tenth Circuit's decision in *Fowler* does not compel a different decision for the same reasons. There, the question was whether purported discrimination based on transgender status was sex-based discrimination that implicated the Equal Protection clause.  2024 WL 3035712, at *13.  Here, the sex-based categories of Title IX are explicit—and the question is what the text of Title IX requires as a result.

The Final Rule's interpretation of sex and discrimination are therefore contrary to the statute and historical context of Title IX.  The court finds that Plaintiffs are likely to succeed on their claim that the DoE exceed its statutory authority in expanding the definition of sex discrimination in the Final Rule.  *See Tennessee*, 2024 WL 3019146, *13; *Louisiana*, 2024 WL 2978786, *12.

### ii.  Major Questions Doctrine

As discussed herein, the term "sex" is unambiguous as used in Title IX.  Moreover, under *Raimondo*, even if that term was ambiguous, it no longer results in deference to DoE's interpretation of the meaning of "sex" under Title IX.  2024 WL 3208360, at *22.  The court therefore does not defer to the agency's interpretation of Title IX with regard to the Final Rule. The DoE simply lacks authority to expand sex to mean gender identity.  The DoE is an administrative agency created by statute and, as such, only possesses "the authority that Congress has provided."  *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).  In issues of "vast economic and political significance," the Supreme Court has held that Congress must speak clearly if "it wishes to assign" such issues to an agency.  *Util. Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014).  This is because agencies "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line."  *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (internal quotations and citation

omitted). Therefore, if DoE's regulatory action in formulating the Final Rule "bring[s] about an enormous and transformative expansion in [the DoE's] regulatory authority," then there must have been "clear congressional authorization" for those actions. *Util. Air. Reg. Grp.*, 573 U.S. at 324. Here, Congress did not authorize the DoE to rewrite Title IX or "render any statutory provisions meaningless," which is the result of the Final Rule. *Texas*, 2024 WL 2947022, at *36.

In response to Plaintiff's argument, Defendants merely state that this is not a major questions case and that the DoE "does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity." (Doc. 38 at 55.) Rather, Defendants argue that the Final Rule is justified in light of *Bostock* and that the major questions doctrine should not be invoked because it was not invoked in *Bostock*. *Id.* Defendants' argument fails to grasp that the major questions doctrine is applicable to agency action that exceeds its authority. The major questions doctrine could not have been raised in *Bostock* because that case involved a claim of individual discrimination under Title VII; it was not a challenge to agency action. Therefore, Defendants' argument is not persuasive and they make no attempt to address Plaintiffs' arguments that this issue is a major question. Their bedrock position that the Final Rule is justified in light of *Bostock* carries no weight for the reasons stated herein.

The Final Rule clearly decides major questions involving whether to force schools, students, and teachers to accept an individual's subjective gender identity regardless of biological sex. Further, it determines whether biological males who identify as females are allowed in female bathrooms and locker rooms. It further prohibits requiring any medical documentation or other documents to determine whether those beliefs are sincere and there are no limits on how "many times a person may change their gender identity." *Louisiana*, 2024 WL 2978786, at *13. The Final Rule is applicable to "every public elementary school, middle school, high school, and

college in the United States that receives federal financial assistance." *Id*.  The reach of the Final Rule is clearly significant.  Further, States are threatened with hundreds of millions, or even billions, of dollars of lost funding if they fail to comply with the Final Rule.  Moreover, States who have conflicting state laws will be required to spend significant sums to make improvements to facilities to comply with the Final Rule and their own laws.  *Id.*

In deciding these questions, DoE has essentially taken it upon itself to answer questions that have prompted significant debate at both the state and federal levels in recent years.  *See Texas*, 2024 WL 2947022, at *36 and n.126 (citing authority).  In Congress, several proposals that would expand "Title IX's anti-discrimination provisions to include sexual orientation and gender identity" have been repeatedly rejected.  *Id.* (citing Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015); Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021); Equality Act, H.R. 5, 117th Cong. § 9(2) (2021)).  Further, the Final Rule represents an enormous invasion into the sphere of education, which has traditionally been an area where States have been sovereign.  *United States v. Lopez*, 514 U.S. 549, 564 (1995).

In sum, the court finds that the Final Rule involves issues of both vast economic and political significance and therefore involves a major question.  *See Louisiana*, 2024 WL 2978786, *14; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40.  As such, Congress must have given the agency "clear statutory authorization" to promulgate such a Final Rule.  *W. Virginia*, 597 U.S. at 723.  The court finds that Congress did not give such clear statutory authorization to the DoE.  *See Louisiana*, 2024 WL 2978786, *14–15; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40.  Therefore, Defendants do not have authority to expand the meaning of "sex discrimination" to include gender identity.

### iii. Spending Clause

The above analysis is sufficient to show a likelihood of success on the merits as to some of Plaintiff's claims. But the court further notes Plaintiffs argue that the Final Rule violates the Constitution's Spending Clause. Title IX was enacted pursuant to Congress's authority under the Spending Clause, which marks another substantial distinguishing feature between this case and *Bostock*. *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 181 (2005). Under Spending Clause jurisprudence, "Congress may attach conditions on the receipt of federal funds . . . [but] [s]uch conditions must (among other requirements) bear some relationship to the purpose of the federal spending[.]" *New York v. United States*, 505 U.S. 144, 167 (1992). If Congress desires "to impose a condition on the grant of federal moneys, it must do so unambiguously," so that the States may "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Legislation that conditions the receipt of federal moneys must (1) be in pursuit of the general welfare; (2) impose unambiguous conditions; (3) such conditions must relate to federal interests in the program; and (4) not induce unconstitutional action. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Here, Plaintiffs argue that the last three requirements are not met here because Title IX did not impose a condition regarding gender identity discrimination, the Final Rule is contrary to federal interests, and it will violate the First Amendment. (Doc. 25 at 52–56.) The court finds that Plaintiffs are likely to prevail on this claim in that Title IX did not unambiguously condition funds on the prohibition of gender identity discrimination and the Final Rule results in First Amendment constraints. As such, the court declines to address the argument that the Final Rule is contrary to federal interests.

Based on this court's extensive discussion herein, at the time of enactment, sex discrimination under Title IX meant discrimination based on biological sex. Title IX did not

prohibit discrimination based on gender identity. Defendants' arguments relating to *Bostock* are not persuasive for the reasons discussed. Defendants further contend that an express statement covering gender identity is not required and cite to *Jackson* in support. (Doc. 38 at 52–53.) In *Jackson,* the Supreme Court rejected an argument that Title IX did not encompass retaliation because the defendant was not on notice that it could be liable for retaliating against those who complain of Title IX violations. 544 U.S. at 182. While holding as much, the Court made clear that the Board was on notice because Title IX's private cause of action broadly encompasses "diverse forms of intentional sex discrimination," such as retaliation and sexual harassment. *Id.* at 183. The Court further explained the regulations prohibiting retaliation had "been on the books for nearly 30 years" and the courts had already interpreted Title IX to cover retaliation. *Id.*

In contrast, this case involves agency action in which the Final Rule expands the definition of sex discrimination. *Tennessee*, 2024 WL 3019146, *15. Further, DoE has not had regulations regarding gender identity discrimination on the books for several years and, just a few short years ago, took a position contrary to the one being advanced today. Therefore, a "clear statement from Congress equating 'sex' to 'gender identity' or 'transgender status is necessary before States' acceptance of federal funds may be conditioned on such a term." *Id*. Title IX does not provide such a statement. The Plaintiff States here did not knowingly and voluntarily agree to ignore the "differences between biological sex and gender identity in exchange for federal funds under Title IX." *Texas*, 2024 WL 2947022, at *41. Nor did they "agree to abolish sex-specific bathrooms, locker rooms, room assignments, and sports in exchange for Title IX's funds." *Id.* (citing *Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.")). In sum, Title IX falls short of providing notice to the Plaintiff States that "sex discrimination

includes gender identity." *Id.* at *42. Therefore, the Final Rule violates the Spending Clause because it introduces conditions for spending that were not unambiguously clear in Title IX. Further, based on the discussion *infra*, the Final Rule violates the Spending Clause because it violates' students First Amendment rights. *See Louisiana*, 2024 WL 2978786, at *16.

The court finds that Plaintiffs are likely to succeed on their claim that the Final Rule violates the Spending Clause. *See id.*; *Tennessee*, 2024 WL 3019146, *15.

### iv. First Amendment

K.R. and the Plaintiff Organizations assert that the Final Rule violates the First Amendment rights of individuals by compelling speech that aligns with Defendants' ideology, censoring speech through content-based restrictions and viewpoint discrimination, chilling speech through vague and overbroad language, and forcing individuals to engage in speech that violates their sincerely held beliefs. (Doc. 25 at 40.) The court finds that Plaintiffs have shown that the Final Rule violates the First Amendment by chilling speech through vague and overbroad language. See *Tennessee*, 2024 WL 3019146, at *24 (ruling that the Final Rule was vague and overbroad.) Given this ruling, the court declines to address all of Plaintiffs' arguments at this stage.

Plaintiffs assert that the Final Rule violates their constitutional rights because it is unconstitutionally vague and overbroad resulting in chilled speech. Chilled speech is different from the suppression of speech; it is self-imposed but nonetheless violates the First Amendment. *See Speech First, Inc. v. Sands*, 144 S. Ct. 675, 676 (2024) (Thomas, J., dissenting) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (discussing that "self-censorship" violates the "First Amendment just as acutely as a direct bar on speech")). The First Amendment's Free Speech Clause prohibits government entities and actors from "abridging the freedom of speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1326 (2024). When a vague law "abut(s) upon

29

A33

sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal citations and quotations omitted).  A regulation is also impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

Plaintiffs argue that the Final Rule's sexual harassment definition will chill students who want to articulate that sex is immutable and binary, explain their beliefs as to the differences between men and women, refer to individuals with biologically accurate pronouns, and speak in opposition to sharing bathrooms and other intimate spaces with individuals who do not share their biological sex.[5]  (Doc. 25 at 26–30, 44–46.)  They assert that the term "gender identity" is vague as it is not defined but is explained in the preamble to the Final Rule to be an individual's subjective sense of their gender.  (*Id.* at 44) (quoting 89 Fed. Reg. at 33,809.)  Further, the term sex stereotypes is defined as any asserted differences between males and females.  Moreover, and relevant to this particular aspect of Plaintiffs' claim, the standard for harassment has changed and now encompasses gender identity discrimination such that students are concerned that any speech that sex is immutable would risk a harassment claim.  Plaintiffs' concerns were shared by the general public as evidenced in the preamble.  89 Fed. Reg. at 33,809.

---

[5] Plaintiffs also argue that there is a chilling effect for students who wish to speak in opposition of allowing biological males to compete in women's sports, but the court does not consider this argument in its analysis due to the Final Rule's carveout for athletics.

With respect to the concerns that the term "gender identity" was impermissibly vague, the Department disagreed but offered no further guidance.  Rather, the Department stated that this "term of vital importance can be subjectively defined by each and every individual based entirely upon his or her own internal sense of self."  *Tennessee*, 2024 WL 3019146, at *24.  Further, although a student may not know "another's gender identity," the Department stated that gender identity discrimination remains sex discrimination.  89 Fed. Reg. at 33,809.

Turning to the sex-based harassment standard, hostile environment harassment is defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)"  *Id.* at 33,884 (amending 34 C.F.R. § 106.2).  This definition is vague and also overbroad because it is entirely fact dependent and there is no guidance as to how a recipient is to determine what constitutes hostile environment harassment.  Again, commenters raised these same concerns to the Department.  This is concerning given the Department's position on the issues of gender identity and misgendering.  As pointed out by Plaintiffs, the preamble makes clear that the Department views misgendering as potentially sex-based harassment.  The Department states that a "stray remark, such as a misuse of language, would not constitute harassment," but otherwise fails to identify what objectively constitutes harassment and under whose standard is it measured. 89 Fed. Reg. at 33,516.  Rather, the Department merely kept parroting the definition in support of its position that the standard is not vague or overbroad.  *Tennessee*, 2024 WL 3019146, at *26 ("Not only did the Department fail to meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined*.")  This is concerning because the "objective standard" is "inherently not objective at all because the Final Rule imposes a viewpoint

consistent with the affirmation of gender identity.  So, in the context of misgendering, the offensive conduct must be 'subjectively offensive' and 'objectively offensive' as viewed through the lens of someone who recognizes sex and gender to be separate and distinct."  *Id.* at *25 (quotations and citations omitted).

Notably, during the hearing, the court asked the DoE's counsel whether students could engage in a civil discourse regarding the issue of gender identity without being fearful of an accusation of sex-based harassment.  Specifically, the court asked defense counsel if a student were to state that she believes that sex and gender are the same, they are immutable, and/or that a person's gender identity cannot deviate from his or her biological sex, would that person be subjected to an actionable discrimination complaint under the Final Rule?  Defense counsel could not definitively answer the question and continued to state that it would depend on the facts and specific circumstances.  Counsel then stated that the complainant would also have to show that such speech limited or denied a person's ability to participate in or benefit from the recipient's education program or activity.  What does it mean to limit a person's ability to participate in an education program?  Those terms are not defined in the Final Rule and, as discussed at the hearing, the term "program or activity" as defined by Title IX means **all** operations of a school.[6]  *See* 20 U.S.C. § 1687.  Therefore, this standard for actionable discrimination under the Final Rule could conceivably be met in any circumstance where a student simply complained that he could not concentrate in class due to another student's statements on the topic of gender identity.  This interpretation is supported by the Department's statement that the student need not demonstrate a

---

[6] Indeed, as all counsel agreed at the hearing, the statutory definition of "program or activity" reaches every aspect of every part of every state and local government in the entire nation if any part thereof receives federal financial assistance.  *See* 20 U.S.C. 1687(1)(A).  And since pretty much every state and local government receives some federal funding of one kind or another, the practical application of this statute is to sweep in every aspect of every state and local government in the country.  The astonishing sweep of that language only gets pared down when section 1681 of title 20 limits the prohibitions against sex-based discrimination to any "education program or activity."

particular harm just "some impact on their ability to participate or benefit from the education program . . . ." 89 Fed. Reg. at 33,511. Therefore, contrary to defense counsel's argument that this language imposes some limit on the scope of a harassment claim, it does not; rather, it is an entirely subjective standard that is potentially met whenever the complainant alleges that the conduct or speech somehow impacts the complainant's education. And there is no objective standard to measure whether the complainant was actually impacted because there is no need to demonstrate harm.

In sum, the court finds that this standard is impermissibly vague and overbroad. *Tennessee*, 2024 WL 3019146, at *27. There was not one lawyer in the courtroom, including the undersigned, who was able to offer any possible explanation of what a parent should tell their child about the limits of legal speech at their schools on the topic of gender identity or sexual orientation under the Final Rule. The result is that speech is chilled because what student wants to "run the risk of being accused of" sex-based harassment and subjected to an investigation and potential discipline. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022).

### v. Arbitrary and Capricious

Finally, the court finds in the alternative that the Department acted arbitrarily and capriciously when promulgating the Final Rule. Even if the agency had the authority to alter the Title IX standard in this manner, the court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

> An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023) (quoting *Wyoming, U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011)).

Plaintiffs assert that they will succeed on this claim because the DoE's explanation for the Final Rule is implausible and the Final Rule is a sharp departure from past practice without reasonable explanation. With respect to their first argument, Plaintiffs contend that the agency action is implausible because the Final Rule inflicts harm on those it was meant to protect and elevates transgender individuals' interests. Essentially, Plaintiffs argue that the agency failed to consider and give weight to harm to females who will have to share intimate spaces with biological males. In response to this argument, Defendants argue that the DoE's reasoning flows from carefully considering the structure and text of Title IX. (Doc. 38 at 25.) The DoE asserts it fully considered and addressed privacy concerns and determined that there was a lack of evidence that transgender students posed a risk to non-transgender students in a single-sex space and asserted that such generalized concerns have been unsubstantiated. 89 Fed. Reg. at 33,820. The DoE determined that not allowing a biological male who identifies as a female to use the girls' locker room amounts to gender identity discrimination and always results in more than de minimis harm. By contrast, the agency concludes that a biological female is not harmed by having to share a locker room and shower with a biological male because her privacy concerns are not substantiated.

During oral argument, the court noted that such treatment elevates gender identity discrimination over the traditional view of biological sex discrimination that Title IX was intended to address. The DoE has determined that the harm to the transgender student is more than the harm to the biological female. In fact, according to the DoE, biological females are not harmed by having to share a bathroom and shower with biological males. Such a conclusion is not supported by the evidence in this case. Notably, K.R.'s affidavit states that she avoided using school

restrooms and that biological males who do not even identify as females went into the female restroom because they knew that they would get away with it and wanted to go into the female restroom with the girls.  (Doc. 25-3 at 3.)  Such fears by students, therefore, come from real and justified concerns.

Further, the DoE was faced with numerous comments in which similar fears about legitimate harms were expressed.  The State of Tennessee offered evidence of "numerous instances of males attacking females in public restrooms that were designated for females only."  *Tennessee*, 2024 WL 3019146 at *35 (citing to the administrative record).  This comment by Tennessee was not addressed at all in the preamble.  Further, the DoE's position ignores the fact that the biological sexes have long had separate spaces to use the restroom and shower and that this is based on a "significant privacy interest in [one's] unclothed" body.  *Id.* (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) and citing *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) ("most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'"); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy."); *Grimm*, 972 F.3d at 633 (Neimeyer, J., dissenting) (discussing that "courts have long recognized" an individual's bodily privacy interests are "significantly heightened when persons of the opposite biological sex are present.") (collecting cases).  That privacy interest was recognized by Congress as evidenced in the congressional record and as set forth in Title IX.  Further, the Supreme Court recognized that integrating an all-male military institution "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."  *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

In response to the court's questions about biological females' fears and safety concerns, especially in light of K.R.'s affidavit, defense counsel stated that the school should have policies in place to protect the student from transgender biological males using restrooms and locker rooms and that other States that require transgender students have access to the restrooms and locker rooms of their choice have not had privacy and safety concerns.  Further, counsel stated that a biological female who feels unsafe using the locker room or restroom could ask for an accommodation such as using the staff restrooms.  According to the DoE, such accommodation, however, is clearly not acceptable as a response to a transgender student.  Rather, that student is to use the restroom or shower facilities that align with the student's gender identity.  Moreover, the school cannot seek documentation or otherwise attempt to confirm the student's gender identity with a medical provider.  Defense counsel asserts that the recipient can put in place policies to verify gender identity, and the recipient can seek verification from a parent or coach.  The preamble merely discusses that the DoE is aware that some schools rely on the student, or written confirmation from a parent, a coach, or a teacher.  89 Fed. Reg. at 33,819.  However, this was merely an observation of current practices, not the DoE's blessing on such practices.  In the next sentence, the DoE clearly states that requiring a student to submit to "burdensome documentation requirements. . . imposes more than de minimis harm."  *Id.*  The DoE does not explicitly authorize any policy to determine a student's gender identity apart from said student's own statement and, in fact, dissuades a recipient from any documentation requirements, which could include a letter from a parent or coach.  Given that and the evidence before the court, it is not hard to imagine that, under the Final Rule, an industrious older teenage boy may simply claim to identify as a female to gain access to the girls' showers, dressing rooms, or locker rooms so that he can observe his female peers disrobe and shower.  Under the Final Rule, the recipients would appear to be obliged to

accept this young man's assertions and give him unfettered access to those female facilities, or else risk running afoul of the anti-discrimination provisions of the Final Rule. "Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with [biological] females in the girls' locker room goes beyond the scope of arbitrary and capricious." *Louisiana*, 2024 WL 2978786, at *19. "As the Department would have it, sex means sex except when gender identity comes until play. Not only is this an illogical distinction forbidden by Title IX's exclusions, but it would also constitute the very type of sex discrimination Title IX prohibits by privileging transgender persons with the ability to abide by their biological sex or not in order to take advantage of preferred benefits or services." *Texas*, 2024 WL 2947022, at *38.  Therefore, the Final Rule's explanation for its actions is implausible under the arbitrary and capricious standard.  Moreover, it is clear that the DoE failed to consider several important aspects of the problems raised by the Final Rule.

The Final Rule is also a sharp departure from past practice without reasonable explanation. The DoE claims that this rule is merely a clarification.  However, just two short years before the proposed rule was issued, the DoE stated that Title IX *did not* cover gender identity discrimination. Further, the Final Rule's attempt to reason the exceptions in section 106.31(a)(2) rings hollow. The DoE claims that a recipient may engage in sex discrimination, including gender identity discrimination, if it is done in accordance with a statutory exception or the athletics regulation. DoE's justification for allowing gender identity discrimination to continue in athletics is because of the unique considerations that athletics presents and its new proposed regulation which is not at issue here.  89 Fed. Reg. at 33,839.  However, the regulation regarding sex separation in restrooms and locker rooms has been in effect just as long as the athletics regulation.  And just as Congress was concerned about equal treatment in athletics, it was also concerned about privacy for students.

Therefore, the DoE has failed to adequately explain the reason for allowing continued sex separation in athletics but not in restrooms and locker rooms.

The court further finds that the DoE failed to adequately consider several relevant factors when drafting the Final Rule. The DoE failed to include requirements for a change in gender identity, failed to consider harms to non-transgender students, and failed to sufficiently explain how the harm to transgender students is outweighed by the harm to non-transgender students with respect to the use of restrooms and locker rooms. *See Louisiana*, 2024 WL 2978786, *19.

In sum, the court finds that the Final Rule is arbitrary and capricious because it offers an implausible explanation for agency action, is a sharp departure from prior action without a reasonable explanation, and failed to consider important interests as discussed herein.

### vi.  Conclusion

In sum, the court finds that Plaintiffs are likely to prevail on their claims that the Final Rule is contrary to law and exceeds statutory authority, the Final Rule is an unconstitutional exercise of legislative power under the Spending Clause, the Final Rule violates the First Amendment, and the Final Rule is arbitrary and capricious. In light of the decision herein and the relief available as discussed below, the court declines to address all of Plaintiffs' claims and arguments pertaining to other laws and provisions of the Final Rule.

### C. Preliminary Injunction Element 2: Irreparable Injury

The court finds that Plaintiffs have shown irreparable injury if the Final Rule goes into effect on August 1. Based on the declarations, Plaintiff States will incur costs that cannot be recouped including costs to update policies, materials, and hiring additional Title IX staff. Further, States are required to comply with the Final Rule in a short period of time. "Plaintiffs have sufficiently demonstrated that the compliance costs here are extraordinary due to the sweeping

policy changes they are required to implement and the short timeframe in which they must do so. And because the recovery of these costs would necessarily be barred, this factor weighs in favor of a finding of irreparable harm." *Tennessee*, 2024 WL 3019146, at *39 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.")). Further, private Plaintiffs have shown irreparable harm with respect to the violation of First Amendment rights. *Louisiana*, 2024 WL 2978786, at *19. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### D. Preliminary Injunction Elements 3 and 4: Balance of Harms and Public Interest

The final two factors involve balancing the harms to each party and the public interest. The Tenth Circuit has held that when a law "is likely unconstitutional," the government's interests do "not outweigh a plaintiff's interest in having [his or her] constitutional rights protected." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation and citation omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Further it is always in the public interest to "prevent the violation of a party's constitutional rights." *Id.*

Moreover, the regulations that are currently in effect have essentially "been unchanged for approximately 50 years. Therefore, it would be of relatively little harm to others to maintain the status quo pending the resolution of this lawsuit." *Tennessee*, 2024 WL 3019146, *42. The court finds that these factors weigh in favor of Plaintiffs.

### E. Scope

Plaintiffs seek to stay the Final Rule in its entirety and also ask the court for a nationwide preliminary injunction. In response, Defendants ask the court to allow some parts of the Final

Rule to go forward and to limit any injunctive relief to the Plaintiff States and K.R.'s school. Defendants point to the severability clause contained in each subsection in the current regulations which provides: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9; 106.18; 106.48; *see also* 89 Fed. Reg. at 33,848.

Although the court did not explicitly address all of the provisions in the Final Rule, the court finds that § 106.10, the new definition of sex discrimination, is unlawful for the reasons stated herein. That impermissible definition permeates the entire rule and, as such, it is difficult to excise the remaining regulations without also eliminating those regulations that involve sex discrimination. *Tennessee*, 2024 WL 3019146, at *43. Further, Plaintiffs will likely prevail on their claim that the DoE's rulemaking was arbitrary and capricious. Therefore, the Final Rule would be invalid in its entirety. *Id.* The court also declines to parse out the sections that may remain as "rulemaking is exclusively within the purview of the Executive Branch." *Id.* (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (asking whether the legislature would have "preferred what is left of its statute to no statute at all").

Finally, Plaintiffs seek a nationwide injunction[7] so that all parties may be provided relief. Defendants object to a nationwide injunction asserting that the relief should be limited to the Plaintiff States. Plaintiffs argue that universal relief is appropriate here because of the Plaintiff Organizations. In response, Defendants assert that it is not appropriate because the affidavits submitted are mostly limited to individuals in the plaintiff States. (Doc. 47.) Defendants

---

[7] As noted by Judge Crabtree recently, the "proper terminology for this request is unsettled." *Alaska v. United States Dep't of Educ.*, No. 24-1057-DDC-ADM, 2024 WL 3104578, at *17 (D. Kan. June 24, 2024) (discussing that courts have used both nationwide and universal in seeking such relief).

painstakingly review all of the declarations and the physical locations of the declarants in their supplemental brief to support their position that relief should be limited to the Plaintiff States and K.R.'s school even though some affidavits are from individuals in other States. But Defendants fail to cite any authority that injunctive relief should be so limited in light of Plaintiff Organizations' standing to bring this suit. As such, they can seek relief on behalf of all their members. An injunction limiting relief to Plaintiff States would not provide the Plaintiff Organizations complete relief.

The court recognizes that nationwide injunctions are the "subject of much debate." *Alaska*, 2024 WL 3104578, at *17, n.11. Both courts that have granted similar relief have limited that relief to the plaintiff States involved in those cases. *See Tennessee*, 2024 WL 3019146, at *43; *Louisiana*, 2024 WL 2978786, at *20. In *Louisiana*, the Plaintiffs included several school districts in Louisiana, and the States of Louisiana, Montana, Mississippi, and Idaho. 2024 WL 2978786, at *2, n.13. The Plaintiffs in *Tennessee* included Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia. 2024 WL 3019146, at *6. Those actions did not include private plaintiffs and are thus distinguishable.

Under section 705 of the APA a reviewing court is to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is under review. 5 U.S.C. § 705. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (citing *Doran v. Salem Inn, Inc*., 422 U. S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.") Nationwide injunctions are a "relatively new phenomenon" and a phenomenon which

the Supreme Court has yet to fully address. *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J., concurring) (discussing that "the propriety of universal injunctive relief [is] a question of great significance that has been in need of the Court's attention for some time.")  Problems with nationwide injunctions include depriving other courts of the opportunity to weigh in on these important questions, encouraging forum shopping, and circumventing rules governing class-wide relief. *Texas,* 599 U.S. at 694 (Gorsuch, J., concurring).  Issuing a nationwide injunction in this case would result in the court ordering Defendants to stop the Final Rule from taking effect for **everyone**, including States which clearly do not want such relief as evidenced in the amicus brief.  As discussed, this issue is currently being litigated in several districts and a nationwide injunction may result in one or more of those courts concluding that the plaintiffs can no longer show an irreparable injury in light of a decision granting universal relief. Both courts in *Tennessee* and *Louisiana* refrained from issuing nationwide injunctions at least in part because of the ongoing litigation in other courts.  Given the above, the court remains circumspect about the propriety of a nationwide injunction in this case.

In formulating a preliminary injunction, the court is to exercise its discretion and judgment in light of the "equities of a given case [and] the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted).  The Supreme Court instructs that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Here, Plaintiffs include organizations with members all over the country.  Therefore, to provide complete relief to all parties, the court must enjoin the Final Rule from going into effect against Plaintiffs and their members given the rulings herein.  At this time, there is no evidence before the court that enjoining the Final Rule from being applied to the members of the Plaintiff Organizations would be unduly burdensome to Defendants as opposed to providing a nationwide or universal injunction.

Instead, the court determines that the better path is to abide by the traditional approach and limit preliminary injunctive relief to the parties, including the members of Plaintiff Organizations.  That leaves it to Defendants, in the first instance, to determine whether patchwork enforcement of the Final Rule is feasible and worth the risk of running afoul of the court's injunction, thereby exposing Defendants and their representatives to sanctions for contempt.  This seems to align with the APA's admonition that, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."  5 U.S.C. § 705.  That is the first sentence in section 705.  It is only the second sentence of that section that empowers a reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  *Id.*  That sequencing of the statutory language suggests that the better approach is to allow the agency to evaluate the court's ruling and the scope of relief provided in order to determine whether a voluntary stay of the entire rule should be rendered until judicial review is completed.  The agency is in a far better position than the court to evaluate the practicalities and feasibility of continued enforcement of the rule in light of relief afforded to date.  In this case, that means that Defendants can evaluate the cumulative effect of relief provided by this court, along with relief provided in

other courts, both prior to and after this order is entered, in making a decision as to whether to stay the effective date of the Final Rule pending completion of judicial review.

Additionally, the court's decision is influenced by the Tenth Circuit's admonition that certain injunctions are disfavored and require heightened scrutiny, including "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Fish*, 840 F.3d at 723–24.  Under the APA, courts are ultimately authorized to set aside unlawful agency action, a remedy referred to as vacatur.  *See* 5 U.S.C. § 706(2).  "[V]acatur is universal in scope because an unlawful regulation cannot be vacated as to only one party." *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *47 (N.D. Tex. June 11, 2024) (citing *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ., et al.*, 98 F.4th 220, 255 (5th Cir. 2024)).  But that case was decided at summary judgment, not on a motion for preliminary injunction.  *See id.* at *1.  And while the Fifth Circuit case relied on for that proposition held that vacatur was appropriate even at the preliminary injunction phase, that conclusion remains the subject of substantial debate.  *See, e.g., Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J., concurring).  Granting a nationwide injunction in this case would effectively give Plaintiffs all the relief they might ultimately hope to obtain at the completion of this litigation – a decision better made with a fully developed record.  Suffice it to say that this court can fashion appropriate preliminary relief for Plaintiffs without resort to universal injunctions, leaving it to Defendants to determine in the first instance whether continued enforcement in compliance with this decision is worth the effort.  *See, e.g.,* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 476–79 (2017).

As for Plaintiff States, the court can enjoin implementation and enforcement of the Final Rule with respect to the States, including any education programs or activities within those States.

Turning to Plaintiff K.R., the court observes that counsel for Defendants conceded at oral argument that relief for K.R. should be imposed at the level of her school. The court agrees. By way of example, given that the flash points of this dispute involve matters such as how to segregate and restrict access to intimate spaces such as bathrooms, dressing rooms, and showers, it would be impossible to limit relief to K.R., yet allow Defendants to demand compliance with the Final Rule as to everyone else who uses those facilities at her school. Accordingly, relief for K.R. is appropriately provided by enjoining Defendants from implementing or enforcing the Final Rule at her school. As for the Plaintiff Organizations, given their standing to seek relief on behalf of their members, the appropriate scope of relief there is, similar to the relief provided for K.R., to enjoin implementation and enforcement of the Final Rule at any school attended by a member of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.

While the scope of this relief is broad, it follows the traditional approach of limiting injunctive relief to the parties to this litigation. Moreover, there is no obvious reason to limit the relief sought by Plaintiff Organizations to the geographic limits of the co-plaintiff States. The Plaintiff Organizations demonstrated standing in their own right; thus, they could have brought this suit on their own without joining with Plaintiff States. Accordingly, it makes no sense to penalize Plaintiff Organizations by circumscribing the scope of relief to which they are otherwise entitled by limiting it to the States represented by their co-plaintiffs. To rule otherwise would risk rendering the participation of the Plaintiff Organizations a legal nullity because they would have obtained the same relief through the participation of Plaintiff States.

Finally, nothing in this order limits the ability of any school to adopt or follow its own policies, or otherwise comply with applicable state or local laws or rules regarding the subjects

addressed herein.  Rather, it simply prohibits Defendants from demanding compliance with the Final Rule by the schools affected by this order, or imposing any consequences for such schools' failure to comply with the Final Rule.

Accordingly, Defendants are enjoined from implementing or taking any action to enforce the Final Rule against Plaintiff States, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.  In order to effectuate this preliminary injunction, Plaintiff Organizations are directed to file a notice in the record identifying the schools which the members of Young America's Foundation or Female Athletes United attend, as well as the schools attended by the minor children of the members of Moms for Liberty, on or before July 15, 2024. This filing should not identify members of those organizations or the children of any such members.  Rather, it should provide notice to Defendants of the schools as to which this order enjoins enforcement of the Final Rule.  Should Defendants conclude that they need to know the names of members or their children, Defendants can seek that information through discovery and the court can evaluate the propriety of any such requests and the need for protective orders or similar tools surrounding disclosure of such information, all in a more concrete context.

### F.  Bond

Under Rule 65(c), the court may issue an injunction "only if" the moving party provides security sufficient to cover damages sustained by the enjoined party if that enjoined party were wrongly enjoined.  Private Plaintiffs ask the court to waive the bond requirement.  (Doc. 43 at 35 n.9.)  In the Tenth Circuit, district courts have "wide discretion" in determining "whether to require security." *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)

(emphasis added).  Where there is "an absence of proof showing a likelihood of harm" to the enjoined party, failing to require a bond is permissible.  *See id.*

Here, the court finds that no security is necessary in this case due to the strength of Plaintiffs' case and the public interest.  Moreover, the current regulations continue to be in effect which support a finding that the injunction will not harm Defendants.

## IV.  Conclusion

Plaintiffs' motion for a preliminary injunction (Doc. 24) is GRANTED.

Accordingly, it is hereby ordered that the United States Department of Education, Miguel Cardona, Secretary of U.S. Dept. of Education, the United States Department of Justice, Merrick Garland, Attorney General of the United States, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are ENJOINED from implementing, enacting, enforcing, or taking any action to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against Kansas, Alaska, Utah, Wyoming, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty.  Plaintiff Organizations are directed to file a notice in the record identifying the schools which their members or their members' children, as applicable, attend on or before July 15, 2024.[8]  IT IS SO ORDERED.  Dated this 2nd day of July, 2024.

__s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

---

[8] The court will enter the preliminary injunction by separate order.  *See Alaska,* 2024 WL 3208360, *20, n.14 (citing cases requiring a preliminary injunction to be entered by separate document).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

        Plaintiffs,

v.                                    Case No.  24-4041-JWB

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

        Defendants.

## PRELIMINARY INJUNCTION

The United States Department of Education, Miguel Cardona, Secretary of U.S. Dept. of Education, the United States Department of Justice, Merrick Garland, Attorney General of the United States, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are ENJOINED from implementing, enacting, enforcing, or taking any action to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against Kansas, Alaska, Utah, Wyoming, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty.  Plaintiff Organizations are directed to file a notice in the record identifying the schools which their members or their members' children, as applicable, attend on or before July 15, 2024.

IT IS SO ORDERED.  Dated this 2nd day of July, 2024.

                                   _ s/ John W. Broomes_____
                                   JOHN W. BROOMES
                                   UNITED STATES DISTRICT JUDGE