No. 24-3097

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

———————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court for the District of Kansas
No. 5:24-cv-04041-JWB-ADM
Hon. John W. Broomes

———————————

## APPENDIX VOLUME 1 OF 4, PAGES 001 TO 263

———————————

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

# TABLE OF CONTENTS

**Page**

District Court Docket ................................................................ Appx001

Complaint for Declaratory and Injunctive Relief, ECF No. 1 .......................... Appx015

Memorandum in Support of Plaintiffs' Motion for a Stay/Preliminary
    Injunciton, ECF No. 25 ................................................ Appx100

Defedants' Opposition to Plaintiffs' Motion for a Stay or Preliminary
    Injunction, ECF No. 38 ................................................ Appx264

Reply in Support of Plaintiffs' Motion for a Stay/Preliminary Injunciton, ECF
    No. 43 .................................................................. Appx326

Supplemental in Support of Plaintiffs' Motion for a Stay/Preliminary
    Injunciton, ECF No. 45 ................................................ Appx391

Defedants' Supplemental Brief in Opposition to Plaintiffs' Motion for a Stay or
    Preliminary Injunction, ECF No. 47 .................................... Appx399

Transcript of June 20, 2024 Hearing, ECF No. 52 ............................. Appx406

Memorandum and Order, ECF No. 53 ......................................... Appx568

Preliminary Injunction, ECF No. 54 .......................................... Appx615

Notice of Appeal, ECF No. 58 ................................................ Appx616

Plaintiffs Young America's Foundation's, Female Athletes United's, and Moms
    for Liberty's Notice of List of Schools, ECF No. 67 ................... Appx618

Memorandum and Order, ECF No. 70 ......................................... Appx666

Plaintiff Moms for Liberty's Notice of List of Schools, ECF No. 72 .............. Appx674

Plaintiffs Young America's Foundation's, Female Athletes United's, and Moms
    for Liberty's Notice of Supplemtnal List of Schools, ECF No. 74 ........ Appx740

**Query    Reports    Utilities    Help    Log Out**

# U.S. District Court
## DISTRICT OF KANSAS (Topeka)
## CIVIL DOCKET FOR CASE #: 5:24-cv-04041-JWB-ADM

Kansas, State of et al v. United States Department of Education et al
Assigned to: District Judge John W. Broomes
Referred to: Magistrate Judge Angel D. Mitchell
Case in other court: 10CCA, 24-03097
Cause: 05:551 Administrative Procedure Act

Date Filed: 05/14/2024
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Kansas, State of**                     represented by   **Abhishek Kambli**
Office of the Kansas Attorney General
Special Litigation and Constitutional Issues Division
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
785-296-6109
Email: abhishek.kambli@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Braden H. Boucek**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: bboucek@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James L. Kerwin**
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227
303-292-2021
Email: jkerwin@mslegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Rodriguez**
Kansas Attorney General - Topeka
120 SW 10th Avenue, 2nd Floor

Topeka, KS 66612
785-368-8197
Fax: 785-296-3131
Email: jay.rodriguez@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan Rand Miller**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: jmiller@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kimberly S. Hermann**
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA 30075
770-977-2131
Fax: 770-911-2134
Email: khermann@southeasternlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kris W. Kobach**
Kobach Law, LLC
PO Box 155
Lecompton, KS 66050
913-638-5567
Email: kkobach@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lance F. Sorenson**
Utah Attorney General's Office
350 N. State Street, Suite 230
Salt Lake City, UT 84114
801-366-0260
Fax: 801-366-0101
Email: lancesorenson@agutah.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Schelhaas**
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
307-777-5786

**Appx002**

Fax: 307-777-6869
Email: ryan.schelhaas@wyo.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William E. Trachman**
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227
303-292-2021
Email: wtrachman@mslegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
Office of the Kansas Attorney General
120 SW 10th Avenue
Second Floor
Topeka, KS 66612
785-296-7109
Email: erin.gaide@ag.ks.gov
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Alaska, State of**                    represented by   **Abhishek Kambli**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **James Rodriguez**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Erin Gaide**
                                         (See above for address)
                                         *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Utah, State of**                      represented by   **Abhishek Kambli**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **James Rodriguez**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Erin Gaide**
                                         (See above for address)
                                         *ATTORNEY TO BE NOTICED*

**Appx003**

**Plaintiff**

**Wyoming, State of**                    represented by    **Abhishek Kambli**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **James Rodriguez**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Erin Gaide**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawna Rowland**                       represented by    **Henry W. Frampton , IV**
*as mother on behalf of*                                  Alliance Defending Freedom - AZ
*minor*                                                   15100 North 90th Street
K. R.                                                     Scottsdale, AZ 85260
                                                          480-444-0020
                                                          Fax: 480-444-0028
                                                          Email: hframpton@ADFlegal.org
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jonathan A. Scruggs**
                                                          Alliance Defending Freedom - AZ
                                                          15100 North 90th Street
                                                          Scottsdale, AZ 85260
                                                          480-444-0020
                                                          Fax: 480-444-0028
                                                          Email: jscruggs@ADFlegal.org
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Natalie D. Thompson**
                                                          Alliance Defending Freedom - DC
                                                          440 1st treet NW
                                                          Washington, DC 20001
                                                          202-393-8690
                                                          Fax: 202-347-3622
                                                          Email: nthompson@ADFlegal.com
                                                          *LEAD ATTORNEY*
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Rachel A. Rouleau**
                                                          Alliance Defending Freedom
                                                          44180 Riverside Parkway
                                                          Lansdowne, VA 20176

**Appx004**

571-707-4655
Fax: 571-707-4790
Email: rrouleau@ADFlegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyson C. Langhofer**
Alliance Defending Freedom
44180 Riverside Pkwy.
Lansdowne, VA 20176
571-707-4655
Fax: 571-707-4790
Email: tlanghofer@adflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Moms for Liberty**                    represented by  **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Young America's Foundation**          represented by  **Abhishek Kambli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Gaide**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Female Athletes United**              represented by  **Henry W. Frampton , IV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Appx005**

**Jonathan A. Scruggs**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natalie D. Thompson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel A. Rouleau**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tyson C. Langhofer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Department of Education**                 represented by **Rebecca Kopplin**
                                                          DOJ-Civ
                                                          1100 L Street NW
                                                          Washington, DC 20005
                                                          202-514-3953
                                                          Fax: 202-616-8470
                                                          Email: rebecca.m.kopplin@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Miguel Cardona**                                        represented by **Rebecca Kopplin**
*United States Secretary of Education; in his*            (See above for address)
*official capacity*                                       *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice**                   represented by **Rebecca Kopplin**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Merrick Garland**                                       represented by **Rebecca Kopplin**
*United States Attorney General; in his*                  (See above for address)
*official capacity*                                       *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Appx006**

**Movant**

**New Jersey, State of**
*on behalf of California, Pennsylvania,*
*Colorado, Delaware, District Of Columbia,*
*Hawaii, Illinois, Massachusetts, Michigan,*
*Minnesota, New York, Oregon, Rhode*
*Island, Vermont, and Washington*

represented by **Jason Andrew Zavadil**
Irigonegaray, Turney, & Revenaugh LLP
1535 SW 29th Street
Topeka, KS 66611-1901
785-267-6115
Fax: 785-267-9458
Email: jason@itrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren E. Van Driesen**
Office of the New Jersey Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
973-648-2566
Email: lauren.vandriesen@law.njoag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2024 | 1 | COMPLAINT with trial location of Topeka (Filing fee $405, Internet Payment Receipt Number AKSDC-6347300.), filed by Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Attachments: # 1 Table of Exhibits, # 2 Exhibit 1 - Final Rule, # 3 Exhibit 2 - Ohio Comment Letter, # 4 Exhibit 3 - Tennessee Comment Letter, # 5 Exhibit 4 - ADF Comment Letter re: Lack of Legal Authority, # 6 Exhibit 5 - ADF Comment Letter re: Freedom of Speech & Religion, # 7 Exhibit 6 - ADF Comment Letter re: Female Athletics, # 8 Exhibit 7 - SLF Comment Letter, # 9 Exhibit 8 - MSLF Comment Letter) (Gaide, Erin) (Entered: 05/14/2024) |
| 05/14/2024 | 2 | CIVIL COVER SHEET by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Gaide, Erin) (Entered: 05/14/2024) |
| 05/14/2024 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge John W. Broomes and Magistrate Judge Angel D. Mitchell for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at http://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge (jsh) (Entered: 05/14/2024)** |
| 05/15/2024 | | Summons Issued as to Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice; to the U.S. Attorney (issued to Attorney for service). Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (jk) (Entered: 05/15/2024) |
| 05/15/2024 | 3 | MOTION for attorney Jonathan A. Scruggs to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6348699.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) |

Appx007

| | | |
|---|---|---|
| | | (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission of Jonathan Scruggs, # 2 ECF Registration Form for Jonathan Scruggs)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/15/2024 | 4 | MOTION for attorney Henry W. Frampton, IV to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number CKSDC-6348717.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for Henry Frampton, # 2 ECF Registration Form for Henry Frampton)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/15/2024 | 5 | MOTION for attorney Natalie D. Thompson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6348733.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for N. Thompson, # 2 ECF Registration Form for Natalie Thompson)(Langhofer, Tyson) (Entered: 05/15/2024) |
| 05/16/2024 | 6 | ORDER granting 3 Motion to Appear Pro Hac Vice of Jonathan A. Scruggs for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 7 | ORDER granting 4 Motion to Appear Pro Hac Vice of Henry W. Frampton, IV for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 8 | ORDER granting 5 Motion to Appear Pro Hac Vice of Natalie D. Thompson for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 9 | MOTION for attorney Rachel A. Rouleau to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6349478.) by Plaintiffs Female Athletes United, Shawna Rowland. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit to Motion for Pro Hac Vice Admission for R. Rouleau, # 2 ECF Registration Form for Rachel Rouleau)(Langhofer, Tyson) (Entered: 05/16/2024) |
| 05/17/2024 | 10 | ORDER granting 9 Motion to Appear Pro Hac Vice of Rachel A. Rouleau for Female Athletes United and Shawna Rowland pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/17/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/17/2024) |
| 05/20/2024 | 11 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon United States Department of Justice served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
| 05/20/2024 | 12 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon Miguel Cardona served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
| 05/20/2024 | 13 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon Merrick Garland served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |

**Appx008**

| 05/20/2024 | 14 | SUMMONS RETURNED EXECUTED -- Personal Service by Kansas, State of upon United States Department of Education served on 5/17/2024, answer due 6/7/2024. (Kambli, Abhishek) (Entered: 05/20/2024) |
| 05/21/2024 | 15 | MOTION for Leave to File Excess Pages by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/21/2024) |
| 05/21/2024 | 16 | MOTION for attorney Kimberly Hermann to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352391.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 17 | MOTION for attorney Jordan Miller to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352405.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 18 | MOTION for attorney Braden Boucek to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6352408.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kambli, Abhishek) (Entered: 05/21/2024) |
| 05/21/2024 | 19 | CERTIFICATE OF SERVICE by Kansas, State of re 15 Motion for Leave to File Excess Pages. (Gaide, Erin) (Entered: 05/21/2024) |
| 05/21/2024 | 20 | ORDER granting 15 Motion for Leave to File Excess Pages. Entered by District Judge John W. Broomes on 05/21/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (jmr) (Entered: 05/21/2024) |
| 05/23/2024 | 21 | ORDER granting 16 Motion to Appear Pro Hac Vice of Kimberly S. Hermann for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/23/2024 | 22 | ORDER granting 17 Motion to Appear Pro Hac Vice of Jordan Rand Miller for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/23/2024 | 23 | ORDER granting 18 Motion to Appear Pro Hac Vice of Braden H. Boucek for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/23/2024. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (alh) (Entered: 05/23/2024) |
| 05/24/2024 | 24 | MOTION for a Stay / Preliminary Injunction by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Kambli, Abhishek) (Entered: 05/24/2024) |
| 05/24/2024 | 25 | MEMORANDUM IN SUPPORT of 24 Motion for a Stay / Preliminary Injunction by Plaintiffs Kansas, State of, Alaska, State of, Utah, State of, Wyoming, State of, Shawna Rowland, Moms for Liberty, Young America's Foundation and Female Athletes United. (Attachments: # 1 Exhibit List Table of Exhibits, # 2 Ex 1 - Declaration of Amy Cawvey, # 3 Ex 2 - Declaration of Jennie Earl, # 4 Ex 3 - Declaration of K.R., # 5 Ex 4 - Declaration of Kristi Burton Brown, # 6 Ex 5 - Declaration of A.B.S., # 7 Ex 6 - Declaration of A.R.S., # 8 Ex 7 - Declaration of T.P., # 9 Ex 8 - Declaration of Elizabeth Zwahlen, # 10 Ex 9 - Declaration of Rachel Flynn, # 11 Ex 10 - Declaration of Thomas Adcock, # 12 Ex 11 - Declaration of Merianne Jensen, # 13 Ex 12 - Declaration of Rebekah Zoznek, # 14 Ex 13 |

**Appx009**

| | | |
|---|---|---|
| | | - Declaration of Kailee Verdeyen, # 15 Ex 14 - Declaration of Tricia Plank, # 16 Ex 15 - Declaration of Deborah Lochner, # 17 Ex 16 - Declaration of T.Z.)(Kambli, Abhishek) (Entered: 05/24/2024) |
| 05/28/2024 | 26 | MOTION for attorney Ryan Schellhaas to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357284.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/28/2024 | 27 | MOTION for attorney James Luke Kerwin to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357299.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/28/2024 | 28 | MOTION for attorney William E. Trachman to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6357306.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 05/28/2024) |
| 05/29/2024 | 29 | ORDER granting 26 Motion to Appear Pro Hac Vice of Ryan Schelhaas for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/29/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/29/2024) |
| 05/29/2024 | 30 | ORDER granting 27 Motion to Appear Pro Hac Vice of James L. Kerwin for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 5/29/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/29/2024) |
| 05/29/2024 | 31 | ENTRY OF APPEARANCE by Rebecca Kopplin on behalf of Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 05/29/2024) |
| 05/29/2024 | 32 | JOINT MOTION to Set Briefing Schedule on Plaintiffs' Motion for Preliminary Relief and Notice of Availability for Hearing (Doc. 24 ) by Plaintiff Kansas, State of. (Gaide, Erin) (Entered: 05/29/2024) |
| 05/30/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 32 Joint MOTION to Set Briefing Schedule on Pltf Mot for Prelim Relief & Not of Availability for Hearing. The motion will be resolved by the District Judge.**(alh) (Entered: 05/30/2024) |
| 05/30/2024 | 33 | ORDER re 32 the parties' joint motion to set briefing schedule and hearing on Plaintiffs' motion for a stay/preliminary injunction (Doc. 24 ). The parties request the court set deadlines for briefing; the requested briefing deadlines are granted. Defendants are to file a response to the motion (Doc. 24 ) by 11:59 p.m. on 6/13/2024 and are limited to 55 pages. Plaintiffs may file a reply brief by 11:59 a.m. on 6/19/2024 and are limited to 35 pages. The court sets this matter for hearing on 6/20/2024 at 09:00 AM in Wichita Courtroom 238 (JWB). Further, the court directs counsel to confer with one another and file a joint status report on or before noon CDT on 6/7/2024. Although Plaintiffs request a decision by 7/1/2024, the court declines to affirmatively indicate a date by which a decision will be issued. The court is aware of the time sensitive nature of the motion. Signed by District Judge John W. Broomes on 5/30/2024. (mam) (Entered: 05/30/2024) |
| 05/30/2024 | 34 | NOTICE of Hearing re 33 Order: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Case Management Conference set for 6/10/2024 at 01:30 PM before District Judge John W. Broomes by phone (JWB - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 4983860). The court will discuss the joint status report with counsel for the parties, attempt to resolve any disputes presented therein regarding case management |

| | | |
|---|---|---|
| | | and scheduling, and set any additional deadlines that may be appropriate. Counsel may appear for the conference in person at the Wichita Courthouse, Room 238, or by telephone. The parties and party representatives need not attend; however, lead counsel for each side must have the authority to make decisions regarding the need for, and scheduling of, any additional deadlines and events in the case. At or before the time the joint status report is filed, lead counsel for each side shall inform the court by email to chambers at KSD_Broomes_Chambers@ksd.uscourts.gov, regarding who will appear in person and who will appear by phone for the case management conference. To the extent the parties agree on the need for additional scheduling in this case, they may submit a proposed additional scheduling order to chambers email at any time prior to the case management conference. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mam) (Entered: 05/30/2024) |
| 05/31/2024 | 35 | ORDER denying without prejudice 28 Motion for attorney William E. Trachman to appear pro hac vice. The court reached out to Mr. Trachman and advised him on the appropriate actions to take in correcting the affidavit and ECF registration form on 5/29/2024. To date Mr. Trachman has not submitted the corrected forms. For these reasons this motion is denied without prejudice. Signed by Magistrate Judge Angel D. Mitchell on 5/31/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/31/2024) |
| 06/07/2024 | 36 | JOINT STATUS REPORT by Kansas, State of. (Kambli, Abhishek) (Entered: 06/07/2024) |
| 06/10/2024 | 37 | MINUTE ENTRY for proceedings held before District Judge John W. Broomes: STATUS CONFERENCE held on 6/10/2024. (Court Reporter Jana McKinney.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 06/10/2024) |
| 06/13/2024 | 38 | OPPOSITION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 24 Motion for a Stay / Preliminary Injunction. (Kopplin, Rebecca) (Entered: 06/13/2024) |
| 06/17/2024 | 39 | ENTRY OF APPEARANCE by Kris W. Kobach on behalf of Kansas, State of. (Kobach, Kris) (Entered: 06/17/2024) |
| 06/18/2024 | 40 | MOTION for attorney Lauren E. Van Driesen to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6385447.) by Office of the Attorney General for the State of New Jersey. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Attachments: # 1 Affidavit, # 2 ECF Registration Form)(Zavadil, Jason) (Entered: 06/18/2024) |
| 06/18/2024 | 41 | MOTION for Leave to Appear and File a Brief as Amici Curiae in Support of 38 Defendants' Opposition to 24 Plaintiffs' Motion for a Stay and/or Preliminary Injunction by Movant Office of the Attorney General. (Attachments: # 1 Exhibit Brief of Amici Curiae) (Zavadil, Jason) (Entered: 06/18/2024) |
| 06/18/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 41 MOTION for Leave to file TO APPEAR AND FILE A BRIEF AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY AND/OR PRELIMINARY INJUNCTION . The motion will be resolved by the District Judge.(alh)** (Entered: 06/18/2024) |
| 06/18/2024 | 42 | ORDER granting 40 Motion to Appear Pro Hac Vice of Lauren E. Van Driesen for Office of the Attorney General for the State of New Jersey pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/18/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 06/18/2024) |

| 06/19/2024 | 43 | REPLY TO RESPONSE TO MOTION by Plaintiff Kansas, State of re 24 Motion for a Stay / Preliminary Injunction. (Attachments: # 1 Table of Exhibits, # 2 Ex. 1 - Louisiana v. Department of Education Order, # 3 Ex. 2 - Texas v. Cardona Order, # 4 Ex. 3 - Tennessee v. Cardona Order, # 5 Ex. 4 - KASB Policies and Forms, # 6 Ex. 5 - Declaration of Tiffany Justice, # 7 Ex. 6 - Declaration of Madison Hahn, # 8 Ex. 7 - Declaration of KBB, # 9 Ex. 8 - Declaration of Megan Degenfelder)(Kambli, Abhishek) (Entered: 06/19/2024) |
|---|---|---|
| 06/20/2024 | 44 | MINUTE ENTRY for proceedings held before District Judge John W. Broomes: MOTION HEARING held on 6/20/2024 re 24 MOTION for Preliminary Injunction MOTION to Stay Case filed by Kansas, State of. MATTER TAKEN UNDER ADVISEMENT. (Court Reporter Jana McKinney.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 06/20/2024) |
| 06/20/2024 | 45 | SUPPLEMENTAL MEMORANDUM IN SUPPORT of 24 Motion for a Stay / Preliminary Injunction by Plaintiff Kansas, State of. (Kambli, Abhishek) (Entered: 06/20/2024) |
| 06/21/2024 | 46 | ORDER granting 41 Motion for Leave to File. Entered by District Judge John W. Broomes on 06/21/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (jmr) (Entered: 06/21/2024) |
| 06/24/2024 | 47 | SUPPLEMENTAL BRIEF IN OPPOSITION to 24 Motion for a Stay / Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) Modified on 7/15/2024 to re-link. (mam) (Entered: 06/24/2024) |
| 06/25/2024 | 48 | MOTION for attorney Lance Sorenson to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6394456.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Gaide, Erin) (Entered: 06/25/2024) |
| 06/26/2024 | 49 | MOTION for attorney William Trachman to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6395756.) by Plaintiff Kansas, State of. (Motion referred to Magistrate Judge Angel D. Mitchell) (Gaide, Erin) (Entered: 06/26/2024) |
| 06/26/2024 | 50 | ORDER granting 48 Motion to Appear Pro Hac Vice of Lance F. Sorenson for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/26/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 06/26/2024) |
| 06/26/2024 | 51 | ORDER granting 49 Motion to Appear Pro Hac Vice of William E. Trachman for Kansas, State of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 6/26/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 06/26/2024) |
| 07/02/2024 | 52 | TRANSCRIPT of Other Hearing held June 20, 2024 before Judge John W. Broomes, Court Reporter Jana McKinney, 316-315-4268, jana_mckinney@ksd.uscourts.gov. Transcript purchased by: Ms. Rebecca Kopplin. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

<p align="center">Appx012</p>

| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the court reporter or through PACER. Release of Transcript Restriction set for 9/30/2024. (jlm) (Entered: 07/02/2024) |
|---|---|---|
| 07/02/2024 | [53](#) | MEMORANDUM AND ORDER granting [24](#) Motion for Stay/Preliminary Injunction. Signed by District Judge John W. Broomes on 7/2/2024. (kas) (Entered: 07/02/2024) |
| 07/02/2024 | [54](#) | PRELIMINARY INJUNCTION. Signed by District Judge John W. Broomes on 7/2/2024. (kas) (Entered: 07/02/2024) |
| 07/08/2024 | [55](#) | UNOPPOSED MOTION for Extension of Time to File Answer re [1](#) Complaint by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Kopplin, Rebecca) (Additional attachment added on 7/9/2024: # [1](#) Correct Motion) (msb) (Entered: 07/08/2024) |
| 07/09/2024 | [56](#) | DOCKET ANNOTATION: Please be advised that the incorrect document was erroneously attached at time of filing in entry [55](#) Unopposed Motion for Extension of Time to File Answer to [1](#) Complaint. The correct document is now attached to docket entry 55 and to this entry for noticing purposes only. (msb) (Entered: 07/09/2024) |
| 07/09/2024 | 57 | ORDER granting [55](#) Defendants' Unopposed Motion for Extension of Time to Respond to the Complaint. Defendants Miguel Cardona, Merrick Garland, United States Department of Education, and United States Department of Justice must answer or otherwise respond to the complaint by August 5, 2024. Signed by Magistrate Judge Angel D. Mitchell on 7/9/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 07/09/2024) |
| 07/10/2024 | [58](#) | NOTICE OF INTERLOCUTORY APPEAL as to [53](#) Memorandum and Order, [54](#) Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 07/10/2024) |
| 07/10/2024 | [59](#) | MOTION for a Partial Stay Pending Appeal re [53](#) Memorandum and Order, [54](#) Preliminary Injunction by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice. (Kopplin, Rebecca) (Entered: 07/10/2024) |
| 07/11/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: [59](#) MOTION Partial Stay of Preliminary Injunction Pending Appeal re [54](#) Preliminary Injunction, [53](#) Order on Motion for Preliminary Injunction, Order on Motion to Stay Case . The motion will be resolved by the District Judge.**(alh) (Entered: 07/11/2024) |
| 07/11/2024 | | APPEAL FEE STATUS: filing fee waived re: [58](#) Notice of Interlocutory Appeal on behalf of Defendants Miguel Cardona, Merrick Garland, United States Department of Education, and United States Department of Justice. (THIS IS A TEXT ONLY ENTRY-NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (kas) (Entered: 07/11/2024) |
| 07/11/2024 | [60](#) | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re [58](#) Notice of Interlocutory Appeal. (Attachments: # [1](#) Preliminary Packet)(kas) (Entered: 07/11/2024) |
| 07/11/2024 | [61](#) | APPEAL DOCKETED in 10CCA on 7/11/2024 and assigned Appeal No. 24-3097 re [58](#) Notice of Interlocutory Appeal, filed by Merrick Garland, United States Department of Justice, Miguel Cardona, United States Department of Education. (kas) (Entered: 07/11/2024) |
| 07/12/2024 | [62](#) | MOTION to Revise Stay/Preliminary Injunction Order by Plaintiff Moms for Liberty. (Attachments: # [1](#) Exhibit Declaration of Tiffany Justice, # [2](#) List of Counties)(Gaide, Erin) |

Appx013

| | | (Entered: 07/12/2024) |
|---|---|---|
| 07/12/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 62 MOTION to Modify . The motion will be resolved by the District Judge.**(alh) (Entered: 07/12/2024) |
| 07/12/2024 | 63 | OPPOSITION by Plaintiffs Alaska, State of, Female Athletes United, Kansas, State of, Moms for Liberty, Shawna Rowland, Utah, State of, Wyoming, State of, Young America's Foundation re 59 Motion for a Partial Stay Pending Appeal. (Attachments: # 1 Table of Exhibits, # 2 Exhibit Exhibit 1 - Louisiana v. U.S. Dep't of Educ., Case No. 3:24-CV-00563 (W.D. La. July 11, 2024), # 3 Exhibit Exhibit 2 - Tennessee v. U.S. Dep't of Educ., Case No. 2:24-cv-00072-DCR-CJS (E.D. Ky. July 10, 2024))(Gaide, Erin) (Entered: 07/12/2024) |
| 07/14/2024 | 64 | OPPOSITION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 62 Motion to Revise Stay/Preliminary Injunction Order. (Attachments: # 1 Ex. A)(Kopplin, Rebecca) (Entered: 07/14/2024) |
| 07/15/2024 | 65 | REPLY TO RESPONSE TO MOTION by Defendants Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re: 59 Motion for Miscellaneous Relief *(Partial Stay Pending Appeal)* (Kopplin, Rebecca) (Entered: 07/15/2024) |
| 07/15/2024 | 66 | TRANSCRIPT ORDER FORM: Transcript Already on File filed by Miguel Cardona, Merrick Garland, United States Department of Education, United States Department of Justice re 58 Notice of Interlocutory Appeal (Kopplin, Rebecca) (Entered: 07/15/2024) |
| 07/15/2024 | 67 | NOTICE of Organizational Plaintiff Schools by Kansas, State of re 54 Preliminary Injunction, 53 Order on Motion for Preliminary Injunction, Order on Motion to Stay Case (Attachments: # 1 Exhibit List of Schools K-12, # 2 Exhibit List of Colleges and Universities)(Gaide, Erin) (Entered: 07/15/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/16/2024 06:45:47 | | | |
| **PACER Login:** | david.l.peters | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-04041-JWB-ADM |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS; | § | |
| STATE OF ALASKA; | § | |
| STATE OF UTAH; | § | |
| STATE OF WYOMING; | § | |
| K.R., A MINOR, BY SHAWNA | § | |
| ROWLAND, HER MOTHER; | § | Civil Action No. _____ |
| MOMS FOR LIBERTY; | § | |
| YOUNG AMERICA'S FOUNDATION; | § | |
| FEMALE ATHLETES UNITED; | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION; | § | |
| MIGUEL CARDONA, IN HIS OFFICIAL | § | |
| CAPACITY AS UNITED STATES | § | |
| SECRETARY OF EDUCATION; | § | |
| UNITED STATES DEPARTMENT OF | § | |
| JUSTICE; | § | |
| MERRICK GARLAND, IN HIS | | |
| OFFICIAL CAPACITY AS UNITED | | |
| STATES ATTORNEY GENERAL, | | |
| | | |
| *Defendants*. | | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

The Defendants, through an unlawful rule (the "Final Rule"), seek to politicize our country's educational system to conform to the radical ideological views of the Biden administration and its allies. Instead of focusing on the true mission of Title IX, which is to protect women and girls from discrimination in education and to protect and promote women's and girls' sports, the Defendants attempt to rewrite it entirely to (1) institutionalize the left-wing

fad of transgender ideology in our K-12 system and tie school funding to it, (2) mandate that colleges and universities punish students who refuse to comply with these views through a campus grievance process that is akin to "kangaroo courts," and (3) require schools to provide benefits to students and employees seeking voluntary abortions (even in states where it is outlawed) in direct conflict with Title IX's abortion neutrality provision.  None of this has anything to do with Title IX.  This is not only wrong, it is unlawful because the Final Rule (1) violates the text of Title IX, the statute it claims to interpret, (2) attempts to unilaterally settle matters subject to profound debate without clear authorization from Title IX or Congress, (3) violates the Constitution's Spending Clause, and the First, Fifth, Tenth, and Fourteenth Amendments, and (4) is arbitrary and capricious.

This unlawful rule also robs girls and women of their opportunity to participate in their school's education programs and activities, especially athletics, by forcing them to compete with biological males.  It forces both boys and girls, in their most formative years, to sacrifice their privacy in personal spaces such as restrooms, locker rooms, and even overnight accommodations.  Finally, it takes an explicit state function (the creation and administration of public schools) and warps it by conditioning federal education funding on schools violating the constitutional rights of their students and employees.  Rather than allow schools to fulfill their educational functions, it transforms them into ideological centers where only the Defendants' views are allowed to be heard.  Plaintiffs sue to prevent this from becoming reality.

In 1972, in response to serious concerns about discrimination against women and girls with regard to educational opportunities, Congress passed, and President Nixon signed, Title IX of the Education Amendments of 1972.  Title IX specifically prohibits schools that receive federal funding from discriminating on the basis of sex.  But the law and its regulations have

always recognized that providing students with sex-separated facilities, such as restrooms, locker rooms, and overnight sleeping accommodations, ensures the dignity and privacy for both boys and girls and is not "discrimination."  Title IX guarantees that women and girls have equal access to education programs and activities—especially athletic programs—and other school-related activities.  To that end, the law also permits schools to maintain sex-separate activities, including athletics, for students.

Congress charged the Department of Education ("DoEd") with promulgating regulations to ensure this access, opportunity, and privacy.  *See, e.g.*, Education Amendments of 1974, Pub. L. No. 93–380, § 844 (1974) (directing the Secretary of Education to promulgate rules "relating to the prohibition of sex discrimination . . . with respect to intercollegiate athletic activities").  DoEd did so, promulgating regulations that include, for example, those that prohibit sex-based discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient" of federal funding.  45 C.F.R. § 86.41.  This and other regulations have withstood scrutiny in the federal courts.  States, schools, parents, students, volunteers, women, and girls have relied on the plain text of Title IX and on these regulations for decades.

On June 15, 2020, the Supreme Court issued its decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020).  In *Bostock*, the Court held that employers violate Title VII's prohibition on sex discrimination by firing homosexual and transgender employees.  *Id.* at 682–83.  Specifically, the Court held that an employer could not fire a biological male employee for certain conduct while permitting a biological female employee to engage in the same conduct unrestricted.  *Id.* at 659.  Neither may an employer fire a biological male employee *because* he did not sufficiently adhere to masculine stereotypes.  *Id.*  But *Bostock* did *not* hold that "sex" includes "gender identity."  Rather, the "Court [] explained that 'sex' refers to the biological

distinctions between males and females." *Tennessee v. United States Dep't of Educ.*, 615 F.

Supp. 3d 807, 816 (E.D. Tenn. 2022).  Nor did *Bostock* equate transgender status, "gender

identity," or homosexuality with "sex."  In fact, the Court said, "homosexuality and transgender

status are distinct concepts from sex," *Bostock*, 590 U.S. at 669, and discrimination based on

those traits is not discrimination "because of sex" within the meaning of Title VII unless the

discrimination is actually "on the basis of" the person's biological sex.  In other words, it is

emphatically *not* discrimination within the meaning of Title VII merely to recognize and take

account of sex.  Additionally, the Court specifically limited its holding to the facts of the case

and the text and history of Title VII.  *Bostock*, 590 U.S. at 681.

Notwithstanding the limited holding of *Bostock*, in 2021, President Biden ordered federal

agencies to rewrite federal law and remove access and protections for women and girls as well as

privacy protections for all students to accommodate a new interest in "prevent[ing] and

combat[ing] discrimination on the basis of gender identity."  Exec. Order No. 13,988, 86 Fed.

Reg. 7023-25 (Jan. 20, 2021).  DoEd complied, publishing a Notice of Interpretation on June 22,

2021 ("NOI").[1]  To solidify the NOI, the DoEd is now attempting to rewrite Title IX to prohibit

federally funded schools from separating biological males and females in any educational

program, including athletic programs based on the undefined concept of gender identity.  DoEd's

rewrite enshrines into federal regulations the elimination of the dignity and privacy protections

for boys and girls and the equal opportunity protections for girls by unilaterally proclaiming that

treating a person according to his or her biological sex rather than his or her "gender identity"

---

[1] This interpretation was enjoined on July 15, 2022 as to several states, including Kansas and
Alaska, which are parties to this lawsuit.  *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308
(E.D. Tenn.) (Order entering preliminary injunction filed on July 15, 2022), *appeal pending in
Tennessee v. U.S. Dep't of Educ.*, No. 22-5807 (6th Cir.)

constitutes "discrimination on the basis of sex" under Title IX.  This sleight of hand effectively replaces the word "sex" in the statute with "gender identity." And any treatment of a person according to his or her biological sex, rather than his or her "gender identity" is presumed to constitute more than *de minimis* harm.  Causing more than *de minimis* harm opens a school up to investigation by DoEd, which is an onerous process that consumes school resources, energy, and time, and which separately could result in loss of federal funding.  In addition, it opens the school up to a separate civil lawsuit under Title IX's implied cause of action.

The new regulations are contrary to Title IX's text and history.  They prohibit schools from maintaining sex-separate programs for males and females.  They prohibit schools from maintaining sex-separate restrooms or locker rooms.  They open the door for biological males to compete on female-only sports teams by prohibiting schools from making decisions based on "sex-stereotypes," including "stereotypes" based on actual, physiological differences in athletic ability.  And they remove dignity and privacy protections for boys and girls.

Along with the Department of Education, the Department of Justice ("DOJ") enforces Title IX regulations.  Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).  The States of Kansas, Alaska, Utah, and Wyoming (collectively, "the States" or "Plaintiff States")—sue to defend their interest in the continued receipt of federal education funds based on a reliance on biological reality and Title IX, a reliance on the fact that biological males are different from biological females and a reliance on the fact that Title IX was always explicit in its protection of biological females in educational programs and activities, including sports.  The States sue to ensure that women and girls can enjoy the benefits, opportunities, and other rewards from these programs and activities that they are entitled to under the law.  The States also sue to prevent all students, parents, teachers, volunteers, and school staff from having their privacy invaded by

having to share restrooms, locker rooms, and overnight accommodations with those of the opposite sex.  Finally, the States sue to ensure that they are not coerced by DoEd and DOJ into violating the First Amendment rights of students, teachers, and other school employees who disagree with the dictates of the Final Rule.

Plaintiff K.R. has already suffered many of the harms the Final Rule will inflict. K.R. is a 13-year-old female and student at an Oklahoma public school.  She has suffered the embarrassment and indignity of encountering males who identify as females in her school restroom.  To avoid this harm and maintain her privacy, she stopped using the restroom at her school entirely—until an Oklahoma law restored sex-designated restrooms in public schools. After the Oklahoma law was enacted, she resumed using the restroom at school.  But the Final Rule would override that law, requiring schools to admit males who identify as females into girls' locker rooms and restrooms, subjecting her once again to embarrassment and indignity when using the restrooms at school, and causing her to avoid those facilities altogether.

K.R. also wants to continue exercising her right to speak freely.  She wishes to stay true to her religious beliefs and avoid using inaccurate pronouns that contradict someone's sex.  And she wants to express her views about gender identity at school, sharing with her friends that boys cannot become girls (or vice versa), that boys should not access the girls' restrooms, and that girls' privacy from the opposite sex should be respected.  But the Final Rule threatens all these rights and protections, demanding that K.R.'s school punish her for her protected speech and religious exercise.  89 Fed. Reg. 33,888 ("A recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively.") (Final Rule, 34 C.F.R § 106.44(a)(1)).  K.R. challenges the Final Rule to

ensure that she and other girls maintain their rights to privacy, safety, free speech, and religious liberty.

Plaintiff Moms for Liberty is a national organization with chapters across the country, with members whose children attend schools that receive federal funding and are subject to Title IX regulations.  Moms for Liberty seeks to unify, educate, and empower parents to defend their parental rights at all levels of the government.  It is comprised of parents who seek to defend their fundamental right to raise their children in accordance with their values and beliefs, protect their children from indoctrination on social issues in schools, and protect their children from being forced to affirm ideas they do not believe in.

Members of Moms for Liberty have deeply held beliefs on issues involving biological sex, gender identity, sex stereotypes, and sex characteristics.  Included in these beliefs is that an individual's sex is determined at birth and that individuals should use restrooms and locker rooms matching their biological sex.  Moms for Liberty members and the children of Moms for Liberty members have engaged in speech advancing these values and wish to continue doing so. Absent the threat of discipline, their children, within the school setting, plan to continue using pronouns consistent with a transgender individual's biological sex and expressing their views on issues of gender identity and transgenderism, including that there are only two sexes.  If the Final Rule is permitted to take effect, the speech of their members and of their members' children will be chilled and they will be compelled to affirm beliefs and views on sex, sex stereotypes, and gender identity that contradict their beliefs and values.

Plaintiff Young America's Foundation is a national organization devoted to promoting traditional values and providing students on college campuses with resources to advance these values.  Young America's Foundation is a 501(c)(3) organization with thousands of student

members on college campuses across the country, including at Kansas State University, the

University of Wyoming, and the University of Utah.  Its mission is to ensure that young

Americans are inspired by the ideas of individual freedom, a strong national defense, free

enterprise, and traditional values.

Members of Young America's Foundation believe that sex is determined at birth by

biology, there are only two genders based on biological sex, and an individual cannot change his

or her sex or gender.  Young America's Foundation members frequently host speakers on college

campuses that discuss topics involving gender identity, transgenderism, and detransitioning.  If

allowed to go into effect, the Final Rule will impede Young America's Foundation's

organizational mission by chilling its members' speech on topics regarding issues involving

gender identity and transgenderism and will deter its college chapters from hosting speakers who

discuss topics regarding gender identity, transgenderism, and detransitioning.  Furthermore, its

members will be compelled to affirm individuals' so-called gender identity, contrary to their

beliefs and values.

DoEd's new rules also affect female athletes, like members of Plaintiff Female Athletes

United ("FAU").  FAU is a nonprofit organization created to protect women's sports, to support

fairness and equal opportunity for female athletes, and to ensure that women and girls are not

forced to compete against biological males who identify as female.  Many FAU members are

female athletes who currently compete on girls' sports teams at schools governed by Title IX.

And some of these members live in Plaintiff States—including Kansas, Wyoming, and Utah—

that have passed laws or regulations designating women's sports as being open to biological

women only.  Because of these state protections, some of these FAU members have not had to

compete against male athletes and have benefited enormously from fairness in sports and equal

athletic opportunity.  But the Final Rule threatens to override these laws, taking away the right of

FAU members to equal athletic opportunity and subjecting them to future competitions against

males with natural physiological advantages.  The Final Rule strips these women of their chance

to be champions and to compete on a level playing field in their own sports. It also threatens to

deny them the very collegiate scholarship opportunities that Title IX created.

These FAU members also want to protect privacy and safety in school restrooms, locker

rooms, overnight team trips, and showers.  Yet the Final Rule would force these female students

to use restrooms, to change in locker rooms, to sleep in hotel rooms, and to share showers with

biological males who "identify" as females.  In pursuing that goal, the Final Rule purports to

preempt state laws (like Utah's) that protect women's privacy in intimate spaces like locker

rooms.  In this way, the Final Rule exposes these women to embarrassment and humiliation,

placing individuals' subjective feelings over the objective biological differences between the

sexes.  Likewise, some FAU members wish to advocate at school in favor of women's sports and

women's privacy and to use pronouns consistent with others' sex.  They wish to express the view

that males who identify as female are in fact males and that these males should not access

women's-only spaces.  But the Final Rule punishes and chills this protected speech by branding

it harassment.  FAU and its members seek to stop the Final Rule so that its members and other

women can continue to benefit from Title IX's promise made—equal opportunity in education.

### JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this case under 28 U.S.C. § 1331

because this case concerns whether the DoEd acted in compliance with the United States

Constitution and federal law, including Title IX and the Administrative Procedure Act ("APA").

2.      This Court also has jurisdiction pursuant to the judicial review provisions of the

APA, 5 U.S.C. §§ 701–06, and 28 U.S.C. § 1361 (empowering district courts to "compel an

officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff").

3.      Venue is proper in this Court under 28 U.S.C. § 1391(1) because: Plaintiff State of Kansas resides in this judicial district and real property is not involved in this action.

4.      There is a present and actual controversy between the parties.

5.      Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704.

6.      This Court may grant Plaintiffs the relief they request under the APA, 5 U.S.C. §§ 705-06, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1361.

7.      Plaintiffs request that a jury trial, if any, will be held in the Topeka Division of the District of Kansas.

### THE PARTIES

**A. Plaintiffs**

8.      Plaintiff State of Kansas is a sovereign State of the United States of America.

9.      Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

10.     Kansas law mandates that schools "separate overnight accommodations [] for students of each biological sex during school district sponsored travel that requires overnight stays by students."  Kan. Stat. Ann. 72-6286(a) (Supp. 2023).

11.     Kansas law also mandates sex-separation in sports in its public schools and state-sanctioned athletic programs.  Kan. Stat. Ann. 60-5603 (Supp. 2023).

12.     Finally, Kansas protects its citizens' free speech and religious liberty rights both in its constitution and by statute.  *See* Kan. Const. Bill of Rts. §§ 7, 11; Kan. Stat. Ann. 60-5301–22.

13.     Kansas brings this suit through its attorney general Kris W. Kobach.  He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court.  Kan. Stat. Ann. 75-702(a).

14.     Plaintiff State of Alaska is a sovereign State of the United States of America.

15.     Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

16.     Alaska law mandates equal opportunity for "both sexes" in athletics and in recreation in a manner that is commensurate with the general interested of the members of "each sex."  It further mandates that schools provide showers, toilets, and training-room facilities "for both sexes."  AS 14.18.040.

17.     Alaska protects its citizens' free speech and religious liberty in its state constitution.  Alaska Const. art. I, §§ 4, 5.

18.     Alaska brings this suit through its attorney general Treg R. Taylor.  He is the legal advisor to the governor and other state officers and has the authority to represent Alaska in all civil actions in which the state is a party.  AS 44.23.020(a), (b)(3).

19.     Plaintiff State of Utah is a sovereign State of the United States of America.

20.     Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

21.   Utah law generally provides that male students may not compete on school athletic teams that are "designated for students of the female sex in an interscholastic athletic activity."  Utah Code Ann. § 53G-6-902.

22.   Finally, Utah protects its citizens' free speech and religious liberty rights both in its state constitution and by statute.  *See* Utah Const. art. I, §§ 1, 4, 15; Utah Code Ann. § 53G-1-203; *see also* S.B. 150 (Utah 2024) (passed both houses of legislature, awaiting governor's signature).

23.   Sean D. Reyes is the Attorney General of Utah.  He is authorized by Utah law to sue on Utah's behalf.

24.   Plaintiff State of Wyoming is a sovereign State of the United States of America.

25.   Wyoming sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interest in protecting its citizens, schools, and interest in federal education funds.

26.   Wyoming law provides that "[a] public school or a private school that competes against a public school shall expressly designate school athletic activities and teams as one (1) of the following based on sex: (i) Designated for students of the male sex; (ii) Designated for students of the female sex; or (iii) Coed or mixed."  Wyo. Stat. Ann. § 21-25-102(a).

27.   Wyoming law also provides that "[a] student of the male sex shall not compete, and a public school shall not allow a student of the male sex to compete, in an athletic activity or team designated for students of the female sex."  Wyo. Stat. Ann. § 21-25-102(b).

28.   "'Sex' means the biological, physical condition of being male or female, determined by an individual's genetics and anatomy at birth."  Wyo. Stat. Ann. § 22-25-101(a)(iv).

29.     Wyoming also protects its citizens' free speech and religious liberty rights in its state constitution.

30.     Wyoming brings this suit through its attorney general Bridget Hill.  She is the chief legal officer of the State of Wyoming and has the authority to represent Wyoming in federal court.  Wyo. Stat. Ann. § 9-1-603(a).

31.     Plaintiff K.R. is a 13-year-old female and resident of Stillwater, Oklahoma in Payne County.  K.R. attends Stillwater Middle School, a public school in Oklahoma for 6th and 7th graders.  Stillwater Middle School is a recipient of Title IX funding.

32.     In the past, K.R. encountered males who identify as females in the girls' restroom at her school.  These encounters made K.R. feel intensely uncomfortable, embarrassed, and unsafe using the restroom at school.  Those restrooms at her school provide minimal privacy protections because the stalls have large cracks between the door and the wall panels.

33.     If K.R. entered the women's restroom and a male was in the restroom, she would turn around and leave.  She eventually decided to stop using the school restrooms altogether to avoid the loss of privacy and feelings of embarrassment.  So, from around 7:00 a.m. when she left home to around 4:00 p.m. when she returned home, K.R. frequently would not use the restroom at school at all.  This was extremely uncomfortable for K.R.

34.     K.R. feels intensely uncomfortable using the bathroom with males regardless of whether they personally identify as male or female.

35.     For a time, K.R. did not even tell her parents about not using the restrooms at school because her school made the situation feel normal and she felt that she could not object.

36.     Eventually, Oklahoma passed a state law requiring every multiple occupancy restroom in K-12 public schools to be designated by sex and accessible only to members of that sex. *See* Okla. Stat. 70, § 1-125.

37.     Since that law was passed, K.R. has returned to using the female restrooms at her school, and she feels safe doing so because of the state law.

38.     K.R. is also a Christian.  She believes that all people should be treated with dignity and respect, that God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it.  K.R. believes it would be a lie and a violation of her faith for her to falsely affirm that someone is a member of the opposite sex.  For example, it would violate K.R.'s religious beliefs to use inaccurate pronouns of someone else— meaning pronouns that do not accurately reflect the person's sex.

39.     K.R. knows some of her classmates want K.R. to refer to them by pronouns that indicate they are the opposite sex, but K.R. has refused to do so because that would violate her religious beliefs.  Some of K.R.'s classmates have been offended by K.R.'s decision to avoid using inaccurate pronouns.

40.     K.R. has also discussed with her friends at school that having male students in the girls' restroom makes her extremely uncomfortable and anxious.  And she has talked to friends at school about her religious beliefs that there are only two sexes and that people cannot change their sex.

41.     K.R. desires to keep using the restroom without members of the opposite sex present.  She also wants to continue to share her beliefs and not be forced to speak in ways that violate her faith. For example, she wants to continue to share with her friends at school that she believes there are only two sexes and that people cannot change their sex.  And she doesn't want

to be forced to refer to people in a way that violates her religious beliefs by using inaccurate pronouns.  She also wants to express her discomfort and disagreement with males using the girls' restrooms.

42.     Moms for Liberty is a 501(c)(4) nonprofit organization with chapters in forty-eight states and over 130,000 nationwide.  Moms for Liberty is dedicated to organizing, unifying, educating, and empowering parents to defend their parental rights at all levels of government.  The core principles of Moms for Liberty include defending the fundamental right of parents to raise their children in accordance with their values and morals and protecting children from political and social indoctrination by schools.  Moms for Liberty engages in efforts to assure that schools maintain policies that respect these principles.

43.     Young America's Foundation is a 501(c)(3) nonprofit organization with approximately 140 chapters on college campuses across the country.  Young America's Foundation's mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.  Consistent with its mission, Young America's Foundation provides college students with access to educational resources, campus flyers and tabling materials, and speakers.

44.     Plaintiff Female Athletes United ("FAU") is an Internal Revenue Code Section 501(c)(3) membership organization formed for the purpose of defending women and girls' sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field. Simply put, FAU promotes girls' and women's right not to compete against biological males who identify as females on girls' and women's sports teams.

45.     FAU is a coalition of current and former female athletes and anyone, whether male or female, who wants to ensure women's sports remain a place for only women.

46.     FAU has members in states across the county and at least five members located in the Plaintiff States.  These members participate on their girls' and women's sports teams at schools governed by Title IX.  These members compete on their women's teams at their schools and benefit from competing against only women and girls in athletic competitions.  And many of these members attend schools with classmates who identify as transgender or non-binary.

47.     A.B.S. is a 17-year-old female, FAU member, and resident of Topeka, Kansas.  She attended and will soon graduate from Washburn Rural High School where she competed on the girls' powerlifting, volleyball, wrestling, softball, and track and field teams.  Washburn Rural High School is a public school and recipient of Title IX funding.

48.     A.B.S. has a scholarship to play volleyball at MidAmerica Nazarene University in Olathe, Kansas next year.  MidAmerica participates in the National Association of Intercollegiate Athletics, which has a policy that protects female athletes by allowing only biological female athletes onto women's and girls' sports teams.

49.     During her senior year, A.B.S. was invited to compete with the top 24 male and female javelin throwers in all of Kansas.  She broke a school record for the javelin throw that had been in place for 10 years.

50.     A.R.S. is a 13-year-old, FAU member, and resident of Topeka, Kansas.  She attends Washburn Rural Middle School where she competes on the girls' volleyball team.  Washburn Rural Middle School is a public school and recipient of Title IX funding.

51.     A.R.S. is a seventh-grade student and plans to compete in volleyball next year at Rossville Middle School.  She plans to play softball at Rossville High School, and she hopes to play softball in college.

52.     A.R.S. grew up in a sports family and watched her sister, A.B.S., earn a scholarship to play volleyball in college.  She started playing softball when she was four and has played travel softball most of her life.  A.R.S. currently plays softball on a city club team and plans to continue until she can play softball in high school.  She hopes to continue playing in college.

53.     T.P. is a 15-year-old, FAU member, and resident of Park County, Wyoming.  She attends Powell High School where she competes on the junior varsity girls' tennis team.  Powell High is a public school and recipient of Title IX funding.

54.     T.P. is a freshman and plans to play on her school tennis team throughout high school.  She expects to join the varsity team in the coming years.

55.     Elizabeth Zwahlen is an 18-year-old, FAU member, and resident of Summit County, Utah.  She attends Utah Valley University in Orem, Utah, where she just completed her junior year and competes on the girls' track and cross-country teams.  Utah Valley University is a public university and recipient of Title IX funding.

56.     Zwahlen grew up in a family of runners.  Her dad competed in collegiate track, her mom ran in high school, and her grandmother has finished multiple marathons.  Zwahlen has competed on school track and cross-country teams since high school.  She currently competes in the 800 meter and 1500 meter and sometimes in the 5K or 10K.

57.     Zwahlen has a full athletic scholarship and has competed every season since she started college.

58.     T.Z. is a 17-year-old , FAU member, and resident of Summit County, Utah.  She attends North Summit High School where she competes on the girls' cross country and track teams.  North Summit High School is a public school and recipient of Title IX funding.

59.     T.Z. is a high-school junior and plans to continue competing in cross country and track for the remainder of her time at North Summit.

60.     T.Z. grew up in a family that loved sports. Her father and sister both competed in collegiate-level track. T.Z. runs the 3200, 1600, and 800 meter on her high-school track team.

61.     Each of these FAU members identified above uses the women's restrooms and changes in the women's locker rooms at their schools.  Some of them shower in the women's locker rooms, and some go on overnight trips with their schools.

62.     For example, T.Z.'s school team participates in multiple meets throughout the year that require the team to stay overnight.  For these competitions, the students on the team will share a room and often a bed with their teammates.

63.     Zwahlen's track and cross-country teams at Utah Valley go on numerous overnight trips to attend meets.  On these trips, she shares a room and sometimes a bed with her teammates.

64.     None of the FAU members identified above would feel comfortable using the women's restrooms at their schools with a male or using the girls' locker room with a male, or showering with a male nearby, or sharing the same hotel room or bed with a male during an overnight trip.  Doing any of this would make these members feel embarrassed, humiliated, unsafe, exposed, and vulnerable.  The intimate spaces at their schools do not have sufficient privacy protections for them to feel comfortable sharing these spaces with a male.

65.     For example, Zwahlen changes and showers in the locker room area at her school. She does not want to do that in the presence of a male or with a male nearby.

66.     T.Z. also regularly changes in the school locker room for practice and when getting ready for track and cross country meets, and she does not want to do that in the presence of males.

67.     None of the FAU members identified above wants to compete against biological males in their school sports, regardless of how those male competitors personally identity themselves.  These members think that competing against males in their sports would be unfair and would deter and discourage them from pursuing sports and from enjoying the value of participating in competitive sports.  Some of the members identified above also fear being injured if they have to compete against males who are typically bigger, faster, and stronger.

68.     Some of the FAU members identified above want to advocate in favor of fairness in women's sports at their schools to their friends and coaches, express their belief that there are only two sexes, and express their belief that biological males who identify as females are in fact males and should not be allowed to compete on women's sports teams.  As part of this advocacy and to affirm the view that people cannot change their sex, some of the FAU members refuse to use inaccurate pronouns that contradict someone's sex.

69.     For example, A.B.S. and T.P. want to advocate for fairness in women's sports at school and want to share their discomfort with competing against or sharing intimate spaces with males who identify as females.  In addition, T.P. wants to express at school the view that there are only two sexes.  T.P. had a teacher request that she refer to a classmate inaccurately as "they/them," and T.P declined to use those inaccurate pronouns because they did not reflect the classmate's sex.  T.P. believes she will likely have classmates in the future who request to be addressed with inaccurate pronouns like this because some students at her school identify as transgender or non-binary.

70.     T.Z. has also spoken with her friends at school about her belief that only females should compete in girls' sports, that there are only two sexes, and that people cannot change their sex.  She wants to have similar conversations and express her beliefs in the future even though she knows other people may disagree with her.

71.     Many FAU members identified above compete in sports in states with laws that ensure only biological women and girls can join women's sports teams.  Because of these protections, these FAU members have not been forced to compete with or against male athletes.

72.     T.Z. also competes in a state with a law that requires restrooms, locker rooms, showers, and changing rooms in public schools to be designated by sex except in limited circumstances.  Because of these protections, she has not yet encountered a male attempting to utilize these spaces.  She feels safe knowing she can utilize these areas without a male present.

73.     Zwahlen competes in a state with a law that requires locker rooms and attached showers and restrooms in government-owned buildings to be designated by sex in most circumstances.  Because of these protections, she has not yet encountered a male attempting to utilize these spaces.  She feels safe knowing she can utilize these areas without a male present.

74.     The FAU members identified above felt relieved and safe when their respective states passed laws protecting women's sports.  These FAU members fear that without their states' laws ensuring fairness in women's sports teams, they will have to compete against males who identify as female and lose possible scholarship opportunities to these males.

**B.  Defendants**

75.     The DoEd is an executive agency of the federal government responsible for enforcement and administration of Title IX. 20 U.S.C. §§ 3411, 3441.

76.     Defendant Miguel Cardona is the United States Secretary of Education and is responsible for the operation of DoEd.  20 U.S.C. § 3411.  He is sued in his official capacity.

77.     Defendant DOJ is an executive agency of the United States.  DOJ has the authority to enforce Title IX.  Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).

78.     Defendant Merrick B. Garland is the Attorney General of the United States and is responsible for the operation of the DOJ.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.  Title IX of the Education Amendments of 1972

79.     The fundamental declaration of Title IX of the Education Amendments of 1972 is that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).

80.     Title IX frequently refers to "sex" and recognizes a biological male-female dichotomy.  *See, e.g.*, *id.* § 1681(a)(7) and (8).

81.     Title IX never refers to "gender identity" (or any similar or related concept).  *See id.* § 1681.

82.     Members of Congress, recognizing that Title IX currently refers to "sex" and not "gender identity," have introduced legislation to change the law so that it includes protections for "gender identity" on more than one occasion.  *See, e.g.*, Fairness for All Act, H.R. 1440, 117th Congress (2021).  All of these attempts have failed.

83.     Congress has recognized that Title IX allows schools to recognize and consider sex in numerous situations. *See, e.g.*, 20 U.S.C. § 1681(a)(6) and (7) (exempting fraternities, sororities, YMCAs, YWCAs, Boy Scouts, Camp Fire Girls, American Legion conferences related to Boys State conferences and Boys Nation conferences, among other examples).

84.    Separately, DoEd promulgates regulations to fulfill the promise of Title IX.  Its

program and activities regulation largely tracks the fundamental declaration:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied
> the benefits of, or be subjected to discrimination under any academic,
> extracurricular, research, occupational training, or other education program or
> activity operated by a recipient which receives Federal financial assistance.

34 C.F.R. § 106.31 (2023).

85.    The prohibition on discrimination on the basis of sex is not a prohibition on

classification or separation on the basis of sex.  To the contrary, DoEd permits educational

institutions to provide separate housing for males and females, provided that the

> [h]ousing provided by a recipient to students of one sex, when compared to that
> provided to students of the other sex, shall be as a whole: (i) Proportionate in
> quantity to the number of students of that sex applying for such housing; and
> (ii) Comparable in quality and cost to the student.

*Id.* § 106.32(a)–(b); *see also* 20 U.S.C. § 1686.

86.    DoEd also permits federal financial assistance recipients to "provide separate

toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for

students of one sex shall be comparable to such facilities provided for students of the other sex."

34 C.F.R. § 106.33.

87.    DoEd's athletics regulation is similar:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied
> the benefits of, be treated differently from another person or otherwise be
> discriminated against in any interscholastic, intercollegiate, club or intramural
> athletics offered by a recipient, and no recipient shall provide any such athletics
> separately on such basis.

*Id.* § 106.41(a).

88.    DoEd's athletics regulation also allows a federal financial assistance recipient to

separate the sexes in the context of athletics under certain circumstances:

> Notwithstanding the requirements of [34 C.F.R. § 106.41(a)], a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.  For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

*Id.* § 106.41(b).

89.     Thus, Title IX authorizes sex-separate sports as long as men and women have equal opportunities.

90.     Overall, DoEd's regulations repeated references to "sex" recognize a male-female dichotomy.  *See, e.g.*, 34 C.F.R. § 106.41(b) (referring to "one sex" and "the other sex").

91.     DoEd did not promulgate formal regulations requiring schools to adopt grievance procedures for students who had been subject to discrimination (which includes hostile environment harassment), whether from an employee of the institution or a fellow student until May of 2020.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "2020 Amendments").

92.     Before this, schools could, and often did, base their internal grievance procedures on DoEd's 2001 Guidance and separately on a 2011 Dear Colleague Letter and 2016 Dear Colleague Letter.  None of these guidance documents were formal regulations and none have the force of law.  U.S. Dep't. of Educ., Off. for Civil Rts., *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*,62 FR 12034 (Mar. 13, 1997), https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html#skipnav2; U.S. Dep't. of Educ., Off. for Civil Rts., *Revised Guidance on Sexual Harassment: Harassment of*

*Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.; U.S. Dep't. of Educ, Off. for Civil Rts., Dear Colleague Letter: Sexual Violence (April 4, 2011), https://www2.ed.gov/about/ offices/list/ocr/letters/colleague-201104.pdf, *withdrawn by*, U.S. Dep't. of Educ., Off. for Civil Rts., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/ colleague-title-ix-201709.pdf; U.S. Dep't. of Educ., Off. for Civil Rts, Dear Colleague Letter: Sexual Violence (2014), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, withdrawn by, U.S. Dep't. of Educ., Off. for Civil Rts., *Dear Colleague Letter* (2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

93.     Among other things, the 2020 Amendments require schools to "[e]stablish procedural due process protections that must be incorporated into a recipient's grievance process to ensure a fair and factual determination on when a recipient investigates and adjudicates a formal complaint of sexual harassment."  85 Fed. Reg. at 30,030.

94.     The 2020 Amendments require, among other things, (a) notice to the accused; (b) an opportunity for the accused to examine and respond to evidence; (c) an opportunity for both the accused and accuser to "present expert witnesses and other inculpatory and exculpatory evidence"; (d) a live hearing with cross-examination of witnesses at colleges and postsecondary institutions; (e) a neutral decision maker who was not the Title IX coordinator."  85 Fed. Reg. at 30,054.  These procedures are intended to effectuate due process for the accused.

95.     The 2020 Amendments also codify the *Gebser / Davis* framework for determining what constitutes sexual harassment.  85 Fed. Reg. at 30,033 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) & *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,

526 U.S. 629 (1999)).  DoEd adopted "verbatim" the definition of "sexual harassment" from *Davis*.  85 Fed. Reg. at 30,030.

96.     "Sexual harassment" is currently defined by reference to three standards: (1) *quid pro quo* harassment; (2) sexual violence offenses; and, most prominently, (3) as "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education."  85 Fed. Reg. at 30,030, 30,036; 34 C.F.R. § 106.30 (definitions).

97.     This definition applies to administrative enforcement, when federal funding is put at risk, 85 Fed. Reg. at 30,033, and to enforcement in court proceedings.

98.     Congress also passed a special provision related to abortion.  The provision is often called a neutrality clause.  20 U.S.C. § 1688.

99.     Unlike any other form of disability, illness, pregnancy, or related condition or medical procedure, Congress has specifically clarified that "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion.  Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." *Id.*

100.    Schools may, therefore, provide benefits related to an abortion (if otherwise consistent with law), but DoEd cannot condition the receipt of federal funds on the provision of *any* such benefit.

101.    Additionally, by including these provisions in a statue prohibiting sex discrimination, Congress has recognized that pregnancy is inherently tied to biological sex.

**B.  The Proposed Rule**

102.    On July 12, 2022, DoEd published a Notice of Proposed Rulemaking titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Proposed Rule").  The Proposed Rule was published in the Federal Register at 87 Fed. Reg. 41,390–579.

103.    The Proposed Rule supposedly "clarified" DoEd's opinion that "sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  87 Fed. Reg. 41,391.

104.    Further, the Proposed Rule prohibited "sex-based harassment," which DoEd asserted included a "broader range of sexual misconduct than that covered under the definition of 'sexual harassment' in the current regulations."  *Id.* at 41,413.

105.    DoED did, however, correctly recognize that its proposed definition was "more similar to the definition of 'hostile environment' under Title VII than the definition of 'sexual harassment' under the current Title IX regulations."  *Id.* at 41,415.

**C.  Comment on the Proposed Rule**

106.    DoEd opened the Proposed Rule for public comment to address the scope of the regulation and on whether additional regulations would be required.

107.    The Proposed Rule invited comment on the scope of the regulation and on whether additional regulations would be required.

108.    Plaintiff State of Kansas along with other states timely submitted multiple comment letters on the Proposed Rule via the federal rulemaking portal.  True and correct copies of those comments are attached hereto as Exhibits 2–3.

109.    The comments explained in detail why DoEd should re-adopt the position it took in an enforcement matter on August 31, 2020 that when a school provides separate teams for members of each sex under 34 C.F.R. § 106.41(b), the school should separate those teams on the basis of biological sex, not on the basis of gender identity.  *See generally* Exs. 2 & 3.[2]

110.    FAU's and K.R.'s counsel—Alliance Defending Freedom—submitted numerous comment letters addressing how the Rule violates rights to individual privacy and dignity, jeopardizes fairness in women's sports, and burdens free speech and religious liberty.  True and correct copies of these comments are attached.  *See* Exs. 4–6.

111.    As these comments discuss, students suffer harm when forced to allow members of the opposite sex into their intimate spaces like restrooms, locker rooms, and overnight accommodations.  They explain that having sex-designated intimate spaces protects individuals from exposing their bodies to members of the opposite sex and from being exposed to members of the opposite sex.  The need for privacy and the harm from non-consensual exposure is particularly acute for female students.

112.    These comments also address the Proposed Rule's adverse effect on women's athletics and highlight the scientific basis for designating sports by sex and the physiological advantages that males, including males who identify as female, have over female athletes.

113.    Southeastern Legal Foundation's comment letters asserted that the proposed changes to Title IX "would chip away at parents' rights, making the government their children's ultimate caregiver."  Ex. 7, at 2.  The comment letters went on to contend that the changes

---

[2] DoED's 49-page comprehensive analysis of the Title IX problems with biological males competing in female athletics, issued on August 31, 2020, is available here: https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a2.pdf It was withdrawn, however, by the Biden Administration, on February 23, 2021, see https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a5.pdf

"would do away with student's freedom of expression" while "impos[ing] a nationwide orthodoxy on all parents, students, and teachers in any school receiving federal funds." *Id*. The comment letters further contended that the rule would "chill" speech for fear of being charged with harassment and being disciplined for making comments on issues such as gender identity, sex stereotypes, and sex characteristics. *Id.* at 4−5.

114.    Mountain States Legal Foundation submitted a comment in opposition to the proposed changes to Title IX.  A true and correct copy of that comment is attached hereto as Exhibit 8.  MSLF's comment letter explained how the then-proposed regulatory changes to the implementation of Title IX would trigger a cascade of negative effects for schools, including damaging due process rights, impairing the right to free speech, and destabilizing what is currently a settled Title IX regime that will have been in place for nearly 4 years.  *Id.* at 1 ("[T]he proposed regulations would confuse stakeholders, cause unneeded expenses for schools and students, and create regulatory whiplash as the regulations are either struck down or rescinded soon after their enactment.").  Most especially, MSLF addressed the severe consequences that would result if schools had a duty to suppress "misgendering" or compel students and teachers to use "preferred pronouns."  *Id.* at 17-18 (describing a host of neo-pronouns that are laid out by colleges such as "xemself" and "per").  Similarly, MSLF is concerned with compelling the use of neo-honorifics for teachers and administrators (spoken by students and parents) such as "Mx." instead of Mr. or Ms.

**D.  The Final Rule**

115.    Despite extensive criticism in the public comments, the Final Rule nevertheless amends 34 C.F.R. § 106 in numerous identical ways to those that the Proposed Rule previously initially proposed.  89 Fed. Reg. at 33,474.  The Final Rule purports to "provide greater clarity

regarding: the definition of 'sex-based harassment'; the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and recipients' obligations to provide an educational environment free from discrimination on the basis of sex." *Id.* at 33,476.

116.    On April 29, 2024, DoEd issued a final administrative rule titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Final Rule"). The Final Rule was published in the Federal Register at 89 Fed. Reg. 33,474–778. A true and correct copy of the Final Rule is attached hereto as Exhibit 1.

117.    As is relevant here, this part of the Final Rule makes three major changes, none of which are authorized by Title IX: (1) it essentially changes the definition of "sex" to include "gender identity"; (2) it changes the standard for what constitutes sexual harassment; and (3) it changes the person to whom a school may be liable for discrimination.

118.    First, the Final Rule "interprets" Title IX's prohibition on discrimination on the basis of sex to include discrimination on the basis of "gender identity." *Id.* at 33,477.

119.    The DoEd considers "gender identity" to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth" and finds it otherwise "unnecessary to articulate a specific definition of 'gender identity.'" *Id.* at 33,809.

120.    The Final Rule recognizes there is a difference between sex and "gender identity."

121.    The Final Rule assumes that there are more than two "gender identities." *See id.* at 33,804–05 (removing references to "both sexes").

122.    DoEd included an unexhaustive list of categories that could be considered when determining whether discrimination is "sex-based": "lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way." *Id.* at 33,803. None of these terms are specifically defined. *Id.* Even sexual orientation disorders are fairly included within the broad language of the April 29 rule.

123.    Additionally, the Final Rule relies on the World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), which recognizes dozens of "gender identities" including "eunuch," "nonbinary," "transgender," "gender nonconforming," "gender queer or diverse," "gender diverse," "third gender lying beyond the gender binary," "two spirit," and many others that are not widely recognized in the United States. The Final Rule does not account for, provide guidance concerning, or limit liability with respect to, any "gender identity" outside the "gender binary."

124.    The Final Rule would require educational institutions to take a person at their word as to their "gender identity" without documentation or questioning. *Id.* at 33,819.

125.    The Final Rule provides no guidance for ascertaining a person's "gender identity" if the information is not volunteered. In fact, "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes *more than de minimis* harm." *Id.* at 33,819 (emphasis added). The Final Rule considers requesting a birth certificate to be a "burdensome documentation requirement." *Id.*

126.    The Final Rule acknowledges that "gender identity" may not be known or readily knowable.  *Id.* at 33,809.  Nevertheless, the Final Rule states "a recipient must not treat individuals more or less favorably based on their gender identity" and "may not prevent a person from participating in its education program or activity consistent with the person's gender identity," *id.*, which, again, may not be known or readily knowable.  Thus, an educational institution may "discriminate" against a student—risking federal funding and civil liability—without even knowing it is discriminating, especially considering that the Final Rule assumes there are multiple "gender identities."

127.    Currently, a school is not liable for discrimination under Title IX unless the school has *actual notice* of the discrimination.  *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023).  Under the Final Rule, a school could be liable for "discrimination" if it knows it has male-only and female-only restrooms (and knows males cannot use the female restroom and vice versa) even if it does not know if any student, applicant, visiting student, parent, teacher, staff member, or other visitor has a "gender identity" that does not match his or her biological sex.

128.    Second, the Final Rule states that it "clarifies" that a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause *more than de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity."  89 Fed. Reg. at 33,818 (emphasis added).

129.    This would be a change from the courts' current interpretation of "discrimination," which requires a showing of "unwelcome conduct that a reasonable person

would determine is 'so severe, pervasive, and objectively offensive' that it effectively denies a person equal access to education."  85 Fed. Reg. 30,065.  This definition currently applies to both civil liability and administrative enforcement.  *See* 34 C.F.R. § 106.2 (defining "Hostile environment harassment").

130.     The Final Rule acknowledges that, even if the standards for administrative enforcement can be or are different than those used for civil liability, that "does not mean [] that administratively imposed remedial actions can never have financial consequences."  *Id.* at 33,474 n.10.

131.     Third, the Final Rule "clarifies" the definition of "person" to whom the school may be liable for discrimination.  It now "clarifies" that "person" as any student, employee, or any other person who "was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination."  *Id.* at 33,846.

132.     Schools may be liable for "discriminating" against students, parents of students, applicants for admission, parents of applicants, parent chaperones, visiting students, parents of visiting students, teachers, employees, coaches, visiting coaches, independent contractors, guests of the school, and others.  *Id.*

133.     The Final Rule declines to define "specific conduct and practices that constitute . . . gender identity discrimination," *id.* at 33,808, but does provide some instances in which a school would likely be found to be discriminating if it treats a person according to his or her sex rather than "gender identity."  These instances reveal how broad and vague these conduct or practices could be.

134.    For example, the Final Rule acknowledges that students have a "legitimate interest" in "safety and privacy" of sex-separate facilities (such as restrooms, locker rooms, and overnight accommodations).  *Id.* at 33,820.

135.    However, it goes on to state these "concerns" are "unsubstantiated and generalized." *Id.* at 33,820.  Further, "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities [including restrooms, locker rooms, and overnight accommodations] or activities consistent with their gender identity." *Id.* at 33,818.  Any "such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes." *Id.* at 33, 819.

136.    The Final Rule repeatedly refers to prior "Dear Colleague" Letters, including the 2016 Dear Colleague Letter, where DoEd advised recipients that they must treat a transgender female-identifying student the same as a biological female student for the purposes of accommodations on overnight school trips.  2016 Dear Colleague Letter at 4.[3]

137.    Thus, if it is allowed to go into effect, the Final Rule would require that schools permit biological males (including students, visiting students, applicants, their parents, teachers, staff, contractors, visitors, and others) to access female-only facilities (including restrooms, locker rooms, and overnight accommodations) without question (and vice versa), or else the school risks losing its federal funding.

138.    As another example, the Final Rule would make clear that schools can no longer separate students based on biological sex for "classes or portions of classes." *Id.* at 33,819.  This would include gym class and health and sexual education classes.

---

[3] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf

139.    As another example, while the Final Rule claims to maintain First Amendment

protections, *id.* at 33,803 (suggesting nothing in the Final Rule *requires* an educational institution

to violate free speech rights), DoEd has already taken the position that educational institutions

are at risk of losing federal funding (and at risk of civil liability) if a teacher does not use a

student's "preferred pronouns" for any reason, including if the teacher did not know that the

student's "gender identity" differed from his or her biological sex or if the teacher had a free

speech or religious liberty objection.  *See* 2016 Dear Colleague Letter at 3.  The Final Rule

would likely also apply to completely innocuous speech such as the statement that "there are

only two genders."

140.    As evidence of this, the Final Rule would lower the standard for harassment to

include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is

*subjectively* and objectively offensive and is so severe *or* pervasive that it *limits* or denies a

person's ability to participate in or benefit from the recipient's education program or activity."

89 Fed. Reg. at 33,884 (emphasis added).

141.    This position would chill students' and teachers' speech.  Female students who

raise concerns about having to share a locker room with a male athlete or a restroom with a male

visiting parent are at risk of facing investigation and disciplinary proceedings for "hostile

environment harassment" because their words could be seen as offensive and severe or pervasive

and no longer need to meet the current "severe, pervasive, and objectively offensive standard" in

order to amount to harassment.

142.    Similarly, the Final Rule is so vague and broad that students would self-censor for

fear that their speech on topics such as gender identity, sex stereotypes, and sex characteristics

could fall within its new definitions and standards.

143.    The Final Rule would also compel speech from teachers, school employees, parents, and students, in that it would require students to use an individual's "preferred pronouns" and names of choice, forcing students to affirm gender identity and transgender ideology contrary to their personal beliefs and values.

144.    The Final Rule would also compel speech from students and parents, in that it would require students and parents to use teachers' and school staffs' honorifics that do not match their sex, or use "neo-honorifics" such as "Mx."

145.    The Final Rule ostensibly would maintain "current regulations on athletics," which do allow female-only and male-only sport teams.  *Id.* at 33,817.

146.    However, the Final Rule would also apply to all "discrimination" (as the Final Rule now defines it) "except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at [34 C.F.R.] §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation [34 C.F.R.] § 106.32(b)(1), or § 106.41(b)."  *Id.* at 33,817.  The Final Rule would *not* except 34 C.F.R. § 106.41(a), which prohibits discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient," and says "no recipient shall provide any such athletics separately on such basis."

147.    Defendants have already taken the position that "the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls' participation in girls' sports."  Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) at 21; *cf.* U.S. Dept. of Justice and DoED 2016 Dear Colleague Letter on Transgender Students at 3.

148.    In fact, according to Defendants, any "categorical ban" on biological males' participation in female-only sports "is inconsistent with Title IX's overarching goal of ensuring

equal opportunity." Brief of Amicus United States of America, *B.P.J.*, 98 F.4th 542, at 12. They have said that "prohibiting [biological males] from participating on girls' sports teams because their sex assigned at birth was male" causes "harm" and constitutes discrimination on the basis of sex. *Id.*

149.   The Final Rule's assertion that a separate regulation will address athletics is a red herring because, "[DoEd] has indicated that it would consider in a forthcoming notice of proposed rulemaking (NPRM) what criteria, *if any*, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletic team." *Id.* at 29. (emphasis added).

150.   Therefore, DoEd's default position is that *no* separation based on athletics is permitted on the basis of sex but further guidance *may* provide some criteria for limited exceptions to that general rule. The lack of separate guidance identifying such exceptions naturally means that there are no exceptions based on the Final Rule.

151.   The Final Rule also says that DoEd considers it a violation of Title IX when a school engages in "impermissible" "sex-stereotyping" by making decisions "based on 'paternalism and stereotypical assumptions about women's interests and abilities,' and a 'remarkably outdated view of women and athletics.'" *Id.* at 33,811 (quoting *Pederson v. La. State Univ.*, 213 F.3d at 858, 880 (5th Cir. 2000)).

152.   The Final Rule does not explain why sports are exempted if the relative difference in boys' and girls' athletic abilities is only a "sex-stereotype" which cannot be relied on to separate students based on biological sex.

153.    Defendants would likely use the Final Rule to prohibit blanket bans on biological males competing on and against female-only athletics teams, requiring schools to allow men to play on women's teams.

154.    The Final Rule does not provide any guidance as to how schools are to decide which men must be permitted to play on women's teams or how to avoid "sex-stereotyping" in this area.

155.    The Final Rule does not provide any guidance as to whether female athletes are permitted to withdraw or otherwise decline to compete against male athletes if they reasonably fear bodily injury, or if such conduct would constitute discrimination.

156.    The Final Rule does not provide any guidance to schools as to how to maintain competitive fairness for female athletes when other schools field male athletes with an obvious competitive advantage.  (Such as a male 18-year old male Senior in High School who abruptly begins to identify as female).

157.    The Final Rule does not provide any guidance to schools as to how to classify "gender-fluid" or "two-spirited" athletes who wish to compete on both male and female teams.

158.    The Final Rule does not provide any guidance to schools as to how to classify, for athletics purposes, "non-binary" students who decline to participate as either male or female, because they insist that they fall into neither category.

159.    Like the Proposed Rule, the Final Rule notes only in passing DoEd's prior contrary position.  *See* 89 Fed. Reg. at 33,804.

160.    The Final Rule acknowledges that DoEd is currently enjoined from enforcing this interpretation against twenty states, including Plaintiff States Kansas and Alaska, but simply says

that DoEd "disagrees" with the Court's reasoning in that case.  *Id.* at 33,804, citing *Tennessee* v. *U.S. Dep't of Educ.,* 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).

161.    While the Final Rule does acknowledge that DoEd cannot interfere with a person's religious liberty rights or rights under the Religious Freedom Restoration Act of 1993,  PL 103–141, November 16, 1993, 107 Stat 1488, it does not provide any exemption for religious students, teachers, staff, administrators, coaches, etc., and instead says DoEd "will investigate" all complaints and make individual determinations when a person cannot comply with the Final Rule due to his or her religious belief.  *Id.* at 33,809.

162.    These changes (and the constitutional concerns they raise) implicate the Spending Clause contract that the States made with the federal government when they accepted federal funding in exchange for providing equal opportunities for women and girls and for ensuring privacy protections for all students.

163.    The Final Rule fails to adequately address comments made by Plaintiff States regarding the Spending Clause and their contract with the federal government.  *See id.* at 33,516–17.

164.    Instead, the Final Rule suggests "Federal agencies have authority to define the contours of the Spending Clause contract with recipients through their regulations."  *See id.* at 33,517.

165.    The Final Rule clashes with other parts of Title IX as well.  The Final Rule requires that educational institutions "treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave; payment of disability income; accrual of seniority and any other benefit or service; and reinstatement; and under any fringe benefit offered to employees by virtue of

employment." *Id.* at 33,796

166.    The Final Rule defines "pregnancy or related conditions" to mean pregnancy, childbirth, termination of pregnancy."  Termination of pregnancy includes voluntary abortion. *Id.* at 33,575.

167.    Employees must also be allowed a leave of absence to obtain an abortion, even when the educational institution does not maintain a leave policy for its employees, as well as "in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy." *Id.* at 33,798.

168.    The Final Rule also requires educational institutions to provide a woman who has had or who is recovering from an abortion access to all education programs and activities which could include access to online or homebound instruction during recovery from an abortion, providing a student additional time to complete an exam or coursework if a student travels out of state for the abortion.  *Id.* at 33, 777.

169.    The Final Rule requires educational institutions to offer women obtaining abortions "Reasonable Modifications" of policies, practices and procedures to ensure equal access (i.e. to facilitate their abortions), including "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations." *Id.*

170.    Women obtaining abortions must also be allowed a voluntary leave of absence, along with reinstatement "to the academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began." *Id.*

171.    Students obtaining an abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital

benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity. *Id.*

172.    "Fringe benefit offered to employees by virtue of employment," leave—especially mandatory provision of leave when leave is not available under existing policies or when the employee has no accrued leave time available, "payment of disability income," "accrual of seniority," "benefit[s] of service," "access to online or homebound instruction," and "extra time to complete exams" are all benefits provided by the educational institutions.

173.    Thus, the Final Rule requires educational institutions to provide leave, disability, and other benefits in connection with abortions in direct conflict with Title IX's neutrality clause.

174.    In addition to rewriting Title IX to change the definition of "sex" and to requiring schools to provide benefits for abortion, the Final Rule changes current regulations in problematic ways.

175.    The Final Rule eliminates many of the grievance procedure due process protections that were put in place by the 2020 Amendments. *See id.* at 33,876–77.

176.    Prior to the 2020 Amendments, schools across the country had implemented grievance procedures for sexual harassment complaints in conformance with the procedural recommendations contained in DoEd's 2011 Dear Colleague Letter.

177.    Often, these procedures violated the due process rights of accused students and employees.  "As of August 16, 2019, no fewer than 298 of the post-Dear Colleague letter lawsuits (191 in federal court) have yielded substantive decisions, at various stages of the legal process… Of the 298 decisions in state and federal court, colleges have been on the losing side in 151."  Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial*

*Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49, 65-66 (2019).

178.     As of 2024, more than five hundred state and federal lawsuits are estimated to have been filed challenging procedural due process deficiencies in Title IX grievance procedures.[4]  *See Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1020 (D. Colo. 2019) ("The Tenth Circuit has not so opined, but several district courts have found that a lack of meaningful cross-examination may contribute to a violation of due process rights of an accused student in a disciplinary hearing regarding sexual assault."); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) [denying motion to dismiss] ("our circuit has made two things clear: (1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination").

179.     The Final Rule would largely revert to the grievance process that was in effect prior to the 2020 Amendments.  Section 106.45 & .46 (involving students at post-secondary institutions), pg. 1540, 1550.

180.     Rather than an opportunity to examine the evidence, the accused is given access to an "an equal opportunity to access either the relevant and not otherwise impermissible, or the same written investigative report that accurately summarizes the evidence " (106.46(c)(1)(iii), 106.46(e)(6)); rather than an opportunity to question and cross-examine witnesses, "[a] recipient must provide a process that enables the decisionmaker to question parties and witnesses" 106.45(g); the accused may be denied an attorney ("the postsecondary institution may establish

---

[4] https://www.chronicle.com/article/were-making-the-same-title-ix-mistakes-again.

restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties") (106.46(e)(2)); no live hearing is required (106.46(e)(6)(2), 106.46(g)); and the decisionmaker in any grievance may be the same person as the investigator (106.45(b)(2)).

181.    The Final Rule extends beyond the United States.  *Id.* at 33,853. *see contra* 20 U.S.C. § 1681(a) ("No person *in the United States* shall …") (emphasis added).

**E. "Gender Identity"**

182.    "Gender identity" is not a statutorily cognizable identity category.

183.    "Gender identity" is subjective. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018).

184.    The sole criterion used to determine "gender identity" apparently is whether one says one is transgender.  *See, e.g., Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, S.J., concurring); *B.P.J.*, 2023 WL 111875, at *8; *cf.* Cal. Health & Safety Code § 103426; Wash. Admin. Code § 246-490-075.

185.    Unlike biological sex, "gender identity" is not a static or an immutable characteristic "determined solely by accident of birth."  *Adams ex rel. Kasper v. Sch. Bd.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc).  And the Final Rule would require schools to take people at their word as to their "gender identity."

186.    There is also "the issue of gender fluidity in which students may switch between genders with which they identify."  *Id.* at 798.

187.    Lastly, "gender identity" is not limited to a male/female dichotomy.  Depending on whom you ask, gender identity covers people who identify with any of the following gender identities: "boygirl," "girlboy," "genderqueer," "eunuch," "bigender," "pangender,"

"androgyne," "genderless," "gender neutral," "neutrosis," "agender," "genderfluid," "third gender," and others.  *See generally* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022).[5]

188.    Indeed, a third of the respondents to the 2015 National Transgender Discrimination Survey (a survey in which all respondents "identif[ied] as transgender") reported their "primary gender identity" as either "part time as one gender, part time as another" or some gender other than male or female.  Jamie M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 16 (2015).  Each and every time a student's "gender identity" changes, the school is once again at risk of discriminating by treating the student according to his or her biological sex (or according to his or her former "gender identity"), regardless of whether the school is aware of the change.

## F. The Rule Irreparably Harms Plaintiffs

189.    The Final Rule would irreparably harm Plaintiffs.

190.    Plaintiff States operate education programs and activities that are subject to Title IX's requirements.

191.    The Kansas Legislature has created or authorized educational institutions such as K–12 public school districts, schools for the blind and deaf, and state universities that collectively received around $1.5 billion in federal financial assistance for fiscal year 2022 and are projected to receive around $1.6 billion in federal financial assistance during fiscal year 2023.  *E.g.*, 2 KAN. LEGIS. RSCH. DEP'T, BUDGET ANALYSIS FISCAL YEAR 2024 at 913, 945,

---

[5] Cited by DoEd at 89 Fed. Reg. 33,820 n.90.

1003, 1025 (Feb. 2023), *available at* https://tinyurl.com/bdh6us6v.  On information and belief, these numbers have not been substantially diminished for FY2024.

192.   Plaintiff State of Alaska operates educational programs and activities that are subject to Title IX's requirements.

193.   The Alaska Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools, the state board school, and other special schools. It has further established the state university.  In fiscal year 2022, the federal government provided $237 million for K-12 schools and $198 million for the University of Alaska, not including Elementary and Secondary School Emergency Relief funds.  In fiscal year 2023, the federal government provided $225 million for K-12 school and $177 million for the University of Alaska, again not including ESSER funds.  On information and belief, these numbers have not been substantially diminished for FY2024.

194.   The State of Utah has created or authorized educational institutions such as K–12 public school districts, schools for the blind and deaf, and state universities that receive federal financial assistance.  For FY 2025, federal funding is projected to account for approximately 8 percent of Utah's total base public education revenue of $7.7 billion.  *See* LEGIS. FISCAL ANALYST, MINIMUM SCHOOL PROGRAM: BASIC SCHOOL PROGRAM & PUBLIC EDUCATION BUDGET FRAMEWORK 2024 GS at 2 (Jan. 23, 2024), *available at* https://le.utah.gov/interim/2024/pdf/00000511.pdf.

195.   Plaintiff State of Wyoming operates educational programs and activities that are subject to Title IX's requirements.

196.   The Wyoming Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools. It has further established

the state university.  In fiscal years 2022, 2023, and 2024 the federal government provided millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming. On information and belief, the federal government will provide millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming for fiscal year 2025.

197.    The Final Rule says that DoEd's Office of Civil Rights ("OCR") would address complaints of sex discrimination and discrimination based on "gender identity," consistent with OCR's jurisdiction under Title IX and the final regulations, even in religious institutions.  89 Fed. Reg. 33, 837; *id.* at 33,847–848.

198.    The Final Rule also states that "OCR [will] evaluate and, if appropriate, investigate and resolve consistent with these regulations' requirement that a recipient not discriminate against parties based on sex," including gender identity.  *Id.*

199.    Plaintiff State of Kansas has enacted and maintains laws or policies relating to educational institutions that conflict with the Final Rule, as discussed *supra*.

200.    Other laws and state policies do not apply solely to educational institutions but nonetheless conflict with the Final Rule insofar as they apply to educational situations in certain situations.  For example, the state's Women's Bill of Rights defines the terms "sex," "female," "male," "woman," "girl," "man," "boy," "mother," and "father" strictly in connection with biology and requires school districts, as well as other state and local entities that collect vital statistics for certain purposes, to identify each individual person in the collected data set as either male or female at birth.  K.S.A. 77-207.

201.    Kansas and the federal Constitution protect citizens' right to religious liberty and freedom of expression, which includes protecting those who recognize that there are only two

sexes and who refuse to use a person's "preferred pronouns."  *See Green v. Miss U.S.A., LLC*, 52 F.4th 773, 783 (9th Cir. 2022); *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021).

202.    Other Plaintiff States have also enacted and maintain laws (or policies) that also conflict with the Final Rule.  *See* AS 14.18.040; Utah Code Ann. § 53G-6-902; Utah Code Ann. § 63G-31-301(1); Wyo. Stat. Ann. § 21-25-101, *et al.*

203.    Private parties have relied on prior DoEd action to challenge similar laws enacted and maintained by other states.  Private parties would almost certainly rely on the Final Rule to challenge Plaintiff State's laws regarding sex and clubs and organizations (including athletics), locker rooms, restrooms, and overnight travel.

204.    There therefore is a credible threat that private parties would seek to have the DoEd and DOJ enforce, and that DoEd and DOJ would enforce, the Final Rule against Plaintiffs.

205.    Therefore, there is also a credible threat that DoEd and DOJ would enforce the Final Rule against Plaintiff States.

206.    Completed enforcement of the Final Rule could cost Plaintiff States significant federal financial assistance, since the laws of several states prohibit compliance with portions of the Rule.

207.    Plaintiff States adopted their laws and policies, and established sex-separated restrooms, locker rooms, showers, residence halls, and other living facilities, in reliance on their understanding that Title IX does not prohibit such laws, policies, or practices.  This understanding was based on longstanding DoEd regulations and prior guidance, including initial post-*Bostock* guidance from DoEd and DOJ.

208.    The Final Rule undermines Plaintiff States' reliance interests and create regulatory uncertainty for Plaintiffs and other regulated entities.

209.    The Final Rule interferes with Plaintiff States' sovereign right to "create and enforce" their own laws.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Tennessee*, 615 F. Supp. 3d at 821 ("States suffer a cognizable injury for purposes of constitutional standing when they allege an intrusion on their ability to enforce their own legal code, whether by way of direct interference or interference analogous to substantial pressure to change state laws.").

210.    The Final Rule imposes administrative costs and burdens on Plaintiff States and other regulated entities because it forces them to offer training regarding the effect of students' and staffs' "gender identities."

211.    Indeed, the Final Rule estimates that compliance would cost an additional $3,090-$8,986 per year per school.  89 Fed. Reg. at 33,850.

212.    The Final Rule would also require Plaintiff States to redesign or reconfigure the physical facilities they have set up.  Schools today have girls' and boys' (or men's and women's) restrooms, locker rooms, and other facilities.  The Final Rule would require schools to carve out a separate "gender neutral" option.  And a student who identifies as two-spirited, for instance, may contend that a gender-neutral option is inadequate, given that males and females have dedicated intimate facilities such as restrooms. Schools could be forced to create a new restroom for every gender identity, in order to avoid DoED's definition of discrimination.

213.    The Final Rule would also require administrative changes from Plaintiff States, including making changes to application forms for admission or employment, appearance codes, and parental and guardian paperwork.

214.    These changes would be required even if there were no transgender students or staff at the school, because the Final Rule would extend liability to "students, employees, applicants for admission or employment, and other individuals participating in or attempting to participate in the recipient education program or activity, which could also include parents of minor students, students from other institutions participating in events in the resident's campus, visiting lecturers, to other community members whom the recipient invites to campus."

215.    The Final Rule would require Plaintiff States to make these changes even before it takes effect on August 1, 2024, because training and updating forms, codes, and policies take time.

216.    The Final Rule requires administrative changes because educational institutions must update their sexual assault policies (including literature, public policies, fact sheets, internal policies, handouts, etc.), which would cost money.

217.    The Final Rule will lead to an increase in the number of investigations educational institutions must undertake by as much as ten percent. *See* 89 Fed. Reg.  33,474.

218.    The Final Rule requires Plaintiff States to provide leave and other educational and employment benefits to students related to abortions in violation of 20 U.S.C. § 1688.

219.    The Final Rule would require administrative changes from Plaintiff States to update leave policies to allow students and employees to take leave related to abortions.

220.    The Final Rule threatens irreparable harm to K.R, FAU, and FAU members.

221.    The Final Rule threatens irreparable harm to K.R.'s and FAU members' right to privacy because (1) Oklahoma law currently ensures that school restrooms will be designated by biological sex and (2) Utah law ensures, with limited exceptions, that private spaces in k-12 public schools and changing rooms in government-owned buildings will be designated by

biological sex. But the Final Rule says that it preempts these state laws and allows males who identify as females to access these sex-designated spaces.

222.     K.R. and some FAU members want to continue to access girls' restrooms, locker rooms, overnight stays, and showers without the presence of males, but the Final Rule will force their schools to admit biological males who identify as female to girls-only spaces, causing them to feel embarrassment and humiliation. As for K.S. in particular, the Final Rule will cause her to stop using girls' restrooms at school entirely, as she did in the past.

223.     The Final Rule threatens FAU members' right to equal athletic opportunities because FAU has some female members in Kansas, Utah, and Wyoming; those states have laws that require girls' sports teams to be designated by biological sex. But the Final Rule says it preempts these state laws and allows males who identify as females to compete on these women's sports teams, causing FAU members who compete on these teams to lose their state legal protections and to risk competing against males.

224.     The Final Rule also threatens irreparable harm to K.R.'s and some FAU members' right to free speech and religious liberty. K.R., and some FAU members (including T.P.) want to continue to express their views about gender identity at school as they have done in the past, and want to continue to use pronouns that accurately reflect people's sex, but they fear that the Final Rule would cause their school to punish them for speaking consistent with their beliefs, particularly for K.R. because other students at her school have already been offended by her decision not to use inaccurate pronouns that contradict people's sex.  Some FAU members also want to continue to express their views that males who identify as female are in fact males, that there are only two sexes, and that males should not access women's sports and intimate spaces, but they fear that the Final Rule would cause their schools to punish them for speaking

consistent with their beliefs. To avoid punishment, starting August 1, some FAU members (including T.Z. and Zwahlen) will stop expressing at school their views about gender identity, including that there are only two sexes and that men who identify as women are in fact men and should not participate in women's sports.

225.    Final Rule also irreparably harms the organizational plaintiffs: Moms for Liberty and Young America's Foundation.

226.    Moms for Liberty has members across the country whose children currently attend schools that receive federal funding and are subject to Title IX regulations. Transgender individuals also attend these schools.

227.    The Final Rule would result in those schools adopting policies that compel speech contrary to the values and beliefs of Moms for Liberty's members and their children.

228.    For example, Merianne Jensen is a member who lives in Virginia and has four children, D.J., T.J., E.J., and A.J. in public school. Her children are in the 9th, 6th, 6th, and 4th grades respectively.

229.    Ms. Jensen is a member of the Church of Jesus Christ of Latter Day Saints and has raised her children to believe that all human beings—male and female—are created in the image of God and that gender is an essential characteristic of each individual's premortal, mortal, and eternal identity and purpose. Her children believe that biology controls an individual's sex, and that a person's sex is determined at birth.

230.    T.J. and E.J. have a peer at their middle school who is biologically a girl but now self-identifies as a boy. To date, T.J. and E.J. have continued to call their peer by her girl name and continue to use she/her pronouns when referring to their friend.

231.    At T.J.'s and E.J.'s school, the principal has already given an assembly that instructed students on the view that some boys identify as girls and some girls identify as boys. The principal counseled the children that everyone should get used to this and accept it because it is the future. However, to date, neither T.J. nor E.J. have been reprimanded or disciplined for using biologically accurate pronouns and the transgender student's birthname.

232.    Consistent with their beliefs, T.J. and E.J., in the absence of the threat of discipline, would continue to use biologically accurate pronouns and their friend's birthname. Furthermore, T.J. and E.J. do not wish to be forced to affirm that an individual born as a female is a male. However, out of fear of being disciplined because of the changes to Title IX laid out in the Final Rule, T.J. and E.J. are left with the choice of not expressing themselves in accord with their beliefs and affirming something contrary to their beliefs.

233.    Ms. Jensen's children, D.J. and A.J., would also use biologically correct pronouns and speak out about issues related to gender identity, sex stereotypes, and sex characteristics; however, they are afraid of being disciplined if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Jensen's children D.J. and A.J. will self-censor their views.

234.    As a second example, Tricia Plank is a member of Moms for Liberty who lives in Pennsylvania. She has two children, P.M.P. in 9th grade and P.P.P. in 7th grade. She also serves as an elected member on her local school board.

235.    Ms. Plank's children attend schools where transgender students are also enrolled.

236.    Ms. Plank and her two children believe that biology and God determine an individual's sex and that an individual cannot change his or her sex.

237.    Presently, Ms. Plank's children express views about gender identity and transgenderism while in school. To date, they have received scrutiny from teachers and administration but have not received any reprimands or been disciplined for their speech.

238.    Absent the Final Rule becoming effective, Ms. Plank's children would continue to express views on these matters. However, out of fear of punishment following the effective date of the Final Rule, Ms. Plank's children would stop expressing views on matters of gender identity, sex stereotypes, sex characteristics, and transgenderism.

239.    The impact and irreparable injury of the chill on the First Amendment rights of Ms. Plank's children is heightened by recent events in their community.

240.    Ms. Plank's oldest daughter plays tennis on her school's team. A coach for a team against which Ms. Plank's daughter's team has played and could play again is transgender. This coach, a biological male who seemingly has not undergone transition surgery, has used the women's bathroom and changed in a women's locker room at a tennis tournament that Ms. Plank's daughters attended. He did this in front of young girls.

241.    This puts the key issues of gender identity and school locker room and bathroom policies front and center at Ms. Plank's children's school. Ms. Plank's children have expressed views on these matters and would continue to do so absent the Final Rule taking effect. But, due to a fear of discipline, Ms. Plank's children will stop expressing their views about biological males using female restrooms and locker rooms if the Final Rule takes effect.

242.    As a third example, Debbie Lochner is a chapter chair for Moms for Liberty. She lives in New York and has a daughter K.L. who will be attending 9th grade in the fall.

243.    Ms. Lochner and her daughter hold strong views on gender identity, including on pronoun usage and on an individual using a locker room and a dressing room that aligns with the person's biological sex.

244.    Ms. Lochner's daughter is involved in theater, which would require her to use a dressing room at school. Furthermore, the high school that Ms. Lochner's daughter will be attending has a mandatory swimming class, requiring her daughter to change in a locker room.

245.    Ms. Lochner's daughter would speak out against transgender individuals using dressing rooms and locker rooms of their choosing; however, her daughter is a rule follower and is afraid of being disciplined and receiving a negative mark on her record if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Lochner's daughter would censor her views.

246.    As a fourth example, Rebekah Koznek is a vice chair of a chapter of Moms for Liberty. Ms. Koznek lives in California and is the mother of E.K. and T.K. E.K. is in 8th grade and T.K. is in 5th grade.

247.    Ms. Koznek and her children believe God created men and women and that individuals cannot change their biological sex.

248.    Ms. Koznek's children attend public school. Transgender students are enrolled in the school. One of the transgender students, who is a biological male, used the girls' locker room during the 2023-24 school year.

249.    While doing so, the individual "twerked" in the faces of female students and engaged in other attention seeking behaviors that made female students uncomfortable in the locker room.

250.    E.K. has been diagnosed as being on the Autism spectrum and has speech and developmental limitations.

251.    As a result of E.K.'s disabilities, the presence of a biological male sharing a girls' bathroom or locker room with E.K. would create great confusion for E.K. E.K. is unable to process such a situation and is unable to modify her use of pronouns to conform to the requirement of the Final Rule.

252.    As a result, Ms. Koznek is concerned that a "hostile environment harassment" complaint will be filed against E.K. and that E.K. will face investigatory and disciplinary action if the Final Rule is permitted to take effect

253.    Ms. Kozek's son T.K. would speak out against girls using the boys' locker rooms; however, he is afraid of being disciplined if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Koznek's son would censor his own speech.

254.    In sum, members of Moms for Liberty and their children would be subject to policies that their schools, which receive federal funding, adopt to conform to the Final Rule. Their children, in turn, out of a reasonable fear that their current speech qualifies as "hostile environment harassment," would self-censor their speech.

255.    Young America's Foundation has chapters with student members on college campuses around the country, including at Kansas State University and the University of Wyoming.

256.    If the Final Rule takes effect, colleges and universities, including Kansas State University and the University of Wyoming, would be forced to adopt policies that chill the First Amendment rights of Young America's Foundation's members.

257.     Through these policies, universities and colleges would compel students to affirm individuals' "preferred pronouns" and preferred names. This, in turn, would force Young America's Foundation's members to espouse and affirm values and beliefs related to issues of gender identity with which they strongly disagree and which contradicts their religious beliefs.

258.     For example, Thomas Adcock is a student at Kansas State University in his Junior year, Mr. Adcock is the Chairman of his university's Young America's Foundation chapter.

259.     Mr. Adcock is also an Army veteran who is attending college with assistance from the G.I. Bill.

260.     As a student at Kansas State University, Mr. Adcock has had numerous interactions with individuals identifying as transgender, including interactions within the classroom setting.

261.     Mr. Adcock is Christian and holds strong views on issues of gender identity, sex stereotypes, and sex characteristics. He believes that a person's sex is determined at birth by biology such that an individual cannot change his sex.

262.     In furtherance of these views, in the classroom setting, Mr. Adcock has refused to identify preferred pronouns for himself and has refused to use preferred pronouns of other students when the preferred pronouns do not match the student's biological sex.

263.     To date, Mr. Adcock has not been investigated, given a reprimand, disciplined, or forced to attend any educational or training session because of his refusal to use preferred pronouns.

264.     Absent the Final Rule taking effect, Mr. Adcock would continue to refuse to use preferred pronouns because using preferred pronouns would run contrary to his deeply held beliefs.

265.    If the Final Rule is permitted to take effect, Mr. Adcock fears discipline and losing his G.I. Bill funding if he refuses to use another individual's "preferred pronouns" and honorifics.

266.    In his role as Chairman of Young America's Foundation, Mr. Adcock has also organized events implicating issues related to gender identity, sex stereotypes, sex characteristics, and de-transitioning. For example, Mr. Adcock organized movie watch parties for his chapter, at which he played movies such as "What is a Woman" and "Lady Ballers." Mr. Adcock plans to host future movie watch parties featuring films on similar topics and plans to hold some of these parties on campus. Mr. Adcock further plans to advertise these parties on his university's grounds. If the Final Rule is permitted to take effect, Mr. Adcock would be deterred from advertising and hosting movie watch parties featuring films touching on gender identity issues out of fear of facing investigatory and disciplinary action.

267.    Mr. Adcock plans to host future movie watch parties featuring films on similar topics. Mr. Adcock further plans to advertise these parties on his university's grounds. If the Final Rule is permitted to take effect, Mr. Adcock would, out of fear of facing investigatory and disciplinary action, refrain from advertising and hosting movie watch parties featuring films touching on gender identity issues.

268.    Mr. Adcock also helped to host a speech by Chloe Cole, an individual who has de-transitioned. Mr. Adcock and other members of Kansas State University's Young America's Foundation's chapter advertised the speech by writing in chalk on school grounds. Some of the messages included, "Men are not women," "Protect real women," "Detransitioner lives matter," and a depiction of the "trans flag" with an x across it.

269.     Mr. Adcock did not receive any reprimand or discipline from Kansas State University for his role in advertising Chloe Cole's speech. To the contrary, when complaints were presented to Kansas State University's Dean of Student Life, the Dean affirmed Mr. Adcock's and other Young America's Foundation members' right to free speech and used the incident as an opportunity to teach complaining individuals about free speech rights.

270.     Mr. Adcock reasonably fears that if the Final Rule is permitted to take effect, his university's administration would be forced to investigate the complaints and bring sex harassment charges against him for writing messages like "Men are not women" in a location on the university's grounds.

271.     Because of this fear, although Mr. Adcock and his chapter want to host similar speakers and events, including a talk by Matt Walsh called "What is a Woman," Mr. Adcock is deterred from engaging in these expressive activities.

272.     Furthermore, because Mr. Adcock and his chapter are deterred from continuing to engage in speech on topics involving gender identity, sex stereotypes, and sex characteristics, he fears that his chapter will not attract as many new members.

273.     As a second example, Kailee Verdeyen is a Freshman at the University of Wyoming. Ms. Verdeyen is a member of her university's Young America's Foundation chapter and a member of the Delta Delta Delta sorority.

274.     Ms. Verdeyen considers herself to be an "old school feminist" and has deeply-held beliefs about women's rights and supports Title IX's intent to protect biological women. While at the University of Wyoming, she has publicly expressed views consistent with these beliefs.

275.    Ms. Verdeyen has expressed views on these matters partially because she has had uncomfortable experiences with sharing a bathroom with a biological male and because she is concerned that a biological male will join her sorority. Ms. Verdeyen's concern about her sorority is validated by the fact that a biological male joined another sorority at the University of Wyoming.

276.    Ms. Verdeyen intends to continue speaking on these issues, including publicly protesting incidents on campus that advance positions contrary to her views and values.

277.    However, Ms. Verdeyen reasonably fears that if the Final Rule takes effect, she would face investigatory and disciplinary proceedings for expressing views of this nature.

278.    Ms. Verdeyen's fear of repercussions for expressing her views is heightened because she anticipates that she would be removed from her position as a student government senator. Accordingly, Ms. Verdeyen plans to engage in self-censorship if the Final Rule takes effect.

279.     Furthermore, Ms. Verdeyen attended her Young America's Foundation's chapter De-Transition Day event this year. Ms. Verdeyen had planned to be an active member in the chapter during the 2024-25 academic year, with the goal of helping to bring speakers such as Chloe Cole, Paula Scanlan, or Abby Roth to campus.

280.    These three speakers are associated with Young America's Foundation's national organization, with Ms. Roth offering a speech entitled "Welcome to 2024: Where Men Suck and Women Don't Exist."

281.    If the Final Rule is permitted to take effect, Ms. Verdeyen is concerned that her university would not permit speakers of this nature on campus and that she would face investigatory and disciplinary proceedings were she to advertise events hosting these speakers.

Accordingly, Ms. Verdeyen would no longer pursue efforts to have her chapter of Young America's Foundation host these speakers.

282.     As a third example, Rachel Flynn is a Freshman at the University of Utah. Ms. Flynn is a member of her university's Young America's Foundation chapter.

283.     Ms. Flynn has had numerous interactions with transgender individuals at her university.

284.     Ms. Flynn is of the Christian faith, which informs her belief in the importance of biological sex. Ms. Flynn believes sex is determined at birth and has refused to use preferred pronouns when in the university setting. Ms. Flynn has not been the subject of any investigatory or disciplinary action for refusing to use preferred pronouns.

285.     Ms. Flynn wishes to continue to refuse to use preferred pronouns because she views the use of preferred pronouns as an endorsement of the idea that sex is fluid and can change. However, if the Final Rule takes effect, Ms. Flynn will feel compelled to use preferred pronouns out of fear of being reported for harassment and facing investigatory and disciplinary proceedings.

286.     Ms. Flynn also believes women deserve private spaces on campus where they do not have to worry about men entering restrooms and locker rooms. Ms. Flynn places great weight on her right to free speech and has voiced opinions on these matters. Additionally, Ms. Flynn might confront a biological male if she encountered one in the women's restroom.

287.     However, if the Final Rule takes effect, Ms. Flynn will feel compelled to stop speaking on these issues for fear of being reported for harassment and facing investigatory and disciplinary proceedings.

288.     As a member of Young America's Foundation, Ms. Flynn attended events hosted by the organization, including a speech by Chloe Cole on detransitioning, a speech by Michael Knowles on transgenderism, and a screening of the movie "Damaged." Ms. Flynn and her Young America's Foundation chapter are considering bringing speakers to campus who would talk about gender identity issues during the 2024-25 academic year, including Matt Walsh, who gives a speech entitled "What is a Woman." If the Final Rule is permitted to take effect, Ms. Flynn is concerned that her university would not permit Mr. Walsh to give his speech and that she would face investigatory and disciplinary proceedings were she to distribute advertisements for Mr. Walsh's speech. Accordingly, Ms. Flynn is deterred from pursuing efforts to host Mr. Walsh.

289.     Also, as a member of her Young America's Foundation chapter, Ms. Flynn has tabled and distributed flyers about gender identity issues, including flyers with the slogans "Men cannot become women." Ms. Flynn planned to engage in these activities during the 2024-25 academic year. However, if the Final Rule takes effect, Ms. Flynn is deterred from engaging in these activities for fear of facing investigatory and disciplinary proceedings.

290.     The injury to Ms. Flynn's First Amendment rights by the chilling of this speech is exacerbated by the fact that proponents of gender identity are very active on her campus. In the past, other students have chalked messages like "Trans lives matter" and "Men can become women."

291.     As a result of the Final Rule, Ms. Flynn reasonably believes that while her message of "Men cannot become women" would qualify as hostile environment harassment, the counter message of "Men can become women" would not qualify as hostile environment harassment.

292.     In sum, members of Young America's Foundation would be subject to policies that their schools, which receive federal funding, adopt to conform to the Final Rule if it takes effect. Their members, in turn, out of a reasonable fear that their current speech qualifies as "hostile environment harassment," would self-censor their speech.

**CLAIMS FOR RELIEF**

**COUNT I**
**Agency Action That Is Contrary to Law**
**5 U.S.C. § 706**

293.     All of the above paragraphs are realleged as if fully set forth herein.

294.     The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

295.     The Final Rule is contrary to law and exceeds DoEd's statutory authority because it violates the plain language of Title IX and because *Bostock*'s interpretation of Title VII of the Civil Rights Act of 1964 is inapplicable to Title IX's materially different language and a materially different purpose.

296.     The Final Rule is contrary to law and exceeds DoEd's statutory authority because *Bostock*'s interpretation of Title VII of the Civil Rights Act of 1964—even if it were somehow instructive—recognizes and rests on two biological sexes, not "gender identity."

297.     The Final Rule is contrary to law because Title IX nowhere refers to "gender identity," the Title IX term "sex" does not include "gender identity," and Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on "gender identity."

298.     The Final Rule is contrary to law because Title IX and longstanding DoEd regulations explicitly permit distinctions based on biological sex in certain circumstances.

299.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in education, which in 1972 would have been understood to refer to biological women and girls, not a biological male who "identified" as a woman.

300.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in education and the Final Rule deprives some FAU members, K.R., and other students of the equal opportunity to enjoy educational benefits and facilities such as access to sex-specific facilities like restrooms and locker rooms.

301.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in athletics and the Final Rule erases protections for women and girls in athletics.

302.     20 U.S.C. § 1688 states "Nothing in this section shall be construed to require or prohibit any person, or public or private entity, to provide or pay for *any* benefit, including use of facilities, related to an abortion" (emphasis added).  The Final Rule is contrary to this section because it requires educational institutions to provide leave and other employment or educational benefits in connection with any condition related to pregnancy, which the Final Rule defines to include termination of pregnancy (*i.e.* abortion).

303.     Title IX does not have grant extraterritorial jurisdiction.  It does not authorize DoEd to withhold federal funding from a school just because someone associated with the school did not accommodate any person's "gender identity" anywhere in the world.

304.     The Final Rule is also contrary to law because it violates the Religious Freedom Restoration Act of 1993.

305.     RFRA provides that the "Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. 2000bb-1(a). "If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014). RFRA applies to any "department or agency" of the United States, including the DoEd. 42 U.S.C. 2000bb–2(1).

306.    By requiring students like K.R. and school staff to speak or use pronouns in a manner that violates their religious beliefs or restricts their religiously motivated speech about gender identity, the Final Rule violates RFRA. DoEd has no compelling interest in requiring or restricting such speech, and DoEd's construction of "sex-based" harassment is not the least restrictive means of furthering that interest.

307.    The Final Rule is contrary to Title IX and RFRA and therefore is unlawful and should be set aside.

## COUNT II
**Agency Action in Excess of Statutory Jurisdiction and in Violation of Separation of Powers
U.S. Const. art. I, § 1**

308.    All of the above paragraphs are realleged as if fully set forth herein.

309.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

310.    The Final Rule is final agency action subject to judicial review under the APA.
*Id*. § 704.

311.    The Final Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

312.    The DoEd and DOJ are "agencies" under the APA.  *Id*. § 701(b)(1).

313.    Under the constitutional separation of powers, each branch of government has been vested with different powers.  "All legislative Powers" granted by the Constitution "shall be vested in . . . Congress."  U.S. Const. art. I, § 1.  The Constitution does not vest executive agencies with legislative powers.

314.    Separation of powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so.  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (discussing the "major questions" doctrine); *id.* at 743 (Gorsuch, J., concurring). Departure from longstanding past practice (without new authorization from Congress) is strong evidence the agency is acting without Congressional authorization.  *See Nat'l Fed'n Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) [hereinafter *NFIB*].

315.    The Final Rule invokes the major questions doctrine because questions regarding the relationship between "gender identity," biological sex, and First Amendment freedoms are issues of vast political significance, subject to "'earnest and profound debate across the country.'"  *Id.* at 743 (Gorsuch, J., concurring) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)).

316.    Parents, teachers, and school boards can all reasonably disagree about how to accommodate students' "gender identities" and how to balance the privacy and dignity needs of all their students, within the confines of state law and the Constitution.  The Final Rule removes

all of that discretion.  It effectively turns schools into indoctrination factories that push DoEd's preferred progressive viewpoint.

317.    The Final Rule also greatly departs from DoEd's fifty-year-long interpretation of "sex,."

318.    The role that biological sex plays in educational programs and activities (including women's and girls' sports)—and, indeed, the relative importance of gender identity as opposed to biological sex in many areas of daily life—is likewise an issue of political significance that is subject to extensive debate across the country.

319.    DoEd must therefore show Congress "plainly authorize[d]" the Final Rule.  *NFIB*, 595 U.S. at 117.

320.    Nothing in the Title IX Amendments to the Civil Rights Act clearly authorizes DoEd to resolve this debate by unilaterally deciding "harassment on the basis of sex" now includes "gender identity."

321.    Nothing in Title IX gives DoEd clear authorization to replace "sex" with "gender identity."

322.    The Final Rule harms students by opening up women's locker rooms and restrooms to biological males and men's restrooms and locker rooms to biological females.  It requires schools to place students in rooms consistent with their "gender identity," rather than biological sex, during overnight stays or trips.

323.    Nor does Title IX clearly authorize DoEd to change the conditions on which States have relied for decades (namely, that biological males and biological females should be treated equally).

324.    While Congress is no doubt aware of the issue, it has chosen not to rewrite Title

IX's definition of "sex" as DoEd attempts to do.  Members of Congress have introduced

legislation that would accomplish this, *see, e.g.*, H.Res. 269 (2023), but Congress has chosen not

to act.  By acting unilaterally, Defendants have "seiz[ed]he power of the Legislature."  *Biden v.*

*Nebraska*, 143 S. Ct. 2355, 2373 (2023).

325.    DoEd therefore has no clear authorization to replace the word "sex" with concepts

of "gender identity," nor can it reinterpret Title IX in such a broad, unreasonable way.  DoEd

exceeded its authority when it issued the Final Rule.

326.    In addition to making these changes, the Final Rule makes major changes to

campus sexual assault investigations and to how educational institutions must accommodate

students and employees regarding their abortions.

327.    All three of these issues are the subject of national debate, are politically

important, and are subjects Congress should debate and decide.  Nothing in Title IX clearly

authorizes DoEd to end that debate and decide it for themselves.  The Final Rule, taken as a

whole, implicates and violates the major questions doctrine and should be set aside.

328.    The Final Rule also implicates the major questions doctrine because DoEd seeks

to intrude into education which is a domain of the state.  *See West Virginia*, 597 U.S. at 744

(Gorsuch, J., concurring).  "When an agency claims the power to regulate vast swaths of

American life, it not only risks intruding on Congress's power, it also risks intruding on powers

reserved to the States."  *Id.* (internal citation omitted).

329.    Education has always been a particular domain of state law and DoEd's power in

that domain has traditionally been limited.  This Final Rule seeks to intrude upon "vast swaths of

American life" through trying to remake the American education system.  Furthermore, the Final Rule would pre-empt multiple laws in each of the Plaintiff States.

330.    The "longstanding clear-statement rule-the federalism canon-also applies in these situations." *Id.*  "To preserve the 'proper balance between the States and the Federal Government' and enforce limits on Congress's Commerce Clause power, courts must 'be certain of Congress's intent' before finding that it 'legislate[d] in areas traditionally regulated by the States.'" *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991)).

331.    Nothing in Title IX (or any other law) gave the Defendants clear authorization to intrude upon this domain of state law through fundamentally remaking the education system and pre-empting state laws along the way.

332.    Even if the Final Rule does not implicate the major questions doctrine, it still violates the separation of powers.  DoEd's new interpretation of Title IX is so far afield from any reasonable interpretation of the statute that the Final Rule amounts to an unconstitutional act of legislative power.  *See* U.S. Const. art. I, § 1.

333.    Thus, the Final Rule violates separation of powers and should be set aside.

<u>**COUNT III**</u>
**Agency Action That Violates the Spending Clause**
**5 U.S.C. § 706, U.S. Const. art. I, § 8**

334.    All of the above paragraphs are realleged as if fully set forth herein.

335.    The Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Spending Clause of the U.S. Constitution.

336.    The Spending Clause authorizes Congress to "attach conditions on the receipt of

federal funds," but the "spending power is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).

337.    "[I]f Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* at 207 (citation omitted).

338.    Any condition placed on the receipt of such funds must relate directly to the central purpose of Congress in creating the spending program. *Id.* at 208-9.

339.    Also, Congress may not use its spending power to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (opinion of Roberts, C.J.).

340.    Defendants' interpretation of Title IX in the Final Rule violates the Spending Clause because it purports to impose obligations on Plaintiff States that Congress did not clearly impose in Title IX, which is contrary to the requirement that Congress must "unambiguously" condition the receipt of federal financial assistance. *Dole*, 483 U.S. at 207.

341.    In addition, the purposes of the Final Rule bear no direct relationship to the purposes of Title IX as outline by Congress. This violates the constitutional limits of the Spending Clause. *Id.*

342.    The Final Rule would change the conditions on which states accepted federal funding.

343.    The Final Rule would change to whom educational institutions are liable for sex-discrimination by incorporating "gender identity" in sex and by including people other than students and staff in the definition of "person."

344.    The Final Rule would change what educational institutions are liable for by

incorporating "gender identity" in sex and by lowering the bar on what constitutes discrimination to include *de minimis* harm.

345.    The Final Rule would require Plaintiff States to set policies (or risk losing federal funding) based on nebulous terms for which DoEd does not provide any definitions.

346.    Even if DoEd could change the conditions attached to receipt of federal funds, the change proposed in the Final Rule is impermissibly vague and contradictory.

347.    A school may run afoul of the Final Rule if it incorrectly assumes a student's "gender identity" (or "perceives" the student as male or female based on the student's appearance), but it may not ask what the student's "gender identity" or biological sex is.

348.    The school may have sex-separate sports' teams, but the separation cannot be based on "sex-stereotypes" about athletic ability.  If the school does away with sex-separation altogether, it may violate women and girls' rights by denying them equal opportunities.  In any scenario, the school would run the risk of losing federal funding because it cannot comply with the Final Rule and Title IX.

349.    The Final Rule violates the Spending Clause because it jeopardizes Plaintiffs' receipt of billions of dollars of education-related federal funding if they were to refuse or otherwise fail to comply with the Final Rule, resulting in Plaintiffs having "no real option but to acquiesce" to the Final Rule.  *NFIB*, 567 U.S. at 582 (opinion of Roberts, C.J.); *see also Tennessee*, 615 F. Supp. 3d at 828.

350.    At a minimum, if it is ambiguous whether the Final Rule comports with Title IX, the Court should find it does not because it raises these serious constitutional concerns.

351.    The Final Rule is unlawful and should be set aside because it violates the constitutional limits on the Spending Clause.

**COUNT IV**
**Agency Action That Violates the First Amendment**
**5 U.S.C. § 706, U.S. Const. art. I, § 8, U.S. Const. amend. I**

352.    All of the above paragraphs are realleged as if fully set forth herein.

353.    Defendants' interpretation of Title IX in the Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the First Amendment to the U.S. Constitution and conditions the receipt of federal funds on recipients violating the First Amendment rights of others.

354.    Defendants' interpretation of Title IX in the Final Rule conflicts with the First Amendment's protection of religious liberty.  In *Bostock*, the Court did not consider whether its interpretation of Title VII violated the religious liberty protections of the First Amendment because the employers had not raised the issue.  140 S. Ct. 1731, 1754 (2020).  It left open the possibility that a federal law that required employers to treat employees consistently with their gender identities, rather than their biological sex, could raise free exercise concerns.  *Id.*

355.    The Final Rule would require individual teachers, coaches, and school administrators to acknowledge, affirm, and validate students' "gender identities" regardless of the speakers' own religious beliefs on the matter in violation of the First Amendment.  *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023).  The Final Rule would require schools to adopt policies concerning this.

356.    The Final Rule would require K.R., some FAU members, and students like them to speak Defendants' message on gender identity in violation of their religious liberty and freedom of expression under the First Amendment.  The Final Rule also precludes K.R., some FAU members, and other students from sharing certain beliefs about gender identity in violation

of their religious liberty and freedom of expression under the First Amendment. The Final Rule also chills and deters the protected expression of some FAU members who will stop expressing certain views at school in violation of their religious liberty and freedom of expression under the First Amendment.

357.    Schools and school districts would be required to adopt policies related to "gender identity"—including polices related to restrooms, locker rooms, pronoun, and honorific use—even if there are no transgender students enrolled, because the Final Rule extends to guests of the school or visitors to campus.  Therefore, the Final Rule imposes unconstitutional conditions on Plaintiffs' receipt of federal education-related funds.  *Dole*, 483 U.S. at 210.

358.    Further, Plaintiff States have laws protecting freedom of speech, freedom of conscious, and freedom of religion that arguably conflict with the Final Rule.  They will likely not be able to enforce these laws if the Final Rule takes effect.  *Tennessee*, 615 F. Supp. 3d at 828.

359.    The Final Rule is unlawful and should be set aside because it violates the First Amendment and imposes unconstitutional conditions on the receipt of federal funds.

360.    At a minimum, if it is ambiguous whether the Final Rule comports with Title IX, the Court should find that it does not because DoEd's interpretation of Title IX (if accepted) would raise serious constitutional doubt as to whether Title IX violates the First Amendment.

## COUNT V
### Violation of First Amendment
### (Compelled Speech)

361.    Plaintiffs Moms for Liberty and Young America's Foundation reallege all the above paragraphs as if fully set forth herein.

362.    The Supreme Court has long recognized that "freedom of thought and expression

'includes both the right to speak freely and the right to refrain from speaking at all.'" *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 559 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).

363.   To this end, "[t]here is necessarily, and within suitably defined areas, a . . . freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Id.* (quoting *Estate of Hemingway v. Random House, Inc.*, 244 N.E.2d 250, 255 (N.Y. 1968)).

364.   "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Id.*

365.   "When speech is compelled . . . additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to-beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* at 2464 (quoting *Barnette*, 319 U.S. at 633).

366.   The Final Rule forces the children of members of Moms for Liberty and members of Young America's Foundation to, at the risk of investigation and discipline upon refusal, affirm a transgender student's selected sex by using preferred pronouns even though the member

or child has a deeply held belief that sex is determined by God and/or biology.

367.    Courts have held that requiring individuals to use preferred pronouns violates the protection against compelled speech afforded by the First Amendment. *See Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (holding that forced preferred pronoun usage violated the First Amendment and stating, "the premise that gender identity is and idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view'" (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528, at 48−54 (D. Colo. Oct. 23, 2023) (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage).

368.    It is irrelevant that the Final Rule would not literally force any student to engage in speech. The use of pronouns is a "'virtual necessity'" for engaging in any conversation, especially since Plaintiffs Moms for Liberty and Young America's Foundation have members who have engaged in discussions about gender identity and desire to do so in the future. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715).

369.    The Final Rule would prohibit students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and trying not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. The Final Rule "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326.

370.    Also, the Final Rule would require students to make statements that they believe to be false and affirm ideologies that violate their deeply-held beliefs. *See also Wooley*, 430 U.S. at 715 (state cannot require message on license plates, even though no one is required to drive);

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575-76 (1995) (parade

organizers cannot be forced to include certain groups in a parade, even though no one is required

to hold a parade).

371.    In announcing the Final Rule, Assistant Secretary for Civil Rights in the DoEd

affirmatively stated the Office for Civil Rights' view that instances "Deadnaming" or

"misgendering" with respect to gender identity would give rise to hostile environment

discrimination in some instances.

372.    The Final Rule cannot compel affirmance of Defendants' preferred viewpoint

(*e.g.*, that a human can change genders, hold multiple genders, or no gender at all) and ban the

opposing viewpoint (*e.g.*, that sex is immutable, and assigned by God). "To hold differently

would be to treat religious [or traditionally conservative] expression as second class speech and

eviscerate this Court's repeated promise that [students] do not 'shed their constitutional rights to

freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 142 S. Ct. at 2425 (quoting

*Tinker*, 393 U.S. at 506).

373.    Allowing the Final Rule to take effect would, therefore, violate the First

Amendment's protection against compelled speech.

### COUNT VI
**Violation of First Amendment, Fifth, and Fourteenth Amendment
(Vagueness and Overbreadth Resulting in Chilled Speech)**

374.    Plaintiffs Moms for Liberty and Young America's Foundation reallege

Paragraphs 1- _____ as if fully set forth herein.

375.    The First and Fourteenth Amendments prohibit restrictions that are

unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic

principle of due process that an enactment is void for vagueness if its prohibitions are not clearly

defined.".) This requirement furthers two purposes: (1) to provide fair notice to the citizenry of what is outlawed and (2) to provide standards for enforcement to officials.

376.    A restriction is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide *explicit standards* for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" (*Grayned*, 408 U.S. at 108-09) (emphasis added).

377.    Vague policies raise due process concerns because they force individuals to guess at their meaning. *Grayned*, 408 U.S. at 108–09. As a result of this vagueness, individuals "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. at 109 (internal quotation marks and citations omitted).

378.    "[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (citing *Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Baggett v. Bullitt*, 377 U.S. 360 (1964)).

379.    And when policies by their reach "prohibit[] constitutionally protected conduct" and chill speech as a result, they are unconstitutionally overbroad on their face. *Grayned*, 408 U.S. at 114; *accord Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 129-130 (1992).

380.    Vague and overbroad policies are also unconstitutional because they give officials

unfettered discretion to approve or censor speech based on its viewpoint or content. *Forsyth Cnty.*, 505 U.S. at 130–33.

381.    If a restriction "interferes with the right of free speech," then a stringent test for vagueness applies. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959) ("Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law.").

382.    The Final Rule lacks any precise definitions, detail, context, or notice to students about what constitutes sexual harassment, sex, gender identity, or what sorts of statements are can create sex-based discrimination or hostile environment harassment. This provision fails to deliver adequate notice, guarantees arbitrary enforcement and is therefore unconstitutional.

383.    For this reason, Plaintiffs Moms for Liberty and Young America's Foundation have members who fear penalties for engaging in discussions that that they have had and would continue to have, but for the Final Rule.

384.    Allowing the Final Rule to take effect would, therefore, violate the First and Fourteenth Amendment's protections against vagueness and overbreadth.

### COUNT VII
### Violation of First Amendment
### (Content and Viewpoint Discrimination Resulting in Chilled Speech)

385.    Plaintiffs Moms for Liberty and Young America's Foundation reallege all the above as if fully set forth herein.

386.    The Final Rule's revised definition of harassment is a classic restriction that regulates based on content and viewpoint. *See, e.g., Saxe*, 240 F.3d at 206 (bans on "'harassment'" that include speech impose "'content-based'" and "'viewpoint-discriminatory'"

restrictions on that speech); *Meriwether*, 992 F.3d at 507-09 (requiring affirmance of a person's gender identity that is inconsistent with the person's biological sex is viewpoint discrimination).

387.    Chilled speech is a recognized First Amendment injury. *See Laird*, 408 U.S. at 11 (1972) (citing *Baird*, 401 U.S. 1; *Keyishian*, 385 U.S. 589; *Lamont*, 381 U.S. 301; *Baggett*, 377 U.S. 360).

388.    Both Plaintiffs Moms for Liberty and Young America's Foundation have members who have spoken critically on gender identity, and wish to speak, or hold critical speakers on gender identity in the future.

389.    Both Plaintiffs Moms for Liberty and Young America's Foundation have members who will refrain from speech because they are concerned about a credible threat of enforcement of the Final Rule should they continue speaking.

390.    Because the Final Rule discriminates based on viewpoint, it is presumptively unconstitutional.

391.    Regardless, under any balancing test, the Final Rule violates the First Amendment. Defendants cannot show that they have a compelling interest to justify restricting speech. Even if they did, Defendants cannot show that any such interest is narrowly tailored. *See Kennedy*, 142 S. Ct. at 2421 (Once speech is impinged, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of … case law.").

392.    Allowing the Final Rule to take effect would, therefore, violate the First Amendment.

## COUNT VII
**Agency Action That Violates the Tenth Amendment**
**5 U.S.C. § 706, U.S. Const. amend. X**

393.   All of the above paragraphs are realleged as if fully set forth herein.

394.   The Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Tenth Amendment to the U.S. Constitution.

395.   The Final Rule interprets and applies Title IX in a way that intrudes on the States' historic and traditional authority to safeguard privacy expectations in educational settings and provides no evidence Congress intended that result.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Federal law does not preempt State law in areas traditionally reserved to the States unless Congress expressed a "clear and manifest" intent to do so.  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

396.   Under the Spending Clause, only Congress, and not an executive agency, has the constitutional power to preempt a contrary state law (U.S. Const. Art. VI, Cl. 2)—and only then in the exercise of a power clearly delegated by the Constitution to Congress.

397.   The "management of public schools" and institution-level decisions are powers traditionally reserved to the States.  *See Tennessee v. United States Dep't of Agric.*, 665 F. Supp. 3d 880, 918 (E.D. Tenn. 2023).

398.   The Rule has no basis in Title IX, so the statute does not evidence a clear and manifest intent of Congress to redefine "sex."  And it goes further than requiring the States to administer a federal program in a uniform way.  It regulates schools at an institution-level (requiring them to change their single-sex restrooms and locker rooms) and at a team level (requiring them to accept certain players).

399.     The Final Rule purports to preempt state laws that protect the privacy of K.R., some FAU members, and other students like them, requiring schools to force students to share restrooms and other intimate spaces with members of the opposite sex.

400.     The Final Rule purports to preempt state laws that protect the equal athletic opportunities of some FAU members and other students like them, requiring schools to force female athletes to compete against members of the opposite sex.

401.     The Rule is unlawful and should be set aside because it violates the Tenth Amendment. Relatedly, it attempts to exercise preemptive power held only by Congress.

### COUNT IX
### Agency Action that is Arbitrary and Capricious
### 5 U.S.C. § 706

402.     All of the above paragraphs are realleged as if fully set forth herein.

403.     The Rule is arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

404.     Since the dawn of human history, it has been widely recognized that there are two sexes: male and female, which, in nearly all cases, can be determined at birth.

405.     The Final Rule ignores this, in place codifying new theories on "gender identity."

406.     Since the passage of Title IX, schools have designed their educational programs, activities, sports teams, and very structures with this in mind.  They have invested time, money, staff, and resources in building, developing, and maintaining these programs.

407.     The Final Rule would require Plaintiffs and their entities to completely change these to accommodate this radical new thinking.

408.    The Final Rule would require Plaintiffs and their entities to establish new bathrooms, locker rooms, and other facilities for individuals who do not identity as either male or female, such as separate bathrooms for two-spirited and agender individuals.

409.    With respect to schools' responsibility to investigate claims of sex discrimination and assault, the Final Rule acknowledges that "some reports regarding occurring in a recipient's education program or activity may be handled under these final regulations while other [those that occurred before the August 1, 2024 effective date] will be addressed under the requirements of the 2020 amendments."  89 Fed. Reg. 33,841.

410.    DoEd claims this is not "arbitrary" because overlap occurs "any time regulatory requirements are amended prospectively," but it fails to consider the cost to educational institutions in maintaining dual investigative and quasi-judicial systems.

411.    The Final Rule changes and greatly expands the definition of "sexual harassment" with respect to hostile environment discrimination, drawn from the *Gebser/Davis* definition in the 2020 Amendments.

412.    While the Final Rule expresses DoEd's opinion that it can set a different standard for administrative enforcement than for judicial enforcement, 89 Fed. Reg. 33,842, it does not address the State reliance interest on the 2020 definition in the administrative enforcement context.  Failure to address an important concern makes the Final Rule arbitrary and capricious.

413.     The Final Rule does not address the State's reliance interest in the definition of "sexual harassment" from the 2020 Amendments, which applied to administrative enforcement as well as civil liability.

414.    The Final Rule expressly declines to define key terms.

415.    The Final Rule's new "interpretation" of Title IX is so convoluted and implausible it cannot be ascribed to a difference in agency expertise.

416.    The Final Rule is also arbitrary and capricious because it departs sharply from past practice without reasonable explanation and with no legal basis.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1913 (2020).*

417.    Throughout Title IX's history, DoEd enforced Title IX to protect girls and women from discrimination in education.  This makes sense since that is why Title IX exists in the first place.

418.    The Final Rule seeks to upend that prior practice by incorporating a definition of sex-based harassment that includes gender identity.

419.    Rather than provide a reasonable explanation for this sharp departure from past practice, DoEd denies such a departure at all.

420.    Instead the Final Rule states that that its amendments, "clarify the scope and application of Title IX and the obligations of recipients of Federal financial assistant from the Department." 89 Fed. Reg. 33474.

421.    By stating the Final Rule's purpose is to "clarify," DoEd is effectively denying that a sharp departure from past practice is occurring at all.  Consequently, they did not provide a reasonable explanation for such a departure.

422.    The Final Rule is arbitrary and capricious and should be set aside.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)    A declaratory judgment holding the Final Rule unlawful;

(2)    A declaratory judgment holding that Plaintiff States are not bound by the Final Rule;

(3)     A declaratory judgment affirming that Plaintiff States and Title IX recipients located therein may continue to separate students by biological sex in appropriate circumstances in accordance with Title IX's statutory text and longstanding DoEd regulations;

(4)     A declaratory judgment that Title IX does not prohibit Plaintiff States and Title IX recipients located therein from maintaining showers, locker rooms, restrooms, residential facilities, and other living facilities separated by biological sex or from regulating each individual's access to those facilities based on such individual's biological sex;

(5)     A declaratory judgment that Title IX does not require a Title IX recipient's employees or students to use an  individual's preferred pronouns or honorifics;

(6)     A declaratory judgment that Title IX does not prohibit Plaintiff States and Title IX recipients located therein from maintaining athletic teams separated by biological sex or from assigning an individual to a team based on such individual's biological sex;

(7)     A declaratory judgment holding that DoEd lacked authority to issue the Final Rule;

(8)     A judgment setting aside the Final Rule;

(9)     A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and

(10)    A stay of the effective date of the Final Rule under 5 U.S.C. § 705 prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule during the pendency of this litigation.

(11)    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(12)   Grant Plaintiffs such additional and further relief as the Court may deem just and proper.

Respectfully submitted this fourteenth of May, 2024,

<div style="margin-left:50%">

**KRIS W. KOBACH**
Attorney General of Kansas

*/s/ Erin B. Gaide*
Abhishek S. Kambli
 *Deputy Attorney General*
 Kansas Bar No. 29788
Erin B. Gaide
 *Assistant Attorney General*
 Kansas Bar No. 29691
James Rodriguez
 *Assistant Attorney General*
 Kansas Bar No. 29172
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: Abhishek.Kambli@ag.ks.gov
   Erin.Gaide@ag.ks.gov
   Jay.Rodriguez@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

</div>

**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Cori Mills*
Cori Mills*
  *Deputy Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

*Counsel for Plaintiff State of Alaska*

**SEAN REYES**
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson*
  *Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**

*/s/ Ryan Schelhaas*
Ryan Schelhaas*
  *Chief Deputy Attorney General*
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786  Direct line
(307) 777-6869  Fax
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

*/s/ Braden H. Boucek*

Kimberly S. Hermann*
  Ga. Bar No. 646473
Braden H. Boucek*
  Tenn. BPR No. 021399
  Ga. Bar No. 396831
Jordan Miller*
  Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

*Counsel for Plaintiffs Moms for Liberty and Young America's Foundation*

*/s/ William E. Trachman*
William E. Trachman*
James L. Kerwin*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org

*Counsel for Plaintiffs Moms for Liberty and Young America's Foundation*

**Appx098**

*/s/ Tyson C. Langhofer*

Tyson C. Langhofer
Kansas Bar No. 19241
Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*Counsel for Plaintiffs K.R. and FAU*

*\* Pro Hac Vice Forthcoming*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 5:24-cv-4041-JWB-ADM |
| UNITED STATES DEPARTMENT OF EDUCATION, *ET AL.* | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM IN SUPPORT OF PLANTIFFS' MOTION FOR A STAY/PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION .................................................................................................... 1

FACTS ..................................................................................................................... 2

   A.   Title IX and related regulations ............................................................... 2

     1.   Equal opportunity for women ........................................................... 2

     2.   Neutrality with respect to abortion .................................................. 6

   B.   The Final Rule ........................................................................................ 8

     1.   "Gender identity" and discrimination ............................................... 9

     2.   Sex-based harassment and grievance procedures ............................ 11

     3.   Abortion ......................................................................................... 12

   C.   The Parties ............................................................................................ 13

     1.   Plaintiff States ............................................................................... 13

     2.   Plaintiff K.R. .................................................................................. 16

     3.   Plaintiff Female Athletes United ..................................................... 17

     4.   Plaintiff Moms for Liberty .............................................................. 18

     5.   Plaintiff Young America's Foundation ............................................. 19

ARGUMENT .......................................................................................................... 20

   A.   Plaintiffs are likely to succeed on the merits ......................................... 21

     1.   The Final Rule is contrary to three federal statutes ........................ 21

       a.   The Final Rule is contrary to Title IX ...................................... 21

       b.  The Final Rule is contrary to 20 U.S.C. § 1688 ......................... 24

       c.   The Final Rule is contrary to RFRA .......................................... 25

     2. The Final Rule violates the major questions doctrine .......................... 28

     3. The Final Rule is contrary to the Constitution ................................... 30

       a.   The Final Rule violates the First Amendment .......................... 30

       b.   The Final Rule violates the First, Fifth, and Fourteenth Amendment Due Process Clauses ................................................................... 40

       c.   The Final Rule violates the Spending Clause .......................... 42

       d.   The Spending Clause and the Supremacy Clause require Congress to speak . 45

     4.   The Final Rule is arbitrary and capricious .................................... 46

       a. The Final Rule offers an implausible explanation for agency action ...................... 47

       b.   The Final Rule is a Sharp Departure from Past Practice ................... 47

**Appx101**

c.    The Final Rule fails to consider reliance interests ............................................. 48

B.    The Plaintiffs will be irreparably harmed ...................................................... 51

1.    Harm to Plaintiff States ........................................................................ 51

2.    Harm to Moms for Liberty and Young America's Foundation ............................ 52

3.    Harm to Female Athletes United ............................................................. 53

4.    Harm to K.R. ...................................................................................... 54

C.    The balance of harms and public interest favors Plaintiffs .......................................... 54

D.    Relief should not be limited to the parties .................................................. 55

CONCLUSION ......................................................................................... 55

CERTIFICATE OF SERVICE .................................................................................. 1

**Appx102**

## TABLE OF AUTHORITIES

### Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ............................................................27, 39, 40, 45

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc)........................ 53

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ................................ 52

*Am. Petroleum Inst. v. United States Dep't of Interior*, 81 F.4th 1048 (10th Cir. 2023)................................. 47

*Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021)........................................................ 36

*Are You Listening Yet PAC v. Henderson*, No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750 (D.

    Utah Mar. 11, 2024) ........................................................................................................ 52

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ............................................ 43

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ................................................................ 32

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ...................................................................... 32

*Boos v. Barry*, 485 U.S. 312 (1988) ........................................................................................... 39

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)......................................................................... 2, 22

*Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) ....................................................... 27

*Burwell v. Hobby Lobby Stores Inc.*, 573 U.S. 682 (2014) ......................................................... 25, 28

*Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs*, 802 F. Supp. 1223 (D.N.J. 1992) ..... 30

*Clark v. Ariz. Interscholastic Ass'n*, 685 F.2d 1126 (9th Cir. 1982)................................................... 54

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1925) ...................................................................... 41

*Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528

    (D. Colo. Oct. 23, 2023)........................................................................................ 31, 33, 36

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)............................................................... 37

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .................................. 47, 49, 50

**Appx103**

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ................................24

*Does 1–11 v. Board of Regents, et al.*, Nos. 21-1414 & 22-1027 (10th Cir. May 7, 2024) ............................21

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................. 52, 54

Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117 (2016) ...............................46

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .........................46

*First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136 (10th Cir. 2017) ............................21

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ........................ 41

*Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044 (10th Cir. 2023) ............................43

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992) .............................42

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019) ......................55

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................. 40, 41

*Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019) ......................55

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir. 1989) ...............................55

*Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539 (1985) ...........................30

*Hayes v. Marriott*, 70 F.3d 1144 (10th Cir. 1995) ...................................53

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557 (1995) ....................27, 35

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ............................... 30, 39

*Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931 (D. Colo. Oct. 4, 2007)..................55

*Kansas v. United States*, 214 F.3d 1196 (10th Cir. 2000)...........................42, 45

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ...........................52, 55

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ............................ 30, 39

*Matal v. Tam*, 582 U.S. 218 (2017) .................................... 36, 39

*Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983 (E.D. Mich. 2018) ......................54

**Appx104**

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ....................................................35, 39

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ........................................................................ passim

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................................................................................47

*Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018) ................................................................................ 37

*Moore v. Brown*, 448 U.S. 1335 (1980) ......................................................................................................54

*N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ..................................................................................21

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022) ....................................................................................55

*New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236 (10th Cir. 2017) ....51

*New Mexico Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138 (10th Cir. 2019) ......46

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) .................................................................................21, 22

*O Centro Espirita Beneficienty Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc) ..54

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) ............................. 31, 36

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ........................................................42, 43

*Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447 (6th Cir. 2014) ....................................... 53

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..........................................................................................35

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..............................................................................29

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ..........................................................52

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..............................................35, 39

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) ..............................................................35

*Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344 (1959)......................................... 41

*Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34 (2d Cir. 2023)..................................................................54

*Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022)....................................................... 32, 35, 37

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019)....................................................................32

**Appx105**

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) .......................................................... 27, 40

Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807 (E.D. Tenn. 2022)................................................ 26

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000) ........................................................................................ 52

*United States v. Broadway*, 1 F.4th 1206 (10th Cir. 2021) ......................................................................21

*United States v. Williams*, 553 U.S. 285 (2008) ................................................................................. 34

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ...................................... 41

*Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705 (Va. 2023)................................................................ 27, 31

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ................................................................ 28, 29

*Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807 (8th Cir. 2004) .................................................... 39

*Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274 (2018)..................................................................21

*York v. Story*, 324 F.2d 450 (9th Cir. 1963) ........................................................................................ 53

**Statutes**

20 U.S.C. § 1681 .................................................................................................................................. 28

20 U.S.C. § 1681.................................................................................................................................12

20 U.S.C. § 1686 .................................................................................................................................. 6

20 U.S.C. § 1687 .................................................................................................................................. 8

20 U.S.C. § 1688 .................................................................................................................................. 24

42 U.S.C. § 2000bb-1......................................................................................................................... 25

42 U.S.C. § 2000e-2 ........................................................................................................................... 2

Alaska Statute 14.18.040 ............................................................................................................... 16, 37

Civil Rights Restoration Act of 1987, 102 Stat. 28, Pub. L. 100-259, Mar. 22, 1988 ........................... 8

H. Sub. for S.B. 233 (Kan. 2024) .................................................................................................... 37

Kan. Stat. Ann. 60-5603 (Supp. 2023) ..............................................................................................15

**Appx106**

Kan. Stat. Ann. 72-6286(a) (Supp. 2023)........................................................................ 15, 37

Kan. Stat. Ann. 77-207(c) ................................................................................................15

Okla. Stat. 70, § 1-125 ......................................................................................................17

Religious Freedom Restoration Act of 1993, PL 103–141, November 16, 1993, 107 Stat 1488 ..........12

Sex Discrimination Act of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484 ...............................5

Title IX, Sec. 901 of the Act; Pub. L. No. 92-318 , 86 Stat. 373 (codified at 20 U.S.C. 1681) ..............4

Utah Code § 53G-6-902 ...................................................................................................18

Utah Code §§ 63G-31-301 ...............................................................................................18

Utah Code Ann. § 53G-6-902 ..........................................................................................16

Utah Code Ann. § 63G-31-301 .........................................................................................16

Utah Code Annotated § 76-7-302(2)(b) ............................................................................25

Wyo. Stat. Ann. § 21-25-102............................................................................................ 16, 37

Wyo. Stat. Ann. § 22-25-101............................................................................................16

## Other Authorities

118 Cong. Rec. 5803, February 28, 1972.......................................................................... 4, 5, 6

BENEFIT, *New American Heritage Dictionary of the English Language*, 123 (1969) ...........................24

Executive Order 11246, Sept. 24, 1965 ............................................................................. 3

Executive Order 11375, Oct. 13, 1967 .............................................................................. 3

Fairness for All Act, H.R. 1440, 117th Congress (2021)....................................................23

Press Release, Kansas Office of the Governor, Governor Kelly Vetoes Bills, Allow One to Become

    Law Without Signature (Apr. 12, 2024) .................................................................... 37

PROVIDE, *New American Heritage Dictionary of the English Language*, 1053 (1969).......................24

Report of the President's Task force on Women's Rights and Responsibilities, A Matter of

    Simple Justice, 1970 .................................................................................................. 3

**Appx107**

S<small>EX</small>, 9 Oxford English Dictionary 577–78 (1933) ................................................................22

S<small>EX</small>, American Heritage Dictionary 1187 (1969) ....................................................................22

S<small>EX</small>, Merriam Webster Dictionary (2024) .............................................................................22

S<small>EX</small>, Random House Dictionary of the English Language 1307 (1966) ..........................22

Testimony by Representative Patsy T. Mink, Special Subcommittee on Education, U.S. House Committee on Education and Labor, hearings on discrimination against women in higher education (Jun. 24, 1970) ........................................................................................ 4

U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families* ............................................................... 26

U.S. Dept. of Justice and DoEd 2016 Dear Colleague Letter on Transgender Students .................. 11

## Regulations

34 C.F.R. § 106.45..................................................................................................................12

34 C.F.R. § 106.3 ...................................................................................................................14

34 C.F.R. § 106.30(a) ............................................................................................................ 5

34 C.F.R. § 106.31(a) ............................................................................................................ 5

34 C.F.R. § 106.32 .................................................................................................................48

34 C.F.R. § 106.33 ............................................................................................................ 6, 48

34 C.F.R. § 106.4 ...................................................................................................................14

34 C.F.R. § 106.41(b) ............................................................................................................ 6

34 C.F.R. § 106.41(c) ........................................................................................................ 6, 49

34 C.F.R. § 106.42 .................................................................................................................48

34 C.F.R. § 106.46..................................................................................................................12

*Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*

    *Nondiscrimination on the Basis of Sex*, 39 Fed. Reg. 22,228 (Jun. 20, 1974)................................................7

*Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*

    *Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24,128 (Jun. 4, 1975) ...........................................7, 8

## Consitutions

U.S. Const. Art. VI, cl. 2 ......................................................................................................................46

## Briefs

Brief for the United States as *Amicus Curiae* in Supporting Defendant-Appellee and Urging

    Affirmance at 27–30, *Kluge v. Brownsburg Cmty*. Sch. Corp., 64 F.4th 61 (7th Cir. 2023) ..............26

Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) .......11

**Appx109**

## INTRODUCTION

Defendants through this Final Rule seek to destroy both the spirit and the letter of Title IX and turn it into something unrecognizable.  Their approach also obliterates a fundamental understanding of biological reality, First Amendment rights, and due process.  Defendants seek to utilize the rulemaking process to remake our schools and universities to conform to the radical gender ideology of the Biden administration and its allies.  The Final Rule would institutionalize gender ideology in every aspect of K-12 education (including athletics) and tie education funding to it, mandate that colleges and universities punish students who do not comply with these extreme views through a complaint process for "sex-based harassment" that utilizes kangaroo courts, and force schools to provide benefits to students and employees seeking voluntary abortions (even in states where it is outlawed) in direct contravention to Title IX's requirement of abortion neutrality.  This Final Rule is unlawful because (1) it implicates the major questions doctrine and nothing in Title IX provides clear authorization for the Final Rule, (2) it is unconstitutional under the Spending Clause as well as the First, Fifth, and Fourteenth Amendments, and (3) it is arbitrary and capricious.

If Defendants were to succeed, schools in America would no longer be recognizable.  Individuals who (1) believe in biological reality, (2) have sincerely held religious beliefs, or (3) want fairness in sports will no longer be allowed to have their voices heard and, in some cases, will be required to engage in speech that violates their conscience.  Only those who share Defendants' gender ideology will be allowed to speak freely in our schools.  Plaintiffs represent a diverse group that includes: (1) four sovereign states (Kansas, Alaska, Utah, and Wyoming) that do not want their laws preempted by executive fiat and their school funding tied to an unlawful rule that requires them to violate other people's constitutional rights, (2) an organization consisting of parents advocating for their children in schools (Moms for Liberty), (3) college students who want to exercise free speech in college (Young America's Foundation), (4) female athletes who believe sports should remain fair (Female Athletes United), and (5) a 13-year-old girl who does not want to sacrifice her privacy rights and religious liberty when she goes to

school (K.R.).  All will suffer unique irreparable harm if this Final Rule goes into effect. Plaintiffs sue to vindicate their rights, and this Court should ensure this unlawful Final Rule never makes its way into any of their schools through granting a preliminary injunction.

<div align="center">FACTS</div>

A.  **Title IX and related regulations**

  1.  **Equal opportunity for women**

The first major civil rights law banning discrimination against women appeared in the 1964 Civil Rights Act. Initially, the bill that would become the Civil Rights Act focused on race; it did not include a prohibition of discrimination on the basis of sex.  For example, Title VI, which prohibited discrimination at federally funded programs, including educational institutions, applied only on the grounds of "race, color, or national origin."  Section 601 of the Act; 42 U.S.C. § 2000d.  Congress added sex discrimination to Title VII of the bill through an amendment introduced by Representative Howard Smith—"Not necessarily because he was interested in rooting out sex discrimination in all its forms," as Justice Gorsuch noted in *Bostock*, "but because he may have hoped to scuttle the whole Civil Rights Act and thought that adding language covering sex discrimination would serve as a poison pill."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 678-79 (2020) (citing C. Whalen & B. Whalen, The Longest Debate: A Legislative History of the 1964 Civil Rights Act 115–118 (1985)).

Nevertheless, Congress passed the bill and enacted Title VII to prohibit sex discrimination in employment.  Title VII of the Act prohibited discrimination in employment, making it illegal for an employer to

> fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . [or] to limit segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.  Educational institutions, as employers, however, were exempt from Title VII's requirements.

<div align="center">2</div>

<div align="center">**Appx111**</div>

Despite the law's express prohibition of discrimination on the basis of sex in employment, generally, federal policy was slow to follow.  President Lyndon Johnson followed the enactment with an Executive Order prohibiting discrimination in federal employment and contracting on the basis of "race, creed, color, or national origin"—but not on the basis of sex.[1]  It would be another two years before President Johnson issued Executive Order 11375, writing that "it is desirable that the equal employment opportunity programs provided for in Executive Order No. 11246 expressly embrace discrimination on account of sex."[2]

But the Civil Rights Act of 1964 and President Johnson's executive orders still did not address women's equality in education because Title VI did not apply to women and Title VII did not apply to educational institutions.  In recognition of the continuing barriers to equality that women faced, President Richard Nixon established the President's Task Force on Women's Rights and Responsibilities on October 1, 1969.  The Task Force produced a report in 1970, "A Matter of Simple Justice," which recognized pervasive discrimination faced by women and recommended a series of measures that would improve the lot of women in the United States.[3]  Particularly, the report noted that "Discrimination in education is one of the most damaging injustices that women suffer.  It denies them equal education and equal employment opportunity, contributing to a second-class self-image." *Id*. p.7.

At the same time, Congress began to debate legislation that would ban various forms of discrimination against women, especially in education.  In June of 1970, the House of Representatives Special Subcommittee on Education initiated hearings on discrimination

---

[1] Executive Order 11246, Sept. 24, 1965, *available at* https://archives.federalregister.gov/issue_slice/1965/9/28/12315-12325.pdf#page=5

[2] Executive Order 11375, Oct. 13, 1967, *available at* https://archives.federalregister.gov/issue_slice/1967/10/17/14299-14304.pdf#page=5.

[3] Report of the President's Task force on Women's Rights and Responsibilities, A Matter of Simple Justice, 1970, *available at* https://www.nixonfoundation.org/2015/09/a-matter-of-simple-justice/.

**Appx112**

against women, in relation to H.R. 16098, which would have amended the Civil Rights Act of 1964 to remove Title VII's exemption of educational institutions and introduce sex as a prohibited basis of discrimination in Title VI, which would have eliminated sex-based discrimination at federally fund education institutions.

In testimony on June 24, 1970, Representative Patsy T. Mink spoke in favor of H.R. 16098: "Discrimination against women in education is one of the most insidious forms of prejudice extant in our nation.  Few people realize the extent to which our society is denied full use of our human resources because of this type of discrimination."[4]  Representative Mink also observed that, "Scholarship and other forms of financial assistance are also distributed on a discriminatory basis, making it more difficult for women to afford a higher education."

These hearings led to a series of Congressional attempts to prohibit discrimination against women in educational institutions, culminating in the Education Amendments of 1972. These included Title IX, which said that no person "on the basis of sex" could be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[5]  In support of those Amendments, Senator Birch Bayh, one of the sponsors of the legislation noted that

> one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women. It is clear to me that sex discrimination reaches into all facets of education—admissions, scholarship programs, faculty hiring and promotion, professional staffing, and pay scales... [T]he heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds.

118 Cong. Rec. 5803, February 28, 1972.  Senator Bayh made further comments demonstrating that Title IX was geared exclusively toward the protection of women stating, "Discrimination

---

[4] Testimony by Representative Patsy T. Mink, Special Subcommittee on Education, U.S. House Committee on Education and Labor, hearings on discrimination against women in higher education (Jun. 24, 1970), *available at* https://www.loc.gov/resource/mss84957.00102/?sp=4&st=image.
[5] Title IX, Sec. 901 of the Act; Pub. L. No. 92-318 , 86 Stat. 373 (codified at 20 U.S.C. 1681), *available at* https://www.govinfo.gov/content/pkg/STATUTE-86/pdf/STATUTE-86-Pg235.pdf#page=139.

**Appx113**

against women, in contrast to that against minorities, is still overt and socially acceptable within the academic community." *Id.* at 5804.  Congress passed the Education Amendments of 1972; and on June 23, 1972, President Nixon signed them into law.

Following the passage of Title IX, some in Congress questioned its application to college athletics.  In 1974, Senator John Tower proposed an amendment to the law that would have exempted revenue-producing sports from the requirements of Title IX.  This amendment was not adopted, but in response, Senator Jacob Javits proposed an alternative amendment which directed the Department of Health, Education, and Welfare ("HEW") to issue regulations implementing Title IX, "which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports."  The Javits Amendment made it clear that Title IX's provisions with regard to discrimination on the basis of sex would apply to collegiate athletics; the amendment was adopted and enacted as part of the Sex Discrimination Act of 1974.  Pub. L. No. 93-380, § 844, 88 Stat. 484.

Congress charged DoEd with promulgating regulations to effectuate that guarantee, *id.* DoEd enacted regulations guaranteeing that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."  34 C.F.R. § 106.31(a).  DoEd recognized that discrimination on the basis of sex could come in the form of sexual harassment, which it defined as "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."  34 C.F.R. § 106.30(a)(2).

Both Congress and DoEd understood that sex-separation or differentiation was not necessarily discrimination.  While Title IX generally prohibited discrimination on the basis of sex, the law recognized that essential physiological differences between men and women required different treatment in some situations.  These included separate facilities and accommodations for women, when their physical safety and privacy required the exclusion of

<div align="center">5</div>

<div align="center">**Appx114**</div>

biological males.  *See*, *e.g.*, 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."); 34 C.F.R. § 106.41(c) ("Equal opportunity.  A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes.").  They also included separate sports programs, since competitive fairness required the exclusion of biological males from female sports teams due to the significant athletic advantages typical males possess compared to typical females.  *See* 34 C.F.R. § 106.41(b).

Both Congress and DoEd recognized there are situations where males and females require separate facilities or accommodations.  Senator Bayh noted sex separation is allowed in some "cases where such treatment is absolutely necessary to the success of the program-such as in classes for pregnant girls or emotionally disturbed students, in sports facilities or other instances where <u>personal privacy must be preserved</u>."  118 Cong. Rec. 5807 (emphasis added).  Since that time, Congress and DoEd have recognized a male-female dichotomy.

## 2.  Neutrality with respect to abortion

Title IX was enacted in 1972, the year before the Supreme Court in *Roe v. Wade* found a constitutional right to abortion and struck down state prohibitions on abortion across the country.  Following the passage of the Education Amendments of 1974, which contained an amendment offered by Senator Javits (which extended Title IX to athletics), HEW published regulations implementing Title IX.  HEW's proposed rule required educational institutions to "treat disabilities related to pregnancy, childbirth, miscarriage, abortion, or recovery therefrom in the same manner and under the same policies as any other temporary disability or physical

condition." *Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance Nondiscrimination on the Basis of Sex*, 39 Fed. Reg. 22,228, 22,235 (Jun. 20, 1974).  Further, it made it impermissible for an educational institution to "discriminate against any student, or exclude any student from its education program or activity, including any class or extra-curricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, miscarriage, abortion, or recovery therefrom." *Id.* at 22,236.  For employees, a similar provision was proposed:

> "A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of pregnancy, or establish or follow any policy or practice which so discriminates or excludes.  For the purpose of this subpart, "pregnancy" means the entire process of pregnancy, childbirth, and recovery therefrom, and includes false pregnancy, miscarriage, and abortion."

*Id.* at 22,237.[6]

The final rule, issued June 4, 1975, changed the language "miscarriage, abortion," to "termination of pregnancy," but without defining "termination of pregnancy."  *Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24,128, 24,130 (Jun. 4, 1975).  Educational institutions were thus prohibited from discriminating against students and employees on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom." *Id.* at 24,142 (students); *id.* at 24,144 (employees).  Educational institutions were required to treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom" in the same way they treated "any other temporary disability," and were required to offer leaves of absence for both students and employees, even where an educational institution "does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy", and where it "does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a

---

[6] *Available* at https://archives.federalregister.gov/issue_slice/1974/6/20/22211-22240.pdf#page=18.

**Appx116**

policy." *Id.* at 24,142, 24,144.  Students and employees had to be reinstated to their prior status upon their return, although no other benefits were required.  *Id.* at 24,142, 24,144.[7]

In 1984, the Supreme Court narrowed the application of Title IX to those specific programs of an educational institution that receive federal funding.  *Grove City College v. Bell*, 465 U.S. 555, 572 (1984) ("the fact that federal funds eventually reach the College's general operating budget cannot subject Grove City to institution-wide coverage").  In 1988, in response to *Grove City*, Congress passed the Civil Rights Restoration Act of 1987 ("CRRA") in order to correct "certain aspects of recent decisions and opinions of the Supreme Court [that] have unduly narrowed or cast doubt upon the broad application of title IX." 102 Stat. 28, Pub. L. 100-259, Mar. 22, 1988. It amended Title IX to expand the statutory definition of "program or activity" to cover any entity, any part of which receives federal financial assistance.  20 U.S.C. § 1687.

Because the broadened scope of Title IX created serious issues with the termination of pregnancy provisions of HEW rule, on the motion of Senator John Danforth, the CRRA also added abortion neutrality to Title IX: "Nothing in this title shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." Sec. 3, 102 Stat. 29, Public Law 100—259, Mar. 22, 1988; *codified as* 20 U.S.C. 1688.  Section 8 of the Act added a note to 20 U.S.C. 1688: "No provision of this Act or any amendment made by this Act shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal Funds to perform or pay for an abortion."  The Danforth Amendment passed the Senate on January 28, 1988., and became law with the rest of the CRAA on March 22, 1988.

B.  **The Final Rule**

---

[7] *Available at* https://www.govinfo.gov/content/pkg/FR-1975-06-04/pdf/FR-1975-06-04.pdf.

On April 19, 2024, DoEd published the Final Rule, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 89 Fed. Reg. at 33,474 (Apr. 19, 2024).  The Final Rule is set to take effect August 1, 2024.  *Id.* at 33,549. However, schools will have to take steps this summer to implement numerous provisions and modify physical facilities in order to comply when the school year begins.

1. **"Gender identity" and discrimination**

The Final Rule redefines "sex" to include "gender identity" in Title IX.  The Final Rule claims a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity."  89 Fed. Reg. at 33,818 (emphasis added).  DoEd considers "gender identity" to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth."  *Id.* at 33,809.

The Final Rule places limitations on how a school can verify someone's "gender identity." It effectively requires educational institutions to take a person at his or her word as to his or her "gender identity" without documentation or questioning.  *Id.* at 33,819.  In fact, "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with his or her "gender identity" imposes more than *de minimis* harm."  *Id.* at 33,819 (emphasis added).  Even requesting a birth certificate can be a "burdensome documentation requirement."  *Id.*

The contours of what constitutes "discrimination" based on "gender identity" are broad and can include areas where Title IX permits separation between the sexes.  It "clarifies" that a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from

participating in an education program or activity consistent with their gender identity." 89 Fed. Reg. at 33,818 (emphasis added).

The Final Rule declines to define "specific conduct and practices that constitute . . . gender identity discrimination," *id.* at 33,808, but does provide some instances in which a school would likely be found to be discriminating if it treats a person according to his or her biological sex rather than "gender identity."  For example, it states that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity."  *Id.* at 33,818.  Any "such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes."  *Id.* at 33,819.  The Final Rule also notes that schools can no longer separate students based on biological sex for "classes or portions of classes." *Id.* at 33,819.  This would include all gym classes and health and sexual education classes.

Although the Final Rule claims to be silent regarding sports,[8] there is no doubt that it will prevent biological sex separation in athletics.  This is evident both in the text of the Final Rule and in the statements of Defendants in related litigation.  The Final Rule forbids "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity when that person seeks to participate consistent with their gender identity."  *Id.* at 33,818.  The Final Rule also says that DoEd considers it a violation of Title IX when a school engages in "impermissible" "sex-stereotyping" by making decisions "based on 'paternalism and stereotypical assumptions about women's interests and abilities,' and a 'remarkably outdated view of women and athletics.'"  *Id.* at 33,811 (quoting *Pederson v. La. State Univ.*, 213 F.3d at 858, 880 (5th Cir. 2000)).  Finally, Defendants have already taken the position that "the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls'

---

[8] *See, e.g., id.* at 33,834 ("These final regulations do not include any changes to other provisions governing athletics.").

participation in girls' sports." Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) at 21; *cf.* U.S. Dept. of Justice and DoED 2016 Dear Colleague Letter on Transgender Students at 3. In fact, according to Defendants, any "categorical ban" on biological males' participation in female-only sports "is inconsistent with Title IX's overarching goal of ensuring equal opportunity." Brief of Amicus United States of America, *B.P.J.*, 98 F.4th 542, at 12. They have said that "prohibiting [biological males] from participating on girls' sports teams because their sex assigned at birth was male" causes "harm" and constitutes discrimination on the basis of sex. *Id.* Defendants would likely use the Final Rule to prohibit blanket bans on biological males competing on and against female-only athletics teams, requiring schools to allow men to play on women's teams.

### 2. Sex-based harassment and grievance procedures

The Final Rule also changes how sex-based harassment is defined and, in so doing, extends into many areas of speech. In support of this, the Final Rule repeatedly refers to prior "Dear Colleague" Letters, including the 2016 Dear Colleague Letter.[9] While the Final Rule claims to maintain First Amendment protections, *id.* at 33,803 (suggesting nothing in the Final Rule requires an educational institution to violate free-speech rights), DoEd has already taken the position that educational institutions are at risk of losing federal funding (and at risk of civil liability) if a teacher does not use a student's "preferred pronouns" for any reason, including if the teacher did not know that the student's "gender identity" differed from his or her biological sex or if the teacher had a free speech or religious liberty objection. *See* 2016 Dear Colleague Letter at 3. The Final Rule would lower the standard for harassment to include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is <u>subjectively</u> and objectively offensive and is so severe <u>or</u> pervasive that it <u>limits</u> or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (emphases added). While the Final Rule does acknowledge that DoEd cannot interfere

---

[9] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf

with a person's religious liberty rights or rights under the Religious Freedom Restoration Act of 1993, PL 103–141, November 16, 1993, 107 Stat 1488, it does not provide any exemption for religious students, teachers, staff, administrators, coaches, etc., and instead says DoEd "will investigate" all complaints and make individual determinations when a person cannot comply with the Final Rule due to his or her religious belief.  *Id.* at 33,809.

The Final Rule alters the grievance procedures that protect the due-process rights of individuals accused of sex-based harassment.  *See id.* at 33,876–77.  Rather than an opportunity to examine the evidence, the accused is given "an equal opportunity to access either the relevant and not otherwise impermissible evidence," or the same written investigative report that "accurately summarizes the evidence."  34 C.F.R. 106.46(c)(1)(iii) & 106.46(e)(6).  Rather than an opportunity to question and cross-examine witnesses, "[a] recipient must provide a process that enables the decisionmaker to question parties and witnesses." *Id.* 106.45(g).  In addition, the accused may be denied an attorney ("the postsecondary institution may establish restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties," *id.* 106.46(e)(2); no live hearing is required, *id.* 106.46(e)(6)(2),106.46(g); and the decisionmaker in any grievance may be the same person as the investigator, *id.* 106.45(b)(2)).  The Final Rule even extends beyond the United States. *Id.* at 33,853. *see contra* 20 U.S.C. § 1681(a) ("No person <u>in the United States</u> shall . . .") (emphasis added).

### 3.   Abortion

In addition, the Final Rule requires schools to provide benefits for those seeking voluntary abortions.  The Final Rule requires that educational institutions "treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave; payment of disability income; accrual of seniority and any other benefit or service; and reinstatement; and under any fringe benefit offered to employees by virtue of employment."  *Id.* at 33,796.  The Final Rule defines "pregnancy or related conditions" to mean pregnancy, childbirth, termination of pregnancy."

**Appx121**

Termination of pregnancy includes voluntary abortion. *Id.* at 33,575. Employees must also be provided the benefit of a leave of absence to obtain an abortion, even when the educational institution does not maintain a leave policy for its employees, as well as "in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy." *Id.* at 33,798.

The Final Rule also requires educational institutions to provide a female student who has had or who is recovering from an abortion access to all education programs and activities, which could include access to online or homebound instruction during recovery from an abortion and providing a student additional time to complete an exam or coursework if a student travels out of state for the abortion. *Id.* at 33,777. The Final Rule requires educational institutions to offer students obtaining abortions "Reasonable Modifications" of policies, practices, and procedures to ensure equal access (i.e. to facilitate their abortions), including "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations." *Id.* Students obtaining abortions must also be allowed a voluntary leave of absence, along with reinstatement "to the academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began." *Id.* Students obtaining an abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity." *Id.* The Final Rule requires educational institutions to provide leave, disability, and other benefits in connection with abortions.

C.  **The Parties**

1.  **Plaintiff States**

20 U.S.C. § 1682 conditions federal funding on compliance with Title IX: "Compliance with any requirement adopted pursuant to this section may be effected by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement."

Federal agencies that provide financial assistance to states are required to adopt regulations "to effectuate the provisions of 1681" (*i.e.* to prevent discrimination on the basis of sex). DoEd has adopted regulations, *see* 34 C.F.R. § 106.4, that condition DoEd funding on "an assurance from the applicant or recipient . . . that the education program or activity . . . will be operated in compliance with this part [106]." Further, such assurance will not be valid if the recipient has not taken the DoEd's recommended "remedial action," *see* 34 C.F.R. § 106.3(a), necessary to cure existing sex-based discrimination.

Plaintiff States operate educational institutions that are subject to Title IX's requirements. As such, when Title IX was enacted and the initial related regulations were promulgated, they complied with the equal opportunity requirements for males and females. State boards of education enact statewide policies to ensure the safety of students, teacher licensure, and school accreditation, which requires Title IX compliance. Local school boards enact specific Title IX policies for their school districts and hire Title IX coordinators to make sure those policies are carried out. *See* Dec. of Amy Cawvey (attached as Ex. 1).; Dec. of Jennie Earl (attached as Ex. 2).

In exchange for complying with Title IX, the States and their schools receive federal funding. In fiscal year 2023, Kansas received approximately $1.6 billion in federal financial

14

assistance.[10]  Alaska received  $237 million for K-12 schools and $198 million for the University of Alaska (not including Elementary and Secondary School Emergency Relief funds ("ESSER")) in fiscal year 2022 and $225 million for K-12 school and $177 million for the University of Alaska, (again not including ESSER funds) in fiscal year 2023.[11]  In Utah, federal funding is projected to account for approximately 8 percent of the State's total base public education revenue of $7.7 billion.[12]  The Wyoming Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools.  It has further established the state university.  In fiscal years 2022 and 2023, the federal government provided millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming.[13]

In addition to complying with Title IX requirements, the States have enacted their own laws designed to protect all students' privacy and to ensure equal access in athletics for women and girls.  Kansas law mandates that schools "separate overnight accommodations [] for students of each biological sex during school district sponsored travel that requires overnight stays by students," Kan. Stat. Ann. 72-6286(a) (Supp. 2023), and that students are separated by biological sex in sports in its public schools and state-sanctioned athletic programs, Kan. Stat. Ann. 60-5603 (Supp. 2023).  Kansas law also provides that "[a]ny school district, or public school thereof, . . . that collects vital statistics for the purpose of conforming with anti-discrimination laws . . . shall identify each individual who is part of the collected data set as either male or female at birth."  Kan. Stat. Ann. 77-207(c).  Alaska law mandates equal opportunity for "both sexes" in athletics and in recreation in a manner that is commensurate

---

[10] *E.g.,* 2 KAN. LEGIS. RSCH. DEP'T, BUDGET ANALYSIS FISCAL YEAR 2024 at 913, 945, 1003, 1025 (Feb. 2023), available at https://tinyurl.com/bdh6us6v.

[11] *See* Alaska Dep't of Edu, Budgets and Actual Reporting, Operating Fund Reports, https://education.alaska.gov/schoolfinance/budgetsactual, select year and click "Go."

[12] *See* LEGIS. FISCAL ANALYST, MINIMUM SCHOOL PROGRAM: BASIC SCHOOL PROGRAM & PUBLIC EDUCATION BUDGET FRAMEWORK 2024 GS at 2 (Jan. 23, 2024), available at https://le.utah.gov/interim/2024/pdf/00000511.pdf.

[13] *See* Wy. Dep't of Educ., Statistical Report Series No. 3 (School District Financial Profiles (WDE Report Viewer)), p.114;  https://portals.edu.wyoming.gov/Reports/Public/wde-reports-2012/finance/stat-3 reflecting $266,477,085 in federal revenue received for 2021-2022 school year for K-12 schools; *see also* University of Wyoming Financial and Compliance Reports (University of Wyoming – Compliance Report 2023), *available at* https://www.uwyo.edu/budget-finance/financial-affairs/financial-reports.html reflecting $140,202,348 (page 8) in total federal financial assistance (federal awards) expended for fiscal year 2023.

with the general interested of the members of "each sex." It further mandates that schools provide showers, toilets, and training-room facilities "for both sexes." AS 14.18.040. Utah law generally provides that students in public education facilities are to use "sex-designated privacy space[s]," including restrooms and changing rooms, that "correspond[]" to the student's sex. Utah Code Ann. § 63G-31-301(1). Utah law generally provides that male students may not compete on school athletic teams that are "designated for students of the female sex in an interscholastic athletic activity." Utah Code Ann. § 53G-6-902. Wyoming law provides that "[a] public school or a private school that competes against a public school shall expressly designate school athletic activities and teams as one (1) of the following based on sex: (i) Designated for students of the male sex; (ii) Designated for students of the female sex; or (iii) Coed or mixed." Wyo. Stat. Ann. § 21-25-102(a). It also provides that "[a] student of the male sex shall not compete, and a public school shall not allow a student of the male sex to compete, in any athletic activity or team designated for students of the female sex." Wyo. Stat. Ann. § 21-25-102(b). "'Sex' means the biological, physical condition of being male or female, determined by an individual's genetics and anatomy at birth." Wyo. Stat. Ann. § 22-25-101(a)(iv).

 2. **Plaintiff K.R.**

 K.R. is a 13-year-old girl who lives in Stillwater, Oklahoma and goes to Stillwater Middle School. Dec. of K.R. ¶¶ 1–2 (attached as Exhibit 3). Stillwater Middle is a public school that receives federal funding and is subject to Title IX. *Id.* Last year, K.R. encountered biological males who identify as females in a girls' restroom at Stillwater Middle. *Id.* at ¶ 4. This made her feel intensely uncomfortable, embarrassed, and unsafe. *Id.* at ¶¶ 4–11. She is not comfortable sharing a private space with males, regardless of their claimed "gender identity." *Id.* And the restrooms at Stillwater Middle provide minimal privacy: the stalls have large cracks between the door and wall panels, making it easy for someone to see into the stall. *Id.* at ¶¶ 12–13.

 Following this and other similar incidents, K.R. stopped using the restroom at school altogether, which often required her to avoid using the restroom for nine hours at time. *Id.* at ¶¶ 16–18. Thankfully, Oklahoma passed a law requiring that multiple occupancy restrooms be

designated by sex and that members of the opposite sex—defined biologically—not be permitted access.  Okla. Stat. 70, § 1-125. After that, K.R. was able to return to using the girls' restrooms at school. K.R. Decl. at ¶¶ 19–20.  K.R. wants to continue using the girls' restroom without members of the opposite sex.  *Id.* at ¶¶ 21–22.

K.R. is also a Christian who believes that God created humans male or female and that humans cannot change their God-given sex.  *Id.* at ¶¶ 26–27.  Her faith also teaches that she should not lie.  *Id.* at ¶ 28.  She believes that referring to a male as "she," "her," or any other biologically inaccurate pronoun—or vice-versa for a female—would be a lie and would violate her faith.  *Id.*  She is aware of students at her school who identify as the opposite sex and who want others to refer to them with inaccurate pronouns.  *Id.*  K.R. cannot do this consistent with her faith.  *Id.*

K.R. sometimes discusses her religious beliefs with her friends at school.  *Id.* at ¶ 29.  These discussions include her belief that there are only two sexes and that people cannot change their sex.  *Id.*  They also include her discomfort about using the restroom with members of the opposite sex and her belief that admitting males to the girls' restroom is inappropriate.  *Id.*  She wants to continue discussing issues concerning "gender identity" in the context of her religious faith.  *Id.* ¶¶ 30–31.

### 3.  Plaintiff Female Athletes United

Female Athletes United ("FAU") is a membership organization formed to defend equal opportunity, fairness, and safety in women's and girls' sports.  Dec. of Burton Brown ¶ 3 (attached as Ex. 4).  FAU has members in the Plaintiff States who participate on girls' and women's sports teams at schools governed by Title IX.  *Id.* ¶¶ 23–26.

FAU members oppose allowing males to compete in women's sports because males have inherent physical advantages that make competing against them unfair and often unsafe.  *Id.* ¶ 6.  FAU members will be harmed by having to compete against males if the Final Rule takes effect.  *Id.* ¶ 44.  At present, state laws and organizational policies protect many FAU members from this harm.

**Appx126**

For example, this coming fall, FAU member A.B.S. will start playing women's volleyball at MidAmerican Nazarene University, a school governed by Title IX, but does not have to compete against males because of a National Association of Intercollegiate Athletics ("NAIA") policy protecting her. Dec. of A.B.S. ¶ 47(attached as Ex. 5). Likewise, FAU members A.R.S., T.P., and T.Z attend public schools in Kansas, Wyoming, and Utah respectively, play women's sports at those schools, and don't have to play against males because of protective state laws. Decl. of A.R.S. ¶ 28 (attached as Ex. 6); K.R.S. § 60-5603; Dec. of T.P. ¶ 13 (attached as Ex. 7); Wyo. Stat. § 21-25-102; Dec. of T.Z. ¶¶ 20–22 (attached as Ex. 16); Utah Code § 53G-6-902.

FAU members also oppose being forced to share intimate spaces like restrooms, locker rooms, showers, and overnight accommodations with males. Brown Decl. ¶¶ 27–35. And again, many are protected by state laws that prevents males from having access to female intimate spaces based on their claimed "gender identity." That is the case for FAU members Elizabeth Zwahlen and T.Z., both students at schools in Utah covered by Title IX. Both regularly use their school locker rooms to change, and neither would be comfortable doing so in the presence of males. Zwahlen Dec. ¶¶ 17–22 (attached as Ex. 8); T.Z. Dec. ¶¶ 12–15, 27. Thankfully, Utah law protects them both from having to do so in most circumstances. Utah Code §§ 63G-31-301 though 63G-31-302. But the Final Rule would vitiate that protection.

Consistent with the organization's purpose, FAU members want to advocate for women's sports, to explain the enduring physical differences between males and females, and to express the view that sex is real, binary, and unchangeable. Brown Dec. ¶¶ 37–46. Many members will not use inaccurate pronouns that contradict a person's sex. *Id.* ¶ 40. For example, A.R.S., T.P., and T.Z. want to speak freely about their views on women's sports, forcing women to share intimate spaces with males, and similar issues related to "gender identity." A.R.S. Dec. ¶ 34; T.P. Dec. ¶¶ 14–25, 38; T.Z. Dec. ¶¶ 23–24, 29–30. But the new Title IX regulations threaten them with a sex-based harassment claim if they speak out.

### 4.  Plaintiff Moms for Liberty

Moms for Liberty is an organization with over 130,000 members nationwide.  Its mission is to unify, educate, and empower parents to defend their parental rights, including their fundamental right to raise their children in accordance with their values.  To accomplish this mission, Moms for Liberty, through its membership, seeks to protect children from political and social indoctrination in schools.

Moms for Liberty's membership is composed of parents with children in elementary through high school, primarily schools that receive federal funding and are, thus, subject to Title IX. Members of Moms for Liberty include declarants Merianne Jensen, Tricia Plank, Debbie Lochner, and Rebekah Koznek.  Each of these declarants have children who (1) attend schools at which there are transgender individuals; (2) hold values and have expressed viewpoints on issues of "gender identity" and transgenderism that would trigger the harassment standard in the Final Rule; and (3) attend schools that are all but certain to adopt new rules, policies, and procedures in accord with the Final Rule because the schools receive federal funding. Emblematic of this latter reality are provisions in Ms. Lochner's children's school district policies recognizing the controlling nature of Title IX and stating that "[d]eterminations as to whether conduct or an incident constitutes discrimination and/or harassment will be made consistent with applicable <u>federal</u> and state laws and <u>regulations</u> . . . ".[14]

### 5.  Plaintiff Young America's Foundation

Young America's Foundation is an organization with thousands of members on college campuses across the country.  Young America's Foundation promotes free speech and the exchange of ideas on campuses and provides its members access to educational resources, campus flyering and tabling materials, and speakers.  Young America's Foundation's mission is to ensure that young Americans are inspired by ideas including the advancement of traditional

---

[14] Policy 3420 Non-Discrimination and Anti-Harassment in the District, Newark Central School District (Nov. 15, 2023) (emphases added) (available through Featured - Newark Central School District BoardDocs® LT (last visited May 21, 2024)); *see also id.* at Policy 3421 Sex Discrimination & Sexual Harassment Prohibited by Title IX of the Education Amendment of 1972 (Jan. 20, 2021) ("As required by Title IX of the Education Amendments of 1972, the District does not discriminate on the basis of sex in its education programs and activities, admissions or when making employment decisions.")

**Appx128**

values.  Some of Young America's Foundation's materials and speakers focus on issues of "gender identity" and transgenderism, advancing the belief that biological sex controls, and a person cannot select his or her sex or gender.  Its membership's distribution of materials across college campuses inspires new individuals to join and promote Young America's Foundation's organization and mission and sparks valuable debate on these issues.

Young America's Foundation has chapters on the campuses of Kansas State University, the University of Utah, and the University of Wyoming.  Each of these universities receive federal funding and are, thus, subject to Title IX.  Young America's Foundation's members at these universities respectively include the declarants Thomas Adcock, Rachel Flynn, and Kailee Verdeyen.  These individuals believe and express viewpoints that sex is determined at birth, there are only two genders, an individual cannot change his or her gender, one should use pronouns consistent with an individual's biological sex, women deserve sex-segregated private spaces on campuses, and a biological male should not use a women's restroom or locker room or play on a women's sports team.  These individuals also have plans to bring speakers to campus to discuss topics in accord with these viewpoints and to engage in other activism and discussion on their views.  If the Final Rule is permitted to take effect, these individuals fear facing investigatory or disciplinary proceedings if they continue to express these views and promoting speakers consistent with these views.  They will also feel compelled to acquiesce to the dictates of the Final Rule and speak in a manner contrary to their beliefs by using a transgender, non-binary, or gender-nonconforming individual's preferred pronouns.  The chilling and compelling of speech on issues of "gender identity" will, in turn, hamper Young America's Foundation's ability to distribute its message and expand its membership base.

<u>ARGUMENT</u>

"Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the

20

**Appx129**

injunction would not be adverse to the public interest." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal quotation mark omitted).

A. **Plaintiffs are likely to succeed on the merits**

"When evaluating likelihood of success on the merits, it is critical to consider all factors that may bear on the probability that the moving party will succeed." *Does 1–11 v. Board of Regents, et al.*, Nos. 21-1414 & 22-1027, slip op. at 25 (10th Cir. May 7, 2024). "If the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable." *Id.* at 26. Here, there are several reasons the Plaintiffs will ultimately succeed, and so an injunction is appropriate because (1) the Final Rule is contrary to three federal statutes, (2) it violates the major questions doctrine, (3) it is unconstitutional, and (4) it is arbitrary and capricious.

1. **The Final Rule is contrary to three federal statutes**

a. **The Final Rule is contrary to Title IX**

The Final Rule is contrary to Title IX. The Court should begin with the plain language of Title IX. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982). "The plain meaning of a statute is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) (internal quotation mark omitted). The Court should focus on the plain meaning of the statute at the time it was passed. *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." (internal quotation marks and brackets omitted)). Subsequent changes in language are irrelevant. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." (internal quotation marks omitted)). Among other things, when agencies or courts

21

retroactively change the meaning of a word, they "risk [] upsetting reliance interests in the settled meaning of a statute." *Id.*

Title IX prohibits discrimination on the basis of "sex." Sex is defined as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures." SEX, Merriam Webster Dictionary (2024).[15] In 1972, it had the same meaning. Sex referred to biological sex as determined by genetics and identifiable by reproductive organs. *See* SEX, American Heritage Dictionary 1187 (1969) ("The property or quality by which organ-isms are classified according to their reproductive functions [and] Either of two divisions, designated male and female, of this classification."); SEX, 9 Oxford English Dictionary 577–78 (1933) ("Either of the two divisions of organic beings distinguished as male and female respectively"); SEX, Random House Dictionary of the English Language 1307 (1966) ("The fact or character of being either male or female: persons of different sex. . . . the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences").

The Supreme Court has held the same. In *Bostock*, the Court discussed the meaning of "sex" in Title VII, a statute passed just a few years before Title IX. The Court accepted that in 1964 "sex" "referred to 'status as either male or female as determined by reproductive biology'" and "only to biological distinctions between male and female." *Bostock*, 590 U.S. at 655 (internal brackets omitted). Title IX does not refer to "gender identity" at all, nor would it, because the point of the law was to equal the playing field for girls and women. As noted above, the road to girls and women receiving equal treatment was a long and arduous one. It started with a crude attempt to include "sex" in Title VII to <u>prevent</u> its passage in 1964 and did not culminate until 10 years later with the Javits Amendment. Throughout that time, women specifically pushed

---

[15] *Available at* https://www.merriam-webster.com/dictionary/sex.

forward to get Title IX to where it is today.  Title IX has succeeded in achieving Congress's purposes of protecting opportunities for biological women and girls in educations and sports.

The Final Rule ignores this and changes Title IX into something that it is not by pretending "sex" is different from the ordinary definition.  In order for Title IX to have the meaning that Defendants say it does, they would have to change the law.  If Congress <u>today</u> wants amend Title IX to include concepts of "gender identity," it may try.  In fact, it has tried.  There have been several unsuccessful attempts over the years to amend the statute to include "gender identity" as its own separate protected class.  *See, e.g.*, Fairness for All Act, H.R. 1440, 117th Congress (2021).  These attempts underscore the fact that Title IX has nothing to do with "gender identity."

Instead of accepting the statutory text, the Final Rule elevates "gender identity" over "sex" by inventing a *de-minimis*-harm standard to achieve what the statute does not.  89 Fed. Reg. at 33,887.  Besides having no basis in the text of Title IX, this standard creates enormous inconsistencies.  According to DoEd, sex distinctions <u>always</u> cause more than de minimis harm, but only when applied to persons with certain gender identities.  *See e.g.*, *id.*; *see also id.* at 33,815 (explaining "stigmatic injuries" are *per se* harmful).  So, sex-specific rules for restrooms cause de minimis harm when applied only to men who identify as men but more than *de minimis* harm when applied to men who identify as women.  *Id.* at 33,820.

The real-world effects of this illogic on women and girls are significant.  Under this regime, Title IX would no longer protect a middle-school girl like K.R. who wants to use the restroom outside the presence of biological males, or a high-school athlete like T.Z. who wants to change and shower without biological males looking at her.  K.R. Dec. ¶¶ 3–22; T.Z. Decl. ¶¶ 12–15, 20, 27.  Instead, it would force these women and girls to either endure the embarrassment of sharing intimate spaces with biological males or avoid using the restrooms and locker rooms at school altogether.  That is obviously not what Congress intended, meant, or enacted in 1972 when it prohibited sex discrimination in education. The meaning of Title IX is clear and unambiguous: DoEd cannot replace "sex" with "gender identity," eliminate protections

23

for women and girls, or require schools to do away with sex-separation.  That should end the question.  The Final Rule cannot stand.

    **b.  The Final Rule is contrary to 20 U.S.C. § 1688**

    20 U.S.C. § 1688 states that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."  The Final Rule attempts to get around this by misconstruing the statutory text and limiting § 1688 to the actual provision of abortions.  *See* 89 Fed. Reg. 33,757–58 (discussing how the Final Rule does not require student health centers to provide abortions).  This is wrong.  The Defendants ignore the plain language of § 1688, which prohibits DoEd from requiring schools to "<u>provide</u> or pay for <u>any</u> benefit or service." (emphases added).  The word "provide" means to "supply" or " to make available."  PROVIDE, *New American Heritage Dictionary of the English Language*, 1053 (1969).  In examining the plain meaning of the word "benefit", it means "anything that promotes or enhances well-being" to be helpful or advantageous to."  BENEFIT, *New American Heritage Dictionary of the English Language*, 123 (1969).  Basically, supplying a right such as leave is undoubtedly providing benefit.  Defendants try to work around this by "defining" benefit in a narrow manner to exclude leave and reasonable accommodations.  And they would initiate investigations and determine on a "fact-specific" and "case-by-case basis" whether a school violated Title IX by not accommodating a student's abortion.  This not only goes against the plain text of Title IX but also against the reason that abortion neutrality exists in Title IX in the first place. Congress made an explicit decision to amend Title IX to make it neutral toward abortion because they were concerned that post *Roe*, HEW regulations would be interpreted too broadly to force educational institutions to fund abortions.  Defendants try to upend that clear decision by unilaterally erasing that neutrality.

    Defendants' attempt to usurp this power also has the effect of effectively preempting state law on abortion.  In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 302 (2022), the Supreme Court held that "States may regulate abortion for legitimate reasons."  Many states have responded accordingly by establishing their own abortion laws, including Plaintiff Utah.

For instance, shortly after *Dobbs*, Utah Code Annotated § 76-7-302(2)(b), which banned abortion after 18 weeks, went into effect.  The Final Rule would require schools in Utah to provide leave and reasonable accommodations for students receiving an abortion even if it was after 18 weeks.  It would even require Utah schools provide leave for such students to travel outside the state to seek such an abortion.  *See* 89 Fed. Reg. at 33,779 ("Students can legally terminate a pregnancy either in their State or by traveling to another State where the abortion is lawful" and "recipients have no education-related need to access information about how or where a student will obtain medical treatment or for other personal health-related information related to termination of a pregnancy").  This heavy-handed approach to overriding state law on abortion is something that must come through a change of law from Congress.  Defendants cannot do it through the rulemaking process.  In doing so, the Final Rule is contrary to the abortion neutrality provision of Title IX.

       **c.**        **The Final Rule is contrary to RFRA**

       The Final Rule is also contrary to the Religious Freedom and Restoration Act ("RFRA") of 1993.  RFRA provides that the "Government shall not substantially burden a person's exercise of religion <u>even if the burden results from a rule of general applicability</u>." 42 U.S.C. § 2000bb-1(a) (emphasis added).  It exists "to ensure broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores Inc.*, 573 U.S. 682, 694 (2014).  If the Government substantially burdens a person's free exercise of religion, that person is entitled to an exemption unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Id.* at 694-95.  The Final Rule fails the RFRA test.

       The Final Rule substantially burdens religious speech by compelling religious students to use inaccurate pronouns against their beliefs and prohibiting them from sharing their religious views on issues related to gender identity.  For example, K.R. is a Christian who believes that God created human beings male and female and that sex is immutable.  K.R. Decl. ¶¶ 25-27.  She cannot use inaccurate pronouns without violating her religious beliefs.  *Id.* ¶ 28.

And she wants to exercise her faith by sharing her religious beliefs with her fellow students in appropriate circumstances. *Id.* ¶¶ 29–31.

But this violates the Final Rule, which specifies that any "practice" that does not treat a student "consistent with the person's gender identity" automatically causes "more than de minimis harm." 89 Fed. Reg. at 33,887. And anything a student considers "unwelcome" that "limits" the student's ability to benefit from an educational program constitutes unlawful harassment. 89 Fed. Reg. at 33,884. Likewise, the "unwelcome" conduct must only be "offensive" and either "pervasive" or "severe"—not both—to count. *Id.* The complainant does not have to "demonstrate any particular harm, such as reduced grades or missed classes." *Id.* Any "impact on their ability to participate or benefit from the education program" will do. *Id.*

Pronouns are pervasive. Students use them countless times every day. So, a student declining to use another student's inaccurate pronouns will clearly violate the Final Rule: the conduct will be "unwelcome" to students asserting a gender identity disconsonant with their sex; some will consider it "offensive"; it will be pervasive because pronouns are pervasive; and the student will claim it limits their access to the benefits of the educational program. The same is true for any expression of the religious view that sex is immutable.

This interpretation fits with what the Biden Administration has repeatedly said about pronoun use. It had tried to compel pronoun use under Title IX through guidance documents that a district court enjoined.[16] And it has contended that teachers declining to use inaccurate pronouns can trigger Title IX liability. Brief for the United States as *Amicus Curiae* in Supporting Defendant-Appellee and Urging Affirmance at 27–30, *Kluge v. Brownsburg Cmty*. Sch. Corp., 64 F.4th 61 (7th Cir. 2023) The same would apply to a student declining to use inaccurate pronouns since the Final Rule imposes on schools "a responsibility to protect students against sex-based harassment." 89 Fed. Reg. at 33,516.

---

[16] *See, e.g.*, U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families*, https://perma.cc/KA47-U9LJ; Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022), *appeal docketed* No. 22-5807 (6th Cir. June 13, 2022).

**Appx135**

And the Final Rule provides no exceptions for sincerely held religious beliefs.  It only states, "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific." Basically, a person cannot know with certainty whether their religious beliefs violate the Final Rule until they are investigated.  So, under the Final Rule, K.R.'s only option if she wants to continue attending public school and avoid a harassment claim is to "comply wholeheartedly" with regulations she "sees as sinful," by using inaccurate pronouns and keeping silent about her religious beliefs.  *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 938 (5th Cir. 2023); *accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 735 (Va. 2023) (compelling pronoun use violates similar Virginia RFRA).  Coercing people to act against their faith is "precisely what RFRA is designed to prevent." *Braidwood*, 40 F.4th at 938–39.

Defendants cannot show a compelling interest in forcing religious people to speak against their faith or in silencing their religious expression.  "[R]egulating speech because it is [believed to be] discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).  Otherwise, the government could compel or restrict student speech "any time their speech might cause offense." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021).  The government cannot use "[p]urportedly neutral non-discrimination policies" to enforce its preferred view of hot-button public issues, like "gender identity." *Id.* Likewise, the federal government lacks any legitimate objective "to produce speakers free" from purported bias, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 578–79 (1995), and so any non-discrimination interest is not sufficient to justify compelling speech, *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023).  Far from being "always" a "compelling interest," this interest is "comparatively weak" in the context of education and opposite-sex pronouns. *Meriwether*, 992 F.3d at 509–10.

Nor is compelling and restricting speech the least restrictive means of accomplishing any compelling objective. In fact, there was an easy alternative manner in which the government could have achieved its compelling interest if it had one.  Title IX has an exemption for religious institutions that states it "shall not apply to an educational institution which is controlled by a

27

**Appx136**

religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). The government could have simply allowed for that language to apply to individuals at non-religious educational institutes that also hold such beliefs. This is akin to the options available to the government in *Burwell* where, "HHS has already established an accommodation for nonprofit organizations with religious objections." 573 U.S. at 730. The Court there held that "it does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well." *Id.* at 731. Similarly, there is an already established accommodation process that does not impinge on the religious beliefs of K.R. or other individuals like her and serves whatever limited government interests exist equally well. But the Final Rule ignores this option. Thus, it is contrary to RFRA.

> **2. The Final Rule violates the major questions doctrine**

The Final Rule invokes (and violates) the major questions doctrine. The major questions doctrine is a modern phrase to describe the longstanding idea that Congress does not give agencies free rein to make major policy decisions on issues of vast economic or political importance. It "works in much the same way to protect the Constitution's separation of powers. In Article I, 'the People" vested '[a]ll' federal 'legislative powers . . . in Congress.' Preamble; Art. I, § 1." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alternations in original). Separation of powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so. *Id.* at 724 (discussing the "major questions" doctrine); *id.* at 743 (Gorsuch, J., concurring). "[T]his means that important subjects . . . must be entirely regulated by the legislature itself, even if Congress may leave the Executive to act under such general provisions to fill up the details." *Id.* at 737 (internal quotation marks omitted). If an agency claims the power to make these decisions, the Court should consider whether Congress has clearly authorized the agency to do so.

**Appx137**

The major questions doctrine clearly applies here.  The Final Rule attempts to fundamentally reorder the education system across the country through (1) enshrining gender ideology into the entire K-12 education system and tying education funding to it, (2) mandating a campus grievance procedure that limits the due process rights of college students accused of sex-based harassment, and (3) requiring schools to provide benefits to students and employees for voluntary abortions.  All of these issues are subject to profound political discussions across the country.  Furthermore, these provisions raise serious issues regarding First, Fifth, and Fourteenth Amendment rights of individuals within schools.  These are the type of "important subjects" that "must be regulated by the legislature itself." *Id.*  The Final Rule attempts to swing a sledgehammer through the debates continuing around the country on these important subjects and unilaterally end the discussion.  That violates the major questions doctrine.

The Final Rule implicates the major questions doctrine in another equally important manner because Defendants seek to intrude into education, a domain of the state.  "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States." *Id.* (internal citation omitted).  Education has traditionally been in the legal domain of the states.  The Final Rule tramples upon that power reserved to states by imposing a radical ideological framework on sex-based harassment and other matters.  In doing so, it seeks to preempt multiple state laws on matters such as separation of biological males and females in athletics, bathroom laws based on biological sex, and religious liberty.  Federal law does not preempt State law in areas traditionally reserved to the States unless Congress expressed a "clear and manifest" intent to do so. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Therefore, Congress has to express a "clear and manifest" intent to preempt state laws.  At a minimum, the Final Rule has to demonstrate that Congress gave such clear authorization.

The Final Rule certainly invokes the major questions doctrine.  At that point, Defendants have the burden of demonstrating that they have clear authorization to do it.  A colorable or plausible reading of statutory authority is not enough.  This burden is high and Defendants

cannot come close to meeting it.  Indeed, because the Final Rule is contrary to several federal statutes as demonstrated *supra*, Congressional authorization cannot exist.

### 3. The Final Rule is contrary to the Constitution

#### a.  The Final Rule violates the First Amendment

The Final Rule violates the First Amendment in four distinct ways: (1) compelling speech that aligns with the ideology of Defendants, (2) censoring speech that does not align with it through content-based restrictions and viewpoint discrimination, (3) chilling speech through vague and overbroad language, and (4) forcing individuals to engage in speech that violates their sincerely held religious beliefs.  Different types of speech receive different levels of First Amendment protection, "with speech on important social and political topics accorded the highest level of protection." *Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs*, 802 F. Supp. 1223, 1232 (D.N.J. 1992) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992)).

*Compelled Speech*.  The Supreme Court has long recognized that "freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all." *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 559 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018).

Thus, the government cannot "force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance." *303 Creative, LLC*, 600 U.S. at 602–03; *see also id.* at 586 ("[T]he government may not compel a person to speak its own preferred messages.").  "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate [the Supreme Court's] repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 502, 506 (1969)).

"Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508. And courts have repeatedly held that, in an academic setting, compelling the use of "preferred pronouns" violates this principle and qualifies as viewpoint discrimination because baked into the use of "preferred pronouns" is an acknowledgement that an individual can change his or her biological sex. *See id.* at 510 (holding that forced pronoun usage violated the First Amendment and stating, "the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view'" (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023) (school district requiring students to respect a student's "gender identity" contrary to their own beliefs "cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment'"); *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528, at 48-54 (D. Colo. Oct. 23, 2023) (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage); *Vlaming*, 895 S.E.2d at 723-24 (holding, under state constitution, that teacher could proceed on free expression challenge to school district's requirement that he use "preferred pronouns"). So, declining to use inaccurate pronouns is constitutionally protected.

But that is exactly what the Final Rule compels. The preamble to the Final Rule provided by DoEd identifies "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity" to be part of sex-based harassment. 89 Fed. Reg. at 33,516. It also strongly suggests that repeatedly "misgendering" an individual—*i.e.*, using pronouns that correspond with an individual's biological sex rather than his or her subjective "gender identity"—qualifies as harassment. *Id.* And it favorably cites a district court case finding that a plaintiff could advance a Title IX claim based on harassment where classmates called a transgender individual a "girl" and used a feminine version of the individual's preferred name. *Id.*

(citing *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081. 1092 (D. Minn. 2000)).  Lastly, language accompanying the Final Rule concludes that a failure to treat an individual in accord with his or her gender identity creates more than a *de minimis* harm, thus supporting a Title IX claim.  *See id.* at 33,818-19.

The Final Rule subjects an individual alleged to have engaged in harassment to investigatory proceedings.  *See id.* at 33,898-.95.  A credible threat of an investigation is impermissibly compulsory, in violation of the First Amendment.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64, 68 (1963) (because "[p]eople do not lightly disregard" threats of enforcement, "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" are impermissibly coercive); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1283, 1290 (10th Cir. 2004) (finding injury where speaker believed, based on school officials' words, that "it was only a matter of time" before she was punished); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (threat of report to bias response team and team's ability to refer student to school disciplinary proceedings or police chilled speech); *Speech First v. Cartwright*, 32 F.4th 1110, 1123 (11th Cir. 2022) ("Neither formal punishment not the formal power to impose it is strictly necessary to exert an impermissible chill.").

But the Final Rule does not stop at an investigation or even a verbal reprimand.  It goes several steps further, allowing for disciplinary proceedings, which give broad discretion to the hearing officer to impose punishments if an individual is found guilty of hostile-environment harassment.  *See* 89 Fed. Reg. 33,895.  Thus, under the Final Rule, students might face suspension or expulsion if they hold true to their beliefs and (1) use pronouns in accord with a classmate's biological sex regardless of how the classmate identifies, or (2) use a classmate's birth name rather than assumed name that corresponds with the classmate's assumed gender.  Punishments of this nature are undoubtedly sufficient to compel speech.

The threat of investigation and discipline effectively forces individuals to use classmates' "preferred pronouns" when addressing them in a school environment.  Aside from it being impossible to engage in routine day-to-day interactions with transgender, non-binary, or

32

gender-nonconforming persons by artificially avoiding pronoun use, K.R., several members of Young America's Foundation, Moms for Liberty, and FAU have declared that they, or their children, fear being forced to conform to the speech mandated by the Final Rule for fear of being the target of investigatory or disciplinary proceedings. *See* Dec. of Rachel Flynn at 4 (attached as Ex. 9); Dec. of Thomas Adcock at 4 (attached as Ex. 10); Dec. of Merianne Jensen at 3–4 (attached as Ex. 11); Dec. of Rebekah Koznek at 3–4 (attached as Ex. 12); K.R. Dec. ¶¶ 23–31; A.R.S. Dec. ¶ 34; T.P. Dec. ¶¶ 14–25, 38; T.Z. Dec. ¶¶ 23–24, 29–30. So, for K.R., FAU members, Young Americas Foundation members, and Moms for Liberty members, the only option they have is to speak a message with which they disagree.

Compounding this fear, the Final Rule provides no protection against compelled speech. The Final Rule's preamble provides only a single example of speech that would not qualify as hostile environment harassment, stating that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516. Thus, only unintentional and accidental "misgendering" may be protected from the threat of investigation and punishment, though that is unclear in the Final Rule and appears to be within a school's discretion. This puts Moms for Liberty members and their children, as well as Young America's Foundation members, in a situation where the only option they have is to engage in speech that aligns with the ideological preferences of Defendants whether they want to or not. But, as already pointed out, courts have held that requiring individuals to use "preferred pronouns" violates the protection against compelled speech afforded by the First Amendment. *See Meriwether*, 992 F.3d at 510; *see also Roy*, 2023 U.S. Dist. LEXIS 198528, at 48–54.

Finally, as explained above, the Government has no compelling interest in forcing ideological conformity. Nor is forcing teachers and students to use inaccurate pronouns—rather than simply some neutral form of address—the least restrictive means of accomplishing any legitimate objective. Indeed, as the Sixth Circuit noted in *Meriwether*, neutral forms of address are a "win-win" solution. 992 F.3d at 511. So, compelling pronouns fails strict scrutiny.

*Overbreadth*.  A law is overbroad under the First Amendment "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).  Here, the Final Rule chills protected speech related to gender issues by expanding the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes," while also stretching the definition of harassment to prohibit speech that does not meaningfully affect access to education.

Start with expanding the definition of "sex."  According to the Final Rule, "sex" now includes "gender identity," which it says is an individual's inherently subjective "sense of their gender." 89 Fed. Reg. at 33,809.  And it includes "sex stereotypes," which the Final Rule appears to define as any asserted differences between males and females.  89 Fed. Reg. at 33,811 ("not all conduct one might label 'sex stereotyping' necessarily violates Title IX" because, though discriminatory, it "might not impose more than *de minimis* harm on affected students").  With this expansion, the Final Rule brings within its purview nearly any speech about the important public issues of how to treat and understand gender dysphoria, men's participation in women's sports, name and pronoun usage, restroom use, and gender identity generally.

Add to that the Final Rule's "broader standard" for harassment, and students who view sex as immutable cannot speak on the subject without risking a harassment claim.  89 Fed. Reg. at 33,498.  If, for example, a student shared in an informal setting her view that, as a matter of basic biology, there are only two sexes, a fellow student who asserts a non-binary gender identity could claim harassment based on the alleged "unwelcome" and "offensive" nature of the speech.  89 Fed. Reg. at 33,505–06.  One instance of allegedly offensive speech could be enough if considered sufficiently severe.  89 Fed. Reg. at 33,500.  Or if the student repeated herself, the speech could be seen as pervasive "even if no single occurrence of the conduct, taken in isolation, is severe." *Id*.  All the complainant would need to allege is "some impact on their ability to participate or benefit from the education program" from the speech.  89 Fed. Reg. at 33,511. The Final Rule fully contemplates punishing speech that states that sex is binary and unchanging.  It cites *L.M. v. Town of Middleborough*, in which a school punished a student for wearing a t-shirt that

<div align="center">34</div>

<div align="center">**Appx143**</div>

said, "THERE ARE ONLY TWO GENDERS," as an example of appropriately regulating speech that "invades the rights of others." 89 Fed. Reg. at 33,504 (citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023)). So, students are on notice that expressing the view that sex is binary is fair game for a complaint.

Courts regularly hold that policies like the Final Rule that chill speech on controversial subjects are unconstitutionally overbroad. In *Cartwright*, the Eleventh Circuit invalidated a school's hostile-environment harassment policy that mirrors the Final Rule. 32 F.4th at 1114–15. Much like the Final Rule, the *Cartwright* policy prohibited harassment "so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education." *Id.* The Eleventh Circuit enjoined it as "fatally overbroad" because it chilled protected speech like "a man cannot become a woman because he 'feels' like one" and covered "substantially more speech than the First Amendment permits." *Id.* at 1125; *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (invalidating policy covering "any unwelcome verbal" conduct as overbroad). So does the Final Rule.

*Content and Viewpoint Discrimination.* The Final Rule also impermissibly restricts speech based on content and viewpoint. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *accord Hurley*, 515 U.S. at 579 (explaining that the government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"). A law is content-based if "on its face [it] draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). A facially neutral law may still regulate content if it cannot be "justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). A law discriminates based on viewpoint when it allows the expression of some viewpoints but not others. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

<center>35</center>

<center>**Appx144**</center>

The Final Rule does just that.  It restricts speech related to certain characteristics like "gender identity" that it considers "offensive."  89 Fed. Reg. at 33,884.  As noted above, both verbal and nonverbal actions geared toward someone's gender identity can qualify as sex-based harassment.  *Id.* at 33,516.  A person who refuses to address someone by his or her "preferred pronouns" and instead by his or her biological sex or who is critical of the Defendants' views on gender ideology would run afoul of the Final Rule and faces a credible threat of enforcement.  So, the Final Rule plainly refers to the content of the speech. And the Final Rule restricts only certain points of view.  After all, "[g]iving offense is a viewpoint."  *Matal v. Tam*, 582 U.S. 218, 220 (2017).  And it is a "bedrock First Amendment principle" that the government cannot ban speech because "it expresses ideas that offend."  *Id.* at 223.  Indeed, "the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."  *Meriwether*, 992 F.3d at 510 (quotation omitted); *see also Roy*, 2023 U.S. Dist. LEXIS 198528, at 48–54  (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage).  As the Eleventh Circuit noted in *Cartwright*, a harassment policy is a viewpoint-based restriction when, as here, it "prohibits only speech that is 'discriminatory."  34 F.4th at 1126; *see also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) (holding law regulating speech based on intent to "damage" was viewpoint discriminatory).

The issues and speech regulated by the Final Rule involve important social and political topics.  *See Meriwether*, 992 F.3d at 508 ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."); *Linn Mar*, 83 F.4th at 667 (finding that student speech relating to gender identity topics "'concerns political speech"').  This is evidenced by the growing number of recent court decisions addressing matters such as compelled pronoun usage, the ability of transgender and gender-nonconforming individuals to access restrooms and locker rooms of their choice, and the ability of transgender and gender-nonconforming individuals to play on sports team of their choice.  But the importance of this issue goes beyond court rulings.  For instance, in recent years numerous sports associations, including the National Association of

Intercollegiate Athletics, have enacted policies preventing biological men identifying as women from playing on women's sports teams.[17]  Furthermore, states have enacted laws prohibiting transgender biological men from playing on women's sports teams and using sex-segregated restrooms and locker rooms designated for women.  *See, e.g.*, Kan. Stat. Ann. 72-6286(a) (Supp. 2023); AS § 14.18.040; Utah Code Ann. § 63G-31-301(1); Utah Code Ann. § 53G-6-902; Wyo. Stat. Ann. § 21-25-102(a)-(b).  Finally, and specific to the speech of one of the YAF declarants, Thomas Adcock, the Kansas legislature recently passed a bill prohibiting doctors from performing transition surgeries on minors, only to have the governor veto the bill.  *See* Press Release, Kansas Office of the Governor, Governor Kelly Vetoes Bills, Allow One to Become Law Without Signature (Apr. 12, 2024)[18]; *see also* H. Sub. for S.B. 233 (Kan. 2024).  Thus, debate on issues surrounding gender identity and transgenderism hits close to home for those members of Young America's Foundation and Moms for Liberty in states such as Kansas, as well as other states where similar legislative efforts are ongoing.

Because the Final Rule discriminates based on viewpoint, it is *per se* unconstitutional. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("[R]estrictions … based on viewpoint are prohibited.").  But even if strict scrutiny were to apply, the Final Rule could not satisfy it.  As noted above, there is no compelling interest in restricting speech simply because it might cause offense.  And the Final Rule's "gestaltish 'totality of known circumstances' approach" to determining if speech offends or limits a student's educational benefits in unspecified ways "is the opposite of narrow tailoring."  *Cartwright*, 32 F.4th at 1125–26.  Indeed, a less restrictive alternative is obvious: simply maintain the stringent student-on-student harassment standard from *Davis v. Monroe County Board of Education*, which applied for more than 20 years without incident.  526 U.S. 629, 633 (1999) (restricting harassment claims to conduct "so severe,

---

[17] *See, e.g.,* National Association of Intercollegiate Athletics, Transgender Participation Policy (Apr. 8, 2024), https://www.naia.org/transgender/files/TG_Policy_for_webpage_v2.pdf (last visited May 22, 2024); World Athletics, Eligibility Regulations for Transgender Athletes at § 3B (Mar. 23, 2023); *see also* World Aquatics, Competition Regulations at § 5 Competition-Regulations-version-1st-January-2024-.pdf (fina.org) (effective date Jan. 1, 2024).
[18] *Available at* https://governor.kansas.gov/governor-kelly-vetoes-bills-allows-one-to-become-law-without-signature.

pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit").

In sum, the Final Rule's restriction of speech on "gender-identity" issues is contrary to the First Amendment and violates Plaintiffs' rights.  Members of Young America's Foundation and FAU, and the children of members of Moms for Liberty have deeply held beliefs on an array of issues involving "gender identity," sex stereotypes, sex characteristics, transgenderism, faith, and biology.  *See* Adcock Dec. at 2; Flynn Dec. at 2; Dec. of Kailee Verdeyen at 2 (attached as Ex. 13); Jensen Dec. at 2-3; Dec. of Tricia Plank at 2-3 (attached as Ex. 14); Koznek Dec. at 2-3; Dec. of Deborah Lochner at 2 (attached as Ex. 15); K.R. Dec. ¶¶ 2527; Brown Dec. ¶¶ 38–39; T.Z. Dec. ¶ 24; T.P. Dec. ¶ 14; Zwahlen Dec. ¶ 25; A.B.S. Dec. ¶ 43; A.R.S. Decl. ¶ 34.  These members and their children have expressed views on these matters within the school setting, including at times while in the presence of individuals identifying as transgender.  Adcock Decl. at 3; Flynn Dec. at 3; Verdeyen Dec. at 3; Jensen Dec. at 3; Plank Dec. at 3-4; Koznek Dec. at 4; Lochner Dec. at 2; K.R. Dec. ¶ 29; T.Z. Dec. ¶ 23; T.P. Dec. ¶ 24; Zwahlen Dec. ¶¶ 26–27; A.B.S. Dec. ¶¶ 44. In many cases, the views these individuals have formed and expressed are the result of personal experiences they encountered or are likely to encounter.  *See, e.g.,* Plank Dec. at 3; Koznek Dec. at 3; Flynn Dec. at 3; Verdeyen Dec. at 2-3; Lochner Dec. at 3.  The members of Young America's Foundation have also organized or participated in public events promoting these views.  Adcock Dec. at 3; Flynn Dec. at 3; Verdeyen Dec. at 3.  And speaking about women's sports, intimate spaces, and gender-identity issues is important to K.R. and many members of Female Athletes United. K.R. Dec. ¶ 29; T.Z. Dec. ¶¶ 29–30; T.P. Dec. ¶ 38; Zwahlen Dec. ¶ 31; A.B.S. Dec. ¶ 44.

To date, K.R., the members of Young America's Foundation, FAU, and Moms for Liberty and their children have engaged in these speech activities without becoming the subject of any investigatory or disciplinary proceedings.  *See* Adcock Dec. at 3; Flynn Dec. at 4; Verdeyen Dec. at 3; Jensen Dec.  at 3; Plank Dec. at 4; Koznek Decl. at 4; Lochner Decl. at 3; K.R. Dec. ¶ 30; T.P. Dec. ¶ 25.  Absent the Final Rule, these individuals would continue to express views on gender identity issues and organize and promote events advancing biologically-accurate views on these

38

matters; however, now they are deterred from doing so out of a reasonable fear of being the subject of investigatory and disciplinary proceedings upon the Final Rule taking effect.  *See* Adcock Dec. at 4; Flynn Dec. at 4; Verdeyen Dec. at 4; Jensen Dec. at 4; Plank Dec. at 4; Koznek Dec. at 4; Lochner Dec. at 3; K.R. Dec. ¶ 31; T.Z. Dec. ¶ 30; T.P. Dec. ¶ 38; Zwahlen Dec. ¶ 31. Thus, allowing the Final Rule to take effect will chill the speech of members of Young America's Foundation and the speech of the children of members of Moms for Liberty.

   **The Final Rule does not survive scrutiny.**  Strict scrutiny does not apply to compelled speech or viewpoint discrimination.  *See 303 Creative LLC*, 600 U.S. at 596 (forcing a person to "'utter what is not in [her] mind' about a question of political and religious significance . . . is something the First Amendment does not tolerate." (quoting *Barnette*, 319 U.S. at 634)); *Janus*, 138 S. Ct. at 2473 (Court has "never applied" a balancing test when a public employer "commands that its employees mouth a message on its own behalf"); *Rosenberger*, 515 U.S. at 829-30 (finding viewpoint discrimination without conducting strict scrutiny analysis); *Taxpayers for Vincent*, 466 U.S. at 804; *Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807, 814, 815 n.5 (8th Cir. 2004).  Content-based discrimination, however, is subject to strict scrutiny, where the burden is on the government to show that the restriction is narrowly tailored to serve a compelling interest.  *Boos v. Barry*, 485 U.S. 312, 324 (1988). Defendants will be unable to satisfy any of these standards.

   Under strict scrutiny, it is Defendants' burden to show that they have a compelling interest in justifying the restriction on speech and to narrowly tailor it to address that interest. *See Kennedy*, 597 U.S. at 530.  Defendants have no compelling interest in limiting the speech of those who disagree with their stated views on transgender ideology, even if Defendants claim offense at such speech.  *See Matal*, 582 U.S. at 243 ("Giving offense is a viewpoint."); *id.* at 244 (collecting 80 years of cases); *303 Creative*, 600 U.S. at 595 ("Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive.").  Defendants also cannot claim an interest in civil rights enforcement, even if Title IX really did authorize the Final Rule.  *303 Creative*, 600 U.S. at 592 (Colorado's anti-

discrimination laws are not "immune from the demands of the Constitution"); *Lucero*, 936 F.3d at 755 ("Even antidiscrimination laws, as critically important as they are, must yield to the Constitution."). The usage of biologically correct pronouns is not discrimination under Title IX. *Meriwether*, 992 F.3d at 511. To the extent that Defendants have any legitimate interest at all, the Final Rule is not narrowly tailored. Instead, the Final Rule goes in the opposite direction. It takes every possible step to ensure that speech that is not favored by Defendants is chilled as it only cites a "stray remark" as an example of something that does not violate the Final Rule. 89 Fed. Reg. at 33,516. At that point, the implication is that someone who engages in more than a "stray remark" about someone's preferred pronoun would face a credible threat of enforcement. This is far from a narrowly tailored approach.

The Final Rule also forces individuals to engage in speech that violates their sincerely held religious beliefs. The Final Rule would require individual teachers, coaches, students, and school administrators to acknowledge, affirm, and validate students' "gender identities" regardless of the speakers' own religious beliefs on the matter in violation of the First Amendment. *303 Creative LLC*, 600 U.S. at 596. Plaintiffs such as K.R. are Christians who have a sincerely held religious belief that God created individuals as male and female at birth, and a person cannot change that. The Final Rule presents a credible threat of enforcement if they do not use someone's preferred pronouns even if that conflicts with their sincerely held beliefs as it does not provide any religious exemptions. Furthermore, the Final Rule restricts their ability to speak freely on these sincerely held religious beliefs in violation of their First Amendment rights.

**b. The Final Rule violates the First, Fifth, and Fourteenth Amendment Due Process Clauses**

The First, Fifth and Fourteenth Amendments prohibit restrictions that are unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). This requirement furthers two purposes: (1) to provide fair notice to the citizenry of what is outlawed and (2) to provide standards for enforcement to officials. *Id.* at 108-09.

40

**Appx149**

A restriction is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925).  And "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'"  *Grayned*, 408 U.S. at 109 (ellipsis and internal quotation marks omitted) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).  Thus, regulations on speech which are vague chill not only protected speech targeted by the regulation but also speech in grey zones outside the intended edges of the regulation.  If a restriction "interferes with the right of free speech," then a stringent test for vagueness applies.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Est.s, Inc.*, 455 U.S. 489, 499 (1982); *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959) ("Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law.").

The Final Rule is unconstitutionally vague for the same reasons it is overbroad: nearly any statement on a wide range of public issues involving gender identity could reasonably subject a student to a harassment claim.  As the regulation admits, simply saying "there are only two genders" is likely enough.  89 Fed. Reg. at 33,504 (citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023)).  This view is widely held—including by the private plaintiffs—who want to share it in appropriate settings at school.  *See, e.g.*, K.R. Dec. ¶¶ 29–31.  But to avoid being labeled a harasser or disciplined, reasonable students will refrain from this kind of speech at the cost of their First Amendment rights.  That creates an "impermissible risk of suppression of ideas."  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992).  And it fails the "more stringent vagueness test" applicable to speech regulations.  *Vill. of Hoffman Estates*, 455 U.S. at 499.

The Final Rule also fails to clearly define "gender," adds a "subjective" component to the definition of harassment, and permits a complainant to support his or her complaint without identifying a particular harm suffered.  As a result, the Final Rule fails to provide fair notice to

41

**Appx150**

individuals such as the Plaintiffs as to what is outlawed and opens the door to arbitrary enforcement.  Multiple members of Young America's Foundation and the children of Moms for Liberty members are being forced to forgo their rights to speech because (1) it is not clear what speech falls within the ambit of the Final Rule and (2) they credibly fear arbitrary enforcement of the Final Rule.  *See supra.*

### c.  The Final Rule violates the Spending Clause.

Title IX and accompanying regulations implicate Congress's power under the Spending Clause of Article I, section 8, clause 1.  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992). The Supreme Court has "long recognized that Congress may fix the terms on which it shall disburse federal money to the States."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). However, the power to fix terms is not unlimited.  Courts have recognized "four general restrictions on Congress' exercise of power under the Spending Clause."  *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("*Kansas I*").  These are (1) "Congress's object must be in pursuit of the general welfare"; (2) "if Congress desires to place conditions on the state's receipt of federal funds, it must do so unambiguously so that states know the consequences of their decision to participate"; (3) "the conditions must be related to the federal interest in the particular program"; and (4) "Congress may not induce the states to engage in activities that would themselves be unconstitutional."  *Id.* (internal quotation marks and citations omitted).  If DoEd's interpretation of Title IX is correct, it would violate the second, third, and fourth restrictions and would render Title IX unconstitutional.

To begin, the Final Rule is unconstitutional because it imposes conditions on the States to which they did not agree and with which they are unable to comply.  "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."  *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17.  The States must therefore be fully aware of the strings to which federal funding is attached before they accept federal funds.  "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."  *Id.*  Courts

42

"insist[] that Congress speak with a clear voice," imposing any conditions "unambiguously," so that "States [may] exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Courts evaluate whether the conditions were "clear" and "unambiguous" by stepping in the shoes of the "state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). They ask whether the state official would "clearly understand" the obligations, such that it had "clear notice" regarding potential liability." *Id.* The answer in this case is a resounding "no."

As discussed above, it was understood in 1972 and 1975 that "sex" referred to biological sex and that Title IX was intended to provide and protect equal opportunities for women and girls. A state official would have understood that the school would be required to provide equal facilities for men and women—including restrooms, locker rooms, and overnight accommodations—or else incur liability. It was understood that men and women should have equal sports teams—in most cases requiring separate teams—which is why Congress specifically directed DoEd to promulgate regulations affecting such teams. The 1972 or 1975 state official would have understood that, by accepting the funding, the school was open to liability if it did not create equal opportunities for biological women and girls. It would not have understood that accepting Title IX funds opened the school to liability if a student was treated according to their biological sex rather than their internal concept of "gender identity."

The requirements in the Final Rule are so mercurial that it may be difficult for a state official to comply with the conditions. The Final Rule requires schools to treat students according to their own internal sense of their "gender identities" or else face liability for discrimination and potential loss of federal funding. Currently, liability for "discrimination," is understood to require the school to have actual knowledge of harassment that is "so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023). Under this standard, a school would not be liable for discrimination

43

if, for example, a teacher directed a female student with a short haircut to the boys' restroom or directed a male student who "identified" as a girl to the boys' restroom. But if the Final Rule is allowed to take effect, liability could be incurred for as little as directing a biologically male student to the boys' restroom when the boy "identifies" as a girl, regardless of whether the staff member knows of the student's "gender identity." *See* 89 Fed. Reg. 33,816.

Indeed, the Final Rule acknowledges that "gender identity" may not be readily discernable and is up to the individual student. 89 Fed. Reg. at 33,819–20. And the Final Rule suggests that schools should not require documentation or other examinations to determine a student's "gender identity." *Id.* Add to that the fact that the Final Rule understands there to be many "gender identities" and the fact that a person's' "gender identity" may change. 89 Fed. Reg. 33,819 & n.90 (citing the World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022) ("WPATH Standards)). The upshot is that schools may not know, and may have no way of knowing, whether any student's "gender identity" is different than his or her biological sex; and so, the only way for the school to truly know it is in compliance is to eliminate sex-separation altogether. A state official in 1972 and 1975 would have thought this was a violation of the statute, not compliance.

The Final Rule also violates the third restriction. The federal interest advanced by the creation of the Title IX spending program was the promotion and protection of education and athletic opportunities for biological women and girls. The Final Rule is not related to, and does not serve, that interest. Indeed, it undermines that interest. If the Final Rule takes effect, women and girls' sports will be will be effectively destroyed over time. Biological females will be denied the schooling opportunities that Title IX funds were intended to create. And biological females will be placed in unsafe and invasive situations at schools and universities.

The Final Rule also violates the fourth restriction. Under the Final Rule, a teacher would "discriminate" against a student if the teacher refuses to use the student's "preferred pronouns," even if the basis for the teacher's refusal is a religious objection. The Final Rule also violates the

44

**Appx153**

free speech protections of the First Amendment by compelling teachers, administrators, coaches, and staff to use "preferred pronouns," referring to boys as girls and vice-versa. *See 303 Creative*, 600 U.S. at 588–89. "Congress may not induce the states to engage in activities that would themselves be unconstitutional," *Kansas I*, 214 F.3d at 1199, by interfering with their citizens' free speech, religious liberty, or due process rights.

For example, the Final Rule would require a state university to engage in viewpoint discrimination by investigating and disciplining a student who wrote "men cannot become women" on a sidewalk or drew a trans flag with an "X" across it but places no obligation on the university to investigate a complaint against a student for writing the message that "men can become women" or for drawing a trans flag without an "X" across it. The First Amendment protects all of these messages equally. The Final Rule only restricts messages critical of "gender identity theory."

As another example, if K.R. declined a male student's request to refer to the student as "she" or "her" because K.R.'s faith does not allow her to say things she doesn't believe are true, the other student could file a sex-based harassment complaint against K.R. Under the Final Rule, the school would have little choice but to punish K.R. for exercising her constitutional right to avoid compelled speech: declining to use inaccurate pronouns would be "unwelcome" and "offensive" to the other student, it would be pervasive if this were a student K.R. shared classes with or otherwise interacted with frequently, and the other student would claim a limitation on the student's ability to concentrate and otherwise obtain the benefits of the educational program at issue. 89 Fed. Reg. at 33,498–511. So, the school would face a classic Hobson's choice: violate the Final Rule (risking losing federal funding and civil liability) or violate K.R.'s First Amendment rights (again, risking civil liability).

### d. The Spending Clause and the Supremacy Clause require Congress to speak

The power of the Spending Clause can only be exercised by "the Congress." U.S. Const. Art. I, sec. 8. Similarly, the power of the Supremacy Clause is one that can only be exercised by

45

Congress; it is "[t]his Constitution and the laws of the United States which shall be made in pursuance thereof" that preempt contrary state laws.  U.S. Const. Art. VI, cl. 2.  As discussed, Defendants' Final Rule would override multiple contrary state laws governing girls' sports, access to facilities, and the manner in which schools classify students according to sex.  It is an exercise of the spending power that is intended to preempt those state laws.  However, only Congress can exercise the spending power, and only Congress can preempt state laws that it intends to displace.  An executive agency has no authority to issue rules that preempt state law.  Because the Final Rule goes so far beyond what Congress has enacted with respect to Title IX, and because Defendants cannot point to any act of Congress commanding that the Final Rule be promulgated, Defendants are outside the scope of the Spending Clause and the Supremacy Clause.  Defendants cannot stand in the shoes of Congress.

    4. **The Final Rule is arbitrary and capricious**

        An agency acts arbitrarily and capriciously when it: "(1) entirely fails to consider an important aspect of the problem, (2) offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise, (3) fails to base its decision on consideration of the relevant factors, or (4) makes a clear error of judgment."  *New Mexico Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1162 (10th Cir. 2019) (internal brackets omitted).  "[O]ne of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  When an agency departs from a prior policy, it must provide a "more detailed justification than what would suffice for a new policy created on a blank slate" whenever "its prior policy has engendered serious reliance interests that must be taken into account . . . It would be arbitrary and capricious to ignore such matters."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Furthermore, while the APA requires agencies to "take into account <u>any</u> serious reliance

interests created by the prior policy," "present and continuing reliance" requires an especially detailed analysis. *Am. Petroleum Inst. v. United States Dep't of Interior*, 81 F.4th 1048, 1060 (10th Cir. 2023) (emphasis added) (internal brackets and quotation marks omitted). Such analysis must consider costs, which are a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752-53 (2015).

### a. The Final Rule offers an implausible explanation for agency action

Defendants offer an explanation for their decision that is so implausible that it could not be ascribed to a difference in view of the product of agency expertise. Defendants state, "the Department has determined that amendments are required to fully effectuate Title IX's sex discrimination prohibition." 89 Fed. Reg. at 33,477. This explanation is implausible because the Final Rule inflicts harm on those Title IX was intended to protect (women) to avoid *more than de minimis* harm to biological males. For example, the Final Rule concludes transgender students face "substantial harm" if "they are excluded from a sex-separate facility consistent with their gender identity." *Id.* at 33,819. But when it comes to girls, DoEd was not concerned about the harm they face when their privacy rights are violated by sharing a bathroom with a biological male, rejecting "that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* at 33,820. The idea that it is "fully effectuating" Title IX by elevating transgender individuals over girls (who Title IX was meant to protect) is implausible. The real answer is the Final Rule exists to effectuate political change which runs counter to the implausible explanation DoEd offered.

### b.   The Final Rule is a Sharp Departure from Past Practice

The Final Rule is also arbitrary and capricious because it departs sharply from past practice without reasonable explanation. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("*Regents*"). Throughout Title IX's history, it has never applied to

gender identity. It was specifically women who fought for what became Title IX and that is who are protected under the statute. Instead of acknowledging this, the DoEd pretends the mission is simple clarification. The Final Rule states, "The purpose of these Amendments is to better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate" and that the "amendments clarify the scope and application of Title IX and the obligations of recipients of Federal financial assistance from the Department." 89 Fed. Red. at 33,474. This case is worse than *Regents* where the agency acknowledged it was changing course. DoEd pretends it is simply clarifying Title IX. It is impossible to have a reasonable explanation for an agency action without acknowledging departure from past practice.

### c.   The Final Rule fails to consider reliance interests

When Title IX was enacted in 1972, it prohibited discrimination "on the basis of sex." At that time, Congress, DoEd, the States, schools, teachers, parents, and students understood the term "sex" to mean biological sex, not gender identity. The Department maintained this understanding as it interpreted Title IX so as to permit states to discriminate between males and females with respect to "toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, housing, 34 C.F.R. § 106.32, and sports teams, 34 C.F.R. § 106.42. Over the course of more than fifty years, states have established reliance interests rooted in that understanding, which continue to this day. Under DoEd established prior policy, the states constructed toilets, locker rooms, shower facilities, and housing that is separated by biological sex and designed with the different biological needs of males and females in mind.

The Final Rule departs from this prior policy. It "clarifies" that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity causes more than de minimis harm" and is therefore prohibited under Title IX. 89 Fed. Reg. at 33,876. And DoEd itself (and the sources on which it relies for its justification) assumes there are more than two "gender identities." 89 Fed. Reg. at 33,820 & n.90 (citing the WPATH Standards). The Final Rule requires the States to alter their present arrangements to accommodate males with female gender identities in what had

48

**Appx157**

previously been female spaces, to accommodate females with male gender identities in what had previously been male spaces, and to accommodate individuals with gender identities that are neither male nor female, or which are some indeterminate combination of male and female, in spaces which do not currently exist and which would need to be constructed to accommodate them.  These accommodations, especially for those with non-binary or gender-nonconforming gender identities, cannot be accomplished with schools' existing sex-separated facilities.

Additional changes to state programs would be required due to the fact that sports teams separated by gender identity would still be required to provide equal opportunities for males and females.  34 C.F.R. § 106.41(c).  Under DoEd's equal opportunity policies, the new policy requiring sports teams to provide access on the basis of gender identity would make such equal opportunity either impossible, on the basis of biological sex; or the new policy would require significant and unpredictable adjustments to programs in order to maintain the equal opportunity for males and females that is required by Title IX.  Schools have already relied on DoEd's prior understanding of equal opportunity in order to structure their sports programs, sports budgets, scholarships, publicity, and recruitment operations, such that males and females have equal opportunities for participation.  The Final Rule completely fails to consider how the states' reliance on the prior policy affects the states' present and continuing structuring of their sports programs in these ways.

These changes would require an expenditure of state resources on new and modified facilities, additional equipment, and new organization which the Final Rule does not acknowledge, let alone adequately explain.  The Final Rule states merely that "[c]ompliance with proposed § 106.31(a)(2) may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities or creation of new programs."  89 Fed. Reg. 33,876.  Far from the "more detailed justification" that is required under the APA, the department offers a flat denial of any significant costs as a result of the rule.  DoEd's denial without explanation does not meet the requirements of the APA.  In *Regents*, 140 S. Ct. at 1915, the Supreme Court required agencies to undertake a serious analysis of reliance interests.

Agencies that change a longstanding policy, that are not "writing on a blank slate," are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.*

DoEd is obliged to consider reliance interests, determine their significance, and weigh them against competing policy concerns even if it does not believe those reliance interests are legally protectable. In *Regents*, the Department of Homeland Security ("DHS") asserted that the reliance interests at issue were not "legally cognizable" and did not confer "substantive rights." *Id.* at 1913. But the Court stated it did not believe that "such features automatically preclude reliance interests." *Id.* Those factors "are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* Because DHS did not consider the reliance interests, the rule was arbitrary and capricious in violation of the APA.

The Final Rule suffers from the same flaws as the DHS rule in *Regents*. It does not acknowledge any reliance interests of the states in continuing to separate their facilities and sports teams on the basis of biological sex, even to deny their importance. And its terse denial of costs to regulated entities rejects many comments submitted by the public, without explaining in any way why educational institutions will not incur significant costs when they are forced to make alterations to their facilities and sports teams in order to comply with the rule. DoEd's failure to explain the effects the rule would have on the States' reliance interests based on fifty years of policy is arbitrary and capricious.

It also ignores the reliance interests of K.R. and members of FAU, Moms for Liberty, and Young Americas Foundation, who have chosen to attend public schools on the long-held understanding that Title IX protects women. Having committed their academic and athletic careers to these schools, the government is now changing the bargain by forcing them to share intimate spaces with males, compete against males in women's sports, speak against their faith and consciences, and stay silent on important social issues involving gender identity. Changing schools is no simple task, particularly since the Final Rule takes all public schools and many

50

**Appx159**

private schools off the table.  These students and their families will have no choice but to expend substantial time, energy, and resources to find educational and athletic opportunities that respect the inherent differences between males and females and their constitutional rights.

### B.  The Plaintiffs will be irreparably harmed

"A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and therefore the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017) (internal brackets omitted).  "Although irreparable harm does not readily lend itself to definition, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Id.* at 1250 (internal quotation marks omitted).  All Plaintiffs will suffer irreparable harm.

#### 1.  Harm to Plaintiff States

First, the Final Rule will cause irreparable harm to the States by expending time and money in implementing the Final Rule that cannot be recouped.  In order to comply with the Final Rule, schools would at a minimum need to (1) update their training materials, (2) hire additional Title IX coordinators, and (3) update their handouts on Title IX.  *See* Cawvey Dec.; Earl Dec.  In addition, many schools in plaintiff states require bathrooms/locker rooms to be separated by biological sex and have configured their bathrooms/locker rooms.  *See* Cawvey Dec.; Earl Dec.  These schools would have to reconfigure their bathrooms/locker rooms in order to follow the Final Rule and provide some measure of privacy for their students.  *See* Cawvey Dec.; Earl Dec.  Finally, all the Plaintiff States have sex-separated activities to include sports.  *See* Cawvey Dec.; Earl Dec.  The Final Rule would prevent that separation and schools would have to reconfigure them to comply with the Final Rule.  All of these costs will be incurred prior to the Final Rule going into effect on August 1, 2024, as these policies will need to be in effect prior to the school year beginning.  *See* Cawvey Dec.; Earl Dec.  States cannot sue the Defendants to recover lost funds once the Final Rule is vacated and the costs are not recoverable.

51

**Appx160**

Second, the Final Rule irreparably harms the States by preempting their laws.  The Tenth Circuit is clear that States have sovereign interests in enforcing their laws, and will be irreparably harmed if deprived of those interests without first having a full and fair opportunity to be heard on the merits." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (*Kansas II*); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (States have a sovereign interest in the "exercise of sovereign power over individuals and entities within the relevant jurisdiction" which involves "the power to create and enforce a legal code.").  As discussed, Plaintiff States have laws that (1) separate sports teams based on biological sex, (2) require separation of bathrooms/locker rooms based on biological sex, (3) separate overnight accommodations based on biological sex, (4) protect First Amendment/religious liberty, and (5) limit abortions.  Once that sovereignty is trampled upon it cannot be reversed.

Finally, all the Plaintiff States will be put in a position where they are forced to violate the constitutional rights of their students and staff or risk losing federal funding.  As noted above, the Final Rule violates the First, Fifth, and Fourteenth Amendment rights of students and staff that get wrapped up into the broad definition of sex-based harassment.  Not only does this force states to violate the Constitution, it also opens them up to numerous lawsuits.  Once this harm occurs it cannot be undone.

### 2.   Harm to Moms for Liberty and Young America's Foundation

"The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (*per curiam*).  "Courts therefore presume irreparable harm when a plaintiff has demonstrated a likelihood of success on the merits on a First Amendment claim."  *Are You Listening Yet PAC v. Henderson*, No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750, at 24-25 (D. Utah Mar. 11, 2024); *see also Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) ("[V]iolations of First Amendment rights are presumed irreparable.").  Thus, "the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights."

52

**Appx161**

*Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447, 454 (6th Cir. 2014) (quoting *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002)).

As is explained above, Moms for Liberty and Young America's Foundation have demonstrated a likelihood of success on the merits of their First Amendment claims.  Apart from the presumption of irreparable injury that a likelihood of success creates, the injury is irreparable because the Final Rule places both organizations' members in a Catch-22—hold firm to their beliefs on pressing matters of gender identity and face investigatory and disciplinary proceedings for sexual harassment that may stay on their record forever or compromise their beliefs and by verbally acquiescing to the biologically false proposition that gender is fluid and can change.  Further, the harm reverberates beyond the organizations' membership and to the core of Moms for Liberty and Young America's Foundation because it impugns aspects of their respective missions of protecting children from political and social indoctrination by schools and inspiring the ideas of traditional values on college campuses.  The harm particularly strikes at Young America's Foundation because it promotes free speech and provides college students with access to educational resources, campus flyers and tabling materials, and speakers focused on issues of gender identity and transgenderism.  Thus, allowing the Final Rule to take effect will irreparably harm Young America's Foundation's ability to disseminate its message, through its members, to college students across the country.

### 3.  Harm to Female Athletes United

The Final Rule irreparably harms members of FAU by forcing them to share intimate spaces with members of the opposite sex, compelling and restricting their speech on gender-identity issues, and making them compete against male athletes in women's sports.  There is no "more basic subject of privacy than the naked body."  *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963).  So, courts around the country recognize the importance of not being required to share intimate spaces or be unclothed in front of the opposite sex.  *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc) (school facilities); *c.f.*, *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (strip searches in front of the opposite sex).  Nor do athlete-

members of FAU have another viable option: changing and showering in locker rooms is a ubiquitous part of school athletics, so the harm is irreparable. As to compelling and restricting FAU members' speech, it is well-established that violating a person's free-speech rights is per se irreparable. *Elrod*, 427 U.S. at 373.

And having to compete against males in women's sports irreparably harms FAU members because of the inherent athletic advantages that men have. *Clark v. Ariz. Interscholastic Ass'n*, 685 F.2d 1126, 1131 (9th Cir. 1982) ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."). Being displaced by males in athletics is a "concrete injury." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023). Indeed, courts across the country have recognized that the "lost opportunity to participate in . . . athletics" is a form of irreparable harm. *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (collecting cases).

### 4.  Harm to K.R.

K.R. shares some overlapping harms as members of FAU, with the added harm that the Final Rule forces her to violate her religious beliefs by speaking against them. And substantially burdening a person's religious beliefs—as the Final Rule does—is *per se* irreparable harm. *O Centro Espirita Beneficiency Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1008 (10th Cir. 2004) (en banc).

### C.  The balance of harms and public interest favors Plaintiffs

A party requesting a preliminary injunction must also show the balance of equities tips in its favor. *Id.* at 980. The balance of harms overwhelmingly favors the States. If the Final Rule is allowed to take effect, the States will immediately be put in a position of having to choose between enforcing their own laws and following the unlawful Final Rule. They will immediately face risk of lawsuit and loss of federal funding if they do not reorganize programs, teams, student groups, and building facilities to accommodate students' "gender identities." The only way to prevent this harm is to enjoin the Final Rule.

On the other side, a preliminary injunction will cause "little or no harm" to Defendants. *Moore v. Brown*, 448 U.S. 1335, 1339 (1980). Defendants have no interest in enforcing a rule that

**Appx163**

completely bypasses constitutional separation of powers principles. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). An injunction will not cost Defendants, will not impose financial costs, and will not require them to take any action. *See Kansas II*, 249 F.3d at 1228. For the same reasons an injunction weighs against Defendants, it weighs in favor of the public interest. The public has an interest in making sure the only rules federal agencies are allowed to enact are lawful. *See Free the Nipple-Fort Collins*, 916 F.3d at 806. The public is not harmed by maintaining the *status quo* while the issue is decided. *See Kansas II*, 249 F.3d at 1227.

### D. Relief should not be limited to the parties

The Court should grant a nationwide injunction and prevent Defendants from unlawfully forgiving hundreds of billions in loans pending a decision on merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated-not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C.Cir. 1989). "Courts have, thus, found a nationwide injunction appropriate in such cases." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019); *see also id.* (collecting cases); *Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007).

There are practical reasons to extend the injunction nationwide as well. "[T]ailoring an injunction to address the alleged harms to the [] States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). The problems are especially apparent in this APA case where there are State, private, and organizational plaintiffs spread throughout the country. Limiting an injunction to only the parties would create an unworkable patchwork of enforcement. The Final Rule should be stayed across the country while the Court examines the legality of Defendants' actions.

<u>CONCLUSION</u>

For these reasons, the Court should set aside or stay the Final Rule, or otherwise enjoin Defendants from enforcing the Final Rule.

**Appx164**

Respectfully submitted this 24th of May, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

/s/ *Abhishek S. Kambli*
Abhishek S. Kambli
Deputy Attorney General
Erin B. Gaide
Assistant Attorney General
Jay Rodriguez
Assistant Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov
jay.rodriguez@ag.ks.gov

TREG TAYLOR
**Attorney General of Alaska**

/s/ *Cori Mills*
Cori Mills**
Deputy Attorney General
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

Counsel for Plaintiff State of Alaska

SEAN REYES
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson**
Assistant Utah Attorney General
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

Counsel for Plaintiff State of Utah

**Appx165**

BRIDGET HILL
Attorney General of Wyoming

/s/ Ryan Schelhaas
Ryan Schelhaas**
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786 Direct line
(307) 777-6869 Fax
ryan.schelhaas@wyo.gov

Counsel for Plaintiff State of Wyoming

/s/ William E. Trachman
William E. Trachman**
James L. Kerwin**
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org
Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation

/s/ Braden H. Boucek
Kimberly S. Hermann*
Ga. Bar No. 646473
Braden H. Boucek*
Tenn. BPR No. 021399
Ga. Bar No. 396831
Jordan Miller*
Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation

Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

/s/ Tyson C. Langhofer
Tyson C. Langhofer
Kansas Bar No. 19241

Rachel A. Rouleau*
Virginia Bar No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

Counsel for Plaintiffs K.R. and FAU

* Pro Hac Vice
* Pro Hac Vice Forthcoming

57

**Appx166**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on this the 24th day of May, 2024, Plaintiffs' Motion for Leave to File in Excess Pages (ECF #15) was electronically filed with the Clerk of the Court by using the CM/ECF system. Counsel will serve a copy of this motion on the Defendants through the United States Attorney for the District of Kansas in accordance with F.R.C.P. 4(i)(1)(A)(i) as counsel for the Defendants have yet to make an appearance in this matter.

<u>*/s/ Abhishek S. Kambli*</u>
Abhishek S. Kambli

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | |
|---|---|
| STATE OF KANSAS, *ET AL.*, § | |
| § | |
| *Plaintiffs,* § | |
| § | |
| v. § | |
| § | |
| UNITED STATES DEPARTMENT OF § | Civil Action No. 5:24-cv-4041-JWB-ADM |
| EDUCATION, *ET AL.* § | |
| § | |
| *Defendants.* § | |

## TABLE OF EXHIBITS

| Exhibit Number | Exhibit Name | Pages |
|---|---|---|
| Exhibit 1 | Declaration of Amy Cawvey | 14, 51 |
| Exhibit 2 | Declaration of Jennie Earl | 14, 51 |
| Exhibit 3 | Declaration of K.R. | 16, 17, 23, 33, 38, 39, 41 |
| Exhibit 4 | Declaration of Burton Brown | 17, 18, 38 |
| Exhibit 5 | Declaration of A.B.S. | 18, 38 |
| Exhibit 6 | Declaration of A.R.S. | 18, 19, 33, 38 |
| Exhibit 7 | Declaration of T.P. | 18, 33, 38, 39 |
| Exhibit 8 | Declaration of Elizabeth Zwahlen | 18, 38, 39 |
| Exhibit 9 | Declaration of Rachel Flynn | 33, 38, 39 |
| Exhibit 10 | Declaration of Thomas Adcock | 33, 37, 38, 39 |
| Exhibit 11 | Declaration of Merianne Jensen | 33, 38, 39 |
| Exhibit 12 | Declaration of Rebekah Koznek | 33, 38, 39 |
| Exhibit 13 | Declaration of Kailee Verdeyen | 38, 39 |
| Exhibit 14 | Declaration of Tricia Plank | 38, 39 |
| Exhibit 15 | Declaration of Deborah Lochner | 38, 39 |
| Exhibit 16 | Declaration of T.Z. | 18, 23, 33, 38, 39 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALASKA, | § | |
| STATE OF OKLAHOMA, | § | |
| STATE OF UTAH, | § | |
| STATE OF WYOMING, | § | |
| | § | Civil Action No. _____ |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION; MIGUEL CARDONA, IN | § | |
| HIS OFFICIAL CAPACITY AS UNITED | § | |
| STATES SECRETARY OF EDUCATION; | § | |
| UNITED STATES DEPARTMENT OF | §§§ | |
| JUSTICE; MERRICK GARLAND, IN HIS | § | |
| OFFICIAL CAPACITY AS UNITED | § | |
| STATES ATTORNEY GENERAL, | § | |
| | § | |
| Defendants. | | |

### DECLARATION OF AMY CAWVEY

I, Amy Cawvey, declare as follows:

1. I am the USD 469 School Board Member in the State of Kansas. I have personal knowledge of the facts contained in this declaration and could competently testify as to the contents of this declaration if called upon to do so.
2. I have served as the school board member for approximately two and half years
3. As a school board member, I approve the Title IX director and set the Title IX policies for the school district.
4. There is one elementary school, one intermediate school, one middle school, and one high school in USD 469.
5. There are approximately 2,600 students in USD 469.
6. The schools in USD 469 accept funding from the federal government and are subject to the requirements of Title IX.
7. The schools in USD 469 annually train teachers and staff members on the requirements of Title IX. Trainings cost the schools money.
8. If the Final Rule takes effect, the schools will have to update their trainings to include the new requirements. This will cost time and money, and may requiring hiring additional Title IX coordinators to accomplish, especially given the short timeline.
9. The schools in USD 469 print materials regarding Title IX requirements and procedures and make them available to students and staff. These can include fact sheets, brochures, posters, power points, booklets, and other material. These cost the district money to update, print, and distribute.
10. If the Final Rule takes effect, schools in USD 469 must update all their material and trainings to reflect the Final Rule's new Title IX requirements or risk losing federal funding. This will cost the district time and money.
11. These changes will have to be done over the summer, before August 1, so that they are in place by the time the new school year starts.
12. The schools in USD 469 have boys'/men's restrooms for biological males and girls'/women's restrooms for biological females.
13. Biological males (including students, teachers, staff, and visitors) are not permitted to use the girls'/women's restroom and locker rooms and vice versa.
14. It is up to the board's discretion whether to allow biological males (including students, teachers, staff, and visitors) to use the girls'/women's restrooms and locker rooms and vice versa.
15. If the Final Rule takes effect, and schools in USD 469 are required to allow biological

males (including students, teachers, staff, and visitors) to use the girls'/women's restrooms and locker rooms and vice versa they will have to reconfigure existing restrooms and locker rooms to ensure student dignity and privacy. This will cost the schools time and money.

16. Schools in USD 469 have sex-segregated activities for boys and girls, including athletic teams.

17. If the schools in USD 469 are required to allow biological males to join female groups—including athletic teams—they will be required to reconfigure existing groups and teams and update policies.

18. The current policy in USD 469 is attached as Exhibit 1.

19. Currently, teachers, staff, and students are not required to use a anyone's preferred pronouns.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in Leavenworth County KS, on this 6 day of May 2024.

## CERTIFICATE OF SERVICE

I certify that on May DAY, 2024, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all attorneys in this case.

/s/ DRAFT
NAME
POSITION

1

EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, | § | |
| STATE OF ALASKA, | § | |
| STATE OF OKLAHOMA, | § | |
| STATE OF UTAH, | § | |
| STATE OF WYOMING, | § | |
| | § | |
| *Plaintiffs*, | § | Civil Action No. _____ |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION; MIGUEL CARDONA, IN | § | |
| HIS OFFICIAL CAPACITY AS UNITED | § | |
| STATES SECRETARY OF | § | |
| EDUCATION; UNITED STATES | § | |
| DEPARTMENT OF JUSTICE; | § | |
| MERRICK GARLAND, IN HIS | § | |
| OFFICIAL CAPACITY AS UNITED | § | |
| STATES ATTORNEY GENERAL, | § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF JENNIE EARL

I, Jennie Earl, declare as follows

1. I am an elected member of the Utah State Board of Education (Board).  I have personal knowledge of the facts contained in this declaration and could competently testify as to the contents of this Declaration if called upon to do so.

2. I have served as a member of the Board for 5 ½ years,

3. As a member of the Board, I have responsibility for the general supervision and control of public education in the State of Utah.

4.  There are approximately 1,053 public schools in the state of Utah serving Kindergarten through 12th grade students.

5.  There are approximately 662,672 students enrolled in public K-12 schools in the State of Utah.

6.  The schools in Utah accept funding from the federal government and are subject to the requirements of Title IX.

7.  There are approximately 153 Local Education Agencies (LEAs) in the State of Utah.

8.  Every LEA in the State of Utah designates and trains at least one Title IX Coordinator, Investigator, and Decision Maker on the requirements of Title IX.  Trainings for Coordinators take approximately 14 hours and trainings for Investigators and Decision Makers take approximately 4 hours.  These trainings cost the schools money.

9.  The schools in Utah train teachers and staff members on the requirements of Title IX. These trainings cost the schools money.

10. To comply with the Final Rule, Utah schools would need to update their trainings to include the new requirements.  This will cost time and money, and may requiring hiring additional Title IX coordinators to accomplish, especially given the short timeline.

11. The schools in Utah print materials regarding Title IX requirements and procedures and make them available to students and staff.  These can include fact sheets, brochures, posters, power points, booklets, and other material.  These cost the schools money to update, print, and distribute.

12. To comply with the Final Rule, Utah schools would need to update all their material and trainings to reflect the Final Rule's new Title IX requirements or risk losing federal funding.  This will cost the schools time and money.

13. These changes will have to be done over the summer, before August 1, so that they are in place by the time the new school year starts.

14. The schools in Utah have boys'/men's restrooms for biological males and girls'/women's restrooms for biological females.

15. In accordance with Utah Code § 63G-31-301, students who are biological males are not permitted to use the girls'/women's restrooms in public schools and locker rooms and vice versa.

16. To comply with the Final Rule, Utah schools would be required to allow students who are biological males to use the girls'/women's restrooms and locker rooms and vice versa or to reconfigure existing restrooms and locker rooms to ensure student dignity and privacy. This will cost the schools time and money.

17. Schools in Utah have sex-segregated activities for boys and girls, including athletic teams.

18. To comply with the Final Rule, Utah schools would be required to reconfigure these activities to allow biological males to take part in girls' activities and vice versa. This includes permitting biological males to play on girls' sports teams and vice versa.

19. Currently, teachers, staff, and students are not required to use a student's preferred pronouns.

 I declare under penalty of perjury under the laws of the United States of America and the States of Kansas and Utah that the foregoing is true and correct.

Executed in Morgan, Utah, this 17th day of May 2024.

Jennie Earl

**EXHIBIT 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, <br><br> *Defendants.* | **Case No.** 5:24-cv-04041-JWB-ADM |

## DECLARATION OF K.R. IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, K.R., under penalty of perjury, declare as follows:

1.      I am a 13-year-old resident of Stillwater, Oklahoma, in Payne County, and have personal knowledge of the information below.

2.      I am a 7th-grade student at Stillwater Middle School, a public school in Oklahoma.

### Males Accessing Private Spaces

3.      Stillwater Middle School has two grades, sixth and seventh. There are almost a thousand kids in my school. There are fi e hundred kids in my grade. There are about 30 boys who identify as girls in my grade, at least that I know of. There are approximately 60–70 kids at my school that identify as transgender or nonbinary in my school.

4.      One day when I was in sixth grade, I went to the restroom at school, and there was a boy who identifies as a girl in the girls' restroom. I freaked out and yelled at him, asking him why he was in the girls' restroom. It startled me and made me feel very uncomfortable. After this incident, I would just turn around and leave. Then I decided to wait and use the restroom at home.

5.      This started when I was 11 years old.

6.      My school day starts at 8:20 and ends at 3:20. I have six classes each day, and each class is about 50 minutes long.

7.      I take the bus to school, so I usually leave my house around 7:00 a.m. in the morning and come back around 4:00 p.m. in the afternoon.

8.      Once I realized that boys were using the girls' restroom, I decided I didn't want to risk the embarrassment of using the restroom with a boy. If I had to use the restroom, I would go and see if a boy was there. If no boy was there, I would go to the restroom as fast as possible and then leave. But many times, there was a boy when I opened the door, and I decided to hold it for the rest of the day.

9.      After that happened enough times, I decided I wouldn't use the restroom at school at all. So I would wait nine hours until I got home.

10.     I avoided the restroom because using the restroom with a boy makes me really uncomfortable. I do not feel safe, and it makes me feel weird.

11.     It does not feel normal. I get scared and creeped out. The girls' restroom is a place for girls. Allowing boys to use the girls' restroom violates my personal space, privacy, and safety. Even if the boys who use the girls' restroom are boys who identify as girls, I still do not feel safe. It does not matter how they identify. They are still boys.

12.     My school has girls' and boys' restrooms on the top and bottom floors of every building. Each restroom has five stalls with doors. The stalls have gaps between the doors that are larger than they should be, so there is not much privacy in the restroom stalls.

13.     There are no single-use restrooms for students to use at the school.

14.     I remember two times when I had to use the restroom at school, and a boy was there. Even though I wanted to avoid the restroom, I had to use the restroom so badly that I had no choice. So I used the restroom with the boys in it, and I left as soon as I could.

15.     Most of the time, the boys using the girl's restroom were boys who identified as girls. But it was not only boys who identified as girls who used the girls' restroom. Over time, boys who did not identify as girls used the girls' restroom because they knew they could get away with it, and they used it as an excuse to use the restroom with girls.

16.     Because I felt uncomfortable using the restroom with a boy in it, I would almost always wait all day until I got home. And because I took the bus to school, I frequently waited nine hours to go to the restroom.

17.     When my parents found out I was avoiding the restroom at school, they were surprised and angry. They asked me why I hadn't told them about not using the school restroom. I hadn't told them earlier because the teachers and school administrators made the situation seem normal—like we all just had to accept that boys could use the girls' restroom and we had no input.

18.     Most of my friends also avoided using the restroom at school and would hold it all day. I also know of a few other girls outside my friend group who avoided using the restroom at school. In my conversations with them, they agreed that they also felt uncomfortable and unsafe using the restroom with a boy. It is not normal, and it shouldn't be accepted as normal.

19.     Thankfully, Oklahoma passed a law protecting women's safety and privacy by ensuring that only girls could use the girls' restroom.

20.     Now boys are not allowed to use the girls' restroom, and I feel safe and confident that I can use the restroom at school without being put in embarrassing situations. Now, I use the restroom at school because I know that only girls will be in the girls' restroom.

21.     I understand that the new Title IX rule will allow a male who identifies as female to once again use the restroom with me. It makes me really angry knowing that I may have to avoid the restroom at school again. It makes me angry knowing that adults do not care if I feel scared, unsafe, or uncomfortable at school. I should not have to feel embarrassed and uncomfortable when I use the restroom at school.

22.     If this new rule is put in place and boys are once again allowed in the restroom, I will again stop using the restroom at my school.

### *Speaking Up*

23.     I have also learned that this new Title IX rule will punish me for what I say or do not say.

24.     I fear the new rule will force me to speak and express ideas that I disagree with and that violate my religious beliefs. I also worry that I might be punished for expressing views I do agree with.

25.     I am a Christian, and I believe that God created everyone and that God loves everyone. Based on that, I believe that everyone deserves to be treated with respect and dignity. I try to show people God's love by treating people that way.

26.     I also believe God created everyone to be either male or female. I feel that everyone should be respected for the sex that God created them, that people should not attempt to change their sex, and that people should live consistent with their sex.

27.     Based on my religious beliefs, I also believe there are only two sexes, and you cannot change your sex, a boy cannot become a girl, and a girl cannot become a boy.

28.     Even though I know some of my classmates use pronouns that do not align with their sex, I have not used those inaccurate pronouns. There have even been a few times when I have not used the requested pronouns for one of my classmates at school, and they have gotten mad at me. But I do not want to be forced to lie about what I know is true and to violate my religious beliefs. It would violate my religious beliefs to use a pronoun for people that does not accurately reflect their sex.

29.     In the past, I have talked to my friends about my religious beliefs on gender-identity issues and about my beliefs that boys should not be allowed to use the girls' restrooms. I still want the freedom to talk about these things. I have said things like, there are only two sexes, and I don't believe that people can change

their sex based on how they feel. Some of my classmates have gotten frustrated with me about my beliefs because I do not agree with them.

30.     So far, my school has never punished me for expressing my beliefs. But I know some people at my school who strongly disagree with my views and would be mad and offended if they heard me expressing my beliefs. I also know people at my school who would be mad and offended if they asked me to use pronouns that did not reflect someone's actual sex and I refused. But I do not want to speak lies and violate my religious beliefs.

31.     I am afraid that, if the new Title IX rule goes into effect, I could be punished for expressing my beliefs, for using accurate pronouns, and for declining to use inaccurate pronouns. I do not want to be punished for this. I want the freedom to speak consistently with my beliefs.

## DECLARATION UNDER PENALTY OF PERJURY

I,  K███ R█████, a citizen of the United States and a resident of the State of

Oklahoma, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of May, 2024 at 8:50pm



K.R.

**EXHIBIT 4**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

|  |  |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, <br><br> *Defendants.* | **Case No.** 5:24-cv-04041-JWB-ADM |

### DECLARATION OF KRISTI BURTON BROWN IN SUPPORT OF
### PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, Kristi Burton Brown, under penalty of perjury, declare as follows:

1.      I am over the age of 18, of sound mind, and otherwise competent to sign this declaration. I have personal knowledge of the information below.

2.      I am the Chairman of the Board of Directors of Female Athletes United, also known as FAU.

***Female Athletes United Background***

3.      Female Athletes United is an Internal Revenue Code Section 501(c)(3), membership organization incorporated in Texas and formed for the purpose of defending women's sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field. Simply put, FAU promotes girls' and women's right to not compete against males who identify as females on girls' and women's sports teams. FAU also promotes its members' right to advocate for women's sports and for women competing on women's only sports teams.

4.      FAU was founded in November 2023 to respond to the growing trend of males who identify as females entering women's sports. The founding officials of FAU watched as males identifying as females stole women's opportunities to advance, earn scholarships, be champions in their own sports, and in some cases, watched female athletes get injured by competing against male athletes.

5.      At FAU, we publicly advocate for women's sports and ensure women's sports remain women-only. FAU is a coalition of prospective, current, and former female athletes and also allows coaches and family members who want to ensure that women's and girls' sports remain a place for only women and girls. Many of FAU's members are female athletes who currently compete on their girls' sports teams at public schools that receive Title IX funding.

6.      The prospective and current athlete members do not want to be forced to compete against male athletes who have a physical advantage over female athletes.

7.      FAU also has male and female members who care about the existence of female sports. They want to make sure that women's sports teams are not eliminated as men are being permitted to play on women's and girls' sports teams.

8.      Several FAU members are parents of current and former female athletes. These members supported their daughters throughout their athletic careers. They saw the benefits women's sports had on their daughters and they want to ensure that future generations of women and girls will have the same equal opportunities their own daughters experienced in sports.

9.      When FAU members sign up as members, they can input their background information about why they feel passionate about women's sports. Board members review this information when they check FAU's membership.

### FAU's Founding Board Members

10.      I am the Chairman of the Board, and I founded FAU to protect women's sports. As the Board Chairman, I am familiar with the biographies of the other FAU board members.

11.      I have spent time and effort in my professional life working to protect women's sports.

12.      From childhood through junior high, I competed in figure skating. Figure skating shaped my childhood, and I learned many valuable lessons from competing in such an intense sport.

13.      I am a constitutional law attorney, focusing on First Amendment and equal-protection issues. I am admitted to the Bar of the U.S. Supreme Court. I was honored to submit an amicus brief to the U.S. Supreme Court on behalf of dozens of female athletes to defend women's rights in sports in *West Viginia, et al. v. B.P.J.*

14.     I want to protect women's sports for the next generation, specifically for my daughter who is involved in dance.

15.     The other two founding members of the board are invested in protecting women's sports. Michele Hadley is the President and Treasurer of FAU and grew up in a family that was very involved in soccer.

16.     She competed in travel soccer and on softball teams for many years. She was a four-sport varsity athlete in soccer, softball, cross country, and track. Michele chose soccer as her one love and received a scholarship to play soccer at the University of Central Arkansas. Michele led the school's Division 1 women's soccer team as its captain, won a championship ring her senior year, and helped the team secure an undefeated record in the regular season.

17.     As a former college athlete, Michele is passionate about protecting girls who seek to compete fairly in their sport. Michele's family is deeply involved in female sports: her dad and brother coach girls' softball teams, her mother is a sports-recruiting consultant, and her sister is a college softball coach.

18.     Sandra Bucha is the Secretary for FAU. She was a nationally and world-ranked age group swimmer during her swimming career. She became an American record holder and national champion. Sandra was allowed to train with the boys' swim team at Hinsdale Central High School during the 1968–1972 high school seasons as there were no organized sporting activities for girls during that time.

19.     Sandra recognized the discrimination all female athletes in high school faced because she lacked opportunities during those years. With the assistance and encouragement of her parents and coach, Sandra filed suit against the Illinois High School Association in federal court. The court's opinion in *Sandra Lynn Bucha, et al. v. Illinois High School Association, et al., United States District Court, N.D. Illinois, E.D. 72 C 378 (Opinion issued November 15, 1972)* was a precursor of things to

come as Title IX of the Civil Rights Act, and several amendments were soon thereafter enacted. Although Sandra did not personally prevail in her independent action, the case was cited often in subsequent legal cases.

20.     Sandra was a finalist in the 1972 Olympic trials and narrowly missed making the 1972 Olympic team. While attending Stanford University, Sandra embarked on her professional marathon swimming career. She joined the professional marathon swimming circuit in the summer of 1973 and for the next three years, competed in nine marathon swims.

21.     She was undefeated as the first female in all her marathon swims, consistently placing second overall to International Swimming Hall of Fame (ISHOF), John Kinsella, earning her a place in the ISHOF, class of 2014.

22.     Her accomplishments in the water and as a women's advocate helped pave the way for thousands of girls and women to participate in sports, the acceptance of women in the male-dominated sport of marathon swimming, and for marathon swimming to become an Olympic sport.

23.     The FAU board members founded FAU to respond to the growing number of males participating in women's sports. In reaction to these numerous instances, we decided to start an organization that would address these concerns. Given our backgrounds in fighting for women's sports, we were inspired to start an organization.

24.     When we started our organization, we expended time and resources, and we had a website created for members to join and to share our purpose. Our website can be found at https://www.femaleathletesunited.org/. We intend to grow the website over time as a way to educate our members and the public about our mission and the need to protect women's sports.

***FAU's Members***

25.    FAU has members in states across the country, including members located in the states challenging the Title IX rule changes—Utah, Wyoming, Kansas, and Alaska.

26.    We also have members in states across the country including Arizona, Colorado, Florida, Illinois, Minnesota, North Carolina, Texas, Washington, and Wisconsin.

27.    I can confirm that the following persons identified in the complaint are members of FAU: A.B.S., A.R.S., Elizabeth Zwahlen, T.P., and T.Z.

28.    Based on the information they submitted to FAU, these persons are female athletes who compete on girls' sports teams for their public schools in Kansas, Utah, and Wyoming.

***Women's Private Spaces***

29.    Not only does FAU support women's equality in sports, but FAU also wants to ensure that women and girls have access to sex-specific private spaces like locker rooms, showers, restrooms, and hotel rooms on overnight trips.

30.    Having safe access to locker rooms, showers, and overnight trips is an essential part of playing athletics and participating on sports teams. Athletes need to be able to change in locker rooms and travel with their sports team to play on their sports team.

31.    Likewise, having safe access to restrooms is also essential to enjoying the benefits of school.

32.    FAU knows there are an increasing number of individuals who identify as transgender and are seeking access to sex-specific spaces like locker rooms, showers, and restrooms belonging to the opposite sex.

33.    Ensuring privacy in women's restrooms and locker rooms is a paramount concern for female athletes. In many cases, women's restrooms and

locker rooms often do not provide privacy. Women's restroom stalls often have wide gaps between the stall doors, exposing women and girls to other individuals in the restroom.

34.     Also, women's locker rooms tend to have wide open spaces for women and girls to change in front of lockers. There are usually only a few stalls providing privacy for women to change. But in school and in sports, there tends not to be enough time for every girl to change in time for practice or even for P.E. class. So many of the girls change in the open space, exposing them to the other girls in class and in the locker room.

35.     I have heard about the experiences of women across the country dealing with men in women's spaces. Riley Gaines, a female athlete who competed on Kentucky's women's swim team, was forced to share a locker room with biological male Lia Thomas. Gaines has shared what a traumatizing experience it was to have to change into a swimsuit in front of a male. She felt uncomfortable, embarrassed, and traumatized by this experience. Riley Gaines also signed on to the amicus brief I filed on behalf of female athletes in *B.P.J.*

36.     At FAU, we want to ensure that women have the right to private spaces. We believe that many of our members do not want to share their private spaces with biological males, whether that be a restroom, locker room, shower area, or overnight accommodation.

### *Speaking Out in Favor of Women's Sports*

37.     Not only does FAU advocate for our female athlete members to have an equal playing field and privacy in their spaces, FAU wants to ensure that our members can speak about their beliefs on these issues without fear of punishment.

38.     FAU provides an organization that female athlete members can join because they do not want to compete against males at their schools. They feel

strongly about this issue and know that males are almost always physiologically advantaged in sports.

39.    One reason FAU exists is to enable FAU members who want to advocate—and some want to do so—in favor of women's sports to their friends, coaches, and other classmates at their schools.

40.     Based on my interactions with the other board members and their interaction with the membership intake forms, and the intake forms that list the members' desire to join FAU, I believe that some FAU members want to express their beliefs that males do not belong on women's sports teams and that male athletes who identify as female are in fact males. And I believe that some FAU members want to make sure that they can address these male athletes as males, using accurate male pronouns—or at least avoiding inaccurate pronouns, and that some FAU members want to speak about the potential issues that could arise when competing against a male athlete.

41.    These members could lose out on scholarship opportunities to these males, lose their privacy in locker rooms, and lose their freedom to speak consistently with their belief that males who identify as females are still male. They could lose out on public recognition and the chance to be champions in their own sports. These members could even potentially be physically harmed by competing against a male on their sports teams.

42.    I believe some of our members want to speak out about how these males competing in women's sports would hurt women's opportunities, and even place them in physical danger.

43.    One purpose of FAU, and one reason members join FAU, is FAU provides legal cover for its members to speak about the issues mentioned above. FAU speaks on behalf of its members and provides anonymity for some female

athletes and some members who want to express their beliefs on males competing in women's sports and accessing women's private spaces.

44.     I fear that the Title IX rule changes deter female athletes from speaking out against males who identify as females. But this contradicts FAU's purpose to empower its members to express their views that that males should not be permitted access to women's teams, women's restrooms, locker rooms, and hotel rooms on overnight trips. Our members should not have to risk punishment for speaking about what is true of biological reality or be punished for speaking their views about the differences between male and female athletes or be compelled to say that male athletes are females.

45.     If Defendants are not enjoined and the Title IX actions are not set aside, FAU's members could be forced to compete against males, lose opportunities, and be forced to change with males in their private spaces like restrooms, locker rooms, and even hotel rooms on overnight trips. That would frustrate FAU's purpose and goals.

46.     These Title IX rule changes could cause many of our members to be more reluctant to speak about women's fairness if they knew they could be penalized for their speech. That result would also frustrate FAU's purpose and goals. FAU exists so that its members can freely advocate in favor of fairness in women's sports at their schools and talk to their coaches and friends to express their beliefs that males who identify as females are bigger, faster, and stronger and do not belong on women's sports teams and that male athletes who identify as female are in fact still male and should not participate in women's sports.

## DECLARATION UNDER PENALTY OF PERJURY

I, Kristi Burton Brown, a citizen of the United States and a resident of the State of Colorado, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 20th day of May, 2024 at Douglas County, Colorado.

Kristi Burton Brown

10

Appx191

**EXHIBIT 5**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

|  |  |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, | |
| *Plaintiffs,* | |
| v. | **Case No.** 5:24-cv-04041-JWB-ADM |
| **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, | |
| *Defendants.* | |

## DECLARATION OF A.B.S. IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, A.B.S., under penalty of perjury, declare as follows:

1.      I am a 17-year-old resident of Topeka, Kansas and have personal knowledge of the information below.

2.      I was a 12th-grade student and multi-sport athlete at Washburn Rural High School in Topeka, Kansas, where I competed on the girls' track and field, powerlifting, softball, volleyball, and wrestling teams.

***Athletic Experience***

3.      Both of my parents grew up playing sports, and sports were very important in their lives. My mom played college golf and volleyball, and my dad wrestled and played semi-pro football. My little sister is also talented in sports and plays volleyball and softball, with aspirations of playing college softball.

4.      I have been playing sports since I could walk. It started with catching a tennis ball when I started walking or carrying around an oversized baseball bat. Sports always felt very natural for me. I've typically learned new sports and new techniques quickly and enjoy doing so.

5.      My first experience in organized sports was tee-ball when I was 5 years old. I was so small and could barely hold a softball bat, but I remember being fast and wanting to run around the bases. I loved warming up and playing catch with my dad before all my games. From that point on, I have been playing travel softball for most of my life.

6.      My first serious sports injury also happened in recreation league softball. One of my teammates threw the ball too hard at me when we were warming up, and I ended up with a split forehead and seven stitches. But even with frequent injuries, I loved playing sports.

7.      I started playing volleyball with my mom growing up and love that sport the most. My mom was an exceptional volleyball player, and she earned a

scholarship to Western New Mexico University. I learned so much from her, and it set me up for success in volleyball to this day.

8.     My first organized volleyball team was with the city's recreational league when I was in third grade.

9.     Volleyball was also the first sport I played at Washburn Rural Middle School. I played volleyball at the high school there too, and I will be playing volleyball for MidAmerica Nazarene University in Olathe, Kansas on a scholarship starting in the fall.

10.    In volleyball, six girls are on the court at a time. There are several different positions in volleyball:

      a.     outside hitter;

      b.     middle hitter;

      c.     right side hitter;

      d.     setter;

      e.     and a defensive specialist, or libero.

11.    When it is our team's turn to serve, every position rotates to a new spot on the floor. The players will transition back to their positions after every serve.

12.    I play outside hitter for my team. But I also play all the way around the court. That means I rotate to every position, and I have an opportunity to serve and play defense in the back row. I may be a defensive specialist on my college team in the fall.

13.    Volleyball requires you to pay close attention to every play and always be ready for the ball to come to you. It requires you to react quickly to short hits or deep hits. It is a fast-paced game, and you are always doing something when you are on the court, whether you are moving, yelling, or touching the ball.

14.    I love the pace of volleyball, which requires so much attention and quick movements. I also love the team aspect of volleyball. Volleyball requires

communication with a team and for someone to take leadership and to make sure the team is communicating with one another.

15.     I've always enjoyed and done well with the leadership part of sports. I have been the captain of my team of seven years. I am good at rallying my team around a common goal and ensuring that we work together to win the game.

16.     While I love volleyball, I also competed in track and field for the first time my senior year in high school and excelled quickly. I started throwing javelin in March and became one of the top 24 female javelin throwers in the state of Kansas.

17.     On the eighth time I threw the javelin, I unofficially beat our school's record, which had been held for ten years. The record was 122 feet, and I broke it in practice by throwing 128 feet. Then, in our next meet, I officially broke the school record and my own unofficial record by throwing 135 feet.

18.     Learning to throw the javelin well has come easy to me. I feel like I have been doing the throwing motion my entire life. The footwork to throw the javelin takes some technique that I needed to learn.

19.     But I love it. I love that I have excelled at a sport so quickly, and I am seeing the results.

20.     After the meet where I beat the women's school record, I was invited to compete with the top 24 male and female javelin throwers in Kansas. I am the only woman from my school who attended the meet, and two males from my school were also selected.

21.     I am in conversations with the track and field coach at MidAmerica to possibly join the track team as well as the volleyball team.

22.     My love of sports has encouraged me to try many different sports while I was in high school. I also competed on the girls' softball, wrestling, and powerlifting teams.

23.     I only competed on the wrestling and softball teams during my freshman year at Washburn Rural High School.

24.     Wrestling is an incredibly aggressive and violent sport. I won my first match against a girl who had been wrestling for three years. My dad taught me jiu-jitsu growing up, so that experience gave me an advantage over girls my age. But my wrestling experience ended with an injury to my elbow where I tore most of the ligaments in my elbow. The sport's intensity and the risk of injury kept me from continuing to compete throughout high school.

25.     I also competed in softball during my freshman year at Washburn Rural High School.  I played catcher, which is physically demanding. I also suffered injuries while playing softball, from broken ribs as a catcher to jammed fingers and even nerve damage in my elbow from being hit by a bat. I only played school softball for one year in high school.

26.      My senior year in high school was the first time I competed on the women's powerlifting team. I really enjoyed learning a new skill and watching my personal bests improve. I competed in one powerlifting meet where I tied for second. It was fun trying a new sport and improving.

27.     But being a multi-sport athlete takes sacrifice. From seventh grade until now, I have had practices most days after school. If I was on a sports team for that season, I practiced every day after school. I have had to be late to school dances or miss them altogether. I have had to miss work and lose out on the money I could have made at my after-school job. I have rescheduled appointments countless times and sometimes even had to miss school.

28.     One of my biggest sacrifices is my body. I am constantly sore or bruised from one of my sports. I injured my elbow in wrestling, received countless bruises from diving in volleyball, and even have constant blisters on my hands from throwing javelin. My constantly bruised body even kept me from wearing the dress I

wanted to wear to prom. But those sacrifices would never keep me from competing in sports.

29.     Sports have been instrumental in helping me become the person I am today. Sports have helped me establish and grow my leadership abilities. I love to lead my teams, and this leadership skill has helped me learn how to communicate well with others, which has helped my people skills. Sports have also allowed me to go to college on a scholarship to play the sport I love.

### Males Competing in Girls' Sports

30.     The idea of males competing in girls' sports makes me frustrated and discouraged. I remember hearing about this issue for the first time in connection with Lia Thomas competing in women's swimming and winning a national championship. But I've heard and seen many similar instances since then of women and girls losing to male athletes.

31.     It is frustrating that women are now forced to share their sports categories with men. It is unfair to force women to give up their opportunities to be champions in their own sports by allowing males to compete with them.

32.     I have worked my entire life to be the best in volleyball. But even my best would never be good enough to beat a male competitor. Earlier this year, I played a co-ed volleyball game with some friends. A guy who is 5'3" tall asked to play with us. He didn't have any volleyball experience, but the game was for fun. The first time he approached the net, both his shoulders rose above the net when he jumped, and he hit the ball at the 10-foot line—a difficult feat for many female volleyball players.

33.     After that first hit, I refused to play with him for fear of being physically injured in the game. I have seen other experiences where a male competed against a girls' team in North Carolina, and one of the female players

received a concussion when she was hit by a ball hit by the male opponent.

https://bit.ly/3UHGytj.

34.     I already face injuries frequently in my sports when I compete against only women. I cannot imagine what other injuries I would sustain if I were forced to compete against men.

35.     Men are bigger, faster, and stronger, and no matter what I do in my sports, I will not be able to compete on a level playing field with males.

36.     For example, in track and field, the women's javelin is 7 feet 2 inches long and weighs 21 ounces, while the men's javelin is 8 feet and 6 inches and weighs 28 ounces. So the men's javelin is longer and heavier than the women's javelin. Not only that but in the track meets, the men and women javelin throwers must meet certain minimum distances to continue competing in the meet. The women's minimum distance is 90 feet, while the men's minimum distance is 130 feet. I threw 130 feet at my last meet, setting a school record that has not been broken for 10 years—and that is the minimum distance men must throw to move on in their track and field competition.

37.     The men's world record in javelin is 323 feet, and the women's world record is 237 feet. The men's world record is almost 100 feet further than the women's. I enjoyed competing in javelin because I knew the result would be fair and would reflect my hard work and training to be the best. If I knew I would have to compete against a male, it would be pointless for me to even try because nothing I could do would allow me to beat a male.

38.     It was hard enough to earn a scholarship to play volleyball in college by only competing against other female athletes. I do not know if I would have secured a scholarship to play sports in college if I had to compete against male athletes to receive a scholarship.

39.     Based on my personal experience competing against males in sports in casual settings and my experience in competitive sports, I do not think I could adequately compete against most males in most sports. It simply would not be a fair competition, and I do not think I could consistently win.

40.     More than that, there is nothing I could do to protect myself if males were allowed to change in women's locker rooms or restrooms or shower in the locker room. At my school, the storage closet and athletic trainer's office are in the girls' locker room. The boys' track team even stores their equipment by the girls' showers. This creates a problem when males need to get something out of the storage room or go visit the athletic trainer. Boys at my school are supposed to call out to make sure the locker room is empty. But that does not happen occasionally, and boys walk in while we are changing.

41.     When a boy accidentally walks into the locker room while we are changing, I feel vulnerable, uncomfortable, and small. I do not feel respected, and it even makes me feel afraid. I change in the restroom stall because I do not know when a male could walk through the girls' locker room. I also do not use the shower for fear that a male could come into the restroom.

42.     I also would not want to use the women's restroom if males were allowed to use the women's restroom. Males and females are different, and males do not belong in the women's restroom. I understand that the new Title IX rule will allow a boy who considers himself to be a girl to be in the women's restroom and locker room with my teammates and me. This would make me feel uncomfortable and embarrassed.

43.     Males and females are different. I believe we cannot change our sex. I feel strongly about this issue, and I would not want to be forced to say something that goes against what I believe. I will not use a pronoun that does not align with

someone's biological sex, and I do not want to stop talking about what I believe at school or with my friends.

44.    I have talked with my teammates about this issue and how men do not belong on women's sports teams. They are encouraging and are thankful that I am brave enough to speak about this issue. I do not want to be punished for saying what I believe.

45.    But I feel safe living in Kansas. When Kansas passed its Save Women's Sports Law, I breathed a sigh of relief. I have watched videos of women being hospitalized and displaced from competing against women in their sports, and I finally felt safe. I also felt respected by my state. They recognized the importance of the separate category for women's sports, and I am thankful for its protection.

46.    I fear that if this law goes away, or if Title IX is changed, I will be forced to compete against bigger, stronger, and faster males. I am going to play college volleyball next year, and I do not want to be forced to compete against a male who could put me in the hospital if I am forced to compete against him.

47.    Thankfully, when I play college volleyball next year, I will be playing for MidAmerica University, which is in the National Association of Intercollegiate Athletics. The NAIA has recently protected women's sports by implementing a policy that forbids males from competing on female sports teams. If Title IX is changed, I fear that NAIA policy will go away and I may have to play against male athletes who are playing on the women's team.

48.    I'll be playing volleyball next year and we are scheduled to play teams in a competitive schedule, including Avalia College, Stephens College, Columbia College, Xavier University of Indiana, Hastings College, Mount Mercy College, Clarke University, Missouri Valley College, Park University, Central Methodist University, Baker University, Peru State University, Graceland University, Culver-Stockton College, William Penn University, and Grand View University.

49.     I am not sure who I would have become without playing sports, and I don't want younger girls to miss out on the life-defining moments I have had playing sports.

## DECLARATION UNDER PENALTY OF PERJURY

I, A█████ S███████ a citizen of the United States and a resident of the State of Kansas , hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of May , 2024 at Topeka , Kansas .

A.B.S.

**EXHIBIT 6**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, | |
| *Plaintiffs,* | |
| v. | **Case No.** 5:24-cv-04041-JWB-ADM |
| **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, | |
| *Defendants.* | |

## DECLARATION OF A.R.S. IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, A.R.S., under penalty of perjury, declare as follows:

1.      I am a 13-year-old resident of Topeka, Kansas in Shawnee County, and have personal knowledge of the information below.

2.      I am a 7th-grade student and multi-sport athlete at Washburn Rural Middle School in Topeka, Kansas where I am on a girls' volleyball team for my school. I am also on a girls' club softball team.

***Athletic Experience***

3.      I grew up in a family of athletes. My mom played college volleyball and golf at Western New Mexico University, and my dad played semi-professional football and was a wrestler. My older sister will be playing college volleyball at MidAmerica Nazarene University next fall.

4.      I have loved sports for as long as I can remember. I grew up playing sports with my family, whether throwing around a softball or playing volleyball with my mom.

5.      My first memories of sports are watching my older sister play softball and running around the bases. I wanted to be just like her.

6.      I have played girls' travel softball for most of my life, starting when I was four. I play club softball right now because my middle school does not have a softball team. I plan to join the school softball team when I get to high school. I plan to attend Rossville Middle School next year and stay there for high school.

7.      In softball, there are nine girls on the field at a time. Usually, I either pitch or play in the outfield. But pitching is my favorite.

8.      Even though I love pitching, it can be scary. You are only 43 feet away from the pitcher and all you have on is a chest protector and a face guard. The ball can come back to you very quickly.

9.      Once a year, we do a father vs. daughter softball game. You can tell the fathers are not trying their hardest, but it always scares me to have to pitch to the

dads because I know the ball could come back and hit me quickly without much time to react.

10.    It is also intimidating when I bat. When a taller and bigger pitcher comes to the mound, I get nervous that I may get hit by a pitch. I have been hit by pitches several times, and it always hurts.

11.    Once I was hit running to second base and the force was so great, it knocked me over. I enjoy the thrill of playing softball, but I am aware there are risks in playing, even with precautions.

12.    My favorite part about playing softball is playing with my team. We have played with the same girls for years and have become good friends.

13.    Because my middle school does not have a softball team, I have to wait until high school to play softball for my school. Right now, the only girls' middle school sport I want to play is volleyball. But I plan to play softball in high school, and one day, I hope to receive a scholarship and play softball in college.

14.    My dream is to play for Oklahoma University because they are the best in college softball. And I want to become one of the best.

15.    But until I can play school softball, I am playing volleyball at my middle school. I made the B team in seventh grade this year. In middle school, we have an A team and a B team. About one hundred girls came to try out for the two teams, and only eighteen girls made a team. While I was disappointed that I did not make the A team, I was proud of myself for making a team.

16.    I really enjoy playing volleyball. I can play any position, but my main position is outside hitter. When it is your team's turn to serve, everyone on the court rotates, and I can play all the positions.

17.    It takes a lot of physical effort to be successful in volleyball. You always have to move and pay attention to the play. If your team does not communicate well, you will not be successful. There are six girls on a 30-foot by 30-

foot court, and you need to quickly communicate and move with your teammates to retrieve the ball hit by the opponent.

18.     You also have to be ready to move in for a close hit, or transition back to retrieve a hit to the back corners. You need to time your footwork with the ball. There are times when you could start transitioning to hit the ball, and you will go too late or too early, and your hit will not be effective, or it may not go over the net.

19.     Playing volleyball this year has taught me so much. I have learned to work with my friends as a team. I have learned people skills and how to encourage my friends and not get frustrated with them when we are not playing well.

20.     The school volleyball season goes from August to October. When the school season ends, I start playing club volleyball with a city league. I play club volleyball from November to March, and I also play club softball until I can play softball when I get to high school. We play several times a year. We have a small season in the fall, with three tournaments in October. The season starts mid-April and runs through July, and I will play in six or seven tournaments. I play sports almost year-round.

21.     Playing all these sports requires sacrifice in other parts of my life.

22.     When I play softball, I practice on Tuesdays and Sundays, and I practice volleyball on Wednesdays and Sundays. I have had to miss school dances and football games to play my sports. I have had to wake up at four in the morning to make it to softball tournaments on time. Because of my sports schedule, we go on fewer vacations as a family. It is a sacrifice to play sports, but I love it.

23.     Sports have taught me how to work well with my teammates. I have learned how to work well in a group and to accomplish a common goal. I have also learned leadership skills by being on sports teams from such a young age.

24.     I can't wait to see where sports take me. I hope to use my athletic skills to make it onto a college softball team and hopefully earn a scholarship.

***Males in Female Sports***

25.     When I first heard about males competing in girls' sports, I said that was not fair. It's not fair that bigger and stronger boys get to play in girls' sports, making it impossible for girls to win.

26.     Boys in my grade are bigger and stronger than me. It is scary to think about a boy coming up to bat when I am standing only 43 feet from him on the pitching mound. He could hit the ball, and I would have almost no time to react and protect myself.

27.     Sometimes, I try to play with the boys in my grade in gym class or at recess. When the boys choose teams, they always form a group against the girls, and we are no match for them. We always get demolished, and there is little we can do about it.

28.     When I heard about the Kansas law that protects women's sports, I felt a lot safer and more confident that I could pursue sports and try for a sports scholarship going forward. Even if I have to compete against a girl who is bigger or taller than me, I at least know I have a shot of competing on a level playing field with her. But I know that I cannot beat out a boy in my sports. It feels more fair knowing that I will only have to compete against other girls, especially knowing that when I get to high school, the males will be even bigger and stronger than they are now.

29.     Based on my personal experience competing against boys in sports in casual situations, I do not think I could physically compete against them in sports in more competitive settings. Most males just have physical advantages that would make it impossible for me to compete, win, or enjoy the competition.

30.     It would also make me feel unsafe if I had to change with a boy in my locker room, or if males were allowed in the girls' bathroom. That would feel creepy and strange, and I would refuse to get changed if a boy was in the locker room.

31.     When I use the girls' restroom at school, I would also feel uncomfortable if there was a male using the girls' restroom. I would not want to use the restroom with a male because it would make me feel unsafe and vulnerable.

32.     In P.E. class, we have to change in the locker room before class. In my locker room, there is not much privacy. It is mainly a few stalls and a big open area in front of our lockers to change. There is not enough time for every girl to change into their P.E. clothes in the bathroom stalls before class starts. I would feel uncomfortable if there was a male in my P.E. class. I would refuse to change if a boy was in my room.

33.     Everyone knows males and females are different. It is not surprising that boys are better than girls at sports. Boys are stronger than girls and everyone knows that. I do not want to sign up to play a sport where I know I will be signing up to get injured.

34.     I also don't want to be forced to express messages that I disagree with. Males and females are different, and I do not want to be forced to use a pronoun for someone that does not match their biological sex. I believe that God has designed each person as a male or a female, and I would not want to say anything that goes against those beliefs. I want to be able to continue speaking about my beliefs in school and with my friends when it comes up. But I fear that if the Title IX rules are changed, I will not be able to say what I believe.

35.     I hope one day I will be able to get a college scholarship to play softball. But I fear that if the Title IX rules are changed, then boys will get scholarships ahead of me. I saw my sister go through the process of getting a college scholarship, and it was very difficult and extremely competitive. I fear that if I have to compete against boys and girls, I will not be able to play softball in college.

36.     I have loved sports for as long as I can remember. I am proud to stand up to protect women's sports so that other girls and I can get the chance to excel in sports.

## DECLARATION UNDER PENALTY OF PERJURY

I, A████ S█████, a citizen of the United States and a resident of

the State of Kansas, hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of May, 2024 at Topeka, Kansas.

A████ S█████

A.R.S.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

|  |  |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, <br><br> *Defendants.* | **Case No.** 5:24-cv-04041-JWB-ADM |

## DECLARATION OF T.P. IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, T.P., under penalty of perjury, declare as follows:

1.      I am a 15-year-old resident of Park County, Wyoming, and have personal knowledge of the information below.

2.      I am a student-athlete and a member of Female Athletes United.

3.      As an athlete with a passion for competition and fairness, I joined Female Athletes United to take a stand for women's sports.

4.      Protecting fairness for women's athletics is important to me and, as a female athlete, has personal implications.

5.      I think that advocating with a united voice conveys our message more powerfully. I am grateful to be a member of Female Athletes United.

6.      I am a freshman at Powell High School. I play on the junior varsity tennis team.

7.      From a very young age I have competed in sports. I started playing soccer in early elementary school but eventually moved to tennis.

8.      There are approximately 25 girls on my school tennis team. The team includes freshmen through seniors and is divided between varsity and junior varsity.

9.      Before practice, we get changed in the school locker room. The changing area in the locker room is a pretty open space. There is not much privacy when we change together for practice or before a match.

10.      Sometimes we scrimmage against the boys' tennis team. This can be fun and a great challenge, but I never win against them.

11.      Guys are built differently and it shows in how they play. They tend to have stronger muscles, broader shoulders, and taller heights. Their serves and hits are incredibly strong. They can jump and slam the ball down in a way that makes it

extremely difficult to return. The guys swing the racquet much harder, harder than any of the girls on my team.

12.     I am also in a weight-lifting class at school and have experienced the differences between girls and boys in that class. Most of the guys lift three to four times what I lift, but I am lifting close to what the other girls in my class lift.

13.     I enjoy the challenge of competing against guys in scrimmages and doing weight training with them, but would not want to compete against them in competitive settings. It would be disheartening to know that I would enter into any competition with an automatic disadvantage against males. Based on my personal experience in sports and in competing against males in casual and practice settings, I do not think I would be able to adequately compete against males in competitive sports. Most males just have physical advantages that would make this competition unfair and not enjoyable.

14.     I am also a Christian and believe that God creates people male and female. I believe that males and females are equal in dignity and worth, but have important differences. I do not believe that a boy can be a girl or a girl can be a boy. I do not believe that we can change what God created us to be even if we feel that we are a different sex. These beliefs are rooted in the Bible.

15.     I cannot express things that contradict my beliefs through words or actions.

16.     But I fear that I will be forced to say things I disagree with.

17.     Outside of tennis, I am also active on the speech and debate team at Powell High and several of my teammates on the debate team identify as non-binary. On several occasions, I also competed against students from other schools who identified as transgender.

18.     Ahead of one debate match, my name placard was printed listing pronouns for me. But I felt that having pronouns on my placard would be an endorsement of the idea that people can change their sex. This violates my beliefs.

19.     Because of this, my family requested that the pronouns be removed and that only my name be placed on my placard. The school accommodated our request and removed the pronouns.

20.     Likewise, I cannot use pronouns that do not accurately match someone's sex. Using these inaccurate pronouns would violate my religious beliefs and express the view that gender identity matters more than someone's sex and that someone can and sometimes should try to change their sex.

21.     When I was in middle school, a teacher asked my class to use "they/them" pronouns for a non-binary student, and I declined to do so because of my religious beliefs. I chose to not use pronouns for that student at all and instead used only the student's name.

22.     My speech and debate coach has told us that anyone who bullies an LGBTQ teammate would be kicked off the team.

23.     I would never bully anyone, but I sometimes worry that if one of my teammates asked me to use inaccurate pronouns and I declined, that student or the coach would think this was bullying.

24.     I have spoken with my friends about my belief that girls cannot be boys and boys cannot be girls. I have shared that I believe God makes people male or female and that sex can't be changed.

25.     My coaches and school administrators have never stopped me from speaking with my friends at school on this issue.

26.     One of the students at Powell who identifies as transgender is a male who identifies as a girl. This student uses the girls' restroom.

27.     Since I learned that the student uses the girls' bathroom, I have avoided going into the restroom location that I have seen this student use. I do not use this restroom even if it means I need to go to a farther one.

28.     Going to the restroom with a male present would make me feel uncomfortable and unsafe. I think it is important for safety and privacy that the girls' restroom be open only to females.

29.     My friends and I have spoken to each other about our discomfort using the restroom with a male present. They agree with me that it would not feel safe or dignified to go to the restroom with a male.

30.     Wyoming has a law that requires that sports teams be divided based on sex.

31.     This makes me feel confident that I will not need to change in front of a male before a tennis competition or play against a male in a match.

32.     The varsity team also takes multiple overnight trips each season. On these trips the players share rooms.

33.     I hope to be on varsity in the coming years, but I would not feel comfortable sharing a room with a male teammate who identifies as a girl.

34.     Wyoming's law makes me feel comfortable that I do not have to worry about this.

35.     It is my understanding that the Department of Education just passed new rules, which would redefine sex to include gender identity.

36.     From what I understand, my school abides by Title IX and anyone can report what they consider to be sexual harassment to the school and these reports can be made anonymously.

37.     I understand that the new Title IX rules go into effect on August 1, 2024.

38.     When these rules go into effect, I will no longer feel comfortable speaking about my beliefs on gender identity at school. I desire to continue to discuss with my friends my beliefs that a girl cannot be a boy and a boy cannot be a girl. I want to express to them my discomfort with males using the girls' bathrooms. But under these rules, I would be afraid to speak about this at school for fear of getting punished. I am afraid that under these rules I will be required to use inaccurate pronouns and that my not using them because of my faith will be considered bullying or harassment under the rules. But I cannot use inaccurate pronouns.

39.     I also desire to continue competing only against females in tennis. Under the new rules, a male who identifies as female could play on the girls' team and I would be required to compete against male athletes. I also may be assigned to share a room with a male athlete on an overnight trip if one joined my tennis team. I would not feel comfortable or safe sharing a room with a male teammate. I also do not think it is fair for females to be forced to compete against male athletes. If I am forced to compete against or share a room with a male, I would leave the team.

I, T.P., under penalty of perjury, declare as follows:

1.      I am a 15-year-old resident of Park County, Wyoming, and have personal knowledge of the information below.

2.      I am a student-athlete and a member of Female Athletes United.

3.      As an athlete with a passion for competition and fairness, I joined Female Athletes United to take a stand for women's sports.

4.      Protecting fairness for women's athletics is important to me and, as a female athlete, has personal implications.

5.      I think that advocating with a united voice conveys our message more powerfully. I am grateful to be a member of Female Athletes United.

6.      I am a freshman at Powell High School. I play on the junior varsity tennis team.

7.      From a very young age I have competed in sports. I started playing soccer in early elementary school but eventually moved to tennis.

8.      There are approximately 25 girls on my school tennis team. The team includes freshmen through seniors and is divided between varsity and junior varsity.

9.      Before practice, we get changed in the school locker room. The changing area in the locker room is a pretty open space. There is not much privacy when we change together for practice or before a match.

10.     Sometimes we scrimmage against the boys' tennis team. This can be fun and a great challenge, but I never win against them.

11.     Guys are built differently and it shows in how they play. They tend to have stronger muscles, broader shoulders, and taller heights. Their serves and hits are incredibly strong. They can jump and slam the ball down in a way that makes it

extremely difficult to return. The guys swing the racquet much harder, harder than any of the girls on my team.

12.    I am also in a weight-lifting class at school and have experienced the differences between girls and boys in that class. Most of the guys lift three to four times what I lift, but I am lifting close to what the other girls in my class lift.

13.    I enjoy the challenge of competing against guys in scrimmages and doing weight training with them, but would not want to compete against them in competitive settings. It would be disheartening to know that I would enter into any competition with an automatic disadvantage against males. Based on my personal experience in sports and in competing against males in casual and practice settings, I do not think I would be able to adequately compete against males in competitive sports. Most males just have physical advantages that would make this competition unfair and not enjoyable.

14.    I am also a Christian and believe that God creates people male and female. I believe that males and females are equal in dignity and worth, but have important differences. I do not believe that a boy can be a girl or a girl can be a boy. I do not believe that we can change what God created us to be even if we feel that we are a different sex. These beliefs are rooted in the Bible.

15.    I cannot express things that contradict my beliefs through words or actions.

16.    But I fear that I will be forced to say things I disagree with.

17.    Outside of tennis, I am also active on the speech and debate team at Powell High and several of my teammates on the debate team identify as non-binary. On several occasions, I also competed against students from other schools who identified as transgender.

18.     Ahead of one debate match, my name placard was printed listing pronouns for me. But I felt that having pronouns on my placard would be an endorsement of the idea that people can change their sex. This violates my beliefs.

19.     Because of this, my family requested that the pronouns be removed and that only my name be placed on my placard. The school accommodated our request and removed the pronouns.

20.     Likewise, I cannot use pronouns that do not accurately match someone's sex. Using these inaccurate pronouns would violate my religious beliefs and express the view that gender identity matters more than someone's sex and that someone can and sometimes should try to change their sex.

21.     When I was in middle school, a teacher asked my class to use "they/them" pronouns for a non-binary student, and I declined to do so because of my religious beliefs. I chose to not use pronouns for that student at all and instead used only the student's name.

22.     My speech and debate coach has told us that anyone who bullies an LGBTQ teammate would be kicked off the team.

23.     I would never bully anyone, but I sometimes worry that if one of my teammates asked me to use inaccurate pronouns and I declined, that student or the coach would think this was bullying.

24.     I have spoken with my friends about my belief that girls cannot be boys and boys cannot be girls. I have shared that I believe God makes people male or female and that sex can't be changed.

25.     My coaches and school administrators have never stopped me from speaking with my friends at school on this issue.

26.     One of the students at Powell who identifies as transgender is a male who identifies as a girl. This student uses the girls' restroom.

27.     Since I learned that the student uses the girls' bathroom, I have avoided going into the restroom location that I have seen this student use. I do not use this restroom even if it means I need to go to a farther one.

28.     Going to the restroom with a male present would make me feel uncomfortable and unsafe. I think it is important for safety and privacy that the girls' restroom be open only to females.

29.     My friends and I have spoken to each other about our discomfort using the restroom with a male present. They agree with me that it would not feel safe or dignified to go to the restroom with a male.

30.     Wyoming has a law that requires that sports teams be divided based on sex.

31.     This makes me feel confident that I will not need to change in front of a male before a tennis competition or play against a male in a match.

32.     The varsity team also takes multiple overnight trips each season. On these trips the players share rooms.

33.     I hope to be on varsity in the coming years, but I would not feel comfortable sharing a room with a male teammate who identifies as a girl.

34.     Wyoming's law makes me feel comfortable that I do not have to worry about this.

35.     It is my understanding that the Department of Education just passed new rules, which would redefine sex to include gender identity.

36.     From what I understand, my school abides by Title IX and anyone can report what they consider to be sexual harassment to the school and these reports can be made anonymously.

37.     I understand that the new Title IX rules go into effect on August 1, 2024.

38.     When these rules go into effect, I will no longer feel comfortable speaking about my beliefs on gender identity at school. I desire to continue to discuss with my friends my beliefs that a girl cannot be a boy and a boy cannot be a girl. I want to express to them my discomfort with males using the girls' bathrooms. But under these rules, I would be afraid to speak about this at school for fear of getting punished. I am afraid that under these rules I will be required to use inaccurate pronouns and that my not using them because of my faith will be considered bullying or harassment under the rules. But I cannot use inaccurate pronouns.

39.     I also desire to continue competing only against females in tennis. Under the new rules, a male who identifies as female could play on the girls' team and I would be required to compete against male athletes. I also may be assigned to share a room with a male athlete on an overnight trip if one joined my tennis team. I would not feel comfortable or safe sharing a room with a male teammate. I also do not think it is fair for females to be forced to compete against male athletes. If I am forced to compete against or share a room with a male, I would leave the team.

## DECLARATION UNDER PENALTY OF PERJURY

I, _____T.P._____, a citizen of the United States and a resident of

the State of Wyoming , hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of May , 2024 at Powell , Wyoming .

T.P.

Carrie I. Peters

7

**Appx222**

**EXHIBIT 8**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, <br><br> *Defendants.* | **Case No.** 5:24-cv-04041-JWB-ADM |

## DECLARATION OF ELIZABETH ZWAHLEN IN SUPPORT OF
## PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, Elizabeth Zwahlen, under penalty of perjury, declare as follows:

1.     I am over the age of eighteen and competent to testify, and I make this declaration as follows:

2.     I am a 20-year-old resident of Utah County, Utah, and have personal knowledge of the information below.

3.     I am a student-athlete and a member of Female Athletes United.

4.     Coming from a family of athletes including numerous female athletes, I am a firm advocate of fairness in women's sports.

5.     I grew up surrounded by runners. My dad ran track at the collegiate level and my mom ran in high school. One of my grandmothers has completed over twenty-six marathons. All my siblings and cousins also run or play other sports.

6.     I began competing in track and cross country in high school.

7.     I worked extremely hard because I wanted to compete in college. I knew it would be difficult to get onto a collegiate team and even more competitive to get an athletic scholarship.

8.     In my senior year of high school alone, I placed first twelve times in the outdoor track season. In my senior year cross county, I finished first four times and only placed below the top ten once.

9.     It took discipline and sacrifice to get and stay in shape to win those medals. We practiced hard and in all kinds of weather.

10.     I was on the swim team to stay in shape between seasons, which sometimes involved very early practices.

11.     I was overjoyed when Utah Valley University offered me a full athletic scholarship.

12.     I have competed in track and cross country every season since starting here. Recently, I completed my junior year at UVU.

13.     My track events are the 800m and 1500m and occasionally the 400 meter or 4x400 meter relay. Women's cross-country races in college are generally 6K whereas men's are 8K or 10K.

14.     I had personal records in both the 800 meter and 1500 meter this year, which was very rewarding. I finished in the top ten in five different events.

15.     There is nothing like finishing a race, knowing you have run your best and receiving recognition for the countless hours of hard work.

16.     In track especially, it is important to train diligently because there are only a few spots for each team in most events. To compete, you need to be one of the team's top runners in your division.

17.     As a team, we frequently travel for meets.

18.     Between cross country and track, about 15 of these trips involve spending the night in a hotel. We share a room with other teammates and sometimes we even have to share beds.

19.     When we are at school, I often change in the locker rooms and sometimes shower in the shower area in the locker room. These locker rooms have minimal privacy with semi-open areas available for changing. Because of this, I have to change in view of my teammates.

20.     When traveling to away meets, I also change in the locker room and sometimes use the shower. In these cases, both my teammates and the athletes on the opposing teams share the locker room.

21.     As I understand it, Utah law currently requires that individuals in most cases must use sex-designated changing facilities based on their sex in government-owned buildings. This includes the locker rooms at my school, as well as the restrooms and showers attached to the locker rooms there.

22.     I am grateful for this law because I would not feel safe or comfortable using a locker room with a male present.

23.     Likewise, I do not feel comfortable sharing a hotel room or a bed with a male teammate, even if the teammate identifies as female, or showering in the locker room with a male nearby, or with using the restroom with a male nearby.

24.     I would feel unsafe, vulnerable, and humiliated having to undress or shower near a male or having to sleep in the same hotel room or bed next to a male.

25.     I am a Christian and believe that God creates people male or female and that people cannot change their sex. I believe God loves everyone equally and that every person has equal dignity and worth, but that people have meaningful distinctions based on their sex. I also believe that people should try to live consistently with their God-given sex and view it as a gift rather than try to change or reject it.

26.     In the past, my teammates and I have spoken about gender identity and males competing in women's sports.

27.     During these conversations, I have shared my beliefs that everyone should be treated with love and compassion, but that I do not believe that people can change their sex and that males who identify as females are in fact male. I have also shared that I do not think it is fair for males to compete in women's sports.

28.     I have played against men in sports for fun and know from experience the very real physical advantages men have. Despite being an athlete who has been competing for years, I still cannot match men for strength or speed. I do not think I would be competitive against most males in a meet, especially if they had comparable training as runners.

29.     I often play pick-up soccer with a group that is mostly guys. It is fun to play co-ed sports in a casual setting like this, but it would be discouraging to play competitively against men. Despite being a runner, the male players even in this casual setting are faster and stronger than I am. Based on my personal experiences

like these, I do not think I could fairly compete against most men in sports and I wouldn't enjoy trying because most men have these physical advantages.

30.     Utah Valley University follows Title IX. Every year my teammates and I attend Title IX training. The training instructs us to report any sexual harassment or bullying that comes to our attention. This includes not only situations in which we have experienced or witnessed sexual harassment, but also any instances where we are made aware of sexual harassment.

31.     I understand that the Department of Education just put out new rules related to Title IX. I am worried that, under these rules, I would no longer be allowed to share my beliefs with my teammates that God created two sexes and that people cannot change their sex. I will be worried that this would be considered harassment or bullying. When the rules go into effect on August 1, 2024, I will no longer share my beliefs on these issues at school for fear of being reprimanded.

32.     I also understand that the new rules require that schools, including Utah Valley, open their bathrooms, locker rooms, shower areas, overnight accommodations, and sports teams to students based on gender identity.

33.     I do not think this is fair or right. I want to continue to access these women's only areas with confidence knowing that I won't have to encounter, undress, sleep, or shower next to a male. If male students use these women's only areas with me, I will feel very uncomfortable and vulnerable.

34.     I also think it is unfair if I have to compete against male students in competitive athletics. I want the chance to compete, to excel, and to win because I have trained so hard to be the best athlete I can be. If I am forced to compete against males in my own sport, it will be very discouraging and frustrating.

## DECLARATION UNDER PENALTY OF PERJURY

I, __Elizabeth Zwahlen___, a citizen of the United States and a resident of

the State of ___Utah___, hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _15th_ day of ____May___, 2024 at ___Tyler___, ____Texas__.

_____

Elizabeth Zwahlen

**EXHIBIT 9**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS;<br>STATE OF ALASKA;<br>STATE OF UTAH;<br>STATE OF WYOMING;<br>K.R., A MINOR, BY SHAWNA<br>ROWLAN, HER MOTHER;<br>MOMS FOR LIBERTY;<br>YOUNG AMERICA'S FOUNDATION;<br>FEMALE ATHLETES UNITED;<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION;<br>MIGUEL CARDONA, IN HIS OFFICIAL<br>CAPACTIY AS UNITED STATES<br>SECRETARY OF EDUCATION;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE;<br>MERRICK GARLAND, IN HIS<br>OFFICIAL CAPACITY AS UNITED<br>STATES ATTORNEY GENERAL,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 5:24-cv-04041-JWB-ADM |

---

## DECLARATION OF RACHEL FLYNN

---

I, Rachel Flynn, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Utah, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4.      I am a student in my freshman year at the University of Utah, majoring in pre-nursing.

5.      I am a member of the Christian faith.

6.      I am presently a member of my institution's chapter of the Young America's Foundation and have been a member since fall semester of 2023. I am also the incoming Chairwoman for our chapter. As a member of Young America's Foundation, I have attended a speech by Chloe Cole on detransitioning; a speech by Michael Knowles on transgenderism; and a screening of the documentary "Damaged," which features the stories of several individuals who have destransitioned and the struggles they faced in the transitioning and destransitioning processes.

7.      Before joining Young America's Foundation, I held the following views:

  a.   Sex is determined at birth based on biology and by God. A man cannot become a woman and a woman cannot become a man.

  b.   In conversation, one should use pronouns consistent with a person's biological sex. Being forced to use preferred pronouns is an endorsement of the idea that sex is fluid and can change.

  c.   Women deserve private spaces on campus. Biological men should not be permitted to use sex-segregated areas such as the women's restroom and the women's locker room.

8.      As a student at the University of Utah, I have had frequent interactions with fellow students who identify as transgender and expect to continue to have frequent interactions with individuals identifying as transgender.

**Appx230**

9.     As a student at the University of Utah, I have expressed numerous views about issues of gender identity and transgenderism, including:

    a.   That a person's sex is determined at birth and by God such that a man cannot choose to become a woman and a woman cannot choose to be a man.

    b.   Biological men should not be permitted to use women's restrooms and women's locker rooms.

10.     As a student at the University of Utah, I have used pronouns consistent with an individual's biological sex, including when identifying fellow students who identify as transgender.

11.     As a student at the University of Utah, absent the Final Title IX Rule taking effect, I likely would, in the future, confront a biological male if I encountered him in the women's restroom.

12.     While a member of Young America's Foundation, I have participated in tabling and flyering events focused on the subject of gender identity and transgenderism. At these events, we have advertised for our Young America's Foundation chapter and displayed slogans such as "Men cannot become women."

13.     As the incoming Chairwoman of the Young America's Foundation chapter at the University of Utah, I have plans to engage in events similar to those identified in Paragraph 12 during the 2024-25 academic year. Furthermore, I am considering working with Young America's Foundation to bring speakers to campus who would talk about gender identity issues during the 2024-25 academic year, including Matt Walsh, who gives a speech entitled "What is a Woman."

14.     As a student at the University of Utah, I have observed transgender activists display messages such as "Trans lives matter" and "Men can become women."

3

15.     To date, while a student at the University of Utah, I have not received a warning, been subject to any investigatory or disciplinary proceeding, or been required to attend any education programs or training sessions as a result of expressing the views discussed in Paragraph 9, using pronouns based on biological sex, or participating in and promoting the events identified in Paragraph 12.

16.     As a result of the Final Title IX Rule and my institution's history of enforcing similar rules, I believe there is a threat my institution would punish me for expressing the views discussed in Paragraph 9, using pronouns based on biology, confronting a biological male in the women's restroom, and/or organizing or promoting events similar to those identified in Paragraphs 12 and 13.

17.     Absent the Final Title IX Rule and the threat of being subject to investigatory or disciplinary proceedings, I would continue to express the views discussed in Paragraph 9, use pronouns based on biology, and organize and promote events for Young America's Foundation similar to those identified in Paragraphs 12 and 13.

18.     Because I am afraid of being subjected to investigatory proceedings and being disciplined for engaging in hostile environment harassment as defined by the Final Title IX Rule, I will (a) be deterred from expressing the views discussed in Paragraph 9, (b) be deterred from using pronouns based on biology, (c) opt not to confront a biological male if I encounter him in the women's restroom, and (d) be deterred from organizing and promoting events similar to those identified in Paragraphs 12 and 13.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 05/13/2024

_Rachel Flynn_
Rachel Flynn (May 13, 2024 16:29 MDT)

Rachel Flynn

5

**EXHIBIT 10**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS; | ) | |
| STATE OF ALASKA; | ) | |
| STATE OF UTAH; | ) | |
| STATE OF WYOMING; | ) | |
| K.R., A MINOR, BY SHAWNA | ) | |
| ROWLAN, HER MOTHER; | ) | |
| MOMS FOR LIBERTY; | ) | Civil Action No. 5:24-cv-04041-JWB-ADM |
| YOUNG AMERICA'S FOUNDATION; | ) | |
| FEMALE ATHLETES UNITED; | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION; | ) | |
| MIGUEL CARDONA, IN HIS OFFICIAL | ) | |
| CAPACTIY AS UNITED STATES | ) | |
| SECRETARY OF EDUCATION; | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE; | ) | |
| MERRICK GARLAND, IN HIS | ) | |
| OFFICIAL CAPACITY AS UNITED | ) | |
| STATES ATTORNEY GENERAL, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF THOMAS ADCOCK

I, Thomas Adcock, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Kansas, over 18 years of age, and have personal knowledge of the facts set forth herein.

**Appx234**

3.      I am fully competent to make this declaration.

4.      I am a student in my junior year at Kansas State University, majoring in history.

5.      I am a member of the Christian faith.

6.      I am also an Army veteran, attending school with assistance from the G.I. Bill.

7.      I became a member Young America's Foundation's national chapter in fall 2022. I formed my school's chapter of Young America's Foundation in spring 2023. I am presently the Chairman for our chapter. As Chairman of our Young America's Foundation's chapter, I have organized multiple events, including hosting speaker Chloe Cole, engaging in chalking events, and hosting movie watch parties for my chapter at which I displayed "What is a Woman" and "Lady Ballers."

8.      Before joining Young America's Foundation, I held the following views:

   a.   Sex is determined at birth based on biology and by God. A man cannot become a woman and a woman cannot become a man.

   b.   In conversation, one should use pronouns consistent with a person's biological sex. Being forced to use preferred pronouns is an endorsement of the idea that sex is fluid and can change.

   c.   State law should prohibit doctors from performing transition surgeries on minors. This issue is particularly at the forefront of Kansas politics because the Governor recently vetoed a bill prohibiting such surgeries.

9.      As a student at Kansas State University, I have had numerous interactions with fellow students who identify as transgender. I expect to continue to have interactions with individuals identifying as transgender.

2

**Appx235**

10.     As a student at Kansas State University, I have expressed numerous views about issues of gender identity and transgenderism, including that a person's sex is determined at birth and by God such that a man cannot choose to become a woman and a woman cannot choose to be a man.

11.     As a student at Kansas State University, I have used pronouns consistent with an individual's biological sex, including when identifying fellow students who identify as transgender.

12.     While a member of Young America's Foundation, I have participated in chalking events as a way of advertising other events hosted by my Young America's Foundation's chapter. At these events, we wrote several slogans focused on issues of gender identity, including "Men are not women," "Protect real women," "Detransitioner lives matter," and "stop erasing detransitioners." We also drew the trans flag and placed an "X" across the flag.

13.     As the Chairman of the Young America's Foundation chapter at Kansas State University, I have plans to engage in activities similar to those identified in Paragraphs 7 and 12 during the 2024-25 academic year.

14.     To date, while a student at Kansas State University, I have not received a warning, been subject to any investigatory or disciplinary proceeding, or been required to attend any education programs or training sessions as a result of expressing the views discussed in Paragraph 10, using pronouns based on biological sex, or organizing and promoting the events identified in Paragraphs 7 and 12. To the contrary, when other students complained to our Dean of Student Life about the messages we promoted at our chalking event, the Dean used the incident as an opportunity to teach the complaining students about free speech.

3

**Appx236**

15.     As a result of the Final Title IX Rule, I believe there is a threat my institution would punish me for expressing the views discussed in Paragraphs 8 and 10, using pronouns based on biology, and/or organizing or promoting events similar to those identified in Paragraphs 7 and 12. I am also concerned that I may lose G.I. Bill funding and that my chapter may not garner enough new members to continue on.

16.     Absent the Final Title IX Rule and the threat of being subject to investigatory or disciplinary proceedings, I would express the views discussed in Paragraphs 8 and 10, use pronouns based on biology, and organize and promote events for Young America's Foundation similar to those identified in Paragraphs 7 and 12.

17.     Because I am afraid of being subjected to investigatory proceedings and being disciplined for engaging in hostile environment harassment as defined by the Final Title IX Rule, I will (a) be deterred from expressing the views discussed in Paragraph 8, (b) be deterred from using pronouns based on biology, and (c) be deterred from organizing and promoting events similar to those identified in Paragraphs 7 and 12.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 05/13/2024
_____

*Thomas Adcock*
Thomas Adcock (May 13, 2024 17:33 CDT)
_____
Thomas Adcock

EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | |
|---|---|
| STATE OF KANSAS;<br>STATE OF ALASKA;<br>STATE OF UTAH;<br>STATE OF WYOMING;<br>K.R., A MINOR, BY SHAWNA<br>ROWLAN, HER MOTHER;<br>MOMS FOR LIBERTY;<br>YOUNG AMERICA'S FOUNDATION;<br>FEMALE ATHLETES UNITED;<br><br>    *Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION;<br>MIGUEL CARDONA, IN HIS OFFICIAL<br>CAPACTIY AS UNITED STATES<br>SECRETARY OF EDUCATION;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE;<br>MERRICK GARLAND, IN HIS<br>OFFICIAL CAPACITY AS UNITED<br>STATES ATTORNEY GENERAL,<br><br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 5:24-cv-04041-JWB-ADM<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## DECLARATION OF   ERIANNE   ENSEN

---

I, Merianne Jensen, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of  irginia, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4.      I am a practicing member of the Church of Jesus Christ of Latter Day Saints.

5.      I am a member of Moms for Liberty and have been a member since 2022.

6.      As a member of Moms for Liberty, I have attended school board meetings, conducted monthly chapter meetings, promoted events, held fundraisers, helped campaign for candidates, set up meet-and-greets for candidates, and helped members in the community with education and parental rights issues affecting their families.

7.      I joined Moms for Liberty because the organization represents and advocates for many of the values that I hold dearly, including views about parental rights and school policies regarding "gender identity" and transgender individuals.

8.      I maintain several deeply held beliefs regarding gender identity and transgender issues, including:

    a.   All human beings are created in the image of God. Each is a beloved spirit son or daughter of heavenly parents, and, as such, each has a divine nature and destiny. Gender is an essential characteristic of individual premortal, mortal, and eternal identity and purpose.

    b.   An individual's sex is determined at birth. An individual cannot change his or her sex or gender. An individual born male will always be male and an individual born female will always be female.

    c.   Issues regarding transgenderism and gender identity should not be taught in schools and schools should not promote events celebrating transgenderism.

2

9.      I am the mother of D.J., T.J., E.J., and A.J.

10.     D.J. is a ninth-grade student at Patriot High School in the Prince William County School District. T.J. and E.J. are sixth graders at Marsteller Middle School in the Prince William County School District. A.J. is a fourth-grade student at Cedar Point Elementary School in the Prince William County School District.

11.     I have raised my four children in accord with my values and morals, including those identified in Paragraph 8 regarding gender identity and transgenderism. My children have adopted these beliefs as their own.

12.     T.J. and E.J. have a peer at their middle school who was born female but now self-identifies as transgender and as male.

13.     Within the school setting, T.J. and E.J. have continued to use female pronouns when identifying their now transgender schoolmate and have continued to use their now-transgender schoolmate's name of birth. All four of my children have also expressed views at school consistent with the views identified in Paragraph 8.

14.     My children have not received any warnings or discipline from or been required to attend any training or diversity programing by Prince William County School District for using a transgender individual's birth name, refusing to use a transgender individual's preferred pronouns, and/or speaking on issues of gender identity and transgenderism.

15.     Absent the threat of discipline, my children plan to continue using birth names for transgender individuals, refusing to use preferred pronouns, and speaking on issues of gender identity and transgenderism in the school setting, as outlined in Paragraph 8.

16.     The principal at T.J.'s and E.J.'s school has already given an assembly touching on issues of gender identity and promoting the view that some boys identify as girls and some girls

3

identify as boys. During the assembly, the principal counseled that everyone should get accustomed to this and accept this because it is the future.

17.    Because of the Title IX Rule and how it defines sex to include gender identity and sex stereotypes, my children are afraid of facing discipline for using birth names for transgender individuals, refusing to use preferred pronouns, and speaking on issues of gender identity and transgenderism in the school setting. As a result, my children will be deterred from expressing their views on these matters and in manners consistent with their past speech.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: _____

_____
Merianne Jensen (May 13, 2024 21:57 EDT)
Merianne Jensen

4

**Appx241**

**EXHIBIT 12**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS; | ) | |
| STATE OF ALASKA; | ) | |
| STATE OF UTAH; | ) | |
| STATE OF WYOMING; | ) | |
| K.R., A MINOR, BY SHAWNA | ) | |
| ROWLAN, HER MOTHER; | ) | |
| MOMS FOR LIBERTY; | ) | Civil Action No. 5:24-cv-04041-JWB-ADM |
| YOUNG AMERICA'S FOUNDATION; | ) | |
| FEMALE ATHLETES UNITED; | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION; | ) | |
| MIGUEL CARDONA, IN HIS OFFICIAL | ) | |
| CAPACTIY AS UNITED STATES | ) | |
| SECRETARY OF EDUCATION; | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE; | ) | |
| MERRICK GARLAND, IN HIS | ) | |
| OFFICIAL CAPACITY AS UNITED | ) | |
| STATES ATTORNEY GENERAL, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DECLARATION OF REBEKAH KOZNEK

I, Rebekah Koznek, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of California, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4.      I am an elected school board trustee to the Atascadero Unified School District.

5.      I am a member of Moms for Liberty and have been a member since March 2021.

6.      I am the   ice Chair of our local Moms for Liberty chapter.

7.      I joined Moms for Liberty because the organization represents and advocates for many of the values that I hold dearly, including views about parental rights and school policies regarding gender identity and transgender individuals.

8.      I maintain several deeply held beliefs regarding gender identity and transgender issues, including:

    a.   All human beings are created in the image of God. God and biology determine the sex of an individual.

    b.   An individual's sex is set at birth. An individual cannot change his or her sex or gender. An individual born male will always be male and an individual born female will always be female.

    c.   People should have the right to use pronouns that are in accord with another individual's biological sex. Requiring a person to use a preferred pronoun that matches a transgendered individual's self-selected gender is a way of forcing the person to accept and promote values contrary to their beliefs.

    d.   Individuals should use sex-segregated facilities, such as bathrooms and locker rooms, that match their biological sex.

9.      I am the mother of E.K. and T.K.

**Appx243**

10.     E.K. is an eighth-grade student at Atascadero Middle School, in the Atascadero Unified School District. T.K. is a fifth-grade student at San Benito Elementary School, in the Atascadero Unified School District.

11.     E.K. has been diagnosed as being on the Autism spectrum and has speech and developmental limitations.

12.     I have raised my two children in accord with my values and morals, including those identified in Paragraph 8 regarding gender identity and transgenderism. My children have adopted these beliefs as their own.

13.     E.K. has had interactions with students who identify as transgender while at school. Additionally, our school district has a policy that permits individuals to use sex-segregated facilities, such as bathrooms and locker rooms, that match their self-identified gender rather than their biological sex. In the fall of the 2023-24 academic year, a biologically male student used the girls' locker room. While doing so, the transgender individual "twerked" in the faces of several girls and engaged in other attention seeking behaviors, making the girls in the locker room quite uncomfortable. Members of the school community, including teachers and parents, brought complaints to school board trustees, including myself, about the biological male's use of and behavior in the girls' locker room.

14.     E.K. uses pronouns that match an individual's biological sex and the sex as represented by the individual when E.K. first met the individual, in part due to E.K.'s learning disabilities but also because of her belief in biological sex. Accordingly, E.K. does not use a transgender individual's preferred pronouns because her developmental and speech disabilities preclude her from adapting her use of pronouns such that she could not use he/him pronouns for an individual who presented as female when E.K. first met the individual. Additionally, because

3

**Appx244**

of her disabilities, E.K. would experience great confusion if she encountered someone she knew as a biological male in the women's restroom or women's locker room.

15.    Due to his beliefs, T.K. has continued to use pronouns consistent with an individual's biological sex when identifying transgender individuals.

16.    While in the school setting, E.K. and T.K. have expressed views at school consistent with the views identified in Paragraph 8.

17.    My children have not received any warnings or discipline from or been required to attend any training or diversity programing by the Atascadero Unified School District for using pronouns consistent with a transgender individual's biological sex and/or expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8.

18.    Absent the threat of discipline, my children, within the school setting, plan to continue using pronouns consistent with a transgender individual's biological sex and expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8.

19.    Because of the Final Title IX Rule and how it defines sex to include gender identity and sex stereotypes, my children are afraid of facing discipline for using pronouns consistent with a transgender individual's biological sex and/or expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8. As a result, my children will be deterred from expressing their views on these matters and in manners consistent with their past speech.

**Appx245**

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.


Dated: _____

Rebekah Koznek (May 13, 2024 18:43 PDT)
_____

Rebekah Koznek

5

**EXHIBIT 13**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | |
|---|---|
| STATE OF KANSAS; | ) |
| STATE OF ALASKA; | ) |
| STATE OF UTAH; | ) |
| STATE OF WYOMING; | ) |
| K.R., A MINOR, BY SHAWNA | ) |
| ROWLAN, HER MOTHER; | ) |
| MOMS FOR LIBERTY; | ) Civil Action No. 5:24-cv-04041-JWB-ADM |
| YOUNG AMERICA'S FOUNDATION; | ) |
| FEMALE ATHLETES UNITED; | ) |
| | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| EDUCATION; | ) |
| MIGUEL CARDONA, IN HIS OFFICIAL | ) |
| CAPACTIY AS UNITED STATES | ) |
| SECRETARY OF EDUCATION; | ) |
| UNITED STATES DEPARTMENT OF | ) |
| JUSTICE; | ) |
| MERRICK GARLAND, IN HIS | ) |
| OFFICIAL CAPACITY AS UNITED | ) |
| STATES ATTORNEY GENERAL, | ) |
| | ) |
| *Defendants.* | ) |

## DECLARATION OF KAILEE VERDEYEN

I, Kailee   erdeyen, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Colorado, over 18 years of age, and have personal knowledge of the facts set forth herein.

**Appx247**

3.      I am fully competent to make this declaration.

4.      I am a student in my freshman year at the University of Wyoming, majoring in criminal justice and communications.

5.      I am a member of the Delta Delta Delta sorority at the University of Wyoming.

6.      I am also a Senator on my university's student government.

7.      I consider myself to be an "old school feminist."

8.      I am presently a member of my institution's chapter of the Young America's Foundation and have been a member since the 2023-24 academic year. As a member of Young America's Foundation, I attended our chapter's De-transition Day event.

9.      Before joining Young America's Foundation, I held the following views:

    a.   Sex is determined at birth based on biology. Women are women and men are men. A man cannot become a woman and cannot give birth.

    b.   Women deserve private spaces on campus. Biological men should not be permitted to use sex-segregated areas such as the women's restroom and the women's locker room. Biological men should also be prohibited form joining women's only organizations.

    c.   Title IX was meant to protect biological women and it is a misuse of Title IX to protect biological men who self-identify as women.

10.     As a student at the University of Wyoming, I have had many interactions with fellow students who identify as transgender and will continue to have many interactions with individuals identifying as transgender.

11.     On multiple occasions, I have had uncomfortable interactions in the women's restroom with biological males, identifying as transgender. Furthermore, I am concerned that a

2

**Appx248**

biological male may try to join my sorority because a biological male joined another sorority at the University of Wyoming.

12.     As a student at the University of Wyoming, I have expressed numerous views about issues of gender identity and transgenderism, including:

      a.  That a person's sex is determined at birth such that a man cannot choose to become a woman, a woman cannot choose to be a man, and a man cannot give birth.

      b.  Biological men should not be permitted to use women's restrooms and women's locker rooms.

      c.  Biological men should not be permitted to join women-only organizations and student groups such as a sorority.

13.     As a member of my university's chapter of the Young America's Foundation, I participated in a tabling event for De-transition Day.

14.     Looking forward to the 2024-25 academic year, as a member of my Young America's Foundation's chapter, I have plans to help organize several speaker events. Specifically, we hope to bring Chloe Cole and Paula Scanlan to campus to speak about detransitioning and protecting women's sports respectively. I also hope to help bring Abby Roth to campus to give a speech entitled "Welcome to 2024: Where Men Suck and Women Don't Exist."

15.     To date, while a student at the University of Wyoming, I have not received a warning, been subject to any investigatory or disciplinary proceeding, or been required to attend any education programs or training sessions as a result of expressing the views discussed in Paragraph 12 or for participating in and promoting the event identified in Paragraph 13.

16.     As a result of the Final Title IX Rule, I believe there is a threat my institution would punish me for expressing the views discussed in Paragraph 12 and/or for organizing or promoting events similar to those identified in Paragraphs 13 and 14. I am also concerned that I might be removed from my Senator position on our student government association.

17.     Absent the Final Title IX Rule and the threat of being subject to investigatory or disciplinary proceedings, I would continue to express the views discussed in Paragraph 12 and organize and promote events for Young America's Foundation similar to those identified in Paragraphs 13 and 14.

18.     Because I am afraid of being subjected to investigatory proceedings and being disciplined for engaging in hostile environment harassment as defined by the Final Title IX Rule, I will (a) be deterred from expressing the views discussed in Paragraph 12 and (b) be deterred from organizing and promoting events similar to those identified in Paragraphs 13 and 14.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 05/13/2024

*Kailee Verdeyen*
Kailee Verdeyen (May 13, 2024 17:43 MDT)

Kailee  erdeyen

**EXHIBIT 14**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS; | ) | |
| STATE OF ALASKA; | ) | |
| STATE OF UTAH; | ) | |
| STATE OF WYOMING; | ) | |
| K.R., A MINOR, BY SHAWNA | ) | |
| ROWLAN, HER MOTHER; | ) | |
| MOMS FOR LIBERTY; | ) | Civil Action No. 5:24-cv-04041-JWB-ADM |
| YOUNG AMERICA'S FOUNDATION; | ) | |
| FEMALE ATHLETES UNITED; | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION; | ) | |
| MIGUEL CARDONA, IN HIS OFFICIAL | ) | |
| CAPACTIY AS UNITED STATES | ) | |
| SECRETARY OF EDUCATION; | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| JUSTICE; | ) | |
| MERRICK GARLAND, IN HIS | ) | |
| OFFICIAL CAPACITY AS UNITED | ) | |
| STATES ATTORNEY GENERAL, | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## DECLARATION OF TRICIA PLANK

---

I, Tricia Plank, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Pennsylvania, over 18 years of age, and have personal knowledge of the facts set forth herein.

**Appx251**

3.      I am fully competent to make this declaration.

4.      I am an elected member on the Upper Adams School Board.

5.      I am a member of Moms for Liberty and have been a member since February 8, 2023.

6.      As a member of Moms for Liberty, I have attended meetings, assisted with tabling events, distributed informational materials to members of the community.

7.      I joined Moms for Liberty because the organization represents and advocates for many of the values that I hold dearly, including views about parental rights and school policies regarding gender identity and transgender individuals.

8.      I maintain several deeply held beliefs regarding gender identity and transgender issues, including:

    a.   All human beings are created in the image of God. God and biology determine the sex of an individual.

    b.   An individual's sex is determined at birth. An individual cannot change his or her sex or gender. An individual born male will always be male and an individual born female will always be female.

    c.   People should have the right to use pronouns that are in accord with another individual's biological sex. Requiring a person to use a preferred pronoun that matches a transgendered individual's self-selected gender is a way of forcing the person to accept and promote values contrary to their beliefs.

    d.   An individual should use bathroom and locker room facilities consistent with their biological sex. This is particularly true as to adult biological males using sex-segregated restrooms and locker rooms for girls and women.

2

9.      I am the mother of P.M.P. and P.P.P.

10.     P.M.P. is a ninth-grade student at Biglerville High School, in the Upper Adams School District. P.P.P. is a seventh-grade student at Upper Adams Middle School, in the Upper Adams School District.

11.     I have raised my two children in accord with my values and morals, including those identified in Paragraph 8 regarding gender identity and transgenderism. My children have adopted these beliefs as their own.

12.     P.M.P. and P.P.P. have interactions with students who identify as transgender while at school. A transgender student in P.M.P's school has used a bathroom and locker room that does not align with the student's biological sex.

13.     Issues involving gender identity and transgenderism are particularly prevalent in my community and will be particularly prevalent in my children's schools because Gettysburg School District in our area has hired a biological male, who identifies as a female, to coach their tennis team. In the past, this individual, who reportedly has not undergone transition surgery, has used the women's restroom and changed in the women's locker room. The latter action occurred in front of young girls also changing in the women's locker room.

14.     P.M.P. is currently on her school's tennis team and her school has competed and may in the future compete against the school with the biological male tennis coach discussed in Paragraph 13. Accordingly, there is a very real chance that an adult biological male will be using women's restroom and locker room facilities at a tennis tournament that P.M.P. attends.

15.     Within the school setting, P.M.P. and P.P.P have continued to use pronouns consistent with an individual's biological sex when identifying a transgender individual. P.M.P. also uses a birth name when identifying a transgender individual. Finally, while in the school

3

**Appx253**

setting, P.M.P. and P.P.P. have expressed views at school consistent with the views identified in Paragraph 8.

16.     My children have received scrutiny from teachers and administrators for their views on gender identity and transgenderism. However, my children have not received any warnings or discipline from or been required to attend any training or diversity programing by Upper Adams School District for using pronouns consistent with a transgender individual's biological sex and/or expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8.

17.     Absent the threat of discipline, my children, within the school setting, plan to continue using pronouns consistent with a transgender individual's biological sex and expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8.

18.     Because of the Title IX Rule and how it defines sex to include gender identity and sex stereotypes, my children are afraid of facing discipline for using pronouns consistent with a transgender individual's biological sex and/or expressing views on issues of gender identity and transgenderism consistent with those outlined in Paragraph 8. As a result, my children will be deterred from expressing their views on these matters and in manners consistent with their past speech.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: _____

*Tricia Plank*
Tricia Plank (May 14, 2024 09:27 EDT)
_____
Tricia Plank

**EXHIBIT 15**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | |
|---|---|
| STATE OF KANSAS; | ) |
| STATE OF ALASKA; | ) |
| STATE OF UTAH; | ) |
| STATE OF WYOMING; | ) |
| K.R., A MINOR, BY SHAWNA | ) |
| ROWLAN, HER MOTHER; | ) |
| MOMS FOR LIBERTY; | ) Civil Action No. 5:24-cv-04041-JWB-ADM |
| YOUNG AMERICA'S FOUNDATION; | ) |
| FEMALE ATHLETES UNITED; | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| EDUCATION; | ) |
| MIGUEL CARDONA, IN HIS OFFICIAL | ) |
| CAPACTIY AS UNITED STATES | ) |
| SECRETARY OF EDUCATION; | ) |
| UNITED STATES DEPARTMENT OF | ) |
| JUSTICE; | ) |
| MERRICK GARLAND, IN HIS | ) |
| OFFICIAL CAPACITY AS UNITED | ) |
| STATES ATTORNEY GENERAL, | ) |
| | ) |
| *Defendants*. | ) |

---

## DECLARATION OF DEBORAH LOCHNER

---

I, Deborah Lochner, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of New York, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4.      I am a member of Moms for Liberty and have been a member since 2021.

5.      I am the Chair of our local Moms for Liberty chapter.

6.      I joined Moms for Liberty because the organization represents and advocates for many of the values that I hold dearly, including views about parental rights and school policies regarding gender identity and transgender individuals.

7.      I maintain several deeply held beliefs regarding gender identity and transgender issues, including:

    a.   An individual's sex is determined at birth by biology. An individual cannot change his or her sex or gender. An individual born male will always be male and an individual born female will always be female.

    b.   People should have the right to use pronouns that are in accord with another individual's biological sex. Requiring a person to use a preferred pronoun that matches a transgendered individual's self-selected gender is a way of forcing the person to accept and promote values contrary to their beliefs.

    c.   An individual should use bathroom, dressing room, and locker room facilities consistent with their biological sex.

8.      I am the mother of K.L.

9.      K.L. is an eighth-grade student at Newark Middle School, in the Newark Central School District.

10.     I have raised K.L.in accord with my values and morals, including those identified in Paragraph 7 regarding gender identity and transgenderism. K.L. has adopted these beliefs as her own.

11.     K.L. uses pronouns that match an individual's biological sex consistent with the views identified in Paragraph 7.

12.     K.L. has not received any warnings or discipline from or been required to attend any training or diversity programing by Newark Central School District for expressing views on gender identity and transgender issues consistent with those outlined in Paragraph 7.

13.     K.L. is involved in her school's theater program, which will require her to use a dressing room while at school. K.L. may encounter a biological male who identifies as transgender while she is changing in the ladies' dressing room.

14.     K.L.'s school also has a mandatory swimming class as part of its physical education program. K.L. may encounter a biological male who identifies as transgender while she is changing in the women's locker room. In such an event, K.L.'s choices would be to acquiesce to the biological male's presence in the locker room, find another place to change for swim class in the school, or receive a failing mark for her physical education class.

15.     Absent the threat of discipline, K.L. would continue to express views on gender identity and transgender issues consistent with those outlined in Paragraph 7.

16.     Because of the Final Title IX Rule and how it defines harassment relative to transgender individuals, K.L. is afraid of facing discipline for expressing views on gender identity and transgender issues in the school setting. As a result, K.L. will be deterred from expressing her views on these matters and in manners consistent with their past speech.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated:  5/22/24

Deborah Lochner

3

**Appx257**

EXHIBIT 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### TOPEKA DIVISION

| | |
|---|---|
| **State of Kansas**; **State of Alaska**; **State of Utah**; **State of Wyoming**; **K.R.**, a minor, by Shawna Rowland, her mother; **Moms for Liberty**; **Young American's Foundation**; **Female Athletes United**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **United States Department of Education**; **Miguel Cardona**, in his official capacity as United States Secretary of Education; **United States Department of Justice**; and **Merrick Garland**, in his official capacity as United States Attorney General, <br><br> *Defendants.* | **Case No.** 5:24-cv-04041-JWB-ADM |

## DECLARATION OF T.Z. IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I, T.Z., under penalty of perjury, declare as follows:

1.      I am a 17-year-old resident of Summit County, Utah, and have personal knowledge of the information below.

2.      I am a member of Female Athletes United and a student-athlete.

3.      Female Athletes United has the important mission of advocating for fairness in women's sports, and I am grateful to be a part of that.

4.      Growing up, I played sports frequently with my family. I also attended sports camps that focused on a specific sport like soccer or volleyball.

5.      Our family is full of athletes and even my grandma enjoys running races.

6.      I started running competitively when I joined my middle school's cross-country team.

7.      I am in my junior year at North Summit High School in Summit County, Utah.

8.      My freshman year of high school, I was on the school volleyball and track teams.

9.      I currently compete on the high school cross country and track and field teams. I plan to stay on these teams for the remainder of high school.

10.     My track events are the 3200 meter, 1600 meter, and 800 meter. Cross-country races are generally 5 kilometers for high school girls.

11.     Training for cross country and track is rigorous but rewarding.

12.     We generally go straight from school to the locker room to change for practice. Once we are ready, we head outside to meet our coach and get started on the workout for the day. On competition days, we quickly change and get on the bus to travel to the meet.

13.     The locker rooms do not have much privacy. The changing area is open and we change in view of each other.

14.     Several times each year, we spend the night in hotels when traveling for competitions.

15.     On these overnight stays, I share a room and often a bed with one or more teammates.

16.     Both my cross country and track teams are tight-knit. My teammates have become close friends. We spend a lot of time together, from running countless miles to spending hours on buses traveling to competitions.

17.     I am also competitive and work hard to win. It is a lot of fun training hard and achieving my goals. It is also extremely rewarding watching my teammates set new personal records and take their place on the victory podium.

18.     This year at the regional championships, I competed in three events in the women's varsity division. I finished 5th in the 1600 meter, 7th in the 800 meter, and 6th in the 3200 meter. I am in the top five athletes on my team in each of these events.

19.     I am grateful to have the opportunity to compete in sports and to enjoy all the doors that athletic participation opens for me.

20.     It is my understanding that Utah has passed laws requiring that students compete on the sports team and generally use the changing facilities and restrooms that correspond to their sex.

21.     I am grateful for these laws because I think it would be extremely unfair for males to compete against women or to let males access women's-only private spaces.

22.     Males have clear biological advantages in sports. This is evident from my personal experience watching male runners and from looking at the top times for track and cross-country runners in the male and female categories for the same

age groups. For example, while I placed in the top five for the women's varsity division in the 1600, I would not have even been in the top 20 in the men's division. I would be discouraged if I were forced to compete against men and am not sure I would continue racing. It would be disheartening to train hard knowing that I was at an unfair disadvantage before I even got to the starting blocks.

23.    I have shared my belief that males should not compete in women's sports with my teammates when the subject has come up.

24.    I am a Christian and believe that God created people male and female. I believe that God created people in a way that they will flourish if they embrace their sex rather than try to reject it. I believe that people cannot and should not try to erase the meaningful differences between males and females. I have shared these beliefs with my friends and teammates at school.

25.    My school abides by Title IX. Our school handbook expressly says that the school policies comply with Title IX and the district has a designated Title IX Coordinator.

26.    But it is my understanding that starting August 1, 2024, there are new rules under Title IX, which would allow males who identify as female to join female sports teams and compete as women. I understand that the rules also allow males to come into women's and girl's private spaces like locker rooms, restrooms, and overnight accommodations if they identify as female.

27.    I would not feel comfortable using restrooms, changing areas, or shower areas in a locker room with a male. And I think it would be inappropriate and unsafe for me to share a room or a bed with a male on an overnight stay. Forcing me to share any of these women's only spaces with a male would make me feel embarrassed, humiliated, and vulnerable.

28.    I also would be frustrated and discouraged if I were required to compete against a male in track or cross-country races. I do not think this is fair.

29.     It is also my understanding that under the new Title IX rules, I could more easily be punished for expressing my views to classmates about gender identity and the unfairness of males competing in women's sports.

30.     Under the new rules, I would also be afraid to share my beliefs on these topics. Because there are students at my school who identify as transgender or non-binary, I do not want to be accused of violating Title IX if I express my beliefs and that happens to offend someone.

31.     Starting August 1, 2024, I will no longer speak about my belief that males who identify as females are actually males and should not be allowed to compete in women's sports at school for fear of getting in trouble.

## DECLARATION UNDER PENALTY OF PERJURY

I, _____T.Z._____, a citizen of the United States and a resident of the

State of ___Utah___, hereby declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _14th_ day of _May_, 2024 at _Wanship_ , _UT_____.

T.Z.

Brian Zwahlen

6

Appx263

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ David L. Peters*
David L. Peters